**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| **In re:** | § | **Chapter 11** |
| | § | |
| **CBL & ASSOCIATES** | § | |
| **PROPERTIES, INC.,** *et al.*, | § | **Case No. 20-35226 (DRJ)** |
| | § | |
| **Debtors.**[1] | § | **(Joint Administration Requested)** |
| | § | **(Emergency Hearing Requested)** |

**DECLARATION OF MARK RENZI IN SUPPORT OF
DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

I, Mark A. Renzi, pursuant to section 1746 of title 28 of the United States Code, hereby declare that the following is true to the best of my knowledge, information, and belief:

1.     I am a Managing Director of Berkeley Research Group, LLC ("**BRG**") and have been retained to advise CBL & Associates Properties, Inc. (the "**REIT**") and its direct and indirect subsidiaries that are debtors and debtors in possession in the above-captioned chapter 11 cases (the "**Debtors**" and, together with the REIT's non-Debtor direct or indirect subsidiaries "**CBL**" or the "**Company**").  I have been advising the Debtors in that capacity since June 2020.

2.     I have more than 25 years of business experience, with approximately 16 years of financial consulting experience, including liquidity and capital structure assessment, debt and equity restructuring, advice, and identification of reorganization alternatives.  I have provided restructuring services on more than 35 engagements in both out-of-court workout situations and in-court reorganizations.

---

[1]     A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://dm.epiq11.com/CBLProperties.  The Debtors' service address for the purposes of these chapter 11 cases is 2030 Hamilton Place Blvd., Suite 500, Chattanooga, Tennessee 37421.

3.     On the date hereof (the "**Petition Date**"), the Debtors each commenced with the Court a voluntary case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").  In my capacity as a financial advisor to the Debtors, I am knowledgeable and familiar with the Debtors' day-to-day operations, business and financial affairs, books and records, and the circumstances that led to the commencement of these chapter cases.  Except as otherwise indicated herein, the facts set forth in this declaration (this "**Declaration**") are based upon my personal knowledge, my review of relevant documents, information provided to me by my team, employees of or advisors to the Debtors, or my opinion based upon my experience, knowledge, and information concerning the Debtors' operations. If called upon to testify, I would testify competently to the facts set forth in this Declaration on that basis.

4.     The Debtors have requested a variety of relief in their "first day" motions (collectively, the "**First Day Motions**") filed concurrently herewith to minimize the adverse effects of the commencement of these chapter 11 cases on their operations and their various constituents.  I am familiar with the contents of each First Day Motion, and I believe that the relief sought therein is necessary to permit the Debtors the most seamless transition into chapter 11.  This, I believe, will serve to preserve and maximize the value of the Debtors' estates.

5.     Sections II through IV of this Declaration provide a general overview of the Debtors' businesses, organizational structure, capital structure, the circumstances giving rise to the commencement of these chapter 11 cases, and certain of the Debtors' restructuring goals. Section V summarizes the relief requested with respect to, and the support for, the First Day Motions.

# I.

## PRELIMINARY STATEMENT[2]

6.      CBL is a publicly-traded, self-administered, and self-managed real estate investment trust.   CBL owns, develops, acquires, leases, manages, and operates regional shopping malls, open-air and mixed-use centers, outlet centers, associated centers, community centers, offices, and other properties.   Since Charles B. Lebovitz and five business associates founded the Company in 1978, CBL's portfolio has steadily grown to a nationwide portfolio of owned and managed Properties totaling approximately 107 properties spanning approximately 67 million square feet across 26 states.   In addition to providing shoppers with a wide array of retail options, the Company's malls and other properties serve as active members of their local communities, providing a variety of dining options, entertainment and events, health and wellness offerings, and more.

7.      Despite enjoying many years of steady growth and forging strong relationships with prominent nationally-recognized tenants across numerous retail sectors, the Company's recent performance has been acutely impacted by the recent struggles of the Company's tenants and the headwinds facing the retail market generally.   Retailers' struggles, and, consequently, their ability to keep their stores open and satisfy their rent obligations, have been compounded by the COVID-19 pandemic and the resulting shut down orders and other restrictions imposed by state and local authorities.   Indeed, in 2020 alone, more than 30 of the Company's retail tenants have commenced their own chapter 11 cases, some of which have closed—or are in the process of closing—stores at the Company's properties, resulting in significant loss of rental revenue to the Company.   Further, the Company has provided rent

---

[2]    Capitalized terms not otherwise defined in this Preliminary Statement shall have the meaning ascribed to such terms in the body of this Declaration.

deferrals and other concessions to their tenants to mitigate the impact of the pandemic and the challenging economic conditions in the retail market on the Company's revenue.

8. To best position the Company to navigate the current economic environment and to ensure its long term growth and success, CBL must de-lever its balance sheet. In addition to approximately $2.0 billion of Property Level Debt, the Company has approximately $2.5 billion in outstanding parent-level funded indebtedness—approximately $1.1 billion outstanding under the First Lien Credit Facility and $1.375 billion of Senior Unsecured Notes. Given the current economic climate, the Company's capital structure is simply unsustainable.

9. Recognizing that a holistic deleveraging solution was necessary, in early 2020, the Company and its Advisors first reached out to the Bank Lenders to explore the possibilities of reaching a consensual resolution to the Company's financial situation. After not receiving constructive engagement from the Bank Lenders, the Company then engaged with an ad hoc group of holders of over 55% of the Company's Senior Unsecured Notes (the "**Ad Hoc Bondholder Group**") and their advisors to negotiate the terms of a comprehensive restructuring. After weeks of intense, arms' length negotiations between the Company and the Ad Hoc Bondholder Group, the parties agreed on the key terms of a restructuring transaction, which are memorialized in the Restructuring Support Agreement and accompanying Restructuring Term Sheet. Among other things, the restructuring contemplates:

- The equitization of the Senior Unsecured Notes in exchange for 90% of the New Equity Interests (as defined in the Restructuring Support Agreement) and approximately $49.6 million in cash;

- The issuance of $500 million of New Senior Secured Notes secured by, among other things, certain of the Company's currently unencumbered properties;

- A recovery to the Company's current equityholders, who will receive 10% of the New Equity Interests and Warrants; and

- The reinstatement or unimpairment of the Property Level Debt and related guarantee claims against the Operating Partnership.

10.    The restructuring will reduce the Company's funded indebtedness by approximately $875 million, and annual interest expenses by approximately $25 million. Importantly, the Company is not currently seeking to modify or impair the Property Level Debt or to make operational changes to the business, and that debt is not currently the subject of these chapter 11 cases.

11.    As discussed herein, the Restructuring Support Agreement contains certain agreed-upon milestones to facilitate efficient and expeditious Chapter 11 Cases to preserve and maximize the going-concern value of Debtors' estates.  The proposed timeline for these chapter 11 cases appropriately balances the Debtors' need to complete their restructuring process generally and their need to effectuate a comprehensive restructuring that will deleverage their capital structure and preserve their real estate holdings.  Using the chapter 11 process, the Debtors hope to emerge as a reorganized and stronger enterprise for their tenants and stakeholders.

12.    Upon executing the Restructuring Support Agreement, the Company and the Ad Hoc Bondholder Group focused their efforts on negotiations with the Bank Lenders in an attempt to reach a tripartite agreement among the Company, the Ad Hoc Bondholder Group and the Bank Lenders over the terms of a fully consensual restructuring.  Indeed, on October 13, 2020, certain of the Ad Hoc Bondholder Group executed confidentiality agreements and became "restricted" to negotiate directly with the Bank Lenders.  On October 27, 2020, the Ad Hoc Bondholder Group's advisors sent a restructuring term sheet to the Administrative Agent's

advisors (the "**October 27 Term Sheet**"), which contemplated further deleveraging the Company's funded indebtedness by another $500 million.

13.     Unfortunately, the negotiation process was abruptly cut short by the Bank Lenders.  Instead of responding to the October 27 Term Sheet with a counterproposal, the Bank Lenders, under cover of darkness and asserting a variety of conjured up alleged Events of Default that occurred during the global pandemic, purported to exercise remedies, including exercising proxy rights, to exercise control over certain of the entities owning the Credit Facility Properties.  Notwithstanding that the Bank Lenders' actions were invalid, this unfortunate and unwarranted development left the Company no choice but to commence these chapter 11 cases on an accelerated timeline to protect the Company and its stakeholders within the time frame contemplated by the Restructuring Support Agreement instead of further extending the filing deadline to continue consensual negotiations as the Company had intended.

14.     Consequently, in addition to seeking standard "first day" relief, the Company is contemporaneously commencing an adversary proceeding (the "**Adversary Proceeding**") seeking a declaratory judgment that, among other things, that the Bank Lenders' actions are null and void because they were undertaken in violation of the documents governing the First Lien Credit Facility and applicable law.  The Company is also seeking a temporary restraining order and injunctive relief enjoining the Bank Lenders from taking any further action pending the resolution of the Adversary Proceeding (together with the Adversary Proceeding, the "**Bank Lender Litigation**").  The Company seeks protection from this Court from the Bank Lenders' unlawful and value-destructive conduct to ensure the smooth operation of the Company while the Court makes a determination on the issues outlined in the Bank Lender Litigation.

## II.

## THE DEBTORS' BUSINESS

**A.**     **History and Business**

15.     CBL was founded in 1978 by Charles B. Lebovitz and five business associates.  In 1979, the Company constructed its first mall in Del Rio, Texas.  In 1987, the Company built its flagship mall, Hamilton Place, in Chattanooga, Tennessee, where the Company's corporate headquarters are currently located.  When it opened in 1987, Hamilton Place was the largest shopping mall in Tennessee and among the largest in the nation.

16.     In 1993, CBL & Associates Properties Inc. (the "**REIT**") was formed as a REIT and became a public company through an initial public offering.  The REIT's stock is currently traded on the New York Stock Exchange under the symbol "CBL."

17.     Since going public in 1993, under the leadership of Charles Lebovitz and his son Stephen Lebovitz, the Company's current chief executive officer, CBL experienced tremendous growth measured by both portfolio size and cash flow increases.  In 2005, the Debtors expanded their reach to the west coast, opening their first mall in California—Imperial Valley Mall in El Centro.  Between 2007 and 2017, the Debtors steadily grew their portfolio through joint ventures, large-scale acquisitions—including a record year in 2007 with $1.4 billion in acquisitions.  The Company has also expanded existing operations into new spaces, including entry into the outlet center space in 2011 with the development of the Outlet Shoppes at Oklahoma City.  CBL continually strengthened its portfolio with a strategy that included, among other things, active management, aggressive leasing and profitable reinvestment in its properties with the ultimate goal of increasing shareholder value.

18.     By 2018, the Debtors had over 100 properties in their portfolio, positioning them as the largest owner and manager of shopping centers in the Southeast and among the largest mall REITs in the United States.

**B.     Properties and Business Operations**

19.     As discussed above, the Company's owned and managed portfolio currently consists of interests in 107 properties (the "**Properties**"), which total approximately 67 million square feet.  The Properties are located across 26 states, but primarily in the southeastern and midwestern United States.  The Company wholly owns approximately 66 properties, owns joint venture interests in approximately 33 properties, and manages approximately eight (8) properties for third parties.  As discussed below, the Company's portfolio consists of a various types of Properties.

20.     Shopping Malls and Outlet Centers:  As of the Petition Date, the Company owns a controlling interest in 52 shopping malls and a non-controlling interests in 10 shopping malls (collectively, the "**Malls**").  The Malls are primarily located in middle markets and generally have strong competitive positions because they are the only, or the dominant, regional mall in their respective trade areas.  The Company also owns five (5) outlet centers, each featuring an array of outlet shops.

21.     The Malls are generally anchored by two or more "**Anchors**," a department store, other large format retail store, non-retail space, or theater greater than 50,000 square feet, or "**Junior Anchors**," a retail store, non-retail space, or theater comprising more than 20,000 square feet but less than 50,000 square feet.[3]  Anchors offer merchandise that appeals to a broad range of shoppers and play a significant role in generating customer traffic and creating a desirable location for the tenants at a particular Mall.  In addition to the Anchors

---

[3]     Examples of Anchor or Junior Anchor tenants include retailers such as T.J. Maxx, Michael's, and Kohl's.

and Junior Anchors, the Malls contain well diversified groups of smaller retailers, offering a wide variety of products and services.  The Company has approximately 5,250 stores across all of the Malls.

22.     <u>Associated Centers</u>:  The Company owns, either in whole or in part, 23 "**Associated Centers**," which are retail properties that are adjacent to a Mall.  Associated Centers generally include one or more Anchors, or "big box" retailers along with some smaller tenants.  The Associated Centers are typically managed by the staff at the adjacent Mall.

23.     <u>Community Centers</u>:  The Company owns, or has an interest in, 6 "**Community Centers**."  Community Centers are properties designed to attract local and regional area customers and are typically anchored by a combination of supermarkets, or value-priced stores, which attract shoppers to Community Center's smaller retail shops.  The tenants at the Community Centers typically offer necessities, value-oriented, and convenience merchandise.

24.     <u>Office Buildings and Self-Storage Facilities</u>:  The Company owns four (4) office buildings, including the building that houses the Company's corporate headquarters in Chattanooga, Tennessee, and four (4) self-storage facilities.

25.     <u>Outparcels</u>:  The Company owns, either in whole or in part, 34 "**Outparcels**," which is land, generally located on the periphery of another Property, used for freestanding developments, such as retail stores, banks, and restaurants.

26.     The Properties also can be generally classified into three broad groups based upon the debt (if any) that encumbers a particular Property.  Approximately 45 of the Company's Properties (the "**Property Level Loan Properties**") are mortgaged to secure Property Level Debt (as defined herein).  Approximately 22 Property Level Loan Properties are

wholly owned by certain of the Company's non-debtor affiliates or subsidiaries (the "**Non-Debtor Affiliates**") and approximately 23 Property Level Loan Properties are partially owned by Non-Debtor Affiliates.   Approximately 22 of the Company's Properties (the "**Credit Facility Properties**") are mortgaged and the equity in the entities owning such Bank Facility Properties are pledged to secure the First Lien Credit Facility (as defined below).   The remainder of the Properties are currently unencumbered by any debt.

C.      **Tenant Composition and Diversification**

27.      The Company's tenant base is well diversified from both a geographic and revenue perspective.   The top five markets for CBL, based on percentage of total revenues, were as follows for the year ended December 31, 2019:

| Market | Percentage of Total Revenues |
|:---:|:---:|
| **St. Louis, MO** | 6.8% |
| **Chattanooga, TN** | 5.2% |
| **Laredo, TX** | 4.2% |
| **Lexington, KY** | 4.1% |
| **Madison, WI** | 3.1% |

28.      With respect to tenant mix, national and regional retail chains (excluding local franchises), including among others, Macy's, Victoria's Secret, GAP, J.C. Penney, Dick's Sporting Goods, Barnes & Noble and Cinemark, leased approximately 79.1% of the occupied mall store gross leasable area.   CBL's top 10 tenants, based on percentage of total revenues, were as follows for the six months ended June 30, 2020.

| # | Tenant | # Stores | Percentage of Total Revenues |
|---|--------|----------|------------------------------|
| 1 | L Brands, Inc. (e.g., Bath & Body Works, PINK, Victoria's Secret, White Barn Candle) | 125 | 4.50% |
| 2 | Signet Jewelers Limited (e.g., Beldon Jewelers, Jared Jewelers) | 138 | 3.10% |
| 3 | Foot Locker, Inc. | 105 | 3.01% |
| 4 | American Eagle Outfitters, Inc. | 65 | 2.34% |
| 5 | Dick's Sporting Goods, Inc. | 26 | 1.80% |
| 6 | Genesco, Inc. (e.g., Clubhouse, Hat Shack, Johnston & Murphy) | 98 | 1.56% |
| 7 | H&M Hennes & Mauritz AB | 44 | 1.55% |
| 8 | Ascena Retail Group, Inc. (e.g., Ann Taylor, Lane Bryant, LOFT) | 108 | 1.52% |
| 9 | Luxottica Group, S.P.A. (e.g., Lenscrafters, Pearle Vision, Sunglasses Hut) | 99 | 1.37% |
| 10 | Finish Line, Inc. | 37 | 1.32% |
| | | **845** | **22.07%** |

## D.    Centralized Management and Operations

29.    CBL primarily derives revenue from two sources—rental revenue from retail tenants and income from property management and development activities.    Rental revenues are primarily derived from leases with retail tenants and generally include fixed minimum rents, percentage rents based on tenants' sales volumes, and reimbursements from tenants for expenditures related to real estate taxes, insurance, common area maintenance, and other recoverable operating expenses, as well as certain capital expenditures.    CBL also generates revenues from management, leasing and development fees, sponsorships, sales of

peripheral land at the Properties, and from sales of operating real estate assets when it is determined that CBL can realize an appropriate value for a particular asset. The Company's general operational objective is to achieve stabilization in same center net operating income ("**NOI**") and reduce overall cost of debt and equity by maximizing earnings before income, taxes, depreciation, and amortization ("**EBITDA**") and cash flows.

30.     To achieve operating efficiencies and revenue enhancement at the Properties, CBL employs a centralized management approach through the Operating Partnership and CBL & Associates Management, Inc., a wholly owned subsidiary of the operating partnership (the "**Management Company**").[4]

31.     CBL conducts its management and development activities through the Management Company. Specifically, the Management Company manages all but 14 of the Properties (the "**Non-Managed Properties**").[5]   The Management Company is also responsible for the Company's leasing activities. Additionally, the Management Company employs the Company's workforce, which consists of, as of the Petition Date, approximately 450 full-time employees and approximately 40 part-time employees.

32.     The Management Company also provides and centrally administers accounting, business development, construction, contracting, design, finance, forecasting, human resources and employee benefits, insurance and risk management, property services, marketing, leasing, legal, tax, treasury, and other services for all properties under the CBL's ownership and management.

---

[4]   The Company also utilizes this approach so as to comply with certain requirements of the Internal Revenue Code of 1986 with respect to real estate investment trusts.

[5]   The Non-Managed Properties are all owned by unconsolidated joint ventures and are managed by a property manager that is affiliated with the third-party partner, which receives a fee for its services. The third-party partner of each of these Properties controls the cash flow distributions, although CBL's approval is required for certain major decisions.

33.     CBL's integrated, national business model benefits the Company in numerous ways.  The centralized leasing programs enables the Company to develop relationships with national retailers and to meet retailer needs at multiple properties and locations across the Company's portfolio.  It also facilitates a single point of contact for tenants at shopping centers across the country for both leasing and tenant-service issues.  Centralized management also enables the Company to obtain national contracts for property services (such as security, janitorial, and trash collection) in order to reduce costs and ensure uniformity and quality in services.

34.     Consistent with its centralized and integrated business model, the Company does not have the infrastructure in place for each Property to independently perform cash management and treasury functions.  The Debtor and Non-Debtor Affiliates that own Properties lack the personnel trained to manage cash and do not have check writing capabilities. Consequently, the Company manages its cash through a centralized cash management system (the "**Cash Management System**").[6]  The centralized Cash Management System reduces costs associated with cash management, including bank accounts, personnel, bookkeeping, treasury and related expenses.  The Cash Management System also serves to smooth cash flows and provide liquidity to the individual Properties as needed.

E.     **Recent Financial Performance**

35.     After years of steady growth, given the recent struggles in the retail sector, CBL's financial performance has been declining.  CBL had a net loss of $131.7 million for the year ending December 31, 2019 as compared to a net loss of $99.2 million in the prior-

---

[6]     The Cash Management System is described in greater detail in the Cash Management Motion (as defined herein).

year period.  For the reasons discussed below, the Company's financial performance in 2020—as exacerbated by the COVID-19 pandemic—has further declined.

36.     As of June 30, 2020, CBL reported approximately $4.66 billion in total assets and approximately $4.0 billion in total liabilities (including CBL's proportionate share of joint venture indebtedness).  For the quarter ending June 30, 2020, CBL reported total revenue of approximately $124.2 million and a net quarterly loss of approximately $72.8 million.

## III.

## DEBTORS' CORPORATE AND CAPITAL STRUCTURE

### A.     Corporate Structure

37.     CBL is a self-administered and self-managed real estate investment trust. The REIT Common Stock (as defined below) is publicly traded on the New York Stock Exchange under the symbol "CBL."  The REIT is the 100% owner of two qualified real estate investment trust subsidiaries, CBL Holdings I, Inc. ("**Holdings I**") and CBL Holdings II, Inc. ("**Holdings II**").

38.     Holdings I and Holdings II own approximately 1.0% and 96%, respectively, of the outstanding common units of CBL & Associates Limited Partnership (the "**Operating Partnership**").  Holdings I is the sole general partner of the Operating Partnership.

39.     The Company conducts substantially all of its business through the Operating Partnership. The Operating Partnership owns 100% of the equity interests of the Management Company.  Except for the REIT, Holdings I, Holdings II, and as set forth in the following sentence, the Operating Partnership owns, either directly or indirectly, 100% of the outstanding equity interests in the Debtors.  The REIT owns (i) 0.1% of the equity interests in CoolSprings Crossing Limited Partnership and (ii) less than 0.05% of the equity interests in Henderson Square Limited Partnership.

14

40.     A chart depicting the Company's organizational structure as of the Petition Date is attached as **Exhibit A** to this Declaration.   The following chart depicts the Company's simplified corporate structure:



## B.     Corporate Governance and Management

41.     The board of directors of the REIT (the "**Board**") consists of nine (9) directors.  Charles Lebovitz serves as the Chairman of the Board.

42.     The  Company's  executive  officer  team  consists  of  the  following individuals:

| **Name** | **Position** |
|---|---|
| Stephen D. Lebovitz | Chief Executive Officer |
| Michael I. Lebovitz | President |
| Farzana Khaleel | Executive Vice President – Chief Financial Officer |
| Jeffery V. Curry | Chief Legal Officer and Secretary |
| Katie A. Reinsmidt | Executive Vice President – Chief Investment Officer |
| Michael C. Harrison, Jr. | Executive Vice President – Operations |
| Alan L. Lebovitz | Executive Vice President – Management |

C.      **Prepetition Capital Structure**

43.     The following description of the Company's capital structure is for informational purposes only and is qualified in its entirety by reference to the documents setting forth the specific terms of such obligations and their respective related agreements.

44.     **First Lien Credit Facility**:  On January 30, 2019, certain of the Debtors entered into that certain Credit Agreement (as may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, and including all related credit documents, the "**First Lien Credit Agreement**"), by and among the Operating Partnership, as borrower, Well Fargo Bank, National Association, as administrative agent, (together with any successor administrative agent, the "**Administrative Agent**"), the lenders party thereto (the "**Bank Lenders**") and certain other parties specified therein.  The First Lien Credit Agreement provides for a term loan facility (the "**Term Loan**") in the original aggregate principal amount of $500 million and a revolving loan facility (the "**Revolver**") in the aggregate maximum committed principal amount of $685 million (including any letters-of-credit issued thereunder). The First Lien Credit Agreement matures in July 2023 and bears interest at a variable rate of LIBOR plus 2.25%.

45.     As of the Petition Date, the aggregate principal amount outstanding under the Term Loan is approximately $439 million.  As of the Petition Date, the Revolver has approximately $676 million in aggregate principal amount outstanding thereunder, and no further draws are permitted.

46.     The obligations under the First Lien Credit Agreement are secured, pursuant to, among other documents, (i) that certain Collateral Agreement, dated as of January 30, 2019, by and among certain subsidiaries of the Operating Partnership, and Wells Fargo Bank, National Association, as collateral agent (the "**Collateral Agent**"), (ii) that certain Pledge

Agreement dated January 30, 2019, by and among the Operating Partnership and the Collateral Agent, and (iii) certain mortgages granted to the Collateral Agent in respect of the Credit Facility Properties, principally by the Credit Facility Properties and by pledges of the equity interests of the entities owning such Credit Facility Properties.

47.     The REIT is a limited guarantor of the First Lien Credit Facility, solely with respect to the payment obligations of Holdings I as the general partner of the Operating Partnership, under the First Lien Credit Facility.

48.     **Senior Unsecured Notes**:  The Operating Partnership, as issuer, the REIT, as limited Guarantor, and Delaware Trust Company (as successor to U.S. Bank National Association), as trustee, are parties to that certain indenture, dated as of November 23, 2013 (as amended, restated, or supplemented from time to time, the "**Indenture**") governing the following three tranches of senior unsecured notes (collectively, the "**Senior Unsecured Notes**"):

| Notes | Principal Amount Outstanding | Rate | Maturity |
|---|---|---|---|
| "**2023 Notes**" | $450 million | 5.250% | December 1, 2023 |
| "**2024 Notes**" | $300 million | 4.600% | October 15, 2024 |
| "**2026 Notes**" | $625 million | 5.950% | December 15, 2026 |

49.     The REIT is a limited guarantor of the Senior Unsecured Notes, solely with respect to losses suffered solely by reason of fraud or willful misrepresentation by the Operating Partnership or its affiliates.

50.     **Property-Level Debt**:  The Company has incurred, in the aggregate, approximately $2.0 billion of debt secured by certain of the Company's Properties, including non-recourse mortgage loans (the "**Non-Recourse Loans**") and certain other loans with recourse

to the general credit of the Operating Partnership, and/or the REIT, including construction loans (the "**Recourse Loans**" and, together with the Non-Recourse Loans, the "**Property Level Debt**").  There are four loans that are recourse to a subsidiary of the Operating Partnership.

51.     Much of the Property Level Debt has been securitized and sold into the commercial mortgage backed securities ("**CMBS**") markets and is currently being administered by special servicers.  With the exception of six (6) Non-Recourse Loans, the Operating Partnership and/or the REIT is a non-recourse carveout guarantor and environmental guarantor on each of the Non-Recourse Loans and a guarantor under each of the Recourse Loans.

52.     As of the Petition Date, the Company is current with respect to its obligations under the Property Level Debt, with the exception of the Property Level Debt on the following Properties, which were in default prior to the Petition Date:  (i) Greenbrier Mall; (ii) Burnsville Center; (iii) EastGate Mall; (iv) Park Plaza; and (v) Asheville Mall.

