**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **In re:** | § | |
| | § | |
| **CBL & ASSOCIATES** | § | **Chapter 11** |
| **PROPERTIES, INC.,** *et al.*, | § | **Case No. 20-35226** |
| | § | |
| **Debtors.**[1] | § | |
| ------------------------------------------ | § | |
| | § | **Adversary Proc. No. 20-____** |
| **CBL & ASSOCIATES** | § | |
| **PROPERTIES, INC.,** *et al.*, | § | **(Emergency Hearing Requested)** |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| **v.** | § | |
| | § | |
| **WELLS FARGO BANK,** | § | |
| **NATIONAL ASSOCIATION,** | § | |
| | § | |
| **Defendant.** | § | |
| ------------------------------------------ | § | |

**COMPLAINT FOR DECLARATORY JUDGMENT,**
**INJUNCTIVE RELIEF, AND DAMAGES**

CBL & Associates Properties, Inc. (the "REIT") and its direct and indirect subsidiaries

that are debtors and debtors in possession in the above-captioned chapter 11 cases, including

CBL & Associates Limited Partnership (the "Debtors" and, together with the REIT's non-Debtor

direct or indirect subsidiaries "CBL" or the "Company"), and as Plaintiffs in the above-captioned

adversary proceeding (the "Adversary Proceeding"), hereby file this Complaint against Wells

---

[1]   A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://dm.epiq11.com/CBLProperties.  The Debtors' service address for the purposes of these chapter 11 cases is 2030 Hamilton Place Blvd., Suite 500, Chattanooga, Tennessee 37421.

Fargo Bank, National Association, as administrative agent ("Wells Fargo" or the "Administrative Agent") for a number of bank lenders ("Bank Lenders") and allege as follows:

**INTRODUCTION**

1.      This action is necessary to protect CBL—a publicly traded real estate investment trust that owns, develops, acquires, manages, and operates regional shopping malls and other properties—from the irreparable harm caused by Wells Fargo's (1) unjustified assertions that various alleged defaults constitute continuing Events of Default[2] under the First Lien Credit Agreement and other Loan Documents, [3] and (2) opportunistic decision to purportedly exercise remedies under the First Lien Credit Agreement and other Loan Documents by accelerating payment on over $1.1 billion dollars of loans and attempting to exercise control over the Credit Facility Properties and rent derived therefrom.  CBL is also entitled to damages based on Wells Fargo's actions, including for Wells Fargo's breach of the First Lien Credit Facility and other Loan Documents and tortious interference with CBL's contracts and business relations with its tenants.

2.      Wells Fargo's recent actions recklessly put the value of the Debtors' estate at risk and are naked attempts to gain advantage during restructuring negotiations.  Indeed, the timing of Wells Fargo's purported exercise of remedies reveals its true motives.

3.      In August 2020, the same day that Wells Fargo learned that CBL had entered into a restructuring support agreement ("the RSA") with the majority of its unsecured

---

[2] *See* First Lien Credit Agreement at 11 (defining "Event of Default" as "any of the events specified in Section 11.1 provided that any requirement for notice or lapse of time or any other condition has been satisfied").  Section 11.1 specifies events including default in performance, including violating a covenant of the First Lien Credit Agreement and commencing a voluntary bankruptcy proceeding, among other defaults.  *Id.* at 117-118.

[3] Capitalized terms not defined herein are defined as set forth in the First Lien Credit Agreement.

bondholders (the "Ad Hoc Bondholder Group"), Wells Fargo served CBL with a Notice of Acceleration demanding immediate repayment of over $1.1 billion in loans under the First Lien Credit Facility. The Notice of Acceleration, which CBL considers invalid and Wells Fargo had not sought to enforce, sat dormant in the background of the parties' continued negotiations.

4. Now several months after the alleged Events of Default, immediately after receiving a restructuring term sheet proposed by the Ad Hoc Bondholder Group that apparently offended the Bank Lenders, Wells Fargo suddenly purports to exercise a number of remedies that it allegedly possess, including proxy rights, to exercise control over the Credit Facility Properties and the rent derived therefrom. Wells Fargo's purported exercise of remedies, however, is predicated on baseless alleged non-monetary defaults that do not amount to Events of Default under the First Lien Credit Agreement.

5. The cascading and dire effects of the Administrative Agent's exercise of remedies are real, immediate, and will irreparably damage CBL. Absent action by this Court, the Company's business reputation will suffer and the Administrative Agent, by holding the Credit Facility Properties hostage, will bleed the Debtors' estate of essential assets, including a continuing rental revenue stream.

