IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| CBL & ASSOCIATES | § | |
| PROPERTIES, INC., *et al.*, | § | Case No. 20-35226 (DRJ) |
| | § | |
| Debtors.[1] | § | (Joint Administration Requested) |
| | § | (Emergency Hearing Requested) |

## NOTICE OF FIRST DAY HEARING DEMONSTRATIVE

> EMERGENCY RELIEF HAS BEEN REQUESTED.  A **VIDEO/TELEPHONIC** HEARING WILL BE CONDUCTED ON THIS MATTER ON NOVEMBER 2, 2020 AT 12:00 P.M. (PREVAILING CENTRAL TIME).  PARTIES WISHING TO PARTICIPATE TELEPHONICALLY MUST DIAL IN USING THE COURT'S TELECONFERENCE SYSTEM AT 832-917-1510 AND ENTERING CONFERENCE CODE 205691.  PARTIES WHO ALSO WISH TO PARTICIPATE BY VIDEOCONFERENCE MAY DO SO BY USE OF AN INTERNET CONNECTION, USING THE WEBSITE GOTOMEET.ME/JUDGEJONES, SELECTING "JOIN A MEETING," AND ENTERING MEETING CODE "judgejones"
>
> IF YOU OBJECT TO THE RELIEF REQUESTED OR YOU BELIEVE THAT EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU MUST EITHER APPEAR AT THE HEARING OR FILE A WRITTEN RESPONSE PRIOR TO THE HEARING.  OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.
>
> RELIEF IS REQUESTED NOT LATER THAN NOVEMBER 2, 2020.

---

[1] A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://dm.epiq11.com/CBLProperties.  The Debtors' service address for the purposes of these chapter 11 cases is 2030 Hamilton Place Blvd., Suite 500, Chattanooga, Tennessee 37421.

Dated: November 2, 2020
   Houston, Texas

        Respectfully submitted,

          /s/  Alfredo R. Pérez
        WEIL, GOTSHAL & MANGES LLP
        Alfredo R. Pérez (15776275)
        700 Louisiana Street, Suite 1700
        Houston, Texas  77002
        Telephone: (713) 546-5000
        Facsimile:  (713) 224-9511
        Email:  Alfredo.Perez@weil.com

        -and-

        WEIL, GOTSHAL & MANGES LLP
        Ray C. Schrock, P.C. (*pro hac vice* admission pending)
        Garrett A. Fail (*pro hac vice* admission pending)
        Moshe A. Fink (*pro hac vice* admission pending)
        767 Fifth Avenue
        New York, New York  10153
        Telephone:  (212) 310-8000
        Facsimile:  (212) 310-8007
        Email: Ray.Schrock@weil.com
          Garrett.Fail@weil.com
          Moshe.Fink@weil.com

        *Proposed Attorneys for Debtors*
        *and Debtors in Possession*

WEIL:\97692471\1\32626.0003

## <u>Certificate of Service</u>

I hereby certify that on November 2, 2020, a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas, and will be served as set forth in the Affidavit of Service to be filed by the Debtors' proposed claims, noticing, and administrative agent.


   /s/  Alfredo R. Pérez
Alfredo R. Pérez





First Day Hearing Demonstrative

November 2, 2020

# Roadmap



1. Introductions & Company Background

2. History of Prepetition Actions & Negotiations with Stakeholders

3. Wells Fargo's Unprecedented Actions Against the Company

4. The Company's Restructuring Support Agreement with Bondholders

5. The Company's Path Forward

# Introductions & Key Players



| Company's Management | |
|---|---|
| **Chief Executive Officer** | Stephen D. Lebovitz |
| **Chief Financial Officer** | Farzana Khaleel |
| **General Counsel** | Jeffrey V. Curry |

| Party | Advisors |
|---|---|
| **CBL Professionals** | **Weil, Gotshal & Manges, LLP** – Debtors' Proposed Counsel<br>**Moelis & Company** – Debtors' Proposed Investment Banker<br>       Barak Klein, Senior Managing Director<br>**BRG Consulting** – Debtors' Proposed Financial Advisor<br>     – Mark Renzi, Senior Managing Director &<br>     First Day Declarant |
| **Unsecured Bonds** | **Akin Gump** – Counsel to Ad Hoc Bondholders Group<br>**PJT** – Investment Banker to Ad Hoc Bondholders Group<br>**White & Case** – Counsel to Canyon Capital & Oaktree |
| **Term Loan Lenders** | **Jones Day** – Counsel to Wells Fargo as Administrative Agent<br>**Ducera** – Investment Banker |