53.     **REIT Preferred Stock**:  As of the Petition Date, the REIT has (i) approximately 1,185,000 shares of 7.375% Series D Cumulative Redeemable Preferred Stock outstanding (the "**Series D Preferred Stock**") and (ii) approximately 690,000 shares of 6.625% Series E Cumulative Redeemable Preferred Stock outstanding (the "**Series E Preferred Stock**" and, together with the Series D Preferred Stock, the "**REIT Preferred Stock**").  The Operating Partnership issues an equivalent number of preferred units (the **"LP Preferred Units"**) to Holdings II on behalf of the REIT in exchange for the contribution of proceeds from the REIT to the Operating Partnership when the REIT issues REIT Preferred Stock.  The LP Preferred Units generally have the same terms and economic characteristics as the corresponding REIT Preferred Stock.

54. **REIT Common Stock**:   As of October 30, 2020, the REIT has approximately 196,572,455 shares of common stock outstanding (the "**REIT Common Stock**"). As discussed above, the REIT Common Stock is listed on the New York Stock Exchange under the symbol "CBL."

55. **Operating Partnership Common Units**:   Partners in the Operating Partnership hold their ownership through LP Preferred Units and common and special common units of limited partnership interests in the Operating Partnership (the "**LP Common Units**"). As of the Petition Date, the Operating Partnership has approximately 201,690,311 LP Common Units outstanding.  The LP Common Units and the REIT Common Stock have essentially the same economic characteristics, as they effectively participate equally in the net income and distributions of the Operating Partnership.  For each share of REIT Common Stock, the Operating Partnership has issued a corresponding number of LP Common Units to Holdings I and Holdings II in exchange for the proceeds from the REIT Common Stock issuance.  Each limited partner in the Operating Partnership has the right to exchange all or a portion of its LP Common Units for REIT Common Stock, or at the Company's election, their cash equivalent. When an exchange for REIT Common Stock occurs, the REIT assumes the LP Common Units.

56. The Operating Partnership has also issued three series of special common units:

- **Series S Special Common Units**:   Among other rights under the Operating Partnership's limited partnership agreement, the holder of Series S special common units ("**S-SCUs**") has the right, subject to certain conditions, to exchange all or a portion of its S-SCUs for CBL Common Shares (or, at the Company's election, their cash equivalent) and the S-SCUs are entitled to a minimum annual distribution of $ 2.92875 per S-SCU.  Approximately 1,560,942 S-SCUs are outstanding as of the Petition Date.

- **<u>Series L Special Common Units</u>**:   Among other rights under the Operating Partnership's limited partnership agreement, the holders of Series L special common units ("**L-SCUs**")are entitled to a minimum annual distribution of $3.0288 per unit.  Approximately 571,700 L-SCUs are outstanding as of the Petition Date.

- **<u>Series K Special Common Units</u>**:   Among other rights under the Operating Partnership's limited partnership agreement, the holder of Series K special common units ("**K-SCUs**") has the right, subject to certain conditions, to receive an annual dividend at a rate of 6.25%, or $ 2.96875 per K-SCU and may exchange their K-SCUs for CBL Common Shares on a one-for-one basis (or, at the Company's election, their cash equivalent).  Approximately 868,821 K-SCUs are outstanding as of the Petition Date.

57.     During 2019, subject to further quarterly review, the Board suspended all future dividends with respect to the REIT Preferred Stock and REIT Common Stock, as well as all distributions with respect to the LP Common Units (except for the special common units of the Operating Partnership) and LP Preferred Units (the "Dividend Suspension").  Other than distributions to holders of special common units of the Operating Partnership, CBL has not paid any dividends since the Dividend Suspension. The Operating Partnership has not made any distributions to holder of special common units since October 1, 2019.

<div align="center">

**IV.**

**<u>SIGNIFICANT EVENTS LEADING TO CHAPTER 11 FILING</u>**

</div>

**A.     <u>Trends and Uncertainties in Retail Market</u>**

58.     CBL, as a national retail landlord, is susceptible to changes in the retail real estate markets.  Over the past several years, the brick-and-mortar retail industry has been shifting, with the closing of brick-and-mortal retail stores becoming more common as shoppers have increasingly moved towards e-commerce.  The Company anticipates that the number of traditional department stores, like those acting as Anchors or Junior Anchors in the Malls, will

<div align="center">20</div>

decline over time.  Beyond the decline in number, the market share of traditional department stores is declining, as is their ability to drive traffic.

59.     As new technologies emerge, the relationships between customers, retailers, and shopping centers are evolving on a rapid basis.  Commercial landlords like CBL must invest in strategic technology to enhance the mall experience, which may not necessarily be feasible despite the potential benefits.  Additionally, a small but increasing number of tenants utilize the Malls as showrooms or as part of an omni-channel strategy (allowing customers to shop seamlessly through various sales channels, where customers' sales occur outside the Malls).  As a result, customers may make purchases through other sales channels during or immediately after visiting the Malls, with such sales not being captured currently in the Company's sales figures or monetized in minimum or overage rents.

60.     The Company also faces significant competition in the retail leasing business.  The Company competes with other major real estate investors with significant capital for attractive investment opportunities. These competitors include other real estate investment trusts, investment banking firms, and private and institutional investors, some of whom have greater financial resources or have different investment criteria than the Company does. In particular, there is competition to acquire, develop, or redevelop highly productive retail properties, which become even more severe as competitors gain size and economies of scale as a result of merger and consolidation activity.

61.     There is also an emerging trend of more tenants moving to gross leases, which provide that the tenant pays a single specific amount, with no additional payments for reimbursements of the tenant's portion of the operating expenses.  CBL is then responsible for

any increases in operating expenses but benefits from any decreases in operating expenses.  This change leads to more predictable revenue but less predictable expenses.

**B.**     **Tenant Struggles and Rent Abatement**

62.     Even before the start of the COVID-19 pandemic, CBL was suffering from the ongoing challenges in the retail environment that have resulted in store closings, tenant bankruptcies, and rental reductions for tenants with high occupancy costs.  These challenges impacted CBL's financial performance in 2019, including by reducing average leasing spreads, decreasing renewal lease rates, and reducing occupancy. Bankruptcy-related closures impacted 2019 occupancy by approximately four percent or 702,000 square feet.  Additionally, in 2019, rental revenues were negatively impacted by rent concessions for tenants with high occupancy cost levels and tenants that closed in 2019 due to bankruptcy.

63.     These trends continued in 2020.  Year-to-date, more than 30 of the Company's national tenants have declared bankruptcy, including major tenants such as J.C. Penney, Ascena Retail Group, Stage Stores, and GNC.  As of June 30, 2020, J.C. Penney and Ascena Retail Group, Inc. represented $18.5 million in gross annual revenue and comprised 6.1 million square feet.  The remaining ten tenants in bankruptcy represented approximately $22.3 million in gross annual revenue and comprised 1.1 million square feet.  Although some of these tenants expect to continue operate, the majority of these have announced store closures.

64.     Additionally, in response to the financial challenges facing the retail market, the Company's tenants began to request rent deferrals and/or abatements and other tenants began to default on rent obligations.  As discussed below, the adverse impact of rent deferrals and abatements has been exacerbated by the COVID-19 pandemic.

C.      **Impact of COVID-19 Pandemic**

65.     On March 11, 2020, the World Health Organization classified COVID-19 as a pandemic.  The COVID-19 pandemic has acutely impacted all states where the Company's Properties are located.  Measures taken by federal, state and local authorities to prevent or remediate COVID-19, including "shelter-in-place" or "stay-at-home" orders or other quarantine mandates resulted in sustained closure of many of the Company's Properties, as well as the cessation of the operations of certain of its tenants.  This, in turn, resulted in a reduction of the revenues and cash flows generated by many of the Company's Properties due to the adverse financial impact on its tenants, as well as reductions in other sources of income generated by the Properties.  In addition to reduced revenues, the Company's ability to obtain sufficient financing for such Properties has been impaired, as has the Company's ability to lease or re-lease Properties as a result of worsening market and economic conditions resulting from the COVID-19 pandemic.

66.     Moreover, as a result of the COVID-19 pandemic, the Company experienced—and continue to experience—increased levels of requests for rent deferrals and abatements, as well as defaults on rent obligations.  Through September 30, 2020, the Company estimated approximately $50.2 million associated with potentially uncollectible revenues.  The Company anticipates further abatements and deferrals for 2020, based upon, among other things, active negotiations with tenants concerning deferrals and other concessions.

67.     Although restrictions are being relaxed in various jurisdictions and the Malls have reopened, the financial losses suffered by Properties in those jurisdictions will not be easily recovered.  A recurrence, or "second wave," of COVID-19 cases could further impact CBL's and its tenants' operations going forward.

**D.**        **Prepetition Operational Initiatives**

68.        Since at least 2013, but gaining greater focus in first half of 2018, the Company has undertaken various operational and other initiatives to navigate through the challenges presented by the current retail environment.  Given the decline in traditional department stores and changing retail consumer trends, the Company has been working to transform its portfolio of traditional Malls to dynamic suburban town centers, with diversified tenant bases.  To that end, the Company has been redeveloping those spaces to attract new non-retail uses such as restaurants, entertainment, fitness centers, casinos, grocery stores, and lifestyle retailers that engage consumers and encourage them to spend more time at the Properties. However, non-department store Anchors may demand higher tenant allowances for development or expenses than a standard mall tenant due to the nature of services and products they provide, which presents a separate challenge for the Company in redeveloping those spaces.

69.        CBL has also tried to adjust its tenant mix to meet shifting consumer demand and purchasing patterns.  For example, apparel retailers have been particularly hard-hit by shifts in consumer purchasing patterns.  Consequently, the Company has been proactively reducing its exposure to apparel retailers.

70.        Additionally, while the Company suspended several major capital expenditures projects, the Company is pursuing capital-lite solutions for backfilling the remaining available Anchors, including joint venture partnerships, favorable lease structures, and third-party arrangements—all of which benefit the portfolio while preserving capital.

71.        With respect to its debt obligations, the Company has been able to achieve debt service payment deferrals for a portion of the Property Level Debt even though securitized lenders in general have shown minimal flexibility in amending loan payments.  The Company addressed nearly all of its major debt maturities in 2020 and is in discussions with existing

lenders for certain 2021 secured loan maturities.  Further, as discussed above, in 2019, CBL suspended all future dividends on the REIT Common Stock and REIT Preferred Stock, as well as distributions on account to interest investors in the Operating Partnership.

72.    More recently, the Company undertook additional actions in response to the COVID-19 pandemic.  To bolster its liquidity position, in March 2020, the Company drew down approximately $280 million on the First Lien Credit Facility, which represented substantially all the remaining available balance thereunder.  The Company also implemented comprehensive programs to halt all non-essential expenditures, to reduce operating and overhead expenses, and to reduce, defer, or suspend capital expenditures, including redevelopment investments.  These programs included temporary reductions to the compensation of certain Board members and members of senior management, as well as a temporary salary reduction for the entire workforce.  The Company also implemented a broad-based furlough program reducing the employee base by roughly 10%, and reduced or deferred capital expenditures for 2020 by approximately $60.0 million to $80.0 million.  CBL also discontinued monthly "cash option" investments in the Company's dividend reinvestment plan.

**E.    Appointment of New Independent Director and Formation of Special Committee**

73.    On September 29, 2020, Mr. Michael Ashner resigned from the Board. On October 7, 2020, the Board unanimously appointed Mr. Scott D. Vogel as an additional independent director, for an initial term expiring at the Company's 2021 Annual Meeting of Stockholders.  Mr. Vogel has extensive restructuring experience and the Board believed that Mr. Vogel's experience would be beneficial to the Company as it navigated through the restructuring process.

74.    Further, on October 14, 2020, in connection with the Company's evaluation of strategic alternatives, the board of directors of the REIT approved the formation of

a special committee (collectively, the "**Special Committee**").   The Special Committee is authorized to, among other things, consider, evaluate, and approve any transactions for and on behalf of the Company in which the Chief Legal Officer or outside counsel advises that a conflict exists between the Company and its equity holders, its affiliates, or its managers and officers in the context of a chapter 11 restructuring case.  The Special Committee consists of Mr. Vogel and Ms. Carolyn B. Tiffany.

### F.      Debt Restructuring Effort and Restructuring Support Agreement

75.      As discussed above, in addition to the Property Level Debt, the Company has approximately $2.5 billion of outstanding funded indebtedness under the First Lien Credit Facility and the Senior Unsecured Notes.  In light of the current state of the retail rental market and the adverse effects of the COVID-19 pandemic, and notwithstanding the initiatives undertaken to weather the market headwinds in the short-term, the Company's existing capital structure is unsustainable in the long run.

76.      Consequently, in early 2020, the Company engaged Weil, Gotshal & Manges LLP ("**Weil**") and Moelis & Company LLC ("**Moelis**" and, together with Weil, the "**Advisors**") to explore comprehensive capital structure solutions that would, among other things, reduce overall leverage and interest expense and extend maturities on the Company's funded indebtedness.  In May 2020, the Company, together with its legal and financial advisors, engaged with the Ad Hoc Bondholder Group and its advisors on a comprehensive capital restructuring.

77.      To facilitate negotiations, in June 2020, CBL entered into forbearance agreements with the Ad Hoc Bondholder Group with respect to approximately $12 million and $19 million of cash interest payments that came due on June 1 and June 15, respectively, on the Senior Unsecured Notes (the "**Bondholder Forbearance Agreement**").  CBL also entered into a

forbearance agreement with the Bank Lenders with respect to a cross-default under the First Lien Credit Facility triggered by the missed interest payments on the Senior Unsecured Notes (the "**Bank Forbearance Agreement**," and together with the Bondholder Forbearance Agreement, the "**Forbearance Agreements**").   The Forbearance Agreements were each extended multiple times by the Ad Hoc Bondholder Group and the Administrative Agent to facilitate further negotiations.   On August 5, 2020 prior to the expiration of the Forbearance Agreements (as extended), CBL made the June 1 and June 15 interest payments on the Senior Unsecured Notes. Negotiations with the Ad Hoc Bondholder Group continued after the interest payments were made.   Most recently, the Company decided not to make an interest payment on the Senior Unsecured Notes due 2024 and entered the applicable 30-day grace period.

78.     After intense arms' length negotiation between the Company and the Ad Hoc Bondholder Group and its advisors, on August 18, 2020, the parties reached an agreement on the terms of a comprehensive restructuring transaction.   The parties executed the Restructuring Support Agreement (the "**Restructuring Support Agreement**" or "**RSA**"), attached hereto as **Exhibit B**, along with an accompanying term sheet (the "**Restructuring Term Sheet**") outlining the material terms of a restructuring to be implemented through a plan of reorganization (the "**Pre-Negotiated Plan**") for the Company.

79.     Among other things, the RSA contemplates that: (i) the Unsecured Noteholders receive their pro rata share of (x) $49.6 million of cash consideration; (y) $500 million of 10% first-priority secured notes due June 2028 on the terms set forth in the Restructuring Term Sheet, including liens on certain unencumbered properties, priority guarantees from certain entities, and equity pledges of certain entities; and (z) 90% of the New Equity Interests (as defined in the RSA), subject to dilution as set forth in the Term Sheet; (ii) the

Bank Lenders receive treatment acceptable to the Company and the Required Consenting Noteholders (as defined in the RSA) in a manner consistent with the Bankruptcy Code or treatment determined by the Bankruptcy Court; and (iii) holders of the REIT Preferred Stock and CBL Common Shares receive 10% of the New Equity Interests and warrants exercisable for 20% of the New Equity Interests exercisable solely for cash. The allocation of the New Equity Interests and the warrants between the holders of the REIT Preferred Stock and the CBL Common Shares was to be determined by the Company and the Required Consenting Noteholders.

80. The milestones and transaction structure as proposed in the RSA provide the Company with the opportunity to continue negotiations with the Bank Lenders with the goal of achieving a fully consensual restructuring. The RSA reflects, among other things, the mutual pursuit by the Debtors and their economic stakeholders of the following timeline for these chapter 11 cases (subject to the Court's availability and unless otherwise extended):

- No later than three business days after the Petition Date, the Debtors shall have filed the plan of reorganization and motion seeking approval of the disclosure statement;

- No later than 60 days after the Petition Date, entry of a final order approving the use of cash collateral;

- No later than 85 days after the Petition Date, entry of an order approving the disclosure statement;

- No later than 165 days after the Petition Date, entry of the confirmation order; and

- No later than 195 days after the Petition Date, the plan effective date shall have occurred.

81. The RSA provides the Company with a viable path forward and a framework to successfully exit chapter 11 in a timely fashion with the support of the Company's largest creditor constituency.

82.     Upon executing the Restructuring Support Agreement, the Company and the Ad Hoc Bondholder Group focused their efforts on negotiations with the Bank Lenders in an effort to reach a tripartite agreement among the Company, the Ad Hoc Bondholder Group and the Bank Lenders over the terms of a fully consensual restructuring.  Indeed, on October 13, 2020, certain members of the Ad Hoc Bondholder Group executed confidentiality agreements and became "restricted" to negotiate directly with the Bank Lenders.  On October 27, 2020, the Ad Hoc Bondholder Group's advisors sent a restructuring term sheet to the Administrative Agent's advisors.

### G.     Recent Bank Lender Actions

83.     As discussed, the Bank Lenders have wrongfully asserted the occurrence of various prior Events of Default (as defined in the First Lien Credit Agreement) under the First Lien Credit Facility.  As set forth in the Bank Lender Litigation, the Company has—and continues to—dispute the occurrence of these alleged Events of Defaults.  On October 28, 2020, however, instead of continuing to negotiate with the Company and the Ad Hoc Bondholder Group, the Administrative Agent delivered to the Company various notices purporting to exercise remedies under the First Lien Credit Facility.  Those notices stated, among other things, that (i) the Administrative Agent elected to exercise all voting rights and all other ownership rights in respect of all Credit Facility Properties; (ii) the Administrative Agent had revoked the Company's right to collect rents and that the Company had three days to instruct its tenants to pay rent directly to the Administrative Agent; and (iii) the Administrative Agent removed the manager and officers from the governing boards of the Credit Facility Properties and appointed itself as manager via a joint written consent.  Most ominously, the joint written consents purport to strip the governing boards of the Credit Facility Properties of the authority to file any

bankruptcy petition without the consent of the Administrative Agent thereby exposing the Company—and its collective creditors—to the mercy of the Bank Lenders.

84.     Faced with the draconian action taken by the Bank Lenders, the Company had no choice but to immediately commence these chapter 11 cases and seek the Court's protection to protect the Company and to ensure that value is preserved for the benefit of the Company's stakeholders.  Instead of landing smoothly into chapter 11 in an orchestrated fashion, the Company was forced by its Banks Lenders—alleging contrived defaults during a global pandemic—into an emergency filing over the weekend.

85.     As discussed, contemporaneously with the commencement of these chapter 11 cases, the Debtors are seeking, among other things, a declaratory judgment that the Bank Lenders actions were unlawful and a nullity, together with related injunctive relief.  The Debtors also intend to seek damages from the Bank Lenders for any harm caused to the Company by the Bank Lenders' unlawful acts.

**V.**

## **SUMMARY OF OTHER FIRST DAY MOTIONS**

86.     The First Day Motions seek relief to allow the Debtors to meet necessary obligations and fulfill their duties as debtors in possession.  I am familiar with the contents of each First Day Motion and believe that the relief sought in each First Day Motion is necessary to enable the Debtors to operate in chapter 11 with minimal disruption or loss of productivity and value, constitutes a critical element in achieving a successful reorganization of the Debtors, and best serves the Debtors' estates and creditors' interests.  The facts set forth in each First Day Motion are incorporated herein by reference.  Capitalized terms used but not otherwise defined in this section of this Declaration shall have the meanings ascribed to them in the relevant First Day Motions.  Below is an overview of each of the First Day Motions.

**A.**     <u>**Joint Administration Motion**</u>

87.     Pursuant to the *Emergency Motion of Debtors for Entry of Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief* (the "**Joint Administration Motion**"), the Debtors request entry of an order directing joint administration of these chapter 11 cases for procedural purposes only.  There are 177 Debtors, and I have been informed that there are approximately 37,500 potential creditors and other parties in interest in these cases.  I believe that joint administration of these cases would save the Debtors and their estates substantial time and expense because it would remove the need to prepare, replicate, file, and serve duplicative notices, applications, motions, and orders.  Further, I believe that joint administration would relieve the Court of entering duplicative orders and maintaining duplicative files and dockets.  The United States Trustee for the Southern District of Texas and other parties in interest would similarly benefit from joint administration of these cases, sparing them the time and effort of reviewing duplicative pleadings and papers.

88.     I believe that joint administration would not adversely affect any creditors' rights because the Debtors' motion requests only the administrative consolidation of these cases for procedural purposes.  It does not seek substantive consolidation of the Debtors' estates. Accordingly, I believe that joint administration of these chapter 11 cases is in the best interests of the Debtors, their estates, and all other parties in interest and should be granted in all respects.

**B.**     <u>**Request for Emergency Consideration**</u>

89.     Pursuant to the *Request for Emergency Consideration of Certain "First Day" Matters* (the "**Request for Emergency Consideration**"), the Debtors request emergency consideration of the following motions:  (i) the Joint Administration Motion; (ii) the Claims and Noticing Agent Retention Application; (iii) the Cash Management Motion; (iv) the Cash Collateral Motion; (v) the Wages Motion; (vi) the Critical Service Provider Motion; (vii)

the Tenant Obligations Motion; (viii) the Taxes Motion; (ix) the Tax Attribute Motion; (x) the Utilities Motion; (xi) the Insurance and Surety Bond Motion; (xii) the Schedules and Statements Extension Motion; and (xiii) the Notice Motion.  I believe that, based on the complexity of these chapter 11 cases (as explained to me by the Debtors' counsel) and the Debtors' urgent need to continue operations during these cases, emergency consideration of such motions is warranted.

**C.**     **Claims and Noticing Agent Retention Application**

90.     Pursuant to the *Emergency Application of Debtors Pursuant to 28 U.S.C. § 156(c) and 11 U.S.C. §§ 105(a) and 327 for an Order (I) Appointing Epiq Corporate Restructuring, LLC as Claims, Noticing, and Administrative Agent, and (II) Granting Related Relief* (the "**Claims and Administrative Agent Retention Application**"), the Debtors request entry of an order approving the retention and appointment of Epiq as Claims and Administrative Agent in the Debtors' chapter 11 cases.

91.     I believe that the appointment of Epiq as the Claims and Administrative Agent is appropriate under the circumstances and is in the best interests of the Debtors' estates, their creditors, and all parties-in-interest.  The Debtors selected Epiq as the Claims and Administrative Agent after determining, based on all engagement proposals obtained and reviewed, that Epiq's rates are competitive and reasonable given Epiq's quality of services and expertise.

92.     As more fully described in the Claims and Administrative Agent Retention Application, the Claims and Administrative Agent will, among other things, (i) serve as the noticing agent to mail notices to the estates' creditors, equity security holders, and parties in interest, (ii) provide computerized claims, objection, solicitation, and balloting database services, and (iii) provide expertise, consultation, and assistance in claim and ballot processing and other administrative services with respect to the Debtors' chapter 11 cases, pursuant to the provisions

of the Engagement Agreement.  I believe that, by appointing Epiq as the Claims and Noticing Agent in these chapter 11 cases, the distribution of notices will be expedited and the Office of the Clerk of the Bankruptcy Court will be relieved of the administrative burden of, among other things, noticing, administering claims, and soliciting and tabulating votes.  Accordingly, I believe the Claims and Administrative Agent Retention Application should be granted in all respects.

**D.      Cash Management Motion**

93.      Pursuant to the Emergency Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors to Continue (A) Using Existing Cash Management System, Bank Accounts, and Business Forms, and (B) Funding Intercompany Transactions, (II) Providing Administrative Expense Priority for Postpetition Intercompany Claims; and (III) Granting Related Relief (the "**Cash Management Motion**"), the Debtors request authority to:

(a)      continue using their existing Cash Management System, as described in the Cash Management Motion, including the maintenance of existing Bank Accounts at their existing banks and Business Forms  in the ordinary course of business and consistent with past practices;

(b)      honor certain prepetition obligations related to the Cash Management System in the ordinary course of business and consistent with prepetition practices;

(c)      continue Intercompany Transactions  between and among the Debtors and their Non-Debtor Affiliates, as described in the Cash Management Motion and otherwise in the ordinary course of business and consistent with their prepetition practices, and to provide administrative expense priority for postpetition Intercompany Claims;

(d)      pay Bank Fees  including any prepetition amounts outstanding; and

(e)      continue the Debtors' Corporate Credit Card Program  in the ordinary course and consistent with prepetition practices and pay prepetition amounts thereunder.

94.     The Debtors further requested (a) a 45-day extension from the entry of the Interim Order (or such additional time as the U.S. Trustee may agree to) to comply with the requirements of section 345(b) of the Bankruptcy Code to the extent they apply to any of the Debtors' Bank Accounts (the "**Extension Period**"), and (b) to the extent the Debtors and the U.S. Trustee cannot reach an agreement during the Extension Period, the Debtors shall schedule a hearing seeking waiver of such requirements for cause.

95.     To facilitate the efficient operation of their businesses, the Debtors utilize the Cash Management System; an integrated, centralized cash management system of approximately 133[7] Bank Accounts, as reflected in **Exhibit C** to the Cash Management Motion, used to collect, transfer, and disburse funds generated by their operations.  The Cash Management System (which includes both Debtors and Non-Debtor Affiliates) facilitates cash monitoring, forecasting, and reporting and enables the Debtors to maintain control over the administration of the Bank Accounts.  The Debtors' treasury department maintains daily oversight of the Cash Management System and implements cash management controls for entering, processing, and releasing funds.  I believe that any disruption of the Cash Management System would be materially detrimental and disruptive to the Debtors' operations, as their businesses require prompt and reliable access to cash and accurate cash tracking.

96.     The Cash Management System broadly consists of (i) property-level bank accounts, which CBL uses to collect and transfer revenues received from transfers and to disburse funds to pay operating and other property-level expenses, and (ii) corporate-level accounts that the Company utilizes to, among other things, pay corporate expenses.  The Cash Management System is tailored to meet the Debtors' operating needs, thereby enabling the

---

[7]     There are seven (7) additional Lockbox Accounts where the property level lenders have exercised a cash trap, consequently, funds in such Bank Accounts are controlled by certain property level lenders and the Debtors do not have access to such funds.

Debtors to control and monitor corporate funds, ensure cash availability and liquidity across the Debtors' operations, and reduce administrative expenses by facilitating the movement of funds and the development of accurate account balances.  The Cash Management System reduces costs associated with cash management, including bank accounts, personnel, bookkeeping, treasury and related expenses.