6. The Debtors are entitled to a declaratory judgment, injunctive relief, and damages.

## PARTIES

7. CBL—a publicly traded real estate investment trust that owns, develops, acquires, manages, and operates regional shopping malls and other properties— is a corporation duly organized under the laws of the state of Delaware, with its principal place of business located at 2030 Hamilton Place Boulevard, Suite 500, Chattanooga, Tennessee 37421.

8.     Defendant Wells Fargo Bank, National Association, is a national banking association with its principal executive office located at 101 North Phillips Avenue, Sioux Falls, South Dakota, 57104, as designated in its articles of association pursuant to 12 U.S.C. § 21 et seq.

## JURISDICTION AND VENUE

9.     The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334 and Federal Rules of Bankruptcy Procedure 7001(7), (9) and 7065.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedure and Rule 7008-1 of the Bankruptcy Local Rules for the Southern District of Texas, the Debtors consent to the entry of final orders or judgment by this Court in connection with this adversary proceeding if it is determined that, absent consent of the parties, the Court cannot enter final orders or judgments consistent with Article III of the United States Constitution.

10.     Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## FACTUAL BACKGROUND

### CBL'S Business and the First Lien Credit Facility

11.     CBL is a self-administered and self-managed real estate investment trust whose stock is traded on the New York Stock Exchange.  CBL owns, develops, acquires, leases, manages, and operates regional shopping malls, open-air and mixed-use centers, outlet centers, associated centers, community centers, offices, and other properties.  The Company wholly owns approximately 66 properties, owns joint venture interests in approximately 33 properties, and manages approximately eight properties for third parties.  CBL primarily derives rental revenue from leases from retail and non-retail tenants occupying the aforementioned centers.

4

12.      In January 2019, the Company entered into the "First Lien Credit Agreement" for a new $1.185 billion senior secured credit facility, which includes a $685,000,000 revolving credit facility and a $500,000,000 term loan.  The First Lien Credit Facility is secured by a portfolio of approximately twenty-two properties consisting of malls and associated centers (the "Credit Facility Properties").  The First Lien Credit Agreement contains various restrictive covenants including a liquidity covenant (the "Liquidity Covenant"), which provides that aggregate amounts of unrestricted cash or "Cash Equivalents" (a defined term under the First Lien Credit Agreement) that constitute proceeds of the revolving loans may not exceed $100,000,000 at any time.  The First Lien Credit Agreement also contains default and cross-default provisions.

13.      In the case of a valid Event of Default under the First Lien Credit Agreement, the Administrative Agent may accelerate payment of outstanding debt and terminate the Credit Facility.

14.      Since the effective date of the First Lien Credit Agreement, CBL has continuously complied with all of its obligations thereunder, including without limitation, making payments of interest, amortization and fees of over $130 million, and all other amounts properly due and owing.  There have never been, nor are there now, any alleged monetary defaults by the Company with respect to the Credit Facility.

**CBL'S Response to the COVID-19 Crisis**

15.      As the economic impact of the COVID-19 pandemic shuttered businesses across the country, CBL, as the owner of various shopping malls and retail locations, faced incredible hardship.  With in-person shopping grinding to a halt virtually overnight, CBL's tenants faced declining revenues and record numbers filed for bankruptcy, causing substantial losses for CBL.

16.     Confronted with these unprecedented challenges, CBL has worked diligently to protect the Company—including its approximately 500 employees, literally thousands of vendors, over 7,400 tenants/retailers, and its shareholders.  The First Lien Credit Facility played an important role in this effort, allowing CBL to access short-term financing and stay afloat in the middle of an unprecedented public health crisis that had a particularly harsh impact on the Company's business.  Despite these challenges, CBL has steadfastly honored the terms of the First Lien Credit Agreement and stayed true to its spotless record of timely payment.

17.     Like many companies seeking to navigate the economic crisis, in March 2020, CBL faced an urgent need to draw on lines of credit to shore up the liquidity necessary to fund vital ongoing business operations.  Knowing that the Company needed to create liquidity, CBL's Chief Financial Officer and Treasurer, Farzana Khaleel, contacted Wells Fargo Managing Director Scott Solis, CBL's principal contact at Wells Fargo, and notified him that the Company planned to draw on its lines of credit.

18.     On Tuesday, March 17 at 4:00 p.m. Eastern Time, consistent with the terms of the First Lien Credit Facility, CBL gave Wells Fargo three-day notice of the Company's intention to draw down $100 million from the First Lien Credit Facility.  The next day, and again consistent with the terms of the First Lien Credit Facility, the Company gave Wells Fargo one-day notice of the Company's intention to draw down $180 million from the First Lien Credit Facility.