2

# About CBL



- Founded in 1978, CBL & Associates Properties, Inc. (the "<u>Company</u>" or the "<u>Debtors</u>") is a self-administered and self-managed real estate investment trust ("<u>REIT</u>") that is publicly traded on the New York Stock Exchange.

- The Company is one of the largest shopping mall REITs in the United States, and owns , leases, and operates 107 properties, including regional shopping malls, open-air and mixed-use centers, outlet centers, associated center, community centers, offices, and other properties.

- The Company is the largest owner and manager of shopping centers in the Southeast.

- The Company's tenants include national and regional retail chains, such as Macy's, Victoria's Secret, GAP, J.C. Penney, Dick's Sporting Goods, Barnes & Noble, and Cinemark, among others.

- The Company primarily derives revenue from two sources: (i) rental revenue from retail tenants; and (ii) income from property management and development activities.

3

# CBL Properties



**Portfolio:**

**107** properties

**59** malls

**5** outlet centers

**23** associated centers

**6** community centers

**6** office buildings

**8** properties managed for 3rd parties

The Company owns and manages a national portfolio of market-dominant properties located in dynamic and growing markets in 26 states and primarily in the southeastern and midwestern United States.



4

# Organizational Structure





# Capital Structure



## Funded Debt

| First Lien Credit Facility | Senior Unsecured Notes |
|---|---|
| <u>Borrower</u>: Operating Partnership<br><u>Limited Guarantor</u>: REIT<br><u>Administrative Agent</u>: Wells Fargo Bank, National Association ("<u>Wells Fargo</u>")<br><u>Interest</u>: LIBOR + 2.25%<br><u>Secured Debt</u>:<br>*Term Loan*<br>• Principal Amount: $500 million<br>• Amount Outstanding: $439 million<br>*Revolver*<br>• Principal Amount: $685 million<br>• Amount outstanding: $676 million | <u>Issuer</u>: Operating Partnership<br><u>Limited Guarantor</u>: REIT<br><u>Indentured Trustee</u>: U.S. Bank National Association<br><u>Tranches</u>:<br>*2023 Notes*<br>• Principal Amount Outstanding: $450 million<br>• Rate: 5.25%<br>• Maturity: December 2023<br>*2024 Notes*<br>• Principal Amount Outstanding: $300 million<br>• Rate: 4.60%<br>• Maturity: October 2024<br>*2026 Notes*<br>• Principal Amount Outstanding: $625 million<br>• Rate: 5.95%<br>• Maturity: December 2026 |

# Capital Structure (Cont'd)



**Property-Level Debt (approximately $2 billion)**

- Approximately $2 billion
- Includes recourse and non-recourse loans
- Mostly securitized and sold into the commercial mortgage-backed securities markets
- CMBS Properties not included in chapter 11 filing at this time

**REIT Preferred Stock**

- Series D Preferred Stock (7.375%): approximately 1,185,000 shares outstanding; approximately $453,750,000 owed
- Series E Preferred Stock (6.625%): approximately 690,000 shares outstanding; approximately $172,500,000 owed

**REIT Common Stock**

- Approximately 196,000,000 shares of common stock outstanding

**Operating Partnership Common Units**

- Approximately 201,690,311 common units outstanding
- Three series special common units
  - Series S: 1,560,942 outstanding
  - Series L: 571,700 outstanding
  - Series K: 868,821 outstanding

7

# History of Prepetition Actions & Negotiations



<u>March 2020</u>

- On March 19, 2020, the Company drew down on its senior secured credit facility (the "<u>First Lien Credit Facility</u>") .