97.     The LP Main Operating Account is maintained at First Horizon Bank. The Debtors and Non-Debtor Affiliates maintain Bank Accounts at numerous different local and national banks, such as U.S. Bank, PNC, Wells Fargo, Citizens Bank and BB&T.

98.     A general overview of the movement of cash through the Cash Management System, which is illustrated by the flow of funds diagram attached as **Exhibit C** to the Cash Management Motion and in the Cash Management Motion itself, is as follows:

(a)     ***Receipts***:  Tenant receipts are deposited into the appropriate property-level Lockbox Account.  Aggregate balances in excess of $25,000 are automatically swept into either the appropriate Encumbered Property Operating Account or the Clearing Accounts, as applicable.  After the payment of property-level expenses including debt service payments, excess funds are transferred to the LP Main Operating Account, in the form of distributions.

(b)     ***Disbursements***:     Disbursements are generally made from the Disbursement Accounts, the Payroll Account, and the Benefit Account with funds transferred from the LP Main Operating Account.  Funds in the LP Main Operating Account are also used to directly pay certain expenses and make certain distributions.

99.     The Debtors incur Bank Fees, which are paid monthly and automatically deducted from the Debtors' Bank Accounts as they are assessed by their respective Cash Management Banks.  On average, the Debtors pay approximately $115,000 per month in Bank Fees.  I am told that approximately $115,000 will come due and payable in the first thirty (30) days of these chapter 11 cases.

100.     In the ordinary course of business, the Debtors engage in Intercompany Transactions with each other and with the Non-Debtors Affiliates which may generate Intercompany Claims.  For example, in the ordinary course, if a Non-Debtor property-level entity does not have sufficient cash flow to meet its operating expenses or service its debt payments, the LP Main Operating Account will contribute funds by wire in the form of contributions to the relevant Encumbered Property Operating Account to cover any shortfall.  Similarly, with respect to the JV Properties, in certain instances, the Company will contribute funds from the LP Main Operating Account to cover any shortfall of the Company's share of a mortgage loan or operating expenses on the JV Property.  Additionally, as discussed above, excess funds from Property Operating Accounts, which may be held by Non-Debtor Affiliates, flow upstream to the LP Main Operating Account either by ACH or by wire in the form of distributions.  Given the recent actions by the Bank Lenders purporting to exercise proxy rights and exercise control over the entities owning the Credit Facility Properties,[8] the Company will segregate the rents and revenues received from tenants at the Credit Facility Properties, subject to using those revenues to pay operating expenses and necessary capital expenditures and tenant allowances associated with the Credit Facility Properties.  To the extent necessary, the Company will prepare operating budgets for the Credit Facility Properties, to be presented to the Administrative Agent.

101.     The Intercompany Transactions are tracked through "Intercompany Reports," which the Debtors maintain, and will continue to maintain, on a postpetition basis to ascertain, trace, and account for the Intercompany Transactions.  To minimize business disruption and preserve estate value, I believe the Debtors need authority to continue entering into ordinary course Intercompany Transactions and tracking such Intercompany Transactions by way of Intercompany Reports.

---

[8]     I am advised that this will be disputed by the Debtors at the appropriate time and manner.

102.     The Debtors use a variety of Business Forms and maintain Books and Records to document their financial results and a wide array of necessary operating information. I believe that granting the Debtors authorization to continue using all of the Business Forms and Books and Records in use immediately before the Petition Date, including with respect to the Debtors' ability to update authorized signatories and services, as needed—without reference to the Debtors' status as chapter 11 debtors in possession—rather than requiring the Debtors to incur the expense and delay of ordering new Business Forms and creating new Books and Records, would avoid a significant disruption to the Debtors' business operations that would result from a disruption of the Cash Management System and to avoid unnecessary expense.

103.     In the ordinary course of business, the Debtors provide certain employees with Corporate Credit Cards (as administered by the Debtors and U.S. Bank), which employees can use to make business-related purchases.  Approximately 330 employees have been issued Corporate Credit Cards, each of which were issued to employees in their own names by U.S. Bank.  Participating employees use the Corporate Credit Cards to incur eligible business expenses and submit expense reports through the Debtors' electronic expense management platform, which are processed on a rolling basis.  On an average annual basis, the Debtors pay approximately $7.8 million to U.S. Bank on account of the Corporate Credit Cards.  The Debtors request authority to continue to make all payments in connection with the Corporate Credit Cards in the ordinary course of business and consistent with the Debtors' past practices.

104.     I understand that the Debtors' cash management system is tailored to meet the Debtors' operating needs, thereby enabling the Debtors to control and monitor corporate funds, ensure cash availability and liquidity, comply with the requirements of their financing

agreements, and reduce administrative expenses by facilitating the movement of funds and the development of accurate account balances.

105.    I believe the Debtors' cash management system constitutes an ordinary-course and essential business practice providing significant benefits to the Debtors.   The Debtors' cash management system has historically reduced the Debtors' expenses by enabling them to use funds in an optimal and efficient manner.   Accordingly, I believe the Debtors' continued use of their cash management system without interruption is vital to the Debtors' business operations and the success of these chapter 11 cases. Accordingly, on behalf of the Debtors, I respectfully submit that the relief requested in the Cash Management Motion is in the best interests of the Debtors' estates, and should be granted.

**E.      Cash Collateral Motion**

106.    Pursuant to the *Emergency Motion of Debtors for Interim Order (I) Authorizing the Debtors to Use Cash Collateral, (II) Determining Adequate Protection, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* (the "**Cash Collateral Motion**"), the Debtors request entry of an Interim Order providing for:

(a)    authority for the Debtors' limited use of Cash Collateral of Wells Fargo in its capacity as Administrative Agent under the First Lien Credit Agreement solely to maintain and cover the ordinary course operating expenses of the Credit Facility Properties;

(b)    authority for the Debtors to use Cash Collateral, if any, of the Property Lenders under the Property Level Loans, in accordance with the terms and conditions set forth in the Interim Order;

(c)    the determination of adequate protection to the Prepetition Secured Parties with respect to their interests in the Properties;

(d)    limited modification of the Automatic Stay;

(e)    a waiver of any applicable stay (including under Bankruptcy Rule 6004) with respect to the effectiveness and enforceability of the Interim Order and providing for the immediate effectiveness of the Interim Order;

(f)      scheduling a Final Hearing within thirty (30) days of the Petition Date and approving notice with respect thereto in accordance with Bankruptcy Rules 4001(b) and (d); and

(g)      entry of a Final Order approving the relief granted in the Interim Order (as such relief may be modified on notice in advance of the Final Hearing) on a final basis.

107.    As stated above and in the Cash Collateral Motion, as of the Petition Date, pursuant to the First Lien Loan Documents, the First Lien Secured Parties may assert Prepetition First Lien Claims against certain of the Debtors in an aggregate amount equal to: (a) $439 million in aggregate principal amount of term loans plus (b) $676 million in aggregate principal amount of revolving loans plus (c) prepetition accrued interest and all fees, costs, expenses (including any attorneys', financial advisors', and other professionals' fees and expenses), premiums (if any), reimbursement obligations, indemnification obligations, contingent obligations, and all other charges of whatever nature, whether or not contingent, whenever arising, due, or owing, and all other Obligations owing under or in connection with First Lien Loan Documents whether arising prepetition or postpetition, including postpetition interest at the default rate.

108.    It is my understanding that the First Lien Secured Claims are secured in accordance with the terms of the First Lien Loan Documents, including by direct or indirect pledges of the Credit Facility Properties, including in rents therefrom, from the Credit Facility Property Entities.  However, it is my understanding that the Administrative Agent does not have perfected security interest with respect to any deposit account control agreements, although certain Bank Lenders may purport to have a security interest through control of certain accounts and could, subject to the automatic stay, exercise setoff rights thereon.

109.    Additionally, as of the Petition Date, pursuant to the Property Level Loans, the Property Level Lenders may assert Property Level Secured Claims against certain

Non-Debtor Affiliates in an aggregate amount equal to approximately $2 billion plus prepetition accrued interest and all fees, costs, expenses.  It is my understanding that the Property Level Secured Claims are secured in accordance with the Property Level Loan Documents, including by, among other things, the borrowing interest in the Mortgage Loan Properties owned in whole or in part by the Non-Debtor Property-Level Entities.

110.    By the Cash Collateral Motion, the Debtors seek authority, to the extent necessary and applicable, to use Cash Collateral of the Bank Lenders and the Property Lenders during the Interim Period on a limited basis and solely to the extent necessary to maintain and operate the Properties in the ordinary course.

111.    As adequate protection for the Bank Lenders, the Debtors will (a) continue to operate and maintain their business and the Credit Facility Properties in the ordinary course of business, including the payment of associated wages, management fees, taxes, insurance costs, necessary capital expenditures, tenant allowances, and other operational expenses, and (b) to the extent rents from the Credit Facility Properties come into the Debtors' estates, the Debtors will segregate postpetition rents—net of operating expenses applicable to the Credit Facility Properties, including utilities, employee expenses, management fees, taxes, insurance costs, necessary capital expenditures, tenant allowances, and other expenses incurred in the ordinary course of business—and not commingle such cash with the Debtors remain cash until the Court makes a determination on the issues raised in the Bank Lender Litigation.

112.    As adequate protection for the Property Lenders, to the extent the Property Lenders have valid interest in net proceeds flowing from the Non-Debtor Property-Level Entities up to the Debtors, the Debtors and Non-Debtor Property-Level Entities will (a) make ordinary course interest payments and satisfy other obligations, subject to limited exceptions, arising

under the Property Level Loan Documents in accordance with the terms thereof, and (b) continue to operate and maintain the Mortgage Loan Properties in the ordinary course of business, including the payment of associated wages, management fees, taxes, insurance costs, necessary capital expenditures, tenant allowances, and other operational expenses.

113.    It is my understanding that, (a) the Bank Lenders are under-secured, as demonstrated by the Debtors' recent appraisals, (b) the Debtors are continuing to maintain and operate the Credit Facility Properties, including maintaining insurance and making required capital and operating expenditures, (c) the value of the Credit Facility Properties is likely to increase from current historic lows as the Company progresses through to the other side of the pandemic, (d) as described in the Cash Management Motion, all net rents of the Credit Facility Properties during the Interim Period will be segregated and will not be used by the Debtors absent a further order authorizing such use.

114.    Similarly, it is my understanding that the Property Lenders, to the extent they have valid interests in Cash Collateral, are adequately protected because the Debtors and Non-Debtor Property-Level Entities will continue to make ordinary course interest payments arising under the applicable Property Level Loan Documents.

115.    As described more fully in the Cash Collateral Motion, the Debtors have an immediate and ongoing need to use cash collateral to, among other things, satisfy payroll and other working capital and general corporate purposes at the Property-Level Entities.    The Debtors require immediate access to Cash Collateral for these limited purposes to avoid the operational and administrative burden that would result if the Debtors were required to unnecessarily reconfigure their cash management procedures to maintain the Properties.

116.     It is my understanding that the Debtors' business depends on their ability to maintain property-level operations, including using property-level rent proceeds to satisfy the operational expenses of such properties.  Deviation from the ordinary course cash management mechanics at the property levels will be overly burdensome on the Debtors, divert time and resources that would be better allocated towards implementing the contemplated restructuring, and significantly hinder operations and cause immediate and irreparable harm to the value of the Debtors' estates to the detriment of all stakeholders.  Conversely, I believe the limited relief requested in the Cash Collateral Motion will maintain the status quo, preserve the value of the Properties and, thereby, preserve the value of the Debtors' estates, and permit the Debtors to continue to operate as a going concern during the Interim Period.

117.     Accordingly, I believe the use of Cash Collateral in accordance with the terms of the Interim Order is essential to the Debtors' ability to minimize disruptions and maximize value for their estates and parties in interest and that the requested relief should be granted.

**F.     Wages Motion**

118.     Pursuant to the *Emergency Motion of Debtors for Entry of an Order (I) Authorizing Debtors to (A) Pay Prepetition Wages, Salaries, Reimbursable Expenses, and Other Obligations on Account of Compensation and Benefits Programs, and (B) Continue Compensation and Benefits Programs; and (II) Granting Related Relief* (the "**Wages Motion**"), the Debtors request (i) authority to (a) pay prepetition wages, salaries, reimbursable expenses, and other obligations on account of the Compensation and Benefits Programs in the ordinary course of business, and (b) continue to administer the Compensation and Benefits Programs and (ii) related relief.  The monetary relief sought in the Wages Motion with respect to prepetition obligations, is summarized in the following chart:

| Compensation and Benefits Program | Total Relief Requested |
|---|---|
| Compensation | $120,000 |
| Supplemental Workforce Compensation | $7,600 |
| Withholding Obligations | $41,500 |
| Reimbursable Expenses | $114,000 |
| Employee Incentive Programs | $0 |
| Health Insurance Programs | $122,000 |
| Life Insurance and Disability Programs | $500 |
| 401(k) Plan[9] | $10,700 |
| BTA Insurance | $8,200 |
| Non-Insider Employee Incentive Program | $0 |
| Paid Leave | $2,200,000 |
| Non-Insider Severance Practice | $0 |
| **Total** | $2,624,500 |

119.    As described more fully in the Wages Motion, as of the Petition Date, the Debtors' workforce is comprised of approximately 490 Employees across the United States, including approximately 450 Employees on a full-time basis and approximately 40 Employees on a part-time basis.    Approximately 155 Employees are paid on an hourly basis, and approximately 335 Employees are salaried.[10]   None of the Employees are party to a collective bargaining agreement or other similar labor agreements.  The Debtors also utilize a Supplemental Workforce comprised of one (1) independent contractor, which provides information technology and other operational services, which promote continuity across the Debtors' business and customer satisfaction on a daily basis.

---

[9]   For the avoidance of doubt, the relief requested with respect to the 401(k) Plan includes remittance of Employee contributions to the 401(k) Plan, the 401(k) Company Match Contributions, and any administrative, advisory, or service fees paid in connection with the 401(k) Plans (each as defined and described below).

[10]   In the months leading up to the Petition Date, the Debtors permanently laid off approximately 140 additional Employees, all of whom were part-time.  The lay-offs were a direct result of the COVID-19 pandemic and temporary closures of non-essential businesses, in accordance with federal, state, and local laws, orders, and guidelines with respect thereto.

120.    The Debtors' Workforce performs a wide variety of functions that are critical to the Debtors' operations and cannot be easily replaced without investing in training and on-the-job experience.   During these times of turbulent shifts in the labor market, failure to maintain the continued, uninterrupted services of their Workforce could upend the Debtors' reorganization efforts and jeopardize the value of their businesses as a going concern.

121.    As further described in the Wages Motion, the Debtors pay their Employees Compensation in the form of wages, annual salaries, commissions and other compensation (excluding Reimbursable Expenses and Paid Time Off) on a semi-monthly basis, through direct deposits or checks issued on the 15th and last business day of each month.   In the twelve (12) months prior to the Petition Date, the Debtors spent an average of approximately $3.9 million[11] per month on account of Compensation.   The Debtors process payroll internally and do not utilize a third-party payroll processor, and the Debtors' next payroll processing date is November 15, 2020.   As of the Petition Date, the Debtors estimate that they owe approximately $120,000 on account of Compensation earned by Employees prior to the Petition Date.   I am advised that the Debtors do not believe that any Employee is owed payment on account of Compensation in excess of the statutory cap of $13,650 per Employee imposed by section 507(a)(4) of the Bankruptcy Code.

122.    Further, I am advised that the Debtors pay Supplemental Workforce Compensation, on average, approximately $7,300 in aggregate Supplemental Workforce Compensation each month.    As of the Petition Date, the Debtors estimate that they owe approximately $7,600 in Supplemental Workforce Compensation.

---

[11]   This figure reflects the average monthly gross spend on account of Compensation.  On an average, monthly, net basis, the Debtors spend approximately $2.7 million on account of Compensation

123.     Additionally, as described in the Wages Motion, in the ordinary course of business, the Debtors make various benefit plans available to their Employees.  I understand that these benefit plans fall within the following categories: (i) Paid Leave; (ii)  Health Insurance Programs; (iii)  Life Insurance and Disability Programs; (iv) the 401(k) Plan; (v) BTA Insurance; and (vi) certain Other Employee Benefits.  To procure many of the Employee Benefit Programs, the Debtors employ the Employee Benefits Broker.  The Debtors require these services to determine the needs of their Workforce, compare various benefits programs, engage in performance projections and benchmarking, and negotiate contracts with respect to programs and program renewals.  By the Wages Motion, the Debtors seek authority to continue each of the Employee Benefit Programs and continue their engagement with the Employee Benefits Brokers, all in the ordinary course of business and consistent with past practices.

124.     I am advised that the relief requested represents a sound exercise of the Debtors' business judgment and is necessary to avoid immediate and irreparable harm to the Debtors' estates.  Absent authorization to pay prepetition wages, employee benefits, and similar obligations, the Debtors are at the risk of significant Employee attrition, as the Debtors' Employees may seek alternative opportunities.  Employee attrition would cause the Debtors to incur additional expenses to find appropriate and experienced replacements, severely disrupting the Debtors' operations at a critical juncture.  Additionally, I believe that the loss of valuable Employees, who are the lifeblood of the Debtors' operations, would deplete the Debtors' workforce, thereby hindering the Debtors' ability to meet their obligations and likely diminishing the Debtors' ability to carry out their chapter 11 strategy and successfully reorganize.

125.     In addition to Employee attrition, failure to satisfy prepetition Employee Obligations will likely jeopardize Employee morale and loyalty at a time when Employee

support is critical to the Debtors' businesses.  I understand that the majority of the Debtors' Employees rely on their compensation, benefits, and reimbursement of expenses to satisfy their daily living expenses.  These Employees will be exposed to significant financial difficulties and other distractions if the Debtors are not permitted to honor their obligations for unpaid compensation, benefits and reimbursable expenses.  Similarly, if the Court does not authorize the Debtors to honor their various obligations under the Employee Benefit Programs, many Employees will lose access to health coverage at a time when the Debtors need their Employees to perform their jobs at peak efficiency.  I believe the loss in morale and potential distraction of Employees worrying about paying their bills and their healthcare costs will harm the Debtors' ability to operate, causing an erosion in the Debtors' value.

126.    Further, I am advised that, as priority claims, certain of the Debtors' obligations on account of the Compensation and Benefit Programs are entitled to payment in full before any general unsecured claims asserted against the Debtors can be satisfied.  Thus, the relief requested largely affects only the timing of payment of the priority prepetition obligations on account of the Compensation and Benefit Programs and should not prejudice the rights of general unsecured creditors and other parties in interest.

127.    For the foregoing reasons, I believe the payment of the prepetition amounts due under and continuation of the Employee Benefit Programs, all as described in the Wages Motion,  is necessary, appropriate, and in the best interests of the Debtors, their estates, and all other parties in interest in these cases.

## G.    Critical Service Provider Motion

128.    Pursuant to the *Emergency Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors to Pay Prepetition Obligations to Critical Service Providers and Lien Claimants; and (II) Granting Related Relief* (the "**Critical Service Provider**

46

Motion"), the Debtors are requesting entry of an order (i) authorizing, but not directing, the Debtors to pay, in the ordinary course of business, certain Critical Service Providers and Lien Claimants on account of their Service Provider Claims and (ii) granting related relief.

129.    The Debtors rely on essential services provided by various service providers to ensure that the Properties remain open, safe, and fully operational.  These essential services primarily include security services; cleaning, maintenance and janitorial services; fire and alarm monitoring services; vertical transportation system services; and promotional/marketing services.  Without these basic services, the Debtors' Properties cannot remain open and operating.  Even a brief disruption of the essential services could result in the closure or cessation of operations of one or more Properties, which could have a significant adverse effect on the Debtors' estates.

130.    In some instances, the Critical Service Providers are the only available source for such services, due to the highly specialized nature of such services.  In other instances, the Critical Service Providers are the most preferred source from which the Debtors can procure services within a timeframe and at a price that will permit the Debtors to continue to operate their business smoothly and effectively.   Some of the Critical Service Providers have longstanding relationships with the Debtors and provide services at several of the Debtors' Properties.  I understand that replacing such Critical Service Providers, even in the infrequent instances where possible, could result in substantially higher costs for the Debtors and their estates and risk delays that could harm the Debtors' businesses.

131.    In narrowing the Debtors' list of service providers to only those that are critical, the Debtors and their advisors have engaged in a comprehensive process reviewing and analyzing the Debtors' books and records, consulting with the Debtors' management and

personnel responsible for operations, reviewing contracts, and analyzing applicable laws, regulations, and past practices to (a) identify those service providers and/or service providers that may be "critical" to the Debtors' businesses (who, if lost, would materially impair the going-concern viability of the Debtors' businesses), and (b) quantify the relief necessary to avoid immediate and irreparable harm to the Debtors at the outset of these chapter 11 cases.  Further, the Debtors propose to condition payment of Critical Service Provider claims on the Critical Service Provider's binding agreement to continue providing services to the Debtors.  To facilitate this process, the Debtors propose to use a letter agreement which ensures, among other things, the Debtors will continue conducting business with such Service Providers on Customary Trade Terms during these chapter 11 cases.

132.    Moreover, the Debtors routinely engage a number of Lien Claimants that may be able to assert and perfect liens, including mechanic's liens, artisan's liens, construction liens, and other similar liens, against the Debtors' Property if the Debtors fail to pay for the services rendered.  The Lien Claimants perform a number of services for the Debtors, including, without limitation, construction and servicing of equipment and facilities, supplies and products that are essential to the Debtors' enterprise.  It is my understanding that if the Debtors are unable to timely pay the Lien Claims, they risk being unable to fully maintain their Properties, which could prevent them from maximizing recoveries for all stakeholders in these chapter 11 cases.

133.    Accordingly, given the importance of the services provided by the Critical Service Providers and Lien Claimants and the Debtors' need to retain such relationships, I believe the payment of such Critical Service Provider Claims is necessary, appropriate, and in the best interests of the Debtors, their estates, and all other parties in interest in these cases.

**H.**     **Tenant Obligations Motion**

134.    Pursuant to the Debtors' *Emergency Motion for Entry of Interim and Final Orders Authorizing (I) Payment of Tenant Obligations and (II) Granting Related Relief* (the "**Tenant Obligations Motion**"), the Debtors seek the entry of interim and final orders confirming the Debtors' authority to pay or otherwise satisfy prepetition tenant obligations arising under tenant leases.  Many of the Debtors' leases with tenants require a Debtor, as landlord, to pay for, among other things, tenant improvement allowances, agreed landlord build-out work, and tenant commercial broker fees.  Specifically, the Debtors seek, on an interim basis, authority, in their discretion, to satisfy up to $1.35 million of prepetition tenant obligations in the ordinary course of business in accordance with practices and procedures that were in effect before the Petition Date, and on a final basis, authority, but not direction, to pay or otherwise satisfy any remaining tenant obligations, without regard to whether accruing or relating to the period before or after the Petition Date, as they come due in the ordinary course of business in accordance with the practices and procedures that were in effect before the Petition Date.

135.    Based on the Debtors' books and records, the Debtors may owe up to $23 million in potential tenant obligations under prepetition leases that either have or will become due in the next year.  The Tenant Allowances to be paid under the Interim Period Amount include amounts due and owing to certain tenants and commercial brokers that have submitted the required documentation, satisfied the prerequisites, and, thus, triggered the Debtors' payment obligations under the applicable leases.  It also includes Tenant Allowances undertaken, in whole or in part, prior to the Petition Date, but for which (i) the work may not have been completed prepetition, and/or (ii) the tenant has not submitted the required documentation or satisfied other contractual prerequisites to obtain reimbursement.

136.    The continuity and viability of the Debtors' business is largely dependent on (i) the development and maintenance of the loyalty of their tenants and commercial brokers and (ii) the revenue generated by tenant rent.   Without the ability to satisfy these tenant obligations, the Debtors believe, and I agree, that tenants are likely to assert and/or exercise perceived rights of setoff and/or recoupment or simply withhold postpetition rent.   Finally, the Debtors' inability to honor their tenant obligations could have a detrimental effect on their tenant relationships.   Accordingly, I believe that the relief requested in the tenant obligations motion is necessary to avoid immediate and irreparable harm that would result from the failure to authorize the Debtors to honor such tenant obligations.

I.    **Taxes Motion**

137.    Pursuant to the *Emergency Motion of Debtors for Entry of an Order (I) Authorizing Debtors to Pay Certain Prepetition Taxes and Fees; and (II) Granting Related Relief* (the "**Taxes Motion**"), the Debtors request authority to (i) satisfy, in the Debtors' sole discretion and in the ordinary course of business, all Taxes and Fees due and owing to the various local, state, and federal Taxing Authorities that arose prior to the Petition Date, including all Taxes and Fees subsequently determined by audit or otherwise to be owed for periods prior to the Petition Date and (ii) related relief.

138.    I understand that, in the ordinary course of their business, the Debtors are obligated to pay certain taxes and fees, which generally fall into the following categories, each of which is discussed in more detail below: (i) Sales and Use Taxes, (ii) Franchise Taxes, (iii) Income Taxes, (iv) Property Taxes, and (v) Fees related to regulatory and compliance obligations.  I further understand that approximately $73.5 million in Taxes and Fees relating to the prepetition period will become due and owing to the Taxing Authorities after the Petition Date.   The following table describes the various categories of Taxes and Fees incurred by the

Debtors in the ordinary course of their business, and includes the Debtors' estimates of such Taxes and Fees that have accrued as of the Petition Date:

| Category | Description | Approx. Amount as of Petition Date |
|---|---|---|
| Sales and Use Taxes | Taxes on goods and services that are used/consumed or sold and assessed based on the value of those goods and services. | $150,000 |
| Franchise Taxes | Taxes incurred in connection conducting business within certain states in which the Debtors operate. | $1,470,000 |
| Income Taxes | Taxes incurred in connection with profits generated in certain states in which the Debtors operate. | $242,000 |
| Property Taxes | Taxes and obligations related to real and personal property holdings of the Debtors. | $71,600,000 |
| Fees | Fees related to, among other things, business licenses, permits, fees, unclaimed property, and annual reports. | $5,000 |
| **Total** | | **$73,467,000** |

139. Further, I understand and am advised that failure to pay the Taxes and Fees could adversely affect the Debtors' business operations because certain governmental authorities may assert liens on the Debtors' property, assert penalties, or significant interest on past-due taxes, or possibly bring personal liability actions against directors, officers, and other employees in connection with non-payment of the Taxes and Fees, thus distracting the Debtors' management and employees from their important reorganization efforts, and potentially causing immediate and irreparable harm to the Debtors. Accordingly, I believe that the relief requested in the Taxes Motion is in the best interests of the Debtors, their estates, and all parties-in-interest and should be granted in all respects.