19.     From late Thursday, March 19 to late Friday, March 20, CBL drew down $280 million from the First Lien Credit Facility.  At all times CBL intended to immediately place $180 million of that amount in long-term investments (i.e. not subject to the restrictions

applying to cash or Cash Equivalents in the Liquidity Covenant) and thus remain in compliance with the Liquidity Covenant of the First Lien Credit Agreement, which permits CBL to maintain no more than $100 million in proceeds from the First Lien Credit Facility as unrestricted cash of "Cash Equivalents" (defined in the First Lien Credit Agreement to include certain types of investments) on hand at a given time.

20.     Specifically, on Thursday, March 19 at 4:00 p.m. Eastern Time, CBL received $177.4 million in funds pursuant to its March 18 one-day notice of a $180 million draw with the remaining $2.6 million deposited the next morning.  Within an hour of receiving the $177.4 million in funds, CBL transferred $100 million of the proceeds to Goldman Sachs ("Goldman"), having previously instructed Goldman to purchase United States Treasury Notes with a maturity of more than one year (which investment would not have been subject to the $100 million limitation under the Liquidity Covenant).  The next morning, Friday March 20, Goldman informed CBL that it was unable to open a treasury account due to certain regulatory restrictions and required a week to execute on a treasury purchase.  CBL then urgently sought to find another banker who might be able to execute the transactions. Later that day, CBL was informed by Jefferies, another investment bank, that it could open an account on an expedited basis and make the investments no later than Monday, March 23.

21.     On Friday, March 20 at 4:00 p.m. Eastern Time, pursuant to the March 17 three-day notice of a $100 million draw, CBL received the additional $100 million from the First Lien Credit Facility.  Within an hour of receipt, the Company transferred a total of $180 million to Jefferies with the intention of investing these funds in United States Treasury Notes (which investment would not have been subject to the $100 million limitation in the Liquidity Covenant), which would have left CBL with the permitted $100 million in

unrestricted cash.  Given that it was Friday and the markets were closed for the day, Jefferies

could not start its efforts until the next business day, Monday March 23.

22.    On Monday, March 23, Jefferies worked throughout the day trying to purchase

Treasury Notes on behalf of CBL but was thwarted due to skyrocketing demand in the

market—every time Jefferies identified and notified me of a potential option, the treasuries

were sold before Jefferies could buy them.  CBL was in constant contact with Jefferies

throughout the day as they worked to make the investments.

23.    Given these circumstances, and mindful of the Liquidity Covenant, on Friday,

March 20 and again on March 23, Ms. Khaleel, contacted Mr. Solis and explained the

difficulty that CBL was encountering trying to invest the excess cash.  Mr. Solis

acknowledged the challenge created by the volatile market conditions, assured Ms. Khaleel

that he understood the Company's predicament, and stated that CBL should do its best under

the circumstances.  Given Mr. Solis's assurance, CBL believed that Wells Fargo would not

claim that CBL was in default of the Liquidity Covenant and would not subsequently allege

that an Event of Default had occurred or seek any remedial action in connection with these

circumstances.

24.    On Tuesday, March 24, Jefferies succeeded in investing most of the $180 million

by purchasing $154 million in United States Treasury Notes for CBL that had maturities

beyond one year as permitted under the Credit Agreement.  Because Jefferies was unable to

purchase securities with the remaining approximately $26 million, at Ms. Khaleel's direction,

CBL deposited the remaining funds in its account for necessary business expenses.  By April

2, CBL had used the majority of the funds in excess of this amount to cover its operations,

service its debts, make its payroll and pay certain taxes.  CBL had no intention to, nor did it,

hold cash in excess of the $100 million threshold to the detriment of Wells Fargo, but rather, utilized that money as expeditiously and frugally as possible to sustain CBL's business operations.

25.     On March 31, the fiscal quarter closed, and CBL's auditor, Deloitte Touche Tohmatsu Limited ("Deloitte"), began its work on a 10-Q due to be filed on June 5, 2020. After reviewing CBL's most recent Compliance Certificate, Deloitte advised CBL in May that notwithstanding the previous assurances provided by Wells Fargo, it should obtain a written waiver from Wells Fargo to ensure there would be no allegation of non-compliance with the Liquidity Covenant during the few days in question back in March at the height of the market meltdown.

26.     Although CBL believed that no default had occurred, or was otherwise excused by Wells Fargo, at Deloitte's recommendation and advice Ms. Khaleel requested a waiver on May 15, 2020, referencing her prior discussion with Mr. Solis in March and fully expecting to receive a favorable response as a matter of course.  Mr. Solis, however, never responded to the email.