<u>May</u>

- On May 26, Wells Fargo sent the Company a notice of default (the "<u>Notice of Default</u>"), alleging a breach of a liquidity covenant and related noticing provisions.

- The Company and its advisors engaged with the Bank Lenders under the First Lien Credit Facility regarding potential restructuring transactions.

- The Company, however, did not receive any constructive response from the Bank Lenders, and informed the Bank Lenders it would instead attempt to start negotiations with its unsecured bondholders.

<u>June</u>

- The Company engaged with the Ad Hoc Bondholder Group and its advisors regarding a comprehensive capital restructuring. The Ad Hoc Bondholder Group executed non-disclosure agreements in mid June and became "restricted" to negotiate with the Company.

- On June 2, Wells Fargo sent another letter to the Company alleging a default under the First Lien Credit Agreement and reserving all rights and remedies thereunder.

8

# History of Prepetition Actions & Negotiations (Cont'd)



<u>June (cont'd)</u>

- On June 9, the Company responded to the Notice of Default through a letter expressing its disagreement concerning any alleged default under the First Lien Credit Facility and formally advised Wells Fargo of the Company's engagement with the Ad Hoc Bondholder Group.

- On June 15, the Company elected not to make an interest payment on the 2026 Notes, thus entering a 30-day grace period to cure the missed interest payment without triggering an "Event of Default" under the 2026 Notes.

- On June 16, Wells Fargo sent another letter to the Company alleging a default under the First Lien Credit Agreement and reserving all rights and remedies thereunder.

- To facilitate negotiations, the Company entered into forbearance agreements with the Ad Hoc Bondholder Group with respect to cash interest payments due in June on the Senior Unsecured Notes.

<u>July</u>

- Negotiations with the Bondholders continued after the Company made interest payments.

- The Company entered into Forbearance Agreements with Ad Hoc Bondholder Group and First Lien Credit Agreement as it continued negotiating with Bank Lenders and Ad Hoc Bondholder Group and elected not to make the interest payment at the conclusion of the grace period.

9

# History of Prepetition Actions & Negotiations (Cont'd)



**August & September**

- On August 5, the Company elected to make the interest payment on its unsecured bonds. Under the terms of the Bank Lender and Ad Hoc Bondholder Group forbearances, any default associated with the delayed bond interest payment was waived.

- On August 6, the Company received a letter advising the Company of alleged defaults and certain reservation of rights taken by Wells Fargo.

- On August 10, the Company responded to the notice of additional defaults and imposition of rates refuting the allegations in prior letters and notices concerning alleged defaults.

- On August 18, the Company and the Ad Hoc Bondholder Group reached an agreement on the terms of a comprehensive restructuring transactions and executed the Restructuring Support Agreement (the "RSA").

- The Company engaged CBRE for appraisals of all properties serving as collateral under the First Lien Credit Facility.

- On August 19, the Company received a notice that the Bank Lenders accelerated the debt under the First Lien Credit Facility.

10

# History of Prepetition Actions & Negotiations (Cont'd)



<u>August & September (cont'd)</u>

- On August 20, the Company's advisors sent a letter to Wells Fargo's advisors disputing allegations that entry into the RSA was an event of default under the First Lien Credit Agreement.

- On August 21, counsel to the Wells Fargo stated it will not rescind the acceleration, but wished to continue a dialogue towards a consensual resolution.

- Ad Hoc Bondholder Group became "unrestricted."

- The Bank Lenders continued negotiations with the Company and advisors to the Ad Hoc Bondholder Group.

<u>October</u>

- CBRE appraisals completed and demonstrate that the Bank Lenders are significantly under-secured.

- On October 13, members of the Ad Hoc Bondholder Group executed confidentiality agreements and became "restricted" to negotiate directly with the Bank Lenders.

- On October 27, 2020, the Ad Hoc Bondholder Group's advisors sent a restructuring term sheet to Wells Fargo's advisors.