**J.**     **Tax Attributes Motion**

140.     Pursuant to the *Emergency Motion of Debtors for Entry of Interim and Final Orders Establishing Notification Procedures and Approving Restrictions on Certain Transfers of Interests in the Debtors* (the "**Tax Attributes Motion**"), the Debtors request entry of interim and final orders authorizing the Debtors to establish procedures (the "**Procedures**") to protect the potential value of the Debtors' (i) "net unrealized built-in loss" ("**NUBIL**"), (ii) net operating loss carryforwards ("**NOLs**"), and (iii) other tax benefits (collectively, the "**Tax Attributes**"), for use during the pendency of these chapter 11 cases and in connection with a reorganization of the Debtors.  The Procedures apply to transfers of beneficial ownership of CBL Common Stock and any options or similar rights (within the meaning of applicable treasury regulations) to acquire such stock (collectively, the "**Common Stock**") and allow the Debtors to monitor the transfer of beneficial ownership of Common Stock and thereby preserve their ability to seek the necessary relief if it appears that any such transfer(s) may jeopardize the Debtors' ability to utilize the Tax Attributes.

141.     It is my understanding that the Debtors possess certain Tax Attributes, including, as of the Petition Date, estimated NUBIL in their assets (i.e., the amount by which the Debtors' adjusted tax basis in their assets exceeds the fair market value of the assets) of at least approximately $1.8 billion and federal NOLs of approximately $50 million.  The Tax Attributes are potentially of significant value to the Debtors and their estates because the Debtors can carry forward certain Tax Attributes to offset taxable income in future years, and such Tax Attributes may also be utilized by the Debtors to offset any taxable income that may be generated by transactions consummated during these chapter 11 cases.  In order to qualify for taxation as a real estate investment trust, the REIT must meet various requirements including a requirement to distribute 90% of its taxable income; and, to avoid paying corporate income tax, the REIT must

distribute 100% of its taxable income.  If and to the extent the Tax Attributes can be used to offset taxable income in current and future tax periods and potentially reduce the annual distribution requirements of the REIT and tax liabilities of the Debtors, I believe the Tax Attributes are valuable assets.  Further, I understand and am advised that the Debtors' ability to utilize the Tax Attributes is subject to certain statutory limitations—*namely*, sections 382 and 383 of Title 26 of the U.S. Code (the "**Tax Code**"), which limit a corporation's ability to utilize its NUBIL, NOLs and certain other tax benefits to offset future income once the corporation has undergone an "ownership change" within the meaning of section 382 of the Tax Code (an "**Ownership Change**").

142.    I believe that, by establishing and implementing such Procedures, the Debtors will be in a position to object to any potential Ownership Change resulting from a transfer of beneficial ownership of Common Stock.  It is critical for the Debtors to closely monitor any such activity involving the Common Stock, so that they may be in a position to act expeditiously to preserve the value of their Tax Attributes.  Accordingly, I believe that the relief requested in the Tax Attributes Motion is in the best interests of the Debtors, their estates, and all other parties in interest and should be granted in all respects.

### K.    Utilities Motion

143.    Pursuant to the *Emergency Motion of Debtors for Entry of Order (I) Approving Debtors' Proposed Form of Adequate Assurance of Payment to Utility Companies; (II) Establishing Procedures for Resolving Objections by Utility Companies, (III) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Services, and (IV) Granting Related Relief* (the "**Utilities Motion**"), the Debtors seek approval of their proposed form of Adequate Assurance Procedures, and a prohibition on utility providers from altering, refusing, or

discontinuing utility service on account of the commencement of these chapter 11 cases or outstanding prepetition invoices.

144.     As more fully described in the Utilities Motion, in the ordinary course of business, the Debtors incur expenses, for among other things, electricity, natural gas, water, and telecommunications.  The Debtors make utility payments directly to a utility provider and I believe that preserving utility services on an uninterrupted basis is essential to the Debtors' ongoing operations.  The Debtors serve customers nation-wide, and any interruption in utility services—even for a brief period—could severely disrupt the Debtors' ability to continue operations and jeopardize the Debtors' restructuring efforts and, ultimately, creditor recoveries.

145.     Based on a monthly average for the twelve months prior to the Petition Date, the Debtors estimate that their aggregate cost of Utility Services for the next thirty (30) days will be approximately $3.5 million.   To provide additional assurance of payment, the Debtors propose to Adequate Assurance Deposit, within twenty (20) days after the Petition Date, approximately $2.4 million into a newly created, segregated Utility Deposit Account owned by the Debtors for the benefit of the Utility Companies. The Adequate Assurance Deposit represents an amount equal to two weeks' cost of Utility Services, calculated using the historical average for such payments during the past twelve (12) months.

146.     Furthermore, I believe and am advised that the Adequate Assurance Procedures are necessary for the Debtors to effectuate their chapter 11 strategy without unnecessary and costly disruptions on account of discontinued utility services.  If the Adequate Assurance Procedures are not approved, the Debtors likely will be confronted with and forced to address numerous requests by their utility providers at a critical time for their businesses.  I understand that the Debtors' utility providers could unilaterally decide that they are not

adequately protected and, therefore, may make exorbitant demands for payment to continue providing service or discontinue providing service to the Debtors altogether.  Such an outcome could seriously jeopardize the Debtors' operations and their ability to maximize the value of their estates.

147.    Accordingly, on behalf of the Debtors, I respectfully submit that the relief requested in the Utilities Motion is in the best interests of the Debtors' estates, and should be granted.

**L.**    **Insurance and Surety Bond Motion**

148.    Pursuant to the *Emergency Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Maintain Their Insurance Programs and Surety Bond Program and (B) Honor All Obligations With Respect Thereto, (II) Modifying Automatic Stay With Respect to Workers' Compensation Claims, and (III) Granting Related Relief* (the "**Insurance and Surety Bond Motion**"), the Debtors request interim and final orders (i) authorizing, but not directing, the Debtors to (a) maintain their Insurance Programs and their Surety Bond Programs, (b) honor their Insurance Obligations and Surety Bond Obligations in the ordinary course of business during the administration of these chapter 11 cases, including paying any prepetition Insurance Obligations and Surety Obligations; (ii) modifying the automatic stay, if necessary, to permit the Debtors' employees who hold valid Workers' Compensation Claims to pursue such claims; and (iii) granting related relief.

149.    In connection with the operation of the Debtors' businesses and the management of their properties, I understand the Debtors maintain various Insurance Programs and Insurance Policies with a variety of Insurers, with varying policy periods, deductible amounts, and limits pursuant to each policy.

150.    Pursuant to the Insurance Programs, the Debtors pay Insurance Premiums based upon fixed rates established and invoiced directly or indirectly by each Insurer.  The Debtors paid approximately $12.6 million[12] in Insurance Premiums each year, not including applicable taxes and surcharges, deductibles, and broker fees.  I understand that no Insurance Premiums will become due and payable during the Interim Period.

151.    I understand that the Debtors maintain the Insurance Programs to help manage and limit the various risks associated with operating their businesses, which is essential to the preservation of the value of the Debtors' businesses and properties.  Accordingly, I believe it is in the best interests of the Debtors, their estates, creditors, and all parties-in-interest for the Debtors to continue to maintain and renew any Insurance Programs and Insurance Policies that may expire during the Interim Period in the ordinary course of business, whether arising from the prepetition or postpetition period, throughout these Chapter 11 cases.

152.    The Debtors' Insurance Programs include: (i) General Liability and Property Programs; (ii) Workers' Compensation Programs; (iii) Umbrella and Excess Coverage Programs; (iv) D&O Programs; and (v) Other Insurance Programs.

153.    As stated above, the Debtors maintain the General Liability and Property Programs in the ordinary course of business.  The General Liability and Property Programs cover liabilities up to $1 million per occurrence, and up to $25 million in the aggregate, for commercial general liability claims and up to $600 million for property-related insurance claims.  As of the Petition Date, the Debtors estimate that there is an aggregate total liability of approximately $270,000 outstanding in connection with pending claims under the General Liability and Property Programs, all or any portion of which may come due and owing in the Interim Period.  Accordingly, I believe it is in the best interests of the Debtors, their estates, creditors, and all

---

[12] Given the changing market for Insurance Policies, this number varies on a yearly basis.

parties-in-interest for the Debtors to continue to maintain the General Liability and Property Programs in the ordinary course of business throughout these chapter 11 cases.

154.    Additionally, in the ordinary course of business, the Debtors maintain Workers' Compensation Programs as required by statute in each of the jurisdictions in which they operate and provide coverage to employees for claims arising from or related to their employment by the Debtors.  Accordingly, I believe it is in the best interests of the Debtors, their estates, creditors, and all parties-in-interest for the Debtors to continue to administer the Workers' Compensation Programs, including paying applicable premium amounts, in the ordinary course of business.  I understand that, as of the Petition Date, the Debtors do not owe any prepetition amounts on account of the Workers' Compensation Programs, and do not expect any amounts to come due and owing on account of the Workers' Compensation Programs during the Interim Period.

155.    Under the Debtors' Guaranteed Cost Policies, the Debtors' liability for each Workers' Compensation Claim is covered in full by the Insurer and requires no deductible. The Debtors, as the insured, only pay an annual premium and the Insurer pays all claims and expenses directly to an employee, his or her medical providers, or his or her heirs or legal representatives.  Under the Compulsory Policies, the Debtors pay annual premiums and any deductibles to the applicable state-run Insurer, and the Insurer pays all claims and expenses above any applicable deductible directly to an employee, his or her medical providers, or his or her heirs or legal representatives.  As of the Petition Date, the Debtors believe that there is one (1) open Workers' Compensation Claims under the Sompo Policy.[13]  The Debtors are not aware

---

[13]   The Debtors previously maintained workers' compensation policies with other insurance companies.  Although the Debtors no longer maintain these policies, there are still open claims and payments to be made with respect to these policies. Accordingly, the one (1) open workers' compensation claim described in the Insurance and Surety Bond Motion and estimated liabilities with respect to such claim includes the claim under these legacy

of any outstanding Workers' Compensation Claims under the Praetorian Policy or the Compulsory Policies.  I understand, however, that it is possible that an event giving rise to an obligation of the Insurers under the Workers' Compensation Policies to make a payment on account of a Workers' Compensation Claim—for example, for injury or disease of an employee—could have occurred prepetition without the Debtors' knowledge.  Accordingly, I believe it is in the best interests of the Debtors, their estates, creditors, and all parties-in-interest for the Debtors to modify the automatic stay to enable employees with Workers' Compensation Claims to pursue such claims.

156.    In the ordinary course of business, I understand that the Debtors also maintain Umbrella and Excess Coverage Programs, D&O Programs, and Other Insurance Programs.  With respect to the Umbrella and Excess Coverage Programs, the annual premiums are approximately $297,000 in the aggregate.  As of the Petition Date, the Debtors are not aware of any outstanding premiums or prepetition amounts owed under the Umbrella and Excess Coverage Programs, and do not expect any amounts to come due and owing on account of the Umbrella and Excess Coverage Programs during the Interim Period.  As of the Petition Date, the Debtors are not aware of any outstanding premiums or prepetition amounts owed under the D&O Programs and do not expect any amounts to come due and owing on account of the D&O Programs during the Interim Period, but out of an abundance of caution, the Debtors seek authority to continue to administer the D&O Programs, including paying applicable premium amounts, in the ordinary course.  I believe it is in the best interests of the Debtors, their estates, creditors, and all parties-in-interest for the Debtors to continue to maintain the Umbrella and Excess Coverage Programs, D&O Programs, and Other Insurance Programs, including paying

policies.

applicable premium amounts, in the ordinary course of business to ensure adequate insurance coverage for the Debtors and their stakeholders throughout these chapter 11 cases.

157.    In connection with maintaining the Insurance Programs, the Debtors USI as their insurance broker and service provider to assist with the procurement and negotiation of certain Insurance Policies and, in certain circumstances, to remit payment to the Insurers on behalf of the Debtors.  In exchange for these services, the Debtors pay USI an annual fee of approximately $600,000 that is reduced for any commissions USI receives from certain Insurers.[14]  As of the Petition Date, I understand there are no obligations due and payable to USI, and do not expect any amounts to come due and owing to USI during the Interim Period. However, considering the importance of the Broker's role in maintaining the Debtors' Insurance Programs, I believe it is in the best interests of the Debtors, their estates, creditors, and all parties-in-interest for the Debtors to be permitted to continue making payments to the Broker for any applicable fees incurred postpetition in the ordinary course of business.

158.    Finally, pursuant to their Surety Bond Program, in the ordinary course of business, the Debtors are required to provide Surety Bonds to certain third-party Obligees, including governmental units and other public agencies, to secure the Debtors' payment or performance of certain obligations in connection with utility deposits, tax permits, and various business licenses.  Each Debtor obligated under a Surety Bond has an Indemnity Agreement with the Surety that allows the Surety to potentially require such Debtor to either replace their Surety Bonds or post additional collateral under certain circumstances.  The Debtors estimate that as of the Petition Date, the total principal amount on all Surety Bonds is approximately $825,000.

---

[14]    The annual fee paid to USI in April 2020 was reduced by approximately $107,000 on account of commissions USI received from certain Insurers.

159.    Pursuant to the Surety Bond Program, the Debtors pay Surety Premiums based upon a fixed rate established and billed by each Obligee.  The Debtors estimate that the Surety Premiums total approximately $3,500 per year in the aggregate.  The Debtors do not believe any Surety Premiums are outstanding as of the Petition Date and do not expect any of the Surety Premiums will come due and payable during the Interim Period.

160.    To continue their business operations during these chapter 11 cases, the Debtors must be able to continue to provide financial and other assurances to Obligees in the form of Surety Bonds.  This requires the Debtors to maintain their existing Surety Bond Program, including the payment of Surety Bond Obligations as and when they come due, providing the Surety and any additional sureties with collateral, if required, renewing or potentially acquiring additional bonding capacity as needed in the ordinary course of their business, and executing other indemnity agreements, as needed, in connection with the Surety Bond Program.  Accordingly, I believe the Debtors should be permitted to continue the Surety Bond Program in the ordinary course of business, including providing new or additional surety bonds to third parties, and to pay any Surety Bond Obligations, as they come due, in the ordinary course of business, whether arising from the prepetition or postpetition period, throughout these chapter 11 cases.

161.    Based on the foregoing, I believe that the relief requested in the Insurance and Surety Bond Motion is in the best interests of the Debtors, their estates, and all other parties-in-interest and should be granted in all respects.

## M.    Schedules and Statements Extension Motion

162.    Pursuant to the *Emergency Motion of Debtors for Entry of an Order Extending Time to File Schedules and Statements and Rule 2015. Reports* (the "**Schedules and Statements Extension Motion**"), the Debtors request entry of an order extending the deadline

by which the Debtors must file their Schedules and Statements by 30 days, for a total of 44 days from the Petition Date, through and including December 16, 2020, without prejudice to the Debtors' ability to request additional extensions for cause shown.

163.    To prepare the Schedules and Statements, the Debtors must compile information from books, records, and documents across multiple information systems relating to a substantial number of claims, assets, leases, and contracts for each Debtor entity.  Accordingly, collection of the necessary information will require a significant expenditure of time and effort on the part of the Debtors and their employees.  Additionally, because numerous invoices related to prepetition goods and services have not yet been received and entered into the Debtors' accounting system, it may be some time before the Debtors have access to all of the information required to prepare the Schedules and Statements.  Given the amount of work entailed in completing the Schedules and Statements and the competing demands on the Debtors and their professionals to maintain business operations, the Debtors anticipate that they will require at least 46 additional days to do so.

164.    Moreover, the Debtors request that the Court grant an extension until the later of (i) 15 days after 341 Meeting and (ii) 45 days from the Petition Date, for the Debtors to either file their 2015.3 Reports, or file a motion with the Court seeking a modification of such reporting requirements for cause.

165.    The Debtors consist of 177 separate entities.  The Debtors have certain Non-Debtor Affiliates that are not publicly traded corporations in which there is a presumption that the Debtors hold a "substantial or controlling" equity interest (collectively, the "**Qualifying Entities**").  Thus, I believe that cause exists to extend the deadline for filing the Rule 2015.3 Reports for the Qualifying Entities as requested herein based on (a) the size and complexity of

the Debtors' businesses and (b) the substantial burdens imposed by compliance with Bankruptcy Rule 2015.3 in the early days of these chapter 11 cases.

166.    Accordingly, I believe that the relief requested in the Schedules and Statements Extension Motion is in the best interests of the Debtors' estates, their creditors, and all parties-in-interest, and should be granted in all respects.

**N.      Notice Motion**

167.    Pursuant to the *Emergency Motion of Debtors for an Order (I) Authorizing Debtors to (A) File a Consolidated Creditor Matrix and a Consolidated List of 30 Largest Unsecured Creditors, and (B) Redact Certain Personal Identification Information; (II) Modifying Requirement to File a List of Equity Security Holders; and (III) Approving Form and Manner of Notifying Creditors of Commencement of Chapter 11 Cases and Other Information* (the "**Notice Motion**"), the Debtors seek entry of an order (i) authorizing the Debtors to (a) file a Consolidated Creditor Matrix and Consolidated Top 30 Creditors List, and (b) redact certain personal identification information, (ii) modifying the requirement to file a list of and provide notice directly to the Debtors' equity security holders, and (iii) approving the form and manner of notifying creditors of the commencement of the chapter 11 cases and other information.

168.    I am advised that Bankruptcy Rule 1007(a) requires each debtor to file a separate mailing matrix, each containing names and addresses of all creditors, including individuals, as well as a separate list of top unsecured creditors for each debtor. Because the preparation of separate lists of creditors for each Debtor would be expensive, time consuming, and administratively burdensome, the Debtors request authority to file one Consolidated Creditor Matrix for all Debtors.  Further, because a significant number of creditors may be shared among the Debtors, the Debtors request authority to file the Consolidated Top 30 Creditors List for all Debtors, rather than file separate top 20 creditor lists for each Debtor.  I understand that the

Consolidated Top 30 Creditors List will help alleviate administrative burden, costs, and the possibility of duplicative service.

169.    I also believe that cause exists to authorize the Debtors to redact address information of the Debtors' current and former employees, the Debtors' current and former directors, and the Debtors' individual creditors, to the extent applicable, from the Consolidated Creditor Matrix and from the Debtors' lists of equity security holders because such information could be used to perpetrate identity theft.  Further the Debtors propose to provide upon request an unredacted version of the Consolidated Creditor Matrix and the lists of equity security holders to the Court, the Office of the United States Trustee for the Southern District of Texas, and counsel to the official committee of unsecured creditors should one be appointed in these chapter 11 cases.

170.    Furthermore, I am advised that Bankruptcy Rules 1007(a)(3) and 2002(d) require a debtor to (i) file a list of the debtor's equity security holders within fourteen (14) days of the petition date, and (ii) provide notice of, among other things, commencement of the chapter 11 case directly to such equity security holders.  CBL & Associates Properties, Inc. is a publicly-traded company with approximately 196 million common shares outstanding and does not maintain a list of its equity security holders in the ordinary course of business.  Accordingly, the preparation of such a list and the provision of such notices will be expensive, time consuming, and will be of little or no benefit to the Debtors' reorganization efforts.  Therefore, I believe that the modifications proposed in the Notice Motion are necessary and appropriate.

171.    Finally, I am advised that, in compliance with the requirements of Bankruptcy Rule 2002(a), of which I have been advised, the Debtors, through Epiq, their proposed claims and noticing agent, propose to serve the Notice of Commencement on all parties

entitled to notice of commencement of these chapter 11 cases, to advise them of the section 341 meeting of creditors.  I believe service of the Notice of Commencement on the Consolidated Creditor Matrix will not only prevent the Debtors' estates from incurring unnecessary costs associated with serving multiple notices to the parties listed on the Debtors' voluminous Consolidated Creditor Matrix, but will also preserve judicial resources and prevent creditor confusion through the efficient service of critical information.

172.    Based on the foregoing, I believe that the relief requested in the Notice Motion is in the best interests of the Debtors, their estates, and all other parties in interest and should be granted in all respects.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: November 2, 2020
       Boston, Massachusetts


                                        /s/ Mark A. Renzi
                                        _____

                                        Mark A. Renzi
                                        Managing Director
                                        Berkeley Research Group, LLC

**EXHIBIT A**

**Organizational Chart**

# UPPER TIER OWNERSHIP & KEY

1

**Colors**

- Owns Unencumbered Property
- Owns Property in Wells Fargo Borrowing Base
- Owns Property with Recourse Debt
- Owns Property with Non-recourse Debt

**Items**

- Non-member Manager
- Equity Ownership
- Property Name
- Note
- Debtor D

**Shapes**

- Third Party
- Non-JV Entity
- Joint Venture

**Abbreviations**

- CM—Chief Manager
- GP—General Partner
- MGP—Managing General Partner
- MM—Managing Member

**Credit Facility**

- Grantor G
- Issuer I
- Pledged Subsidiary S
- Pledgor P

**Ownership**

- CBL & Associates Limited Partnership
- CBL & Associates Management, Inc.
- Mortgage Holdings, LLC

**Bonds**

- Guarantor U
- Issuer I
- Limited Guarantor L

**General Notes**

1. Ownership assumed to be 100% unless otherwise noted.
2. Unless entity has only one member, ownership is assumed to be non-controlling unless otherwise noted.
3. CBL & Associates Management, Inc. owns various unencumbered parcels that have not been noted on this chart.
4. These charts exclude certain inactive subsidiaries of CBL & Associates Properties, Inc. that do not currently own assets or engage in business activity.



# CBL & ASSOCIATES LIMITED PARTNERSHIP
## SUBSIDIARIES



# CBL & ASSOCIATES LIMITED PARTNERSHIP
## SUBSIDIARIES



# CBL & ASSOCIATES LIMITED PARTNERSHIP
## SUBSIDIARIES



## CBL & ASSOCIATES LIMITED PARTNERSHIP SUBSIDIARIES



# CBL & ASSOCIATES LIMITED PARTNERSHIP
## SUBSIDIARIES

6



CBL & Associates Limited Partnership (DE)

**D P I**

---

**[D] [U] [S]** CBL/Kirkwood Mall, LLC (DE)

**[D]** CBL/Gulf Coast, LLC (FL)

**[D]** North Charleston Joint Venture II, LLC (DE)

**[D]** Asheville, LLC (NC)

**[D] [U] [G]** Kirkwood Mall Mezz LLC (DE)

**[D]** JG Gulf Coast Town Center LLC (OH)
Gulf Coast Town Center—Phase III—Land

**Asheville Mall CMBS, LLC (DE)**
Asheville Mall

CM

**[D] [U] [I]** Kirkwood Mall Acquisition LLC (DE)
Kirkwood Mall

**[D]** GCTC Peripheral IV, LLC (FL)
Gulf Coast Town Center—Peripheral IV—Land

**Northwoods Mall CMBS, LLC (DE)**
Northwoods Mall

CM

CM

**[D]** Alamance Crossing, LLC (NC)
Alamance Crossing—OPs

**[D]** Mid Rivers Land LLC (DE)
Mid Rivers Mall—Vacant Parcel

**[D]** Jefferson Mall Company II, LLC (DE)
Jefferson Mall—Self Development

**[D]** TX-Land Parcels, LLC (TX)
• Mall del Norte TX Outparcel
• Pearland Town Center—Outparcel TX Land LLC

**Alamance Crossing CMBS, LLC (DE)**
Alamance Crossing—East

**[D]** Mid Rivers Mall CMBS, LLC (DE)
Mid Rivers Mall

**Jefferson Mall CMBS, LLC (DE)**
Jefferson Mall

CM

CM

# CBL & ASSOCIATES LIMITED PARTNERSHIP SUBSIDIARIES

7



8

# CBL & ASSOCIATES LIMITED PARTNERSHIP SUBSIDIARIES



# CBL & ASSOCIATES LIMITED PARTNERSHIP
## SUBSIDIARIES



## MADISON JOINT VENTURE, LLC &
## CBL/J I, LLC SUBSIDIARIES



# CBL/J II, LLC & MORTGAGE HOLDINGS, LLC SUBSIDIARIES

11



# MORTGAGE HOLDINGS, LLC
## SUBSIDIARIES



12

CBL & Associates Limited Partnership (DE)

D
P
I

GP—99.9209%

MM—99.9%

GP—99.9%

D  U P

Mortgage Holdings, LLC (DE)

GP—99.9%

GP—99.92%

—0.0791%

—0.1%

—0.1%

—0.1%

—0.8%

D

CBL/Nashua Limited Partnership (NH)

D  U S

**Frontier Mall Associates Limited Partnership (WY)**

**Frontier Mall**

D  U S

**Turtle Creek Limited Partnership (MS)**

**Turtle Creek Mall**

D

Seacoast Shopping Center Limited Partnership (NH)

D

**Harford Mall Business Trust (MD)**

• **Harford Mall**
• **Harford Mall—Annex**

D

Southpark Mall, LLC (VA)

D  U S

**POM-College Station, LLC (TX)**

**Post Oak Mall & Phase III**

D

**Valley View Mall SPE, LLC (DE)**

**Valley View Mall**

**Southpark Mall CMBS, LLC (DE)**

**Southpark Mall**

CM



# MULTI-GP HOLDINGS, LLC
## SUBSIDIARIES

# MULTI-GP HOLDINGS, LLC
## SUBSIDIARIES



# CBL & ASSOCIATES MANAGEMENT, INC.
## SUBSIDIARIES



# CBL & ASSOCIATES MANAGEMENT, INC.
## SUBSIDIARIES



# CBL & ASSOCIATES MANAGEMENT, INC. SUBSIDIARIES



18

# CBL & ASSOCIATES LIMITED PARTNERSHIP
## 3RD PARTY



# CBL & ASSOCIATES LIMITED PARTNERSHIP
## 3RD PARTY



# CBL & ASSOCIATES MANAGEMENT, INC.
## 3RD PARTY

20



**Supplemental Key for this Chart only**

The Lewis Forrest Conner Family Trust

The Holland Ashley Conner Family Trust

# CBL & ASSOCIATES MANAGEMENT, INC.
# 3RD PARTY

21



# CBL & ASSOCIATES MANAGEMENT, INC.
## 3RD PARTY





**CBL/T-C, LLC**
**3RD PARTY**







# MISCELLANEOUS 3RD PARTY

MISCELLANEOUS
3RD PARTY

MISCELLANEOUS
3RD PARTY

26

Supplemental Key for this Chart only

CBL Gettysburg Member, LLC ⟶

Pleasant Lake-Skoien Investments, LLC ⟶

CBL & Associates Limited Partnership (DE)

D
P
I

CBL Gettysburg Member, LLC (DE)

Pleasant Lake-Skoien Investments, LLC (DE)

CBL Laredo Member, LLC (TX)

CBL Fremaux Member, LLC (DE)

29.8426%    29.8426%

MM—50%    MM—50%

MM—65%    MM—65%

Individual Retirement Account of Thomas Berlin, Equity Trust Company, custodian

El Portal Center LLC (DE)

1.0987%    1.0987%

35%

Horizon Group Properties, L.P. (DE)

Lawrence A. Friedman

19.0587%    19.0587%

Class B Member

Gettysburg Outlet Center Holding, LLC (DE)

Gettysburg Outlet Center, LLC (DE)

Outlet Shoppes at Gettysburg Phase II

Stirling-Levis, L.L.C. (DE)

Gettysburg Outlet Center GP, Inc. (DE)

99%

GP—1%

35%

Gettysburg Outlet Center, LP (PA)

Laredo Outlet JV, LLC (DE)

Fremaux Town Center JV, LLC (DE)

CM

Gettysburg Outlet Center CMBS, LLC (DE)

Outlet Shoppes at Gettysburg Phase I

Laredo Outlet Shoppes, LLC (DE)

Outlet Shoppes at Laredo

Fremaux Town Center SPE, LLC (DE)

Fremaux Town Center Phase I and II





# MISCELLANEOUS 3RD PARTY

28

MISCELLANEOUS
3RD PARTY

**Supplemental Key for this Chart only**

Montgomery Partners, L.P. ⟶

Cafaro Governor's Square Partnership ⟶

CBL & Associates Limited Partnership (DE)

D
P
I

CBL & Associates Management, Inc. (DE)

CBL/GP VI, Inc. (TN)

CBL/Kentucky Oaks, LLC (DE)

Anthony M. Cafaro, Trustee of the Revocable Family Trust

99%

GP—1%

50%   GP—10%

Montgomery Partners, L.P. (TN)

The Marion Plaza, Inc. (DE)

William A. Cafaro, Anthony M. Cafaro, Jr., Mark J. Beck, Co-Trustees of the Anthony M. Cafaro Irrevocable Trust

47.5%   50%

Donald J. DeSalvo

Cafaro Governor's Square Partnership (OH)

MGP—47.5%   MGP—50%

MGP—30%   GP—10%

5%

Governor's Square Company (OH)

**Governor's Square**

Governor's Square Company IB (OH)

**Governor's Square Plaza**

Kentucky Oaks Mall Company (OH)

**Kentucky Oaks Mall**

**EXHIBIT B**

**Restructuring Support Agreement**

THIS RESTRUCTURING SUPPORT AGREEMENT IS NOT AN OFFER OR ACCEPTANCE WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE.  ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE.  NOTHING CONTAINED IN THIS RESTRUCTURING SUPPORT AGREEMENT SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE AGREEMENT EFFECTIVE DATE ON THE TERMS DESCRIBED HEREIN, DEEMED BINDING ON ANY OF THE PARTIES HERETO.