**Wells Fargo Alleges Baseless Defaults Under the First Lien Credit Agreement**

27.     On May 26, Wells Fargo sent CBL a notice of default (the "May 26 Letter") alleging that CBL breached the Liquidity Covenant, breached a related provision requiring the Company to provide notice of the alleged breach, and failed to timely provide a compliance certificate.  CBL was surprised by the unjustified letter given the assurance that Wells Fargo gave CBL in March that led CBL to believe the investment delay had not triggered an Event of Default, and that any alleged default was long since remedied.

28.     The Events of Default asserted in the May 26 Letter are without merit.  First, with respect to the alleged breach of the Liquidity Covenant and related alleged breach of a

provision regarding the obligation to provide notice of a breach, unprecedented market volatility made it impossible for CBL to immediately invest funds, CBL invested funds as soon as possible, CBL promptly notified Wells Fargo that market conditions prevented CBL from remaining under the liquidity threshold, and Wells Fargo assured CBL that its efforts to invest the funds were acceptable.  Second, with respect to Wells Fargo's allegation that CBL failed to timely provide a compliance certificate, CBL timely provided the compliance certificate to Wells Fargo on May 18.  As a matter of course, CBL has timely provided Wells Fargo with compliance certificates throughout the term of the Credit Agreement, as well as under prior credit agreements with the Wells Fargo.

29.     CBL denied Wells Fargo's allegations but consistent with Company practice of generally deferring to the auditor's recommendations and taking a conservative approach, at the recommendation of Deloitte in light of the Notice of Default letter, CBL included language in its 10-Q regarding the brief period of alleged non-compliance with the Liquidity Covenant and alleged default that Wells Fargo previously led the Company to believe would not be a basis for action against CBL.

30.     On June 9, CBL responded to the Administrative Agent's May 26 Letter and disputed the alleged defaults described therein.

31.     In addition to the three purported Events of Default set forth in the May 26 Letter, Wells Fargo has since asserted four other Events of Defaults.  These additional purported Events of Default are likewise without merit.

32.     On August 6, Wells Fargo sent CBL a notice of default asserting three Events of Default (the "August 6 Letter").  First, Wells Fargo asserted an Event of Default stemming from CBL's alleged failure to make certain Restricted Payments in contravention of the

Credit Agreement.  As CBL explained in response, these asserted Events of Default are without merit: no Default or Event of Default existed when CBL made such Restricted Payments; the parties intended the underlying provision to permit CBL to make this type of Restricted Payment; and CBL paid standard dividends in the exact same fashion for years without any complaint from Wells Fargo.  <u>Second</u>, Wells Fargo asserted an Event of Default based on CBL's alleged failure to make certain interest payments to *other parties* that were due in June.  As CBL explained in response, any failure to make certain interest payments does not constitute an Event of Default: CBL has cured any alleged default by making the payments in full and, in any event, Wells Fargo entered into a Forbearance Agreement explicitly waiving this claim.  <u>Third</u>, Wells Fargo asserted an Event of Default based on a provision providing for default if CBL "generally fails" to pay its debts as they become due. To support its assertion, Wells Fargo points to only *two* instances of alleged delayed interest payments and an unpaid settlement in connection with an action brought in Florida.  As CBL detailed in response, CBL has since paid the few delayed interest payments prior to the expiration of the forbearance period, payment on the settlement is not yet due, and, in any event, the identified provision is intended to apply in the case of insolvency, not a few errant delays in payment.  The Events of Default asserted in the August 6 Letter are therefore without merit.

33.     On August 19, Wells Fargo sent CBL another notice of default asserting one additional Event of Default (the "<u>August 19 Letter</u>").  Wells Fargo claims that a restructuring support agreement ("RSA") that CBL entered into with certain of its other creditors contravenes a default provision triggered by a voluntary bankruptcy proceeding.  CBL explains in response that this asserted Event of Default is without merit because the RSA is

an agreement intended to further negotiations related to CBL's debt profile and does not

commit CBL to filing for bankruptcy and furthermore requires approval from CBL's board

that has not been obtained; therefore, CBL's decision to enter into an RSA is not an Event of

Default.  The Event of Default asserted in the August 19 Letter is without merit.

34.     The unfounded Events of Default that Wells Fargo asserts across the May 26

Letter, August 6 Letter, and August 19 Letter are unsupported and entirely without merit.

**Good Faith Negotiations with Stakeholders and the Restructuring Support Agreement**

35.     Since May 2020, CBL and its advisors have tirelessly engaged with the Ad Hoc

Bondholder Group and the bank lenders for whom Wells Fargo acts as administrative agent

(the "Bank Lenders") and their respective advisors on a comprehensive capital restructuring.