# Wells Fargo's Unprecedented Actions Against the Company



- The **same day** after receiving the first counter from the Ad Hoc Bondholder Group after becoming restricted again, the Company received notice from Wells Fargo that it was exercising remedies under the First Lien Credit Agreement based on alleged defaults that the Company disputes.

- Specifically, the Company received a 250-page facsimile notifying the Company that all rents for the Bank Lenders' collateral should be sent directly to Wells Fargo (apparently while the Debtors continue to manage and operate the properties) and that all managers and officers were removed and that the sole manager of those Companies was a senior Vice President of Wells Fargo.

- Wells Fargo also sent notices directly to the Company's tenants instructing them to pay rent to Wells Fargo instead of the Company. Wells Fargo presumably expected the Company to somehow continue managing the properties, pay expenses, capital expenditures, employees and otherwise operate the malls in question. There has been virtually no communication from Wells Fargo on these issues.

12

# Wells Fargo's Unprecedented Actions Against the Company (Cont'd)



- At all times, the Company disputed that any event of default had ever occurred under the Credit Facilities.

- Notably, the Company has made every payment required under the Credit Agreement on-time and in accordance with the documents. Wells Fargo appears to rely principally on a non-monetary event of default relating to anti-cash hoarding from March 2020, which the Debtors always have disputed.

- Notably, however, the Pledge Agreement only allows the exercise of proxy rights **"after the occurrence and during the continuance"** of an event of default. *See* Pledge Agreement, § 8.  Further, the Collateral Agreement only allows the exercise of proxy rights "upon the occurrence and during the continuance" of an event of default. *See* Collateral Agreement, § 5.2(b)(iv). No separate proxy instrument was ever executed.

- The Company's Board of Directors, having considered Wells Fargo's actions, the relevant facts, and the advice of counsel, have determined that filing the Bank Collateral Entities for chapter 11 protection with this Court was the most prudent step in exercising their fiduciary duties for the benefit of all stakeholders.

- There was and is no event of default, Well Fargo's actions were ultra vires and the Company is now required to commence an expedited chapter 11 filing to seek this Court's protection, instead of continuing to negotiate what was hoped to be a prepackaged, or highly prearranged, chapter 11 for an NYSE-listed REIT.

13

# Summary of RSA Material Terms



| | |
|---|---|
| Administrative, Priority, and Tax Claims | • Paid in full |
| Bank Claims | • Bank claims shall receive either:<br>• (a) such other treatment acceptable to the Company and the Required Consenting Noteholders in a manner consistent with the Bankruptcy Code; or<br>• (b) such treatment as determined by the Bankruptcy Court. |
| Other Secured Claims | • Reinstated, unimpaired, or receive treatment reasonably acceptable to the Company Parties and the Required Consenting Noteholders. |
| Notes Claims | • Each holder of an allowed Notes Claim shall receive its *pro rata* share of:<br>• (a) $49.6 million of Cash Consideration (reduced by any interest payments prior to Plan Effective Date, if any)<br>• (b) $500 million of 10% first-priority secured notes due June 2028 (the "<u>New Notes</u>")<br>• (c) 90% of the common equity in the reorganized Company, subject to dilution by the Warrants, Management Incentive Plan, and subsequent issues of common equity by the Company from time to time after the Plan Effective Date.<br>• To the extent the holders of the Bank Claims do not vote to accept the Plan as a class, the treatment of the Notes Claims may be modified on terms acceptable to the Company Parties and the Required Consenting Noteholders. |