THIS RESTRUCTURING SUPPORT AGREEMENT IS THE PRODUCT OF SETTLEMENT DISCUSSIONS AMONG THE PARTIES THERETO.  ACCORDINGLY, THIS RESTRUCTURING SUPPORT AGREEMENT IS PROTECTED BY RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND ANY OTHER APPLICABLE STATUTES OR DOCTRINES PROTECTING THE USE OR DISCLOSURE OF CONFIDENTIAL SETTLEMENT DISCUSSIONS.

THIS RESTRUCTURING SUPPORT AGREEMENT DOES NOT PURPORT TO SUMMARIZE ALL OF THE TERMS, CONDITIONS, REPRESENTATIONS, WARRANTIES, AND OTHER PROVISIONS WITH RESPECT TO THE TRANSACTIONS DESCRIBED HEREIN, WHICH TRANSACTIONS WILL BE SUBJECT TO THE COMPLETION OF DEFINITIVE DOCUMENTATION INCORPORATING THE TERMS SET FORTH HEREIN AND THE CLOSING OF ANY TRANSACTION SHALL BE SUBJECT TO THE TERMS AND CONDITIONS SET FORTH IN SUCH DEFINITIVE DOCUMENTATION AND THE APPROVAL RIGHTS OF THE PARTIES SET FORTH HEREIN AND IN SUCH DEFINITIVE DOCUMENTATION.

## *RESTRUCTURING SUPPORT AGREEMENT*

This RESTRUCTURING SUPPORT AGREEMENT (including all exhibits, annexes, and schedules hereto in accordance with Section 13.02, collectively, this "**Agreement**") is made and entered into as of August 18, 2020 (the "**Execution Date**"), by and among the following parties (each of the following described in sub-clauses (i) and (ii) of this preamble, collectively, the "**Parties**"):[1]

    i.    CBL & Associates Properties, Inc., a corporation incorporated under the Laws of Delaware (the "**Company**"), and each of its Affiliates listed on **Exhibit A** to this Agreement that has executed and delivered counterpart signature pages to this Agreement to counsel to the Consenting Noteholders (collectively and together with the Company, the "**Company Parties**"); and

---

[1]   Capitalized terms used but not defined in the preamble and recitals to this Agreement have the meanings ascribed to them in Section 1.

ii.  the undersigned beneficial owners and/or investment advisors or managers of discretionary funds, accounts, or other entities for the holders or beneficial owners of the Company Claims that have executed and delivered counterpart signature pages to this Agreement, a Joinder, or a Transfer Agreement to counsel to the Company Parties (collectively, the "**Consenting Noteholders**").

## RECITALS

**WHEREAS**, the Company Parties and the Consenting Noteholders have in good faith and at arm's length negotiated or been apprised of certain restructuring and recapitalization transactions with respect to the Company Parties' capital structure on the terms set forth in this Agreement and as specified in the term sheet attached as **Exhibit B** hereto (the "**Restructuring Term Sheet**" and, such transactions as described in this Agreement and the Restructuring Term Sheet, collectively, the "**Restructuring Transactions**");

**WHEREAS**, the Company Parties will implement the Restructuring Transactions through the commencement by the Company Parties of voluntary cases under chapter 11 of the Bankruptcy Code in the Bankruptcy Court (the cases commenced, the "**Chapter 11 Cases**"); and

**WHEREAS**, the Parties have agreed to take certain actions in support of the Restructuring Transactions on the terms and conditions set forth in this Agreement and the Restructuring Term Sheet;

**NOW, THEREFORE**, in consideration of the covenants and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each of the Company Parties (jointly and severally) and each of the Consenting Noteholders (severally but not jointly), intending to be legally bound hereby, agrees as follows:

## AGREEMENT

**Section 1.**   *Definitions and Interpretation.*

1.01.   <u>Definitions</u>.  Capitalized terms used but not defined in this Agreement have the meanings given to such terms in the Restructuring Term Sheet attached hereto.  Additionally, the following terms shall have the following definitions:

"**2023 Missed Payment**" has the meaning set forth in <u>Section 4.02(b)</u>.

"**2023 Notes**" means CBL Limited Partnership's 5.25% Senior Notes due 2023, issued in the aggregate principal amount of $450 million, pursuant to the Indenture.

"**2026 Missed Payment**" has the meaning set forth in <u>Section 4.02(b)</u>.

"**2026 Notes**" means CBL Limited Partnership's 5.95% Senior Notes due 2026, issued in the aggregate principal amount of $625 million, pursuant to the Indenture.

"**Affiliate**" means, with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with, such Person as of the date on which, or at any time during the period for which, the determination of affiliation is being made (including any affiliated funds of such Person).  For purposes of this definition, the term "control" (including the correlative meanings of the terms "controlled by" and "under common control with"), as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management policies of such Person, whether through the ownership of voting securities, by contract or otherwise, provided that, for the avoidance of doubt, with respect to the Company Parties, Affiliates shall not include any of the Company Parties' joint venture partners.

"**Agreement**" has the meaning set forth in the preamble.

"**Agreement Effective Date**" has the meaning set forth in Section 2.

"**Agreement Effective Period**" means, with respect to a Party, the period from the Agreement Effective Date to the Termination Date applicable to that Party.

"**Akin Gump**" means Akin Gump Strauss Hauer and Feld LLP.

"**Alternative Restructuring Proposal**" means any plan, inquiry, proposal, offer, bid, term sheet, discussion, or agreement with respect to a sale, disposition, new-money investment, restructuring, reorganization, merger, amalgamation, acquisition, consolidation, dissolution, debt investment, equity investment, liquidation, asset sale, share issuance, tender offer, recapitalization, plan of reorganization, share exchange, business combination, joint venture or similar transaction involving any one or more Company Parties, or any Affiliates of the Company Parties, or the debt, equity, or other interests in any one or more Company Parties or any Affiliates of the Company Parties, in each case other than the Restructuring Transactions.

"**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended.

"**Bankruptcy Court**" means the United States Bankruptcy Court administering the Chapter 11 Cases, in such jurisdiction as determined with the reasonable consent of the Required Consenting Noteholders and the Company Parties.

"**Business Day**" means any day other than a Saturday, Sunday, or a U.S. federal holiday as recognized by banking institutions in the City of New York.

"**Causes of Action**" means any action, Claim, cause of action, controversy, demand, right, action, lien, indemnity, existing equity interest, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, license, and franchise of any kind or character whatsoever, whether known, unknown, contingent or noncontingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or

unsecured, assertable directly or derivatively, in contract or in tort, in law or in equity, or pursuant to any other theory of law.

"**CBL Limited Partnership**" means CBL & Associates Limited Partnership, a Delaware limited partnership.

"**Chapter 11 Cases**" has the meaning set forth in the recitals to this Agreement.

"**Claim**" has the meaning ascribed to it in section 101(5) of the Bankruptcy Code.

"**Common Equity Interests**" means the common stock of the Company and the common units, and all classes of special common units of the CBL Limited Partnership.

"**Company**" has the meaning set forth in the preamble.

"**Company Claims**" means any Claim against a Company Party, including the Notes Claims.

"**Company Interests**" means any existing equity interest in the Company Parties.

"**Company Parties**" has the meaning set forth in the preamble.

"**Confirmation Order**" means the order of the Bankruptcy Court confirming the Plan pursuant to Section 1129 of the Bankruptcy Code, which Confirmation Order shall be in accordance with this Agreement and the Definitive Documentation.

"**Consenting Noteholders**" has the meaning set forth in the preamble.

"**Definitive Documentation**" has the meaning set forth in <u>Section 3</u>.

"**Disclosure Statement**" means the related disclosure statement with respect to the Plan, which Disclosure Statement shall be in accordance with this Agreement and the Definitive Documentation.

"**Entity**" has the meaning set forth in section 101(15) of the Bankruptcy Code.

"**Execution Date**" has the meaning set forth in the preamble.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended.

"**Final Order**" means an order or judgment of the Bankruptcy Court (or any other court of competent jurisdiction) entered by the Clerk of the Bankruptcy Court (or such other court) on the docket in the Chapter 11 Cases (or the docket of such other court), which has not been modified, amended, reversed, vacated or stayed and as to which (A) the time to appeal, petition for certiorari, or move for a new trial, stay, reargument or rehearing has expired and as to which no appeal, petition for certiorari or motion for new trial, stay, reargument or rehearing shall then be pending

4

or (B) if an appeal, writ of certiorari, new trial, stay, reargument or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court (or other court of competent jurisdiction) shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, stay, reargument or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari or move for a new trial, stay, reargument or rehearing shall have expired, as a result of which such order shall have become final in accordance with Rule 8002 of the Federal Rules of Bankruptcy Procedure; provided that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Federal Rules of Bankruptcy Procedure, may be filed relating to such order, shall not cause an order not to be a Final Order.

"**First Day Pleadings**" means the first-day pleadings that the Company Parties determine, with the reasonable consent of the Required Consenting Noteholders, are necessary or desirable to file.

"**Governmental Entity**" means any U.S. or non-U.S. international, regional, federal, state, municipal or local governmental, judicial, administrative, legislative or regulatory authority, entity, instrumentality, agency, department, commission, court, or tribunal of competent jurisdiction (including any branch, department or official thereof).

"**Indenture**" means that certain Indenture, dated as of November 26, 2013, among CBL Limited Partnership, as issuer, the Company, as limited guarantor, and the Indenture Trustee, as amended, modified or supplemented by that certain First Supplemental Indenture dated as of November 26, 2013 by and among the CBL Limited Partnership, the Company, and the Indenture Trustee, the Second Supplemental Indenture dated as of December 13, 2016 by and among the CBL Limited Partnership, the Company and the Indenture Trustee and the Third Supplemental Indenture dated as of January 30, 2019 by and among CBL Limited Partnership, the Company, the subsidiary guarantors of the Company party thereto (the "**Subsidiary Guarantors**"), and the Indenture Trustee, pursuant to which the Notes are outstanding.

"**Indenture Trustee**" means Delaware Trust Company, as successor trustee under the Indenture.

"**Law**" means any law, constitution, statute, rule, regulation, ordinance, code, judgment, order, decree, treaty, convention, governmental directive or other legally enforceable requirement, U.S. or non-U.S., of any Governmental Entity, including common law.

"**Lien**" means any mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), charge, or other security interest or preferential arrangement in the nature of a security interest of any kind or nature whatsoever (including any conditional sale or other title retention agreement, any easement, right of way or other encumbrance on title to real property, and any financing lease having substantially the same.

"**New Equity Interests**" has the meaning set forth in the Restructuring Term Sheet.

"**New Organizational Documents**" means all organizational and governance documents for the reorganized Company and its direct and indirect subsidiaries.

"**Non-Consenting Noteholder**" has the meaning set forth in Section 12(b).

"**Notes**" means, collectively, the 2023 Notes, the 2024 Notes and the 2026 Notes.

"**Notes Claims**" means any Claim against a Company Party arising under, derived from, based on, or related to the Notes or the Indenture.

"**Person**" means an individual, firm, corporation (including any non-profit corporation), partnership, limited liability company, joint venture, association, trust, Governmental Entity or other entity or organization.

"**Petition Date**" means the date on which the Company Parties commence the Chapter 11 Cases.

"**PJT Partners**" means PJT Partners LP, as financial advisor to the Consenting Noteholders.

"**Plan**" means the joint chapter 11 plan of reorganization filed by the Company Parties in the Chapter 11 Cases to implement the Restructuring Transactions in accordance with this Agreement and the Definitive Documentation.

"**Plan Effective Date**" means the date on which all conditions to consummation of the Plan have been satisfied in full or waived, in accordance with the terms of the Plan, and the Plan becomes effective.

"**Plan Supplement**" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan that will be filed by the Company Parties with the Bankruptcy Court in accordance with this Agreement and the Definitive Documentation.

"**Preferred Equity Interests**" means the preferred stock of the Company and the preferred units of the CBL Limited Partnership.

"**Qualified Marketmaker**" means an entity that (a) holds itself out to the public or the applicable private markets as standing ready in the ordinary course of business to purchase from customers and sell to customers Company Claims (or enter with customers into long and short positions in Company Claims), in its capacity as a dealer or market maker in Company Claims and (b) is, in fact, regularly in the business of making a market in claims against issuers or borrowers (including debt securities or other debt).

"**Required Consenting Noteholders**" means, as of the relevant date, Consenting Noteholders that collectively hold at least 75% of the aggregate outstanding principal amount of the Notes held by all such Consenting Noteholders.

"**Restructuring Term Sheet**" has the meaning set forth in the recitals.

"**Restructuring Transactions**" has the meaning set forth in the recitals.

"**Section 16 Officer**" means any employee of the Company Parties who is subject to the disclosure requirements of Section 16(a) of the U.S. Securities Exchange Act of 1934, as amended.

"**Securities Act**" means the Securities Act of 1933, as amended.

"**Solicitation Materials**" means all solicitation materials in respect of the Plan together with the Disclosure Statement, which Solicitation Materials shall be in accordance with this Agreement and the Definitive Documentation.

"**Termination Date**" means the date on which termination of this Agreement as to a Party is effective in accordance with Sections 11.01, 11.02, 11.03, or 11.04.

"**Transfer**" means to sell, resell, reallocate, use, pledge, assign, transfer, hypothecate, participate, donate or otherwise encumber or dispose of, directly or indirectly (including through derivatives, options, swaps, pledges, forward sales or other transactions).

1.02.   Interpretation.  For purposes of this Agreement:

(a)      in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender;

(b)      capitalized terms defined only in the plural or singular form shall nonetheless have their defined meanings when used in the opposite form;

(c)      unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions;

(d)      unless otherwise specified, any reference herein to an existing document, schedule, or exhibit shall mean such document, schedule, or exhibit, as it may have been or may be amended, restated, supplemented, or otherwise modified from time to time; provided that any capitalized terms herein which are defined with reference to another agreement, are defined with reference to such other agreement as of the date of this Agreement, without giving effect to any termination of such other agreement or amendments to such capitalized terms in any such other agreement following the date hereof;

(e)      unless otherwise specified, all references herein to "Sections" are references to Sections of this Agreement;

7

(f)      the words "herein," "hereof," and "hereto" refer to this Agreement in its entirety rather than to any particular portion of this Agreement;

(g)      captions and headings to Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Agreement;

(h)      references to "shareholders", "directors", and/or "officers" shall also include "members", "partners", and/or "managers", as applicable, as such terms are defined under the applicable limited liability company or partnership Laws;

(i)      the use of "include" or "including" is without limitation, whether stated or not;

(j)      the phrase "counsel to the Company Parties" refers in this Agreement to counsel specified in Section 13.10(a);

(k)       the phrase "counsel to the Consenting Noteholders" refers in this Agreement to counsel specified in Section 13.10(b); and

(l)      the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.

**Section 2.** *Effectiveness of this Agreement.*  This Agreement shall become effective and binding upon each of the Parties at 12:01 a.m., prevailing New York local time, on the date on which all of the following conditions have been satisfied or waived in accordance with this Agreement (the "**Agreement Effective Date**"):

(a)      each of the Company Parties shall have executed and delivered counterpart signature pages of this Agreement to counsel to the Consenting Noteholders;

(b)      each of the Consenting Noteholders, who hold in the aggregate at least 54% of the aggregate outstanding principal amount of Notes shall have executed and delivered counterpart signature pages of this Agreement to counsel to the Company Parties; and

(c)      the Company Parties shall have timely paid all (i) invoiced and outstanding fees and expenses of Akin Gump, one local counsel, and PJT Partners (to the extent that such advisors are for the ad hoc group of Consenting Noteholders and not any individual Consenting Noteholder) and (ii) reasonable and documented out of pocket expenses of individual Consenting Noteholders (including fees and expenses of external counsel) not to exceed $250,000 in the aggregate.

**Section 3.** *Definitive Documentation.*

3.01.   The documents related to or otherwise utilized to implement or effectuate the Restructuring Transactions (collectively, the "**Definitive Documentation**") shall include, without limitation, the following:  (A) the Plan and its exhibits, ballots, and solicitation procedures; (B) the Confirmation Order; (C) the Disclosure Statement; (D) the order of the Bankruptcy Court approving the Disclosure Statement and the other Solicitation Materials; (E) the First Day

Pleadings and all orders sought pursuant thereto; (F) the Plan Supplement; (G) the Warrants and any related documentation; (H) the documentation issuing and setting forth the rights, preferences and privileges of the New Equity Interests; (I) the Registration Rights Agreement; (J) the New Organizational Documents; (K) the New Notes indenture and any related documentation; and (L) such other agreements and documentation reasonably desired or necessary to consummate and document the transactions contemplated by this Agreement, the Restructuring Term Sheet, and the Plan.

3.02.    Upon completion, the Definitive Documentation and every other document, deed, agreement, filing, notification, letter or instrument related to the Restructuring Transactions shall contain terms, conditions, representations, warranties, and covenants consistent with the terms of this Agreement, as they may be modified, amended, or supplemented in accordance with <u>Section 12</u>.  Further, the Definitive Documentation not executed or in a form attached to this Agreement as of the Execution Date shall otherwise be in form and substance reasonably acceptable to the Company Parties and, the Required Consenting Noteholders; <u>provided</u>, <u>however</u>, that, notwithstanding the foregoing, the New Organizational Documents shall be acceptable only to the Required Consenting Noteholders; <u>provided</u>, <u>further</u>, <u>however</u>, that the Required Consenting Noteholders will consult with the Company Parties regarding such New Organizational Documents, <u>provided</u>, that nothing in the New Organizational Documents shall adversely impact the economic recovery of the holders of Common Equity Interests as set forth in the Restructuring Term Sheet.

**Section 4.**    *Commitments of the Consenting Noteholders.*

4.01.    <u>General Commitments, Forbearances, and Waivers.</u>

(a)    During the Agreement Effective Period, each Consenting Noteholder severally, and not jointly, agrees to:

(i)    support the Restructuring Transactions and vote and exercise any powers or rights available to it (including in any shareholders', or creditors' meeting or in any process requiring voting or approval to which they are legally entitled to participate) in each case in favor of any matter requiring approval to the extent reasonably necessary to implement the Restructuring Transactions, including, but not limited to, supporting any request by the Company Parties for further interest rate forbearance periods in advance of the commencement of the Chapter 11 Cases;

(ii)    use commercially reasonable efforts to give, subject to applicable Laws, any notice, order, instruction, or direction to the Indenture Trustee necessary to give effect to the Restructuring Transactions; and

(iii)    negotiate in good faith and use commercially reasonable efforts to execute and implement the Definitive Documentation that are consistent with this Agreement to which it is required to be a party;

9

(b)     During the Agreement Effective Period, subject to applicable Laws and as otherwise set forth in this Agreement, each Consenting Noteholder severally, and not jointly, agrees that it shall not directly or indirectly:

(i)     object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the Restructuring Transactions;

(ii)     propose, file, support, or vote for any Alternative Restructuring Proposal;

(iii)     file any motion, pleading, or other document with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is not materially consistent with this Agreement or the Plan;

(iv)     initiate, or have initiated on its behalf, any litigation or proceeding which would materially or unreasonably delay, impede, or interfere with the implementation or consummation of the Restructuring Transactions, other than to enforce this Agreement or any Definitive Documentation or as otherwise permitted under this Agreement; or

(v)     object to, delay, impede, or take any other action to interfere with the Company Parties' or their Affiliates' ownership and possession of their assets, wherever located, or interfere with the automatic stay arising under section 362 of the Bankruptcy Code; provided, however that nothing in this Agreement shall limit the right of any Party to exercise any right or remedy provided under this Agreement, the Confirmation Order, or any Definitive Documentation.

4.02.   Commitments with Respect to Chapter 11 Cases.

(a)     During the Agreement Effective Period, each Consenting Noteholder that is entitled to vote to accept or reject the Plan pursuant to its terms agrees that it shall, subject to receipt by such Consenting Noteholder, whether before or after the commencement of the Chapter 11 Cases, of the Solicitation Materials:

(i)     vote each of its Company Claims to accept the Plan by delivering its duly executed and completed ballot accepting the Plan on a timely basis following the commencement of the solicitation of the Plan and its actual receipt of the Solicitation Materials and the ballot that meet the requirements of Sections 1125 and 1126 of the Bankruptcy Code; provided, however, that the consent or votes of the Consenting Noteholders shall be immediately revoked and deemed null and void ab initio upon the occurrence of the Termination Date (other than a Termination Date as a result of the occurrence of the Plan Effective Date);

(ii)     to the extent it is permitted to elect whether to opt out of the releases set forth in the Plan, elect not to opt out of the releases set forth in the Plan by timely delivering its duly executed and completed ballot(s) indicating such election; and

(iii)     not change, withdraw, amend, or revoke (or cause to be changed, withdrawn, amended, or revoked) any vote or election referred to in clauses (i) and (ii) above; provided, however, that nothing in this Agreement shall prevent any Party from withholding,

10

amending or revoking (or causing the same) its timely consent or vote with respect to the Plan if this Agreement has been terminated in accordance with its terms with respect to such Party (other than a Termination Date as a result of the occurrence of the Plan Effective Date).

(b)       During the Agreement Effective Period, each Consenting Noteholder, in respect of each of its Company Claims, will not directly or indirectly object to, delay, impede, or take any other action to interfere with any motion or other pleading or document filed by a Company Party in the Bankruptcy Court that is contemplated by and in accordance with this Agreement.

4.03.    <u>Waiver of Prior Events of Default</u>.  The Consenting Noteholders acknowledge and agree that each of the Events of Default (as such term is defined under the Indenture) under the Indenture resulting from the failure by the Company to make each of the payments of (i) the interest payment originally due and payable on June 1, 2020 for the 2023 Notes (the "**2023 Missed Payment**") and (ii) the interest payment originally due and payable on June 15, 2020 for the 2026 Notes (the "**2026 Missed Payment**") are no longer continuing under the Indenture as a result of the Company making each of the 2023 Missed Payment and the 2026 Missed Payment in full on August 5, 2020.  Further, in the event that either the Indenture Trustee or other holders of the 2023 Notes or 2026 Notes, as applicable, take any action to declare either or both of 2023 Notes or the 2026 Notes immediately due and payable pursuant to Section 502 under the Indenture, solely due to either or both of Events of Default (as such term is defined under the Indenture) under the Indenture resulting from the 2023 Missed Payment or 2026 Missed Payment, the Consenting Noteholders agree (solely to the extent permitted under the Indenture) to rescind and cancel any such acceleration(s); <u>provided</u>, <u>however</u>, that in no event shall the Consenting Noteholders be required to provide an indemnity or bear responsibility for any out of pocket costs related to any such rescission and cancellation.

4.04.    <u>No Liabilities</u>.  Notwithstanding any other provision in this Agreement, including this <u>Section 4</u>, nothing in this Agreement shall require any Consenting Noteholder to incur any expenses, liabilities or other obligations, or agree to any commitments, undertakings, concessions, indemnities or other arrangements that could result in expenses, liabilities or other obligations to any Consenting Noteholder.  Notwithstanding the immediately preceding sentence, nothing in this <u>Section 4.04</u> shall serve to limit, alter or modify any Consenting Noteholder's express obligations under the terms of this Agreement.