36.     In late June and early July, CBL entered into forbearance agreements with the Ad

Hoc Bondholder Group with respect to approximately $12 million and $19 million of cash

interest payments that came due on June 1 and June 15, respectively, on CBL's unsecured

notes.  CBL also entered into a forbearance agreement with the Bank Lenders with respect to

a cross-default under the Credit Facility triggered by the missed interest payments on the

notes.  The forbearance agreements were each extended multiples times by the noteholders

and the Bank Lenders to facilitate further negotiations.  On August 5, prior to the expiration

of the forbearance agreements, CBL made the previously missed June 1 and June 15 interest

payments on the unsecured notes, resulting in termination of those forbearance agreements.

During and after the forbearance period, negotiations continued with both the Ad Hoc

Bondholder Group and the Bank Lenders.

37.     On August 19, CBL advised Wells Fargo, and then announced publicly, that it

entered into a restructuring support agreement (the "RSA") with the Ad Hoc Bondholder

Group.  The RSA was intended to significantly strengthen CBL's balance sheet and

organization.  Included in Wells Fargo's laundry list of claims is the incorrect assertion that entering into the RSA constituted an Event of Default.

**Wells Fargo Issues Notice of Acceleration Based on Meritless Allegations of Default**

38.     On August 19—immediately after CBL entered into the RSA with another creditor—Wells Fargo sent a notice of acceleration ("Notice of Acceleration") demanding, as a remedy for default, immediate accelerated payment of over $1.1 billion and termination of the Company's access to the credit provided under the Credit Agreement.

39.     The Notice of Acceleration also carried with it the threat of other enforcement remedies, including (i) a purported takeover of the Board of Directors of certain CBL subsidiaries; (ii) the immediate appointment of a receiver "without notice of any kind whatsoever;" (iii) the exercise all voting powers pertaining to the pledged collateral and the right to sell CBL's equity and (iv) revoking rights to collect rents and revenues.  Acceleration also threatened to impact other loan agreements CBL has with third parties.  For example, provisions in the Company's Senior Unsecured Notes authorize cross-default upon acceleration or certain defaults on loans with other lenders.  In addition, a number of property level loan agreements contain cross-default provisions that are triggered upon an acceleration and which provide those other lenders remedies against CBL, including foreclosure on the Credit Facility Properties.

40.     CBL immediately responded to the Notice of Acceleration disputing its efficacy and requesting that the Administrative Agent rescind the notice immediately.  CBL expressed its interest in continuing to work with the Bank Lenders cooperatively to negotiate a resolution in good faith, while simultaneously allowing all parties to reserve their rights.  Although the Administrative Agent refused to rescind the Notice of Acceleration, it did not attempt to exercise any remedies.  The parties engaged in negotiations and the Notice of

Acceleration, and any threat that it carried, was dormant until late October, when Wells Fargo suddenly sought to exercise control over the Company's Credit Facility Properties.

41.     Having sat quietly for months, Wells Fargo's sudden move to claim entitlement to a draconian remedy against CBL immediately after it had reached an agreement with another constituency of stakeholders was a naked attempt to gain leverage at the negotiating table that recklessly and needlessly put CBL in imminent and irreparable peril.

**<u>Wells Fargo Purports to Exercise Remedies, Forcing CBL Into an Immediate Chapter 11 Filing</u>**

42.     Notwithstanding the Notice of Acceleration, which was issued erroneously and in bad faith, CBL had continuously engaged with the Bank Lenders in good faith and has stated publicly that it intended to continue collaborative negotiation to reach consensus among its stakeholders.  Upon executing the RSA, the Company and the Ad Hoc Bondholder Group focused their efforts on negotiations with the Bank Lenders in an effort to reach a tripartite agreement among the Company, the Ad Hoc Bondholder Group and the Bank Lenders over the terms of a fully consensual restructuring.  In fact, despite wrongfully using the Notice of Acceleration as a negotiation tactic, Wells Fargo continued to negotiate with CBL on a potential global resolution and gave no indication that it would seek to act on it or seek to enforce any of these remedies it claimed it had until recently.

43.     On October 13, 2010, the members of the Ad Hoc Bondholder Group executed confidentiality agreements and became "restricted" to negotiate directly with the Bank Lenders.  On October 27, 2020, the Ad Hoc Bondholder Group's advisors sent a restructuring term sheet to the Administrative Agent's advisors that the Bank Lenders apparently found offensive.  Instead of responding with a counterproposal, under cover of darkness, the Bank Lenders abruptly cut short the negotiation process and purported to

14

exercise remedies, including proxy rights, to take control of the Credit Facility Properties and implement governance changes at certain of the REIT's subsidiaries that own the Credit Facility Properties.