14

# Summary of RSA Material Terms (Cont'd)



| | |
|---|---|
| Property Level Debt and Guarantee Claims | To the extent that a debtor in the chapter 11 cases is a borrower or guarantor on property level debt, such property level debt and guarantee claims shall be reinstated, unimpaired, or receive treatment acceptable to the Company Parties and the Required Consenting Noteholders. |
| General Unsecured Claims | Treatment reasonably acceptable to the Company Parties and the Required Consenting Noteholders. |
| Intercompany Claims and Company Interests | Reinstated, unimpaired, compromised, or cancelled at the election of the Company and the Required Consenting Noteholders such that intercompany claims and Company Interests are treated in a tax-efficient manner. |
| Preferred Equity Interests | • If holders of Preferred Equity Interests vote to accept the Plan as a class, each holder shall receive its *pro rata* share of [TBD]% of the New Equity Interests and [TBD]% of the Warrants.<br>• Cash out option for preferred shares in the amount of $5 million. |
| Common Equity Interests and Special Common Units | • If holders of Common Equity Interests and Special Common Units vote to accept the Plan as a class, each holder shall receive its *pro rata* share of [TBD]% of the New Equity Interests and [TBD]% of the Warrants. |
| Corporate Governance | • Terms and conditions of new Corporate Governance Documents shall be acceptable to the Required Consenting Noteholders with the consent of the Company Parties (such consent not unreasonably withheld). |

# Summary of RSA Material Terms (Cont'd)



| | |
|---|---|
| Board of Directors | • New board shall consist of 7 members in total:<br><br>   • Current Chief Executive Officer<br><br>   • Five members selected by the Required Consenting Noteholders (chosen in consultation with the Company)<br><br>   • One member selected by Company Parties (with Charles Lebovitz being acknowledged as acceptable to the Required Consenting Noteholders). |
| Management Incentive Plan ("MIP") | • Includes grant of 10% of New Equity Interests on a fully diluted basis.<br><br>• Terms of the MIP remain subject to ongoing negotiation with Ad Hoc Group. If annexed to the RSA, the final terms of the MIP, as set forth in the MIP term sheet, will be subject to the approval of the Board of the Reorganized Company. |
| Tax Issues | • Reorganized Company shall be structured as a REIT and the Transaction shall be structured to achieve a tax-efficient structure, in a manner reasonably acceptable to the Company Parties and the Required Consenting Noteholders. |
| SEC Reporting and Stock Exchange Listing | • New Equity Interests and Warrants shall be listed on the New York Stock Exchange or NASDAQ. |

# Summary of RSA Material Terms (Cont'd)



| | |
|---|---|
| **Payment of Fees and Expenses** | • Payment of fees and expenses for (i) Akin Gump, (ii) PJT Partners, and (iii) one local counsel for the Ad Hoc Group. |
| **Terms of New Notes** | • Interest rate 10% per annum in cash<br>• Maturity June 2028<br>• Liens on unencumbered properties, priority guarantees from certain entities, and equity pledges of certain entities<br>• Asset sale provision allowing for 102% paydown<br>• Liens on certain unencumbered assets, cash, and cash equivalents<br>• Full parent guarantee<br>• Incurrence test for Total Debt/Total Assets (excluding outparcels)<br>• 105% call protection for first 18 months, no call for next 3 years, 105% for next year, 102.5% for next year<br>• Bankruptcy make-whole<br>• Other terms (including covenants) TBA |

# Summary of RSA Material Terms (Cont'd)



| | |
|---|---|
| Terms of Warrants | <ul><li>Three series exercisable for 20% of New Equity Interests<ul><li>*Series A*: TEV implies 80% recovery of outstanding principal plus accrued interest through July 31, 2020; maturity 3 years from Plan Effective Date</li><li>*Series B*: TEV implies 95% recovery of outstanding principal plus accrued interest through July 31, 2020; maturity 4 years from Plan Effective Date</li><li>*Series C*: TEV implies 110% recovery of outstanding principal plus accrued interest through July 31, 2020; maturity 5 years from Plan Effective Date</li></ul></li><li>Springing maturity date feature</li></ul> |

18

## Path Forward



1. The Debtors are confident they will forge a viable path forward to reorganize, stabilize operations, and resolve issues with the Bank Lenders surrounding these chapter 11 cases.

2. Although the parties have significant differences at the moment, the Debtors intend to immediately attempt to restart negotiations with Bank Lenders and Ad Hoc Bondholder Group to reach a consensual path forward.

3. The Debtors will simultaneously press forward with the RSA and their plan with the support of the Ad Hoc Bondholder Group.

4. Speed is paramount for a number of reasons. The Debtors must press toward confirmation and emergence as soon as possible.