**Section 5.       *Additional Provisions Regarding the Consenting Noteholders' Commitments.***
Notwithstanding anything contained in this Agreement, nothing in this Agreement shall: (a) subject to any confidentiality obligations set forth in the Indenture, this Agreement or in any confidentiality agreement entered into by a Company Party and the Consenting Noteholders, or the advisors to the Consenting Noteholders, affect the ability of any Consenting Noteholder to consult with any other Consenting Noteholder, the Company Parties, or any other party in interest in the Chapter 11 Cases (including any official committee and the United States Trustee); (b) impair or waive the rights of any Consenting Noteholder to assert or raise any objection permitted under this Agreement in connection with the Restructuring Transactions; (c) prevent any Consenting Noteholder from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement; (d) other than as may be required by

a court of competent jurisdiction, including the Bankruptcy Court, require any Consenting Noteholder to provide any information that it determines, in its sole discretion, to be sensitive or confidential; (e) obligate a Consenting Noteholder to deliver a vote to support the Plan or prohibit a Consenting Noteholder from withdrawing such vote, in each case from and after the Termination Date (other than a Termination Date as a result of the occurrence of the Plan Effective Date); provided, however, that upon the withdrawal of any such vote after the Termination Date (other than a Termination Date as a result of the occurrence of the Plan Effective Date), such vote shall be deemed null and void *ab initio* and such Consenting Noteholder shall have the opportunity to change its vote; (f) (i) prevent any Consenting Noteholder from taking any action which is required by applicable Law or (ii) require any Consenting Noteholder to take any action which is prohibited by applicable Law or to waive or forego the benefit of any applicable legal/professional privilege; (g) prevent any Consenting Noteholder by reason of this Agreement or the Restructuring Transactions from making, seeking, or receiving any regulatory filings, notifications, consents, determinations, authorizations, permits, approvals, licenses, or the like; or (h) prohibit any Consenting Noteholder from taking any action that is not inconsistent with this Agreement.

**Section 6.**     *Commitments of the Company Parties.*

6.01.   <u>Affirmative Commitments</u>.  Except as set forth in <u>Section 7</u>, during the Agreement Effective Period, the Company Parties agree to:

(a)     support and take all steps reasonably necessary and desirable to consummate the Restructuring Transactions in accordance with this Agreement, including the applicable milestones set forth in the Restructuring Term Sheet (the "**Milestones**"), provided that, notwithstanding anything to the contrary in this Agreement, nothing herein shall be deemed an approval by the Company to commence the Chapter 11 Cases, for which separate board approval shall be required;

(b)     support and take all steps reasonably necessary and desirable to facilitate solicitation of the Plan in accordance with this Agreement and the Milestones;

(c)     use commercially reasonable efforts to obtain entry of the Confirmation Order and to cause the Confirmation Order to become a Final Order;

(d)     to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Plan or the Restructuring Transactions contemplated herein, use commercially reasonable efforts to negotiate in good faith with the Required Consenting Noteholders in an effort to agree to appropriate additional or alternative provisions or alternative implementation mechanics to address any such impediment;

(e)     use commercially reasonable efforts to obtain any and all required regulatory (including self-regulatory) and/or third-party approvals for the Restructuring Transactions;

(f)     negotiate in good faith and use commercially reasonable efforts to execute and deliver the Definitive Documentation and any other required agreements to effectuate and consummate the Restructuring Transactions as contemplated by this Agreement;

(g)     to the extent the Company Parties receive any Joinders or Transfer Agreements, notify the Consenting Noteholders of such Joinders and Transfer Agreements as soon as practicable after receiving such Joinders or Transfer Agreements;

(h)     provide draft copies of all substantive motions, documents, and other pleadings to be filed in the Chapter 11 Cases to counsel to the Consenting Noteholders if reasonably practicable at least two (2) Business Days prior to the date when the Company Parties intend to file such documents, and, without limiting any approval rights set forth in this Agreement, consult in good faith with counsel to the Consenting Noteholders regarding the form and substance of any such proposed filing; notwithstanding the foregoing, in the event that not less than two (2) Business Days' notice is not reasonably practicable under the circumstances, the Company Parties shall provide draft copies of any such motions, documents, or other pleadings to counsel to the applicable Consenting Noteholders as soon as otherwise reasonably practicable before the date when the Company intends to file any such motion, documents, or other pleading;

(i)     subject to any confidentiality agreements between the Company and the Consenting Noteholders and their advisors, provide, and direct their employees, officers, advisors, and other representatives to provide, to each of the Consenting Noteholders, and each of their respective legal and financial advisors, (i) reasonable access to the management and advisors of the Company Parties on reasonable advance notice to such persons and without disruption to the operation of the Company Parties' business, and (ii) such other information as reasonably requested by the Consenting Noteholders or their respective legal and financial advisors;

(j)     timely file a formal objection to any motion filed with the Bankruptcy Court by a third party seeking the entry of an order, (i) directing the appointment of a trustee or examiner (with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code), (ii) converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, or (iii) dismissing the Chapter 11 Cases;

(k)     inform counsel to the Consenting Noteholders as soon as reasonably practicable after becoming aware of: (i) any notice of any commencement of any involuntary insolvency proceedings, legal suit for payment of debt or securement of security from or by any person in respect of any Company Party; (ii) a breach of this Agreement (including a breach by any Company Party); and (iii) any representation or statement made or deemed to be made by them under this Agreement which is or proves to have been materially incorrect or misleading in any material respect when made or deemed to be made;

(l)     upon request of the Required Consenting Noteholders, inform Akin Gump and PJT Partners as to: (i) the material business and financial performance of the Company Parties and each of its and their direct and indirect subsidiaries, (ii) the status and progress of the Restructuring Transactions, including progress in relation to negotiations of the Definitive Documents and the

13

status of any negotiations with other stakeholders, and (iii) the status of obtaining any necessary or desirable authorizations (including any consents) from any stakeholder or joint venture partner, any competent judicial body, governmental authority, banking, taxation, supervisory, or regulatory or self-regulatory) body or any stock exchange;

(m)     use commercially reasonable efforts to maintain the good standing of all Company Parties and any joint ventures or other entity in which any Company Party has an equity interest in under the Laws of the state or other jurisdiction in which they are incorporated or organized, provided, however, that the Company Parties' obligations pursuant to this section 6.01(l) shall only apply if, and to the extent, a Company Party has authority to maintain such status per the terms of the joint venture or entity agreement;

(n)     timely pay all fees and expenses as set forth in <u>Section 13.23</u> of this Agreement; provided that the Company Parties shall not be responsible for any fees incurred after the termination of this Agreement (other than with respect to fees and expenses incurred after the termination of this Agreement due to the consummation of the Plan on the Plan Effective Date); and

(o)     timely file a formal objection to any motion filed with the Bankruptcy Court by a third party seeking the entry of an order modifying or terminating the Company Parties' exclusive right to file and/or solicit acceptances of a plan of reorganization, as applicable.

6.02.   <u>Negative Commitments</u>.  Except as set forth in <u>Section 7</u>, during the Agreement Effective Period, each of the Company Parties shall not directly or indirectly:

(a)     object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the Restructuring Transactions;

(b)     take any action (i) that is inconsistent in any material respect with the Restructuring Transactions described in this Agreement or the Plan, (ii) is intended to frustrate or impede approval, implementation and consummation of the Restructuring Transactions described in this Agreement or the Plan, or (iii) would have the effect of frustrating or impeding approval, implementation and consummation of the Restructuring Transactions described in this Agreement or the Plan;

(c)     modify the Plan, in whole or in part, in a manner that is not consistent with this Agreement in all material respects;

(d)     file any motion, pleading, or Definitive Documentation with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is not materially consistent with this Agreement (including the consent rights of the Required Consenting Noteholders set forth herein as to the form and substance of such motion, pleading or Definitive Document) or the Plan; or

(e)     seek or solicit any Alternative Restructuring Proposal.

14

**Section 7.**          *Additional Provisions Regarding Company Parties' Commitments.*

7.01.     Notwithstanding anything to the contrary in this Agreement, nothing in this Agreement shall require a Company Party or the board of directors, board of managers, or similar governing body of a Company Party, upon advice of external counsel, to continue performing under this Agreement, to take any action or to refrain from taking any action with respect to the Restructuring Transactions to the extent taking or failing to take such action would cause such Company Party or the board of directors, board of managers or similar governing body of a Company Party to violate applicable Law or its fiduciary obligations under applicable Law, and any such action or inaction pursuant to this Section 7.01 shall not be deemed to constitute a breach of this Agreement. At all times prior to the date on which the Company Parties enter into any definitive agreement in respect of an Alternative Restructuring Proposal that a majority of the board of directors, board of managers or similar governing body of a Company Party determines in good faith consistent with its fiduciary duties, after receiving advice from external counsel, is a proposal that represents a higher or otherwise better recovery to the Company's stakeholders than the Restructuring Transactions contemplated herein and in the Restructuring Term Sheet, the Company Parties shall (x) provide to Akin Gump and PJT Partners a copy of any written offer or proposal (and notice and a description of any oral offer or proposal) for such Alternative Restructuring Proposal, in each case, identifying the Person making such Alternative Restructuring Proposal and specifying in detail the material terms and conditions of such Alternative Restructuring Proposal within two (2) Business Day of the Company Parties' or their advisors' receipt of such offer or proposal and (y) provide such information to Akin Gump and PJT Partners regarding such discussions (including copies of any materials provided to such parties hereunder) as necessary to keep Akin Gump and PJT Partners contemporaneously informed as to the status and substance of such discussions.  The Company Parties shall have first exercised their right in accordance with Section 11.02(c) of this Agreement to declare a termination event prior to the date on which the Company Parties enter into a definitive agreement in respect of such an Alternative Restructuring Proposal or make a public announcement regarding their intention to do so.  Upon any determination by any Company Party to exercise a fiduciary out, the other Parties to this Agreement shall be immediately and automatically relieved of any obligation to comply with their respective covenants and agreements herein in accordance with Section 11.05 hereof.

7.02.     Nothing in this Agreement shall:  (a) impair or waive the rights of any Company Party to assert or raise any objection permitted under this Agreement in connection with the Restructuring Transactions; or (b) prevent any Company Party from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement.

**Section 8.**          *Transfer of Interests and Securities.*

8.01.     During the Agreement Effective Period, no Consenting Noteholder shall Transfer any ownership (including any beneficial ownership as defined in the Rule 13d-3 under the Exchange Act) in any Company Claims, in whole or in part, to any affiliated or unaffiliated party, including any party in which it may hold a direct or indirect beneficial interest, unless:  either (i) the transferee executes and delivers to counsel to the Company Parties, at or before the time of the proposed Transfer, either (x) a transfer agreement in the form attached here to as Exhibit C (each,

15

a "**Transfer Agreement**") or (y) a joinder in the form attached hereto as Exhibit D (each, a "**Joinder**") or (ii) the transferee is a Consenting Noteholder or an affiliate thereof and the transferee provides notice of such Transfer (including the amount and type of Company Claim Transferred) to counsel to the Consenting Noteholders by the close of business on the second Business Day following such Transfer.

8.02.   Upon compliance with the requirements of Section 8.01, the transferor shall be deemed to relinquish its rights (and be released from its obligations) under this Agreement to the extent of the rights and obligations in respect of such transferred Company Claims.  With respect to Company Claims held by the relevant transferee upon consummation of a Transfer, such transferee is deemed to make all of the representations and warranties of a Consenting Noteholder and undertake all obligations relevant to such transferor (including, for the avoidance of doubt, the commitments made in Section 4.02) set forth in this Agreement.  Any Transfer in violation of Section 8.01 shall be null and void *ab initio*.

8.03.   This Agreement shall in no way be construed to preclude any Consenting Noteholders from acquiring additional Company Claims; provided, however, that (a) such additional Company Claims shall automatically and immediately upon acquisition by a Consenting Noteholder be deemed subject to the terms of this Agreement (regardless of when or whether notice of such acquisition is given to counsel to the Company Parties or to each of counsel to the Consenting Noteholders) and (b) such Consenting Noteholder must provide notice of such acquisition (including the amount and type of Company Claim acquired) to counsel to the Company Parties within three (3) Business Days of such acquisition.

8.04.   This Section 8 shall not impose any obligation on any Company Party to issue any "cleansing letter" or otherwise publicly disclose information for the purpose of enabling a Consenting Noteholder to Transfer any of its Company Claims.  Notwithstanding anything to the contrary herein, to the extent a Company Party and another Party have entered into a Confidentiality Agreement, the terms of such Confidentiality Agreement shall continue to apply and remain in full force and effect according to its terms, and this Agreement does not supersede any rights or obligations otherwise arising under such Confidentiality Agreements.

8.05.   Notwithstanding Section 8.01, (a) a Consenting Noteholder may Transfer any Company Claims to an Entity that is an Affiliate, affiliated fund, or affiliated entity with a common investment advisor, which Entity shall automatically be bound by this Agreement upon the Transfer of such Company Claims and (b) a Qualified Marketmaker that acquires any Company Claims with the purpose and intent of acting as a Qualified Marketmaker for such Company Claims shall not be required to execute and deliver a Transfer Agreement in respect of such Company Claims if such Qualified Marketmaker subsequently Transfers such Company Claims (by purchase, sale assignment, participation, or otherwise) to a transferee that is a Consenting Noteholder or a transferee who executes and delivers to counsel to the Company Parties, at or before the time of the proposed Transfer, a Transfer Agreement, provided that the original Consenting Noteholder shall remain bound by the terms of this Agreement until such time as the Qualified Marketmaker transfers the Company Claims to a transferee that delivers a Transfer Agreement.

16

8.06.    Notwithstanding anything to the contrary in this <u>Section 8</u>, the restrictions on Transfer set forth in this <u>Section 8</u> shall not apply to the grant of any Liens or encumbrances on any Company Claims in favor of a bank or broker-dealer holding custody of such Company Claims in the ordinary course of business and which Lien or encumbrance is released upon the Transfer of such Company Claims.

**Section 9.**    ***Representations and Warranties of Consenting Noteholders.***   Each Consenting Noteholder severally, and not jointly, represents and warrants that, as of the date such Consenting Noteholder executes and delivers this Agreement:

(a)    it beneficially holds, or advises or manages for a beneficial holder, the face amount of the Company Claims reflected in such Consenting Noteholder's signature page to this Agreement, a Joinder or a Transfer Agreement, as applicable (as may be updated pursuant to <u>Section 8</u>);

(b)    it has the full power and authority to act on behalf of, vote and consent to matters concerning, such Company Claims;

(c)    such Company Claims are free and clear of any pledge, Lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal, or other limitation on disposition, transfer, or encumbrances of any kind, that would materially and adversely affect such Consenting Noteholder's ability to perform any of its obligations under this Agreement at the time such obligations are required to be performed;

(d)    it is (i) a "qualified institutional buyer" as defined in Rule 144A under the Securities Act, (ii) not a "U.S." person as defined in Regulation S under the Securities Act, or (iii) an "accredited investor" within the meaning of Rule 501 of Regulation D promulgated under the Securities Act, in each case with sufficient knowledge and experience to evaluate properly the terms and conditions of this Agreement and to consult with its legal and financial advisors with respect to its investment decision to execute this Agreement, and it has made its own analysis and decision to enter into this Agreement;

(e)    it has reviewed, or has had the opportunity to review, with the assistance of professional and legal advisors of its choosing, all information it deems necessary and appropriate for it to evaluate the financial risks inherent in the Restructuring Transactions and the terms of the Plan; and

(f)    it has all necessary power and authority to vote, approve changes to, and Transfer all of its Company Claims referable to it as contemplated by this Agreement subject to applicable Law.

**Section 10.**    ***Mutual Representations, Warranties, and Covenants***.   Each of the Parties, severally, and not jointly, represents, warrants, and covenants to each other Party, as of the date such Party executed and delivers this Agreement:

17

(a)     it is validly existing and in good standing under the Laws of the state of its organization, and this Agreement is a legal, valid, and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by applicable Laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability;

(b)     except as expressly provided in this Agreement, the Plan, and the Bankruptcy Code, no consent or approval is required by any other Entity in order for it to effectuate the Restructuring Transactions contemplated by, and perform its respective obligations under, this Agreement;

(c)     the entry into and performance by it of, and the transactions contemplated by, this Agreement do not, and will not, conflict in any material respect with any Law or regulation applicable to it or with any of its articles of association, memorandum of association or other constitutional documents;

(d)     except as expressly provided in this Agreement, it has (or will have, at the relevant time) all requisite corporate or other power and authority to enter into, execute, and deliver this Agreement and to effectuate the Restructuring Transactions contemplated by, and perform its respective obligations under, this Agreement; and

(e)     except as expressly provided by this Agreement, it is not party to any restructuring or similar agreements or arrangements with the other Parties to this Agreement that have not been disclosed to all Parties to this Agreement.

**Section 11.**     *Termination Events*.

11.01.   <u>Consenting Noteholder Termination Events</u>.  This Agreement may be terminated by the Required Consenting Noteholders by the delivery to the Company Parties of a written notice in accordance with <u>Section 13.10</u> hereof upon the occurrence of the following events:

(a)     (x) any Company Party shall have breached (other than an immaterial breach) its obligations under this Agreement, which breach (to the extent curable) is not cured within five (5) Business Days after the giving of written notice of such breach in accordance with <u>Section 13.10</u> hereof, or (y) a Company Party files, publicly announces, or informs counsel to the Consenting Noteholders of its intention to file a chapter 11 plan that contains terms and conditions that: (i) do not provide the Consenting Noteholders, as applicable, with the economic recovery set forth in the Restructuring Term Sheet or (ii) are not otherwise consistent in all material respects with this Agreement and the Restructuring Term Sheet;

(b)     any Company Party shall have breached (other than an immaterial breach) any representation, warranty, or covenant of such Company Party set forth in this Agreement that (to the extent curable) remains uncured for a period of five (5) Business Days after written notice and a description of such breach is provided to the Company Parties;

(c)     the issuance by any Governmental Entity of any final, non-appealable ruling or order that (i) would reasonably be expected to prevent the consummation of a material portion of the Restructuring Transactions and (ii) remains in effect for ten (10) Business Days after the Required Consenting Noteholders transmit a written notice in accordance with Section 13.10 hereof detailing any such issuance;

(d)     the entry of an order by the Bankruptcy Court, or the filing of a motion or application by any Company Party seeking an order (without the prior written consent of the Required Consenting Noteholders), (i) converting one or more of the Chapter 11 Cases of a Company Party to a case under chapter 7 of the Bankruptcy Code, (ii) appointing an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code or a trustee in one or more of the Chapter 11 Cases of a Company Party, or (iii) rejecting this Agreement;

(e)     the Bankruptcy Court enters an order denying confirmation of the Plan;

(f)     any Company Party files with the Bankruptcy Court any motion or application seeking authority to sell any material assets outside the ordinary course of business without the prior written consent of the Required Consenting Noteholders (such consent not to be unreasonably withheld), provided that the Consenting Noteholder Termination Event in this section shall not apply if the aggregate purchase price of such assets is less than $15 million, provided that the Company Parties shall segregate the proceeds from such sales for the benefit of the Consenting Noteholders;

(g)     the occurrence of any one of the following events:

(i)     the Company Parties or any Affiliate of the Company Parties files a motion, application, adversary proceeding, or Cause of Action challenging the validity, enforceability or priority of, or seeking avoidance or subordination of the Notes Claims; or

(ii)     the Company Parties or any Affiliate of the Company Parties support any application, adversary proceeding, or Cause of Action referred to in the immediately preceding clause (i) filed by a third party, or consents to the standing of any such third party to bring such application, adversary proceeding, or Cause of Action;

(h)     the modification in any material respect of the employment terms of any member of the Section 16 Officers without the consent of the Required Consenting Noteholders;

(i)     the failure to comply with or achieve any one of the Milestones, unless such Milestone is extended with the express prior written consent of the Required Consenting Noteholders (such consent not to be unreasonably withheld), which consent may be provided via email from counsel to the Required Consenting Noteholders;

(j)     any Company Party (i) files, amends, or modifies, or files a pleading seeking approval of, any Definitive Document or authority to amend or modify any Definitive Document,

in a manner that is inconsistent with, or constitutes a breach of, this Agreement, without the prior written consent of the Required Consenting Noteholders, (ii) withdraws the Plan without the prior consent of the Required Consenting Noteholders, or (iii) publicly announces its intention to take any such acts listed in the foregoing clause (i) or (ii), in the case of each of the foregoing clauses (i) through (ii), which remains uncured (to the extent curable) for five (5) Business Days after such terminating Consenting Noteholders transmit a written notice in accordance with <u>Section 13.10</u> detailing any such breach;

(k)    upon delivery of notice by a Company Party pursuant to <u>Section 7.01</u>; or

(l)    any Company Party fails to pay the fees and expenses set forth in <u>Section 13.23</u> as and when required; <u>provided</u>, <u>however</u>, that the Plan Effective Date shall not occur until and unless the fees and expenses set forth in Section 13.23 shall have been paid in full.

11.02.    <u>Company Party Termination Events</u>.  Any Company Party may terminate this Agreement as to all Parties upon prior written notice to all Parties in accordance with <u>Section 13.10</u> hereof upon the occurrence of any of the following events:

(a)    the breach in any material respect by Consenting Noteholders holding an amount of Notes that would result in non-breaching Consenting Noteholders holding less than two-thirds (66.67%) of the aggregate principal amount of Notes held by all of the Consenting Noteholders of any provision set forth in this Agreement that remains uncured for a period of three (3) Business Days after the receipt by such Consenting Noteholders of notice of such breach;

(b)    the issuance by any Governmental Entity of any final, non-appealable ruling or order that (i) would reasonably be expected to prevent the consummation of a material portion of the Restructuring Transactions and (ii) remains in effect for ten (10) Business Days after such terminating Company Party transmits a written notice in accordance with <u>Section 13.10</u> hereof detailing any such issuance; <u>provided</u>, <u>however</u>, that this termination right shall not apply to or be exercised by any Company Party if any Company Party sought or requested such ruling or order in contravention of any obligation or restriction set out in this Agreement; <u>provided</u>, <u>further</u>, <u>however</u>, that nothing in this paragraph is intended to limit the rights of the Company Parties as set forth in <u>Section 7.01</u>;

(c)    the board of directors, board of managers, or similar governing body of a Company Party determines, after receiving written advice from external counsel, that, based on such advice, continued performance under this Agreement would violate applicable Law or would be inconsistent with the exercise of its fiduciary duties under applicable Law; or

(d)    the entry of an order by the Bankruptcy Court (i) converting one or more of the Chapter 11 Cases of a Company Party to a case under chapter 7 of the Bankruptcy Code or (ii) appointing an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code or a trustee in one or more of the Chapter 11 Cases of a Company Party; <u>provided</u>, <u>however</u>, that this termination right shall not apply to or be exercised by any Company Party if any Company Party sought or requested such order or appointment in

20

contravention of any obligation or restriction set out in this Agreement or otherwise violated Section **Error! Reference source not found.**.

11.03.  <u>Mutual Termination</u>.  This Agreement, and the obligations of all Parties hereunder, may be terminated by mutual written agreement among all of the following: (a) the Required Consenting Noteholders and (b) each Company Party.

11.04.  <u>Automatic Termination</u>.  This Agreement shall terminate automatically without any further required action or notice immediately upon the Plan Effective Date.

11.05.  <u>Effect of Termination.</u>  Upon the occurrence of a Termination Date as to a Party, this Agreement shall be of no further force and effect as to such Party and each Party subject to such termination shall be released from its commitments, undertakings, and agreements under or related to this Agreement and shall have the rights and remedies that it would have had, had it not entered into this Agreement, and shall be entitled to take all actions, whether with respect to the Restructuring Transactions or otherwise, that it would have been entitled to take had it not entered into this Agreement, including with respect to any and all Claims or Causes of Action.  Upon the occurrence of a Termination Date prior to the Confirmation Order being entered by a Bankruptcy Court, any and all consents or ballots tendered by the Parties subject to such termination before a Termination Date shall be deemed, for all purposes, to be null and void *ab initio* from the first instance and shall not be considered or otherwise used in any manner by the Parties in connection with the Restructuring Transactions and this Agreement or otherwise.  Nothing in this Agreement shall be construed as prohibiting a Company Party or any of the Consenting Noteholders from contesting whether any such termination is in accordance with its terms or to seek enforcement of any rights under this Agreement that arose or existed before a Termination Date.  Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict (a) any right of any Company Party or the ability of any Company Party to protect and reserve its rights (including rights under this Agreement), remedies, and interests, including any Causes of Action against any Consenting Noteholder, and (b) any right of any Consenting Noteholder, or the ability of any Consenting Noteholder, to protect and preserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any Company Party or Consenting Noteholder.  No purported termination of this Agreement shall be effective under this <u>Section 11</u> or otherwise if the Party seeking to terminate this Agreement is in material breach of this Agreement.  Nothing in this <u>Section 11.05</u> shall restrict any Company Party's right to terminate this Agreement in accordance with <u>Section 11.02(c)</u>.

**Section 12.** *Amendments and Waivers*.

(a)  This Agreement may not be modified, amended, or supplemented, and no condition or requirement of this Agreement may be waived, in any manner except in accordance with this <u>Section 12</u>.

(b)  Except as otherwise provided herein, this Agreement may not be modified, amended, amended and restated or supplemented without the express prior written consent of the Company Parties and the Required Consenting Noteholders (in each case, in their sole discretion);

provided, however, that if the proposed modification, amendment or supplement has a material, disproportionate (as compared to the other Consenting Noteholders) and adverse effect on any of the Consenting Noteholders, then the consent of each such affected Consenting Noteholder shall also be required to effectuate such modification, amendment or supplement. In the event that an adversely affected Consenting Noteholder ("**Non-Consenting Noteholder**") does not consent to a modification, amendment and restatement or supplement to this Agreement, but such modification, amendment and restatement or supplement receives the consent of the Required Consenting Noteholders, this Agreement shall be deemed to have been terminated only as to such Non-Consenting Noteholder, but this Agreement shall continue in full force and effect in respect of all other Consenting Noteholders who have so consented.

(c)     Any proposed modification, amendment, waiver or supplement that does not comply with this Section 12 shall be ineffective and null and void *ab initio*.