44.     The timing of Wells Fargo's Notice of Acceleration and Notice of Exercise of Remedies makes clear that it is acting in bad faith and using these tactics to pressure CBL in restructuring negotiations.

45.     Specifically, on October 28, 2020 and with no prior notice—despite the fact that over seven months had passed since the alleged defaults and over two months had passed since the Administrative Agent sent the Notice of Acceleration—the Company received a number of documents from the Administrative Agent, including (1) a Notice of Exercise of Remedies under the Collateral Agreement and the Pledge Agreement, (2) a Revocation of License to Collect Rents, (3) Joint Written Consents for multiple of the Company's subsidiaries which own the Credit Facility Properties purporting to take a number of actions, including transitioning leadership of those entities to Wells Fargo, and (4) sending nearly 400 Tenant Direction Letters to over 200 tenants at the Credit Facility Properties, effective immediately, to stop paying rent to CBL's subsidiaries which own and operate those Credit Facility Properties and instead to pay rent directly to the Administrative Agent.

46.     Those notices stated, among other things, that the Administrative Agent purportedly was (i) electing to exercise all voting rights and all other ownership rights in respect of all Credit Facility Properties; (ii) revoking the Company's right to collect rents and that the Company had three (3) days to instruct its tenants to pay rent directly to the Administrative Agent; and (iii) removing the manager and officers from the governing boards of the Credit Facility Properties and appointing itself as manager via a joint written

consent.  Most ominously, the joint written consents purport to strip the governing boards of the Credit Facility Properties of the authority to file any bankruptcy petition without the consent of the Administrative Agent thereby exposing the Company—and its collective creditors—to the mercy of the Bank Lenders.

47.     The Administrative Agent had no valid basis for sending these letters and instead, upon information and belief, sent them to knowingly and intentionally disrupt the Debtors' contracts and business relationships with its tenants in a plain attempt to gain advantage.  The Debtors have suffered damages as a result, including to their business reputation, contractual relationships with their tenants, and the value of the enterprise.

48.     Additionally, the Company was forced to commence these Chapter 11 Cases on an accelerated timeline to protect the Company, its stakeholders and its properties.  While the Company intended to have a deliberate and thoughtful entry into chapter 11, it was left to scramble for an emergency filing over a weekend due to the entirely unlawful, unnecessary, and unprovoked conduct of the Administrative Agent.

**Wells Fargo's Actions Will Cause the Debtors Immediate and Irreparable Harm**

49.     The Agent's purported exercise of unauthorized and unlawful "remedies" based on manufactured Events of Default will cause the Debtors immediate and irreparable harm.

50.     The Notice of Acceleration served on the Company in August sets forth a demand for immediate payment of over $1.1 billion in debt—which the Company was not and is not in a position to pay—and purports to terminate the Company's access to the credit provided under the First Lien Credit Agreement.  Particularly in light of the circumstances CBL has faced in attempting to weather the economic fallout of the pandemic, the Notice of Acceleration, and all of the associated enforcement remedies to which CBL was exposed as a

result, carried with it the threat of drastic and irreversible injury to CBL and its employees, tenants, vendors, shareholders, and creditors.

51.     The Bank Lenders' recent actions through the Administrative Agent have, and, if not immediately enjoined, will continue, to create chaos and confusion among the tenants that occupy these Credit Facility Properties, multiple of which have already contacted the Company for guidance as to how to proceed and to which entity to make payment.  As would be expected given this willful and malicious conduct on the part of the Administrative Agent, the interference with the Company's business relationships and contracts with its counterparties will be severe and significant if not enjoined.  Indeed, the Bank Lenders' actions pose dire consequences to the Company's ability to maximize liquidity and protect the people—vendors, employees, and retailers—who rely on the Company's stability.

52.     These actions are not only value destructive to the Credit Facility Properties but to the Company's enterprise as a whole as they are extremely disruptive to the operations of the Credit Facility Properties, including with respect to application of rents, collection of rents, cutting off vital funds to pay operating expenses and capital and emergency items, and disrupting the Company's ongoing negotiations with tenants.

53.     Because of the tumultuous impact of the pandemic on mall tenants, the Company has worked tirelessly to negotiate solutions, including through rent abatements and deferrals, to preserve its operations.  These efforts will be severely and adversely impacted by the Bank Lenders' actions and will cause the Company irreparable damage through its negative impact on the Company's good will and business relationship with its tenants and suppliers and the uncertainty it creates with respect to the ongoing operations of the Credit Facility Properties,

which are already suffering from the tumultuous impact of the pandemic and negative economic climate.