(d)     The waiver by any Party of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach. No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy under this Agreement shall operate as a waiver of any such right, power or remedy or any provision of this Agreement, nor shall any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise of such right, power or remedy or the exercise of any other right, power or remedy. All remedies under this Agreement are cumulative and are not exclusive of any other remedies provided by Law.

**Section 13.     *Miscellaneous.***

13.01.   Acknowledgement. Notwithstanding any other provision herein, this Agreement is not and shall not be deemed to be an offer with respect to any securities or solicitation of votes for the acceptance of a plan of reorganization for purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise. Any such offer or solicitation will be made only in compliance with all applicable securities Laws, provisions of the Bankruptcy Code, and/or other applicable Law.

13.02.   Exhibits Incorporated by Reference; Conflicts. Each of the exhibits, annexes, signatures pages, and schedules attached hereto is expressly incorporated herein and made a part of this Agreement, and all references to this Agreement shall include such exhibits, annexes, and schedules. In the event of any inconsistency between this Agreement (without reference to the exhibits, annexes, and schedules hereto) and the exhibits, annexes, and schedules hereto, this Agreement (without reference to the exhibits, annexes, and schedules thereto) shall govern.

13.03.   Further Assurances. Subject to the other terms of this Agreement, the Parties agree to execute and deliver such other instruments and perform such acts, in addition to the matters herein specified, as may be reasonably appropriate or necessary, or as may be required by order of the Bankruptcy Court, from time to time, to effectuate the Restructuring Transactions, as applicable; provided, however, that this Section 13.03 shall not limit the right of any party hereto

to exercise any right or remedy provided for in this Agreement (including the approval rights set forth in <u>Section 3.02</u>).

13.04.  <u>Complete Agreement</u>.  Except as otherwise explicitly provided herein, this Agreement constitutes the entire agreement among the Parties with respect to the subject matter hereof and supersedes all prior agreements, oral or written, among the Parties with respect thereto, other than any Confidentiality Agreement.

13.05.  <u>GOVERNING LAW; SUBMISSION TO JURISDICTION; SELECTION OF FORUM</u>.  THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN SUCH STATE, WITHOUT GIVING EFFECT TO THE CONFLICT OF LAWS PRINCIPLES THEREOF.  Notwithstanding the foregoing consent to jurisdiction in either a state or federal court of competent jurisdiction in the State of New York, Borough of Manhattan, upon the commencement of the Chapter 11 Cases, each of the Parties hereby agrees that, if the Chapter 11 Cases are pending, the Bankruptcy Court shall have exclusive jurisdiction over all matters arising out of or in connection with this Agreement.  Each Party hereto agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement, to the extent possible, in the Bankruptcy Court, and solely in connection with claims arising under this Agreement:  (a) irrevocably submits to the exclusive jurisdiction of the Bankruptcy Court; (b) waives any objection to laying venue in any such action or proceeding in the Bankruptcy Court; and (c) waives any objection that the Bankruptcy Court is an inconvenient forum or does not have jurisdiction over any Party hereto.

13.06.  <u>TRIAL BY JURY WAIVER</u>.   EACH PARTY HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

13.07.  <u>Execution of Agreement</u>.  This Agreement may be executed and delivered in any number of counterparts and by way of electronic signature and delivery, each such counterpart, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement.  Except as expressly provided in this Agreement, each individual executing this Agreement on behalf of a Party has been duly authorized and empowered to execute and deliver this Agreement on behalf of said Party.

13.08.  <u>Rules of Construction</u>.  This Agreement is the product of negotiations among the Company Parties and each of the Consenting Noteholders, and in the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement, or any portion hereof, shall not be effective in regard to the interpretation hereof.  The Company Parties and the Consenting Noteholders were each represented by counsel during the negotiations and drafting of this Agreement and continue to be represented by counsel.

13.09.  Successors and Assigns; Third Parties.  This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors and permitted assigns, as applicable.  There are no third party beneficiaries under this Agreement, and the rights or obligations of any Party under this Agreement may not be assigned, delegated, or transferred to any other Entity except as expressly permitted hereby.

13.10.  Notices.  All notices hereunder shall be deemed given if in writing and delivered, by electronic mail, courier, or registered or certified mail (return receipt requested), to the following addresses (or at such other addresses as shall be specified by like notice):

(a)      if to a Company Party, to:

CBL & Associates Properties, Inc.
2030 Hamilton Place Blvd., Suite 500
Chattanooga, Tennessee 37421-6000
Attention:      Stephen Lebovitz, Chief Executive Officer
                      Jeff Curry, Chief Legal Officer

E-mail addresses:      Stephen.Lebovitz@cblproperties.com
                               Jeff.Curry@cblproperties.com

with a copy to (which shall not constitute notice):

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
Attention:      Ray C. Schrock, P.C.
                      Moshe A. Fink

E-mail addresses:      ray.schrock@weil.com
                               moshe.fink@weil.com

(b)      if to a Consenting Noteholder, as set forth on the signature page for such Consenting Noteholder to this Agreement, a Transfer Agreement or a Joinder, as applicable, with a copy to (which shall not constitute notice):

Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
Bank of America Tower
New York, NY 10036-6745
Attention:      Michael S. Stamer
                      Meredith A. Lahaie
                      Daniel G. Walsh

24

Email addresses:     mstamer@akingump.com
mlahaie@akingump.com
dwalsh@akingump.com

Any notice given by delivery, mail, or courier shall be effective when received.

13.11.  <u>Enforceability of Agreement</u>.  Each of the Parties to the extent enforceable waives any right to assert that the exercise of termination rights under this Agreement is subject to the automatic stay provisions of the Bankruptcy Code, and expressly stipulates and consents hereunder to the prospective modification of the automatic stay provisions of the Bankruptcy Code for purposes of exercising termination rights under this Agreement, to the extent the Bankruptcy Court determines that such relief is required.

13.12.  <u>Waiver</u>.  If the Restructuring Transactions are not consummated, or if this Agreement is terminated for any reason, the Parties fully reserve any and all of their rights and nothing herein shall constitute or be deemed to constitute such Party's consent or approval of any chapter 11 plan of reorganization for the Company Parties or any waiver of any rights such Party may have under any subordination agreement. Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms or the payment of damages to which a Party may be entitled under this Agreement.

13.13.  <u>Specific Performance</u>.  It is understood and agreed by the Parties that money damages would be an insufficient remedy for any breach of this Agreement by any Party, and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief (without the posting of any bond and without proof of actual damages) as a remedy of any such breach, including an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder.

13.14.  <u>Several, Not Joint, Claims</u>.  Except where otherwise specified, the agreements, representations, warranties, and obligations of the Parties under this Agreement are, in all respects, several and not joint.

13.15.  <u>Severability and Construction</u>.  If any provision of this Agreement shall be held by a court of competent jurisdiction to be illegal, invalid, or unenforceable, the remaining provisions shall remain in full force and effect if essential terms and conditions of this Agreement for each Party remain valid, binding, and enforceable

13.16.  <u>Survival</u>. Notwithstanding (a) any Transfer of any Company Claims in accordance with <u>Section 8</u> or (b) the termination of this Agreement in accordance with its terms, the agreements and obligations of the Parties in <u>Section 11.05</u>, <u>Section 13</u> (except for <u>Section 13.23</u> with respect to fees and expenses incurred after the termination of this Agreement (other than with respect to fees and expenses incurred after the termination of this Agreement due to the consummation of the Plan on the Plan Effective Date)), and the Confidentiality Agreements shall

25

survive such Transfer and/or termination and shall continue in full force and effect for the benefit of the Parties in accordance with the terms hereof and thereof.

13.17.  <u>Remedies Cumulative</u>.  All rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at Law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party.

13.18.  <u>Capacities of Consenting Noteholders</u>.  Each Consenting Noteholder has entered into this Agreement on account of all Company Claims that it holds (directly or through discretionary accounts that it manages or advises) and, except where otherwise specified in this Agreement, shall take or refrain from taking all actions that it is obligated to take or refrain from taking under this Agreement with respect to all such Company Claims; <u>provided</u>, <u>however</u>, that the foregoing shall not include any Company Claims held by any such Consenting Noteholder as of the Agreement Effective Date other than Notes Claims; <u>provided</u>, <u>further</u>, <u>however</u>, that any Person (other than any Consenting Noteholder as of the Agreement Effective Date and any of its its Affiliates) that becomes a party hereto as a Consenting Noteholder pursuant to this Agreement following the Agreement Effective Date agrees that it shall cause its Affiliates that hold Company Claims (directly or through discretionary accounts that it manages or advises) to comply with the provisions of this Agreement as if such Affiliate was a Consenting Noteholder.

13.19.  <u>Relationship Among Consenting Noteholders.</u>

(a)     Notwithstanding anything herein to the contrary, the duties and obligations of the Consenting Noteholders under this Agreement shall be several, not joint, with respect to each Consenting Noteholder.  None of the Consenting Noteholders shall have any fiduciary duty, any duty of trust or confidence in any form, or other duties or responsibilities in any kind or form to each other, any Consenting Noteholder, any Company Party, or any of the Company Party's respective creditors or other stakeholders, and there are no commitments among or between the Consenting Noteholders as a result of this Agreement or the transactions contemplated herein or in the Restructuring Term Sheet, in each case except as expressly set forth in this Agreement.  No Party shall have any responsibility by virtue of this Agreement for any trading by any other entity, and it is hereby expressly acknowledged by the Consenting Noteholders, on the one hand, and the Company Parties, on the other, that they are in privity with each other and that no Consenting Noteholder is in privity with any other Consenting Noteholder in connection with this Agreement or any of the transactions contemplated hereby.  The Consenting Noteholders represent and warrant that as of the date hereof and for so long as this Agreement remains in effect, the Consenting Noteholders have no agreement, arrangement, or understanding with respect to acting together for the purpose of acquiring, holding, voting, or disposing of any equity securities of the Company Parties.  No prior history, pattern, or practice of sharing confidences among or between the Parties shall in any way affect or negate this Agreement, and each Consenting Noteholder shall be entitled to independently protect and enforce its rights, including the rights arising out of this Agreement, and it shall not be necessary for any other Consenting Noteholder to be joined as an additional party in any proceeding for such purpose.  Nothing contained in this Agreement, and no action taken by any Consenting Noteholder pursuant hereto is intended to constitute the

Consenting Noteholders as a partnership, an association, a joint venture or any other kind of entity, or create a presumption that any Consenting Noteholder is in any way acting in concert or as a member of a "group" with any other Consenting Noteholder or Consenting Noteholders within the meaning of Rule 13d-5 under the Exchange Act.  For the avoidance of doubt: (1) each Consenting Noteholder is entering into this Agreement directly with the Company and not with any other Consenting Noteholder, (2) no other Consenting Noteholder shall have any right to bring any action against any other Consenting Noteholder with respect this Agreement (or any breach thereof) and (3) no Consenting Noteholder shall, nor shall any action taken by a Consenting Noteholder pursuant to this Agreement, be deemed to be acting in concert or as any group with any other Consenting Noteholder with respect to the obligations under this Agreement nor shall this Agreement create a presumption that the Consenting Noteholders are in any way acting as a group. All rights under this Agreement are separately granted to each Consenting Noteholder by the Company and vice versa, and the use of a single document is for the convenience of the Company. The decision to commit to enter into the transactions contemplated by this Agreement has been made independently.

(b)      The Company Parties understand that the Consenting Noteholders are engaged in a wide range of financial services and businesses, and, in furtherance of the foregoing, the Company Parties acknowledge and agree that the obligations set forth in this Agreement shall only apply to the trading desk(s) and/or business group(s) of the Consenting Noteholders that principally manage and/or supervise the Consenting Noteholder's investment in the Company Parties, and shall not apply to any other trading desk or business group of the Consenting Noteholder so long as they are not acting at the direction or for the benefit of such Consenting Noteholder.

13.20.  <u>Email Consents</u>.   Where a written consent, acceptance, approval, or waiver is required pursuant to or contemplated by this Agreement, pursuant to <u>Section 3.02</u>, <u>Section 12</u>, or otherwise, including a written approval by the Company Parties or the Required Consenting Noteholders, such written consent, acceptance, approval, or waiver shall be deemed to have occurred if, by agreement between counsel to the Parties submitting and receiving such consent, acceptance, approval, or waiver, it is conveyed in writing (including electronic mail) between each such counsel without representations or warranties of any kind on behalf of such counsel.

13.21.  <u>Settlement Discussions</u>.  This Agreement is part of a proposed settlement of matters that could otherwise be the subject of litigation among the Parties. Nothing in this Agreement shall be deemed an admission of any kind.  Pursuant to Federal Rule of Evidence 408, any applicable state rules of evidence and any other applicable law, foreign or domestic, this Agreement, and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than to prove the existence of this Agreement or in a proceeding to enforce the terms of this Agreement.

13.22.  <u>Good Faith Cooperation</u>. The Parties shall cooperate with each other in good faith and shall coordinate their activities (to the extent reasonably practicable) in respect of all matters concerning the implementation and consummation of the Restructuring.

13.23.  <u>Fees and Expenses</u>.   Regardless of whether the Restructuring Transactions are consummated, the Company Parties shall within three (3) Business Days of receipt of an invoice,

pay in cash or reimburse all reasonable and documented fees and out-of-pocket expenses (regardless of whether such fees and expenses were incurred before or after the Petition Date) of any advisors, whether retained directly or indirectly, of the Consenting Noteholders, including: (i) Akin Gump, as legal counsel to the Consenting Noteholders; (ii) PJT Partners, as the financial advisor retained on behalf of the Consenting Noteholders; (iii) one local counsel to the Consenting Noteholders; (iv) any other professionals or advisors retained by the Consenting Noteholders with the consent of the Company (such consent not to be unreasonably withheld); and (v) reasonable and documented out of pocket expenses of individual Consenting Noteholders (including fees and expenses of external counsel) in amount not to exceed $250,000 in the aggregate (collectively, the "**Consenting Noteholder Fees and Expenses**"); provided, however, that all outstanding invoices of such professionals and advisors shall be paid in full by the Petition Date.

13.24.  <u>Public Disclosure; Confidential Information</u>.  Under no circumstances may any Party make any public disclosure of any kind that would disclose either: (i) the holdings of any Consenting Noteholders (including the signature pages hereto, which shall not be publicly disclosed or filed) or (ii) the identity of any Consenting Noteholder without the prior written consent of such Consenting Noteholder or the order of a Bankruptcy Court or other court with competent jurisdiction, or as may otherwise be required by law.  Any obligations the Company may have under or in connection with this Agreement to furnish Confidential Information to a Consenting Noteholder shall be subject to such any confidentiality agreement in place between the Company and such Consenting Noteholder.

13.25.  <u>Withholding</u>.  The Company Parties shall each be entitled to deduct and withhold (or cause to be deducted or withheld) from amounts otherwise payable and deliverable to any Person hereunder such amounts as it is required to deduct and withhold with respect to the making of the relevant payment under applicable law.  The Company Parties shall use commercially reasonable efforts to provide the payment recipient with reasonable advance notice of any withholding that it intends to make pursuant to this provision, and shall use its commercially reasonable efforts to cooperate with such payment recipient to minimize any applicable withholding.  To the extent that amounts are deducted and withheld, such amounts shall be paid to the appropriate Governmental Authority and treated for all purposes as having been paid to the Person in respect of which such deduction and withholding was made.  The Parties agree not to treat the Notes as a "United States real property interest" within the meaning of section 897(c)(1) of title 26 of the United States Code and no Party shall take any position (whether in audits, tax returns, or otherwise) that is inconsistent with the foregoing treatment unless required to do so by applicable law.

*[Remainder of Page Intentionally Blank.]*

28

[Signature Pages Redacted]

## EXHIBIT A

**Company Parties**

CBL & Associates Limited Partnership.

# **EXHIBIT B**

## **Restructuring Term Sheet**

## CBL & Associates Properties, Inc.
## Restructuring Term Sheet

### August 18, 2020

THIS TERM SHEET IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCE OR REJECTION OF A CHAPTER 11 PLAN OF REORGANIZATION PURSUANT TO THE BANKRUPTCY CODE.  ANY SUCH OFFER OR SOLICITATION WILL BE MADE ONLY IN COMPLIANCE WITH ALL APPLICABLE SECURITIES LAWS AND, IF APPLICABLE, PROVISIONS OF THE BANKRUPTCY CODE.  THIS TERM SHEET IS BEING PROVIDED IN FURTHERANCE OF SETTLEMENT DISCUSSIONS AND IS ENTITLED TO PROTECTION PURSUANT TO RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND ANY SIMILAR FEDERAL OR STATE RULE OF EVIDENCE.  THE TRANSACTIONS DESCRIBED IN THIS TERM SHEET ARE SUBJECT IN ALL RESPECTS TO, AMONG OTHER THINGS, EXECUTION AND DELIVERY OF DEFINITIVE DOCUMENTATION AND SATISFACTION OR WAIVER OF THE CONDITIONS PRECEDENT SET FORTH THEREIN.

NOTHING IN THIS TERM SHEET SHALL CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, A STIPULATION OR A WAIVER, AND EACH STATEMENT CONTAINED HEREIN IS MADE WITHOUT PREJUDICE, WITH A FULL RESERVATION OF ALL RIGHTS, REMEDIES, CLAIMS AND DEFENSES OF THE COMPANY PARTIES AND ANY CREDITOR PARTY.  THIS TERM SHEET DOES NOT INCLUDE A DESCRIPTION OF ALL OF THE TERMS, CONDITIONS, AND OTHER PROVISIONS THAT ARE TO BE CONTAINED IN THE DEFINITIVE DOCUMENTATION, WHICH REMAIN SUBJECT TO DISCUSSION, NEGOTIATION AND EXECUTION.  EXCEPT AS PROVIDED IN THE RESTRUCTURING SUPPORT AGREEMENT, THIS TERM SHEET, AND THE TERMS CONTAINED HEREIN, ARE CONFIDENTIAL.

### Summary Of Principal Terms
### Of Proposed Restructuring Transactions

This term sheet (the "**Term Sheet**") sets forth certain key terms of a proposed restructuring transaction (the "**Transaction**") with respect to the existing debt and other obligations of CBL & Associates Properties, Inc. and certain of its affiliates and subsidiaries (collectively, the "**Company Parties**" or the "**Company**").  This Term Sheet is the "Restructuring Term Sheet" referenced as Exhibit B in that certain Restructuring Support Agreement, dated as of August 18, 2020 (as the same may be amended, modified or supplemented, the "**RSA**"), by and among the Company Parties and the Consenting Noteholders party thereto.  Capitalized terms used but not otherwise defined in this Term Sheet shall have the meanings given to such terms in the RSA.  This Term Sheet supersedes any proposed summary of terms or conditions regarding the subject matter hereof and dated prior to the date hereof.  Subject to the RSA, the Transaction will be implemented through pre-packaged or pre-negotiated Chapter 11 Cases pursuant to the Plan.

### Treatment Of Claims And Interests

The below summarizes the treatment to be received on or as soon as practicable after the Plan Effective Date (as defined below) by holders of claims against, and interests in, the Company pursuant to the Transaction.

| | |
|---|---|
| **Administrative, Priority, and Tax Claims** | Allowed administrative, priority, and tax claims will be satisfied in full, in cash, or otherwise receive treatment reasonably acceptable to the Company Parties and the Required Consenting Noteholders and consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code. |
| **Bank Claims** | On the Plan Effective Date, each holder of an allowed Claim (each a "**Bank Claim**") under that certain Credit Agreement, dated January 30, 2019 (as amended, restated, amended and restated, replaced, supplemented or otherwise modified from time to time) (the "**Credit Agreement**"), by and among the CBL Limited Partnership, as borrower, the Company Parties thereto, the lenders from time to time |

|  | party thereto (the "**Bank Lenders**"), and Wells Fargo Bank, National Association, as administrative agent ("**Administrative Agent**") for itself and for the benefit of the Bank Lenders shall receive either: (a) treatment as is acceptable to the Company and the Required Consenting Noteholders in a manner consistent with the Bankruptcy Code, including, but not limited to, section 1129(b) of the Bankruptcy Code; or (b) such treatment as determined by the Bankruptcy Court. |
|---|---|
| **Other Secured Claims** | Secured Claims (other than Bank Claims) shall be reinstated, unimpaired, or receive treatment reasonably acceptable to the Company Parties and the Required Consenting Noteholders. |
| **Notes Claims** | On the Plan Effective Date, each holder of an allowed Notes Claim shall receive its *pro rata* share of (a) $49.6 million of Cash consideration (such Cash consideration to be reduced by the amount of any interest payments made by the Company Parties, if any, during the Agreement Effective Period); (b) $500 million of 10% first-priority secured notes due June 2028 having the terms set forth on Exhibit 1 hereto (the "**New Notes**"); and (c) 90% of the common equity in the reorganized Company (the "**New Equity Interests**"), subject to dilution by the Warrants, the Management Incentive Plan (each as defined below) and subsequent issuances of common equity (including securities or instruments convertible into common equity) by the Company from time to time after the Plan Effective Date, as set forth herein.<br><br>To the extent the holders of Bank Claims do not vote to accept the Plan as class, the treatment of Notes Claims may be modified on terms acceptable to the Company Parties and the Required Consenting Noteholders and consistent with the Bankruptcy Code. |
| **Property Level Debt and Guarantee Claims** | To the extent that a debtor in the Chapter 11 Cases is a borrower or guarantor on property level debt, such property level debt and guarantee claims shall be reinstated, unimpaired, or receive treatment acceptable to the Required Consenting Noteholders and the Company Parties.[1] |
| **General Unsecured Claims** | Unsecured Claims other than Notes Claims shall receive treatment reasonably acceptable to the Company Parties and the Required Consenting Noteholders. |
| **Intercompany Claims and Company Interests** | Intercompany claims and Company Interests shall be reinstated, unimpaired, compromised, or cancelled, at the election of the Company and the Required Consenting Noteholders such that intercompany claims and Company Interests are treated in a tax-efficient manner. |
| **Preferred Equity Interests** | If holders of Preferred Equity Interests vote to accept the Plan as a class, each holder of an allowed Preferred Equity Interest shall receive its *pro rata* share of [TBD][2]% of the New Equity Interests and [TBD]% of the Warrants (as defined below), which New Equity Interests shall be subject to dilution by the Warrants, the Management Incentive Plan and subsequent issuances of common stock (including securities or instruments convertible into common equity) by the Company from time to time after the Plan Effective Date, as set forth herein.   If holders of Preferred Equity Interests vote to reject the Plan as a class, holders of Preferred Equity Interests shall receive no recovery under the Plan. |

---

[1] The entities to be debtors in the Chapter 11 Cases shall be reasonably acceptable to the Company Parties and Required Consenting Noteholders.