54.     Significantly, for example, the malls and other properties at issue have to still be operated by the Company's subsidiaries, and those operations cost money.  The rents from tenants are the principle source of funding for those operations, yet the Administrative Agent has made no accommodation for providing funds for the operations.  In fact, even under the terms of the First Lien Credit Facility, the Administrative Agent at most would be entitled to only rents net of operational costs, yet it has sought to take all of the funds.  This is particularly problematic at the Pearland Town Center in Pearland, Texas where there is currently being constructed a medical office building.  Rents from tenants at the Pearland Town Center are required so that the construction company working on the project gets paid.  Through its actions, the Administrative Agent has put that construction in jeopardy.

55.     In fact, the Bank Lenders conduct has left the Company no choice but to commence these Chapter 11 Cases on an accelerated timeline to protect the Company and its stakeholders.  If not immediately restrained, the Administrative Agent's continued unauthorized exercise of remedies on behalf of the Bank Lenders will jeopardize the operations of the Credit Facility Properties as well as the success of these Chapter 11 Cases.

56.     By contrast, Wells Fargo will suffer no harm if the injunction issues.  None of the alleged Events of Default was monetary or even allegedly resulted in non-payment.  Indeed, the Credit Facility Properties securing the loans administered by Wells Fargo will continue to secure the loans, and if Wells Fargo were to ultimately prevail, it will be able to exercise remedies from the exact same position.

## COUNT ONE

### (Declaratory Judgment Pursuant to 28 U.S.C. § 2201)

57.     The Debtors incorporate by reference the allegations in Paragraphs 1- 56 as if set forth fully herein.

58.     Pursuant to the Declaratory Judgment Act, "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."  28 U.S.C. § 2201(a).  Bankruptcy Courts, as units of the district court, have the authority to issue declaratory judgments.

59.     Courts possess jurisdiction to issue declaratory relief where "the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment."  *MedImmune, Inc. v. Genetech, Inc.*, 549 U.S. 118, 127 (2007).

60.     There is a substantial controversy between the Debtors and the Administrative Agent of sufficient immediacy and reality to warrant the issuance of a declaratory judgment, which is both necessary and appropriate.

61.     The Debtors seek a declaratory judgment confirming that (1) no Event of Default has occurred or is continuing under the First Lien Credit Agreement, and (2) the Administrative Agent's purported exercise of remedies detailed herein are null and void.

## COUNT TWO

### (Declaratory Judgment Pursuant to 28 U.S.C. § 2201)

62.     The Debtors incorporate by reference the allegations in Paragraphs 1-61 as if set forth fully herein.

63.     Section 541 of the Bankruptcy Code provides that all of the debtor's legal and equitable interests in property as of the commencement of the case constitute "property of the estate."  11 U.S.C. § 541(a).

64.     Because no Event of Default has occurred or is continuing under the First Lien Credit Agreement such that the Bank Lenders' purported exercise of remedies is null and void, the Debtors' seek a declaratory judgment that the Credit Facility Properties and rental incomes derived therefrom constitute property of the estate under section 541.

## COUNT THREE

### (Enforcement of Section 362 Automatic Stay)

65.     The Debtors incorporate by reference the allegations in Paragraphs 1-64 as if set forth fully herein.

66.     Pursuant to section 362 of the Bankruptcy Code, the filing of a bankruptcy petition operates as a stay, applicable to all entities, of any act to obtain possession of property of the estate, or to exercise control over property of the estate.

67.     The automatic stay prohibits "all entities" from taking any "act" to "exercise control over property of the estate."  11 U.S.C. § 362(a)(3).

68.     The Credit Facility Properties, including the rents received therefrom, are property of the estate under sections 362 and 541 of the Bankruptcy Code.

69.     The Administrative Agent's continued attempt to exercise control over the Credit Facility Properties, which are part of the Debtors' estate, violates the automatic stay.

70.     Issuing an order enforcing the automatic stay as to the Administrative Agent's attempt to exercise control over the Credit Facility Properties, including the rents received therefrom, is therefore necessary and appropriate.

## COUNT FOUR

### (Section 105 Preliminary and Permanent Injunction)

71.     The Debtors incorporate by reference the allegations in Paragraphs 1-70 as if set forth fully herein.

72.     A Bankruptcy Court may "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."  11 U.S.C. § 105(a).

73.     A Bankruptcy Court may therefore issue injunctive relief under section 105 of the Bankruptcy Code to restrain activities that threaten the reorganization process or impair the court's jurisdiction with respect to the case before it.