[2] Percentage of New Equity Interests for existing preferred and common shareholders to total 10%. Company to determine equity splits in consultation with the Required Consenting Noteholders.

| | Cash out option for preferred shares in the amount of $5 million and on terms reasonably acceptable to the Company Parties and Required Consenting Noteholders. |
|---|---|
| **Common Equity Interests and Special Common Units** | If holders of Common Equity Interests and limited partnership units of CBL & Associates Limited Partnership designated as special common units (the "**Special Common Units**") vote to accept the Plan as a class, each holder of existing Common Equity Interests and Special Common Units shall receive its *pro rata* share of [TBD] % of the New Equity Interests and [TBD]% of the Warrants (as defined below) on terms and conditions consistent with the term sheet attached hereto as <u>Exhibit 2</u> (the "**Warrants**"), which New Equity Interests shall be subject to dilution by the Warrants and the Management Incentive Plan and subsequent issuances of common stock (including securities or instruments convertible into common stock) by the Company from time to time after the Plan Effective Date. If holders of Common Equity Interests and Special Common Units vote to reject the Plan as a class, holders of Common Equity Interests and Special Common Units shall receive no recovery under the Plan. |
| **Modifications to Treatment of Claims** | To the extent that any Claims or Interests are required or permitted to share in the consideration provided to the holders of Notes Claims as set forth in this Term Sheet, the treatment of Notes Claims and other Claims and Interests may be modified on terms acceptable to the Company Parties and the Required Consenting Noteholders and consistent with the Bankruptcy Code. |

<div align="center">

**OTHER TERMS OF THE TRANSACTION**

</div>

| **Corporate Governance** | The terms and conditions of the new corporate governance documents of the reorganized Company (including the bylaws and certificates of incorporation or similar documents, among other governance documents of each of the Company Parties, collectively, the "**Corporate Governance Documents**"), as well as the structure and other governance matters, shall be acceptable to and determined by the Required Consenting Noteholders in their sole discretion; provided that the Required Consenting Noteholders will consult with the Company Parties regarding such Corporate Governance Documents, provided further that nothing in the Corporate Governance Documents shall adversely impact the economic recovery of the holders of Preferred Equity Interests, Common Equity Interests, or Special Common Units as set forth in this Term Sheet. |
|---|---|
| **Board of Directors** | The initial board or other governing body of the reorganized Company (the "**New Board**") shall consist of seven (7) members in total, which shall include the current Chief Executive Officer, five (5) members selected by the Required Consenting Noteholders and one (1) member selected by the Company Parties and reasonably acceptable to the Required Consenting Noteholders (it being understood that Charles Lebovitz is acceptable to the Required Consenting Noteholders). The Required Consenting Noteholders agree to consult with the Company Parties regarding the selection of the five (5) members with the understanding that the selection of such members shall be in the sole discretion of the Required Consenting Noteholders. |
| **Management Incentive Plan** | On or after the Plan Effective Date, the reorganized Company shall adopt a management incentive plan (the "**Management Incentive Plan**") which shall provide for the grant of up to 10% of the New Equity Interests (or warrants or options to purchase New Equity Interests or other equity-linked interests) on a fully diluted basis to certain members of management of the reorganized Company. The |

| | |
|---|---|
| | form, allocation and any limitations on the Management Incentive Plan shall be determined by the New Board (or a committee thereof). |
| **Releases & Exculpation** | To the maximum extent permitted by applicable law, the Plan and the Confirmation Order will contain customary mutual releases and other exculpatory provisions in favor of the Company, the Consenting Noteholders, the indenture trustees for the Notes, the holders of existing Preferred Equity Interests that provide a release, the holders of existing Common Equity Interests and Special Common Units that provide a release, and each of their respective current and former affiliates, subsidiaries, members, professionals, advisors, employees, directors, and officers, in their respective capacities as such.  Such release and exculpation shall include, without limitation, any and all claims, obligations, rights, suits, damages, causes of action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, including any derivative claims and avoidance actions, of the Company, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that the Company would have been legally entitled to assert in its own right (whether individually or collectively), or on behalf of the holder of any claim or equity interest (whether individually or collectively) or other entity, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place at any time prior to or on the Plan Effective Date arising from or related in any way in whole or in part to the Company, the Notes, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any security of the Company, the subject matter of, or the transactions or events giving rise to, any claim or equity interest that is affected by the Transaction or treated in the Plan, or the negotiation, formulation, or preparation of the Definitive Documentation or related agreements, instruments, or other documents, in each case other than claims, actions, or liabilities arising out of or relating to any act or omission that constitutes willful misconduct, actual fraud, or gross negligence as determined by final order of a court of competent jurisdiction.  To the maximum extent permitted by applicable law, any such releases shall bind holders of Notes Claims, all parties whose Claims are unimpaired under the Plan, all parties who affirmatively agree or vote to accept the Plan, those parties who abstain from voting on the Plan if they fail to opt-out of the releases, and those parties that vote to reject the Plan unless they opt-out of the releases. |
| **Injunction & Discharge** | The Plan and Confirmation Order will contain customary injunction and discharge provisions. |
| **Cancellation of Instruments, Certificates, and Other Documents** | On the Plan Effective Date and immediately prior to or concurrent with the distributions contemplated in this Term Sheet, except to the extent otherwise provided herein or in the Definitive Documentation, all instruments, certificates, and other documents evidencing debt of or equity interests in the Company shall be cancelled, and the obligations of the Company thereunder, or in any way related thereto, shall be discharged. |
| **Assumption and Rejection of Executory Contracts and Unexpired Leases** | The executory contracts and unexpired leases that shall be assumed, assumed and assigned, or rejected in the Chapter 11 Cases shall be reasonably acceptable to the Company Parties and the Required Consenting Noteholders, provided that the Company Parties and the Required Consenting Noteholders shall work in good faith following the execution of the RSA and prior to the commencement of the Chapter 11 Cases to determine which employment agreements (and any modification to such employment agreements, including, without limitation, modifications to the terms of any retention or incentive arrangements for senior executives of the Company as |

| | |
|---|---|
| | requested by the Required Consenting Noteholders) shall be assumed pursuant to the Plan. |
| **Employee Compensation and Benefit Programs** | All employment agreements and severance policies, and all employment, compensation and benefit plans, policies, and programs of the Company applicable to any of its employees and retirees, including, without limitation, all workers' compensation programs, savings plans, retirement plans, deferred compensation plans, SERP plans, healthcare plans, disability plans, severance benefit plans, incentive plans, life and accidental death and dismemberment insurance plans, shall be treated under the Plan in a manner acceptable to the Required Consenting Noteholders, provided that the assumption of the Company's key employee retention program for "Tier 2" non-executive employees in an amount not to exceed $5 million in the aggregate shall be deemed acceptable to the Required Consenting Noteholders. |
| **Tax Issues** | As reasonably determined by the Company Parties and the Required Consenting Noteholders, upon emergence from the Chapter 11 Cases, the Reorganized Debtor may be structured as a real estate investment trust ("**REIT**") and the Transaction shall, subject to the terms and conditions of the RSA, be structured to achieve a tax-efficient structure, in a manner reasonably acceptable to the Company Parties and the Required Consenting Noteholders. |
| **Exemption from SEC Registration** | The issuance of all securities in connection with the Plan, including the New Notes, the New Equity Interests, and the Warrants (including any securities issuable upon the exercise of the Warrants), will be exempt from registration with the U.S. Securities and Exchange Commission under section 1145 of the Bankruptcy Code. |
| **Registration Rights** | The Company shall enter into a registration rights agreement with each of the Consenting Noteholders (unless such Consenting Noteholder opts out) relating to the registration of the resale of the New Equity Interests, and to the extent the reorganized Company is not public post-emergence, shall be post-IPO registration rights. The registration rights agreement shall contain customary terms and conditions, including provisions with respect to demand rights, piggyback rights, shelf rights (including as to minimum ownership requirements), and blackout periods and shall be reasonably acceptable to the Company and Required Consenting Noteholders. Other registration rights and terms to be determined by the Required Consenting Noteholders, which shall be reasonably acceptable to the Company. |
| **SEC Reporting and Stock Exchange Listing** | As reasonably determined by the Company Parties and the Required Consenting Noteholders, upon emergence from the Chapter 11 Cases, the New Equity Interests and the Warrants to be issued by the Company on the Plan Effective Date may be listed on the New York Stock Exchange, ("**NYSE**"), or NASDAQ, either by retaining or succeeding to the Company's existing NYSE listing or otherwise, so long as the Company is able to satisfy the initial listing requirements of the NYSE or NASDAQ, or such alternative exchange as the Company Parties and the Required Consenting Noteholders reasonably determine if the Company is not able to satisfy the initial listing requirements of the NYSE or NASDAQ. |

| D&O Liability Insurance Policies, Tail Policies, and Indemnification | The Company shall purchase a tail policy providing for coverage for current or former directors, managers, and officers of the Company prior to the Petition Date on market terms with coverage in the amount of up to $70 million. The Company shall implement a new D&O insurance policy for directors, managers, and officers of the reorganized Company from and after the Plan Effective Date on terms and conditions acceptable to the Company Parties and the Required Consenting Noteholders. Any indemnification obligations (whether in by-laws, certificate of formation or incorporation, board resolutions, employment contracts, or otherwise) to be assumed pursuant to the Plan shall be on terms and conditions reasonably acceptable to the Company Parties and the Required Consenting Noteholders. |
|---|---|
| **Plan Effective Date** | The date on which the Transaction shall be fully consummated in accordance with the terms and conditions of the Definitive Documentation, which shall be the effective date of the Plan (the "**Plan Effective Date**"). |
| **Conditions to the Plan Effective Date** | The Plan Effective Date shall be subject to the following conditions precedent, some of which may be waived in writing by agreement of the Company and the Required Consenting Noteholders, subject to the consent rights provided for in the RSA:<br><br>(i)     the Definitive Documentation (as applicable) shall be in form and substance consistent with this Term Sheet and the RSA and such documents shall be reasonably acceptable to the Company Parties and the Required Consenting Noteholders unless this Term Sheet or the RSA provide otherwise;<br><br>(ii)    the Bankruptcy Court shall have entered an order confirming the Plan in form and substance consistent with this Term Sheet and the RSA, such order shall otherwise be reasonably acceptable to the Company Parties and the Required Consenting Noteholders, and such order shall be a Final Order;<br><br>(iii)   all of the schedules, documents, supplements, and exhibits to the Plan and Disclosure Statement shall be in form and substance consistent with this Term Sheet and the RSA and such documents shall be reasonably acceptable to the Company Parties and the Required Consenting Noteholders unless this Term Sheet or the RSA provide otherwise;<br><br>(iv)   all fees and expenses of the professionals and advisors to the ad hoc group of Consenting Noteholders (and out of pocket expenses of individual Consenting Noteholders up to the cap set forth herein) shall be paid in full;<br><br>(v)    the RSA shall be in full force and effect; and<br><br>(vi)   all governmental approvals and consents that are legally required for the consummation of the Transaction shall have been obtained, not be subject to unfulfilled conditions, and be in full force and effect |
| **Fees and Expenses of the Consenting Noteholders** | As a condition to the occurrence of the Plan Effective Date, the Company shall pay or reimburse all reasonable and documented fees and out-of-pocket expenses (regardless of whether such fees and expenses were incurred before or after the Petition Date) of the Consenting Noteholders, which shall include the following: (a) Akin Gump Strauss Hauer & Feld LLP, as counsel to the ad hoc group of Consenting Noteholders; (b) one local counsel to the ad hoc group of Consenting |

|  | Noteholders; (c) PJT Partners LP, as the financial advisor retained by the Consenting Noteholders; (d) any other professionals or advisors retained by the Consenting Noteholders with the consent of the Company (such consent not to be unreasonably withheld); and (e) reasonable and documented out of pocket expenses of individual Consenting Noteholders (including fees and expenses of external counsel) in amount not to exceed $250,000 in the aggregate; provided, however, that all outstanding invoices of the Consenting Noteholders professionals and advisors shall be paid in full immediately prior to the Petition Date. |
|---|---|
| **Milestones** | (a) No later than October 1, 2020, the Company Parties shall commence the Chapter 11 Cases.<br><br>(b) No later than 3 Business days after the Petition Date, the Company Parties shall have filed the Plan and a motion seeking approval of the Disclosure Statement.<br><br>(c) No later than 3 Business days after the Petition Date, the Bankruptcy Court shall have entered an interim order approving use of cash collateral.<br><br>(d) No later than 60 days after the Petition Date, the Bankruptcy Court shall have entered a final order approving use of cash collateral.<br><br>(e) No later than 85 days after the Petition Date, the Bankruptcy Court shall have entered an order approving the Disclosure Statement.<br><br>(f) No later than 165 days after the Petition Date, the Bankruptcy Court shall have entered the Confirmation Order.<br><br>(g) No later than 195 days after the Petition Date, the Plan Effective Date shall have occurred. |

**Exhibit 1**

**Terms of New Notes**

- Interest rate of 10% per annum payable in cash
- Maturity of June 2028
- Liens on unencumbered properties, priority guarantees from certain entities (including to-be-formed intermediate holdcos of entities holding encumbered properties and joint ventures of the Company), and equity pledges of certain entities (including to-be-formed intermediate holdcos of entities holding encumbered properties and joint ventures of the Company) as set forth on Schedule 1.
  - o Baskets to remove collateral TBD, and based upon release prices to be negotiated
- Asset sale provision allowing for 102% paydown
- Except for pledges of equity interests not otherwise listed on Schedule 1 to the extent such equity pledges would be prohibited by any non-recourse loan document, CMBS loan document, construction loan document, joint venture document or other document related to the foregoing (collectively, the "Restrictive Documents", which, for the avoidance of doubt, shall not include the Credit Agreement or related documents), in each case, remaining in effect post Plan Effective Date, liens on all other unencumbered assets not otherwise identified on Schedule 1 except as consented to by the Required Consenting Noteholders, provided that the Company Parties shall not transfer unencumbered assets to or from entities that are party to a Restrictive Document outside the ordinary course of business.
- Except, solely in the case of direct or indirect subsidiaries of CBL & Associates Limited Partnership that are directly party to Restrictive Documents remaining in effect post Plan Effective Date, to the extent otherwise prohibited by such Restrictive Document remaining in effect post Plan Effective Date, liens on cash, cash equivalents, and treasuries except as consented to by the Required Consenting Noteholders, provided that the Company Parties shall not transfer cash, cash equivalents, or treasuries to or from entities that are party to a Restrictive Document outside the ordinary course of business.
- Full parent guaranty
- Incurrence test for Total Debt/Total Assets (excludes outparcels)
- Ability to form joint ventures with contributed land from collateral so long as joint ventures remain as credit support
- 105% call protection for the first 18 months, no call for the next 3 years, 105% for the next year, and 102.5% for the next year
- Bankruptcy make-whole
- Other terms (including covenants) to be agreed between the Required Consenting Noteholders and the Company

**Exhibit 2**

**Warrant Term Sheet**

| | |
|---|---|
| **Shares Represented** | Three series of Warrants exercisable for 20% (in the aggregate calculated as of the Plan Effective Date and including any shares issuable upon exercise of the Warrants) of the New Equity Interests exercisable solely for cash, subject to dilution on account of the Management Incentive Plan and future issuances of New Equity Interests by the Company from time to time after the Plan Effective Date. |
| **Strike Price (cash only)** | Series A:  Total equity value that implies 80% recovery of outstanding principal to holders of the Notes Claims plus accrued interest through July 31, 2020. |
| | Series B:  Total equity value that implies 95% recovery of outstanding principal to holders of the Notes Claims plus accrued interest through July 31, 2020. |
| | Series C:  Total equity value that implies 110% recovery of outstanding principal to holders of the Notes Claims plus accrued interest through July 31, 2020. |
| **Scheduled Maturity Date** | Series A:  Three (3) years from the Plan Effective Date |
| | Series B:  Four (4) years from the Plan Effective Date |
| | Series C:  Five (5) years from the Plan Effective Date |
| **Springing Maturity Date** | Warrants, if unexercised, will automatically terminate on the 15th day after the applicable series of Warrants has traded at a 35% premium to their strike price for 90 consecutive days. On the day after such a price is achieved (the "**Warrant Trigger Date**," which may be a different Warrant Trigger Date with respect to each series of Warrants), the Company shall publicly disclose the occurrence of such event, along with the stated Springing Maturity Date for any unexercised Warrants. |
| **Other Terms** | Other terms to be agreed between the Required Consenting Noteholders and the Company. |

**<u>Schedule 1</u>**

**Collateral and Credit Support for New Notes**

## Schedule 1

### Collateral and Credit Support for New Notes

1. **The New Notes will be secured by a first priority lien on the following properties, which shall be evidenced by mortgages recorded in the applicable recording offices, and a pledge of the equity of the entity that owns the following properties:**

Certain Mall Assets

- Alamance Crossing – West
- Brookfield Square
- Dakota Square
- Eastland Mall
- Harford Mall
- Laurel Park Place
- Meridian Mall
- Mid Rivers Mall
- Monroeville Mall
- Monroeville Mall - Anchor
- Monroeville Mall - CBL/Monroeville LP
- Monroeville Mall - District
- Northpark Mall
- Old Hickory Mall
- Parkway Place
- South County Center
- Southaven Towne Center
- Southaven Towne Center - Self Development
- St. Clair Square
- Stroud Mall
- Valley View Mall
- York Galleria
- York Galleria - Sears Redevelopment

Certain Associated Centers & Other Properties

- 840 Greenbrier Circle
- Coolsprings Crossing
- Courtyard at Hickory Hollow
- Frontier Square
- Gunbarrel Point
- Harford Mall - Annex
- Monroeville Mall - Annex @ Monroeville
- Pearland Town Center – Residences

- Shoppes @ St. Clair
- Sunrise Commons
- West Town Crossing
- WestGate Crossing

2. **The New Notes will have a priority guaranty from the CBL member in the joint venture that owns the following properties and will be secured by a pledge of the CBL member's interest in such joint venture. To the extent CBL Limited Partnership is a direct member of the joint venture, the Company will use reasonable efforts to seek consent to place an intermediate holding company as the new CBL member in the joint venture, which will give a priority guaranty and use reasonable efforts to seek consent to pledge the CBL interest in the joint venture.**

Joint Venture Properties

- CBL Center – Phase I and II
- Hamilton Corner
- Hamilton Corner – AAA Parcel
- Hamilton Place – ALOFT Hotel[1]
- Hamilton Place and OP
- Hamilton Place – Regal Cinema
- Governor's Square Plaza
- Governor's Square
- The Shoppes at Hamilton Place
- The Terrace

3. **The New Notes will (i) include a restriction on mortgaging the following properties to the extent such property is wholly owned directly or indirectly by CBL Limited Partnership, except (a) in connection with a refinancing of an existing mortgage loan currently encumbering an applicable property as of the date hereof in an amount no greater than the loan being refinanced (plus customary interest and refinancing costs) and (b) if the Company reinvests the proceeds of a financing or pays down the New Notes as set forth below, (ii) have a priority guarantee (1) to the extent such property is owned by a joint venture, from an intermediate holding company that directly owns the entity that holds the interest in the joint venture entity that directly or indirectly owns the following properties, or (2) to the extent such property is wholly owned indirectly by CBL Limited Partnership, from an intermediate holding company that directly owns the entity that owns the following properties (except to the extent an existing intermediate holding company cannot give a priority guaranty, an intermediate holding company will be inserted as close as possible above the property-owning entity as may**

---

[1] Notwithstanding the introductory paragraph to this section 2, the Company shall only be required to use commercially reasonable efforts to obtain consent from the joint venture partner for a pledge of the equity by CBL Limited Partnership of the property owning entity. For the avoidance of doubt, the Company shall not be required to seek consent from the lender to obtain a guaranty from an intermediate holding company.

**be permitted and such entity will give a priority guarantee), and (iii) will be secured by a pledge of the equity of such intermediate holding company:**

- Kentucky Oaks Mall
- Outlet Shoppes of the Bluegrass – OP Tract 8
- Pavilion at Port Orange West JV – Apts

<u>Outparcels</u> (The Company shall be allowed to reinvest proceeds from the sale or financing of such properties into the properties set forth herein which are mortgaged (other than section 5 below) or whose equity is pledged as collateral for the New Notes, or to use such proceeds to pay down the New Notes, subject to customary terms to be agreed by the Required Consenting Noteholders.)

- Brookfield Square - Lifestyle Center
- Coolsprings Crossing - (Parcel(s) in Main Project)
- Cross Creek - Sears - (Parcel(s) in Main Project)
- Dakota Square - (Parcel(s) in Main Project)
- Dakota Square – Mgmt GL Parcels
- East Towne Mall - Outparcel
- East Towne Mall - Parcel
- EastGate Mall - Self Development
- EastGate Mall - Shops at Eastgate
- Eastland Mall - (Parcel(s) in Main Project)
- Hamilton Place - Sears - (Parcel(s) in Main Project)
- Hanes Mall - Restaurants
- Jefferson Mall -Self Development
- Kirkwood Mall – Mgmt GL
- Parcels Laurel Park Mall - (Parcel(s) in Main Project)
- Layton Hills Mall - Mgmt GL Parcels
- Layton Hills Mall - Outparcel II
- Mall Del Norte – Mgmt GL Parcels
- Mall Del Norte TX Outparcel
- Mayfaire Town Center – Mgmt GL Parcels
- Meridian Mall - (Parcel(s) in Main Project)
- Mid Rivers Mall - (Parcel(s) in Main Project)
- Monroeville Mall - (Parcel(s) in Main Project)
- Northgate Mall - Outparcel
- Northgate Mall Sears TBA- Outparcels
- Northpark Mall - (Parcel(s) in Main Project)
- Northpark Mall – Mgmt GL Parcels
- Parkdale Mall - Corner (Self Dev. Tract 4/Pad B)
- Parkdale Mall - Mgmt GL Parcels
- Pearland Town Center – Mgmt GL Parcels
- Pearland Town Center - Outparcel TX Land LLC

3

- Pearland Town Center - Self Development (Parcel 8)
- Post Oak Mall – Mgmt GL Parcels
- South County Center - (Parcel(s) in Main Project)
- South County Center – Mgmt GL Parcels
- Southaven Towne Center - (Parcel(s) in Main Project)
- Southpark Mall - Dick's Sporting Good
- St. Clair Square - (Parcel(s) in Main Project)
- The Landing at Arbor Place - (Parcel(s) in Main Project)
- The Plaza at Fayette - (Parcel(s) in Main Project)
- Valley View Mall - (Parcel(s) in Main Project)
- Volusia Mall - Restaurant Village
- West Towne Crossing - (Parcel(s) in Main Project)
- West Towne Mall - Restaurant District
- York Galleria - (Parcel(s) in Main Project)

**4. The New Notes will (i) include a restriction on mortgaging the following properties to the extent such property is wholly owned directly or indirectly by CBL Limited Partnership, except in connection with a refinancing of an existing mortgage loan currently encumbering an applicable property as of the date hereof in an amount no greater than the loan being refinanced (plus customary interest and refinancing costs), and (ii) will have a priority guarantee (1) to the extent such property is owned by a joint venture, from an intermediate holding company that directly owns the entity that holds the interest in the joint venture entity that directly or indirectly owns the following properties, or (2) to the extent such property is wholly owned indirectly by CBL Limited Partnership, from an intermediate holding company that directly owns the entity that owns the following properties. To the extent an existing intermediate holding company cannot give a priority guaranty, an intermediate holding company will be inserted as close as possible above the property-owning entity as may be permitted and such entity will give a priority guarantee:**

<u>Joint Venture Properties</u>

Malls
- Coastal Grand Mall and District
- Coastal Grand Mall – Dick's Sporting Goods
- Coastal Grand OP
- CoolSprings Galleria
- Coolsprings Macy's Outparcel - Red Robin
- Friendly Center – Belk
- Friendly Shopping Center
- Northgate Mall - JCP
- Oak Park Mall
- Outlet Shoppes at Atlanta
- Outlet Shoppes at Atlanta - Outparcels

- Outlet Shoppes at Atlanta - Parcel
- Outlet Shoppes at Atlanta – Tract 1B
- Outlet Shoppes at El Paso - OP
- Outlet Shoppes at El Paso - OP II
- Outlet Shoppes at El Paso - .2763 Acre Tract
- Outlet Shoppes at EL Paso - Phase I and II
- Outlet Shoppes at Gettysburg Phase I
- Outlet Shoppes at Gettysburg Phase II
- Outlet Shoppes at Laredo
- Outlet Shoppes of the Bluegrass
- Outlet Shoppes of the Bluegrass - OP
- Outlet Shoppes of the Bluegrass - Phase II
- Outlet Shoppes of the Bluegrass – OP Tract 11
- Shops at Friendly Center – Phase I and II
- West County Center

Associated Centers
- Coastal Grand Outparcel
- Hamilton Crossing and Expansion[2]
- York Town Center
- York Town Center - Pier One

Community Centers
- Ambassador Town Center
- Fremaux Town Center Phase I and II
- Hammock Landing - Phase I
- Hammock Landing - Phase II
- Pavilion @ Port Orange - Phase I
- Promenade at D'lberville
- Shoppes at Eagle Point

Storage
- Eastgate Mall - Self-Storage
- Hamilton Place - Self Storage
- Mid Rivers - Self Storage
- Parkdale Mall - Self Storage

Other Encumbered Properties

Malls
- Alamance Crossing - East

---

[2] The Company will use commercially reasonable efforts to obtain consent to place an intermediate holding company as the new CBL member in the joint venture, which will give a priority guaranty.

- Asheville Mall
- Brookfield Square - Sears and Street Shops
- Burnsville Center & Dick's Sporting Goods
- Cross Creek Mall
- Eastgate Mall
- Fayette Mall
- Jefferson Mall
- Northwoods Mall
- Parkdale Mall and Crossing
- Parkdale Mall and Crossing - Lifeway Christian Redevelopment
- Southpark Mall
- Volusia Mall
- WestGate Mall

5. **The New Notes will be secured by a first priority lien on the following properties, which shall be evidenced by mortgages recorded in the applicable recording offices (unless otherwise consented to by the Required Consenting Noteholders in their reasonable discretion, in which case the New Notes will include a restriction on mortgaging the following properties to the extent such property is wholly owned directly or indirectly by CBL Limited Partnership) and a pledge of the equity of the entity that owns the following properties, provided that the following properties will be released at the request of the New Board, subject to certain customary conditions (and there shall not be any release prices).**

Malls
- Cross Creek Mall - Sears
- EastGate Mall - Sears
- Eastland Mall - Macy's
- Fayette Mall - Sears Renovation
- Hamilton Place - Sears
- Jefferson Mall - Macy's / Round 1
- Jefferson Mall - Sears
- Parkdale Mall - Macy's
- Volusia - Sears TBA

Associated Centers
- The Landing at Arbor Place
- The Plaza at Fayette
- The Plaza at Fayette – Johnny Carino's Redevelopment

Land
- Alamance Crossing - OP
- Alamance Crossing – Utility Mgmt

6

- Arbor Place - APWM, LLC
- Arbor Place - OP
- Chapel Hill Land
- Citadel Mall - OP
- Gulf Coast Galleria
- Gulf Coast Town Center - Peripheral IV - Land
- Gulf Coast Town Center - Phase III - Land
- Hamilton Place – Lebcon (Land)[3]
- Hickory Point Mall - OP
- Imperial Valley Commons - Kohl's and Land
- Imperial Valley Mall - OP
- Jacksonville Regal Cinema Mgt
- Meridian Mall - Land E. Lansing
- Meridian Mall - Township Property
- Statesboro – Land[4]
- Sunrise Mall - Excess Land
- The Landing at Arbor Place - OP
- Walden Park – Land

---

[3] The Company will use commercially reasonable efforts to obtain consent from the joint venture partner to grant a pledge of the equity, but shall not be required to provide a first priority lien on the property.

[4] The Company will use commercially reasonable efforts to obtain consent from the joint venture partner to grant a pledge of the equity, but shall not be required to provide a first priority lien on the property.

## Exhibit C

### Form of Transfer Agreement

The undersigned (the "**Transferee**") hereby acknowledges that it has read and understands the Restructuring Support Agreement, dated as of _____ (the "**Agreement**"),[1] by and among CBL & Associates Properties, Inc. and its affiliates and subsidiaries bound thereto and the Consenting Noteholders, including the transferor to the Transferee of any Company Claims (each such transferor, a "**Transferor**"), and agrees to be bound by the terms and conditions thereof to the extent the Transferor was thereby bound, and shall be deemed a "Consenting Noteholder" under the terms of the Agreement.

The Transferee specifically agrees to be bound by the terms and conditions of the Agreement and makes all representations and warranties contained therein as of the date of this transfer agreement, including the agreement to be bound by the vote of the Transferor if such vote was cast before the effectiveness of the Transfer discussed herein.

Date Executed:

_____

Name:
Title:
Address:
E-mail address(es):

| Aggregate Amounts Beneficially Owned or Managed on Account of: | |
|---|---|
| 2023 Notes | |
| 2024 Notes | |
| 2026 Notes | |
| Bank Claims | |

---

[1]    Capitalized terms used but not otherwise defined herein shall having the meaning ascribed to such terms in the Agreement.

**Exhibit D**

**Form of Joinder Agreement**

The undersigned (the "**Joining Noteholder**") hereby acknowledges that it has read and understands the Restructuring Support Agreement, dated as of _____ (the "**Agreement**"),[2] by and among CBL & Associates Properties, Inc. and its affiliates and subsidiaries bound thereto and the Consenting Noteholders, and agrees to be bound by the terms and conditions thereof, and shall be deemed a "Consenting Noteholder" under the terms of the Agreement.

The Joining Noteholder specifically agrees to be bound by the terms and conditions of the Agreement and makes all representations and warranties contained therein as of the date of this joinder.

Date Executed:

_____

Name:
Title:
Address:
E-mail address(es):

| Aggregate Amounts Beneficially Owned or Managed on Account of: | |
|---|---|
| 2023 Notes | |
| 2024 Notes | |
| 2026 Notes | |
| Bank Claims | |

---

[2]    Capitalized terms used but not otherwise defined herein shall having the meaning ascribed to such terms in the Agreement.