74.     The Debtors are likely to succeed on the merits.

75.     The Administrative Agent's attempt to exercise control over the Credit Facility Properties—which includes taking control of those assets and the associated rental income that should continue to flow to the Debtors' estate—would irreparably harm the Debtors estate; impinges on this Court's exclusive jurisdiction over the Debtors' estates and the integrity of the Debtors' reorganization process; and otherwise burdens the Debtors.

76.     The Court's issuance of relief enjoining the Administrative Agent's action would not harm the Administrative Agent in any way.

77.     The requested injunctive relief will serve the public interest by allowing this Court to retain its exclusive jurisdiction over these Chapter 11 Cases and the Debtors' estate, facilitating the Debtors' successful reorganization, and treating all general unsecured creditors equally.

78.     Preliminary and permanent injunctive relief pursuant to section 105 of the Bankruptcy Code—specifically, enjoining the Administrative Agent from exercising remedies based on the alleged Events of Default—is therefore necessary and appropriate.

## COUNT FIVE

### (Tortious Interference with Contract and Business Relations)

79.     The Debtors incorporate by reference the allegations in Paragraphs 1-78 as if set forth fully herein.

80.     Valid binding contracts exist between the Debtors and their tenants at the Credit Facility Properties.

81.     When the Administrative Agent committed the acts set forth herein, it knew of the existence of these contracts and the Debtors' business relationship with their tenants.

82.     The Administrative Agent knowingly and intentionally interfered with the Debtors' contractual business relationship with their tenants.

83.     The Administrative Agent has no legal right, privilege, or valid justification of its conduct.

84.     As a direct and proximate result of the Administrative Agent's intentional interference, the Debtors have suffered, and will continue to suffer, monetary damages.

85.     Based on the intentional, willful, and malicious nature of the Administrative Agent's actions, the Debtors have suffered damages, for which they are entitled to recover.

## COUNT SIX

### (Breach of Contract)

86.     The Debtors incorporate by reference the allegations in Paragraphs 1-85 as if set forth fully herein.

87.     Certain of the Debtors entered into the First Lien Credit Agreement and Loan Documents with Wells Fargo.

88.     At all relevant times, the Debtors have complied with the terms of these agreements.

89.     The Administrative Agent's conduct described herein, including its exercise of remedies under the First Lien Credit Agreement and other Loan Documents, constitutes a breach of the First Lien Credit Agreement and other Loan Documents.

90.     As a result of the Administrative Agent's breach, the Debtors have suffered damages, for which they are entitled to recover.

WHEREFORE, the Debtors respectfully request relief as follows:

a.  That this Court issue a declaratory judgment confirming that (1) no Event of Default has occurred or is continuing under the First Lien Credit Agreement, (2) the Administrative Agent's purported exercise of remedies detailed herein are null and void given that there is no underlying Event of Default to trigger any remedy set forth in the First Lien Credit Agreement; and (3) that the Credit Facility Properties and rental incomes derived therefrom constitute property of the estate under section 541.

b.  That this Court, pursuant to section 362 of the Bankruptcy Code, issue an order enforcing the automatic stay as to the Administrative Agent's attempt to exercise control of the Credit Facility Properties.

c.  That that this Court, to the extent it determines that the automatic stay does not apply, exercise its broad discretionary powers under section 105 of the Bankruptcy Code and preliminary and permanently enjoin the Administrative Agent from exercising remedies based on the alleged Events of Default.

d.  Award the Debtors damages for the harm they have suffered as a result of the Administrative Agent's tortious interference with the Debtors' contracts and business relations with their tenants in an amount to be determined.

e.  Award the Debtors damages for the harm they have suffered as a result of the Administrative Agent's breach of contract in an amount to be determined.

f.  Award all such other and further relief that this Court deems just and proper.

Dated: November 2, 2020
      Houston, Texas

                    Respectfully submitted,

                     */s/ Alfredo Pérez*
                    WEIL, GOTSHAL & MANGES LLP
                    Alfredo R. Pérez (15776275)
                    700 Louisiana Street, Suite 1700
                    Houston, Texas 77002
                    Telephone:  (713) 546-5000
                    Facsimile:  (713) 224-9511
                    Email:   Alfredo.Pérez@weil.com

                    -and-

                    WEIL, GOTSHAL & MANGES LLP
                    Theodore E. Tsekerides (*pro hac vice* pending)
                    Ray C. Schrock, P.C. (*pro hac vice* pending)
                    767 Fifth Avenue
                    New York, New York 10153
                    Telephone:  (212) 310-8000
                    Facsimile:  (212) 310-8007
                    Email:   Theodore.Tsekerides@weil.com
                              Ray.Schrock@weil.com

                    *Proposed Attorneys for Debtors*