*Solicitation Version*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| CBL & ASSOCIATES | § | |
| PROPERTIES, INC., *et al.*, | § | Case No. 20-35226 (DRJ) |
| | § | |
| Debtors.[1] | § | (Jointly Administered) |
| | § | |

## DISCLOSURE STATEMENT FOR THIRD AMENDED JOINT CHAPTER 11 PLAN OF CBL & ASSOCIATES PROPERTIES, INC. AND ITS AFFILIATED DEBTORS

**WEIL, GOTSHAL & MANGES LLP**
Alfredo R. Pérez (15776275)
700 Louisiana Street, Suite 1700
Houston, Texas  77002
Telephone: (713) 546-5000
Facsimile:  (713) 224-9511

**WEIL, GOTSHAL & MANGES LLP**
Ray C. Schrock, P.C. (admitted *pro hac vice*)
Garrett A. Fail (admitted *pro hac vice*)
Moshe A. Fink (admitted *pro hac vice*)
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

*Counsel for Debtors and
Debtors in Possession*

Dated: May 25, 2021
Houston, Texas

---

[1]     A complete list of the Debtors in these Chapter 11 Cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://dm.epiq11.com/CBLProperties.  The Debtors' service address for the purposes of these Chapter 11 Cases is 2030 Hamilton Place Blvd., Suite 500, Chattanooga, Tennessee 37421.

**DISCLOSURE STATEMENT, DATED MAY 25, 2021**

**Solicitation of Votes on the Third Amended Joint Plan of**

**CBL & ASSOCIATES PROPERTIES, INC.,** *ET AL.*

---

THIS SOLICITATION OF VOTES (THE "<u>SOLICITATION</u>") IS BEING CONDUCTED TO OBTAIN SUFFICIENT VOTES TO ACCEPT THE THIRD AMENDED JOINT CHAPTER 11 PLAN OF CBL & ASSOCIATES PROPERTIES, INC. AND ITS AFFILIATED DEBTORS IN THE ABOVE-CAPTIONED CHAPTER 11 CASES (COLLECTIVELY, THE "<u>DEBTORS</u>"), ATTACHED HERETO AS <u>EXHIBIT A</u> (THE "<u>PLAN</u>").

THE VOTING DEADLINE TO ACCEPT OR REJECT THE PLAN IS <u>4:00 P.M. (PREVAILING CENTRAL TIME) ON JULY 26, 2021</u> UNLESS EXTENDED BY THE DEBTORS IN WRITING.

THE RECORD DATE FOR DETERMINING WHICH HOLDERS OF CLAIMS OR INTERESTS MAY VOTE ON THE PLAN IS MAY 13, 2021 (THE "<u>RECORD DATE</u>").

---

**RECOMMENDATION BY THE DEBTORS**

The board of directors of CBL & Associates Properties, Inc. has unanimously approved the transactions contemplated by the Solicitation and the Plan. The Debtors believe the Plan is in the best interests of all stakeholders and recommend that all creditors whose votes are being solicited submit ballots to accept the Plan.

Subject to the terms and conditions of the Restructuring Support Agreement (as defined below), the Consenting Creditors (as defined below) have already agreed to vote in favor of, or otherwise support, the Plan.

---

HOLDERS OF CLAIMS OR INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE AND SHOULD CONSULT WITH THEIR OWN ADVISORS BEFORE CASTING A VOTE WITH RESPECT TO THE PLAN.

THE ISSUANCE OF THE NEW SENIOR SECURED NOTES, NEW CONVERTIBLE NOTES (AND THE NEW COMMON STOCK ISSUABLE UPON CONVERSION THEREOF), NEW COMMON STOCK, AND NEW LP UNITS UNDER THE PLAN SHALL BE EXEMPT UNDER THE SECURITIES ACT OF 1933 (AS AMENDED, THE "<u>SECURITIES ACT</u>"), ALL RULES AND REGULATIONS PROMULGATED THEREUNDER, AND ANY OTHER APPLICABLE FEDERAL SECURITIES LAWS

PURSUANT TO SECTION 1145 OF THE BANKRUPTCY CODE AND TO THE FULLEST EXTENT PERMITTED BY SECTION 1145 OF THE BANKRUPTCY CODE, WITHOUT FURTHER ACT OR ACTIONS BY ANY PERSON.

THE SECURITIES ISSUED PURSUANT TO THE PLAN HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR BY ANY STATE SECURITIES COMMISSION OR SIMILAR PUBLIC, GOVERNMENTAL, OR REGULATORY AUTHORITY, AND NEITHER THE SEC NOR ANY SUCH AUTHORITY HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR UPON THE MERITS OF THE PLAN.  ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

CERTAIN STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT, INCLUDING STATEMENTS INCORPORATED BY REFERENCE, PROJECTED FINANCIAL INFORMATION, AND OTHER FORWARD-LOOKING STATEMENTS, ARE BASED ON ESTIMATES AND ASSUMPTIONS.   THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL BE REFLECTIVE OF ACTUAL OUTCOMES.  FORWARD-LOOKING STATEMENTS SHOULD BE EVALUATED IN THE CONTEXT OF THE ESTIMATES, ASSUMPTIONS, UNCERTAINTIES, AND RISKS DESCRIBED HEREIN.

FURTHERMORE, READERS ARE CAUTIONED THAT ANY FORWARD-LOOKING STATEMENTS HEREIN, INCLUDING ANY PROJECTIONS, ARE SUBJECT TO A NUMBER OF ASSUMPTIONS, RISKS, AND UNCERTAINTIES, MANY OF WHICH ARE BEYOND THE CONTROL OF THE DEBTORS, INCLUDING THE IMPLEMENTATION OF THE PLAN.  IMPORTANT ASSUMPTIONS AND OTHER IMPORTANT FACTORS THAT COULD CAUSE ACTUAL RESULTS TO DIFFER MATERIALLY INCLUDE, BUT ARE NOT LIMITED TO, THOSE FACTORS, RISKS AND UNCERTAINTIES DESCRIBED IN MORE DETAIL UNDER THE HEADING "CERTAIN RISK FACTORS TO BE CONSIDERED" BELOW, AS WELL AS CERTAIN OTHER RISKS INHERENT IN THE DEBTORS' BUSINESSES AND OTHER FACTORS LISTED IN THE DEBTORS' SEC FILINGS.  PARTIES ARE CAUTIONED THAT THE FORWARD-LOOKING STATEMENTS SPEAK AS OF THE DATE MADE, ARE BASED ON THE DEBTORS' CURRENT BELIEFS, INTENTIONS AND EXPECTATIONS, AND ARE NOT GUARANTEES OF FUTURE PERFORMANCE.  ACTUAL RESULTS OR DEVELOPMENTS MAY DIFFER MATERIALLY FROM THE EXPECTATIONS EXPRESSED OR IMPLIED IN THE FORWARD-LOOKING STATEMENTS, AND THE DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE OR OTHERWISE REVISE ANY FORWARD-LOOKING STATEMENTS, INCLUDING ANY PROJECTIONS CONTAINED HEREIN, TO REFLECT EVENTS OR CIRCUMSTANCES EXISTING OR ARISING AFTER THE DATE HEREOF OR TO REFLECT THE OCCURRENCE OF UNANTICIPATED EVENTS OR OTHERWISE, UNLESS INSTRUCTED TO DO SO BY THE BANKRUPTCY COURT.

NO INDEPENDENT AUDITOR OR ACCOUNTANT HAS REVIEWED OR APPROVED THE FINANCIAL PROJECTIONS OR THE LIQUIDATION ANALYSIS HEREIN.

THE DEBTORS HAVE NOT AUTHORIZED ANY PERSON TO GIVE ANY INFORMATION OR ADVICE, OR TO MAKE ANY REPRESENTATION, IN CONNECTION WITH THE PLAN OR THIS DISCLOSURE STATEMENT.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED. THE TERMS OF THE PLAN GOVERN IN THE EVENT OF ANY INCONSISTENCY WITH THE SUMMARIES IN THIS DISCLOSURE STATEMENT.

THE INFORMATION IN THIS DISCLOSURE STATEMENT IS BEING PROVIDED SOLELY FOR PURPOSES OF VOTING TO ACCEPT OR REJECT THE PLAN OR OBJECTING TO CONFIRMATION.  NOTHING IN THIS DISCLOSURE STATEMENT MAY BE USED BY ANY PARTY FOR ANY OTHER PURPOSE.

ALL EXHIBITS TO THIS DISCLOSURE STATEMENT ARE INCORPORATED INTO, AND ARE A PART OF, THIS DISCLOSURE STATEMENT AS IF SET FORTH IN FULL HEREIN.

THE PLAN PROVIDES THAT THE FOLLOWING PARTIES, EACH IN THEIR RESPECTIVE CAPACITIES AS SUCH, ARE DEEMED TO GRANT THE RELEASES PROVIDED FOR IN THE PLAN: (I) HOLDERS OF ALL CLAIMS AND INTERESTS THAT VOTE TO ACCEPT THE PLAN, (II) HOLDERS OF ALL CLAIMS AND INTERESTS WHOSE VOTE TO ACCEPT OR REJECT THE PLAN IS SOLICITED BUT THAT DO NOT VOTE EITHER TO ACCEPT OR TO REJECT THE PLAN, (III) HOLDERS OF CLAIMS AND INTERESTS THAT VOTE, OR ARE DEEMED, TO REJECT THE PLAN BUT DO NOT OPT OUT OF GRANTING THE RELEASES SET FORTH IN THE PLAN, (IV) HOLDERS OF CLAIMS AND INTERESTS AND ALL OTHER BENEFICIAL OWNERS THAT WERE GIVEN NOTICE OF THE OPPORTUNITY TO OPT OUT OF GRANTING THE RELEASES SET FORTH IN THE PLAN BUT DID NOT OPT OUT, AND (V) THE RELEASED PARTIES (AS DEFINED IN THE PLAN).

HOLDERS OF CLAIMS IN VOTING CLASSES (CLASSES 3, 4, 5, 7, 10, 11, 12, AND 14) HAVE RECEIVED A RELEASE OPT-OUT FORM ATTACHED TO THEIR BALLOT. HOLDERS OF CLAIMS IN NON-VOTING CLASSES (CLASSES 1, 2, 6, 8, 9, AND 13) HAVE RECEIVED A RELEASE OPT-OUT FORM ATTACHED TO THEIR NOTICE OF NON-VOTING STATUS AND NOTICE OF RIGHT TO OPT OUT OF CERTAIN RELEASES.  SEE SECTION 10.7 OF THE PLAN FOR A DESCRIPTION OF THE RELEASES AND RELATED PROVISIONS.

**TABLE OF CONTENTS**

**Page**

I.     INTRODUCTION ........................................................................................8
       A.     Background and Overview of the Plan and Restructuring.....................8
       B.     Summary of Plan Classification and Treatment of Claims...................13
       C.     Inquiries ..............................................................................................21
II.    THE DEBTORS' BUSINESS ..................................................................22
       A.     History and Business...........................................................................22
       B.     Properties and Business Operations.....................................................23
       C.     Tenant Composition and Diversification ..............................................24
       D.     Centralized Management and Operations .............................................25
       E.     Recent Financial Performance .............................................................27
III.   DEBTORS' CORPORATE AND CAPITAL STRUCTURE .........................27
       A.     Corporate Structure..............................................................................27
       B.     Corporate Governance and Management...............................................28
       C.     Prepetition Capital Structure................................................................28
IV.    SIGNIFICANT EVENTS LEADING TO THE CHAPTER 11 FILINGS.......35
       A.     Trends and Uncertainties in Retail Market ..........................................35
       B.     Tenant Struggles and Rent Abatement .................................................36
       C.     Impact of COVID-19 Pandemic ...........................................................36
       D.     Prepetition Operational Initiatives .......................................................37
       E.     Debt Restructuring Effort and Original Restructuring Support Agreement .........38
       F.     Prepetition Bank Lender Actions..........................................................42
       G.     Prepetition Employee Retention Programs ...........................................43
       H.     Appointment of New Independent Director and Formation of a Special Committee ...............................................................................44
       I.     Independent Investigation....................................................................44
V.     OVERVIEW OF CHAPTER 11 CASES ....................................................44
       A.     Commencement of Chapter 11 Cases ...................................................44
       B.     De Minimis Asset Sales, Claims, and Causes of Action Procedures....................46
       C.     Appointment of Creditors' Committee ..................................................47
       D.     Wells Fargo Adversary Proceeding ......................................................47

| | E. | Court-Ordered Mediation | 48 |
|---|---|---|---|
| | F. | Exclusivity | 48 |
| | G. | Statements and Schedules, and Claims Bar Dates | 49 |
| | H. | Motion to Extend Time to Assume or Reject Unexpired Leases | 49 |
| VI. | | SUMMARY OF PLAN | 49 |
| | A. | General | 49 |
| | B. | Administrative Expense Claims, Fee Claims, and Priority Tax Claims. | 50 |
| | C. | Classification of Claims and Interests | 52 |
| | D. | Treatment of Claims and Interests | 55 |
| | E. | Means for Implementation | 62 |
| | F. | Distributions | 72 |
| | G. | Procedures for Resolving Claims | 80 |
| | H. | Executory Contracts and Unexpired Leases | 83 |
| | I. | Conditions Precedent to the Occurrence of the Effective Date | 89 |
| | J. | Effect of Confirmation | 91 |
| | K. | Retention of Jurisdiction | 98 |
| | L. | Miscellaneous Provisions | 99 |
| VII. | | TRANSFER RESTRICTIONS AND CONSEQUENCES UNDER FEDERAL SECURITIES LAWS | 102 |
| VIII. | | CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF PLAN | 103 |
| | A. | Consequences to the Debtors and Certain Unitholders | 105 |
| | B. | Consequences to U.S. Holders of Certain Claims | 110 |
| | C. | Consequences to U.S. Holders of Existing REIT Common Stock or Existing REIT Preferred Stock | 121 |
| | D. | Consequences to Non-U.S. Holders of Certain Claims and Interests | 121 |
| | E. | Consequences of the Ownership and Disposition of the New LP Units | 124 |
| | F. | Consequences of the Ownership and Disposition of New Common Stock | 127 |
| | G. | Information Reporting and Backup Withholding | 134 |
| IX. | | CERTAIN RISK FACTORS TO BE CONSIDERED | 135 |
| | A. | Certain Bankruptcy Law Considerations | 135 |
| | B. | Risks Relating to the New Common Stock and New LP Units Issued Under the Plan | 137 |
| | C. | Risks Relating to the New Senior Secured Notes and the New Convertible Notes | 139 |

|  | D. | Additional Risks Relating to the New Convertible Notes ................................. | 142 |
|  | E. | Risks Relating to the Exit Credit Facility .......................................................... | 143 |
|  | F. | Additional Risk Factors To Be Considered ......................................................... | 144 |
| X. | | VOTING PROCEDURES AND REQUIREMENTS.................................................. | 151 |
|  | A. | Voting Deadline .................................................................................................... | 151 |
|  | B. | Voting Procedures.................................................................................................. | 151 |
|  | C. | Parties Entitled to Vote ......................................................................................... | 152 |
|  | D. | Convertible Notes Election .................................................................................... | 155 |
|  | E. | Further Information, Copies of Materials .............................................................. | 156 |
| XI. | | CONFIRMATION OF PLAN ................................................................................... | 156 |
|  | A. | Confirmation Hearing ........................................................................................... | 156 |
|  | B. | Objections to Confirmation.................................................................................... | 156 |
|  | C. | Requirements for Confirmation of Plan................................................................. | 158 |
| XII. | | ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF PLAN ........ | 164 |
|  | A. | Alternative Plan of Reorganization....................................................................... | 164 |
|  | B. | Sale Under Section 363 of the Bankruptcy Code .................................................. | 164 |
|  | C. | Liquidation under Chapter 7 of Bankruptcy Code................................................. | 164 |
| XIII. | | CONCLUSION AND RECOMMENDATION.............................................................. | 166 |

## EXHIBITS

| | |
|---|---|
| **EXHIBIT A** | Plan |
| **EXHIBIT B** | Organizational Chart |
| **EXHIBIT C** | RSA |
| **EXHIBIT D** | Liquidation Analysis |
| **EXHIBIT E** | Financial Projections |
| **EXHIBIT F** | Valuation Analysis |

WEIL:\97988370\1\32626.0004

# I.
# INTRODUCTION

## A.    Background and Overview of the Plan and Restructuring

CBL & Associates Properties, Inc. (the "**REIT**") and its direct and indirect subsidiaries that are debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**" and, together with the REIT's non-Debtor direct or indirect subsidiaries, "**CBL**" or the "**Company**"), submit this disclosure statement (as may be amended from time to time, the "**Disclosure Statement**") in connection with the solicitation of votes (the "**Solicitation**") on the *Third Amended Joint Chapter 11 Plan of CBL & Associates Properties, Inc. and Its Affiliated Debtors*, dated May 25, 2021 (the "**Plan**"),[2] attached hereto as **Exhibit A**.

The purpose of this Disclosure Statement is to provide information of a kind, and in sufficient detail, to enable creditors of, and holders of interests in, the Debtors that are entitled to vote on the Plan to make an informed decision on whether to vote to accept or reject the Plan.  This Disclosure Statement contains summaries of the Plan, certain statutory provisions, events contemplated in the chapter 11 cases (the "**Chapter 11 Cases**") that commenced beginning on November 1, 2020 (the "**Petition Date**"), and certain documents related to the Plan.

As described in more detail below, the Debtors faced certain financial and other challenges prior to the Petition Date, including the ongoing COVID-19 pandemic.  Recognizing that a comprehensive balance sheet deleveraging and restructuring was necessary, the Company, Weil, Gotshal & Manges LLP ("**Weil**") and Moelis & Company LLC ("**Moelis**" and, together with Weil, the "**Advisors**") engaged in extensive arms' length, good faith negotiations with an ad hoc group of the beneficial owners and/or investment advisors or managers of discretionary funds, accounts or other entities for the holders or beneficial owners of approximately 66% of the Company's Senior Unsecured Notes (collectively, with other holders of the Senior Unsecured Notes that subsequently executed the Original Restructuring Support Agreement (as defined herein), the "**Consenting Noteholders**" or the "**Ad Hoc Bondholder Group**"), which culminated in the execution of that certain Restructuring Support Agreement dated August 18, 2020 (the "**Original Restructuring Support Agreement**") pursuant to which the Consenting Noteholders agreed to, among other things, support a plan.  After the Petition Date, the Debtors and the Required Consenting Noteholders negotiated certain modifications to the terms of the restructuring, which are reflected in the original plan (Docket No. 370) (the "**Original Plan**").

Thereafter, the Debtors, the Bank Lenders (as defined below), and the Ad Hoc Bondholder Group re-engaged in negotiations, including a Court-ordered mediation (the "**Mediation**") between the Debtors, Ad Hoc Bondholder Group, Bank Lenders, and the Creditors' Committee (collectively, the "**Mediation Parties**").  After several weeks of extensive good faith negotiations, the Debtors, Consenting Noteholders, and Consenting Bank Lenders agreed upon terms of a consensual restructuring and entered into an amended restructuring support agreement (the "**Restructuring Support Agreement**" or "**RSA**") dated March 21, 2021 (the "**RSA Effective Date**").  On April

---

[2]    Capitalized terms used in this Disclosure Statement, but not defined herein, have the meanings ascribed to them in the Plan or the RSA, as applicable.  To the extent any inconsistencies exist between this Disclosure Statement and the Plan, the Plan shall govern.

29, 2021, the Court authorized the Debtors to perform their obligations under the RSA (Docket No. 1090). The terms of the comprehensive, tripartite settlement embodied in the RSA resolve the contentious and complicated issues at the heart of these Chapter 11 Cases, including (i) the treatment of the Bank Lenders', Consenting Crossholders', and Consenting Noteholders' claims in these Chapter 11 Cases, and (ii) claims asserted by the Debtors and the Bank Lenders in the Wells Fargo Adversary Proceeding (as defined below).

In accordance with the RSA, including the Plan Term Sheet (as defined below) attached thereto, the Plan provides for a comprehensive restructuring of the Company's balance sheet. Specifically, the proposed restructuring embodied in the Plan (the "**Restructuring**") contemplates, among other things:

- The following treatment of holders of Claims and Interests:

  o Each holder of an Allowed First Lien Credit Facility Claim will receive its pro rata share of (i) the Exit Credit Facility Distribution and (ii) $100,000,000 in Cash, payable, first, from Cash deposited in the segregated account maintained by the Debtors pursuant to paragraph 11(a)(ii) of the Final Cash Collateral Order and, second, from other Cash on hand.

  o Each holder of an Allowed Consenting Crossholder Claim will receive its pro rata share of (based on the ratio of such holder's Consenting Crossholder Claims to the aggregate amount of Consenting Crossholder Claims held by all Consenting Crossholders) the Consenting Crossholder Claims Recovery Pool; provided, that each Consenting Crossholder entitled to receive New Senior Secured Notes on account of its Crossholder Claim shall be entitled to make the Convertible Notes Election.

  o Each holder of an Allowed Ongoing Trade Claim will receive the following treatment: (i) if a holder of an Ongoing Trade Claim executes a trade agreement (a "**Trade Agreement**") with the Debtors (the form and terms of such Trade Agreement to be determined by the Debtors in consultation with the (A) Required Consenting Noteholders and the Creditors' Committee and, (B) solely with respect to the Exit Credit Facility Subsidiaries, the Required Consenting Bank Lenders), four (4) equal cash installments, payable on a quarterly basis, which payments shall result in full payment in the Allowed amount of such Ongoing Trade Claim; or (ii) if a holder of an Ongoing Trade Claim does not execute a Trade Agreement, such holder's Pro Rata share of the Unsecured Claims Recovery Pool in accordance with section 4.7 of the Plan.

  o Each Allowed Property-Level Guarantee Settlement Claim will either (i) be Reinstated; (ii) remain Unimpaired; or (iii) receive such treatment as agreed upon between the Debtors and the holder of such Property-Level Guarantee Claim (with the consent of the Required Consenting Noteholders, such consent not to be unreasonably withheld). For the avoidance of doubt, any Property-Level Guarantee Claim that is not a Property-Level Guarantee Settlement Claim will be treated like a General Unsecured Claim.

o    Each holder of an Allowed Unsecured Claim will receive its pro rata share of the Unsecured Claims Recovery Pool; provided, that each Consenting Noteholder (and, for the avoidance of doubt, only a Consenting Noteholder) entitled to receive New Senior Secured Notes on account of its Senior Unsecured Notes Claim shall be able to make the Convertible Notes Election; provided, however, that, if the Debtors determine that, pursuant to section 1129(a)(7)(ii), such holder would be entitled to a greater recovery than the foregoing if the Debtor against whom such holder's Allowed Unsecured Claim is asserted were to liquidate under chapter 7 of the Bankruptcy Code, then such holder shall receive Cash in an amount necessary to satisfy section 1129(a)(7)(ii).

o    Each holder of an Existing LP Common Unit will either (i) receive a percentage of New LP Units, issued in accordance with the Restructuring Transactions, equal to the product of (A) 5.5% and (B) the percentage equal to the number of Existing LP Common Units that such holder elects to exchange for New LP Units divided by the number of Existing LP Common Units issued and outstanding immediately prior to the Plan Distributions or (ii)(A) be deemed to have converted or redeemed, as applicable, such holder's Existing LP Common Unit(s), effective the day prior to the Distribution Record Date, in exchange for Existing REIT Common Stock on terms consistent with the applicable prepetition agreements for the Existing LP Common Units and (B) receive a Pro Rata[3] share of the Existing Common Equity Recovery Pool, subject to reduction in accordance with section 4.14(a) of the Plan, if applicable; provided that, if the Bankruptcy Court does not approve the recovery to holders of Existing LP Common Units, Existing REIT Preferred Stock, and Existing REIT Common Stock, the New Common Stock set forth in section 4.10(a)(ii) of the Plan shall be added to the Unsecured Claims Recovery Pool and the New LP Units set forth in section 4.10(a)(i) of the Plan shall not be issued; provided, however, that the value otherwise allocable to holders of Existing LP Common Units under section 4.10(a) of the Plan shall be reduced, on a dollar-for-dollar basis utilizing the equity value implied by the mid-point of the Debtors' valuation set forth in connection with confirmation, by any costs incurred by or attributed to the Debtors' Estates in connection with any litigation or objection prosecuted after the Bankruptcy Court's approval of the Disclosure Statement by one or more holders of Existing LP Common Units prior to or in connection with the Confirmation Hearing as such costs are determined by the Bankruptcy Court in connection with confirmation of the Plan; provided, further, that, to the extent that no holder of Existing LP Common Units objects to confirmation of the Plan, the recovery to holders of Interests in Class 10 on account of such Interests shall not be reduced notwithstanding any objection(s) by holders of Claims or Interests in another Class.  Further, notwithstanding anything to the

---

[3]    For purposes of section 4.10(a)(ii)(B) of the Plan, the Pro Rata amounts shall be calculated as the Pro Rata share of all Allowed Existing LP Common Units electing to receive such treatment and Allowed Existing REIT Common Stock.

WEIL:\97988370\1\32626.0004

contrary herein, even if Class 10 votes, as a class, to accept the Plan, the rights of holders of Existing LP Common Units to object to confirmation of the Plan on the grounds that the Plan does not comply with section 1129(b)(2) of the Bankruptcy Code are preserved, and the Debtors reserve all rights to dispute any such objection(s) on any grounds other than on the basis that such party does not have a legal right to prosecute such an objection as a matter of law.

o    Each holder of Allowed Existing REIT Preferred Stock will receive its Pro Rata share of a percentage of the New Common Stock, issued in accordance with the Restructuring Transactions, equal to 5.5% divided by the REIT LP Ownership Percentage, subject to dilution by the Management Incentive Plan and subsequent issuances of common equity (including securities or instruments convertible into common equity) by the REIT from time to time after the Effective Date, as set forth herein, and subject to reduction in accordance with section 4.14(a) of the Plan, if applicable; provided that, if the Bankruptcy Court does not approve the recovery to holders of Existing LP Common Units, Existing REIT Preferred Stock, and Existing REIT Common Stock, the New Common Stock set forth in section 4.11(a) of the Plan shall be added to the Unsecured Claims Recovery Pool; provided, however, that the value otherwise allocable to holders of Existing REIT Preferred Stock under section 4.11(a) of the Plan shall be reduced, on a dollar-for-dollar basis utilizing the equity value implied by the mid-point of the Debtors' valuation set forth in connection with confirmation, by any costs incurred by or attributed to the Debtors' Estates in connection with any litigation or objection prosecuted after the Bankruptcy Court's approval of the Disclosure Statement by one or more holders of Existing REIT Preferred Stock prior to or in connection with the Confirmation Hearing as such costs are determined by the Bankruptcy Court in connection with confirmation of the Plan; provided, further, that, to the extent that no holder of Existing REIT Preferred Stock objects to confirmation of the Plan, the recovery to holders of Interests in Class 11 on account of such Interests shall not be reduced notwithstanding any objection(s) by holders of Claims or Interests in another Class.  Further, notwithstanding anything to the contrary herein, even if Class 11 votes, as a class, to accept the Plan, the rights of holders of Existing REIT Preferred Stock to object to confirmation of the Plan on the grounds that the Plan does not comply with section 1129(b)(2) of the Bankruptcy Code are preserved, and the Debtors reserve all rights to dispute any such objection(s) on any grounds other than on the basis that such party does not have a legal right to prosecute such an objection as a matter of law.

o    Each holder of Allowed Existing REIT Common Stock will receive its Pro Rata[4] share of the Existing Common Equity Recovery Pool, subject to reduction in accordance with section 4.14(a) of the Plan, if applicable; provided that, if

---

[4]    For purposes of section 4.12(a) of the Plan, the Pro Rata amounts shall be calculated as the Pro Rata share of all Allowed Existing LP Common Units electing to receive such treatment and Allowed Existing REIT Common Stock.

WEIL:\97988370\1\32626.0004

the Bankruptcy Court does not approve the recovery to holders of Existing LP Common Units, Existing REIT Preferred Stock, and Existing REIT Common Stock, the Existing Common Equity Recovery Pool shall be added to the Unsecured Claims Recovery Pool; provided, however, that the value otherwise allocable to holders of Existing REIT Common Stock under section 4.12(a) of the Plan shall be reduced, on a dollar-for-dollar basis utilizing the equity value implied by the mid-point of the Debtors' valuation set forth in connection with confirmation, by any costs incurred by or attributed to the Debtors' Estates in connection with any litigation or objection prosecuted after the Bankruptcy Court's approval of the Disclosure Statement by one or more holders of Existing REIT Common Stock prior to or in connection with the Confirmation Hearing as such costs are determined by the Bankruptcy Court in connection with confirmation of the Plan; provided, further, that, to the extent that no holder of Existing REIT Common Stock objects to confirmation of the Plan, the recovery to holders of Interests in Class 12 on account of such Interests shall not be reduced notwithstanding any objection(s) by holders of Claims or Interests in another Class.  Further, notwithstanding anything to the contrary herein, even if Class 12 votes, as a class, to accept the Plan, the rights of holders of Existing REIT Common Stock to object to confirmation of the Plan on the grounds that the Plan does not comply with section 1129(b)(2) of the Bankruptcy Code are preserved, and the Debtors reserve all rights to dispute any such objection(s) on any grounds other than on the basis that such party does not have a legal right to prosecute such an objection as a matter of law.

- On the Effective Date, (i) the First Lien Credit Agreement will be replaced by a new credit facility in an aggregate principal amount of $883.7 million (the "**Exit Credit Facility**") pursuant to the terms set forth in that certain exit credit facility term sheet (the "**Exit Credit Facility Term Sheet**"), a copy of which is attached to the Plan as Exhibit B; and (ii) the Senior Unsecured Notes will be replaced by new senior secured notes in an aggregate principal amount of up to $555 million (the "**New Senior Secured Notes**") pursuant to the terms set forth in that certain new notes term sheet (the "**New Notes Term Sheet**"), a copy of which is attached to the Plan as Exhibit C; *provided*, the Debtors may distribute up to $100 million of New Convertible Notes (exchangeable with the New Notes Issuer for New Common Stock) in lieu of the New Senior Secured Notes on a dollar-for-dollar basis pursuant to the terms set forth in that certain term sheet (the "**New Convertible Notes Term Sheet**"), a copy of which is attached to the Plan as Exhibit D.

- The Debtors' receipt of Commitment Letters from the Commitment Parties where such parties agree to purchase, in the aggregate, $50 million of New Convertible Notes on the Effective Date.

- The Restructuring will leave the Debtors' operations and business intact without impairing the Property Level Debt (as defined herein).

The Debtors believe that the Restructuring contemplated by the Plan and RSA provides the Company with a viable path forward and a framework to successfully exit chapter 11 in a timely

fashion with the support of the Consenting Creditors. As described more fully herein, the restructuring will reduce the Company's funded indebtedness by approximately $1 billion and annual interest expenses by approximately $20 million while eliminating the Debtors' outstanding preferred stock. This deleveraging will enhance the Debtors' long-term growth prospects and competitive position and will provide the Debtors with excess capital to invest in and grow their business. Thus, the Restructuring will allow the Debtors to emerge from the Chapter 11 Cases as a stronger company, better positioned to withstand the challenges and volatility of the real estate industry and retail market. Importantly, the Company is not currently seeking to modify or impair the Property Level Debt (as defined herein) or to make operational changes to the business, and that debt is not currently the subject of these Chapter 11 Cases. The Consenting Creditors have played a critically important role in formulating the Restructuring and actively participated in the development and negotiation of the Plan.

The effect of the Restructuring on the Operating Partnership's (as defined below) funded indebtedness is summarized as follows (in millions):

| Pre-Restructuring Capital Structure (Approx.) | | Pro Forma Post-Restructuring Capital Structure (Approx.) | |
|---|---|---|---|
| First Lien Credit Facility | $1,115.7 | Exit Credit Facility | $883.7 |
| Senior Unsecured Notes | $1,375.0 | Senior Secured Notes / New Convertible Notes | $555.0 |
| | | New Money Convertible Notes | $50.0 |
| **Total Funded Debt** | $2,490.0 | **Total Funded Debt** | $1,488.7 |

The Debtors believe that upon consummation of the Plan and the transactions contemplated thereby, the post-emergence enterprise will have the ability to continue to succeed as a REIT and develop, redevelop, acquire, lease, manage, and operate regional shopping malls, open-air and mixed-use centers, outlet centers, associated centers, community centers, office buildings, and other properties.

### B.    Summary of Plan Classification and Treatment of Claims

Pursuant to the Bankruptcy Code, only holders of claims or interests in "impaired" Classes are entitled to vote on the Plan (unless, for reasons discussed in more detail below, such holders are deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code). Under section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "impaired" unless (i) the Plan leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder thereof or (ii) notwithstanding any legal right to an accelerated payment of such claim or interest, the Plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

Holders of Claims and Interests in the following Classes (the "**Voting Classes**", and each a "**Voting Class**") are, subject to section X(C)(iv) below, being solicited under, and are entitled to vote on, the Plan:

- Class 3 — First Lien Credit Facility Claims;

- Class 4 — Consenting Crossholder Claims;

- Class 5 — Ongoing Trade Claims;

- Class 7 — Unsecured Claims;

- Class 9 — Existing LP Preferred Units;

- Class 10 — Existing LP Common Units;

- Class 11 — Existing REIT Preferred Stock;

- Class 12 — Existing REIT Common Stock; and

- Class 14 — Section 510(b) Claims.

The following table summarizes:  (1) the treatment of Claims and Interests under the Plan; (2) which Classes are impaired by the Plan; (3) which Classes are entitled to vote on the Plan; and (4) the estimated recoveries for holders of Claims and Interests.[5] The table is qualified in its entirety by reference to the full text of the Plan.[6]   For a more detailed summary of the terms and provisions of the Plan, see Section VI — Summary of the Plan below.  A detailed discussion of the analysis underlying the estimated recoveries, including the assumptions underlying such analysis, is set forth in the valuation analysis (the "**Valuation Analysis**") attached as __**Exhibit F**__ hereto.

| Class and Designation | Treatment under the Plan | Impairment and Entitlement to Vote | Approx. Percentage Recovery[7] |
|---|---|---|---|
| Class 1: Other Priority Claims | The legal, equitable, and contractual rights of the holders of Allowed Other Priority Claims are unaltered by the Plan.  Except to the extent that a holder of an Allowed Other Priority Claim agrees to different treatment, on the later of the Effective Date and the date that is twenty (20) days after the date such Other Priority Claim becomes an Allowed Claim, or as soon thereafter as is reasonably practicable, each holder of an Allowed Other Priority Claim shall receive, on account of such Allowed Claim, at the option of the | Unimpaired<br><br>**(Not entitled to vote** — presumed to accept) | 100% |

---

[5]   Any Claim or Interest in a Class that is considered vacant under section 3.6 of the Plan will be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to such Class.

[6]   The summary of the Plan provided herein is qualified in its entirety by reference to the Plan.

[7]   The values set forth under Approximate Percentage Recovery are based on the midpoint of the range of reorganized equity value of the Debtors as described in the Valuation Analysis attached hereto.

| Class and Designation | Treatment under the Plan | Impairment and Entitlement to Vote | Approx. Percentage Recovery[7] |
|---|---|---|---|
| | Reorganized Debtors (i) Cash in an amount equal to the Allowed amount of such Claim or (ii) other treatment consistent with the provisions of section 1129 of the Bankruptcy Code. | | |
| Class 2: Other Secured Claims | The legal, equitable, and contractual rights of the holders of Allowed Other Secured Claims are unaltered by the Plan.  Except to the extent that a holder of an Allowed Other Secured Claim agrees to different treatment, on the later of the Effective Date and the date that is twenty (20) days after the date such Other Secured Claim becomes an Allowed Claim, or as soon thereafter as is reasonably practicable, each holder of an Allowed Other Secured Claim shall receive, on account of such Allowed Claim, at the option of the Reorganized Debtors (i) Cash in an amount equal to the Allowed amount of such Claim, (ii) Reinstatement or such other treatment sufficient to render such holder's Allowed Other Secured Claim Unimpaired pursuant to section 1124 of the Bankruptcy Code, or (iii) such other recovery necessary to satisfy section 1129 of the Bankruptcy Code. | Unimpaired<br><br>**(Not entitled to vote** — presumed to accept) | 100% |
| Class 3: First Lien Credit Facility Claims | Each holder of an Allowed First Lien Credit Facility Claim shall receive, in full and final satisfaction of such Claim its Pro Rata share of (i) the Exit Credit Facility Distribution and (ii) $100,000,000 in Cash payable, first, from Cash deposited in the segregated account maintained by the Debtors pursuant to paragraph 11(a)(ii) of the Final Cash Collateral Order and, second, from other Cash on hand. | Impaired **(Entitled to vote)** | 100% |
| Class 4: Consenting Crossholder Claims | Pursuant to Bankruptcy Rule 9019, in full and complete satisfaction of Consenting Crossholder Claims, each Consenting Crossholder shall agree to receive, and receive, as less favorable treatment than the First Lien Credit Facility Claims in respect of its Consenting Crossholder Claims, its Pro Rata share (based on the ratio of such holder's Consenting Crossholder Claims to the aggregate amount of Consenting Crossholder Claims held by all Consenting Crossholders) of the Consenting Crossholder Claims Recovery Pool; provided that each Consenting Crossholder entitled to receive New Senior Secured Notes on account of its Crossholder Claim shall be entitled to make the Convertible Notes Election. | Impaired **(Entitled to vote)** | 96.0% |

WEIL:\97988370\1\32626.0004

| Class and Designation | Treatment under the Plan | Impairment and Entitlement to Vote | Approx. Percentage Recovery[7] |
|---|---|---|---|
| Class 5: Ongoing Trade Claims | Except to the extent that a holder of an Allowed Ongoing Trade Claim agrees to different treatment, on and after the Effective Date, or as soon as reasonably practicable thereafter, each holder of an Allowed Ongoing Trade Claim shall receive: (i) if a holder of an Ongoing Trade Claim executes a Trade Agreement with the Debtors (the form and terms of such Trade Agreement to be determined by the Debtors in consultation with the (A) Required Consenting Noteholders and the Creditors' Committee and, (B) solely with respect to the Exit Credit Facility Subsidiaries, the Required Consenting Bank Lenders), four (4) equal Cash installments, payable on a quarterly basis, which payments shall result in full payment in the Allowed amount of such Ongoing Trade Claim; or (ii) if a holder of an Ongoing Trade Claim does not execute a Trade Agreement, such holder's Pro Rata share of the Unsecured Claims Recovery Pool in accordance with section 4.7 of the Plan. | Impaired **(Entitled to vote)** | 100% |
| Class 6: Property-Level Guarantee Settlement Claims | Pursuant to Bankruptcy Rule 9019, on and after the Effective Date, or as soon as reasonably practicable thereafter, each Allowed Property-Level Guarantee Settlement Claim shall, in accordance with the applicable settlement agreement between the Debtors and such holder of a Property-Level Guarantee Claim, either (i) be Reinstated; (ii) remain Unimpaired; or (iii) receive such treatment as agreed upon between the Debtors and the holder of such Property-Level Guarantee Claim (with the consent of the Required Consenting Noteholders, such consent not to be unreasonably withheld). | Unimpaired **(Not entitled to vote** — presumed to accept) | 100% |
| Class 7: Unsecured Claims | Except to the extent that a holder of an Allowed Unsecured Claim agrees to different treatment, on and after the Effective Date, or as soon as reasonably practicable thereafter, each holder of an Allowed Unsecured Claim shall receive, in full and final satisfaction of such Claim, such holder's Pro | Impaired **(Entitled to vote)** | 54% – 56%[8] |

---

[8]   The projected recovery is based upon the midpoint value set forth in the Valuation Analysis attached hereto as <u>Exhibit F</u>. The projected recovery assumes total Unsecured Claims ranging from approximately $1.41 billion to approximately $1.46 billion and is based upon the Company's books and records as of February 28, 2021 and Proofs of Claim compiled as of the General Bar Date (which are subject to final claims reconciliation). The projected recovery range is based upon the Debtors' assumption concerning the amount of Property-Level Guarantee Claims and General Unsecured Claims in Class 7 arising from prepetition litigation. To the extent there are additional Property-Level Guarantee Claims or General Unsecured Claims in Class 7, recoveries may be further diluted.

WEIL:\97988370\1\32626.0004

| Class and Designation | Treatment under the Plan | Impairment and Entitlement to Vote | Approx. Percentage Recovery[7] |
|---|---|---|---|
| | Rata share of the Unsecured Claims Recovery Pool; provided that each Consenting Noteholder (and, for the avoidance of doubt, only a Consenting Noteholder) entitled to receive New Senior Secured Notes on account of its Notes Claim shall be able to make the Convertible Notes Election; provided, however, that, if the Debtors determine that, pursuant to section 1129(a)(7)(ii), such holder would be entitled to a greater recovery than the foregoing if the Debtor against whom such holder's Allowed Unsecured Claim is asserted were to liquidate under chapter 7 of the Bankruptcy Code, then such holder shall receive Cash in an amount necessary to satisfy section 1129(a)(7)(ii). | | |
| Class 8: Intercompany Claims | On or after the Effective Date, all Intercompany Claims shall be paid, adjusted, continued, settled, reinstated, discharged, or eliminated, in each case to the extent determined to be appropriate by the Debtors (with the consent of the Required Consenting Noteholders, such consent not to be unreasonably withheld) or Reorganized Debtors, as applicable; *provided*, that any Intercompany Claims that shall remain as liabilities of the Exit Credit Facility Borrower or any Exit Credit Facility Subsidiary shall be subject to approval by the Required Consenting Bank Lenders (and absent consent from the Required Consenting Bank Lenders, such remaining liabilities shall be reduced to zero). | Unimpaired<br><br>**(Not entitled to vote** — presumed to accept) | 100% |
| Class 9: Existing LP Preferred Units | On the Effective Date, the Existing LP Preferred Units shall be cancelled (or otherwise eliminated) and shall receive no distribution under the Plan. | Impaired<br><br>**(Not entitled to vote** — deemed to reject) | 0% |
| | On the Effective Date, the Existing LP Common Units shall be cancelled (or otherwise eliminated) and each holder of an Existing LP Common Unit shall, at such holder's election, either (i) receive a percentage of New LP Units, issued in accordance with the Restructuring Transactions, equal to the product of (A) 5.5% and (B) the percentage equal to the number of Existing LP Common Units that such holder elects to exchange for New LP Units divided by the number of Existing LP Common Units issued and outstanding immediately prior to | Impaired<br>**(Entitled to vote)** | |

| Class and Designation | Treatment under the Plan | Impairment and Entitlement to Vote | Approx. Percentage Recovery[7] |
|---|---|---|---|
| Class 10: Existing LP Common Units | the Plan Distributions or (ii)(A) be deemed to have converted or redeemed, as applicable, such holder's Existing LP Common Unit(s), effective the day prior to the Distribution Record Date, in exchange for Existing REIT Common Stock on terms consistent with the applicable prepetition agreements for the Existing LP Common Units and (B) receive a Pro Rata[9] share of the Existing Common Equity Recovery Pool, subject to reduction in accordance with section 4.14(a) of the Plan, if applicable; provided that, if the Bankruptcy Court does not approve the recovery to holders of Existing LP Common Units, Existing REIT Preferred Stock, and Existing REIT Common Stock, the New Common Stock set forth in section 4.10(a)(ii) of the Plan shall be added to the Unsecured Claims Recovery Pool and the New LP Units set forth in section 4.10(a)(i) of the Plan shall not be issued; provided, however, that the value otherwise allocable to holders of Existing LP Common Units under section 4.10(a) of the Plan shall be reduced, on a dollar-for-dollar basis utilizing the equity value implied by the mid-point of the Debtors' valuation set forth in connection with confirmation, by any costs incurred by or attributed to the Debtors' Estates in connection with any litigation or objection prosecuted after the Bankruptcy Court's approval of the Disclosure Statement by one or more holders of Existing LP Common Units prior to or in connection with the Confirmation Hearing as such costs are determined by the Bankruptcy Court in connection with confirmation of the Plan; provided, further, that, to the extent that no holder of Existing LP Common Units objects to confirmation of the Plan, the recovery to holders of Interests in Class 10 on account of such Interests shall not be reduced notwithstanding any objection(s) by holders of Claims or Interests in another Class.   Further, notwithstanding anything to the contrary herein, even if Class 10 votes, as a class, to accept the Plan, the rights of holders of Existing LP Common Units to object to confirmation of the Plan on the grounds | | Up to 5.5% of New Common Stock (or equivalent New LP Units) shared with holders of Existing REIT Common Stock |

---

9   For purposes of section 4.10(a)(ii)(B) of the Plan, the Pro Rata amounts shall be calculated as the Pro Rata share of all Allowed Existing LP Common Units electing to receive such treatment and Allowed Existing REIT Common Stock.

WEIL:\97988370\1\32626.0004

| Class and Designation | Treatment under the Plan | Impairment and Entitlement to Vote | Approx. Percentage Recovery[7] |
|---|---|---|---|
| | that the Plan does not comply with section 1129(b)(2) of the Bankruptcy Code are preserved, and the Debtors reserve all rights to dispute any such objection(s) on any grounds other than on the basis that such party does not have a legal right to prosecute such an objection as a matter of law. | | |
| Class 11: Existing REIT Preferred Stock | On the Effective Date, the Existing REIT Preferred Stock shall be cancelled (or otherwise eliminated), and, on the Effective Date, or as soon as reasonably practicable thereafter, each holder of Allowed Existing REIT Preferred Stock shall receive, in full and final satisfaction of such Interest, such holder's Pro Rata share of a percentage of the New Common Stock, issued in accordance with the Restructuring Transactions, equal to 5.5% divided by the REIT LP Ownership Percentage, subject to dilution by the Management Incentive Plan and subsequent issuances of common equity (including securities or instruments convertible into common equity) by the REIT from time to time after the Effective Date, as set forth herein, and subject to reduction in accordance with section 4.14(a) of the Plan, if applicable; provided that, if the Bankruptcy Court does not approve the recovery to holders of Existing LP Common Units, Existing REIT Preferred Stock, and Existing REIT Common Stock, the New Common Stock set forth in section 4.11(a) of the Plan shall be added to the Unsecured Claims Recovery Pool; provided, however, that the value otherwise allocable to holders of Existing REIT Preferred Stock under section 4.11(a) of the Plan shall be reduced, on a dollar-for-dollar basis utilizing the equity value implied by the mid-point of the Debtors' valuation set forth in connection with confirmation, by any costs incurred by or attributed to the Debtors' Estates in connection with any litigation or objection prosecuted after the Bankruptcy Court's approval of the Disclosure Statement by one or more holders of Existing REIT Preferred Stock prior to or in connection with the Confirmation Hearing as such costs are determined by the Bankruptcy Court in connection with confirmation of the Plan; provided, further, that, to the extent that no holder of Existing REIT Preferred Stock objects to confirmation of the Plan, the recovery to holders of Interests in Class 11 on account of such Interests shall not be reduced notwithstanding any objection(s) by holders of | Impaired **(Entitled to vote)** | Up to 5.5% of New Common Stock |

WEIL:\97988370\1\32626.0004

| Class and Designation | Treatment under the Plan | Impairment and Entitlement to Vote | Approx. Percentage Recovery[7] |
|---|---|---|---|
| | Claims or Interests in another Class. Further, notwithstanding anything to the contrary herein, even if Class 11 votes, as a class, to accept the Plan, the rights of holders of Existing REIT Preferred Stock to object to confirmation of the Plan on the grounds that the Plan does not comply with section 1129(b)(2) of the Bankruptcy Code are preserved, and the Debtors reserve all rights to dispute any such objection(s) on any grounds other than on the basis that such party does not have a legal right to prosecute such an objection as a matter of law. | | |
| Class 12: Existing REIT Common Stock | On the Effective Date, the Existing REIT Common Stock shall be cancelled (or otherwise eliminated), and, on the Effective Date, or as soon as reasonably practicable thereafter, each holder of Allowed Existing REIT Common Stock shall receive, in full and final satisfaction of such Interest, such holder's Pro Rata[10] share of the Existing Common Equity Recovery Pool, subject to reduction in accordance with section 4.14(a) of the Plan, if applicable; provided that, if the Bankruptcy Court does not approve the recovery to holders of Existing LP Common Units, Existing REIT Preferred Stock, and Existing REIT Common Stock, the Existing Common Equity Recovery Pool shall be added to the Unsecured Claims Recovery Pool; provided, however, that the value otherwise allocable to holders of Existing REIT Common Stock under section 4.12(a) of the Plan shall be reduced, on a dollar-for-dollar basis utilizing the equity value implied by the mid-point of the Debtors' valuation set forth in connection with confirmation, by any costs incurred by or attributed to the Debtors' Estates in connection with any litigation or objection prosecuted after the Bankruptcy Court's approval of the Disclosure Statement by one or more holders of Existing REIT Common Stock prior to or in connection with the Confirmation Hearing as such costs are determined by the Bankruptcy Court in connection with confirmation of the Plan; provided, further, that, to the extent that no holder of Existing REIT Common Stock objects to confirmation of the Plan, the recovery to holders | Impaired (Entitled to vote) | Up to 5.5% of New Common Stock shared with holders of Existing LP Common Units |

---

[10]   For purposes of section 4.12(a) of the Plan, the Pro Rata amounts shall be calculated as the Pro Rata share of all Allowed Existing LP Common Units electing to receive such treatment and Allowed Existing REIT Common Stock.

WEIL:\97988370\1\32626.0004

| Class and Designation | Treatment under the Plan | Impairment and Entitlement to Vote | Approx. Percentage Recovery[7] |
|---|---|---|---|
| | of Interests in Class 12 on account of such Interests shall not be reduced notwithstanding any objection(s) by holders of Claims or Interests in another Class.  Further, notwithstanding anything to the contrary herein, even if Class 12 votes, as a class, to accept the Plan, the rights of holders of Existing REIT Common Stock to object to confirmation of the Plan on the grounds that the Plan does not comply with section 1129(b)(2) of the Bankruptcy Code are preserved, and the Debtors reserve all rights to dispute any such objection(s) on any grounds other than on the basis that such party does not have a legal right to prosecute such an objection as a matter of law. | | |
| Class 13: Intercompany Interests | On the Effective Date, all Intercompany Interests shall be treated as set forth in section 5.10 of the Plan. | Unimpaired<br><br>(**Not entitled to vote** — presumed to accept) | 100% |
| Class 14: Section 510(b) Claims | Section 510(b) Claims shall be cancelled, released, discharged, and extinguished as of the Effective Date and shall be of no further force or effect, and, to the extent such holder of a Section 510(b) Claim is not receiving a recovery on account of the Security giving rise to such Claim under the Plan, each holder of an Allowed Section 510(b) Claim shall receive on account of such holder's Allowed Section 510(b) Claim its Pro Rata share of New Common Stock, if any, issued in accordance with the Restructuring Transactions to holders of Existing LP Common Units, Existing REIT Preferred Stock, and Existing REIT Common Stock pursuant to sections 4.10(a), 4.11(a), and 4.12(a) of the Plan.  For the avoidance of doubt, to the extent that a holder of a Section 510(b) Claim receives a recovery under the Plan on account of the Security underlying such Claim, such holder shall not receive a recovery on account of such holder's Section 510(b) Claim, if any, arising from such Security. | Impaired (**Entitled to vote**) | New Common Stock on Pro Rata basis shared with holders of Existing LP Common Units, Existing REIT Preferred Stock, and Existing REIT Common Stock |

## C.    Inquiries

If you have any questions regarding the packet of materials you have received, please contact Epiq Corporate Restructuring, LLC ("**Epiq**"), the Debtors' voting agent (the "**Voting Agent**") at (i) (855) 914-4668 (US & Canada toll-free), (ii) 1 (503) 520-4416 (international), or (iii)

CBLProperties@epiqglobal.com.  Additional copies of this Disclosure Statement, which includes the Plan and the Plan Supplement (when filed), are also available on the Voting Agent's website, https://dm.epiq11.com/cblproperties.    PLEASE DO NOT DIRECT INQUIRIES TO THE BANKRUPTCY COURT.

**WHERE TO FIND ADDITIONAL INFORMATION:**  The Company currently files quarterly and annual reports with, and furnishes other information to, the SEC.  Copies of any document filed with the SEC may be obtained by visiting the SEC website at http://www.sec.gov and performing a search under the "Company Filings" link.  Each of the following filings is incorporated as if fully set forth herein and is a part of this Disclosure Statement.  Reports filed with the SEC (but not furnished) on or after the date of this Disclosure Statement are also incorporated by reference herein.

- Annual Report on Form 10-K for the fiscal year ended December 31, 2020, filed with the SEC on April 8, 2021 (the "**10-K**"); and

- Current Reports on Form 8-K filed with the SEC on March 22, 2021 (with respect to Item 1.01), April 9, 2021 (with respect to Item 2.02) and April 30, 2021.

## II.
## THE DEBTORS' BUSINESS

### A.    History and Business

CBL was founded in 1978 by Charles B. Lebovitz and five business associates.  In 1979, the Company constructed its first mall in Del Rio, Texas.  In 1987, the Company built its flagship mall, Hamilton Place, in Chattanooga, Tennessee, where the Company's corporate headquarters is currently located.  When it opened in 1987, Hamilton Place was the largest shopping mall in Tennessee and among the largest in the nation.

In 1993, CBL & Associates Properties Inc. was formed as a REIT and became a public company through an initial public offering.

Since going public in 1993, under the leadership of Charles Lebovitz and his son Stephen Lebovitz, the Company's current chief executive officer, CBL experienced tremendous growth measured by both portfolio size and cash flow increases.  In 2005, the Debtors expanded their reach to the west coast, opening their first mall in California, Imperial Valley Mall in El Centro.  Between 2007 and 2017, the Debtors steadily grew their portfolio through joint ventures and large-scale acquisitions, including a record year in 2007 with approximately $1.6 billion in acquisitions.  The Company has also expanded existing operations into new spaces, including entry into the outlet center space in 2011 with the development of the Outlet Shoppes at Oklahoma City in a joint venture with a third party.  Over the years, CBL continually strengthened its portfolio with a strategy that included, among other things, active management, aggressive leasing, and profitable reinvestment in its properties with the ultimate goal of increasing shareholder value.

By 2018, the Debtors had over 100 Properties (as defined below) in their portfolio, positioning them as one of the largest owners and managers of shopping centers in the southeast region of the United States and among the largest mall REITs in the country.

WEIL:\97988370\1\32626.0004

### B.   Properties and Business Operations

As of December 31, 2020, the Company's owned and managed portfolio consisted of interests in 104 properties (the "**Properties**"), which total approximately 67 million square feet. The Properties are located across 24 states primarily in the southeastern and midwestern United States. The Company wholly owns 65 properties, owns joint venture interests in 33 properties, and manages six (6) properties for third parties. The Company's portfolio is comprised of various types of Properties, each of which is discussed below.

### i.   *Shopping Malls and Outlet Centers:*

As of the Petition Date, the Company owns a controlling interest in 51 shopping malls and a non-controlling interest in 10 shopping malls (collectively, the "**Malls**"). The Malls are primarily located in middle markets and generally have strong competitive positions because they are the only, or the dominant, regional mall in their respective trade areas. The Company also owns, together with joint venture partners, five (5) outlet centers, each featuring an array of outlet shops.

The Malls are generally anchored by two or more "**Anchors**," a department store, other large format retail stores, non-retail space, or theaters greater than 50,000 square feet, or "**Junior Anchors**," a retail store, non-retail space, or a theater comprising more than 20,000 square feet but less than 50,000 square feet. Traditional retail Anchors and non-retail and theater Anchors offer an experience, service, or merchandise, as applicable, that appeals to a broad range of customers and plays a significant role in generating customer traffic and creating a desirable location for the tenants at a particular Mall. In addition to the Anchors and Junior Anchors, the Malls contain well diversified groups of smaller retailers, offering a wide variety of products and services. The Company has over 5,000 stores across all of the Malls.

### ii.   *Associated Centers:*

The Company owns, or has an interest in, twenty-three (23) "**Associated Centers**," which are retail properties that are adjacent to a Mall. Associated Centers generally include one or more Anchors, or "big box" retailers, along with some smaller tenants. The Associated Centers are typically managed by the staff at the adjacent Mall.

### iii.   *Community Centers:*

The Company owns, or has an interest in, six (6) "**Community Centers**." Community Centers are properties designed to attract local and regional area customers and are typically anchored by a combination of supermarkets, or value-priced stores, which attract shoppers to a Community Center's smaller retail shops. The tenants at the Community Centers typically offer necessities, value-oriented merchandise, and convenience merchandise.

### iv.   *Office Buildings and Self-Storage Facilities:*

The Company owns, or has an interest in, four (4) office buildings, including the buildings that house the Company's corporate headquarters in Chattanooga, Tennessee, and the Company has an interest in four (4) self-storage facilities.

> ### v. *Outparcels:*

The Company owns, either in whole or in part, various "**Outparcels**," which is land, generally located on the periphery of another Property, used for freestanding developments, such as retail stores, banks, and restaurants.

> ### vi. *Encumbered vs. Unencumbered Properties:*

The Properties also can be generally classified into three broad groups based upon the debt (if any) that encumbers a particular Property. As of December 31, 2020, approximately forty-two (42) of the Properties (the "**Property Level Loan Properties**") are mortgaged to secure Property Level Debt (as defined below). Approximately sixteen (16) Property Level Loan Properties are wholly owned by certain of the Company's non-debtor affiliates or subsidiaries (the "**Non-Debtor Affiliates**") and approximately twenty-six (26) Property Level Loan Properties are partially owned by Non-Debtor Affiliates. Further, approximately twenty (20) of the Properties (the "**Credit Facility Properties**") are mortgaged and the equity in certain of the entities directly and indirectly owning such Bank Facility Properties are pledged to secure the First Lien Credit Facility (as defined below). The remainder of the Properties are currently unencumbered by any debt (collectively, the "**Unencumbered Properties**").

## C. <u>Tenant Composition and Diversification</u>

The Company's tenant base is well diversified from both a geographic and revenue perspective. The top five markets for CBL, based on percentage of total revenues, were as follows for the year ended December 31, 2020:

| Market | Percentage of Total Revenues |
|---|---|
| Chattanooga, TN | 7.0% |
| St. Louis, MO | 6.1% |
| Lexington, KY | 5.1% |
| Laredo, TX | 5.0% |
| Madison, WI | 3.8% |

With respect to tenant mix, national and regional retail chains (excluding local franchises), including among others, *Victoria's Secret*, *Footlocker,* and *American Eagle*, leased approximately 68.7% of the occupied mall store gross leasable area as of December 31, 2020. CBL's top 10 tenants, based on percentage of total revenues, were as follows as of December 31, 2020:

| # | Tenant | # Stores | Percentage of Total Revenues |
|---|--------|----------|------------------------------|
| 1 | L Brands, Inc. (e.g., Bath & Body Works, PINK, Victoria's Secret, White Barn Candle) | 117 | 3.96% |
| 2 | Foot Locker, Inc. | 106 | 3.55% |
| 3 | Signet Jewelers Limited (e.g., Kay Jewelers, Jared Jewelers) | 135 | 3.01% |
| 4 | American Eagle Outfitters, Inc. | 68 | 2.57% |
| 5 | Dick's Sporting Goods, Inc. (e.g., Dick's Sporting Goods, Golf Galaxy, Field & Stream) | 26 | 2.13% |
| 6 | Genesco, Inc. (e.g., Journey's, Hat Shack, Johnston & Murphy) | 98 | 1.78% |
| 7 | H&M Hennes & Mauritz AB | 43 | 1.71% |
| 8 | Luxottica Group S.P.A. (e.g., Lenscrafters, Pearle Vision, Sunglass Hut) | 96 | 1.49% |
| 9 | Finish Line, Inc. | 40 | 1.44% |
| 10 | The Gap, Inc. | 49 | 1.42% |
| | | 778 | 23.06% |

### D.     Centralized Management and Operations

CBL primarily derives revenue from two sources:  (i) rental revenue from retail and non-retail tenants and (ii) income from property management, leasing, and development activities.  Rental revenues are primarily derived from leases with retail and non-retail tenants and generally include fixed minimum rents, percentage rents based on tenants' sales volumes, and reimbursements from tenants for expenditures related to real estate taxes, insurance, common area maintenance, and other recoverable operating expenses, as well as certain capital expenditures.  CBL also generates revenues from management, leasing and development fees, sponsorships, sales of peripheral land at the Properties, and from sales of operating real estate assets when it is determined that CBL can realize an appropriate value for a particular asset.  The Company's general near-to-midterm operational objectives are to achieve stabilization in same center net operating income ("**NOI**") and reduce overall cost of debt and equity by maximizing earnings before income, taxes, depreciation, and amortization ("**EBITDA**") and cash flows.

To achieve operating efficiencies and revenue enhancement at the Properties, CBL employs a centralized management approach through CBL & Associates Limited Partnership (the

"**Operating Partnership**") and CBL & Associates Management, Inc. (the "**Management Company**"), a wholly-owned subsidiary of the Operating Partnership.[11]

CBL conducts its management and development activities through the Management Company. Specifically, the Management Company manages all but fourteen (14) of the Properties (the "**Non-Managed Properties**").[12]   The Management Company is also responsible for the Company's leasing activities.  Additionally, the Management Company employs the Company's workforce, which, as of December 31, 2020, consisted of approximately 418 full-time employees and approximately fifty-six (56) part-time employees.

The Management Company also provides and centrally administers accounting, collections, business development, construction, contracting, design, finance, forecasting, human resources and employee benefits, insurance and risk management, property services, marketing, leasing, legal, tax, treasury, and other services for all properties under CBL's ownership and management.

CBL's integrated, national business model benefits the Company in numerous ways.  The centralized leasing programs enable the Company to develop relationships with department stores and national and regional retailers and to meet retailer needs at multiple properties and locations across the Company's portfolio.  It also facilitates a single point of contact for tenants at shopping centers across the country for both leasing and tenant-service issues.  Centralized management also enables the Company to obtain national contracts for property services (such as security, janitorial, and trash collection) in order to reduce costs and ensure uniformity and quality in services.

Consistent with its centralized and integrated business model, the Company has a strong infrastructure in place for cash management and treasury functions.  Each Property's cash (receipts and disbursements) is controlled and safely transmitted through the centralized treasury platform.  The Property-owning Debtors and Non-Debtor Affiliates' personnel at the Properties are not allowed to manage cash for security purposes.  Consequently, all cash management functions are performed through the treasury platform via a centralized cash management system (the "**Cash Management System**").[13]

The centralized Cash Management System reduces costs associated with cash management, including bank accounts, personnel, bookkeeping, treasury, and related expenses.  The Cash

---

[11]   The Company also utilizes this approach so as to comply with certain requirements of the Internal Revenue Code of 1986 with respect to real estate investment trusts.

[12]   The Non-Managed Properties are all owned by joint ventures and are managed by a property manager that is affiliated with the third-party partner, which receives a fee for its services.  The third-party partner of each of these Properties controls the cash flow distributions, although CBL's approval is required for certain major decisions.

[13]   The Cash Management System is described in greater detail in the *Emergency Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors to Continue (A) Using Existing Cash Management System, Bank Accounts, and Business Forms and (B) Funding Intercompany Transactions, (II) Providing Administrative Expense Priority for Postpetition Intercompany Claims, and (III) Granting Related Relief* (Docket No. 15).

WEIL:\97988370\1\32626.0004

Management System also serves to provide security and prevent fraud.  The Cash Management System provides management the ability to monitor and allocate liquidity to the Properties.

       **E.**      **Recent Financial Performance**

After years of steady growth, CBL's financial performance has been declining given the recent and ongoing struggles of the retail sector generally.  CBL had a net loss attributable to common shareholders of $332.5 million for the year ending December 31, 2020, as compared to a net loss attributable to common shareholders of $153.7 million in the prior-year period.  For the reasons discussed below, the Company's financial performance in 2020—as exacerbated by the COVID-19 pandemic—declined.

As of December 31, 2020, on a historical GAAP basis, CBL reported approximately $4.44 billion in total assets and approximately $3.91 billion in total liabilities.  For the year ending December 31, 2020, CBL reported total revenue of approximately $575.9 million.

Funds from operations ("**FFO**") allocable to Operating Partnership common unitholders, as adjusted, decreased 48.2% to $140.8 million for the year ended December 31, 2020 compared to $271.5 million for the prior year.  FFO allocable to common shareholders, as adjusted, for the year ending December 31, 2020, was $132.9 million, or $0.70 per diluted share, compared with $235.2 million, or $1.36 per diluted share, for the year ending December 31, 2020.

      **III. DEBTORS' CORPORATE AND CAPITAL STRUCTURE**

       **A.**      **Corporate Structure**

The Company is a self-administered and self-managed real estate investment trust.  The REIT is the 100% owner of two qualified real estate investment trust subsidiaries, CBL Holdings I, Inc. ("**Holdings I**") and CBL Holdings II, Inc. ("**Holdings II**").

As of December 31, 2020, Holdings I and Holdings II own approximately 1.0% and 96.5%, respectively, of the outstanding common units of the Operating Partnership. Holdings I is the sole general partner of the Operating Partnership.  Third parties own approximately 2.5% of the outstanding LP Common Units.

The Company conducts substantially all of its business through the Operating Partnership. The Operating Partnership owns 100% of the equity interests of the Management Company.  Except for the REIT, Holdings I, Holdings II, and as set forth in the following sentence, the Operating Partnership owns, either directly or indirectly, 100% of the outstanding equity interests in the Debtors.  The REIT owns directly (i) 0.1% of the equity interests in CoolSprings Crossing Limited Partnership and (ii) less than 0.05% of the equity interests in Henderson Square Limited Partnership.

A chart depicting the Company's organizational structure as of the Petition Date, is attached hereto as **Exhibit B**.  The following chart depicts the Company's simplified corporate structure:

WEIL:\97988370\1\32626.0004



### B.     Corporate Governance and Management

The board of directors of the REIT (the "**Board**") consists of nine (9) directors.  Charles Lebovitz serves as the Chairman of the Board.

In addition to Charles Lebovitz, the Company's executive officer team consists of the following individuals:

| <u>Name</u> | <u>Position</u> |
| --- | --- |
| Stephen D. Lebovitz | Chief Executive Officer |
| Michael I. Lebovitz | President |
| Farzana Khaleel | Executive Vice President – Chief Financial Officer |
| Jeffery V. Curry | Chief Legal Officer and Secretary |
| Katie A. Reinsmidt | Executive Vice President – Chief Investment Officer |
| Michael C. Harrison, Jr. | Executive Vice President – Operations |
| Alan L. Lebovitz | Executive Vice President – Management |

### C.     Prepetition Capital Structure

The following description of the Company's capital structure is for informational purposes only and is qualified in its entirety by reference to the documents setting forth the specific terms of such obligations and their respective related agreements.

#### i.      *First Lien Credit Facility.*

On January 30, 2019, certain of the Debtors entered into that certain Credit Agreement (as may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, and including all related credit documents, the "**First Lien Credit Agreement**"), by and among the Operating Partnership, as borrower, Well Fargo Bank, National Association, as administrative agent (together with any successor administrative agent, the "**Administrative Agen**t" or "**Wells Fargo**"), the lenders party thereto (the "**Bank Lenders**") and certain other parties specified

WEIL:\97988370\1\32626.0004

therein.  The First Lien Credit Agreement provides for a term loan facility (the "**Term Loan**") in the original aggregate principal amount of $500 million and a revolving loan facility (the "**Revolver**" and, together with the Term Loan, the "**First Lien Credit Facility**") in the aggregate maximum committed principal amount of $685 million (including any letters-of-credit issued thereunder).  The First Lien Credit Agreement matures in July 2023 and bears interest at a variable rate of LIBOR plus 2.25%.

As of the Petition Date, the aggregate principal amount outstanding under the Term Loan was believed by the Debtors to be approximately $439 million.[14]  As of the Petition Date, the Revolver had approximately $676 million in aggregate principal amount outstanding thereunder, and no further draws are permitted.  Additionally, as of the Petition Date, there were no letters of credit outstanding.

The obligations under the First Lien Credit Agreement are secured, pursuant to, among other documents, (i) that certain Collateral Agreement, dated as of January 30, 2019, by and among certain subsidiaries of the Operating Partnership, and Wells Fargo Bank, National Association, as collateral agent (the "**Collateral Agent**"), (ii) that certain Pledge Agreement, dated as of January 30, 2019, by and among the Operating Partnership, the direct and indirect subsidiaries of the Operating Partnership party thereto, and the Collateral Agent, and (iii) certain mortgages granted to the Collateral Agent in respect of the Credit Facility Properties, principally by the Credit Facility Properties and by pledges of the equity interests of the entities owning such Credit Facility Properties.

The REIT is a limited guarantor of the First Lien Credit Facility, solely with respect to the payment obligations of Holdings I as the general partner of the Operating Partnership, under the First Lien Credit Facility.

###### ii.        *Senior Unsecured Notes.*

The Operating Partnership, as issuer, the REIT, as limited Guarantor, and Delaware Trust Company (as successor to U.S. Bank National Association), as trustee, are parties to that certain indenture, dated as of November 23, 2013 (as amended, restated, or supplemented from time to time, the "**Indenture**") governing the following three tranches of senior unsecured notes (collectively, the "**Senior Unsecured Notes**"):

| Notes | Principal Amount Outstanding | Rate | Maturity |
|-------|------------------------------|------|----------|
| 2023 Notes | $450 million | 5.250% | December 1, 2023 |
| 2024 Notes | $300 million | 4.600% | October 15, 2024 |
| 2026 Notes | $625 million | 5.950% | December 15, 2026 |

---

[14]    The Administrative Agent asserts that the aggregate principal amount outstanding under the Term Loan was approximately $447 million as of the Petition Date.

WEIL:\97988370\1\32626.0004

The REIT is a limited guarantor of the Senior Unsecured Notes, solely with respect to losses suffered solely by reason of fraud or willful misrepresentation by the Operating Partnership or its affiliates.

### iii.        Property-Level Debt.

The Company has incurred, in the aggregate, approximately $1.9 billion of property-level debt, which amount includes the Company's share of Property Level Debt incurred together with its joint venture partners, secured by the Property Level Debt Properties, including non-recourse mortgage loans (the "**Non-Recourse Loans**") and certain other loans with recourse to the general credit of the Operating Partnership, and/or the REIT, or subsidiaries thereof, including construction loans (the "**Recourse Loans**" and, together with the Non-Recourse Loans, the "**Property Level Debt**").  The borrowers on the Property Level Debt instruments are generally non-Debtor affiliates. There are thirteen (13) loans that are recourse to a subsidiary of the Operating Partnership.

Much of the Property Level Debt has been securitized and sold into the commercial mortgage-backed securities ("**CMBS**") markets and is currently being administered by primary servicers. With the exception of two (2) Non-Recourse Loans, the Operating Partnership and/or the REIT, or a subsidiary thereof, is a non-recourse carveout guarantor and environmental guarantor on each of the Non-Recourse Loans and a guarantor under each of the Recourse Loans.

As of December 31, 2020, the Company was current with respect to its obligations under the Property Level Debt, with the exception of the Property Level Debt on the following Properties, which were in default and not subject to a forbearance or waiver agreement with the applicable lender:  (i) Greenbrier Mall; (ii) EastGate Mall; (iii) Park Plaza (currently in receivership); and (iv) Asheville Mall (currently in receivership).  The commencement of the Chapter 11 Cases constituted an event of default or termination event, and caused the automatic and immediate acceleration of all debt outstanding under or in respect of, thirty-eight (38) of the Property Level Debt instruments. Such Property Level Debt instruments provide that, as a result of the Chapter 11 Cases, the principal and interest due thereunder shall be immediately due and payable without notice from the lenders thereunder.  As discussed above, a number of Property Level Loans have matured or are about to mature and remain outstanding, including Fayette Mall, Alamance Crossing – East, Hamilton Crossing and Expansion, Parkdale Mall and Crossing, and Greenbrier Mall.  The Debtors, in connection with the settlement process, have engaged with the lenders of such Properties to negotiate an extension of the respective loans.

### iv.        REIT Preferred Stock and Operating Partnership Preferred Units.

The REIT issued depositary shares representing a 1/10th fractional share of the 7.375% Series D Cumulative Redeemable Preferred Stock outstanding (such depositary shares, the "**Series D Preferred Stock**") and depositary shares representing a 1/10th fractional share of the 6.625% Series E Cumulative Redeemable Preferred Stock outstanding (such depositary shares, the "**Series E Preferred Stock**" and, together with the Series D Preferred Stock, the "**REIT Preferred Stock**").  As of December 31, 2020, the REIT had approximately 18,150,000 shares of Series D Preferred Stock outstanding and approximately 6,900,000 shares of Series E Preferred Stock outstanding.  The Operating Partnership issues an equivalent number of preferred units (the "**LP Preferred Units**") to Holdings II on behalf of the REIT in exchange for the contribution of

proceeds from the REIT to the Operating Partnership when the REIT issues REIT Preferred Stock. The LP Preferred Units generally have the same terms and economic characteristics as the corresponding REIT Preferred Stock.

#### v.      *REIT Common Stock.*

As of December 31, 2020, the REIT had approximately 196,569,917 shares of common stock outstanding (the "**REIT Common Stock**").  As of the Petition Date, the REIT Common Stock was listed on the New York Stock Exchange (the "**NYSE**") under the symbol "CBL."

However, on November 2, 2020, the NYSE announced that (i) it had suspended trading in the REIT Common Stock and (ii) it had determined to commence proceedings to delist the REIT Common Stock, as well as the depositary shares representing a 1/10th fractional share of the Series D Preferred Stock and the depositary shares representing a 1/10th fractional share of the Series E Preferred Stock due to "abnormally low" trading price levels.  As a result, immediately thereafter, the REIT Common Stock and the depositary shares representing fractional interests in its Series D Preferred Stock and Series E Preferred Stock commenced trading on the OTC Markets, operated by the OTC Markets Group, Inc., under the symbols "CBLAQ", "CBLDQ" and "CBLEQ", respectively.  On November 17, 2020, CBL submitted to the NYSE regulation staff a formal request for review of the NYSE's decision to delist the common stock and to make an oral presentation to the committee of the board of directors of NYSE regulation staff in support of its appeal.  By communication dated February 1, 2021, the NYSE scheduled a formal review of its decision for July 15, 2021.

#### vi.      *Operating Partnership Common Units.*

Partners in the Operating Partnership hold their ownership through LP Preferred Units and common and special common units of limited partnership interests in the Operating Partnership (the "**LP Common Units**").  As of December 31, 2020, the Operating Partnership had approximately 201,687,773 LP Common Units outstanding.  The LP Common Units and the REIT Common Stock have essentially the same economic characteristics, as they effectively participate equally in the net income and distributions of the Operating Partnership.  For each share of REIT Common Stock, the Operating Partnership has issued a corresponding number of LP Common Units to Holdings I and Holdings II in exchange for the proceeds from the REIT Common Stock issuance.  Subject to certain limitations, each limited partner in the Operating Partnership has the right to exchange all or a portion of its LP Common Units for REIT Common Stock, or at the Company's election, their cash equivalent. When an exchange for REIT Common Stock occurs, the REIT assumes the LP Common Units.

As of December 31, 2020, the Operating Partnership had three series of special common units outstanding:

- **Series S Special Common Units**:   Among other rights under the Operating Partnership's limited partnership agreement, the holders of Series S special common units ("**S-SCUs**") have the right, subject to certain conditions, to a minimum annual distribution of $2.92875 per S-SCU.   Approximately 1,560,942 S-SCUs were outstanding as of December 31, 2020.

- **Series L Special Common Units**:   Among other rights under the Operating Partnership's limited partnership agreement, the holders of Series L special common units ("**L-SCUs**") are entitled to the same distribution rights as the holders of the common units of the Operating Partnership.  Approximately 571,700 L-SCUs were outstanding as of December 31, 2020.

- **Series K Special Common Units**:   Among other rights under the Operating Partnership's limited partnership agreement, the holders of Series K special common units ("**K-SCUs**") have the right, subject to certain conditions, to an annual dividend at a rate of 6.25%, or $2.96875 per K-SCU.  Approximately 868,821 K-SCUs were outstanding as of December 31, 2020.

During 2019, subject to further quarterly review, the Board suspended all future dividends with respect to the REIT Preferred Stock and REIT Common Stock.  The Board also suspended all distributions with respect to the LP Common Units and LP Preferred Units (the "**Dividend Suspension**").  CBL has not paid any dividends since the Dividend Suspension.

### vii.    *Prepetition Legal Proceedings*

(a)    Prepetition Litigation.

Certain Debtors are named as defendants from time to time in routine litigation proceedings, including, but not limited to, personal injury and breach of contract disputes.  The Debtors, however, cannot predict with certainty the outcome or effect of the resolution of Claims arising from pending or threatened litigation or legal proceedings, and the eventual outcome could materially differ from their current estimates.

(b)    Salon Adrian Litigation

On March 16, 2016, a class action lawsuit was brought against the Company in the United States District Court for the Middle District of Florida (the "**Florida Court**") by Wave Lengths Hair Salons of Florida, Inc. d/b/a Salon Adrian, alleging, among other things that certain of the Company entities overcharged tenants for electricity at certain bulk-metered malls (the "**Salon Adrian Litigation**" or "**Wave Litigation**").  In April 2019, the Company entered into a settlement agreement and release with respect to the class action (the "**Salon Adrian Settlement**") whereby the Company set up a reserve to meet its settlement obligations.  In August 2019, the Florida Court approved the Salon Adrian Settlement.  For the avoidance of doubt, the Reorganized Debtors intend on satisfying their obligations under the Salon Adrian Settlement, including with respect to tenant credits, in the ordinary course following the Debtors' emergence from these chapter 11 cases.

In the third quarter of 2019, the Company received document requests, in the form of subpoenas, from the SEC and the Department of Justice regarding the Salon Adrian Litigation and other related matters.  The Company cooperated in these matters and has been advised by the SEC and the Department of Justice that both agencies have closed their investigations.

(c)      Securities Litigation.

The Company and its current and former officers and directors are parties to the following securities litigations.

- **The Securities Class Action**:  A consolidated securities class action lawsuit (the "**Securities Class Action**") is pending against the Company and certain of its officers and directors (the "**D&Os**") in the United States District Court for the Eastern District of Tennessee (the "**Tennessee District Court**").   Specifically, CBL & Associates Properties, Inc, CBL & Associates Limited Partnership, Charles B. Lebovitz, Stephen D. Lebovitz, Farzana Khaleel, A. Larry Chapman , Augustus N. Stephas, and Don Sewell have been named as defendants in the Securities Class Action. The matter is stayed as against the Company pursuant to the automatic stay under section 362 of the Bankruptcy Code. The Securities Class Action, which was brought by persons who purchased or otherwise acquired the Company's securities during a specified period of time, alleged, among other things, that (i) the Company failed to timely disclose the potential material liability that CBL faced as a result of the Salon Adrian Litigation and (ii) the Company knowingly engaged in an illegal scheme to overcharge its tenants and made false statements to its investors regarding its revenues and prospects, which were materially overstated due to the alleged underlying scheme.   The plaintiffs in the Securities Class Action allege a putative class period of July 29, 2014 to March 26, 2019, although no class has been certified by the Tennessee District Court. While the outcome of the Securities Class Action is unknown, the plaintiffs are seeking, among other things, compensatory damages and attorneys' fees and costs. The defendants in the Securities Class Action have filed a motion to dismiss, which is currently pending. A mediation on the Securities Class Action occurred on December 10, 2020, but it did not result in a settlement.

  On December 4, 2020, the Debtors filed a motion with the Bankruptcy Court seeking, among other things, an order authorizing: (i) certain insurers under the Debtors' directors and officers insurance policies (the "**D&O Policies**") to advance defense costs on behalf of certain of the D&Os in accordance with the D&O Policies and (ii) the potential use of D&O proceeds for settlement purposes in connection with the Securities Class Action mediation (Docket No. 298) (the "**D&O Proceeds Motion**"). By order dated December 21, 2020, the Bankruptcy Court granted the D&O Proceeds Motion (Docket No. 345) (the "**D&O Insurance Order**").   Additional detail concerning the D&O Policies can be found in the D&O Proceeds Motion.  Pursuant to section 8.6 of the Plan, the Debtors will not terminate or otherwise reduce coverage under any D&O Policy.

  On December 23, 2020, the plaintiffs in the Securities Class Action filed additional pleadings in the Tennessee District Court requesting that they be allowed to proceed with their claims against the D&Os.  Consequently, on January 7, 2021, the Debtors filed a motion with the Bankruptcy Court seeking an order extending the automatic stay to the D&Os (Docket No. 763) (the "**D&O Stay Motion**").  By order dated January 16, 2021, the Bankruptcy Court extended the automatic stay to the D&Os through and

including April 16, 2021 (the "**D&O Deadline**"), without prejudice to the Debtors to seek further extensions (Docket No. 819).

On March 25, 2021, the Debtors filed a motion seeking to further extend the D&O Deadline through and including the 30th day following the Bankruptcy Court's entry of the Confirmation Order (Docket No. 992) (the "**D&O Extension Motion**").  By order dated April 12, 2021, the Bankruptcy Court extended the automatic stay to the D&Os to the earlier of (i) May 27, 2021, and (ii) the date on which the Bankruptcy Court enters a separate order on the D&O Extension Motion, without prejudice to the Debtors to seek further extensions (Docket No. 1042).  Further, by order dated May 20, 2021, the Bankruptcy Court (i) further extended the automatic stay to the D&Os through and including the 30th day following the date on which the Bankruptcy Court enters an order confirming the Plan and (ii) enjoined the plaintiffs in the Securities Class Action from continuing the Securities Class Action against the D&Os through August 12, 2021, without prejudice to the Debtors to seek further extensions of the automatic stay or injunction or to the rights of the plaintiffs in the Securities Class Action to assert any and all defenses, opposition, or arguments against such request (Docket No. 1146).

On April 28, 2021, the plaintiffs in the Securities Class Action filed a motion for relief from the automatic stay to allow the Florida Court to rule on a separate motion to unseal certain documents in connection with the Wave Litigation (Docket No. 1088) (the "**Wave Litigation Motion**").  On May 13, 2021, the Debtors filed an objection to the Wave Litigation Motion asserting that such stay relief should be denied (Docket No. 1117).  Currently, evidence that is potentially relevant to the allegations in the Securities Class Action is being held pursuant to the required Private Securities Litigation Reform Act hold.  Moreover, the sealed court filings sought by the plaintiffs in the Securities Class Action in the Florida Court remain under seal.

- **The Derivative Litigation**: Certain of the Company's current and former directors and officers have been named as defendants in nine (9) shareholder derivative lawsuits (the "**Derivative Litigations**" and, together with the Securities Class Action, the "**Securities Litigation**").  The complaints allege, among other things, breaches of fiduciary duties, unjust enrichment, waste of corporate assets and violation of federal securities laws.  The factual allegations upon which the Derivative Litigations are based are similar to the factual allegations made in the Securities Class Action.  While the outcome of the Derivative Litigations is unknown, the plaintiffs are seeking, among other things, unspecified damages and restitution for the Company from the individual defendants, the payment of costs and attorneys' fees, and that the Company be directed to reform certain governance and internal procedures.  On the Petition Date, the Derivative Litigations became property of the Debtors' Estates.  Additional information concerning the Securities Litigation can be found in the 10-K.

WEIL:\97988370\1\32626.0004

# IV.
# SIGNIFICANT EVENTS LEADING
# TO THE CHAPTER 11 FILINGS

### A.    Trends and Uncertainties in Retail Market

CBL, as a national retail landlord, is susceptible to changes in the retail real estate markets.  Over the past several years, the retail industry has been shifting, with the closing of brick-and-mortal retail stores becoming more common as shoppers have increasingly moved towards e-commerce.  The Company anticipates that the number of traditional department stores, such as those acting as Anchors or Junior Anchors in the Malls, will continue to decline over time.  Beyond the decline in number, the market share of traditional department stores is also declining, as is their ability to drive traffic.

As new technologies emerge, the relationships between customers, retailers, and shopping centers are evolving on a rapid basis.  Commercial landlords like CBL must diversify its sources of income and types of tenants to enhance the mall experience, which demands additional capital.  Additionally, an increasing number of retailers are utilizing their stores as showrooms or as part of an omni-channel strategy (allowing customers to shop seamlessly through various sales channels, where customers' sales occur outside the Malls).  As a result, customers may make purchases through other sales channels during or immediately after visiting the Malls, with such sales not being captured currently in the Company's sales figures or monetized in minimum or overage rents.

The Company also faces significant challenges in the retail leasing business.  Its traditional tenant base of retailers have increasingly focused on closing stores in order to streamline store fleets and maximize profitability.  There have been very few expansions involving national retailers.  To the extent expansions have occurred, they have more frequently involved local or regional retailers.  Local or regional retailers are generally less productive, which impacts their ability to afford market rents.  These retailers also have fewer financial resources.  As a result of the challenges in the retail sector, the Company is targeting more non-retail uses for its redevelopment projects such as hotels, residential facilities, medical facilities, or offices.   While these uses can demand significant capital, the Company has utilized a number of strategies such as land sales, ground leases, and joint ventures to mitigate this need.  There is also significant competition for these users from other redevelopment projects or vacant land opportunities.

There is also an emerging trend of certain other large mall landlords purchasing retailers in bankruptcy.  These acquisitions are generally favorable for the Company since the majority of stores purchased remain open.  However, the new owners are able to extract greater rental concessions from the Company and other non-owner landlords, which puts the Company at a competitive disadvantage.  In addition, a trend in the industry for several years is for tenants to move to gross or PIL (percent in lieu) leases, which provide that the tenant pays a single specific amount or a certain percentage of sales, with no additional payments for reimbursements of the tenant's portion of the operating expenses.  CBL is then responsible for any increases in operating expenses or real estate taxes instead of being able to pass such increases along to retailers.

WEIL:\97988370\1\32626.0004

B.        **Tenant Struggles and Rent Abatement**

Even before the start of the COVID-19 pandemic, the Company was suffering from the ongoing challenges in the retail environment that have resulted in store closings, tenant bankruptcies, and rental reductions for tenants with high occupancy costs.    These challenges impacted the Company's financial performance in 2019, including a decrease in new and renewal lease rates and reduced occupancy.      Bankruptcy-related closures impacted 2019 occupancy by approximately four percent (4%) or 702,000 square feet.  Additionally, in 2019, rental revenues were negatively impacted by rent concessions for tenants with high occupancy cost levels and tenants that closed in 2019 due to bankruptcy.

These trends continued in 2020 and 2021.  During 2020, more than thirty (30) of the Company's national tenants declared bankruptcy, including major tenants such as J.C. Penney, Ascena Retail Group, Stage Stores, and GNC.  These tenants represented more than $40 million in gross annual rent and comprised 7.2 million square feet in 2020, prior to any subsequent closures or lease modifications.  Although some of these tenants expect to continue to operate, the majority of these have announced store closures.  As negative retail trends and the COVID-19 pandemic continue to impact retailer sales, the Company expects additional tenant bankruptcies to occur.

Additionally, in response to the financial challenges facing the retail market, the Company's tenants began to request rent deferrals and/or abatements and other tenants defaulted on rent obligations.  As discussed below, the adverse impact of rent deferrals and abatements has been exacerbated by the COVID-19 pandemic.

C.        **Impact of COVID-19 Pandemic**

On March 11, 2020, the World Health Organization classified COVID-19 as a pandemic.  The COVID-19 pandemic has acutely impacted all states where the Company's Properties are located. Measures taken by federal, state, and local authorities to prevent or remediate COVID-19, including "shelter-in-place" or "stay-at-home" orders or other quarantine mandates, resulted in sustained closure of many of the Properties, as well as the cessation of the operations of certain of its tenants. This, in turn, resulted in a reduction of the revenues and cash flows generated by many of the Properties due to the adverse financial impact on its tenants, as well as reductions in other sources of income generated by the Properties.  In addition to reduced revenues, the Company's ability to obtain sufficient financing for such Properties has been impaired, as has the Company's ability to lease or re-lease Properties as a result of worsening market and economic conditions resulting from the COVID-19 pandemic.

Moreover, as a result of the COVID-19 pandemic, the Company experienced—and continues to experience—increased levels of requests for rent deferrals and abatements, as well as defaults on rent obligations.  For the year ended December 31, 2020, the Company estimated approximately $48.2 million associated with potentially uncollectible revenues.  The Company anticipates further abatements and deferrals for 2021, based upon, among other things, active negotiations with tenants concerning deferrals and other concessions.

Although restrictions have been relaxed in various jurisdictions and all of the Malls have reopened, the financial losses suffered by Properties in those jurisdictions will not be easily recovered.  In

addition, an increase in restrictions, including mandated closures, due to the protraction of the COVID-19 pandemic would severely impact CBL's and its tenants' operations and financial condition going forward.

### D. Prepetition Operational Initiatives

Since at least 2013, but gaining greater focus in first half of 2018, the Company has undertaken various operational and other initiatives to navigate through the challenges presented by the current retail environment. Given the decline in traditional department stores and changing retail consumer trends, the Company has been working to transform its portfolio of traditional Malls to dynamic suburban town centers, with diverse tenant bases. To that end, the Company has been redeveloping those spaces to attract new non-retail uses such as restaurants, entertainment, fitness centers, casinos, grocery stores, and lifestyle retailers that engage consumers and encourage them to spend more time at the Properties. However, non-department store Anchors may demand higher tenant allowances for development or expenses than a standard mall tenant due to the nature of services and products they provide, which presents a separate challenge for the Company in redeveloping those spaces.

CBL has also adjusted its tenant mix to meet shifting consumer demand and purchasing patterns. For example, apparel retailers have been particularly hard-hit by shifts in consumer purchasing patterns. Consequently, the Company has been proactively reducing its exposure to apparel retailers.

Additionally, while the Company suspended several major capital expenditures projects, the Company is pursuing cost-efficient and capital-conserving solutions for backfilling the remaining available Anchors, including joint venture partnerships, favorable lease structures, and third-party arrangements—all of which benefit the portfolio while preserving capital.

With respect to its debt obligations, in 2020, the Company was able to achieve debt service payment deferrals for a portion of the Property Level Debt even though securitized lenders in general have shown minimal flexibility in amending loan payments. The Company addressed nearly all of its major debt maturities in 2020 and is in discussions with existing lenders for certain 2021 secured loan maturities. Further, as discussed above, in 2019, CBL suspended all future dividends on the REIT Common Stock and REIT Preferred Stock, as well as distributions on interests in the Operating Partnership.

In 2020, the Company undertook additional actions in response to the COVID-19 pandemic. In March 2020, the Company drew down approximately $280 million on the First Lien Credit Facility, which represented substantially all the remaining available balance thereunder. The Company also implemented comprehensive programs to halt all non-essential expenditures, to reduce operating and overhead expenses, and to reduce, defer, or suspend capital expenditures, including redevelopment investments. These programs included temporary reductions to the compensation of Board members and members of senior management, as well as a temporary salary reduction for the entire workforce. The Company also implemented a broad-based temporary furlough program, as well as a permanent reduction in the workforce, reducing the employee base by roughly 10%, and reduced or deferred capital expenditures for 2020 by approximately $60.0 million. The Company also (i) discontinued monthly "cash option"

investments in the Company's dividend reinvestment plan and (ii) suspended all cash dividend payments for holders of preferred stock, common stock, and special common units.

###    E.    Debt Restructuring Effort and Original Restructuring Support Agreement

As discussed above, in addition to the Property Level Debt of nearly $1.9 billion, the Company has approximately $2.5 billion of outstanding funded indebtedness under the First Lien Credit Facility and the Senior Unsecured Notes.  In light of the current state of the retail rental market and the adverse effects of the COVID-19 pandemic, and notwithstanding the initiatives undertaken to weather the market headwinds in the short-term, the Company's existing capital structure is unsustainable in the long run.

Consequently, in early 2020, the Company engaged the Advisors to explore comprehensive capital structure solutions that would, among other things, reduce overall leverage and interest expense and extend maturities on the Company's funded indebtedness.  In May 2020, the Company, together with its legal and financial advisors, engaged with the Ad Hoc Bondholder Group and its advisors on a comprehensive capital restructuring.

To facilitate negotiations, in June 2020, CBL entered into forbearance agreements with certain members of the Ad Hoc Bondholder Group with respect to approximately $12 million and $19 million of cash interest payments that came due on June 1 and June 15, respectively, on the Senior Unsecured Notes (the "**Bondholder Forbearance Agreement**").  CBL also entered into a forbearance agreement with the Bank Lenders with respect to a cross-default under the First Lien Credit Facility triggered by the missed interest payments on the Senior Unsecured Notes due 2023 and 2026 (the "**Bank Forbearance Agreement**," and together with the Bondholder Forbearance Agreement, the "**Forbearance Agreements**").  The Forbearance Agreements were each extended multiple times by the Ad Hoc Bondholder Group and the Administrative Agent to facilitate further negotiations.  On August 5, 2020, prior to the expiration of the Forbearance Agreements (as extended), CBL made the June 1 and June 15 interest payments on the Senior Unsecured Notes due 2023 and 2026.  Negotiations with the Ad Hoc Bondholder Group continued after the interest payments were made.  More recently, the Company decided not to make an interest payment of $6.9 million on the Senior Unsecured Notes due 2024 that was due October 15, 2020, and as such, entered the applicable 30-day grace period.

After intense arms' length negotiations between the Company, the Ad Hoc Bondholder Group, and their respective advisors, on August 18, 2020, the parties reached an agreement on the terms of a comprehensive restructuring transaction.  On the same day, the parties executed the Original Restructuring Support Agreement.  After the Petition Date, the Debtors and the Required Consenting Noteholders negotiated certain modifications to the terms of the proposed restructuring, which are reflected in the Original Plan.

Thereafter, the Debtors, the Bank Lenders, and the Ad Hoc Bondholder Group re-engaged in negotiations, including by participating in the Mediation.  The Mediation was successful. Following extensive good faith negotiations over the course of many weeks, the Debtors, Consenting Noteholders, and Consenting Bank Lenders agreed to terms of a global settlement and entered into the RSA, a copy of which is attached hereto as **Exhibit C**, along with an accompanying term sheet (the "**Plan Term Sheet**") attached thereto outlining the material terms

of a restructuring to be implemented through a plan of reorganization.  As discussed above, on April 29, 2021, the Court authorized the Debtors to perform their obligations under the RSA (Docket No. 1090).  The terms of the comprehensive, tripartite settlement embodied in the RSA resolve the contentious and complicated issues at the heart of these Chapter 11 Cases, including (i) the treatment of the Bank Lenders', Consenting Crossholders', and Consenting Noteholders' claims in these Chapter 11 Cases, and (ii) claims asserted by the Debtors and the Bank Lenders in the Wells Fargo Adversary Proceeding.

As discussed above, the Plan contemplates, among other things, that:

- the holders of Allowed First Lien Credit Facility Claims will receive their Pro Rata share of (i) the Exit Credit Facility Distribution and (ii) $100,000,000 in Cash payable, first, from Cash deposited in the segregated account maintained by the Debtors pursuant to paragraph 11(a)(ii) of the Final Cash Collateral Order and, second, from other Cash on hand;

- the holders of Allowed Consenting Crossholder Claim will receive their Pro Rata share of (based on the ratio of such holder's Consenting Crossholder Claims to the aggregate amount of Consenting Crossholder Claims held by all Consenting Crossholders) the Consenting Crossholder Claims Recovery Pool; provided, that each Consenting Crossholder entitled to receive New Senior Secured Notes on account of its Crossholder Claim shall be entitled to make the Convertible Notes Election;

- the holders of Ongoing Trade Claims will receive the following treatment:  (i) if a holder of an Ongoing Trade Claim executes a Trade Agreement with the Debtors (the form and terms of such Trade Agreement to be determined by the Debtors in consultation with the (A) Required Consenting Noteholders and the Creditors' Committee and, (B) solely with respect to the Exit Credit Facility Subsidiaries, the Required Consenting Bank Lenders), four (4) equal cash installments, payable on a quarterly basis, which payments shall result in full payment in the Allowed amount of such Ongoing Trade Claim; or (ii) if a holder of an Ongoing Trade Claim does not execute a Trade Agreement, such holder's Pro Rata share of the Unsecured Claims Recovery Pool in accordance with section 4.7 of the Plan;

- Each Allowed Property-Level Guarantee Settlement Claim will either (i) be Reinstated; (ii) remain Unimpaired; or (iii) receive such treatment as agreed upon between the Debtors and the holder of such Property-Level Guarantee Claim (with the consent of the Required Consenting Noteholders, such consent not to be unreasonably withheld).  For the avoidance of doubt, any Property-Level Guarantee Claim that is not a Property-Level Guarantee Settlement Claim will be treated like a General Unsecured Claim;

- the holders of Allowed Unsecured Claims will receive their Pro Rata share of the Unsecured Claims Recovery Pool; provided, that each Consenting Noteholder (and, for the avoidance of doubt, only a Consenting Noteholder) entitled to receive New Senior Secured Notes on account of its Senior Unsecured Notes Claim shall be able to make the Convertible Notes Election; provided, however, that, if the Debtors determine that, pursuant to section 1129(a)(7)(ii), such holder would be entitled to a greater recovery than the foregoing if the Debtor against whom such holder's Allowed Unsecured Claim is

asserted were to liquidate under chapter 7 of the Bankruptcy Code, then such holder shall receive Cash in an amount necessary to satisfy section 1129(a)(7)(ii);

- The holders of Existing LP Common Units will either (i) receive a percentage of New LP Units, issued in accordance with the Restructuring Transactions, equal to the product of (A) 5.5% and (B) the percentage equal to the number of Existing LP Common Units that such holder elects to exchange for New LP Units divided by the number of Existing LP Common Units issued and outstanding immediately prior to the Plan Distributions or (ii)(A) be deemed to have converted or redeemed, as applicable, such holder's Existing LP Common Unit(s), effective the day prior to the Distribution Record Date, in exchange for Existing REIT Common Stock on terms consistent with the applicable prepetition agreements for the Existing LP Common Units and (B) receive a Pro Rata[15] share of the Existing Common Equity Recovery Pool, subject to reduction in accordance with section 4.14(a) of the Plan, if applicable; provided that, if the Bankruptcy Court does not approve the recovery to holders of Existing LP Common Units, Existing REIT Preferred Stock, and Existing REIT Common Stock, the New Common Stock set forth in section 4.10(a)(ii) of the Plan shall be added to the Unsecured Claims Recovery Pool and the New LP Units set forth in section 4.10(a)(i) of the Plan shall not be issued; provided, however, that the value otherwise allocable to holders of Existing LP Common Units under section 4.10(a) of the Plan shall be reduced, on a dollar-for-dollar basis utilizing the equity value implied by the mid-point of the Debtors' valuation set forth in connection with confirmation, by any costs incurred by or attributed to the Debtors' Estates in connection with any litigation or objection prosecuted after the Bankruptcy Court's approval of the Disclosure Statement by one or more holders of Existing LP Common Units prior to or in connection with the Confirmation Hearing as such costs are determined by the Bankruptcy Court in connection with confirmation of the Plan; provided, further, that, to the extent that no holder of Existing LP Common Units objects to confirmation of the Plan, the recovery to holders of Interests in Class 10 on account of such Interests shall not be reduced notwithstanding any objection(s) by holders of Claims or Interests in another Class.  Further, notwithstanding anything to the contrary herein, even if Class 10 votes, as a class, to accept the Plan, the rights of holders of Existing LP Common Units to object to confirmation of the Plan on the grounds that the Plan does not comply with section 1129(b)(2) of the Bankruptcy Code are preserved, and the Debtors reserve all rights to dispute any such objection(s) on any grounds other than on the basis that such party does not have a legal right to prosecute such an objection as a matter of law.

- The holders of Allowed Existing REIT Preferred Stock will receive their Pro Rata share of a percentage of the New Common Stock, issued in accordance with the Restructuring Transactions, equal to 5.5% divided by the REIT LP Ownership Percentage, subject to dilution by the Management Incentive Plan and subsequent issuances of common equity (including securities or instruments convertible into common equity) by the REIT from time to time after the Effective Date, as set forth herein, and subject to reduction in

---

[15]   For purposes of section 4.10(a)(ii)(B) of the Plan, the Pro Rata amounts shall be calculated as the Pro Rata share of all Allowed Existing LP Common Units electing to receive such treatment and Allowed Existing REIT Common Stock.

WEIL:\97988370\1\32626.0004

accordance with section 4.14(a) of the Plan, if applicable; provided that, if the Bankruptcy Court does not approve the recovery to holders of Existing LP Common Units, Existing REIT Preferred Stock, and Existing REIT Common Stock, the New Common Stock set forth in section 4.11(a) of the Plan shall be added to the Unsecured Claims Recovery Pool; provided, however, that the value otherwise allocable to holders of Existing REIT Preferred Stock under section 4.11(a) of the Plan shall be reduced, on a dollar-for-dollar basis utilizing the equity value implied by the mid-point of the Debtors' valuation set forth in connection with confirmation, by any costs incurred by or attributed to the Debtors' Estates in connection with any litigation or objection prosecuted after the Bankruptcy Court's approval of the Disclosure Statement by one or more holders of Existing REIT Preferred Stock prior to or in connection with the Confirmation Hearing as such costs are determined by the Bankruptcy Court in connection with confirmation of the Plan; provided, further, that, to the extent that no holder of Existing REIT Preferred Stock objects to confirmation of the Plan, the recovery to holders of Interests in Class 11 on account of such Interests shall not be reduced notwithstanding any objection(s) by holders of Claims or Interests in another Class.  Further, notwithstanding anything to the contrary herein, even if Class 11 votes, as a class, to accept the Plan, the rights of holders of Existing REIT Preferred Stock to object to confirmation of the Plan on the grounds that the Plan does not comply with section 1129(b)(2) of the Bankruptcy Code are preserved, and the Debtors reserve all rights to dispute any such objection(s) on any grounds other than on the basis that such party does not have a legal right to prosecute such an objection as a matter of law.

- The holders of Allowed Existing REIT Common Stock will receive their Pro Rata[16] share of the Existing Common Equity Recovery Pool, subject to reduction in accordance with section 4.14(a) of the Plan, if applicable; provided that, if the Bankruptcy Court does not approve the recovery to holders of Existing LP Common Units, Existing REIT Preferred Stock, and Existing REIT Common Stock, the Existing Common Equity Recovery Pool shall be added to the Unsecured Claims Recovery Pool; provided, however, that the value otherwise allocable to holders of Existing REIT Common Stock under section 4.12(a) of the Plan shall be reduced, on a dollar-for-dollar basis utilizing the equity value implied by the mid-point of the Debtors' valuation set forth in connection with confirmation, by any costs incurred by or attributed to the Debtors' Estates in connection with any litigation or objection prosecuted after the Bankruptcy Court's approval of the Disclosure Statement by one or more holders of Existing REIT Common Stock prior to or in connection with the Confirmation Hearing as such costs are determined by the Bankruptcy Court in connection with confirmation of the Plan; provided, further, that, to the extent that no holder of Existing REIT Common Stock objects to confirmation of the Plan, the recovery to holders of Interests in Class 12 on account of such Interests shall not be reduced notwithstanding any objection(s) by holders of Claims or Interests in another Class.  Further, notwithstanding anything to the contrary herein, even if Class 12 votes, as a class, to accept the Plan, the rights of holders of Existing REIT Common Stock to object to confirmation of the Plan on the grounds that the Plan does not comply with section 1129(b)(2) of the

---

[16]   For purposes of section 4.12(a) of the Plan, the Pro Rata amounts shall be calculated as the Pro Rata share of all Allowed Existing LP Common Units electing to receive such treatment and Allowed Existing REIT Common Stock.

Bankruptcy Code are preserved, and the Debtors reserve all rights to dispute any such objection(s) on any grounds other than on the basis that such party does not have a legal right to prosecute such an objection as a matter of law.

Further, the Debtors will receive Commitment Letters from the Commitment Parties where such parties agree to purchase, in the aggregate, $50 million of New Convertible Notes on the Effective Date.

The RSA reflects, among other things, the mutual pursuit by the Debtors and their economic stakeholders of the following timeline for these Chapter 11 Cases (subject to the Court's availability and unless otherwise extended):

- No later than 65 days after the RSA Effective Date, the Bankruptcy Court shall have entered an order approving this Disclosure Statement;

- No later than 180 days after the RSA Effective Date, the Bankruptcy Court shall have entered the Confirmation Order; and

- No later than November 1, 2021, the Effective Date shall have occurred.

The RSA provides the Company with a viable path forward and a framework to successfully exit chapter 11 in a timely fashion with the support of the Company's two largest creditor constituencies.

## F.    **Prepetition Bank Lender Actions**

Upon executing the Original Restructuring Support Agreement, the Company and the Ad Hoc Bondholder Group focused their attention on negotiations with the Bank Lenders in an effort to reach a tripartite agreement among the Company, the Ad Hoc Bondholder Group, and the Bank Lenders over the terms of a fully consensual restructuring. Indeed, on October 13, 2020, certain members of the Ad Hoc Bondholder Group executed confidentiality agreements and became "restricted" to negotiate directly with the Bank Lenders. On October 27, 2020, the Ad Hoc Bondholder Group's advisors sent a restructuring term sheet to the Administrative Agent's advisors.

The next day, the Administrative Agent delivered to the Company various notices purporting to exercise remedies under the First Lien Credit Facility (the "**Wells Fargo Notices**"). The Wells Fargo Notices stated, among other things, that (i) the Administrative Agent elected to exercise all voting rights and all other ownership rights in respect of all Credit Facility Properties; (ii) the Administrative Agent had revoked the Company's right to collect rents and the Company had three (3) days to instruct its tenants to pay rent directly to the Administrative Agent; and (iii) the Administrative Agent removed the manager and officers from the governing boards of the Credit Facility Properties and appointed itself as manager via a joint written consent. The joint written consents also purported to strip the governing boards of the Credit Facility Properties of the authority to file any bankruptcy petition without the consent of the Administrative Agent.

The Company commenced these Chapter 11 Cases beginning on November 1, 2020. Contemporaneously therewith, the Debtors commenced an adversary proceeding, Adv. Proc. No.

20-03454 (DRJ) (the "**Wells Fargo Adversary Proceeding**"), seeking, among other things, a declaratory judgment that (i) no Event of Default (as defined in the First Lien Credit Agreement) has occurred or is continuing under the First Lien Credit Agreement and/or applicable law, and (ii) the Administrative Agent's purported exercise of remedies thereunder is null and void. The Debtors also sought a temporary restraining order and injunctive relief enjoining the Bank Lenders from taking any further action or exercising remedies based on the alleged Events of Default pending the resolution of the Wells Fargo Adversary Proceeding.

### G.    Prepetition Employee Retention Programs

In August 2020, to retain key employees throughout the Debtors' restructuring efforts, the Debtors, with input from their Advisors and an independent compensation consultant, adopted a two-tier key employee retention program (as amended, the "**Prepetition KERP**")[17] for certain key employees (the "**Key Employees**"), including Insiders.[18] Each participating Key Employee has received or will receive a cash award (each, a "**Retention Bonus**"), payable in accordance with the terms of the applicable retention agreements signed by each Key Employee (each a "R**etention Agreement**").

The first tier of the KERP (the "**Tier 1 Prepetition KERP**") provides certain key executives with awards designed to retain such executives through these Chapter 11 Cases. The second tier of the KERP (the "**Tier 2 Prepetition KERP**") provides for discretionary bonuses to certain non-executive, non-insider Key Employees—representing approximately 35% of the Company's non-executive workforce (the "**Non-Insider KERP Participants**")—based upon the Company's business judgment in determining the need to retain such Non-Insider KERP Participants throughout the restructuring process. Payments under the Tier 2 Prepetition KERP were split into two installments. The first installment was paid upon the first regular payroll date following the effective date of the applicable Retention Agreement (in August 2020 or later). On January 29, 2021, the Bankruptcy Court authorized the payment of the second installment under the Tier 2 Prepetition KERP (Docket No. 862) with respect to all but two (2) of the Non-Insider KERP Participants.

Further information relating to the KERP can be found in the *Emergency Motion of Debtors for Entry of Order Approving and Authorizing Payments Under Non-Insider Key Employee Retention Plan* (Docket No. 803) (the "**KERP Motion**").

---

[17]    Capitalized terms used but not defined in this Section IV(G) shall have the meanings ascribed to them in the *Emergency Motion of Debtors for Entry of an Order (I) Authorizing Debtors to (A) Pay Prepetition Wages, Salaries, Reimbursable Expenses, and Other Obligations on Account of Compensation and Benefits Programs and (B) Continue Compensation and Benefits Programs and (II) Granting Related Relief* (Docket No. 8).

[18]    The Company offered the KERP in lieu of certain historical, incentive-based Compensation programs, such as the "Named Executive Officer Incentive Program." As a condition of receiving a Retention Bonus under the KERP, therefore, each Key Employee relinquished his or her right to participate in any such incentive-based Compensation programs with respect to 2020.

WEIL:\97988370\1\32626.0004

### H.   Appointment of New Independent Director and Formation of a Special Committee

On September 29, 2020, Michael Ashner resigned from the Board.  On October 7, 2020, the Board unanimously appointed Scott D. Vogel as an additional independent director, for an initial term expiring at the Company's 2021 Annual Meeting of Stockholders.  Mr. Vogel has extensive restructuring experience and the Board believed that Mr. Vogel's experience would be beneficial to the Company as it navigated through the restructuring process.

Further, on October 14, 2020, in connection with the Company's evaluation of strategic alternatives, the board of directors of the REIT approved the formation of a special committee (collectively, the "**Special Committee**").  The Special Committee is authorized to, among other things, consider, evaluate, and approve any transactions for and on behalf of the Company in which the Chief Legal Officer or outside counsel advises that a conflict exists between the Company and its equity holders, its affiliates, and/or its managers and officers in the context of a chapter 11 restructuring case.  The Special Committee consists of two non-employee directors, Mr. Scott D. Vogel and Ms. Carolyn B. Tiffany.

### I.   Independent Investigation

The Special Committee oversaw an investigation (the "**Investigation**") into certain potential claims and causes of action that are proposed to be released pursuant to the Plan, including the Derivative Litigations.  Weil, as counsel to the Special Committee, assisted in evaluating the colorability of those claims and causes of action.  The Investigation included extensive factual and legal analysis, document review, and several interviews. Weil conferred with, and reported to, the Special Committee over the course of the Investigation.  The Investigation commenced in October 2020 and concluded in April 2021.

Based upon the information available to the Special Committee, including, but not limited to, the results of the Investigation, the Special Committee voted to approve the releases set forth in the Plan, including releases for the Company's current and former D&Os.  The Debtors are working with the Creditors' Committee in an effort to respond to its requests for further information regarding the Investigation, while maintaining privilege, work product or other protections that apply to the Investigation.

### V.
### OVERVIEW OF CHAPTER 11 CASES

### A.   Commencement of Chapter 11 Cases

#### i.   *First Day Motions*

As discussed above, beginning on November 1, 2020, the Debtors commenced the Chapter 11 Cases.  The Debtors continue to manage their properties and operate their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

On or about the Petition Date, the Debtors filed multiple motions seeking various relief from the Bankruptcy Court to enable the Debtors to transition into chapter 11 and minimize any disruptions

to the Debtors' operations (the "**First Day Motions**").  The Bankruptcy Court granted substantially all of the relief requested in the First Day Motions and entered various orders authorizing the Debtors to, among other things:

- Continue the use of the Debtors' cash management system, bank accounts, and business forms on a final basis (Docket No. 263);

- Pay certain prepetition claims of service providers and lien claimants on a final basis (Docket No. 63);

- Continue paying employee wages and benefits on a final basis (Docket No. 69);

- Establish procedures for utility companies to request adequate assurance of payment and to prohibit utility companies from altering or discontinuing service on an interim basis (Docket No. 61);

- Pay certain prepetition taxes and assessments on a final basis (Docket No. 68);

- Continue and maintain (i) various insurance policies designed to protect the Debtors' property, assets, key personnel, and business operations and (ii) surety bonds to secure the Debtors' payment or performance of certain obligations on a final basis (Docket No. 70);

- Continue payment of the Debtors' tenant obligations on a final basis (Docket No. 262); and

- Establish procedures to protect the potential value of the Debtors' net unrealized built-in loss, net operating loss carryforwards, and certain other tax benefits on a final basis (Docket No. 64).

### ii. *Procedural Motions*

On or about the Petition Date, the Debtors also filed various motions regarding procedural issues that are common to chapter 11 cases of similar size and complexity as these Chapter 11 Cases. The Bankruptcy Court granted substantially all of the relief requested in such motions and entered various orders authorizing, among other things:

- The joint administration of the Debtors' estates (Docket Nos. 96, 206);

- An extension of time to file the Debtors' Schedules and Statements (as defined below) (Docket No. 67); and

- The Debtors to file a consolidated creditor matrix and list of thirty (30) largest unsecured creditors and modifying the requirement to file a list of equity securityholders (Docket No. 66).

WEIL:\97988370\1\32626.0004

### iii. *Retention of Chapter 11 Professionals*

The Debtors have filed several applications and obtained authority to retain various professionals to assist the Debtors in carrying out their duties under the Bankruptcy Code during the Chapter 11 Cases, including: (i) Weil, as counsel to the Debtors (Docket No. 743); (ii) Epiq, as claims, noticing, and solicitation agent (Docket No. 30); (iii) Moelis, as investment banker (Docket No. 744); (iv) Berkeley Research Group, LLC ("**BRG**"), as financial advisor (Docket No. 742); (v) Deloitte Tax LLP, as a tax services provider (Docket No. 937); and (vi) Deloitte & Touche LLP, as an independent audit services provider (Docket No. 938).

On December 16, 2020, the Bankruptcy Court entered the *Order Authorizing Debtors to Employ Professionals Used in the Ordinary Course of Business Effective as of the Petition Date* (Docket No. 328). The Debtors reserve the right to seek and retain additional professionals. Moreover, on December 22, 2020, the Bankruptcy Court entered the *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals* (Docket No. 350).

### iv. *Use of Cash Collateral*

On or about the Petition Date, the Debtors filed a motion seeking authority to use Cash Collateral (as defined in section 363 of the Bankruptcy Code) (Docket No. 16) (the "**Cash Collateral Motion**"). By order dated November 2, 2020, the Court granted the Cash Collateral Motion on an interim basis (Docket No. 65) (the "**First Interim Cash Collateral Order**").

On November 16, 2020, the Administrative Agent objected to the Cash Collateral Motion (Docket No. 213) (the "**Wells Fargo Cash Collateral Objection**"). On November 23, 2020, the Court held a final hearing on the Cash Collateral Motion (the "**Cash Collateral Motion Final Hearing**"). After hearing oral argument on the Cash Collateral Motion, the Court continued the Cash Collateral Motion Final Hearing to a pending date to occur after the Wells Fargo Trial (as defined below) and directed the parties to submit an agreed-upon second interim order. On December 3, 2020, the Court entered the second interim cash collateral order (Docket No. 292) (the "**Second Interim Cash Collateral Order**") extending the First Interim Cash Collateral Order, with certain modifications, until the date of the Cash Collateral Motion Final Hearing.

In connection with the RSA, the Debtors, the Required Consenting Noteholders, and the Required Consenting Bank Lenders reached a consensual resolution regarding the Cash Collateral Motion. On March 31, 2021, the Debtors filed a revised form of cash collateral order (Docket No. 1007-1) (the "**Final Cash Collateral Order**"). By order dated April 2, 2021, the Court entered the Final Cash Collateral Order (Docket No. 1018).

### B. <u>De Minimis Asset Sales, Claims, and Causes of Action Procedures</u>

On November 12, 2020, the Debtors filed a motion seeking approval of procedures in connection with the sale of certain *de minimis* assets (Docket No. 203) (the "**De Minimis Asset Sale Motion**"). By order dated November 23, 2020, the Court granted the De Minimis Asset Sale Motion (Docket No. 264). The Debtors have sold, or intend on selling in 2021, assets with an aggregate selling price of approximately $20 million pursuant to the *de minimis* asset sale procedures.

WEIL:\97988370\1\32626.0004

On February 18, 2021, the Debtors filed a motion seeking approval of procedures in connection with the settlement of certain *de minimis* claims and causes of action (Docket No. 895) (the "**De Minimis Claims Motion**").  By order dated March 16, 2021, the Court granted the De Minimis Claims Motion (Docket No. 960).

### C.    Appointment of Creditors' Committee

On November 13, 2020, the Official Committee of Unsecured Creditors (the "**Creditors' Committee**") was appointed by the Office of the United States Trustee for Region 7 (the "**U.S. Trustee**") pursuant to section 1102 of the Bankruptcy Code to represent the interests of unsecured creditors in these Chapter 11 Cases (Docket No. 204).  The members of the Creditors' Committee, as amended, are: (i) Delaware Trust Company; (ii) ERMC TN, LLC; and (iii) SecurAmerica TN, LLC.  The Creditors' Committee has retained McDermott Will & Emery LLP, as counsel, and AlixPartners, LLP, as its financial advisor.

### D.    Wells Fargo Adversary Proceeding

As discussed above, on or about the Petition Date, the Debtors commenced the Wells Fargo Adversary Proceeding (Adv. Proc. Docket No. 1) (the "**Adversary Complaint**"), seeking, among other things, a declaratory judgment that (i) no Event of Default has occurred or is continuing under the First Lien Credit Agreement and/or applicable law, and (ii) the Administrative Agent's purported exercise of remedies is null and void.  The Debtors also moved for a temporary restraining order and a preliminary injunction to enjoin Wells Fargo's purported exercise of remedies (Adv. Proc. Docket No. 2).

On November 2, 2020, the Bankruptcy Court granted the Debtors' request for a temporary restraining order on an *ex parte* basis, and thus enjoined Wells Fargo's purported exercise of remedies, stayed Wells Fargo's direction that tenants at the Credit Facility Properties remit payment to Wells Fargo, and ordered that any such payments shall be made to the Debtors in the ordinary course (Adv. Proc. Docket No. 5) (the "**TRO**").  The Court scheduled a hearing on whether a preliminary injunction should issue.

Following entry of the TRO, the parties, by and through counsel, conferred and stipulated to the entry of a standstill order pending resolution of the Wells Fargo Adversary Proceeding.  On November 13, 2020, the Bankruptcy Court entered the *Stipulated Standstill Order* (Adv. Proc. Docket No. 26) (the "**Standstill Order**") pursuant to which, among other things, the Court converted the TRO to the Standstill Order until further order of the Court or fourteen (14) days following resolution by the Bankruptcy Court of the Wells Fargo Adversary Proceeding (including any timely filed counterclaims that the Administrative Agent may pursue), whichever occurs first. Pursuant to the Standstill Order, the Debtors must (i) segregate the rents and revenues received from tenants at the Credit Facility Properties, subject to using those revenues during the pendency of the Standstill Order in accordance with the Second Interim Cash Collateral Order and in all events solely to pay operating expenses, required capital expenditures, and tenant allowances associated with the Credit Facility Properties and (ii) provide certain reporting concerning the Credit Facility Properties to the Administrative Agent.

WEIL:\97988370\1\32626.0004

On November 18, 2020, the Administrative Agent filed its answer and counterclaims to the Adversary Complaint (Adv. Proc. Docket No. 29) (the "**Wells Fargo Counterclaims**") seeking, among other things, dismissal of the Pledged Debtors' (as defined in the Wells Fargo Counterclaims) Chapter 11 Cases and a declaratory judgment that all rents paid or owing to the Mortgage Debtors (as defined in the Wells Fargo Counterclaims) following the Administrative Agent's revocation of the Mortgage Debtors' license to receive those rents are not property of the Mortgage Debtors' respective Estates, but are property of the Administrative Agent. On November 25, 2020, the Debtors filed their answer to the Wells Fargo Counterclaims (Adv. Proc. Docket No. 31).

The trial on the Wells Fargo Adversary Proceeding (the "**Wells Fargo Trial**") commenced on February 3, 2021 and continued thereafter as scheduled by the Bankruptcy Court. In connection with their execution of the RSA, the parties agreed to a dismissal with prejudice of the Wells Fargo Adversary Proceeding and all Causes of Action asserted therein upon the Confirmation Order becoming a Final Order. Consequently, the parties agreed to adjourn the Wells Fargo Adversary Proceeding pending further order of the Bankruptcy Court (Adv. Proc. Docket No. 146).

### E.    Court-Ordered Mediation

Pursuant to the *Agreed Mediation Order Appointing Judge Marvin Isgur as Mediator as to Chapter 11 Plan and Wells Fargo Adversary Proceeding* (Docket No. 749) (as amended, the "**Mediation Order**"), beginning on January 7, 2021, the Mediation Parties participated in a mediation (the "**Mediation**") with the goal of reaching a global settlement regarding the issues underlying the Wells Fargo Adversary Proceeding and plan treatment. As discussed above, the Mediation was successful, and the Mediation Parties reached an agreement and entered into the RSA as discussed herein.

### F.    Exclusivity

Section 1121(b) of the Bankruptcy Code provides for a period of 120 days after the commencement of a chapter 11 case during which time a debtor has the exclusive right to file a plan of reorganization (the "**Exclusive Plan Period**"). In addition, section 1121(c)(3) of the Bankruptcy Code provides that if a debtor files a plan within the Exclusive Plan Period, it has a period of 180 days after commencement of the chapter 11 case to obtain acceptances of such plan (the "**Exclusive Solicitation Period**," and together with the Exclusive Plan Period, the "**Exclusive Periods**"). Pursuant to section 1121(d) of the Bankruptcy Code, the Bankruptcy Court may, upon a showing of cause, extend the Exclusive Periods. On February 22, 2021, the Debtors filed a motion (Docket No. 901) (the "**Extension Motion**"), seeking a 90-day extension of (i) the Exclusive Plan Period from March 1, 2021 to May 31, 2021 and (ii) the Exclusive Solicitation Period from April 30, 2021 to July 29, 2021, without prejudice to the Debtors' right to request further extensions of the Exclusive Periods. By order dated March 19, 2021, the Court granted the relief sought in the Extension Motion (Docket No. 976) and extended the Exclusive Periods to May 31, 2021 and July 29, 2021, respectively. On May 20, 2021, the Debtors filed a motion (Docket No. 1144) seeking an additional 90-day extension of (i) the Exclusive Plan Period from May 31, 2021 to August 30, 2021 and (ii) the Exclusive Solicitation Period from July 29, 2021 to October 27, 2021, without prejudice to the Debtors' right to request further extensions of the Exclusive Periods.

### G.    Statements and Schedules, and Claims Bar Dates

On December 31, 2020, the Debtors filed their schedules and statement of financial affairs (collectively, the "**Schedules and Statements**"), detailing known claims against the Debtors (Docket Nos. 378-735).  The Debtors also filed reports required by Bankruptcy Rule 2015.3, disclosing financial information of certain entities in which the Debtors hold a controlling or substantial interest.

On January 28, 2021, the Debtors filed a motion seeking Bankruptcy Court approval to set the following deadlines: (i) March 26, 2021, as the deadline for all creditors or other parties in interest to file proofs of Claim (the "**General Bar Date**"); and (ii) April 30, 2021, as the deadline for all governmental units to file a proof of Claim (Docket No. 855) (the "**Bar Date Motion**").  By order dated February 23, 2021, the Court granted the Bar Date Motion (Docket No. 902).  As of March 31, 2021, over 1,500 proofs of Claim had been filed against the Debtors asserting in the aggregate approximately $60.9 billion.  The Debtors have begun to review and analyze the filed Claims, and will reconcile objections to the filed Claims as appropriate.

Further, any counterparty to an executory contract that is rejected must file and serve a proof of Claim on the applicable Debtor that is party to the applicable executory contract to be rejected by no later than the applicable bar date governed by the Plan or the Court order governing such rejection.

### H.    Motion to Extend Time to Assume or Reject Unexpired Leases

On February 8, 2021, the Debtors filed a motion (Docket No. 886) (the "**365(d)(4) Motion**") for an extension of time to assume or reject unexpired leases (including sub-leases) of nonresidential real property by ninety (90) days, through and including May 31, 2021 (the "**365(d)(4) Deadline**"), without prejudice to the Debtors' right to seek further extensions in accordance with the Bankruptcy Code.  By order dated March 8, 2021, the Court granted the 365(d)(4) Motion (Docket No. 936).  On May 20, 2021, the Debtors filed a motion (Docket No. 1145) for an additional extension of the 365(d)(4) Deadline by ninety (90) days, through and including August 30, 2021, without prejudice to the Debtors' right to seek further extensions in accordance with the Bankruptcy Code.

**VI.**
**SUMMARY OF PLAN**

### A.    General

This section of this Disclosure Statement summarizes the Plan, a copy of which is annexed hereto as **Exhibit A**. This summary is qualified in its entirety by reference to the Plan.  **YOU SHOULD READ THE PLAN IN ITS ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.**

In general, a chapter 11 plan (i) divides claims and equity interests into separate classes, (ii) specifies the consideration that each class is to receive under the plan, and (iii) contains other provisions necessary to implement the plan.  Under the Bankruptcy Code, "claims" and "equity interests," rather than "creditors" and "shareholders," are classified because creditors and

WEIL:\97988370\1\32626.0004

shareholders may hold claims and equity interests in more than one class.  Under section 1124 of the Bankruptcy Code, a class of claims is "impaired" under a plan unless the plan (1) leaves unaltered the legal, equitable, and contractual rights of each holder of a claim in such class or (2) provides, among other things, for the cure of certain existing defaults and reinstatement of the maturity of claims in such class.  Classes 3, 4, 5, 7, 10, 11, 12, and 14 are impaired under the Plan, and holders of Claims or Interests in such Classes are entitled to vote to accept or reject the Plan unless such Classes of Claims or Interests are deemed to reject the Plan.  Ballots are being furnished herewith to all holders of Claims in Classes 3, 4, 5, 7, 10, 11, 12, and 14 that are entitled to vote to facilitate their voting to accept or reject the Plan.  Class 9 is deemed to reject the Plan and, therefore, Interests in such Classes will not vote on the Plan.

### B. <u>Administrative Expense Claims, Fee Claims, and Priority Tax Claims</u>.

### i. *Treatment of Administrative Expense Claims*

Except to the extent that a holder of an Allowed Administrative Expense Claim agrees to a different treatment, each holder of an Allowed Administrative Expense Claim (other than a Fee Claim or Restructuring Expenses) shall receive, in full and final satisfaction of such Claim, Cash in an amount equal to such Allowed Administrative Expense Claim on, or as soon thereafter as is reasonably practicable, the later of (i) the Effective Date and (ii) the first Business Day after the date that is thirty (30) calendar days after the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim; *provided,* that Allowed Administrative Expense Claims representing liabilities incurred in the ordinary course of business by the Debtors shall be paid by the Debtors or the Reorganized Debtors, as applicable, in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any orders or agreements governing, instruments evidencing, or other documents establishing, such liabilities.

### ii. *Treatment of Fee Claims*

(a)     All Professional Persons seeking approval by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Effective Date under sections 327, 328, 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), 503(b)(5), or 1103 of the Bankruptcy Code shall (i) file, on or before the date that is thirty (30) days after the Effective Date, their respective applications for final allowances of compensation for services rendered and reimbursement of expenses incurred and (ii) be paid in full, in Cash, in such amounts as are Allowed by the Bankruptcy Court or authorized to be paid in accordance with the order(s) relating to or allowing any such Fee Claim.  The Debtors are authorized to pay compensation for professional services rendered and reimbursement of expenses incurred after the Confirmation Date in the ordinary course and without the need for Bankruptcy Court approval.

(b)     On or prior to the Effective Date, the Debtors shall establish and fund the Fee Escrow Account.  The Debtors shall fund the Fee Escrow Account with Cash equal to the Professional Persons' good faith estimates of the Fee Claims, which estimate shall be provided to the Debtors at least three (3) days prior to the

WEIL:\97988370\1\32626.0004

Effective Date.  Funds held in the Fee Escrow Account shall not be considered property of the Debtors' Estates or property of the Reorganized Debtors, but shall revert to the Reorganized Debtors only after all Fee Claims allowed by the Bankruptcy Court have been irrevocably paid in full.  The Fee Escrow Account shall be held in trust for Professional Persons retained by the Debtors or by the Creditors' Committee, as applicable, and for no other parties until all Fee Claims Allowed by the Bankruptcy Court have been paid in full.  Fee Claims shall be paid in full, in Cash, in such amounts as are Allowed by the Bankruptcy Court (i) on the date upon which an order relating to any such Allowed Fee Claim becomes a Final Order or (ii) on such other terms as may be mutually agreed upon between the holder of such an Allowed Fee Claim and the Debtors or the Reorganized Debtors, as applicable.  The Reorganized Debtors' obligations with respect to Fee Claims shall not be limited by nor deemed limited to the balance of funds held in the Fee Escrow Account.  To the extent that funds held in the Fee Escrow Account are insufficient to satisfy the amount of accrued Fee Claims owing to the Professional Persons, such Professional Persons shall have an Allowed Administrative Expense Claim for any such deficiency, which shall be satisfied in accordance with section 2.1 of the Plan.  No Liens, claims, or interests shall encumber the Fee Escrow Account in any way.

(c)     Any objections to Fee Claims shall be served and filed (i) no later than twenty-one (21) days after the filing of the final applications for compensation or reimbursement or (ii) such later date as ordered by the Bankruptcy Court upon a motion of the Reorganized Debtors.

### iii.     *Treatment of Priority Tax Claims*

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a different treatment, each holder of an Allowed Priority Tax Claim shall receive, in full and final satisfaction of such Allowed Priority Tax Claim, at the option of the Debtors (with the consent of the Required Consenting Noteholders, such consent not be unreasonably withheld, conditioned, or delayed) or the Reorganized Debtors, as applicable (i) Cash in an amount equal to such Allowed Priority Tax Claim on, or as soon thereafter as is reasonably practicable, the later of (A) the Effective Date, to the extent such Claim is an Allowed Priority Tax Claim on the Effective Date, (B) the first Business Day after the date that is thirty (30) calendar days after the date such Priority Tax Claim becomes an Allowed Priority Tax Claim, and (C) the date such Allowed Priority Tax Claim is due and payable in the ordinary course as such obligation becomes due; *provided*, that the Debtors reserve the right to prepay all or a portion of any such amounts at any time under this option without penalty or premium, or (ii) such other treatment reasonably acceptable to the Debtors (with the consent of the Required Consenting Noteholders, such consent not be unreasonably withheld, conditioned, or delayed) or Reorganized Debtors (as applicable) and consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.

### iv.     *Payment of Restructuring Expenses*

(a)     The Restructuring Expenses incurred, or estimated to be incurred, up to and including the Effective Date (or, with respect to necessary post-Effective

Date activities, after the Effective Date), other than those previously paid in accordance with the Restructuring Support Agreement and the Restructuring Support Agreement Approval Order, shall be paid in full in Cash on or prior to the Effective Date (to the extent not previously paid during the course of the Chapter 11 Cases) in accordance with, and subject to, the terms of the RSA, without any requirement to file a fee application with the Bankruptcy Court, without the need for itemized time detail, or without any requirement for Bankruptcy Court review or approval.  All Restructuring Expenses to be paid on the Effective Date shall be estimated prior to and as of the Effective Date and such estimates shall be delivered to the Debtors at least three (3) days before the anticipated Effective Date; *provided* that such estimates shall not be considered an admission or limitation with respect to such Restructuring Expenses.  On the Effective Date, or as soon as practicable thereafter, final invoices for all Restructuring Expenses incurred prior to and as of the Effective Date shall be submitted to the Debtors.

(b)     Pursuant to the Senior Unsecured Notes Indenture, all accrued and unpaid reasonable and documented Senior Unsecured Notes Trustee Fees and Expenses incurred up to (and including) the Effective Date shall be paid in full in Cash on the Effective Date, in each case without (i) any reduction to recoveries of the Holders of Senior Unsecured Notes Claims, (ii) any requirement to file a fee application with the Bankruptcy Court, (iii) the need for itemized time detail, or (iv) any requirement for Bankruptcy Court review.  Notwithstanding anything to the contrary set forth herein, the Senior Unsecured Notes Trustee shall have the right to exercise the Senior Unsecured Notes Charging Lien against distributions to holders of the Senior Unsecured Notes Claims, respectively, for the payment of the Senior Unsecured Notes Trustee Fees and Expenses.

### *v.*     *Statutory Fees*

All Statutory Fees due and payable prior to the Effective Date shall be paid by the Debtors or the Reorganized Debtors.  On and after the Effective Date, the Reorganized Debtors shall pay any and all Statutory Fees when due and payable, and shall file with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the U.S. Trustee.  Each Debtor or Reorganized Debtor, as applicable, shall remain obligated to pay quarterly fees to the U.S. Trustee until the earliest of that particular Debtor's, or Reorganized Debtor's, as applicable, case being closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code.

### C.     Classification of Claims and Interests

### *i.*     *Classification in General*

A Claim or Interest is placed in a particular Class for all purposes, including voting, confirmation, and distribution under the Plan and under sections 1122 and 1123(a)(1) of the Bankruptcy Code; *provided,* that a Claim or Interest is placed in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and such Claim or Interest has not been satisfied, released, or otherwise settled prior to the Effective Date.

ii.        *Formation of Debtor Groups for Convenience Only*

The Plan groups the Debtors together solely for the purpose of describing treatment under the Plan, confirmation of the Plan, and making Plan Distributions in respect of Claims against and Interests in the Debtors under the Plan. Such groupings shall not affect any Debtor's status as a separate legal entity, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger or consolidation of any legal entities, or cause the transfer of any Assets; and, except as otherwise provided by or permitted under the Plan, all Debtors shall continue to exist as separate legal entities.

iii.        *Summary of Classification of Claims and Interests*

The following table designates the Classes of Claims against and Interests in the Debtors and specifies which Classes are (i) Impaired and Unimpaired under the Plan, (ii) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code, and (iii) deemed to accept or reject the Plan. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Priority Tax Claims have not been classified. The classification of Claims and Interests set forth herein shall apply separately to each Debtor.

| Class | Type of Claim or Interest | Impairment | Entitled to Vote |
|---|---|---|---|
| Class 1 | Other Priority Claims | Unimpaired | No (Presumed to accept) |
| Class 2 | Other Secured Claims | Unimpaired | No (Presumed to accept) |
| Class 3 | First Lien Credit Facility Claims | Impaired | Yes |
| Class 4 | Consenting Crossholder Claims | Impaired | Yes |
| Class 5 | Ongoing Trade Claims | Impaired | Yes |
| Class 6 | Property-Level Guarantee Settlement Claims | Unimpaired | No (Presumed to accept) |
| Class 7 | Unsecured Claims | Impaired | Yes |
| Class 8 | Intercompany Claims | Unimpaired | No (Presumed to accept) |
| Class 9 | Existing LP Preferred Units | Impaired | No (Deemed to reject) |
| Class 10 | Existing LP Common Units | Impaired | Yes |
| Class 11 | Existing REIT Preferred Stock | Impaired | Yes |
| Class 12 | Existing REIT Common Stock | Impaired | Yes |
| Class 13 | Intercompany Interests | Unimpaired | No (Presumed to accept) |
| Class 14 | Section 510(b) Claims | Impaired | Yes |

iv.        *Special Provision Governing Unimpaired Claims*

Except as otherwise provided in the Plan, nothing under the Plan shall affect the rights of the Debtors or the Reorganized Debtors, as applicable, in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

WEIL:\97988370\1\32626.0004

###### v.       *Separate Classification of Other Secured Claims*

Although all Other Secured Claims have been placed in one Class for purposes of nomenclature within the Plan, each Other Secured Claim, to the extent secured by a Lien on Collateral different from the Collateral securing a different Other Secured Claim, shall be treated as being in a separate sub-Class for the purposes of voting to accept or reject the Plan and receiving Plan Distributions.

###### vi.       *Elimination of Vacant Classes*

Any Class that, as of the commencement of the Confirmation Hearing, does not have at least one holder of a Claim or Interest that is Allowed in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to such Class.

###### vii.       *Voting Classes; Presumed Acceptance by Non-Voting Classes*

With respect to each Debtor, if a Class contained Claims eligible to vote and no holder of Claims eligible to vote in such Class votes to accept or reject the Plan, the Plan shall be presumed accepted by the holders of such Claims in such Class.

###### viii.       *Voting; Presumptions; Solicitation*

(a)       **Acceptance by Certain Impaired Classes.**  Only holders of Claims and Interests in Classes 3, 4, 5, 7, 10, 11, 12, and 14 are entitled to vote to accept or reject the Plan.  An Impaired Class of Claims or Interests shall have accepted the Plan if (i) the holders of at least two-thirds (2/3) in amount of the Allowed Claims or Interests actually voting in such Class have voted to accept the Plan and (ii) the holders of more than one-half (1/2) in number of the Allowed Claims or Interests actually voting in such Class have voted to accept the Plan.  Holders of Claims and Interests in Classes 3, 4, 5, 7, 10, 11, 12, and 14 shall receive ballots containing detailed voting instructions.

(b)       **Presumed Acceptance by Unimpaired Classes.**  Holders of Claims and Interests in Classes 1, 2, 6, 8, and 13 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Accordingly, such holders are not entitled to vote to accept or reject the Plan.

(c)       **Deemed Rejection by Impaired Class.**  Holders of Interests in Class 9 are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Accordingly, such holders are not entitled to vote to accept or reject the Plan.

WEIL:\97988370\1\32626.0004

ix.        *Non-Consensual Confirmation*

If any Class is deemed to reject the Plan or is entitled to vote on the Plan and does not vote to accept the Plan, the Debtors (with the consent of the Required Consenting Creditors, such consent not to be unreasonably withheld) may (i) seek confirmation of the Plan under section 1129(b) of the Bankruptcy Code or (ii) amend or modify the Plan in accordance with the terms hereof and the Bankruptcy Code, including by (A) modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules or (B) withdrawing the Plan as to an individual Debtor at any time before the Confirmation Date.  If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

x.        *No Waiver*

Except as otherwise expressly provided in the Plan (including sections 4.3 and 4.4 of the Plan), nothing contained in the Plan shall be construed to waive a Debtor's or other Person's right to object on any basis to any Claim.

D.    **Treatment of Claims and Interests**

i.        *Class 1:  Other Priority Claims.*

(a)    **Treatment:**  The legal, equitable, and contractual rights of the holders of Allowed Other Priority Claims are unaltered by the Plan.  Except to the extent that a holder of an Allowed Other Priority Claim agrees to different treatment, on the later of the Effective Date and the date that is twenty (20) days after the date such Other Priority Claim becomes an Allowed Claim, or as soon thereafter as is reasonably practicable, each holder of an Allowed Other Priority Claim shall receive, on account of such Allowed Claim, at the option of the Reorganized Debtors (i) Cash in an amount equal to the Allowed amount of such Claim or (ii) other treatment consistent with the provisions of section 1129 of the Bankruptcy Code.

(b)    **Impairment and Voting:**  Allowed Other Priority Claims are Unimpaired.  In accordance with section 1126(f) of the Bankruptcy Code, the holders of Allowed Other Priority Claims are conclusively presumed to accept the Plan and are not entitled to vote to accept or reject the Plan, and the votes of such holders shall not be solicited with respect to such Allowed Other Priority Claims.

ii.        *Class 2:  Other Secured Claims.*

(a)    **Treatment:**  The legal, equitable, and contractual rights of the holders of Allowed Other Secured Claims are unaltered by the Plan.  Except to the extent that a holder of an Allowed Other Secured Claim agrees to different treatment, on the later of the Effective Date and the date that is twenty (20) days after the date such Other Secured Claim becomes an Allowed Claim, or as soon thereafter as is reasonably practicable, each holder of an Allowed Other Secured

WEIL:\97988370\1\32626.0004

Claim shall receive, on account of such Allowed Claim, at the option of the Reorganized Debtors (i) Cash in an amount equal to the Allowed amount of such Claim, (ii) Reinstatement or such other treatment sufficient to render such holder's Allowed Other Secured Claim Unimpaired pursuant to section 1124 of the Bankruptcy Code, or (iii) such other recovery necessary to satisfy section 1129 of the Bankruptcy Code.

(b)     **Impairment and Voting:**   Allowed Other Secured Claims are Unimpaired.  In accordance with section 1126(f) of the Bankruptcy Code, the holders of Allowed Other Secured Claims are conclusively presumed to accept the Plan and are not entitled to vote to accept or reject the Plan, and the votes of such holders shall not be solicited with respect to such Allowed Other Secured Claims.

iii.     *Class 3:  First Lien Credit Facility Claims.*

(a)     **Allowance:**  The First Lien Credit Facility Claims shall be deemed Allowed on the Effective Date in the aggregate amount of $983,700,000.

(b)     **Treatment:**  Upon the Effective Date, each holder of an Allowed First Lien Credit Facility Claim shall receive, in full and final satisfaction of such Claim its Pro Rata share of (i) the Exit Credit Facility Distribution and (ii) $100,000,000 in Cash, payable, first, from Cash deposited in the segregated account maintained by the Debtors pursuant to paragraph 11(a)(ii) of the Final Cash Collateral Order and, second, from other Cash on hand.

(c)     **Impairment and Voting:**  First Lien Credit Facility Claims are Impaired.  Holders of First Lien Credit Facility Claims are entitled to vote on the Plan.

iv.     *Class 4:  Consenting Crossholder Claims.*

(a)     **Allowance:**  The Consenting Crossholder Claims shall be deemed Allowed in the aggregate amount of $133,000,000.

(b)     **Treatment:**  Pursuant to Bankruptcy Rule 9019, in full and complete satisfaction of Consenting Crossholder Claims, each Consenting Crossholder shall agree to receive, and receive, as less favorable treatment than the First Lien Credit Facility Claims in respect of its Consenting Crossholder Claims, its Pro Rata share (based on the ratio of such holder's Consenting Crossholder Claims to the aggregate amount of Consenting Crossholder Claims held by all Consenting Crossholders) of the Consenting Crossholder Claims Recovery Pool; provided that each Consenting Crossholder entitled to receive New Senior Secured Notes on account of its Crossholder Claim shall be entitled to make the Convertible Notes Election.

(c)     **Impairment and Voting:**  Consenting Crossholder Claims are Impaired.  Holders of Consenting Crossholder Claims are entitled to vote on the Plan.

WEIL:\97988370\1\32626.0004

### v.    Class 5:  *Ongoing Trade Claims*.

(a)    **Treatment**:[19]   Except to the extent that a holder of an Allowed Ongoing Trade Claim agrees to different treatment, on and after the Effective Date, or as soon as reasonably practicable thereafter, each holder of an Allowed Ongoing Trade Claim shall receive:

(i)    if a holder of an Ongoing Trade Claim executes a Trade Agreement with the Debtors (the form and terms of such Trade Agreement to be determined by the Debtors in consultation with the (A) Required Consenting Noteholders and the Creditors' Committee and, (B) solely with respect to the Exit Credit Facility Subsidiaries, the Required Consenting Bank Lenders), four (4) equal Cash installments, payable on a quarterly basis, which payments shall result in full payment in the Allowed amount of such Ongoing Trade Claim; or

(ii)    if a holder of an Ongoing Trade Claim does not execute a Trade Agreement, such holder's Pro Rata share of the Unsecured Claims Recovery Pool in accordance with <u>section 4.7</u> of the Plan.

(b)    **Impairment and Voting:**   Allowed Ongoing Trade Claims are Impaired.  Holders of Ongoing Trade Claims are entitled to vote on the Plan.

### vi.    Class 6:  *Property-Level Guarantee Settlement Claims*.

(a)    **Treatment:**   Pursuant to Bankruptcy Rule 9019, on and after the Effective Date, or as soon as reasonably practicable thereafter, each Allowed Property-Level Guarantee Settlement Claim shall, in accordance with the applicable settlement agreement between the Debtors and such holder of a Property-Level Guarantee Claim (with the consent of the Required Consenting Noteholders, such consent not to be unreasonably withheld), either (i) be Reinstated, (ii) remain Unimpaired, or (iii) receive such treatment as agreed upon between the Debtors and the holder of such Property-Level Guarantee Claim (with the consent of the Required Consenting Noteholders, such consent not to be unreasonably withheld).

(b)    **Impairment and Voting:**   Allowed Property-Level Guarantee Settlement Claims are Unimpaired.  In accordance with section 1126(f) of the Bankruptcy Code, the holders of Allowed Property-Level Guarantee Settlement Claims are conclusively presumed to accept the Plan and are not entitled to vote to accept or reject the Plan, and the votes of such holders shall not be solicited with respect to such Allowed Property-Level Guarantee Settlement Claims.

---

[19]    Subject to diligence regarding Ongoing Trade Claims pool.

*vii.*      ***Class 7:  Unsecured Claims.***

(a)      **Treatment:**[20]  Except to the extent that a holder of an Allowed Unsecured Claim agrees to different treatment, on and after the Effective Date, or as soon as reasonably practicable thereafter, each holder of an Allowed Unsecured Claim shall receive, in full and final satisfaction of such Claim, such holder's Pro Rata share of the Unsecured Claims Recovery Pool; <u>provided</u> that each Consenting Noteholder (and, for the avoidance of doubt, only a Consenting Noteholder) entitled to receive New Senior Secured Notes on account of its Notes Claim shall be able to make the Convertible Notes Election; <u>provided</u>, <u>however</u>, that, if the Debtors determine that, pursuant to section 1129(a)(7)(ii), such holder would be entitled to a greater recovery than the foregoing if the Debtor against whom such holder's Allowed Unsecured Claim is asserted were to liquidate under chapter 7 of the Bankruptcy Code, then such holder shall receive Cash in an amount necessary to satisfy section 1129(a)(7)(ii).

(b)      **Impairment and Voting:**  Unsecured Claims are Impaired. Holders of General Unsecured Claims are entitled to vote on the Plan.

*viii.*      ***Class 8:  Intercompany Claims.***

(a)      **Treatment:**  On or after the Effective Date, all Intercompany Claims shall be paid, adjusted, continued, settled, reinstated, discharged, or eliminated, in each case to the extent determined to be appropriate by the Debtors (with the consent of the Required Consenting Noteholders, such consent not to be unreasonably withheld) or Reorganized Debtors, as applicable; *provided* that any Intercompany Claims that shall remain as liabilities of the Exit Credit Facility Borrower or any Exit Credit Facility Subsidiary shall be subject to approval by Required Consenting Bank Lenders (and absent consent from the Required Consenting Bank Lenders, such remaining liabilities shall be reduced to zero).

(b)      **Impairment and Voting:**  All Allowed Intercompany Claims are deemed Unimpaired.  In accordance with section 1126(f) of the Bankruptcy Code, the holders of Allowed Intercompany Claims are conclusively presumed to accept the Plan and are not entitled to vote to accept or reject the Plan, and the votes of such holders shall not be solicited with respect to such Allowed Intercompany Claims.

*ix.*      ***Class 9:  Existing LP Preferred Units.***

(a)      **Treatment:**  On the Effective Date, the Existing LP Preferred Units shall be cancelled (or otherwise eliminated) and shall receive no distribution under the Plan.

---

[20]      Subject to diligence regarding General Unsecured Claims pool.

(b)    **Impairment and Voting:**  The Existing LP Preferred Units are Impaired by the Plan, and the holders thereof are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Holders of Existing LP Preferred Units are not entitled to vote to accept or reject the Plan and the votes of such holders shall not be solicited with respect to such Allowed Existing LP Preferred Units.

*x.*      ***Class 10:  Existing LP Common Units.***

(a)    **Treatment:**  On the Effective Date, the Existing LP Common Units shall be cancelled (or otherwise eliminated) and each holder of an Existing LP Common Unit shall, at such holder's election, either (i) receive a percentage of New LP Units, issued in accordance with the Restructuring Transactions, equal to the product of (A) 5.5% and (B) the percentage equal to the number of Existing LP Common Units that such holder elects to exchange for New LP Units divided by the number of Existing LP Common Units issued and outstanding immediately prior to the Plan Distributions or (ii)(A) be deemed to have converted or redeemed, as applicable, such holder's Existing LP Common Unit(s), effective the day prior to the Distribution Record Date, in exchange for Existing REIT Common Stock on terms consistent with the applicable prepetition agreements for the Existing LP Common Units and (B) receive a Pro Rata[21] share of the Existing Common Equity Recovery Pool, subject to reduction in accordance with section 4.14(a) of the Plan, if applicable; provided that, if the Bankruptcy Court does not approve the recovery to holders of Existing LP Common Units, Existing REIT Preferred Stock, and Existing REIT Common Stock, the New Common Stock set forth in section 4.10(a)(ii) of the Plan shall be added to the Unsecured Claims Recovery Pool and the New LP Units set forth in section 4.10(a)(i) of the Plan shall not be issued; provided, however, that the value otherwise allocable to holders of Existing LP Common Units under section 4.10(a) of the Plan shall be reduced, on a dollar-for-dollar basis utilizing the equity value implied by the mid-point of the Debtors' valuation set forth in connection with confirmation, by any costs incurred by or attributed to the Debtors' Estates in connection with any litigation or objection prosecuted after the Bankruptcy Court's approval of the Disclosure Statement by one or more holders of Existing LP Common Units prior to or in connection with the Confirmation Hearing as such costs are determined by the Bankruptcy Court in connection with confirmation of the Plan; provided, further, that, to the extent that no holder of Existing LP Common Units objects to confirmation of the Plan, the recovery to holders of Interests in Class 10 on account of such Interests shall not be reduced notwithstanding any objection(s) by holders of Claims or Interests in another Class.  Further, notwithstanding anything to the contrary herein, even if Class 10 votes, as a class, to accept the Plan, the rights of holders of Existing LP Common Units to object to confirmation of the Plan on the grounds that the Plan

---

[21]    For purposes of section 4.10(a)(ii)(B) of the Plan, the Pro Rata amounts shall be calculated as the Pro Rata share of all Allowed Existing LP Common Units electing to receive such treatment and Allowed Existing REIT Common Stock.

does not comply with section 1129(b)(2) of the Bankruptcy Code are preserved, and the Debtors reserve all rights to dispute any such objection(s) on any grounds other than on the basis that such party does not have a legal right to prosecute such an objection as a matter of law.

(b)     **Impairment and Voting:**  Existing LP Common Units are Impaired by the Plan.  Holders of Existing LP Common Units are entitled to vote on the Plan.

*xi.*        ***Class 11:  Existing REIT Preferred Stock.***

(a)     **Treatment:**  On the Effective Date, the Existing REIT Preferred Stock shall be cancelled (or otherwise eliminated), and, on the Effective Date, or as soon as reasonably practicable thereafter, each holder of Allowed Existing REIT Preferred Stock shall receive, in full and final satisfaction of such Interest, such holder's Pro Rata share of a percentage of the New Common Stock, issued in accordance with the Restructuring Transactions, equal to 5.5% divided by the REIT LP Ownership Percentage, subject to dilution by the Management Incentive Plan and subsequent issuances of common equity (including securities or instruments convertible into common equity) by the REIT from time to time after the Effective Date, as set forth herein, and subject to reduction in accordance with section 4.14(a) of the Plan, if applicable; provided that, if the Bankruptcy Court does not approve the recovery to holders of Existing LP Common Units, Existing REIT Preferred Stock, and Existing REIT Common Stock, the New Common Stock set forth in section 4.11(a) of the Plan shall be added to the Unsecured Claims Recovery Pool; provided, however, that the value otherwise allocable to holders of Existing REIT Preferred Stock under section 4.11(a) of the Plan shall be reduced, on a dollar-for-dollar basis utilizing the equity value implied by the mid-point of the Debtors' valuation set forth in connection with confirmation, by any costs incurred by or attributed to the Debtors' Estates in connection with any litigation or objection prosecuted after the Bankruptcy Court's approval of the Disclosure Statement by one or more holders of Existing REIT Preferred Stock prior to or in connection with the Confirmation Hearing as such costs are determined by the Bankruptcy Court in connection with confirmation of the Plan; provided, further, that, to the extent that no holder of Existing REIT Preferred Stock objects to confirmation of the Plan, the recovery to holders of Interests in Class 11 on account of such Interests shall not be reduced notwithstanding any objection(s) by holders of Claims or Interests in another Class.  Further, notwithstanding anything to the contrary herein, even if Class 11 votes, as a class, to accept the Plan, the rights of holders of Existing REIT Preferred Stock to object to confirmation of the Plan on the grounds that the Plan does not comply with section 1129(b)(2) of the Bankruptcy Code are preserved, and the Debtors reserve all rights to dispute any such objection(s) on any grounds other than on the basis that such party does not have a legal right to prosecute such an objection as a matter of law.

(b)     **Impairment and Voting**:  Existing REIT Preferred Stock are Impaired.  Holders of Existing REIT Preferred Stock are entitled to vote on the Plan.

60

xii.        *Class 12:  Existing REIT Common Stock*.

(a)        **Treatment**:  On the Effective Date, the Existing REIT Common Stock shall be cancelled (or otherwise eliminated), and, on the Effective Date, or as soon as reasonably practicable thereafter, each holder of Allowed Existing REIT Common Stock shall receive, in full and final satisfaction of such Interest, such holder's Pro Rata[22] share of the Existing Common Equity Recovery Pool, subject to reduction in accordance with <u>section 4.14(a)</u> of the Plan, if applicable; <u>provided</u> that, if the Bankruptcy Court does not approve the recovery to holders of Existing LP Common Units, Existing REIT Preferred Stock, and Existing REIT Common Stock, the Existing Common Equity Recovery Pool shall be added to the Unsecured Claims Recovery Pool; <u>provided</u>, <u>however</u>, that the value otherwise allocable to holders of Existing REIT Common Stock under <u>section 4.12(a)</u> of the Plan shall be reduced, on a dollar-for-dollar basis utilizing the equity value implied by the mid-point of the Debtors' valuation set forth in connection with confirmation, by any costs incurred by or attributed to the Debtors' Estates in connection with any litigation or objection prosecuted after the Bankruptcy Court's approval of the Disclosure Statement by one or more holders of Existing REIT Common Stock prior to or in connection with the Confirmation Hearing as such costs are determined by the Bankruptcy Court in connection with confirmation of the Plan; <u>provided</u>, <u>further</u>, that, to the extent that no holder of Existing REIT Common Stock objects to confirmation of the Plan, the recovery to holders of Interests in Class 12 on account of such Interests shall not be reduced notwithstanding any objection(s) by holders of Claims or Interests in another Class.  Further, notwithstanding anything to the contrary herein, even if Class 12 votes, as a class, to accept the Plan, the rights of holders of Existing REIT Common Stock to object to confirmation of the Plan on the grounds that the Plan does not comply with section 1129(b)(2) of the Bankruptcy Code are preserved, and the Debtors reserve all rights to dispute any such objection(s) on any grounds other than on the basis that such party does not have a legal right to prosecute such an objection as a matter of law.

(b)        **Impairment and Voting**:  Existing REIT Common Stock are Impaired.  Holders of Existing REIT Common Stock are entitled to vote on the Plan.

xiii.       *Class 13:  Intercompany Interests*.

(a)        **Treatment**:  On the Effective Date, all Intercompany Interests shall be treated as set forth in <u>section 5.12</u> of the Plan.

(b)        **Impairment and Voting**:  Allowed Intercompany Interests are Unimpaired.  In accordance with section 1126(f) of the Bankruptcy Code, the holders of Allowed Intercompany Interests are conclusively presumed to accept the

---

[22]   For purposes of <u>section 4.12(a)</u> of the Plan, the Pro Rata amounts shall be calculated as the Pro Rata share of all Allowed Existing LP Common Units electing to receive such treatment and Allowed Existing REIT Common Stock.

WEIL:\97988370\1\32626.0004

Plan and are not entitled to vote to accept or reject the Plan, and the votes of such holders shall not be solicited with respect to such Allowed Intercompany Interests.

> xiv.    **Class 14:  Section 510(b) Claims**.

> (a)    **Treatment**:  Section 510(b) Claims shall be cancelled, released, discharged, and extinguished as of the Effective Date and shall be of no further force or effect, and, to the extent such holder of a Section 510(b) Claim is not receiving a recovery on account of the Security giving rise to such Claim under the Plan, each holder of an Allowed Section 510(b) Claim shall receive on account of such holder's Allowed Section 510(b) Claim its Pro Rata share of New Common Stock, if any, issued in accordance with the Restructuring Transactions to holders of Existing LP Common Units, Existing REIT Preferred Stock, and Existing REIT Common Stock pursuant to <u>sections 4.10(a)</u>, <u>4.11(a)</u>, and <u>4.12(a)</u> of the Plan.  For the avoidance of doubt, to the extent that a holder of a Section 510(b) Claim receives a recovery under the Plan on account of the Security underlying such Claim, such holder shall not receive a recovery on account of such holder's Section 510(b) Claim, if any, arising from such Security.

> (b)    **Impairment and Voting**:  Section 510(b) Claims are Impaired by the Plan.  Holders of Section 510(b) Claims are entitled to vote on the Plan.

> E.    **Means for Implementation**

>> i.    *Compromise and Settlement of Claims, Interests, and Controversies*

Pursuant to section 363 and 1123(b)(2) of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a creditor or an Interest holder may have with respect to any Allowed Claim or Interest or any distribution to be made on account of such Allowed Claim or Interest.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and holders of such Claims and Interests, and is fair, equitable, and reasonable.

>> ii.    *Continued Corporate Existence; Effectuating Documents; Restructuring Transactions*

> (a)    Except as otherwise provided in the Plan or the Plan Documents, the Debtors shall continue to exist after the Effective Date as Reorganized Debtors as a separate corporation, limited liability company, partnership, or other form of entity, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form of entity, as the case may be, in accordance with the applicable laws of the respective jurisdictions in which they are incorporated or organized and pursuant to the respective certificate of incorporation and bylaws (or other analogous formation documents) in effect before the Effective

WEIL:\97988370\1\32626.0004

Date or the New Corporate Governance Documents and the Exit Credit Facility Borrower Corporate Governance Documents, as applicable, except to the extent such certificate of incorporation or bylaws (or other analogous formation, constituent or governance documents) is amended by the Plan or otherwise, and to the extent any such document is amended, such document is deemed to be amended pursuant to the Plan and requires no further action or approval (other than any requisite filings required under applicable state or federal law).

(b)      On and after the Effective Date, all actions contemplated by the Plan shall be deemed authorized and approved by the Bankruptcy Court in all respects without any further corporate or equityholder action (or any other party, including, without limitation, securityholders, members, limited or general partners, managers, directors, or officers of the Debtors or Reorganized Debtors, as applicable), including (i) the adoption, execution, and/or filing of the New Corporate Governance Documents and the Exit Credit Facility Borrower Corporate Governance Documents; (ii) the selection of the directors, managers, and officers for the Reorganized Debtors, including the appointment of the New Board; (iii) the authorization, issuance, and distribution of the Exit Credit Facility, the New Senior Secured Notes, the New Convertible Notes, the New Common Stock, and the  New LP Units, and the execution, delivery, and filing of any documents pertaining thereto, as applicable; (iv) the rejection, assumption, or assumption and assignment, as applicable, of executory contracts; (v) the implementation of the Restructuring Transactions; (vi) the adoption of the Management Incentive Plan by the New Board; and (vii) all other actions contemplated by the Plan (whether to occur before, on, or after the Effective Date).   Upon the Effective Date, all matters provided for in the Plan involving the corporate structure of the Reorganized Debtors, and any corporate, partnership, limited liability company, or other governance action required by the Debtors or the Reorganized Debtors in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further corporate or other action by any security holders, members, directors, or officers of the Debtors or Reorganized Debtors, as applicable.

(c)      On or after the Effective Date, each Reorganized Debtor may, in its sole discretion, without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules take such action as permitted by applicable law and the New Corporate Governance Documents and the Exit Credit Facility Borrower Corporate Governance Documents, as applicable, as such Reorganized Debtor may determine is reasonable and appropriate, including causing (i) a Reorganized Debtor to be merged into another Reorganized Debtor or an affiliate of a Reorganized Debtor; (ii) a Reorganized Debtor to be dissolved, wound down, converted, or liquidated; (iii) the legal name of a Reorganized Debtor to be changed; or (iv) the closure of a Reorganized Debtor's Chapter 11 Case on the Effective Date or any time thereafter, and such action and documents are deemed to require no further action or approval (other than any requisite filings required under applicable state, provincial, federal, or foreign law).

(d)      Following the Confirmation Date, the Debtors may take all actions consistent with the Plan and the Restructuring Support Agreement as may be necessary or appropriate in the Debtors' discretion, with the consent, not to be unreasonably withheld, conditioned, or delayed, of the parties entitled to consent thereunder, prior to the Effective Date, and thereafter in the Reorganized Debtors' discretion, to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Restructuring Transactions (as defined in this section 5.2 of the Plan) under and in connection with the Plan and consistent with the Restructuring Support Agreement.  The Restructuring Transactions shall be subject to the consent, not to be unreasonably withheld, conditioned, or delayed, of the applicable parties entitled to consent under the Restructuring Support Agreement prior to the Effective Date, and thereafter, consummated in the Reorganized Debtors' discretion, and shall be structured in a manner that ensures that the Reorganized Debtors receive favorable and efficient tax treatment, given the totality of the circumstances, but in all events consistent with the Restructuring Support Agreement.

(e)      On or before the Effective Date or as soon thereafter as is reasonably practicable, the Reorganized Debtors may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, or necessary or appropriate to effectuate the Plan, pursuant to section 1123(a)(5)(D) of the Bankruptcy Code, including (i) the consummation of the transactions provided for under or contemplated by the Plan, the Restructuring Support Agreement, the Exit Credit Facility Term Sheet, the New Senior Secured Notes Term Sheet, the New Convertible Notes Term Sheet and the Restructuring Transaction Steps, (ii) the execution and delivery of appropriate agreements or other documents (including the Plan Documents) containing terms that are consistent with or reasonably necessary to implement the terms of the Plan, the Restructuring Support Agreement, the Exit Credit Facility Term Sheet, the New Senior Secured Notes Term Sheet, the New Convertible Notes Term Sheet and the Restructuring Transaction Steps and that satisfy the requirements of applicable law, (iii) the execution and delivery of appropriate instruments (including the Plan Documents) of transfer, assignment, assumption, or delegation of any property, right, liability, duty, or obligation on terms consistent with the terms of the Plan, the Restructuring Support Agreement, the Exit Credit Facility Term Sheet, the New Senior Secured Notes Term Sheet, the New Convertible Notes Term Sheet and the Restructuring Transaction Steps, (iv) the formation of the Exit Credit Facility Borrower and New Notes Issuer, (v) the execution and delivery of appropriate instruments (including the Plan Documents) to effectuate the transfer, assignment, assumption, or delegation of any property, right, liability, duty, or obligation required for the Exit Credit Facility Borrower to become the direct or indirect owner of the Exit Credit Facility Subsidiaries, (vi) the execution and delivery of appropriate instruments (including the Plan Documents) to effectuate the transfer, assignment, assumption, or delegation of any property, right, liability, duty, or obligation required for the New Notes Issuer to become the owner of the direct and indirect subsidiaries of Reorganized LP other than the Exit Credit Facility Borrower and the Exit Credit Facility Subsidiaries and (vii) all other actions that the Debtors or Reorganized

WEIL:\97988370\1\32626.0004

Debtors, as applicable, determine are necessary or appropriate and consistent with the Plan, the Restructuring Support Agreement, the Exit Credit Facility Term Sheet, the New Senior Secured Notes Term Sheet, the New Convertible Notes Term Sheet and the Restructuring Transaction Steps (collectively, together with the transaction in section 5.2(f) of the Plan, the "**Restructuring Transactions**").    The authorizations and approvals contemplated in this section 5.2 of the Plan shall be effective notwithstanding any requirements under non-bankruptcy law.

(f)     With respect to the New Common Stock to be distributed to holders of Classes 4, 7, 10, 11, 12, and 14 as part of the Restructuring Transactions, the New Common Stock shall first be issued and contributed by the REIT to Holdings II and Holdings I in proportion to their respective interests in the LP, and then contributed by Holdings II and Holdings I to the LP in exchange for interests in the LP, and then distributed (in addition to any other consideration) to such holders.

(g)     With respect to the New Common Stock to be distributed to holders of the New Convertible Notes upon an exchange of such notes, the Reorganized REIT will contribute (or cause to be contributed) to the New Notes Issuer (with appropriate adjustments to the ownership of the Reorganized LP to reflect such contribution), as needed from time to time, any New Common Stock required for a subsequent exchange of the New Convertible Notes.

(h)     On the Effective Date, the New Corporate Governance Documents and the Exit Credit Facility Borrower Corporate Governance Documents shall be adopted automatically by the applicable Reorganized Debtors (or any applicable subsidiary created pursuant to the Plan Documents), and shall be amended or amended and restated, as applicable, as may be required to be consistent with the provisions of the Plan and the Restructuring Support Agreement, and shall be deemed to be valid, binding, and enforceable obligations.  To the extent required by section 1123(a)(6) of the Bankruptcy Code, the New Corporate Governance Documents and the Exit Credit Facility Borrower Corporate Governance Documents shall include a provision prohibiting the issuance of non-voting equity securities.  To assist in maintaining the status of the REIT as a real estate investment trust for U.S. federal income tax purposes, the New Corporate Governance Documents for the REIT will generally prohibit (similar to other real estate investment trusts) the ownership of more than a specified percentage of the outstanding shares of the REIT's capital stock by any single stockholder (taking into account the Internal Revenue Code's attribution rules) determined by vote, value and number of shares, as applicable, other than the ownership of any capital stock acquired pursuant to, or as contemplated by, the Plan and the Restructuring Support Agreement or otherwise approved by the Reorganized Debtors in accordance with the New Corporate Governance Documents (provided such ownership would not jeopardize the REIT's qualification as a real estate investment trust unless approved in accordance with the New Corporate Governance Documents).  The percentage in the REIT's current articles of incorporation is generally 6%.  After the Effective Date, the Reorganized Debtors may amend and restate their respective New Corporate Governance Documents and the Exit Credit

WEIL:\97988370\1\32626.0004

Facility Borrower Corporate Governance Documents, as applicable, and other constituent documents in accordance with the terms thereof, as permitted by the laws of their respective states, provinces, or countries of organization and their respective New Corporate Governance Documents and Exit Credit Facility Borrower Corporate Governance Documents, as applicable.

### iii.   *Plan Funding*

Plan Distributions of Cash shall be funded from (i) proceeds of the issuance of the New Money Convertible Notes and (ii) the Debtors' Cash on hand as of the applicable date of such Plan Distribution.

### iv.   *Cancellation of Existing Securities, Agreements, and Security Interests.*

(a)     On the Effective Date, except to the extent otherwise provided in the Plan:  (i) the obligations of the Debtors (A) under each organizational document (including certificates of designation, bylaws, or certificates or articles of incorporation), certificate, share, note, bond, indenture, purchase right, option, warrant, call, put, award, commitment, registration rights, preemptive right, right of first refusal, right of first offer, co-sale right, investor rights, or other instrument or document, directly or indirectly, evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors or giving rise to any Claim or Interest shall be automatically extinguished, cancelled and of no further force or effect and the Debtors and the Reorganized Debtors shall not have any continuing obligations thereunder, and (B) under each agreement evidencing or creating any right to receive or to be eligible to receive any Interest (including any right of an employee under any agreement to participate in any incentive or compensation plan that provides for the issuance or grant of any Interests or to receive or to be eligible to receive any Interests) shall be automatically extinguished, cancelled and of no further force and effect and the Debtors and the Reorganized Debtors shall not have any continuing obligations thereunder; and (ii) the obligations of the Debtors pursuant, relating, or pertaining to any instrument, certificate, agreement or document described in clause (i) above evidencing or creating any indebtedness or obligation of the Debtors shall be released and discharged; *provided* that notwithstanding confirmation of the Plan or the occurrence of the Effective Date, any such indenture, agreement, note, or other instrument or document that governs the rights of the holder of a Claim or Interest shall continue in effect solely for purposes of (A) enabling the holder of such Claim or Interest to seek allowance, and receive distributions on account of such Claim or Interest under the Plan as provided herein; (B) allowing holders of Claims to retain their respective rights and obligations vis-à-vis other holders of Claims pursuant to any applicable loan documents; (C) allowing the First Lien Credit Facility Administrative Agent and the Senior Unsecured Notes Trustee to enforce their rights, claims, and interests vis-à-vis any party other than the Debtors; (D) allowing the First Lien Credit Facility Administrative Agent and the Senior Unsecured Notes Trustee to make the distributions in accordance with the Plan (if any), as applicable; (E) preserving any rights of the First Lien Credit Facility Administrative Agent and the Senior

Unsecured Notes Trustee to payment of fees, expenses, and indemnification obligations as against any money or property distributable to the holders of Senior Unsecured Notes Claims or First Lien Credit Facility Claims and Consenting Crossholder Claims, respectively; (F) allowing the First Lien Credit Facility Administrative Agent and the Senior Unsecured Notes Trustee to enforce any obligations owed to them under the Plan and perform any rights or duties, if any, related thereto; (G) allowing the First Lien Credit Facility Administrative Agent and the Senior Unsecured Notes Trustee to appear in the Chapter 11 Cases or in any proceeding in the Bankruptcy Court or any other court; and (H) permitting the First Lien Credit Facility Administrative Agent and the Senior Unsecured Notes Trustee to perform any functions that are necessary to effectuate the foregoing; *provided*, *further*, that the preceding proviso shall not affect the discharge of Claims or Interests pursuant to the Bankruptcy Code, the Confirmation Order, or the Plan or result in any expense or liability to the Reorganized Debtors, except to the extent set forth in or provided for under the Plan; *provided*, *further*, that notwithstanding confirmation of the Plan or the occurrence of the Effective Date, except to the extent otherwise provided in the Plan, any agreement described in clause (i)(B) above shall, if assumed and assigned to the Reorganized Debtors, otherwise remain in full force and effect and the Reorganized Debtors shall be bound to all other provisions thereunder; provided, further, that nothing in this section shall effect a cancellation of any Intercompany Interests or Intercompany Claims. For the avoidance of doubt, the Senior Unsecured Notes Trustee shall be entitled to assert its Senior Unsecured Notes Charging Lien arising under and in accordance with the Senior Unsecured Notes Indenture, and any ancillary document, instrument, or agreement to obtain payment of the Senior Unsecured Notes Trustee Fees and Expenses.

(b)       Except for the foregoing, on and after the Effective Date, all duties and responsibilities of the Senior Unsecured Notes Trustee shall be fully discharged (i) unless otherwise specifically set forth in or provided for under the Plan, the Plan Supplement, or the Confirmation Order, and (ii) except with respect to such other rights of the Senior Unsecured Notes Trustee that survive termination pursuant to the Senior Unsecured Notes Indenture.

(c)       Upon the full payment or other satisfaction of an Allowed Other Secured Claim, or promptly thereafter, the holder of such Allowed Other Secured Claim shall deliver to the Debtors or Reorganized Debtors, as applicable, any Collateral or other property of a Debtor held by such holder, together with any termination statements, instruments of satisfaction, or releases of all security interests with respect to its Allowed Other Secured Claim that may be reasonably required to terminate any related financing statements, mortgages, mechanics' or other statutory Liens, or lis pendens, or similar interests or documents.

*v.*       ***Officers and Boards of Directors***

(a)       On the Effective Date, the New Board shall consist of seven (7) members, which shall include the following: (i) the Chief Executive Officer, (ii) five (5) members selected by the Required Consenting Noteholders, and

(iii) one (1) member selected by the Debtors and reasonably acceptable to the Required Consenting Noteholders (it being understood that Charles Lebovitz is acceptable to the Required Consenting Noteholders); provided that there shall not be an Executive Chairman or similar role designated or otherwise provided for in connection with the Debtors' emergence from chapter 11.  The composition of the boards of directors or board of managers of each Reorganized Debtor, as applicable, shall be disclosed prior to the Confirmation Hearing in accordance with section 1129(a)(5) of the Bankruptcy Code.

(b)　　Except as otherwise provided in the Plan Supplement, the officers of the respective Reorganized Debtors immediately before the Effective Date, as applicable, shall serve as the initial officers of each of the respective Reorganized Debtors on and after the Effective Date.  After the Effective Date, the selection of officers of the Reorganized Debtors shall be as provided by their respective organizational documents.

(c)　　Except to the extent that a member of the board of directors or a manager, as applicable, of a Debtor continues to serve as a director or manager of such Debtor on and after the Effective Date, the members of the board of directors or managers of each Debtor prior to the Effective Date, in their capacities as such, shall have no continuing obligations or duties to the Reorganized Debtors on or after the Effective Date and each such director or manager shall be deemed to have resigned or shall otherwise cease to be a director or manager of the applicable Debtor on the Effective Date.  Commencing on the Effective Date, each of the directors and managers of each of the Reorganized Debtors shall be appointed in accordance with the Plan and the New Corporate Governance Documents and the Exit Credit Facility Borrower Corporate Governance Documents, as applicable, and serve pursuant to the terms of the applicable organizational documents of such Reorganized Debtor and may be replaced or removed in accordance with such organizational documents.

### vi.　　Management Incentive Plan

On or after the Effective Date, the Reorganized Debtors shall adopt the Management Incentive Plan.  The form, allocation, and any limitations on the Management Incentive Plan shall be determined by the New Board (or a committee thereof).

### vii.　　Exit Credit Facility

On the Effective Date, the Exit Credit Facility Agreement shall be executed and delivered by the Exit Credit Facility Obligors substantially in the form contained in the Exit Credit Facility Term Sheet, and the Exit Credit Facility Obligors shall be authorized to execute, deliver, and enter into such documents without further (i) notice to or order or other approval of the Bankruptcy Court, (ii) act or action under applicable law, regulation, order, or rule, (iii) vote, consent, authorization, or approval of any Person, or (iv) action by the holders of Claims or Interests.  The Exit Credit Facility Documents shall constitute legal, valid, binding, and authorized joint and several obligations of the applicable Exit Credit Facility Obligors, enforceable in accordance with their

terms, and such obligations shall not be enjoined or subject to discharge, impairment, release, avoidance, recharacterization, or subordination (including equitable subordination) under applicable law, the Plan, or the Confirmation Order and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any applicable non-bankruptcy law.

Confirmation of the Plan shall be deemed (i) approval of the Exit Credit Facility, and all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Exit Credit Facility Obligors in connection therewith, including the payment of all fees, indemnities, and expenses as and when due provided for by the Exit Credit Facility Documents and (ii) authorization to enter into and perform under the Exit Credit Facility Documents.

On the Effective Date, all Liens and security interests granted pursuant to, or in connection with the Exit Credit Facility, (i) shall be deemed to be approved and shall, without the necessity of the execution, recordation, or filing of mortgages, security agreements, control agreements, pledge agreements, financing statements, or other similar documents, be valid, binding, fully perfected, fully enforceable Liens on, and security interests in, the property described in the Exit Credit Facility Documents, with the priorities established in respect thereof under applicable non-bankruptcy law, and (ii) shall not be enjoined or subject to discharge, impairment, release, avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any applicable non-bankruptcy law, the Plan, or the Confirmation Order.

The Debtors and Reorganized Debtors and the Persons granted Liens and security interests under the Exit Credit Facility are authorized to make all filings and recordings and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, provincial, federal, or other law (whether domestic or foreign) that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order without the need for any filings or recordings) and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

> **viii.** **Authorization and Issuance of New Senior Secured Notes and the New Convertible Notes**

On the Effective Date, the New Notes Issuer shall issue the New Senior Secured Notes and the New Convertible Notes on the terms set forth in the Plan and the New Senior Secured Notes Documents or the New Convertible Notes Documents, as applicable.

On the Effective Date, the New Senior Secured Notes Documents and the New Convertible Notes Documents shall be executed and delivered. The Reorganized Debtors shall be authorized to execute, deliver, and enter into and perform under the New Senior Secured Notes Documents and the New Convertible Notes Documents (including the issuance of New Common Stock upon conversion of the New Convertible Notes) without the need for any further corporate or limited

liability company action and without further action by the holders of Claims or Interests. Each of the New Senior Secured Notes Documents and the New Convertible Notes Documents shall constitute legal, valid, binding, and authorized joint and several obligations of the applicable New Senior Secured Notes Credit Parties and New Convertible Notes Credit Parties, enforceable in accordance with their terms, and, except as provided for thereunder, such obligations shall not be enjoined or subject to discharge, impairment, release, avoidance, recharacterization, or subordination (including equitable subordination) under applicable law, the Plan, or the Confirmation Order and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any applicable non-bankruptcy law.

Confirmation of the Plan shall be deemed (i) approval of each of the New Senior Secured Notes Documents and the New Convertible Notes Documents, and all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the New Senior Secured Notes Credit Parties and New Convertible Notes Credit Parties in connection therewith, including the payment of all fees, indemnities, and expenses as and when due provided for by the New Senior Secured Notes Documents and the New Convertible Notes Documents and (ii) authorization to enter into and perform under the New Senior Secured Notes Documents and the New Convertible Notes Documents.

On the Effective Date, all Liens and security interests granted pursuant to, or in connection with the New Senior Secured Notes Documents and the New Convertible Notes Documents (i) shall be deemed to be approved and shall, without the necessity of the execution, recordation, or filing of mortgages, security agreements, control agreements, pledge agreements, financing statements, or other similar documents, be valid, binding, fully perfected, fully enforceable Liens on, and security interests in, the property described in the New Senior Secured Notes Documents and the New Convertible Notes Documents, with the priorities established in respect thereof under applicable non-bankruptcy law, and (ii) shall not be enjoined or subject to discharge, impairment, release, avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any applicable non-bankruptcy law, the Plan, or the Confirmation Order.

The Reorganized Debtors and the Persons granted Liens and security interests under the New Senior Secured Notes Documents and the New Convertible Notes Documents are authorized to make all filings and recordings and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, provincial, federal, or other law (whether domestic or foreign) that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order without the need for any filings or recordings) and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

### ix.        *Convertible Notes Election*

Each (i) Consenting Crossholder entitled to receive New Senior Secured Notes on account of its Consenting Crossholder Claim and (ii) each Consenting Noteholder entitled to receive New Senior

Secured Notes on account of its Senior Unsecured Notes Claim, may, at its option, elect, on a dollar-for-dollar basis, to substitute its allocated share of the New Senior Secured Notes for New Convertible Notes; provided that the amount of New Convertible Notes that may be issued in lieu of the New Senior Secured Notes pursuant to the Convertible Notes Election (inclusive of the Convertible Notes Election available for Consenting Crossholders on account of Consenting Crossholder Claims and Consenting Noteholders on account of Senior Unsecured Notes Claims) shall be subject to a maximum principal amount of $100,000,000 in the aggregate; *provided*, *further*, that the Consenting Crossholders shall be entitled to the first $10,000,000 of New Convertible Notes on account of their Consenting Crossholder Claims on a Pro Rata basis; *provided*, *further*, that, with respect to the remaining amount of New Convertible Notes available subject to the Convertible Notes Election, the Consenting Crossholders shall receive New Convertible Notes on a Pro Rata basis with the Consenting Noteholders that exercise the Convertible Notes Election (with such Pro Rata allocation being determined by the electing holder's allocation of New Senior Secured Notes (on account of both Consenting Crossholder Claims and Senior Unsecured Notes Claims) as the numerator and the total amount of New Senior Secured Notes available to be received by electing holders (on account of both Consenting Crossholder Claims and Senior Unsecured Notes Claims) as the denominator).

### x.        *Authorization and Issuance of New LP Units*

On and after the Effective Date, if applicable, the Reorganized LP is authorized to issue, or cause to be issued, and shall issue the New LP Units in accordance with the terms of the Plan without the need for any further corporate, limited liability company, or shareholder action. All of the New LP Units distributable under the Plan shall be duly authorized, validly issued, and fully paid and non-assessable. All of the New LP Units distributable under the Plan will be entitled to economically equivalent distribution and liquidation rights and will be the only units outstanding with respect to the Reorganized LP upon emergence.

### xi.        *New Common Stock; Listing*

On and after the Effective Date, the Reorganized REIT is authorized to issue, or cause to be issued, and shall issue the New Common Stock in accordance with the terms of the Plan without the need for any further corporate, limited liability company, or shareholder action (or action of any other party, including, without limitation, securityholders, members, limited or general partners, managers, directors, or officers of the Debtors or Reorganized Debtors, as applicable). All of the New Common Stock distributable under the Plan, including New Common Stock that may be issued upon conversion of the New Convertible Notes in accordance with the terms of the New Convertible Notes Indenture, shall be duly authorized, validly issued, and fully paid and non-assessable.

On the Effective Date, the Registration Rights Agreement shall be executed and delivered. The Reorganized Debtors shall be authorized to execute, deliver, and enter into and perform under the Registration Rights Agreement without the need for any further corporate or limited liability company action and without further action by the holders of Claims or Interests (or action of any other party, including, without limitation, securityholders, members, limited or general partners, managers, directors, or officers of the Debtors or Reorganized Debtors, as applicable).

Upon the Effective Date, the Reorganized Debtors anticipate that they will continue to be a reporting company under the Exchange Act, 15 U.S.C. §§ 78(a)–78(pp), subject to receiving the approval from the Required Consenting Noteholders.  If approved by the Required Consenting Noteholders, the Reorganized Debtors shall use commercially reasonable efforts to have the New Common Stock listed on the NYSE, NASDAQ, or another nationally recognized exchange, as soon as reasonably practicable, subject to meeting applicable listing requirements following the Effective Date; *provided*, *that*, regardless of the foregoing obligations, the Reorganized Debtors will use commercially reasonable efforts to qualify the New Common Stock for trading in the OTC Markets (formerly known as the Pink Sheets) or otherwise qualify the New Common Stock as "regularly traded" as defined in Treas. Reg. Section 1.897-9T(d) before the end of the calendar year that includes the Effective Date.

### xii.  *Intercompany Interests*

On the Effective Date and without the need for any further corporate action or approval of any board of directors, board of managers, managers, management, or shareholders of any Debtor or Reorganized Debtor, as applicable, the certificates and all other documents representing the Intercompany Interests shall be deemed to be in full force and effect unless otherwise required in accordance with the Restructuring Transactions.

### xiii.  *No Substantive Consolidation*

Notwithstanding the combination of separate plans of reorganization for the Debtors set forth in the Plan for purposes of economy and efficiency, the Plan constitutes a separate chapter 11 plan for each Debtor, and the Plan is not premised upon the substantive consolidation of the Debtors with respect to the Classes of Claims or Interests set forth in the Plan.  Accordingly, if the Bankruptcy Court does not confirm the Plan with respect to one or more Debtors, it may still confirm the Plan with respect to any other Debtor that satisfies the confirmation requirements of section 1129 of the Bankruptcy Code.

### xiv.  *Closing of Chapter 11 Cases*

After an Estate has been fully administered, the Debtors or Reorganized Debtors, as applicable, shall seek authority from the Bankruptcy Court to close the applicable Chapter 11 Case(s) in accordance with the Bankruptcy Code and Bankruptcy Rules.

### xv.  *Notice of Effective Date*

As soon as practicable, but not later than three (3) Business Days following the Effective Date, the Reorganized Debtors shall file a notice of the occurrence of the Effective Date with the Bankruptcy Court.

### F.  **Distributions**

### i.  *Distributions Generally*

The Disbursing Agent shall make all Plan Distributions to the appropriate holders of Allowed Claims and Allowed Interests in accordance with the terms of the Plan.

### ii.        *No Postpetition Interest on Claims*

Except as otherwise specifically provided for in the Plan, the Confirmation Order, or another order of the Bankruptcy Court, postpetition interest shall not accrue or be paid on any Claims, and no holder of a Claim shall be entitled to interest accruing on such Claim on or after the Petition Date.

### iii.        *Date of Distributions*

Unless otherwise provided in the Plan, any distributions and deliveries to be made under the Plan shall be made on the Effective Date or as soon as practicable thereafter; *provided*, that the Reorganized Debtors may implement periodic distribution dates to the extent they determine them to be appropriate.

### iv.        *Distribution Procedures*

(a)        As of the close of business on the Distribution Record Date, the various lists of holders of Claims in each Class, as maintained by the Debtors or their agents, shall be deemed closed, and there shall be no further changes in the record holders of any Claims after the Distribution Record Date.  Neither the Debtors nor the Disbursing Agent shall have any obligation to recognize any transfer of a Claim occurring after the close of business on the Distribution Record Date.  In addition, with respect to payment of any Cure Amounts or disputes over any Cure Amounts, neither the Debtors nor the Disbursing Agent shall have any obligation to recognize or deal with any party other than the non-Debtor party to the applicable executory contract or unexpired lease, even if such non-Debtor party has sold, assigned, or otherwise transferred its Claim for a Cure Amount.

(b)        Notwithstanding anything in the Plan to the contrary, Plan Distributions will be distributed through the facilities of DTC to the extent practicable, whether in exchange for old securities held through DTC or otherwise, or, if such treatment is not eligible for distribution through DTC, will be distributed on the books and records of the respective agent for such instrument, and Reorganized LP, Reorganized REIT, and New Notes Issuer, as applicable, shall take all such reasonable actions as may be required to cause the distribution of the New Senior Secured Notes, New Convertible Notes, New Common Stock, and New LP Units under the Plan.  All New Senior Secured Notes, New Convertible Notes, New Common Stock, and New LP Units to be distributed under the Plan shall be issued on the Effective Date regardless of when the distribution of such instrument actually occurs.  Notwithstanding anything in the Plan to the contrary, DTC and any transfer agent, trustee, notes registrar or similar agent shall be required to accept and conclusively rely upon the Plan or Confirmation Order in lieu of a legal opinion regarding the validity of any transaction contemplated by the Plan, including, whether the initial sale and delivery of the New Senior Secured Notes, New Convertible Notes, New Common Stock (including New Common Stock issuable upon exercise of the New Convertible Notes), and New LP Units, is exempt from registration under the Securities Act and/or eligible for DTC book-entry delivery, settlement and depositary services, and no person (including for the

WEIL:\97988370\1\32626.0004

avoidance of doubt, DTC nor any transfer agent, trustee, notes registrar or similar agent) may require a legal opinion with respect thereto.

### v.        Distributions after Effective Date

Distributions made after the Effective Date to holders of Disputed Claims that are not Allowed Claims as of the Effective Date but which later become Allowed Claims shall be deemed to have been made on the Effective Date.

### vi.        Disbursing Agent

All distributions under the Plan shall be made by the Disbursing Agent on and after the Effective Date as provided in the Plan.  The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties.  The Reorganized Debtors shall use all commercially reasonable efforts to provide the Disbursing Agent (if other than the Reorganized Debtors) with the amounts of Claims and the identities and addresses of holders of Claims, in each case, as set forth in the Debtors' or Reorganized Debtors' books and records.  The Reorganized Debtors shall cooperate in good faith with the applicable Disbursing Agent (if other than the Reorganized Debtors) to comply with the reporting and withholding requirements outlined in section 6.19 of the Plan.

### vii.        Delivery of Distributions

Subject to section 6.4(a) of the Plan, the Disbursing Agent will issue or cause to be issued, the applicable consideration under the Plan and, subject to Bankruptcy Rule 9010, will make all distributions to any holder of an Allowed Claim as and when required by the Plan at: (i) the address of such holder on the books and records of the Debtors or their agents or (ii) at the address in any written notice of address change delivered to the Debtors or the Disbursing Agent, including any addresses included on any transfers of Claim filed pursuant to Bankruptcy Rule 3001.  In the event that any distribution to any holder is returned as undeliverable, no distribution or payment to such holder shall be made unless and until the Disbursing Agent has been notified of the then-current address of such holder, at which time or as soon thereafter as reasonably practicable such distribution shall be made to such holder without interest.

Except as otherwise provided in the Plan, all distributions to holders of First Lien Credit Facility Claims shall be governed by the First Lien Credit Agreement and shall be deemed completed when made to the First Lien Credit Facility Administrative Agent, which shall be deemed to be the holder of all First Lien Credit Facility Claims for purposes of distributions to be made hereunder.  The First Lien Credit Facility Administrative Agent shall hold or direct such distributions for the benefit of the holders of Allowed First Lien Credit Facility Claims, as applicable.  As soon as practicable in accordance with the requirements set forth in this provision, the First Lien Credit Facility Administrative Agent shall arrange to deliver such distributions to or on behalf of such holders of Allowed First Lien Credit Facility Claims.

Except as otherwise provided in the Plan, all distributions to holders of Senior Unsecured Notes Claims shall be governed by the Senior Unsecured Notes Indenture and, except as otherwise reasonably requested by the Senior Unsecured Notes Trustee, shall be deemed completed when made to the Senior Unsecured Notes Trustee, which shall be deemed to be the holder of all Senior

WEIL:\97988370\1\32626.0004

Unsecured Notes Claims for purposes of distributions to be made hereunder. The Senior Unsecured Notes Trustee shall hold or direct such distributions for the benefit of the holders of Allowed Senior Unsecured Notes Claims, as applicable. As soon as practicable in accordance with the requirements set forth in this provision, the Senior Unsecured Notes Trustee shall arrange to deliver such distributions to or on behalf of such holders of Allowed Senior Unsecured Notes Claims. Notwithstanding anything to the contrary in the Plan, the distribution of the New Senior Secured Notes, the New Convertible Notes, the New LP Units, and the New Common Stock shall be made through the facilities of DTC in accordance with the customary practices of DTC for a mandatory distribution, as and to the extent practicable, and the Distribution Record Date shall not apply. In connection with such distribution, the Senior Unsecured Notes Trustee shall deliver instructions to DTC instructing DTC to effect distributions on a Pro Rata basis as provided under the Plan with respect to the Senior Unsecured Notes Claims on the Effective Date. If the Senior Unsecured Notes Trustee is unable to make, or consents to the Reorganized Debtors making, such distributions, the Reorganized Debtors, with the Senior Unsecured Notes Trustee's cooperation, shall make such distributions to the extent practicable to do so. The Senior Unsecured Notes Trustee shall have no duties or responsibility relating to any form of distribution that is not DTC eligible and the Debtors or the Reorganized Debtors, as applicable, shall seek the cooperation of DTC so that any distribution on account of an Allowed Senior Unsecured Notes Claim that is held in the name of, or by a nominee of, DTC, shall be made through the facilities of DTC on the Effective Date or as soon as practicable thereafter. Notwithstanding the preceding, the Debtors may elect (with the consent of the Required Consenting Noteholders) to use any other book entry delivery, settlement and depositary service in lieu of DTC as it deems efficient and appropriate (an "**Alternative Service**") solely to the extent the New Senior Secured Notes, New Convertible Notes, New Common Stock, or New LP Units are not eligible for deposit through DTC, provided, that delivery of the New Senior Secured Notes, New Convertible Notes (and the New Common Stock issued upon conversion thereof), New Common Stock, or New LP Units through Alternative Service shall not be mandatory.

### viii.    *Unclaimed Property*

One (1) year from the later of: (i) the Effective Date and (ii) the date that is ten (10) Business Days after the date of a Claim distribution on an Allowed Claim, all distributions payable on account of such Claim that are undeliverable or otherwise unclaimed shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and shall revert to the Reorganized Debtors or their successors or assigns, and all claims of any other Person (including the holder of a Claim in the same Class) to such distribution shall be discharged and forever barred. The Reorganized Debtors and the Disbursing Agent shall have no obligation to attempt to locate any holder of an Allowed Claim other than by reviewing the Debtors' books and records and the Bankruptcy Court's filings.

### ix.    *Satisfaction of Claims*

Unless otherwise provided in the Plan, any distributions and deliveries to be made on account of Allowed Claims under the Plan shall be in complete and final satisfaction, settlement, and discharge of and exchange for such Allowed Claims.

x.  *Manner of Payment under Plan*

Except as specifically provided in the Plan, at the option of the Debtors or the Reorganized Debtors, as applicable, any Cash payment to be made under the Plan may be made by a check or wire transfer or as otherwise required or provided in applicable agreements or customary practices of the Debtors.

xi.  *Claims Paid or Payable by Third Parties*

**Claims Paid by Third Parties**.  A Claim may be reduced in full, and such Claim may be Disallowed, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor, the Reorganized Debtors, or the Disbursing Agent. To the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor, the Reorganized Debtors, or the Disbursing Agent on account of such Claim, such Holder shall repay, return or deliver any distribution held by or transferred to the Holder to the Debtor, the Reorganized Debtors, or the Disbursing Agent to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.  In the event such Holder fails to timely repay or return such distribution, the Debtors or the Reorganized Debtors may pursue any rights and remedies against such Holder under applicable law.

**Claims Payable by Insurance Carriers**.  No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' Insurance Policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such Insurance Policy.  To the extent that one or more of the Debtors' Insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction or otherwise settled), then immediately upon such Insurers' satisfaction, such Claim may be expunged to the extent of any agreed upon satisfaction on the Claims Register without a Claim objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

**Applicability of Insurance Policies**.  Except as otherwise provided in the Plan, payments to Holders of Claims shall be in accordance with the provisions of any applicable Insurance Policy and subject to the terms thereof.  Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any Insurance Policies, nor shall anything contained herein constitute or be deemed a waiver by such Insurers of any rights or defenses, including coverage defenses, held by such Insurers.

xii.  *Fractional Shares and Notes*

No fractional shares of New Common Stock or New LP Units shall be distributed.  When any distribution would otherwise result in the issuance of a number of shares of New Common Stock or New LP Units that is not a whole number, the New Common Stock, or New LP Units, as applicable, subject to such distribution shall be rounded to the next higher or lower whole number as follows: (i) fractions equal to or greater than 1/2 shall be rounded to the next higher whole number, and (ii) fractions less than 1/2 shall be rounded to the next lower whole number.  The total

number of shares of New Common Stock or New LP Units to be distributed on account of Allowed Claims shall be adjusted as necessary to account for the rounding provided for herein. No consideration shall be provided in lieu of fractional shares that are rounded down. Neither the Reorganized Debtors nor the Disbursing Agent, as applicable, shall have an obligation to make a distribution pursuant to the Plan that is less than one (1) share of New Common Stock, less than one (1) New LP Unit, or less than $100.00 in Cash. Fractional shares of New Common Stock or New LP Units that are not distributed in accordance with this section shall be returned to, and ownership thereof shall vest in, Reorganized REIT.

The New Senior Secured Notes and New Convertible Notes each shall be issued in denomination of $1.00 and integral multiples of $1.00 and any other amounts shall be rounded down.

### xiii.        *No Distribution in Excess of Amount of Allowed Claim*

Notwithstanding anything to the contrary in the Plan, no holder of an Allowed Claim shall receive, on account of such Allowed Claim, Plan Distributions in excess of the Allowed amount of such Claim (plus any postpetition interest on such Claim solely to the extent permitted by <u>section 6.2</u> of the Plan).

### xiv.        *Allocation of Distributions Between Principal and Interest*

Except as otherwise provided in the Plan and subject to <u>section 6.2</u> of the Plan or as otherwise required by law (as determined by the Reorganized Debtors), distributions with respect to an Allowed Claim shall be allocated first to the principal portion of such Allowed Claim (as determined for United States federal income tax purposes) and, thereafter, to the remaining portion of such Allowed Claim, if any.

### xv.        *Exemptions from Securities Laws; Listing*

The offering, issuance of, and the distribution under the Plan of the New Senior Secured Notes, New Convertible Notes (and the New Common Stock issued upon conversion thereof), New Common Stock, and New LP Units shall be exempt, without further act or actions by any Entity, from registration under the Securities Act, and all rules and regulations promulgated thereunder, and any other applicable securities laws to the fullest extent permitted by section 1145 of the Bankruptcy Code. Pursuant to section 1145 of the Bankruptcy Code, the New Senior Secured Notes, the New Convertible Notes (and the New Common Stock issued upon conversion thereof), the New Common Stock, and the New LP Units may be resold without registration under the Securities Act or other federal securities laws by the recipients thereof, subject to (i) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act, (ii) compliance with, or the limitations of, any rules and regulations of the SEC, if any, applicable at the time of any future transfer of such securities, (iii) the restrictions, if any, on the transferability of such securities under the terms of the New Senior Secured Notes Indenture, the New Convertible Notes Indenture, or the New Corporate Governance Documents, as applicable, and (iv) applicable regulatory approval. In addition, such section 1145 exempt securities generally may be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of the several states.

WEIL:\97988370\1\32626.0004

Notwithstanding anything to the contrary in the Plan, no entity (including, for the avoidance of doubt, DTC, or any Alternative Service) shall be entitled to require a legal opinion regarding the validity of any transaction contemplated by the Plan, including, for the avoidance of doubt, whether the initial sale and delivery by the issuer to the holders of New Senior Secured Notes, New Convertible Notes (and the New Common Stock issued upon conversion thereof), New Common Stock, or New LP Units is exempt from registration and/or eligible for DTC (or any Alternative Service) book-entry delivery, settlement, and depository services. The Confirmation Order shall provide that DTC (or any Alternative Service) shall be required to accept and conclusively rely upon the Plan or Confirmation Order in lieu of a legal opinion regarding whether the New Senior Secured Notes, New Convertible Notes (and the New Common Stock issued upon conversion thereof), New Common Stock, or New LP Units is exempt from registration and/or eligible for DTC (or any Alternative Service) book-entry delivery, settlement, and depository services.

### xvi.        Setoffs and Recoupments

Each Reorganized Debtor, or such entity's designee as instructed by such Reorganized Debtor, may, pursuant to section 553 of the Bankruptcy Code or applicable nonbankruptcy law, set off or recoup against any Allowed Claim, other than a Senior Unsecured Notes Claim, First Lien Credit Facility Claim, or Consenting Crossholder Claim, and the distributions to be made pursuant to the Plan on account of such Allowed Claim, any and all claims, rights, and Causes of Action of any nature whatsoever that a Reorganized Debtor or its successors may hold against the holder of such Allowed Claim after the Effective Date; *provided,* that neither the failure to effect a setoff or recoupment nor the allowance of any Claim hereunder shall constitute a waiver or release by a Reorganized Debtor or its successor of any claims, rights, or Causes of Action that a Reorganized Debtor or its successor or assign may possess against the holder of such Claim.

### xvii.       Rights and Powers of Disbursing Agent

The Disbursing Agent shall be empowered to (i) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties hereunder, (ii) make all applicable distributions or payments provided for under the Plan, (iii) employ professionals to represent it with respect to its responsibilities, and (iv) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court (including any Final Order issued after the Effective Date) or pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

### xviii.      Expenses of Disbursing Agent

Except as otherwise ordered by the Bankruptcy Court and subject to the written agreement of the Reorganized Debtors, the amount of any reasonable fees and expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes) and any reasonable compensation and expense reimbursement Claims (including for reasonable attorneys' fees and other professional fees and expenses) made by the Disbursing Agent shall be paid in Cash by the Reorganized Debtors in the ordinary course of business.

*xix.*        ***Withholding and Reporting Requirements***

(a)        **Withholding Rights**.  In connection with the Plan, any party issuing any instrument or making any distribution described in the Plan shall comply with all applicable withholding and reporting requirements imposed by any federal, state, or local taxing authority, and all distributions pursuant to the Plan and all related agreements shall be subject to any such withholding or reporting requirements.  In the case of a non-Cash distribution that is subject to withholding, the distributing party may withhold an appropriate portion of such distributed property and either (i) sell such withheld property to generate Cash necessary to pay over the withholding tax (or reimburse the distributing party for any advance payment of the withholding tax), or (ii) pay the withholding tax using its own funds and retain such withheld property.  Any amounts withheld pursuant to the preceding sentence shall be deemed to have been distributed to and received by the applicable recipient for all purposes of the Plan; *provided*, that in the case of any payments with respect to the Senior Unsecured Notes Claims, the Reorganized Debtors shall use commercially reasonable efforts to provide the payment recipient with reasonable advance notice of any withholding that it, or its agents, intend to make on any such payment, and shall use its commercially reasonable efforts to cooperate, or direct it agents to cooperate, with such payment recipient to minimize any applicable withholding.  Notwithstanding the foregoing, each holder of an Allowed Claim or any other person that receives a distribution pursuant to the Plan shall have responsibility under applicable law for any taxes imposed by any governmental unit, including, without limitation, income, withholding, and other taxes, on account of such distribution.  Any party issuing any instrument or making any distribution pursuant to the Plan has the right, but not the obligation, to not make a distribution until such holder has made arrangements reasonably satisfactory to such issuing or disbursing party for payment of any such tax obligations.

(b)        **Forms**.  Any party entitled to receive any property as an issuance or distribution under the Plan shall, upon request, deliver to the Disbursing Agent or such other person designated by the Reorganized Debtors (which person shall subsequently deliver to the Disbursing Agent any applicable IRS Form W-8 or Form W-9 received) an appropriate Form W-9 or (if the payee is a foreign person) applicable Form W-8.  If such request is made by the Reorganized Debtors, the Disbursing Agent, or such other person designated by the Reorganized Debtors or Disbursing Agent and the holder fails to comply before the earlier of (i) the date that is one hundred and eighty (180) days after the request is made and (ii) the date that is one hundred and eighty (180) days after the date of distribution, the amount of such distribution shall irrevocably revert to the applicable Reorganized Debtor and any Claim in respect of such distribution shall be discharged and forever barred from assertion against such Reorganized Debtor or its respective property.

G.     **Procedures for Resolving Claims**

i.        *Allowance of Claims*

Except as expressly provided in the Plan (including as provided in sections 4.3 and 4.4 of the Plan) or in any order entered in the Chapter 11 Cases before the Effective Date (including the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed pursuant to the Plan or a Final Order, including the Confirmation Order (when it becomes a Final Order), Allowing such Claim.  On and after the Effective Date, each of the Debtors or the Reorganized Debtors, as applicable, shall have and retain any and all rights and defenses with respect to any Claim immediately before the Effective Date.

ii.       *Objections to Claims*

(a)     Except as otherwise expressly provided in the Plan and notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, after the Effective Date, the Reorganized Debtors, shall have the authority (i) to file, withdraw, or litigate to judgment objections to Claims; (ii) to settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (iii) to administer and adjust the Debtors' claims register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.

(b)     Any objections to a Claim shall be filed on or before the date that is the later of (i) one hundred eighty (180) days after the Effective Date and (ii) such later date as may be fixed by the Bankruptcy Court, after notice and a hearing, upon a motion by the Reorganized Debtors, as such deadline may be extended from time to time; *provided*, that the expiration of such period shall not limit or affect the Debtors' or the Reorganized Debtors' rights to dispute Claims asserted in the ordinary course of business other than through a Proof of Claim.

iii.      *Estimation of Claims*

Before or after the Effective Date, the Debtors or the Reorganized Debtors, as applicable, may at any time request that the Bankruptcy Court estimate any Disputed Claim or Disputed Interest that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or Interest or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim or Interest, including during the litigation of any objection to any Claim or Interest or during the appeal relating to such objection.  In the event that the Bankruptcy Court estimates any Disputed, contingent, or unliquidated Claim or Interest, that estimated amount shall constitute a maximum limitation on such Claim or Interest for all purposes under the Plan (including for purposes of distributions), and the Debtors or the Reorganized Debtors, as applicable, may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim or Interest.  Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any holder of a Claim or Interest that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless

such holder has filed a motion requesting the right to seek such reconsideration on or before twenty-one (21) calendar days after the date on which such Claim or Interest is estimated.

*iv.*      ***Disputed Claims Reserve***

On or before the Effective Date, the Debtors (with the reasonable consent of the Required Consenting Noteholders) or Reorganized Debtors, as applicable, shall establish one or more reserves with respect to amounts that would otherwise be distributable to holders of Unsecured Claims and Section 510(b) Claims that are Disputed Claims as of the Distribution Record Date (for the avoidance of doubt, deducting such amounts, if any, from the recoveries set forth in sections 4.7(a) and 4.14(a) of the Plan, respectively), which reserves shall be administered by the Debtors, the Reorganized Debtors, or the Distribution Agent, as applicable.  After the Effective Date, the Reorganized Debtors or the Distribution Agent shall hold such assets in such reserve(s) in trust for the benefit of those holders, if any, of Unsecured Claims and Section 510(b) Claims that are Disputed Claims as of the Distribution Record Date that are determined to be Allowed after the Distribution Record.  The Reorganized Debtors or the Distribution Agent shall distribute such amounts (net of any expenses, including any allocable taxes incurred or payable by the Disputed Claims reserve, including in connection with such distribution), as provided in the Plan, as such Claims are resolved by a Final Order or agreed to by settlement, and such amounts will be distributable on account of such Claims as such amounts would have been distributable had such Claims been Allowed Claims as of the Effective Date under Articles IV and VI of the Plan solely to the extent of the amounts available in the applicable reserve(s).

At such time as all Unsecured Claims and Section 510(b) Claims that are Disputed Claims as of the Distribution Record Date have been resolved, any remaining assets in the Disputed Claims reserve (net of any expenses, including any allocable taxes incurred or payable by the Disputed Claims reserve, including in connection with such distribution) shall be distributed to holders of Allowed Unsecured Claims and Allowed Section 510(b) Claims in accordance with the terms of Article IV of the Plan.

Subject to definitive guidance from the Internal Revenue Service or a court of competent jurisdiction to the contrary, or the receipt of a determination by the Internal Revenue Service, the Debtors, the Reorganized Debtors or the Distribution Agent, as applicable, shall treat the Disputed Claims reserve(s) established under section 7.4 of the Plan as one or more "disputed ownership funds" governed by Treasury Regulation section 1.468B-9 and, to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes.  All parties (including the Debtors, the Reorganized Debtors, the Distribution Agent, and the holders of Disputed Claims) shall be required to report for tax purposes consistently with the foregoing. The Reorganized Debtors or the Distribution Agent, as applicable, may request an expedited determination of taxes under section 505(b) of the Bankruptcy Code for all returns filed for or on behalf of the Disputed Claims reserve(s) for all taxable periods through the date on which final distributions are made.

Each Disputed Claims reserve shall be responsible for payment, out of the assets of such reserve, of any taxes imposed on the Disputed Claims reserve or its assets.  In the event, and to the extent, any Cash in the Disputed Claims reserve is insufficient to pay the portion of any such taxes attributable to the taxable income arising from the assets of such reserve (including any income

81

that may arise upon the distribution of the assets in such reserve) or other expenses, assets of the Disputed Claims reserve (e.g., the New Common Stock) may be sold to pay such taxes or other expenses.

### v.        Adjustment to Claims Register Without Objection

Any duplicate Claim or Interest or any Claim or Interest that has been paid or satisfied, or any Claim that has been amended or superseded, may be adjusted or expunged on the Claims Register by the Debtors or the Reorganized Debtors, as applicable, upon agreement between the parties in interest without a Claims objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

### vi.       Disallowance of Claims

Any Claims (other than any Claims that are expressly deemed Allowed Claims pursuant to the Plan) held by Entities from which property is recoverable pursuant to a Cause of Action under section 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable pursuant to a Cause of Action under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed Disallowed pursuant to section 502(d) of the Bankruptcy Code, and holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Debtors or the Reorganized Debtors, as applicable.

### vii.      Claim Resolution Procedures Cumulative

All of the objection, estimation, and resolution procedures in the Plan are intended to be cumulative and not exclusive of one another.  Claims may be estimated and subsequently settled, compromised, withdrawn, or resolved in accordance with the Plan without further notice or Bankruptcy Court approval.

### viii.     No Distributions Pending Allowance

If an objection, motion to estimate, or other challenge to a Claim is filed, no payment or distribution provided under the Plan shall be made on account of such Claim unless and until (and only to the extent that) such Claim becomes an Allowed Claim.

### ix.       Distributions after Allowance

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the holder of such Allowed Claim in accordance with the provisions of the Plan. As soon as practicable after the date on which the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Disbursing Agent shall provide to the holder of such Claim the distribution (if any) to which such holder is entitled under the Plan as of the Effective Date, without any interest to be paid on account of such Claim unless required by the Bankruptcy Code.

H. **Executory Contracts and Unexpired Leases**

i. *General Treatment*

(a)     As of and subject to the occurrence of the Effective Date and the payment of any applicable Cure Amount, all executory contracts and unexpired leases to which any of the Debtors are parties shall be deemed assumed, unless such contract or lease (i) was previously assumed or rejected by the Debtors, pursuant to a Final Order of the Bankruptcy Court, (ii) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto, (iii) is the subject of a motion to reject filed by the Debtors on or before the Confirmation Date, or (iv) is specifically designated as a contract or lease to be rejected on the Schedule of Rejected Contracts.

(b)     Subject to (i) satisfaction of the conditions set forth in section 8.1(a) of the Plan, (ii) resolution of any disputes in accordance with section 8.2 of the Plan with respect to the contracts or leases subject to such disputes, and (iii) the occurrence of the Effective Date, entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of the assumptions or rejections provided for in the Plan pursuant to sections 365(a) and 1123 of the Bankruptcy Code.  Each executory contract and unexpired lease assumed pursuant to the Plan shall vest in and be fully enforceable by the applicable Reorganized Debtor in accordance with its terms, except as modified by the provisions of the Plan, any Final Order of the Bankruptcy Court authorizing and providing for its assumption, or applicable law.

(c)     To the maximum extent permitted by law, to the extent any provision in any executory contract or unexpired lease assumed pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption of such executory contract or unexpired lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such executory contract or unexpired lease or to exercise any other default-related rights with respect thereto.

(d)     The Debtors reserve the right, subject to the consent of the Required Consenting Noteholders and, solely with respect to the Exit Credit Facility Subsidiaries, the Required Consenting Bank Lenders, in each case, such consent not to be unreasonably withheld, on or before 5:00 p.m. (prevailing Central Time) on the date that is seven (7) days before the Confirmation Hearing, or such other time as may be agreed in writing between the Debtors and the applicable counterparty, to amend the Schedule of Rejected Contracts to add or remove any executory contract or unexpired lease; *provided* that if the Confirmation Hearing is adjourned or continued, such amendment right shall be extended to 5:00 p.m. (prevailing Central Time) on the date that is seven (7) days before the rescheduled or continued Confirmation Hearing, and this proviso shall apply in the case of any and all subsequent adjournments and continuances of the Confirmation Hearing; *provided,*

*further* that the Debtors may amend the Schedule of Rejected Contracts to add or delete any executory contracts or unexpired leases after such date to the extent agreed with the relevant counterparties and entry of an order of the Bankruptcy Court.

**ii.**          ***Determination of Assumption and Cure Disputes; Deemed Consent***

(a)          The Debtors shall file, as part of the Plan Supplement, the Schedule of Rejected Contracts.  At least ten (10) days before the deadline to object to confirmation of the Plan, the Debtors shall serve a notice on parties to executory contracts or unexpired leases to be assumed, assumed and assigned, or rejected reflecting the Debtors' intention to potentially assume, assume and assign, or reject the contract or lease in connection with the Plan and, where applicable, setting forth the proposed Cure Amount (if any).  Any objection by a counterparty to an executory contract or unexpired lease to the proposed assumption, assumption and assignment, or related Cure Amount must be filed, served, and actually received by the Debtors within seven (7) days of the service of the assumption notice, or such shorter period as agreed to by the parties or authorized by the Bankruptcy Court. Any counterparty to an executory contract or unexpired lease that does not timely object to the notice of the proposed assumption of such executory contract or unexpired lease shall be deemed to have assented to assumption of the applicable executory contract or unexpired lease notwithstanding any provision thereof that purports to (i) prohibit, restrict, or condition the transfer or assignment of such contract or lease; (ii) terminate or modify, or permit the termination or modification of, a contract or lease as a result of any direct or indirect transfer or assignment of the rights of any Debtor under such contract or lease or a change, if any, in the ownership or control to the extent contemplated by the Plan; (iii) increase, accelerate, or otherwise alter any obligations or liabilities of any Debtor or any Reorganized Debtor, as applicable, under such executory contract or unexpired lease; or (iv) create or impose a Lien upon any property or Asset of any Debtor or any Reorganized Debtor, as applicable.  Each such provision shall be deemed to not apply to the assumption of such executory contract or unexpired lease pursuant to the Plan and counterparties to assumed executory contracts or unexpired leases that fail to object to the proposed assumption in accordance with the terms set forth in section 8.2(a) of the Plan, shall forever be barred and enjoined from objecting to the proposed assumption or to the validity of such assumption (including with respect to any Cure Amounts or the provision of adequate assurance of future performance), or taking actions prohibited by the foregoing or the Bankruptcy Code on account of transactions contemplated by the Plan.

(b)          If there is an Assumption Dispute pertaining to assumption of an executory contract or unexpired lease (other than a dispute pertaining to a Cure Amount), such dispute shall be heard by the Bankruptcy Court prior to such assumption being effective, *provided*, that the Debtors (with the consent of the Required Consenting Noteholders, such consent not to be unreasonably withheld and, solely with respect to the Exit Credit Facility Subsidiaries, the Required Consenting Bank Lenders, such consent not to be unreasonably withheld) or the

Reorganized Debtors, as applicable, may settle any dispute regarding the Cure Amount or the nature thereof without any further notice to any party or any action, order, or approval of the Bankruptcy Court.

(c)     To the extent an Assumption Dispute relates solely to the Cure Amount, the Debtors may assume and/or assume and assign the applicable executory contract or unexpired lease prior to the resolution of the Assumption Dispute; *provided*, that the Debtors or the Reorganized Debtors, as applicable, reserve Cash in an amount sufficient to pay the full amount reasonably asserted as the required cure payment by the non-Debtor party to such executory contract or unexpired lease (or such smaller amount as may be fixed or estimated by the Bankruptcy Court or otherwise agreed to by such non-Debtor party and the applicable Reorganized Debtor).

(d)     Subject to resolution of any dispute regarding any Cure Amount, all Cure Amounts shall be satisfied by the Debtors or Reorganized Debtors, as the case may be, upon assumption of the underlying contracts and unexpired leases. Assumption of any executory contract or unexpired lease pursuant to the Plan, or otherwise, shall result in the full release and satisfaction of any Claims or defaults, subject to satisfaction of the Cure Amount, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed executory contract or unexpired lease at any time before the effective date of the assumption.  Any proofs of claim filed with respect to an executory contract or unexpired lease that has been assumed or assigned shall be deemed disallowed and expunged, without further notice to or action, order or approval of the Bankruptcy Court or any other Entity, upon the deemed assumption of such contract or unexpired lease.

### iii.     *Rejection Damages Claims*

Unless otherwise provided by an order of the Bankruptcy Court, proofs of claim with respect to Claims arising from the rejection of executory contracts or unexpired leases, if any, must be filed with the Bankruptcy Court by the later of thirty (30) days from (i) the date of entry of an order of the Bankruptcy Court approving such rejection, (ii) the effective date of the rejection of such executory contract or unexpired lease, and (iii) the Effective Date.  Any Claims arising from the rejection of an executory contract or unexpired lease not filed within such time shall be Disallowed pursuant to the Confirmation Order or such other order of the Bankruptcy Court, as applicable, forever barred from assertion, and shall not be enforceable against, as applicable, the Debtors, the Estates, the Reorganized Debtors, or property of the foregoing parties, without the need for any objection by the Debtors or the Reorganized Debtors, as applicable, or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the executory contract or unexpired lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Schedules, if any, or a Proof of Claim to the contrary. Claims arising from the rejection of the Debtors' executory contracts or unexpired leases shall be classified as General Unsecured Claims and may be objected to in accordance with the provisions of section 7.2 of the Plan and applicable provisions of the Bankruptcy Code and Bankruptcy Rules.

WEIL:\97988370\1\32626.0004

### iv.        *Survival of the Debtors' Indemnification Obligations*

(a)      All Indemnification Obligations shall be deemed and treated as executory contracts to be assumed by the Debtors under the Plan and shall continue as obligations of the Reorganized Debtors on terms reasonably acceptable to the Debtors and Required Consenting Noteholders; *provided*, that the Indemnification Obligations assumed pursuant to the Plan shall be on terms and conditions reasonably acceptable to the Debtors and the Required Consenting Noteholders. Any claim based on the Debtors' Indemnification Obligations that are assumed under the Plan shall not be a Disputed Claim or subject to any objection in either case by reason of section 502(e)(1)(B) of the Bankruptcy Code.

(b)      In accordance with the foregoing, the Reorganized Debtors shall cooperate with current and former officers, directors, members, managers, agents, or employees in relation to the Indemnification Obligations assumed under the Plan, including responding to reasonable requests for information and providing access to attorneys, financial advisors, accountants and other professionals with knowledge of matters relevant to any such claim covered by an Indemnification Obligation assumed under the Plan, including any claim or Cause of Action arising under any state or federal securities laws.

### v.        *Employment Arrangements*

(a)      All Employment Arrangements shall be treated as executory contracts under the Plan and deemed assumed on the Effective Date pursuant to sections 365 and 1123 of the Bankruptcy Code (which assumption shall include any modifications to such employments agreements, including, without limitation, modifications to the terms of any retention or incentive agreements for senior executives of the Debtors, as requested by the Required Consenting Noteholders). Any assumption of the Employment Arrangements hereunder shall not trigger any applicable change of control, immediate vesting, termination, or similar provisions therein.  No participant shall have rights under the Benefit Plans and Employment Arrangements assumed pursuant to the Plan other than those existing immediately before such assumption.

(b)      Any amounts outstanding under the Debtors' two-tier key employee retention program for certain key employees shall be paid no later than the Effective Date.

(c)      Notwithstanding anything to the contrary in the Plan, the Reorganized Debtors shall continue to honor all retiree benefits in accordance with section 1129(a)(13) of the Bankruptcy Code, and the obligations thereunder shall be paid in accordance with the terms thereof.

### vi.        *Insurance Policies*

(a)      In addition, after the Effective Date, the Reorganized Debtors shall not terminate or otherwise reduce the coverage under any D&O Policy, and all

members, managers, directors, and officers who served in such capacity at any time before the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such members, managers, directors, and/or officers remain in such positions after the Effective Date, in each case, to the extent set forth in such policies.

(b)     Notwithstanding anything to the contrary in the Plan, Plan Supplement, any claims bar date notice or claim objection, or any other document related to any of the foregoing:  (i) each of the Debtors' Insurance Policies are treated as Executory Contracts under the Plan, and unless otherwise provided in the Plan, on the Effective Date, each Insurance Policy to which the Debtors are a party as of the Effective Date shall be assumed by the Reorganized Debtors in their entirety pursuant to sections 105 and 365 of the Bankruptcy Code unless such Insurance Policy (A) was rejected by the Debtors prior to the Effective Date pursuant to a Bankruptcy Court order or (B) is the subject of a motion to reject pending on the Effective Date; (ii) nothing in the Plan, Plan Supplement, or any other order of the Bankruptcy Court (including any other provision that purports to be preemptory or supervening) (A) alters, modifies, or otherwise amends the terms and conditions of (or the coverage provided by) any of the Insurance Policies or (B) alters or modifies the duty, if any, that the Insurers have to pay claims covered by such Insurance Policies and their rights, if any, to seek payment or reimbursement from the Debtors or the Reorganized Debtors or draw on any collateral or security therefor; (iii) nothing shall alter, modify, amend, affect, impair, or prejudice the legal, equitable or contractual rights, obligations, and defenses of the Insurers, insureds, Debtors, and the Reorganized Debtors, as applicable, under the Insurance Policies in any manner, and such Insurers, insureds, Debtors, and the Reorganized Debtors, as applicable, shall retain all rights and defenses under such Insurance Policies, and such Insurance Policies shall apply to, and be enforceable by and against, the insureds and the Reorganized Debtors, as applicable, in the same manner and according to the same terms and practices applicable to the Debtors, as existed prior to the Effective Date; and (iv) the automatic stay set forth in section 362(a) of the Bankruptcy Code and the injunctions set forth in Article X of the Plan, if and to the extent applicable, shall be deemed lifted without further order of the Bankruptcy Court, solely to permit: (A) claimants with valid workers' compensation claims or direct action claims against an Insurer under applicable non-bankruptcy law to proceed with their claims; and (B) the Insurers to administer, handle, defend, settle, and/or pay, in the ordinary course of business and without further order of the Bankruptcy Court, (I) workers' compensation claims, (II) claims where a claimant asserts a direct claim against any Insurer under applicable non-bankruptcy law, or an order has been entered by the Bankruptcy Court granting a claimant relief from the automatic stay or the injunctions set forth in Article X of the Plan, if and to the extent applicable, to proceed with its claim, and (III) all costs in relation to each of the foregoing.

WEIL:\97988370\1\32626.0004

vii.    *Tax Agreements*

Notwithstanding anything to the contrary in the Plan Documents, the Plan, the Plan Supplement, any claims bar date notice or claim objection, and any other document related to any of the foregoing, any written tax sharing agreements to which the Debtors are a party (of which the principal purpose is the allocation of taxes) in effect as of the date of the Confirmation Order shall be deemed and treated as executory contracts pursuant to the Plan and, to the extent the Debtors determine, with the consent of the Required Consenting Noteholders and, solely with respect to the Exit Credit Facility Subsidiaries, the Required Consenting Bank Lenders (in each case, which consent shall not be unreasonably withheld) that such agreements are beneficial to the Debtors, shall be assumed by the Debtors and Reorganized Debtors and shall continue in full force and effect thereafter in accordance with their respective terms, unless any such tax sharing agreement (of which the principal purpose is the allocation of taxes) otherwise is specifically rejected pursuant to a separate order of the Bankruptcy Court or is the subject of a separate rejection motion filed by the Debtors in accordance with section 8.1 of the Plan.  Unless otherwise noted hereunder, all other written tax sharing agreements to which the Debtors are a party (of which the principal purpose is the allocation of taxes) shall vest in the Reorganized Debtors and the Reorganized Debtors may take all actions as may be necessary or appropriate to ensure such vesting as contemplated herein.

viii.    *Modifications, Amendments, Supplements, Restatements, or Other Agreements*

Unless otherwise provided in the Plan or by separate order of the Bankruptcy Court, each executory contract and unexpired lease that is assumed shall include any and all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affects such executory contract or unexpired lease, without regard to whether such agreement, instruments, or other document is listed in any notices of assumed contracts.

ix.    *Reservation of Rights*

(a)    Neither the exclusion nor the inclusion by the Debtors of any contract or lease on any exhibit, schedule, or other annex to the Plan or in the Plan Supplement, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is or is not an executory contract or unexpired lease or that the Debtors or the Reorganized Debtors or their respective affiliates has any liability thereunder.

(b)    Except as explicitly provided in the Plan, nothing in the Plan shall waive, excuse, limit, diminish, or otherwise alter any of the defenses, claims, Causes of Action, or other rights of the Debtors or the Reorganized Debtors under any executory or non-executory contract or unexpired or expired lease.

(c)    Nothing in the Plan shall increase, augment, or add to any of the duties, obligations, responsibilities, or liabilities of the Debtors or the Reorganized Debtors, as applicable, under any executory or non-executory contract or unexpired or expired lease.

(d)      If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of its assumption under the Plan, the Debtors or Reorganized Debtors, as applicable, shall have thirty (30) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

**I.      Conditions Precedent to the Occurrence of the Effective Date**

   *i.      Conditions Precedent to Effective Date*

The Effective Date shall not occur unless all of the following conditions precedent have been satisfied or waived in accordance with the Plan:

(a)      the Plan Supplement has been filed;

(b)      the Bankruptcy Court has entered the Confirmation Order and such Confirmation Order has not been stayed, modified, or vacated;

(c)      the RSA shall be in full force and effect and binding on all parties thereto and not be (i) identified on the Schedule of Rejected Contracts or (ii) subject of a pending motion to reject executory contracts, all conditions shall have been satisfied thereunder, and no default shall exist thereunder that has not otherwise been cured or waived;

(d)      the conditions to the effectiveness of the Exit Credit Facility Documents, New Senior Secured Notes Documents, and New Convertible Notes Documents have been satisfied or waived in accordance with the terms thereof, and the Exit Credit Facility Documents, New Senior Secured Notes Documents, and New Convertible Notes Documents are in full force and effect and binding on all of the respective parties thereto;

(e)      the Debtors shall have implemented the Restructuring Transactions and all other transactions contemplated by the Plan and the RSA in a manner consistent in all material respects with the Plan and RSA and otherwise reasonably acceptable to the parties entitled to consent thereunder;

(f)      all outstanding Restructuring Expenses incurred, or estimated to be incurred, through the Effective Date (or, with respect to necessary post-Effective Date activities, after the Effective Date), to the extent invoiced before the Effective Date, shall have been paid in full in Cash by the Debtors in accordance with, and subject to, the terms of the RSA;

(g)      all governmental approvals, including Bankruptcy Court approval, necessary to effectuate the Restructuring Transactions shall have been obtained and all applicable waiting periods have expired;

(h)      all actions, documents (including the Plan Documents), and agreements necessary to implement and consummate the Plan shall have been

effected or executed and binding on all parties thereto, in form and substance consistent in all respects with the RSA and reasonably acceptable to the relevant parties under the RSA (other than the New Corporate Governance Documents, which shall be acceptable to the Required Consenting Non-Crossholders and the Required Consenting Crossholders in their sole discretion as provided for in the Plan), and shall not have been modified in a manner inconsistent with the RSA;

(i)      the New Corporate Governance Documents, in form and substance acceptable to the Required Consenting Noteholders, and Exit Credit Facility Borrower New Corporate Governance Documents, in form and substance acceptable to the Required Consenting Noteholders and Required Consenting Bank Lenders, shall have been adopted and (where required by applicable law) filed with the applicable authorities of the relevant jurisdictions of organization and shall have become effective in accordance with such jurisdiction's corporate, limited liability company, or alternative comparable laws, as applicable;

(j)      the Debtors shall have sufficient Cash on hand to make all Cash payments required to be made on the Effective Date pursuant to the Plan;

(k)      the issuance of the New Convertible Notes shall be approved by the Bankruptcy Court on terms substantially similar to the terms set forth in the Plan Documents; and

(l)      the Fee Escrow Account shall have been established and funded with Cash in accordance with section 2.2(b) of the Plan.

## ii.      *Waiver of Conditions Precedent*

(a)      Each of the conditions precedent to the occurrence of the Effective Date may be waived in writing by (i) solely with respect to the condition precedent to the occurrence of the Effective Date set forth in section 9.1(l) of the Plan, the Debtors, the Required Consenting Noteholders, and the Creditors' Committee and (ii) with respect to all other conditions precedent to the occurrence of the Effective Date, in each case, the Debtors and the parties holding applicable consent rights pursuant to the Plan or RSA, as applicable, with respect to such condition precedent without leave of or order of the Bankruptcy Court.  If any such condition precedent is waived pursuant to this section and the Effective Date occurs, each party agreeing to waive such condition precedent shall be estopped from withdrawing such waiver after the Effective Date or otherwise challenging the occurrence of the Effective Date on the basis that such condition was not satisfied, the waiver of such condition precedent shall benefit from the "equitable mootness" doctrine, and the occurrence of the Effective Date shall foreclose any ability to challenge the Plan in any court. If the Plan is confirmed for fewer than all of the Debtors, only the conditions applicable to the Debtor or Debtors for which the Plan is confirmed must be satisfied or waived for the Effective Date to occur.

WEIL:\97988370\1\32626.0004

(b)      Except as otherwise provided herein, all actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously and no such action shall be deemed to have occurred prior to the taking of any other such action.

(c)      The stay of the Confirmation Order pursuant to Bankruptcy Rule 3020(e) shall be deemed waived by and upon the entry of the Confirmation Order, and the Confirmation Order shall take effect immediately upon its entry.

### iii.      *Effect of Failure of a Condition*

If the conditions listed in <u>section 9.1</u> of the Plan are not satisfied or waived in accordance with <u>section 9.2</u> of the Plan on or before the Effective Date, the Plan shall be null and void in all respects and nothing contained in the Plan or this Disclosure Statement shall (i) constitute a waiver or release of any Claims by or against or any Interests in the Debtors, (ii) prejudice in any manner the rights of any Person, or (iii) constitute an admission, acknowledgement, offer, or undertaking by the Debtors, any of the Consenting Creditors, or any other Person.

### iv.      *Substantial Consummation*

"Substantial Consummation" of the Plan, as defined in section 1101(2) of the Bankruptcy Code, shall be deemed to occur on the Effective Date.

## J.      <u>Effect of Confirmation</u>

### i.      *Binding Effect*

Except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code, and subject to the occurrence of the Effective Date, on and after entry of the Confirmation Order, the provisions of the Plan shall bind every holder of a Claim against or Interest in any Debtor and inure to the benefit of and be binding on such holder's respective successors and assigns, regardless of whether the Claim or Interest of such holder is Impaired under the Plan and whether such holder has accepted the Plan.

### ii.      *Vesting of Assets*

Except as otherwise provided in the Plan or any Plan Document, on and after the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all Assets of the Estates, including all claims, rights, and Causes of Action and any property acquired by the Debtors under or in connection with the Plan, shall vest in each respective Reorganized Debtor free and clear of all Claims, Liens, encumbrances, charges, and other interests.  Subject to the terms of the Plan, on and after the Effective Date, the Reorganized Debtors may operate their businesses and may use, acquire, and dispose of property and prosecute, compromise, or settle any Claims (including any Administrative Expense Claims) and Causes of Action without supervision of or approval by the Bankruptcy Court and free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules other than restrictions expressly imposed by the Plan or the Confirmation Order.  Without limiting the foregoing, the Reorganized Debtors may pay the charges that they incur on or after the Effective Date for Professional Persons' fees, disbursements, expenses, or related support

services without application to or order of the Bankruptcy Court. For the avoidance of doubt, to the extent confirmation of the Plan is revoked and the Chapter 11 Cases subsequently are converted to cases under chapter 7 of the Bankruptcy Code, the applicable provisions of chapter 7 and chapter 11 of the Bankruptcy Code, as applicable, shall apply.

### iii. *Discharge of Claims Against and Interests in Debtors*

Upon the Effective Date and in consideration of the distributions to be made under the Plan, except as otherwise expressly provided in the Plan or in the Confirmation Order, each holder (as well as any trustee or agents on behalf of each holder) of a Claim or Interest and any affiliate of such holder shall be deemed to have forever waived, released, and discharged the Debtors, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, Interests, rights, and liabilities that arose prior to the Effective Date. Except as otherwise provided in the Plan, upon the Effective Date, all such holders of Claims and Interests and their affiliates shall be forever precluded and enjoined, pursuant to sections 105, 524, and 1141 of the Bankruptcy Code, from prosecuting or asserting any such discharged Claim against or terminated Interest in any Debtor or Reorganized Debtor, or any of their Assets or property, whether or not such holder has filed a Proof of Claim and whether or not the facts or legal bases therefor were known or existed prior to the Effective Date.

### iv. *Pre-Confirmation Injunctions and Stays*

Unless otherwise provided in the Plan or a Final Order of the Bankruptcy Court, all injunctions and stays arising under or entered during the Chapter 11 Cases, whether under sections 105 or 362 of the Bankruptcy Code or otherwise, and in existence on the date of entry of the Confirmation Order, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

### v. *Injunction against Interference with Plan*

Upon entry of the Confirmation Order, all holders of Claims and Interests and all other parties in interest, along with their respective present and former affiliates, employees, agents, officers, directors, and principals, shall be enjoined from taking any action to interfere with the implementation or the occurrence of the Effective Date.

### vi. *Plan Injunction*

(a) Except as otherwise provided in the Plan or in the Confirmation Order, as of the entry of the Confirmation Order but subject to the occurrence of the Effective Date, all Persons who have held, hold, or may hold Claims against or Interests in any or all of the Debtors and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, and affiliates, are permanently enjoined after the entry of the Confirmation Order from (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative, or other forum) against or affecting, directly or indirectly, a Debtor, a Reorganized Debtor, or an Estate or the property of any of the foregoing, or any direct or indirect transferee of any property of, or direct or

indirect successor in interest to, any of the foregoing Persons mentioned in this subsection (i) or any property of any such transferee or successor, (ii) enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering in any manner or by any means, whether directly or indirectly, any judgment, award, decree, or order against a Debtor, a Reorganized Debtor, or an Estate or its property, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons mentioned in this subsection (ii) or any property of any such transferee or successor, (iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against a Debtor, a Reorganized Debtor, or an Estate or any of its property, or any direct or indirect transferee of any property of, or successor in interest to, any of the foregoing Persons mentioned in this subsection (iii) or any property of any such transferee or successor, (iv) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan, and the Plan Documents, to the full extent permitted by applicable law, and (v) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Plan and the Plan Documents.

(b)    By accepting distributions pursuant to the Plan, each holder of an Allowed Claim or Interest shall be deemed to have affirmatively and specifically consented to be bound by the Plan, including the injunctions set forth in <u>section 10.6</u> of the Plan.

### vii.    *Releases*

(a)    **Releases by Debtors. As of the Effective Date, except for the rights and remedies that remain in effect from and after the Effective Date to enforce the Plan and the obligations contemplated by the Plan Documents or as otherwise provided in any order of the Bankruptcy Court, for good and valuable consideration, the adequacy of which is hereby confirmed, including the service of the Released Parties to facilitate the reorganization of the Debtors and the implementation of the Restructuring Transactions, on and after the Effective Date, the Released Parties shall be deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged, to the maximum extent permitted by law, by the Debtors, the Reorganized Debtors, and the Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives and any and all other Persons that may purport to assert any Cause of Action derivatively, by or through the foregoing Persons, from any and all claims and Causes of Action (including any derivative claims, asserted or assertable on behalf of the Debtors, the Reorganized Debtors, or the Estates, which include, for the avoidance of doubt, all claims and Causes of Action asserted or assertable in the Securities Class Action), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, contract, tort, or otherwise, by statute, violations of federal or state securities laws or otherwise**

WEIL:\97988370\1\32626.0004

that the Debtors, the Reorganized Debtors, the Estates, or their affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Chapter 11 Cases, the Restructuring Transactions, the Restructuring, the Wells Fargo Adversary Proceeding, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation, preparation, or consummation of the Plan, the RSA, the Plan Documents or related agreements, instruments, or other documents relating thereto, or the solicitation of votes with respect to the Plan, in all cases based upon any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date; *provided*, that nothing herein shall be construed to release any Released Party from Claims or Causes of Action arising out of or related to any act or omission of a Released Party that is a criminal act or constitutes intentional fraud, gross negligence or willful misconduct as determined by a Final Order.

Notwithstanding anything to the contrary herein, as of the Effective Date, all claims and Causes of Action arising under chapter 5 of the Bankruptcy Code that exist or may exist against the Senior Unsecured Notes Trustee, the holders of Senior Unsecured Notes Claims, the First Lien Credit Facility Administrative Agent, the holders of First Lien Credit Facility Claims, or Consenting Crossholders shall be released and discharged to the maximum extent permitted by law.

Entry of the Confirmation Order by the Bankruptcy Court shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases in <u>section 10.7(a)</u> of the Plan (the "Debtor Releases"), which includes by reference each of the related provisions and definitions under the Plan, and further, shall constitute the Bankruptcy Court's finding that the Debtor Releases are:  (i) in exchange for the good and valuable consideration provided by the Released Parties, (ii) a good faith settlement and compromise of the released Claims released by the Debtors, the Reorganized Debtors, and the Estates, as applicable, (iii) in the best interests of the Debtors, the Estates, and all holders of Claims and Interests, (iv) fair, equitable and reasonable, (v) given and made after due notice and opportunity for hearing, and (vi) a bar to any of the Debtors, the Reorganized Debtors, and the Estates, as applicable, asserting any Claim or Cause of Action released pursuant to the Debtor Releases.

(b)      **Releases by Holders of Claims or Interests.**  As of the Effective Date, except for the rights that remain in effect from and after the Effective Date to enforce the Plan and the Plan Documents and the obligations

contemplated by the Restructuring Transactions, for good and valuable consideration, the adequacy of which is hereby confirmed, including the service and contribution of the Released Parties to facilitate the reorganization of the Debtors and the implementation of the Restructuring Transactions, on and after the Effective Date, the Released Parties shall be deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged, to the maximum extent permitted by law, by the Releasing Parties, in each case from any and all claims and Causes of Action whatsoever (including any derivative claims, asserted or assertable on behalf of the Debtors, the Reorganized Debtors, or their Estates), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, that such holders or their estates, affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Reorganized Debtors, or their Estates, the Chapter 11 Cases, the Wells Fargo Adversary Proceeding, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors or the Reorganized Debtors (including all claims and Causes of Action asserted or assertable in the Securities Class Action), the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements or interactions between any Debtor and any Released Party, the Wells Fargo Adversary Proceeding, the Restructuring Transactions, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, the Plan Documents, and related agreements, instruments, and other documents, and the negotiation, formulation, preparation, or implementation thereof, the solicitation of votes with respect to the Plan, or any other act or omission; *provided*, that nothing herein shall be construed to release any Released Party from Claims or Causes of Action (including Claims or Causes of Action asserted or assertable in the Securities Class Action) arising out of or related to any act or omission of a Released Party that is a criminal act or constitutes intentional fraud, gross negligence or willful misconduct as determined by a Final Order.

Notwithstanding anything to the contrary herein, as of the Effective Date, all claims and Causes of Action arising under chapter 5 of the Bankruptcy Code that exist or may exist against the Senior Unsecured Notes Trustee, the holders of Senior Unsecured Notes Claims, the First Lien Credit Facility Administrative Agent, the holders of First Lien Credit Facility Claims, or

WEIL:\97988370\1\32626.0004

**Consenting Crossholders shall be released and discharged to the maximum extent permitted by law.**

**Entry of the Confirmation Order by the Bankruptcy Court shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases in <u>section 10.7(b)</u> of the Plan (the "Third-Party Releases"), which includes by reference each of the related provisions and definitions under the Plan, and further, shall constitute the Bankruptcy Court's finding that the Third-Party Releases are:  (i) consensual, (ii) essential to the confirmation of the Plan, (iii) given in exchange for the good and valuable consideration provided by the Released Parties, (iv) a good faith settlement and compromise of the Claims released by the Third-Party Releases, (v) in the best interests of the Debtors and their Estates, (vi) fair, equitable and reasonable, (vii) given and made after due notice and opportunity for hearing, and (viii) a bar to any of the Releasing Parties asserting any Claim or Cause of Action released pursuant to the Third-Party Releases.**

### viii.        *Exculpation*

**To the fullest extent permitted by applicable law, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from, any Claim, Interest, obligation, suit, judgment, damage, demand, debt, right, Cause of Action, loss, remedy, or liability for any claim in connection with or arising out of the administration of the Chapter 11 Cases; the negotiation and pursuit of the Exit Credit Facility, the New Senior Secured Notes, the New Convertible Notes, the New Common Stock, the New LP Units, the Management Incentive Plan, the Disclosure Statement, the Restructuring Support Agreement, the Restructuring Transactions, and the Plan (including the Plan Documents), or the solicitation of votes for, or confirmation of, the Plan; the funding of the Plan; the occurrence of the Effective Date; the Wells Fargo Adversary Proceeding; the administration of the Plan or the property to be distributed under the Plan; the issuance of securities under or in connection with the Plan; the postpetition purchase, sale, or rescission of the purchase or sale of any Security of the Debtors or the Reorganized Debtors; or the transactions in furtherance of any of the foregoing; other than Claims or Causes of Action arising out of or related to any act or omission of an Exculpated Party that is a criminal act or constitutes intentional fraud, gross negligence, or willful misconduct as determined by a Final Order, but in all respects the Exculpated Parties shall be entitled to reasonably rely upon the advice of counsel.  The Exculpated Parties have acted in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation and distribution of securities pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan, including the issuance of securities thereunder.  This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable law or rules protecting such Exculpated Parties from liability.**

WEIL:\97988370\1\32626.0004

### ix. *Injunction Related to Releases and Exculpation*

The Confirmation Order shall permanently enjoin the commencement or prosecution by any Person, whether directly, derivatively, or otherwise, of any Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, losses, or liabilities released pursuant to the Plan, including the claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, and liabilities released or exculpated in the Plan or the Confirmation Order.

### x. *Subordinated Claims*

The allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments thereof under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, sections 510(a), 510(b), or 510(c) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Debtors reserve the right to reclassify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

### xi. *Retention of Causes of Action and Reservation of Rights*

Except as otherwise provided in the Plan, including sections 10.6, 10.7, 10.8 and 10.9 of the Plan, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights, claims, Causes of Action, rights of setoff or recoupment, or other legal or equitable defenses that the Debtors had immediately prior to the Effective Date on behalf of the Estates or of themselves in accordance with any provision of the Bankruptcy Code or any applicable nonbankruptcy law, including any affirmative Causes of Action against parties with a relationship with the Debtors.  The Reorganized Debtors shall have, retain, reserve, and be entitled to assert all such claims, Causes of Action, rights of setoff or recoupment, and other legal or equitable defenses as fully as if the Chapter 11 Cases had not been commenced, and all of the Debtors' legal and equitable rights in respect of any Unimpaired Claim may be asserted after the Confirmation Date and Effective Date to the same extent as if the Chapter 11 Cases had not been commenced.

### xii. *Ipso Facto and Similar Provisions Ineffective*

Any term of any prepetition policy, prepetition contract, or other prepetition obligation applicable to a Debtor shall be void and of no further force or effect with respect to any Debtor to the extent that such policy, contract, or other obligation is conditioned on, creates an obligation of the Debtor as a result of, or gives rise to a right of any Entity based on (i) the insolvency or financial condition of a Debtor, (ii) the commencement of the Chapter 11 Cases, (iii) the confirmation or consummation of the Plan, including any change of control that shall occur as a result of such consummation, or (iv) the Restructuring Transactions.

### K.   **Retention of Jurisdiction**

#### i.       *Retention of Jurisdiction*

On and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction, pursuant to 28 U.S.C. §§ 1334 and 157, over all matters arising in or related to the Chapter 11 Cases for, among other things, the following purposes:

(a)      to hear and determine motions and/or applications for the assumption or rejection of executory contracts or unexpired leases and any disputes over Cure Amounts resulting therefrom;

(b)      to determine any motion, adversary proceeding, application, contested matter, and other litigated matter pending on or commenced after the entry of the Confirmation Order;

(c)      to hear and resolve any disputes arising from or related to (i) any orders of the Bankruptcy Court granting relief under Bankruptcy Rule 2004 or (ii) any protective orders entered by the Bankruptcy Court in connection with the foregoing;

(d)      to ensure that distributions to holders of Allowed Claims are accomplished as provided in the Plan and the Confirmation Order and to adjudicate any and all disputes arising from or relating to distributions under the Plan;

(e)      to consider Claims or the allowance, classification, priority, compromise, estimation, or payment of any Claim;

(f)      to enter, implement, or enforce such orders as may be appropriate in the event that the Confirmation Order is for any reason stayed, reversed, revoked, modified, or vacated;

(g)      to issue and enforce injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any Person with the consummation, implementation, or enforcement of the Plan, the Confirmation Order, or any other order of the Bankruptcy Court;

(h)      to hear and determine any application to modify the Plan in accordance with section 1127 of the Bankruptcy Code to remedy any defect or omission or reconcile any inconsistency in the Plan, this Disclosure Statement, or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

(i)      to hear and determine all Fee Claims;

(j)      to resolve disputes concerning any reserves with respect to Disputed Claims or the administration thereof;

(k) to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, the Confirmation Order, any transactions or payments in furtherance of either, or any agreement, instrument, or other document governing or related to any of the foregoing;

(l) to take any action and issue such orders, including any such action or orders as may be necessary after entry of the Confirmation Order or the occurrence of the Effective Date, as may be necessary to construe, enforce, implement, execute, and consummate the Plan;

(m) to determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(n) to hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including any requests for expedited determinations under section 505(b) of the Bankruptcy Code);

(o) to hear and determine any other matters related to the Chapter 11 Cases and not inconsistent with the Bankruptcy Code or title 28 of the United States Code;

(p) to resolve any disputes concerning whether a Person had sufficient notice of the Chapter 11 Cases, this Disclosure Statement, any solicitation conducted in connection with the Chapter 11 Cases, any claims bar date established in the Chapter 11 Cases, or any deadline for responding or objecting to a Cure Amount, in each case, for the purpose for determining whether a Claim or Interest is discharged hereunder or for any other purposes;

(q) to hear, adjudicate, decide, or resolve any and all matters related to ARTICLE X of the Plan, including the releases, discharge, exculpations, and injunctions issued thereunder;

(r) to hear and determine any rights, Claims, or Causes of Action held by or accruing to the Debtors pursuant to the Bankruptcy Code or pursuant to any federal statute or legal theory;

(s) to recover all Assets of the Debtors and property of the Estates, wherever located; and

(t) to enter a final decree closing each of the Chapter 11 Cases.

## L.   **Miscellaneous Provisions**

### i.   *Exemption from Certain Transfer Taxes*

Pursuant to section 1146 of the Bankruptcy Code, (i) the issuance, transfer or exchange of any securities, instruments or documents, (ii) the creation of any Lien, mortgage, deed of trust or other

security interest, (iii) all sale transactions consummated by the Debtors and approved by the Bankruptcy Court on and after the Confirmation Date through and including the Effective Date, including any transfers effectuated under the Plan, (iv) any assumption, assignment, or sale by the Debtors of their interests in unexpired leases of nonresidential real property or executory contracts pursuant to section 365(a) of the Bankruptcy Code, (v) the grant of Collateral under the Exit Credit Facility Documents, the New Senior Secured Notes Documents, and the New Convertible Notes Documents and (vi) the issuance, renewal, modification, or securing of indebtedness by such means, and the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including the Confirmation Order, shall not be subject to any document recording tax, stamp tax, conveyance fee or other similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, sales tax, use tax or other similar tax or governmental assessment.  Consistent with the foregoing, each recorder of deeds or similar official for any county, city or Governmental Unit in which any instrument hereunder is to be recorded shall, pursuant to the Confirmation Order, be ordered and directed to accept such instrument without requiring the payment of any filing fees, documentary stamp tax, deed stamps, stamp tax, transfer tax, intangible tax or similar tax.

### ii.      *Request for Expedited Determination of Taxes*

The Debtors shall have the right to request an expedited determination under section 505(b) of the Bankruptcy Code with respect to tax returns filed, or to be filed, for any and all taxable periods ending after the Petition Date through the Effective Date.

### iii.      *Dates of Actions to Implement Plan*

In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on or as soon as reasonably practicable after the next succeeding Business Day but shall be deemed to have been completed as of the required date.

### iv.      *Amendments*

(a)      **Plan Modifications.**  The Plan may be amended, modified, or supplemented by the Debtors in accordance with the terms of the Restructuring Support Agreement and with the consent of the parties entitled to consent thereunder, such consent not to be unreasonably withheld, and upon consultation with the Creditors' Committee, and in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law, without additional disclosure pursuant to section 1125 of the Bankruptcy Code, except as otherwise ordered by the Bankruptcy Court.  In addition, after the Confirmation Date, so long as such action does not materially and adversely affect the treatment of holders of Allowed Claims pursuant to the Plan, the Debtors, with consent of the parties entitled to consent thereunder, such consent not to be unreasonably withheld, and upon consultation with the Creditors' Committee, may remedy any defect or omission or reconcile any inconsistencies in the Plan or the Confirmation Order with respect to such matters as may be necessary to carry out the purposes of effects

WEIL:\97988370\1\32626.0004

of the Plan, and any holder of a Claim or Interest that has accepted the Plan shall be deemed to have accepted the Plan as amended, modified, or supplemented.

(b) **Certain Technical Amendments.** Prior to the Effective Date, the Debtors may make appropriate technical adjustments and modifications to the Plan with consent of the Required Consenting Creditors, such consent not to be unreasonably withheld, and upon consultation with the Creditors' Committee, without further order or approval of the Bankruptcy Court; *provided,* that such technical adjustments and modifications do not adversely affect in a material way the treatment of holders of Claims or Interests under the Plan.

### v. *Revocation or Withdrawal of Plan*

Subject to the terms of the RSA, the Debtors reserve the right to revoke or withdraw the Plan prior to the Effective Date as to any or all of the Debtors. If, with respect to a Debtor, the Plan has been revoked or withdrawn prior to the Effective Date, or if confirmation or the occurrence of the Effective Date as to such Debtor does not occur on the Effective Date, then, with respect to such Debtor (i) the Plan shall be null and void in all respects, (ii) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount any Claim or Interest or Class of Claims or Interests), assumption or rejection of executory contracts or unexpired leases affected by the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void, and (iii) nothing contained in the Plan shall (A) constitute a waiver or release of any Claim by or against, or any Interest in, such Debtor or any other Person, (B) prejudice in any manner the rights of such Debtor or any other Person, or (C) constitute an admission of any sort by any Debtor or any other Person.

### vi. *Severability*

If, prior to the entry of the Confirmation Order, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtors, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation by the Bankruptcy Court, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, Impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with this section, is (i) valid and enforceable pursuant to its terms, (ii) integral to the Plan and may not be deleted or modified without the consent of the Debtors or the Reorganized Debtors (as the case may be) and the Required Consenting Creditors, and (iii) nonseverable and mutually dependent.

WEIL:\97988370\1\32626.0004

# VII.
## TRANSFER RESTRICTIONS AND
## CONSEQUENCES UNDER FEDERAL SECURITIES LAWS

Section 1145 of the Bankruptcy Code generally exempts from registration under the Securities Act the offer or sale pursuant to a chapter 11 plan of a security of the debtor, of an affiliate participating in a joint plan with the debtor, or of a successor to the debtor under a plan, if such securities are offered or sold in exchange for a claim against, or interest in, the debtor or such affiliate, or principally in such exchange and partly for cash.  In reliance upon this exemption, the issuance and distribution of the New Senior Secured Notes, New Convertible Notes (and the New Common Stock issuable upon conversion thereof), New Common Stock, and New LP Units to holders of Senior Unsecured Notes Claims, Existing LP Common Units, Existing REIT Preferred Stock, and Existing REIT Common Stock, as applicable, under the Plan (including the New Convertible Notes issued pursuant to the Commitment Letters) shall be exempt, pursuant to section 1145 of the Bankruptcy Code, without further act or action by any Person, from registration under (i) the Securities Act and (ii) any applicable state or local law requiring registration for the issuance or distribution of securities.  The New Senior Secured Notes, New Convertible Notes (and the New Common Stock issuable upon conversion thereof), New Common Stock, and New LP Units issued pursuant to section 1145(a) of the Bankruptcy Code may be resold without registration under the Securities Act or other federal securities laws pursuant to the exemption provided by section 4(a)(1) of the Securities Act, unless the holder is an "underwriter" with respect to such Securities, as that term is defined in section 1145(b) of the Bankruptcy Code.  In addition, such section 1145 exempt Securities generally may be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of the several states.

Section 1145(b) of the Bankruptcy Code defines "underwriter" for purposes of the Securities Act as one who, except with respect to ordinary trading transactions, (i) purchases a claim with a view to distribution of any security to be received in exchange for the claim, (ii) offers to sell securities issued under a plan for the holders of such securities, (iii) offers to buy securities issued under a plan from persons receiving such securities, if the offer to buy is made with a view to distribution, or (iv) is an issuer, as used in Section 2(a)(11) of the Securities Act, with respect to such securities, which includes control persons of the issuer.

**"Control,"** as defined in Rule 405 of the Securities Act, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.  The legislative history of Section 1145 of the Bankruptcy Code suggests that a creditor who owns 10% or more of a class of voting securities of a reorganized debtor may be presumed to be a **"controlling person"** and, therefore, an underwriter.

**Notwithstanding the foregoing, control person statutory underwriters may be able to sell securities without registration pursuant to the resale limitations of Rule 144 under the Securities Act, which permits the resale of securities received by such statutory underwriters pursuant to a chapter 11 plan, subject to applicable volume limitations, notice and manner of sale requirements, and certain other conditions.  Parties who believe they may be statutory underwriters as defined in section 1145 of the Bankruptcy Code are advised to consult with their own counsel as to the availability of the exemption provided by Rule 144.**

WEIL:\97988370\1\32626.0004

Upon the Effective Date, the Reorganized Debtors anticipate that they will continue to be a reporting company under the Exchange Act, 15 U.S.C. §§ 78(a)–78(pp), subject to receiving the approval from the Required Consenting Noteholders.  If approved by the Required Consenting Noteholders the Reorganized Debtors shall use commercially reasonable efforts to have the New Common Stock (and the New Common Stock issuable upon exchange of the New Convertible Notes) listed on the New York Stock Exchange, NASDAQ, or another nationally recognized exchange, as soon as reasonably practicable, subject to meeting applicable listing requirements following the Effective Date; provided, that, regardless of the foregoing obligations, the Reorganized Debtors will use commercially reasonable efforts to qualify the New Common Stock for trading in the OTC Markets (formerly known as the Pink Sheets) or otherwise qualify the New Common Stock as "regularly traded" as defined in Treas. Reg. Section 1.897-9T(d) before the end of the calendar year that includes the Effective Date.

BECAUSE OF THE COMPLEX SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A PARTICULAR PERSON MAY BE AN UNDERWRITER OR AN AFFILIATE AND THE HIGHLY FACT-SPECIFIC NATURE OF THE AVAILABILITY OF EXEMPTIONS FROM REGISTRATION UNDER THE SECURITIES ACT, INCLUDING THE EXEMPTIONS AVAILABLE UNDER SECTION 1145 OF THE BANKRUPTCY CODE AND RULE 144 UNDER THE SECURITIES ACT, NONE OF THE DEBTORS OR THE REORGANIZED DEBTORS MAKE ANY REPRESENTATION CONCERNING THE ABILITY OF ANY PERSON TO DISPOSE OF THE SECURITIES TO BE ISSUED UNDER OR OTHERWISE ACQUIRED PURSUANT TO THE PLAN. THE DEBTORS RECOMMEND THAT POTENTIAL RECIPIENTS OF THE SECURITIES TO BE ISSUED UNDER OR OTHERWISE ACQUIRED PURSUANT TO THE PLAN CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH SECURITIES AND THE CIRCUMSTANCES UNDER WHICH THEY MAY RESELL SUCH SECURITIES.

## VIII.
## CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF PLAN

The following discussion summarizes certain United States ("**U.S.**") federal income tax consequences of the implementation of the Plan to the Debtors (including, for purposes of this discussion, the Reorganized Debtors) and holders of Claims or Interests entitled to vote on the Plan.

This summary is based on the Internal Revenue Code of 1986, as amended (the "**Tax Code**"), the U.S. Treasury Regulations promulgated thereunder (the "**Treasury Regulations**"), judicial decisions, and published administrative rules and pronouncements of the Internal Revenue Service (the "**IRS**"), all as in effect on the date hereof.  Changes in the rules or new interpretations of the rules may have retroactive effect and could significantly affect the U.S. federal income tax consequences described below.

The U.S. federal income tax consequences of the Plan are complex and subject to significant uncertainties.  The Debtors have not requested any ruling or determination from the IRS or any other taxing authority, nor have the Debtors requested an opinion of counsel, with respect to the tax consequences discussed herein, and the discussion below is not binding upon the

WEIL:\97988370\1\32626.0004

IRS or the courts. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

This summary does not address non-U.S., state or local income tax consequences of the Plan (including such consequences with respect to the Debtors) nor does it purport to address all aspects of U.S. federal income taxation that may be relevant to a holder in light of its individual circumstances or to a holder that may be subject to special tax rules, such as persons who are related to the Debtors within the meaning of the Tax Code, persons liable for alternative minimum tax or the base erosion and anti-abuse tax, persons subject to special tax accounting rules as a result of any item of gross income with respect to the Claims or Interests being taken into account in an applicable financial statement (as defined in section 451 of the Tax Code), persons whose functional currency is not the U.S. dollar, U.S. expatriates, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax exempt organizations, controlled foreign corporations, passive foreign investment companies, partnerships (or other entities treated as partnerships or other pass-through entities), beneficial owners of partnerships (or other entities treated as partnerships or other pass-through entities), subchapter S corporations, persons who hold Claims or Interests as part of a straddle, hedge, conversion transaction, or other integrated investment, persons using a mark-to-market method of accounting, persons who are themselves in bankruptcy, and persons who own more than 10 percent of any class of stock (including warrants to acquire such stock) of the REIT. Additionally, this discussion does not address any U.S. federal taxes other than income taxes. The discussion is also not intended to apply to any person that acquires any of the New Common Stock in the secondary market.

This discussion assumes that a U.S. Holder (as defined below) of a Claim or Interest holds only Claims or Interests in a single Class, has held such Claims or Interests only as "capital assets" (within the meaning of section 1221 of the Tax Code) and will hold the Exit Credit Facility, New Senior Secured Notes, New Convertible Notes, New Common Stock, and New LP Units as capital assets. This discussion also assumes that the various debt and other arrangements to which the Debtors are parties will be respected for U.S. federal income tax purposes in accordance with their form.

For purposes of this discussion, a "**U.S. Holder**" is a holder of a Claim or Interest that is: (1) an individual citizen or resident of the United States for U.S. federal income tax purposes; (2) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof or the District of Columbia; (3) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (4) a trust (A) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more United States persons (within the meaning of section 7701(a)(30) of the Tax Code) have authority to control all substantial decisions of the trust or (B) that has a valid election in effect under applicable Treasury Regulations to be treated as a United States person. For purposes of this discussion, a "**Non-U.S. Holder**" is any holder of a Claim or Interest that is neither a U.S. Holder nor a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes).

If a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a holder of a Claim or Interest, the tax treatment of the partner (or

other beneficial owner) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the partnership and the partner. Partnerships and partners (or other beneficial owners) of such partnerships (or other entities treated as partnerships or other pass-through entities) that are holders of Claims or Interests should consult their tax advisors regarding the U.S. federal income tax consequences of the Plan.

**THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM OR INTEREST. ALL HOLDERS OF CLAIMS OR INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS AS TO THE FEDERAL, STATE, LOCAL, NON-U.S., NON-INCOME, AND OTHER TAX CONSEQUENCES OF THE PLAN.**

### A. <u>Consequences to the Debtors and Certain Unitholders</u>

The Operating Partnership is a partnership for U.S. federal income tax purposes. The REIT owns common units and preferred units issued by the Operating Partnership through two qualified REIT subsidiaries—Holdings I and Holdings II, both of which are treated as disregarded entities for U.S. federal income tax purposes. The remaining common units and special common units are issued to non-debtor entities and individuals (the "**Other Unitholders**" and together with the REIT, the "**Unitholders**"). Because the Operating Partnership is a partnership (a pass-through entity) for U.S. federal income tax purposes, the U.S. federal income tax consequences of consummating the Plan generally will not be borne by the Operating Partnership, but by the REIT and the Other Unitholders.

Real estate investment trusts generally are required to distribute at least 90% of their ordinary taxable income on an annual basis (in cash or, in part, in stock) in order to retain their tax status for U.S. federal income tax purposes. Any tax attributes which reduce taxable income also reduce the distribution requirement to which the real estate investment trust is subject. As of December 31, 2020, the REIT had approximately $90 million of federal net operating losses ("**NOLs**"), approximately $20 million of capital loss carryforwards and a net unrealized built-in loss in its assets (i.e., the amount by which the Debtors' adjusted tax basis in their assets exceeds the fair market value of the assets) of approximately $2.0 billion. Any NOLs and net unrealized built-in loss remaining upon implementation of the Plan may be able to offset future taxable income, thereby reducing the REIT's future distribution obligations.

### i. *COD Income to the REIT and Other Unitholders*

In general, absent an exception, a taxpayer will realize and recognize cancellation of indebtedness income ("**COD Income**") upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness. The amount of COD Income, in general, is the excess of (a) the adjusted issue price of the indebtedness satisfied over (b) the sum of the amount of cash paid, the issue price of any new indebtedness of the taxpayer issued, and the fair market value of any other consideration.

WEIL:\97988370\1\32626.0004

In connection with the Plan, the Operating Partnership will recognize COD Income for U.S. federal income tax purposes. The ultimate amount of COD Income will depend on, among other things, the adjusted issue price of new indebtedness, the final amount of cash, and the fair market value of the new equity and other consideration distributed to holders of Claims. Certain of these figures cannot be known with certainty until after the Effective Date. Accordingly, the amount of COD Income the Operating Partnership will incur is uncertain. However, it is expected that the amount of COD Income arising to the Operating Partnership from the consummation of the Plan will be significant.

As described above, because the Operating Partnership is a pass-through entity for U.S. federal income tax purposes, the REIT and the Other Unitholders will be treated as recognizing their respective allocable shares of COD Income from the Operating Partnership. Certain statutory or judicial exceptions potentially can apply to limit the amount of COD Income required to be included in income by the Unitholders, depending on the holders' circumstances. In particular, exceptions are available that would allow COD Income to be excluded from gross income if the COD Income is taken into account by a taxpayer that is insolvent (but only to the extent of insolvency) or in bankruptcy. These exceptions apply at the "partner" level and thus depend on whether the partner, *i.e.,* the Unitholders to whom the COD Income is allocated, is itself insolvent or in bankruptcy. The fact that the Operating Partnership is insolvent and in bankruptcy is not relevant for that purpose. Because the REIT is a debtor in bankruptcy, its share of the COD Income will be excluded from income by reason of the bankruptcy exception and it will be required to reduce its tax attributes accordingly, as discussed below. For purposes of determining a Unitholder's insolvency (measured immediately prior to the Effective Date), the holder is treated as if it were individually liable for an amount of partnership debt equal to the allocated amount of the COD Income. Other exceptions might also be available to the Other Unitholders. Accordingly, the Other Unitholders are urged to consult their own tax advisors.

In general, to the extent that a Unitholder's COD Income is excluded from gross income by reason of the bankruptcy or insolvency exception, the Unitholder's tax attributes will be reduced in the following order (following the determination of its taxable income for the year in which the COD Income is excluded): (a) NOLs and NOL carryforwards; (b) most tax credits; (c) capital loss carryovers; (d) tax basis in assets (including, in the case of a partner in a partnership such partner's outside basis in its partnership interest), but not below the amount of liabilities to which the debtor remains subject; (e) passive activity loss and credit carryovers; and (f) foreign tax credits. Alternatively, the taxpayer can elect first to reduce the basis of its depreciable assets. However, a partner in a partnership may only make this election with respect to the portion of its outside basis attributable to depreciable assets if the partnership so consents (or is deemed to consent). Any COD Income over the amount of available tax attributes will generally not give rise to U.S. federal income tax and will generally have no other U.S. federal income tax impact. The REIT expects that its NOLs and capital loss carryforwards will be reduced to zero and any remaining attribute reduction will be applied to reduce its adjusted tax basis in its Existing LP Units (unless the Operating Partnership becomes a disregarded subsidiary of the REIT for U.S. federal income tax purposes, such as (i) in the event of the conversion of all minority held interests in the Operating Partnership into New Common Stock pursuant to the Plan or (ii) the extinguishment of minority held interests if the Bankruptcy Court does not approve the recovery to holders of Existing LP Common Units, in which event the adjusted tax basis of the assets of the Operating Partnership would be reduced).

A partner's adjusted tax basis in its Existing LP Units will be increased to the extent of any net income or gain allocated to such partner and decreased (but not below zero) to the extent of any net loss allocated to such partner, whether or not such loss is disallowed and thus not deductible.  To the extent a partner was allocated losses in taxable years ending prior to the Effective Date, such losses may have been suspended by reason of certain provisions of the Tax Code (in particular, those relating to so-called "passive losses" or the "at risk" rules).  As a result of the transaction, all or part of such losses may become deductible.

The discharge of the Operating Partnership's indebtedness pursuant to the Plan will also result in a deemed cash distribution to each partner based on the amount of the indebtedness allocable to such partner's Existing LP Units.  To the extent that any such deemed cash distribution exceeds the partner's adjusted tax basis in its Existing LP Units (after adjustment for any allocation of income or loss including COD Income), such partner will recognize capital gain.  Any such capital gain generally should be long-term if the partner's holding period in its Existing LP Units is more than one year and otherwise should be short-term.  A partner's adjusted tax basis in its Existing LP Units will be decreased (but not below zero) to the extent of any such deemed cash distribution.

### ii.  *Limitation on Utilization of REIT NOLs and Other Tax Attributes*

In addition to the reduction in tax attributes pursuant to excluded COD Income described above, the REIT's ability to use any remaining tax attributes post-emergence will be subject to certain limitations under sections 382 and 383 of the Tax Code.

Under sections 382 and 383 of the Tax Code, if the REIT undergoes an "ownership change," the amount of any remaining NOLs, tax credit carryforwards, net unrealized built-in losses, and possibly certain other attributes of the REIT allocable to periods prior to the Effective Date (collectively, the "**Pre-Change Losses**") that may be utilized to offset future taxable income generally is subject to an annual limitation.  For this purpose, if a corporation has a net unrealized built-in loss at the time of an ownership change (taking into account most assets and items of "built-in" income and deductions), then generally built-in losses (including amortization or depreciation deductions attributable to such built-in losses) recognized during the following five years (up to the amount of the original net unrealized built-in loss) will be treated as Pre-Change Losses and similarly subject to the annual limitation.

The Debtors anticipate that the issuance of New Common Stock pursuant to the Plan will result in an "ownership change" of the REIT for this purpose, and that the REIT's utilization of its Pre-Change Losses to offset future income will be subject to annual limitation.

In general, the amount of the resulting annual limitation is equal to the product of (a) the fair market value of the stock of the corporation immediately before the ownership change (with certain adjustments), and (b) the "long-term tax-exempt rate" for the month in which the ownership change occurs (1.64 percent for ownership changes in May 2021).  However, where the ownership change occurs pursuant to a confirmed chapter 11 plan, the annual limitation generally is calculated (with certain adjustments) by reference to the value of the debtor corporation's new stock immediately after the ownership change, but not in excess of the fair market value of the debtor

WEIL:\97988370\1\32626.0004

corporation's pre-change gross assets.  Any unused limitation may be carried forward, thereby increasing the annual limitation in the subsequent taxable year.

An exception to the foregoing annual limitation rules generally applies when so-called "qualified creditors" of a debtor corporation in chapter 11 receive, in respect of their Claims, at least 50 percent of the vote and value of the stock of the debtor corporation (or a controlling corporation if also in chapter 11) as reorganized pursuant to a confirmed chapter 11 plan. However, the Debtors do not expect this exception to be available to the REIT because no creditors of the REIT are expected to receive stock of the REIT.

### iii. Potential Limitations on REIT Interest Deductions

Several provisions of the Tax Code can result in the limitations on the deductibility of interest to the REIT, including the potential application of the applicable high yield discount obligation ("**AHYDO**") provisions of the Tax Code to the New Senior Secured Notes and New Convertible Notes.  The deferral or disallowance of interest deductions may increase the REIT's distribution requirement for maintaining its status as a real estate investment trust.

The AHYDO provisions can result in the deferral, and even disallowance, of an issuer's deduction of interest.  A debt obligation is generally treated as an AHYDO if it is (1) issued with substantial original issue discount ("**OID**") (meaning that there is accrued OID as of the close of the first accrual period ending after the fifth anniversary of issuance in excess of one year's interest, both actual and imputed), (2) has a yield to maturity of at least five percentage points over the applicable federal rate in effect for the calendar month in which such notes are issued, and (3) has a maturity of over five years.  In the event that a debt instrument constitutes an AHYDO, a corporate issuer's interest deduction is deferred until such interest is paid in cash.  Moreover, to the extent the yield to maturity on the debt instrument is at least six percentage points over the applicable federal rate, a portion of a corporate issuer's interest deduction is disallowed.   If the New Senior Secured Notes and New Convertible Notes are issued with OID, the REIT's ability to deduct interest in respect of such notes (if not otherwise limited) may be deferred or denied under the AHYDO rules.   For a discussion of whether such notes are issued with OID, see "*B. Consequences to U.S. Holders of Certain Claims—Ownership and Disposition of the Exit Credit Facility, New Senior Secured Notes and New Convertible Notes—OID and Issue Price*," below.

In addition, under certain circumstances, the deduction of interest may be denied with respect to a convertible debt, particularly where the debt – as in the case of the New Convertible Notes – can be converted into equity at the option of the issuer.   In the case of the New Convertible Notes, the REIT's ability to deduct its allocable portion of the interest depends on whether, as of the Effective Date, it is reasonably expected that the stock value condition to the Operating Partnership's ability to convert the notes into equity will occur.  If the condition is reasonably expected to be satisfied, the REIT will not be allowed to deduct its allocable portion of the interest on the New Convertible Notes (regardless of the application of the AHYDO rules).  Pursuant to the terms of the New Convertible Notes, the stock value condition requires a significant increase in share price above the equity value described in the Valuation Analysis.

WEIL:\97988370\1\32626.0004

### iv. *Consequences to U.S. Holders of Existing LP Common Units of Exchanging Their Existing Units*

Pursuant to the Plan (assuming the Bankruptcy Court approves the recovery to holders of Existing LP Common Units), each holder of an Existing LP Common Units will either (i) receive its share of the New LP Units, if it so elects, or (ii) be deemed to exchange its Existing LP Common Units for Existing REIT Common Stock the day prior to the Distribution Record Date on terms consistent with the applicable prepetition agreements for the Existing LP Common Units, thereby receiving such treatment as if such holder owned Existing REIT Common Stock on the Distribution Record Date.

### (a) *Holders Who Elect to Receive New LP Units*

The Debtors intend to treat the basic exchange of Existing LP Common Units for New LP Units as tax-free exchange for U.S. federal income tax purposes.  Nevertheless, any decrease in the liabilities of the Operating Partnership allocable to a U.S. Holder after an exchange of its Existing LP Common Units for New LP Units (whether by reason of a reduction in the actual liabilities of the Operating Partnership, differences in allocation provisions of the units, or otherwise) will be treated as a cash distribution in amount equal to such decrease.  Cash distributions made by the Operating Partnership to such U.S. Holders generally will not be taxable to such U.S. Holders for U.S. federal income tax purposes, except to the extent the amount of any such cash distributions exceeds such U.S. Holder's adjusted tax basis in its Existing LP Common Units (after adjustment for any allocation of income or loss including COD Income, as described above under "—*COD Income to the REIT and Other Unitholders*").  Cash distributions made by the Debtors to U.S. Holders of Existing LP Common Units in an amount in excess of such U.S. Holder's tax basis in its Existing LP Common Units (after adjustment for any allocation of income or loss including COD Income) generally will be considered to be gain from the sale or exchange of those Existing LP Common Units.

A U.S. Holder will have an adjusted tax basis in its New LP Units equal to its adjusted tax basis in in its Existing LP Common Units (after adjustment for any allocation of income or loss including COD Income), decreased by the amount of the liability reduction.  The U.S. Holder's holding period for the New LP Units should include the U.S. Holder's holding period for the Existing LP Common Units.

The U.S. federal income tax consequences to a U.S. Holder of the ownership and disposition of New LP Units are described below in "*E. Consequences of the Ownership and Disposition of the New LP Units.*"

### (b) *Holders Who Elect to Receive New Common Stock*

If a U.S. Holder of the Existing LP Common Units receives its share of the New Common Stock as if such holder held Existing REIT Common Stock, the Debtors expect to take the position for U.S. federal income tax purposes – and the remainder of this discussion assumes – that the Existing LP Common Units are treated as if (i) first exchanged for Existing REIT Common Stock on terms consistent with the applicable prepetition agreements and (ii) thereafter, the Existing REIT Common Stock is exchanged for New Common Stock on the same terms as an existing

holder of Existing REIT Common Stock.  The tax consequences to the Debtors and holders of Existing LP Common Units described herein could be materially different in the event this characterization is not respected for U.S. federal income tax purposes.

The receipt of the Existing REIT Common Stock by a U.S. Holder of Existing LP Common Units should be treated as a taxable exchange.  Such a U.S. Holder should recognize gain or loss equal to the difference between (a) the amount realized and (b) such U.S. Holder's adjusted tax basis in its Existing LP Common Units (after adjustment for any allocation of income or loss including COD Income).  A U.S. Holder's "amount realized" will be measured by the sum of the fair market value of the Existing REIT Common Stock deemed received plus such U.S. Holder's share of partnership liabilities.  Because the amount realized includes a U.S. Holder's share of partnership liabilities, the gain recognized on the exchange of Existing LP Common Units could result in a tax liability in excess of the value of any property received from the exchange.

Any gain or loss recognized with respect to such an exchange generally will be treated as a capital gain or loss, and will be long-term capital gain or loss if the interest has been held for more than one year (subject to recharacterization as ordinary income in the event of recapture, as described in "*E. Consequences of the Ownership and Disposition of the New LP Units*").  The deductibility of capital losses is subject to certain limitations as described in "*B. Consequences to U.S. Holders of Certain Claims—Character of Gain or Loss.*"

The U.S. federal income tax consequences to a U.S. Holder of the subsequent exchange of Existing REIT Common Stock deemed received for New Common Stock are described below in "*C. Consequences to U.S. Holders of Existing REIT Common Stock or Existing REIT Preferred Stock.*"  With respect to such discussion, a U.S. Holder of Existing LP Common Units should be considered to have a tax basis in the Existing REIT Common Stock deemed received (and immediately exchanged) equal to the fair market value of such stock at the time of the exchange.  The U.S. Holder's holding period in such Existing REIT Common Stock should be a new holding period that begins on the day following the exchange date.

The U.S. federal income tax consequences to a U.S. Holder of the ownership and disposition of New Common Stock are described below in "*F. Consequences of the Ownership and Disposition of New Common Stock.*"

**B.  Consequences to U.S. Holders of Certain Claims**

> ***i.    Consequences to U.S. Holders of First Lien Credit Facility Claims***

Pursuant to the Plan, in exchange for full and final satisfaction, compromise, settlement, release and discharge of Allowed First Lien Credit Facility Claims, each holder thereof will receive its share of the Exit Credit Facility and cash.

For U.S. federal income tax purposes, the purported exchange of a new debt instrument for an existing debt instrument will be respected as an exchange, as a result of which (among other things) gain or loss is realized, if the terms of the new debt instrument compared to the existing debt instrument constitute a "significant modification."  Based on differences between the terms of First Lien Credit Facility Claims and the Exit Credit Facility (including, in particular, changes in the interest rate and other economic terms), the Debtors believe that the exchange of First Lien

WEIL:\97988370\1\32626.0004

Credit Facility Claims for the Exit Credit Facility will be treated as a "significant modification" of the First Lien Credit Facility Claims, and the remainder of this discussion so assumes.

Accordingly, the receipt of an interest in the Exit Credit Facility and receipt of cash by a U.S. Holder of an Allowed First Lien Credit Facility Claim should be treated as a taxable exchange. Such a U.S. Holder should recognize gain or loss equal to the difference between (a) the sum of the cash received and the issue price of the Exit Credit Facility received in respect of its Claim (other than any consideration received in respect of a Claim for accrued but unpaid interest and possibly accrued original issue discount ("**OID**")) and (b) such U.S. Holder's adjusted tax basis in its First Lien Credit Facility Claim (other than any tax basis attributable to accrued but unpaid interest and possibly accrued OID). *See "—Character of Gain or Loss,"* below. For a discussion of the determination of the "issue price" of the Exit Credit Facility, see "—*Ownership and Disposition of the Exit Credit Facility, New Senior Secured Notes and New Convertible Notes*," below.

To the extent that a portion of the consideration received in exchange for its Allowed First Lien Credit Facility Claim is allocable to accrued but untaxed interest (or OID), the U.S. Holder may recognize ordinary income. *See "—Accrued Interest and OID,"* below.

A U.S. Holder of an Allowed First Lien Credit Facility Claim will have a tax basis in the Exit Credit Facility received equal to its issue price. A U.S. Holder's holding period in such Exit Credit Facility should begin on the day following the exchange date.

### ii. Consequences to U.S. Holders of Allowed Consenting Crossholder Claims and Allowed Senior Unsecured Notes Claims

Pursuant to the Plan, in exchange for the full and final satisfaction, compromise, settlement, release and discharge of the Allowed Consenting Crossholder Claims and Allowed Senior Unsecured Notes Claims, each holder thereof will receive (i) New Common Stock, (ii) New Senior Secured Notes, or at its election in lieu of some or all of its New Senior Secured Notes, New Convertible Notes, and (iii) cash. Pursuant to the Plan, and separate from the treatment on their Claim, the holders of the Allowed Consenting Crossholder Claims and certain holders of the Allowed Senior Unsecured Notes Claims have committed to purchase New Convertible Notes in exchange for cash. The Debtors intend to similarly treat such right to purchase New Convertible Notes as separate from the satisfaction of the holders' Claims for U.S. federal income tax purposes.

The receipt of New Common Stock, new notes and cash by a U.S. Holder in exchange for its Allowed Consenting Crossholder Claim or Allowed Senior Unsecured Notes Claim should be treated as a taxable exchange. Accordingly, such a U.S. Holder generally should recognize gain or loss equal to the difference between (a) the sum of the cash received, the fair market value of the New Common Stock received, and the issue price of any new notes received in respect of its Claim (other than any consideration received in respect of a Claim for accrued but unpaid interest and possibly accrued OID) and (b) such U.S. Holder's adjusted tax basis in its Claim (other than any tax basis attributable to accrued but unpaid interest and possibly accrued OID). *See "— Character of Gain or Loss,"* below. For a discussion of the determination of the "issue price" of the New Senior Secured Notes and New Convertible Notes, see "—*Ownership and Disposition of*

111

the Exit Credit Facility, New Senior Secured Notes and New Convertible Notes—OID and Issue Price," below.

To the extent that a portion of the consideration received in exchange for its Allowed Consenting Crossholder Claim or Allowed Senior Unsecured Notes Claim is allocable to accrued but untaxed interest (or OID), the U.S. Holder may recognize ordinary income. *See "—Accrued Interest and OID*," below.

A U.S. Holder of an Allowed Consenting Crossholder Claim or Allowed Senior Unsecured Notes Claims will have a tax basis in the notes received equal to their issue price and a tax basis in the New Common Stock received equal to such stock's fair market value. A U.S. Holder's holding period in the notes and stock received should begin on the day following the exchange date.

### iii.        Consequences to U.S. Holders of Allowed Unsecured Claims

Pursuant to the Plan, in exchange for the full and final satisfaction, compromise, settlement, release and discharge of the Allowed Unsecured Claims, each holder thereof will receive (i) New Common Stock, (ii) New Senior Secured Notes and (iii) cash.

The receipt of New Common Stock, New Senior Secured Notes and cash by a U.S. Holder in exchange for its Allowed Unsecured Claim should be treated as a taxable exchange. Such a U.S. Holder should recognize gain or loss equal to the difference between (a) the sum of the cash received, the fair market value of the New Common Stock received, the issue price of the New Senior Secured Notes received in respect of its Claim (other than any consideration received in respect of a Claim for accrued but unpaid interest and possibly accrued OID) and (b) such U.S. Holder's adjusted tax basis in its Claim (other than any tax basis attributable to accrued but unpaid interest and possibly accrued OID). *See "—Character of Gain or Loss*," below. For a discussion of the determination of the "issue price" of the New Senior Secured Notes, see "—*Ownership and Disposition of the Exit Credit Facility, New Senior Secured Notes and New Convertible Notes—OID and Issue Price*," below.

To the extent that a portion of the consideration received in exchange for its Allowed Unsecured Claim is allocable to accrued but untaxed interest (or OID), the U.S. Holder may recognize ordinary income. *See "—Accrued Interest and OID*," below.

In the event of the subsequent disallowance of certain Disputed Unsecured Claims, it is possible that a U.S. Holder of a previously Allowed Unsecured Claim may receive additional distributions in respect of its Claim, subject to the treatment of a portion of such distribution as interest income under the imputed interest provisions of the Tax Code. Accordingly, it is possible that the recognition of any loss realized by a U.S. Holder with respect to an Allowed Unsecured Claim may be deferred until all Unsecured Claims are Allowed or Disallowed. Alternatively, it is possible that a U.S. Holder will have additional gain in respect of any additional distributions received due to the disallowance of certain Disputed Unsecured Claims. The discussion herein assumes that the installment method does not apply, either because the exchange is not eligible or because the U.S. Holder of Allowed Unsecured Claims elects out of such treatment. *See also "—*

WEIL:\97988370\1\32626.0004

*Tax Reporting for Assets Allocable to a Disputed Claims Reserve for Unsecured Claims and Section 510(b) Claims,*" below.

A U.S. Holder of an Allowed Unsecured Claim will have a tax basis in the New Senior Secured Notes equal to their issue price and a tax basis in the New Common Stock received equal to such stock's fair market value.  A U.S. Holder's holding period in any such New Senior Secured Notes and stock received should begin on the day following the exchange date.

### iv.     Consequences to U.S. Holders of Allowed Ongoing Trade Claims

Pursuant to the Plan, in exchange for the full and final satisfaction, compromise, settlement, release and discharge of the Allowed Ongoing Trade Claims, each holder thereof that executes a Trade Agreement will receive four quarterly cash payments in amount equal to the outstanding amount of its Allowed Ongoing Trade Claim if it executes a Trade Agreement.  Otherwise, each holder thereof will be treated as an Allowed Unsecured Claim (see discussion in the preceding section).

We believe that the right to such four quarterly cash payments will be treated, for U.S. federal income tax purposes, as the receipt of a debt obligation and thus subject to the imputed interest provisions of the Tax Code.  To the extent so treated, a U.S. Holder will be treated as receiving in satisfaction of its Allowed Ongoing Trade Claim for federal income tax purposes an amount less than the full amount of its Allowed Ongoing Trade Claim.

Accordingly, a U.S. Holder of Allowed Ongoing Trade Claims that executes a Trade Agreement generally should recognize gain or loss equal to the difference between (a) the sum of the four quarterly cash payments to be received other than any amounts treated as imputed interest (and other than any payment receivable in respect of a Claim for accrued but unpaid interest) and (b) such U.S. Holder's adjusted tax basis in its Claim (other than any tax basis attributable to a Claim for accrued but unpaid interest).  *See "—Character of Gain or Loss,"* below.

To the extent that a portion of the consideration received in exchange for its Allowed Unsecured Claim is allocable to a Claim for accrued but untaxed interest, the U.S. Holder may recognize ordinary income.  *See "—Accrued Interest and OID,"* below.

### v.     Consequences to U.S. Holders of Allowed Section 510(b) Claims

Pursuant to the Plan, in exchange for the full and final satisfaction, compromise, settlement, release and discharge of Allowed Section 510(b) Claims, each holder thereof may receive New Common Stock.

The U.S. federal income tax treatment of the receipt of New Common Stock by a U.S. Holder in exchange for its Section 510(b) Claim will depend on, among other things, the nature of such Claims, the extent to which, if at all, the holder has previously claimed a loss in respect of its Claim, and whether such New Common Stock was received after the Effective Date due to the subsequent disallowance of a Disputed Section 510(b) Claim.  Holders of Allowed Section 510(b) Claims are urged to consult their own tax advisors as to the U.S. federal income tax consequences to them of receiving New Common Stock, including the extent to which any recovery is taxable (for example, in the case of a prior U.S. Holder of Existing Equity Interests, it is possible that the

WEIL:\97988370\1\32626.0004

receipt of New Common Stock might be treated as a tax-free recapitalization or similar non-recognition transaction for U.S. federal income tax purposes) and the character of any income or loss. Holders of a Section 510(b) Claim should consult their tax advisors regarding the U.S. federal income tax consequences of the Plan. *See also "—Tax Reporting for Assets Allocable to a Disputed Claims Reserve for Unsecured Claims and Section 510(b) Claims,"* below.

###### vi.      *Accrued Interest or OID*

A portion of the consideration received by U.S. Holders of Claims may be attributable to accrued but untaxed interest (or accrued OID) on such Claims. Such amount should be taxable to that U.S. Holder as ordinary interest income if such accrued interest (or OID) has not been previously included in the holder's gross income for U.S. federal income tax purposes. Conversely, U.S. Holders of Claims may be able to recognize a deductible loss to the extent that any accrued interest (or OID) on the Claims was previously included in the holder's gross income but was not paid in full by the Debtors. Such loss may be ordinary, but the tax law is unclear on this point.

If the fair value of the consideration is not sufficient to fully satisfy all principal and interest on Allowed Claims, the extent to which such consideration will be attributable to accrued but untaxed interest (or OID) is uncertain. Under Section 6.14 of the Plan, the aggregate consideration to be distributed to U.S. Holders of Allowed Claims in each Class will be allocated first to the principal amount of Allowed Claims (as determined for U.S. federal income tax purposes) and thereafter, to the remaining portion of such Allowed Claim, if any (in contrast, for example, to a pro rata allocation of a portion of the exchange consideration received between principal and interest, or an allocation first to accrued but unpaid interest). Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan of reorganization is binding for U.S. federal income tax purposes, while certain Treasury Regulations treat payments as allocated first to any accrued but untaxed interest. The IRS could take the position that the consideration received by the U.S. Holder should be allocated in some way other than as provided in the Plan. Holders of Claims should consult their respective tax advisors regarding the proper allocation of the consideration received by them under the Plan between principal and accrued but untaxed interest in such event.

###### vii.      *Character of Gain or Loss*

Where gain or loss is recognized by a U.S. Holder, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the holder, whether the applicable Allowed Claim constitutes a capital asset in the hands of the holder and how long it has been held, whether the Allowed Claim was acquired at a market discount, and whether and to what extent the holder previously claimed a bad debt deduction.

Under the "market discount" provisions of the Tax Code, some or all of any gain realized by a U.S. Holder of a Claim may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the debt instruments constituting the exchanged Claim. In general, a debt instrument is considered to have been acquired with "market discount" if it is acquired other than on original issue and if the U.S. Holder's adjusted tax basis in the debt

114

instrument is less than (a) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or (b) in the case of a debt instrument issued with OID, its adjusted issue price, in each case, by at least a *de minimis* amount (equal to 0.25 percent of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a U.S. Holder on the taxable disposition of a Claim that had been acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while such Claim was considered to be held by the holder (unless the holder elected to include market discount in income as it accrued).  Holders should consult their own tax advisors concerning the application of the market discount rules to their Claims.

U.S. Holders who recognize capital losses as a result of the distributions under the Plan will be subject to limits on their use of capital losses.  For non-corporate U.S. Holders, capital losses may be used to offset any capital gains (without regard to holding periods) plus ordinary income to the extent of the lesser of (a) $3,000 ($1,500 for married individuals filing separate returns) or (b) the excess of the capital losses over the capital gains. U.S. Holders, other than corporations, may carry over unused capital losses and apply them to capital gains and a portion of their ordinary income for an unlimited number of years.  For corporate U.S. Holders, losses from the sale or exchange of capital assets may only be used to offset capital gains.  U.S. Holders who have more capital losses than can be used in a tax year may be allowed to carry over the excess capital losses for use in succeeding tax years.  Corporate U.S. Holders may only carry over unused capital losses for the five years following the capital loss year, but are allowed to carry back unused capital losses to the three years preceding the capital loss year.

### viii.   *Ownership and Disposition of the Exit Credit Facility, New Senior Secured Notes and New Convertible Notes*

The following discussion is based on the principal terms of the Exit Credit Facility, New Senior Secured Notes and New Convertible Notes (each, a **"New Loan Obligation"**) described in the term sheets included as exhibits to the Plan, unless otherwise indicated.  To the extent the terms vary, and depending on any additional terms, the federal income tax treatment may differ from that described below.

In addition, based on the preliminary terms of the Exit Credit Facility, which would mandate its partial repayment upon the occurrence of certain contingencies, it is possible that the Exit Credit Facility may be treated as a "contingent payment debt instrument" (**"CPDI"**) under the applicable Treasury regulations unless such contingencies are "remote" or "incidental" or certain other rules apply.  The Debtors do not currently expect to treat the Exit Credit Facility as a CPDI. However, ultimately, the Reorganized Debtors' determination of whether the Exit Credit Facility is a CPDI will be made based on the facts and circumstances at the time of emergence, including the final agreed terms of the Exit Credit Facility.  No assurance can be provided that the Debtors' treatment would be sustained if challenged by the IRS.  Treatment as a contingent payment debt instrument could affect the timing and amount of a U.S. Holder's income and could cause the gain from the sale or other disposition of the Exit Credit Facility to be treated as ordinary income rather than capital gain.

WEIL:\97988370\1\32626.0004

All holders are urged to consult their own tax advisors regarding the ownership and disposition of the Exit Credit Facility, New Senior Secured Notes and New Convertible Notes.

(a)    Payments of Qualified Stated Interest

Payments of qualified stated interest on a New Loan Obligation generally will be taxable to a U.S. Holder as ordinary income at the time such interest is received or accrued, in accordance with such U.S. Holder's method of tax accounting for U.S. federal income tax purposes.  Qualified stated interest generally means stated interest that is unconditionally payable in cash or in property (other than debt instruments of the issuer) at least annually at a single fixed rate or a single qualified floating rate.

(b)    OID and Issue Price

A New Loan Obligation will be treated as issued with OID for U.S. federal income tax purposes if the "stated redemption price at maturity" exceeds its "issue price" (discussed below) by an amount equal to or more than a statutorily defined *de minimis* amount (generally, 0.25% multiplied by the product of the stated redemption price at maturity and the number of complete years to maturity).  The "stated redemption price at maturity" of a New Loan Obligation is the total of all payments to be made under the New Loan Obligation other than qualified stated interest.

The "issue price" of a New Loan Obligation generally depends on whether, at any time during the 31-day period ending 15 days after the Effective Date, the New Loan Obligation or the debt instrument for which it is exchanged therefor is considered traded on an "established market" for U.S. federal income tax purposes.  However, if a substantial amount of a particular type of New Loan Obligations is issued for cash (as discussed below, in the case of the New Convertible Notes), the "issue price" of all New Loan Obligations of that type is the first price at which a substantial amount was sold for cash (ignoring sales to bond houses, brokers or similar person acting in the capacity of underwriters, placement agents or wholesalers).  This is hereafter referred to as the "cash issue-price" rule.

Pursuant to applicable Treasury Regulations, an "established market" need not be a formal market.  It is sufficient if there is a readily available sales price for an executed purchase or sale of the New Loan Obligation or the debt instrument for which it is exchanged therefor, or if there are one or more "firm quotes" or "indicative quotes" with respect to New Loan Obligation or the debt instrument for which it is exchanged therefor, in each case as such terms are defined in applicable Treasury Regulations.  If the cash issue-price rule does not apply, the issue price of a New Loan Obligation generally will be determined as follows.  If the New Loan Obligation received is considered traded on an established market, the issue price of the New Loan Obligation for U.S. federal income tax purposes will equal its fair market value as of the Effective Date.  If the New Loan Obligation is not considered traded on an established market but a substantial amount of the debt obligations for which it is exchanged is so traded, the issue price of the New Loan Obligation will be based on the fair market value of such debt obligations (with appropriate adjustments, such as for the amount of cash and other property received).  Alternatively, if neither the New Loan Obligation or a substantial amount of the debt obligations for which it is exchanged is considered traded on an established market, the issue price of the New Loan Obligation generally will be its stated principal amount.  If the Debtors determine that the New Loan Obligation or the debt

116

instrument for which it is exchanged therefor is traded on an established market, such determination and the determination of issue price will be binding on a U.S. Holder unless such holder discloses, on a timely-filed U.S. federal income tax return for the taxable year that includes the acquisition date of the New Loan Obligation that such holder's determination is different from Debtors' determination, the reasons for such holder's different determination and, if applicable, how such holder determined the fair market value.

              i.      Issue price of Exit Credit Facility and New Senior Secured Notes

The Exit Credit Facility will be issued (together with cash) in exchange for the Allowed First Lien Credit Facility Claims, and the New Senior Secured Notes will be issued (together with cash and New Common Stock) in exchange for Allowed Consenting Crossholder Claims, Allowed Senior Unsecured Notes Claims and Allowed General Unsecured Claims. The Debtors believe that all or a portion of such Claims, other than the General Unsecured Claims, will be, and the Exit Credit Facility and New Senior Secured Notes may be, considered traded on an established market; however, the relevant determination date for such purpose is the Effective Date and there can be no assurances that a trading market will exist in such claims or New Loan Obligations between now and 15 days after the Effective Date.

If either the First Lien Credit Facility (or a portion thereof) or the Exit Credit Facility is treated as traded on an established market for these purposes, then the issue price of the Exit Credit Facility generally would equal or approximate the fair market value of the Exit Credit Facility (rather than its stated principal amount). Similarly, if any of the First Lien Credit Facility, the Senior Unsecured Notes, or the New Senior Secured Notes were treated as traded on an established market, then the issue price of the New Senior Secured Notes generally would equal or approximate the fair market value of the New Senior Secured Notes (rather than its stated principal amount).

              ii.      Issue price of New Convertible Notes

The New Convertible Notes will be issued in exchange for cash and possibly Allowed Consenting Crossholder Claims and Allowed Senior Unsecured Notes Claims. Under applicable Treasury regulations, if a substantial amount of the debt instruments in a debt offering is issued for cash, the issue price of each debt instrument is determined based on the cash price. Although not defined, a substantial amount of a debt offering could be ten percent or more of the offering. Accordingly, the Debtors expect to take the position that a substantial amount of the New Convertible Notes are issued for cash, such that the issue price of the New Convertible Notes will be determined by reference to the net amount of cash paid for a New Convertible Note.

          (c)      Accrual and Amortization of OID

If a New Loan Obligation is treated as having been issued with more than *de minimis* OID, U.S. Holders generally will be required to include the OID in ordinary income on an annual basis under a constant yield accrual method regardless of such U.S. Holder's regular method of accounting for U.S. federal income tax purposes. A U.S. Holder must include in income in each taxable year the sum of the daily portions of OID for each day on which it held the New Loan Obligation during the taxable year. To determine the daily portions of OID, the amount of OID

allocable to an accrual period is determined, and a ratable portion of such OID is allocated to each day in the accrual period. An accrual period may be of any length and the length of the accrual periods may vary over the life of the New Loan Obligation, provided that no accrual period may be longer than one year and each scheduled payment of interest or principal on the New Loan Obligation must occur on either the first day or last day of an accrual period. The amount of OID allocable to an accrual period will equal (A) the product of (i) the New Loan Obligation's adjusted issue price at the beginning of the accrual period and (ii) the New Loan Obligation's yield to maturity (adjusted to reflect the length of the accrual period), less (B) any qualified stated interest allocable to the accrual period.

A New Loan Obligation's adjusted issue price at any time generally will be its original issue price, increased by the amount of OID on such New Loan Obligation accrued for each prior accrual period and decreased by the amount of payments on such New Loan Obligation other than payments of qualified stated interest. The New Loan Obligation's yield to maturity is the discount rate that, when used in computing the present value of all principal and interest payments to be made on the New Loan Obligation produces an amount equal to the New Loan Obligation's original issue price.

(d)    Bond Premium

If a U.S. Holder's initial tax basis in its New Loan Obligation exceeds such New Loan Obligation's stated redemption price at maturity (which, here, should only occur if the issue price of the New Loan Obligation exceeds the New Loan Obligation's stated redemption price at maturity), the New Loan Obligation will be treated as acquired by such U.S. Holder with bond premium. Generally, a U.S. Holder may elect to amortize such bond premium (or, if it results in a smaller premium, an amount computed with reference to the amount payable on an earlier call date) as an offset to interest income in respect of the New Loan Obligation, using a constant yield method as prescribed under the applicable Treasury Regulations, over the remaining term of the New Loan Obligation. A U.S. Holder that elects or has elected to amortize bond premium must reduce its basis in its New Loan Obligation by the amount of premium used to offset interest. An election to amortize bond premium, once made, applies to all debt instruments held or subsequently acquired by the U.S. Holder on or after the first day of the first taxable year to which the election applied and may not be revoked without the consent of the IRS. U.S. Holders should consult their tax advisors regarding the availability and impact of bond premium for U.S. federal income tax purposes.

(e)    Sale, Retirement or Other Taxable Disposition

A U.S. Holder of a New Loan Obligation will recognize gain or loss upon the sale, redemption, retirement or other taxable disposition of the New Loan Obligation equal to the difference between the amount realized upon the disposition (less a portion allocable to any accrued interest that has not yet been included in income by the U.S. Holder, which generally will be taxable as ordinary income) and the U.S. Holder's adjusted tax basis in the New Loan Obligation at the time of disposition. Generally, a U.S. Holder's adjusted tax basis will be equal to its initial tax basis in such obligation increased by any OID previously included in income, and reduced by cash payments received on such obligation other than payments of qualified stated interest. If applicable, a U.S. Holder's adjusted tax basis in the obligation also will be reduced by

WEIL:\97988370\1\32626.0004

any amortizable premium which the holder has previously deducted or which is deductible in the current period.  Any gain or loss on the sale, redemption, retirement or other taxable disposition of the New Loan Obligation generally will be capital gain or loss, and will be long-term capital gain or loss if the U.S. Holder has held the New Loan Obligation for more than one year as of the date of disposition.  U.S. Holders should consult their tax advisors regarding the applicable tax rates and netting rules for capital gains and losses.  There are limitations on the deduction of capital losses by both corporate and noncorporate taxpayers.  *See "—Character of Gain or Loss"* above.

(f)      "Conversion" of New Convertible Notes

Although referred to as "convertible," the New Convertible Notes would more accurately be termed "exchangeable" notes, since the notes (issued by the New Notes Issuer, a disregarded subsidiary of the Operating Partnership for U.S. federal income tax purposes) will be exchangeable with the New Notes Issuer for New Common Stock, at the holder's election or under certain circumstances at the election of the issuer.  It is expected that the New Common Stock that will be received by holders of New Convertible Notes upon conversion will be contributed by the REIT down to the New Notes Issuer (with appropriate adjustments to the ownership interests in the Operating Partnership).  Accordingly, subject to the discussion below, the receipt of the New Common Stock by a U.S. Holder in exchange for its New Convertible Notes should be treated as a taxable exchange for U.S. federal income tax purposes, generally with the consequences discussed in the preceding section.

If, on or after the Effective Date, the Operating Partnership becomes a disregarded subsidiary of the REIT for U.S. federal income tax purposes (such as (i) in the event of the conversion of all minority held interests in the Operating Partnership into New Common Stock pursuant to the Plan or (ii) the extinguishment of minority held interests if the Bankruptcy Court does not approve the recovery to holders of Existing LP Common Units), it is possible that a subsequent exchange of New Convertible Notes for New Common Stock may qualify for recapitalization treatment if the New Convertible Notes qualify as "securities" of the REIT for U.S. federal income tax purposes.  Whether the New Convertible Notes would so qualify is uncertain.  If the conversion of New Convertible Notes qualifies as a recapitalization exchange, the exchanging U.S. Holder generally would not recognize any gain or loss upon the exchange of New Convertible Notes for New Common Stock and such U.S. Holder's tax basis in the New Common Stock received should equal such U.S. Holder's adjusted tax basis in its New Convertible Notes exchanged (subject to the treatment of any accrued but unpaid interest).  In general, the U.S. Holder's holding period for the New Common Stock would include the U.S. Holder's holding period for its New Convertible Notes exchanged therefor (other than with respect to any New Common Stock, or portion thereof, received in exchange for accrued but unpaid interest).[23]

(g)      "Constructive Distributions" on New Convertible Notes

Under Section 305 of the Tax Code certain transactions that effect an increase in the proportionate interest of a shareholder in the corporation's assets are treated as creating deemed distributions to such shareholder in respect of such "stock" interest, including certain "anti-

---

[23]   Treatment of New Convertible Notes subject to further review and finalization of terms.

dilution" adjustments to the exercise price or conversion ratio of a right to acquire stock in the corporation.  For this purpose, a holder of a right to acquire stock from the corporation, including a holder of convertible securities of the corporation, is treated as a deemed shareholder in the corporation.  A holder of New Convertible Notes is entitled to certain adjustments to the amount of New Common Stock receivable from the New Notes Issuer upon an exchange of New Convertible Notes for New Common Stock under certain circumstances (including if distributions by the REIT exceed  a certain amount in any given year) (the "**Exchange Rate Adjustment**").  Significantly, however, the New Convertible Notes will be issued by the New Notes Issuer (a disregarded subsidiary of the Operating Partnership), and not by the REIT, and will only be exchangeable with the New Notes Issuer for New Common Stock.  As such, provided the Operating Partnership does not become a wholly-owned subsidiary of the REIT and thus a disregarded subsidiary of the REIT for U.S. federal income tax purposes, the Debtors do not believe that the New Convertible Notes are properly within the scope of Section 305.  Accordingly, the Debtors do not currently intend to treat an Exchange Rate Adjustment as a deemed distribution to U.S. Holders of New Convertible Notes.  Nevertheless, the application of Section 305 and the Treasury Regulations thereunder to the New Convertible Notes is uncertain and it is possible that the IRS could successfully take a contrary position.

In addition, if, on or after the Effective Date, the Operating Partnership becomes a disregarded subsidiary of the REIT for U.S. federal income tax purposes (such as (i) due to the conversion of all minority held interests in the Operating Partnership into New Common Stock or (ii) the extinguishment of minority held interests if the Bankruptcy Court does not approve the recovery to holders of Existing LP Common Units), the Debtors expect to report an Exchange Rate Adjustment as a deemed distribution to U.S. Holders of the New Convertible Notes.  U.S. Holders of New Convertible Notes should consult with their own tax advisors regarding the U.S. federal income tax consequences of the Exchange Rate Adjustment.

### ix.        Ownership and Disposition of New Common Stock

The U.S. federal income tax consequences to a U.S. Holder of ownership and disposition of New Common Stock are described below in *"F. Consequences of the Ownership and Disposition of New Common Stock."*

### x.        Tax Reporting for Assets Allocable to a Disputed Claims Reserve for Unsecured Claims and Section 510(b) Claims

On or before the Effective Date, the Debtors or Reorganized Debtors, as applicable, will establish one or more reserves with respect to amounts that would otherwise be distributable to holders of Unsecured Claims and Section 510(b) Claims that are Disputed Claims as of the Distribution Record Date.  Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary, or the receipt of a determination by the IRS, the Debtors, the Reorganized Debtors or the Distribution Agent, as applicable, will treat such Disputed Claims reserve(s) as one or more "disputed ownership funds" governed by Treasury Regulation section 1.468B-9 and, to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes.

Accordingly, a Disputed Claims reserve will be subject to tax annually on a separate entity basis on any net income earned with respect to the assets of such reserve – including any gain recognized upon the disposition (including the distribution) of such assets, such as in connection with the allowance or disallowance of the applicable Disputed Claims.   Accordingly, any appreciation in value in the assets held in such Disputed Claims reserve will be taxable in connection with the subsequent release of such assets from the reserve.  All taxes imposed on assets or income of a Disputed Claims reserve will be payable from the assets of such Disputed Claims reserve.  If a Disputed Claims reserve has insufficient Cash to pay any taxes imposed on such reserve (including any income that may arise upon the distribution of the assets in such reserve), the assets of such reserve (e.g., New Common Stock) can be sold to pay the tax liability.

All distributions to holders of Allowed Claims from a Disputed Claims reserve will be treated as if distributed directly by the Debtors in respect of such Allowed Claims.  All parties (including, without limitation, the Debtors, the Reorganized Debtors, the Distribution Agent, and the holders of Unsecured Claims and Section 510(b) Claims) will be required to report for tax purposes consistent with the foregoing.

## C.   Consequences to U.S. Holders of Existing REIT Common Stock or Existing REIT Preferred Stock

The following summary of U.S. federal income tax consequences to holders of Existing REIT Common Stock and Existing REIT Preferred Stock assumes the Bankruptcy Court approves the recovery to such holders.

Pursuant to the Plan, in exchange for its Existing REIT Common Stock, each holder thereof will receive its share of the New Common Stock, and in exchange for its Existing REIT Preferred Stock, each holder thereof will receive its share of the New Common Stock.

The exchange of Existing REIT Common Stock or Existing REIT Preferred Stock for New Common Stock will qualify for recapitalization treatment for U.S. federal income tax purposes.  Each U.S. Holder of Existing REIT Common Stock or Existing REIT Preferred Stock generally will not recognize any gain or loss upon the exchange of its Existing REIT Common Stock or Existing REIT Preferred Stock for New Common Stock.

In a recapitalization exchange, a U.S. Holder's tax basis in the New Common Stock received should equal such U.S. Holder's adjusted tax basis in its Existing REIT Common Stock or Existing REIT Preferred Stock exchanged therefor.  In general, the U.S. Holder's holding period for the New Common Stock would include the U.S. Holder's holding period for its Existing REIT Common Stock or Existing REIT Preferred Stock exchanged therefor.

## D.   Consequences to Non-U.S. Holders of Certain Claims and Interests

The following discussion includes only certain U.S. federal income tax consequences of the Plan to Non-U.S. Holders.  The discussion does not include any non-U.S. tax considerations.  The rules governing the U.S. federal income tax consequences to Non-U.S. Holders are complex.  Each Non-U.S. Holder should consult its own tax advisor regarding the U.S. federal, state, and local and the non-U.S. tax consequences of the consummation of the Plan to such Non-U.S. Holder.

Whether a Non-U.S. Holder realizes gain or loss on the exchange and the amount of such gain or loss is determined in the same manner as set forth above in connection with U.S. Holders. See the discussion above for information regarding the determination of whether consideration received under the Plan is attributable to accrued interest.

### i.        Gain Recognition

Any gain realized by a Non-U.S. Holder on the exchange of its Claim or Interest generally will not be subject to U.S. federal income taxation unless (i) the Non-U.S. Holder is an individual who was present in the United States for 183 days or more during the taxable year in which the restructuring transactions occur and certain other conditions are met or (ii) such gain is effectively connected with the conduct by such Non-U.S. Holder of a trade or business in the United States (and if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States).

If the first exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of the exchange. If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to any gain realized on the exchange if such gain is effectively connected with the Non-U.S. Holder's conduct of a trade or business in the United States in the same manner as a U.S. Holder (except that the Medicare tax would generally not apply). In order to claim an exemption from withholding tax, such Non-U.S. Holder will be required to provide a properly executed IRS Form W-8ECI (or such successor form as the IRS designates). In addition, if such a Non-U.S. Holder is a corporation, it may be subject to a branch profits tax equal to 30 percent (or such lower rate provided by an applicable treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

### ii.        Accrued but Untaxed Interest

Payments made to a Non-U.S. Holder that are attributable to accrued but untaxed interest generally will not be subject to U.S. federal income or withholding tax, provided that (i) such Non-U.S. Holder is not a bank, (ii) such Non-U.S. Holder does not actually or constructively own 10 percent or more of the total capital or profits interests in the Operating Partnership (with respect to payments of interest on the Senior Unsecured Notes Claims, First Lien Credit Facility Claims or Section 510(b) Claims) or the Reorganized Operating Partnership (with respect to payments of interest on the Exit Credit Facility, New Senior Secured Notes or New Convertible Notes) and (iii) the withholding agent has received or receives, prior to payment, appropriate documentation (generally, IRS Form W-8BEN or W-8BEN-E) establishing that the Non-U.S. Holder is not a U.S. person, unless such interest is effectively connected with the conduct by the Non-U.S. Holder of a trade or business within the United States (in which case, provided the Non-U.S. Holder provides a properly executed IRS Form W-8ECI (or successor form) to the withholding agent, the Non-U.S. Holder (x) generally will not be subject to withholding tax, but (y) will be subject to U.S. federal income tax in the same manner as a U.S. Holder (unless an applicable income tax treaty provides otherwise), and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such Non-U.S. Holder's effectively connected

WEIL:\97988370\1\32626.0004

earnings and profits that are attributable to the accrued but untaxed interest at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty)). A Non-U.S. Holder that does not qualify for exemption from withholding tax with respect to accrued but untaxed interest that is not effectively connected income generally will be subject to withholding of U.S. federal income tax at a 30 percent rate (or at a reduced rate or exemption from tax under an applicable income tax treaty) on payments that are attributable to accrued but untaxed interest. For purposes of providing a properly executed IRS Form W-8BEN or W-8BEN-E, special procedures are provided under applicable Treasury Regulations for payments through qualified foreign intermediaries or certain financial institutions that hold customers' securities in the ordinary course of their trade or business.

### iii. FIRPTA

Under the Foreign Investment in Real Property Tax Act ("**FIRPTA**"), gain on the disposition of certain investments in U.S. real property, including interests in a REIT 50% or more of whose assets constitute U.S. real property (in each case other than an interest solely as a creditor) (a "**USRPI**") is subject to U.S. federal income tax in the hands of Non-U.S. Holders and treated as effectively connected income ("**ECI**") that is subject to U.S. federal net income tax even if a Non-U.S. Holder is not otherwise engaged in a U.S. trade or business. It is expected that the New Common Stock will be considered USRPIs and the New Convertible Notes may be considered USRPIs, in each case subject to the availability of any applicable exception (discussed below).

This discussion assumes there are no Non-U.S. Holders of Existing LP Common Units and so this discussion does not address the U.S. federal income tax consequences to such holders.

Under the FIRPTA rules, if any class of stock (including warrants to acquire such stock) of a REIT is regularly traded on an established securities market, a Non-U.S. Holder that holds 10% or less of such class of stock (including warrants to acquire such stock) will not be subject to substantive FIRPTA taxation or FIRPTA withholding upon a disposition of its shares, and FIRPTA withholding upon dispositions will generally be inapplicable. Additionally, under the applicable FIRPTA regulations, other interests in a regularly traded REIT may qualify for the exception described above, although certain modifications may apply to the methodology for determining whether the 10% threshold is exceeded depending generally on the type of interest and whether the interest is considered "regularly traded" for FIRPTA purposes.

Non-U.S. Holders of Existing REIT Common Stock, Existing REIT Preferred Stock and Existing LP Common Units should consult with their own tax advisors regarding the complex tax rules that govern the disposition of a USRPI. Additionally, the application of the rules described above to the New Convertible Notes is complex and involves issues that have not been definitely addressed in the relevant FIRPTA regulations or applicable IRS guidance. Non-U.S. Holders of the New Convertible Notes should consult with their own tax advisors regarding the application of these rules to their interests in the New Convertible Notes.

### iv. FATCA.

Pursuant to the Foreign Account Tax Compliance Act ("**FATCA**"), withholding at a rate of 30% generally will be required on certain U.S.-source payments such as dividends on and,

potentially in the future, the gross proceeds of a disposition of assets that can produce certain U.S. source payments including dividends and interest held by or through (i) a foreign financial institution (including investment funds) that does not qualify under certain exemptions, unless such institution enters into, and complies with, an agreement with the United States government to collect and provide to the United States tax authorities (or, pursuant to an applicable intergovernmental agreement, such institution provides the required information to the tax authority of such institution's jurisdiction of tax residence) substantial information regarding United States account holders of such institution (which would include certain equity and debt holders of such institution, as well as certain account holders that are foreign entities with United States owners) and agrees to withhold on certain payments or (ii) a foreign entity that is not a financial institution that does not qualify under certain exemptions, unless such entity certifies to the applicable withholding agent that such entity does not have "substantial United States owners" (as defined in the Tax Code) (which generally includes any United States person who directly or indirectly owns more than 10% of the entity) or provides the applicable withholding agent with information regarding the entity's substantial United States owners, which the withholding agent will in turn provide to the United States government.  Accordingly, the entity through which the Claim or Interest is held will affect the determination of whether such withholding is required. Foreign financial institutions and foreign entities that are not financial institutions may be subject to the provisions of an intergovernmental agreement between the United States and the jurisdiction in which such financial institution or foreign entity is located that may modify these requirements. A holder of consideration received pursuant to the Plan should consult its own tax advisors regarding these rules and whether they may be relevant to the ownership and disposition of the consideration received pursuant to the Plan.  Proposed Treasury Regulations, upon which taxpayers are permitted to rely, currently suspend indefinitely the application of withholding under FATCA to gross proceeds from the disposition of assets that can produce certain U.S. source payments including dividends and interest.

Both U.S. Holders and Non-U.S. Holders should consult their tax advisors regarding the possible impact of these rules on such holders' exchange of any of its Claims or Interests pursuant to the Plan.

### E.    Consequences of the Ownership and Disposition of the New LP Units

#### i.    General

Under the Treasury Regulations, a domestic entity that has two or more partners and that is not organized as a corporation under U.S. federal or state law will generally be classified as a partnership for U.S. federal income tax purposes, unless it elects to be treated as a corporation.  No election has been made for the Operating Partnership to be classified as a corporation for U.S. federal income tax purposes.  Thus, subject to the discussion of publicly traded partnerships below, the Operating Partnership will be treated as a partnership for U.S. federal income tax purposes. Each holder of New LP Units is urged to consult its tax advisor regarding the tax consequences of owning and disposing of New LP Units.

Under the "publicly traded partnership" provisions of the Tax Code, an entity that would otherwise be treated as a partnership whose interests are considered to be publicly traded and does not meet the qualifying income test will be taxable as a corporation.  The Operating Partnership's

WEIL:\97988370\1\32626.0004

limited partnership agreement will prohibit the transfer of units in the Operating Partnership if such transfer would jeopardize the status of the Operating Partnership as a partnership for U.S. federal income tax purposes (prior to an actual conversion for U.S. federal income tax purposes to corporate status). Any purported transfer in violation of such provisions will be null and void and would not be recognized by the Operating Partnership.

This discussion of the U.S. federal income tax consequences of the Plan assumes that the Operating Partnership will be treated as a partnership for U.S. federal income tax purposes.

As a partnership, the Operating Partnership itself will not be subject to U.S. federal income tax. Instead, the Operating Partnership will file an annual partnership information return with the IRS, which form will report the results of the Operating Partnership's operations. Each partner will be required to report on its U.S. federal income tax return, and will be subject to tax in respect of, its distributive share of each item of the Operating Partnership's income, gain, loss, deduction and credit for each taxable year of the Operating Partnership ending with or within the partner's taxable year. Each item generally will have the same character as if the partner had realized the item directly. Partners will be required to report these items regardless of the extent to which, or whether, they receive cash distributions from the Operating Partnership for such taxable year, and thus may incur income tax liabilities in excess of any distributions from the Operating Partnership. Partners will also have state filing obligations in jurisdictions where the Operating Partnership's properties are located.

The Operating Partnership's tax basis and holding period in its assets contributed by a partner would be the same as such partner's basis and holding period with respect to such assets.

A partner is allowed to deduct its allocable share of the Operating Partnership's losses (if any) only to the extent of such partner's adjusted tax basis (discussed below) in its units at the end of the taxable year in which the losses occur. In addition, various other limitations in the Tax Code may significantly limit a partner's ability to deduct its allocable share of deductions and losses of the Operating Partnership against other income.

The Operating Partnership will provide each partner with the necessary information to report its allocable share of the Operating Partnership tax items for U.S. federal income tax purposes; however, no assurance can be given that the Operating Partnership will be able to provide such information prior to the initial due date of the partners' U.S. federal income tax returns and the partners may therefore be required to apply to the IRS for an extension of time to file their tax returns.

The Operating Partnership will decide how items will be reported on the Operating Partnership's U.S. federal income tax returns, and all partners will be required under the Tax Code to treat the items consistently on their own returns, unless they file a statement with the IRS disclosing the inconsistency. In the event that the income tax returns of the Operating Partnership are audited by the IRS, the tax treatment of the Operating Partnership income and deductions generally will be determined at the Operating Partnership level in a single proceeding, rather than in individual audits of the partners. The partnership representative will have considerable authority under the Tax Code and the limited partnership agreement for the Operating Partnership to make decisions affecting the tax treatment and procedural rights of all partners.

WEIL:\97988370\1\32626.0004

A partner generally will not recognize gain or loss on the receipt of a distribution of cash or property from the Operating Partnership (provided that the partner is not treated as exchanging such partner's share of the Operating Partnership's "unrealized receivables" and/or certain "inventory items" (as those terms are defined in the Tax Code, and together "ordinary income items") for other partnership property). A partner, however, will recognize gain on the receipt of a distribution of money and, in some cases, marketable securities, from the Operating Partnership (including any constructive distribution of money resulting from a reduction of the partner's share of the indebtedness of the Operating Partnership) to the extent such cash distribution or the fair market value of such marketable securities distributed exceeds such partner's adjusted tax basis in its units. Such distribution would be treated as gain from the sale or exchange of a unit, which is described below.

A partner will recognize gain on the complete liquidation of its units only to the extent the amount of money received exceeds its adjusted tax basis in its interest. Distributions of certain marketable securities are treated as distributions of money for purposes of determining gain. Any gain recognized by a partner on the receipt of a distribution from the Operating Partnership generally will be capital gain, but may be taxable as ordinary income under certain circumstances. No loss can be recognized on a distribution in liquidation of its units, unless the partner receives no property other than money and ordinary income items.

A partner's adjusted tax basis in its units generally will be equal to such partner's initial tax basis (discussed above), increased by the sum of (i) any additional capital contributions such partner makes to the Operating Partnership, (ii) the partner's allocable share of the income of the Operating Partnership, and (iii) increases in the partner's allocable share of the indebtedness of the Operating Partnership, and reduced, but not below zero, by the sum of (iv) the partner's allocable share of the losses of the Operating Partnership, and (v) the amount of money or the adjusted tax basis of property distributed to such partner, including constructive distributions of money resulting from reductions in such partner's allocable share of the indebtedness of the Operating Partnership.

## ii.      Sale, Exchange, or Other Taxable Disposition of New LP Units

A sale of all or part of a partner's interest will result in the recognition of gain or loss in an amount equal to the difference between the amount of the sales proceeds or distribution (including any constructive distribution) and such partner's adjusted tax basis for the portion of the interest disposed of. Any gain or loss recognized with respect to such a sale generally will be treated as a capital gain or loss, and will be long-term capital gain or loss if the interest has been held for more than one year, except to the extent (i) that the proceeds of the sale are attributable to a partner's allocable share of certain ordinary income items of the Operating Partnership and such proceeds exceed the partner's adjusted tax basis attributable to such ordinary income items and (ii) of previously allowed bad debt or ordinary loss deductions. A partner's ability to deduct any loss recognized on the sale of its units will depend on the partner's own circumstances and may be restricted under the Tax Code.

The Operating Partnership's limited partnership agreement will provide that a holder of New LP Units may elect to have the Operating Partnership redeem some or all of such holder's New LP Units in exchange for, at the REIT's election, either (i) a corresponding number of shares

of New Common Stock, or (ii) an amount of cash equal to the fair market value of such shares. A U.S. holder of New LP Units generally will not recognize gain or loss on the receipt of cash or New Common Stock from the Operating Partnership (provided that such U.S. holder is not treated as exchanging such U.S. holder's share of the Operating Partnership's "unrealized receivables" and/or certain "inventory items" for other partnership property). A U.S. holder, however, will recognize gain on the receipt of a distribution of cash and New Common Stock (assuming for these purposes that the New Common Stock is treated as a "marketable security") from the Operating Partnership (including any constructive distribution of money resulting from a reduction of the holder's share of the Operating Partnership's liabilities) to the extent such cash distribution and/or the fair market value of New Common Stock distributed exceeds such holder's adjusted tax basis in the Operating Partnership. Such gain would be treated as gain from the sale or exchange of New LP Units, which is described above.

### iii.    Non-U.S. Holders

This discussion assumes there are no Non-U.S. Holders of Existing LP Common Units that will receive New LP Units and so this discussion does not address the U.S. federal income tax consequences to such holders.

### F.    Consequences of the Ownership and Disposition of New Common Stock

### i.    Taxation of the REIT

The REIT has elected to be taxed as a real estate investment trust under sections 856 through 860 of the Tax Code commencing with its taxable year ended December 31, 1993. The Debtors believe that the REIT has been organized and operated in such a manner that has allowed it to qualify for taxation as a real estate investment trust under the applicable provisions of the Tax Code, commencing with such taxable year, and the Debtors intend that the REIT will continue to be organized and operated in this manner.

The REIT's qualification and taxation as a real estate investment trust depends on its ability to meet on a continuing basis, through actual operating results, distribution levels, and diversity of share ownership, various qualification requirements imposed upon real estate investment trusts by the Tax Code. The REIT's ability to qualify to be taxed as a real estate investment trust also requires that it satisfy certain asset tests, some of which depend upon the fair market values of assets that the REIT owns directly or indirectly. Such fair market values may not be susceptible to a precise determination. Accordingly, no assurance can be given that the actual results of the REIT's operations for any taxable year will satisfy such requirements for qualification and taxation as a real estate investment trust.

Holders of Claims or Interests receiving New Common Stock or New LP Units should consult with their own tax advisors regarding the complex tax rules that govern the tax consequences of owning New Common Stock or New LP Units.

### ii.    U.S. Holders

The following is a summary of certain material U.S. federal income tax consequences of the ownership and disposition of the New Common Stock applicable to taxable U.S. Holders.

For any taxable year for which the REIT qualifies for taxation as a real estate investment trust, amounts distributed to taxable U.S. Holders will be taxed as follows.

(a)    Distributions Generally

Distributions to U.S. Holders, other than capital gain dividends discussed below, will constitute dividends to those holders up to the amount of the REIT's current or accumulated earnings and profits and are taxable to the stockholders as ordinary income.  These distributions are not eligible for the dividends-received deduction for corporations. To the extent that the REIT makes distributions in excess of its current or accumulated earnings and profits, the distributions will first be treated as a tax-free return of capital, reducing the tax basis in the U.S. Holder's shares, and distributions in excess of the U.S. Holder's tax basis in its shares are taxable as capital gain realized from the sale of the shares.  Dividends declared by the REIT in October, November or December of any year payable to a U.S. Holder of record on a specified date in any of these months will be treated as both paid by the REIT and received by the U.S. Holder on December 31 of the year, provided that the REIT actually pays the dividend during January of the following calendar year.  U.S. Holders may not include on their own income tax returns any of the REIT's tax losses.

In general, dividends paid by real estate investment trusts are not eligible for the 20% maximum tax rate on "qualified dividend income" and, as a result, the REIT's ordinary real estate investment trust dividends will continue to be taxed at the higher ordinary income tax rate.  However, dividends received by a noncorporate stockholder could be treated as "qualified dividend income" to the extent the REIT has dividend income from taxable corporations (such as a taxable real estate investment trust subsidiary) and to the extent the REIT's dividends are attributable to income that is subject to tax at the REIT level (for example, if the REIT distributed less than 100% of its taxable income).  In general, to qualify for the reduced tax rate on qualified dividend income, a stockholder must hold the REIT's stock for more than 60 days during the 121-day period beginning on the date that is 60 days before the date on which the New Common Stock becomes ex-dividend.  Pursuant to section 857(g) of the Tax Code, the aggregate amount of dividends designated by the REIT as qualified dividend income or capital gain dividends (discussed below) with respect to any taxable year is limited to the amount of dividends paid by the REIT with respect to such year.  For these purposes, dividends paid after the close of the taxable year pursuant to section 858 of the Tax Code shall be treated as paid with respect to such year.

The REIT will be treated as having sufficient earnings and profits to treat as a dividend any distribution it makes up to the amount required to be distributed in order to avoid imposition of the 4% excise tax under section 4981 of the Tax Code.  As a result, REIT stockholders may be required to treat certain distributions that would otherwise result in a tax-free return of capital as taxable dividends.  Moreover, any deficiency dividend will be treated as a dividend – an ordinary dividend or a capital gain dividend, as the case may be – regardless of the REIT's earnings and profits.

Under the Tax Cuts and Jobs Act of 2017, for tax years beginning after December 31, 2017 and prior to January 1, 2026, noncorporate stockholders are generally eligible to deduct up to 20% of the amount of ordinary real estate investment trust dividends that are

WEIL:\97988370\1\32626.0004

not designated as capital gain dividends or qualified dividend income, subject to certain limitations.

(b)     Dividends Paid Through a Combination of Cash and Issuance of Additional Shares of Stock

To maintain the REIT's qualification as a real estate investment trust, the REIT is required each year to distribute to stockholders at least 90% of its net taxable income after certain adjustments. While the REIT currently expects to pay quarterly dividends on its New Common Stock in cash, depending on liquidity needs, the REIT reserves the right to pay any or all of its quarterly New Common Stock dividends in a combination of shares of New Common Stock and cash in accordance with any applicable IRS guidance. As a result of such a distribution, a U.S. Holder generally must include the sum of the value of the New Common Stock and the amount of cash received in its gross income as dividend income to the extent that such holder's share of such a distribution is made out of its share of the portion of the REIT's current and accumulated earnings and profits allocable to such distribution. The value of any New Common Stock received as part of a distribution generally is equal to the amount of cash that could have been received instead of the New Common Stock. Depending on the circumstances of the holder, the tax on the distribution may exceed the amount of the distribution received in cash, in which case such U.S. Holder would have to pay the tax using cash from other sources. If a U.S. Holder sells the stock it receives as a dividend in order to pay this tax and the sales proceeds are less than the amount required to be included in income with respect to the dividend, such holder could have a capital loss with respect to the stock sale that could not be used to offset such dividend income. (Furthermore, with respect to Non-U.S. Holders, the REIT may be required to withhold U.S. tax with respect to such dividend, including the portion that is payable in stock. For additional information, see "—*Non-U.S. Holders*" below.) A holder that receives New Common Stock pursuant to a distribution generally has a tax basis in such New Common Stock equal to the amount of cash that could have been received instead of such common stock, and a holding period in such New Common Stock that begins on the payment date for the distribution.

Future dividends are determined in the discretion of the REIT's board of directors and depend on actual and projected cash flow, financial condition, funds from operations, earnings, capital requirements, the annual real estate investment trust distribution requirements, contractual prohibitions or other restrictions, applicable law and such other factors as the REIT's board of directors deems relevant.

(c)     Capital Gain Dividends

Dividends to U.S. Holders that the REIT properly designates as capital gain dividends will be treated as long-term capital gain, to the extent they do not exceed the REIT's actual net capital gain and to the extent they do not exceed the limitation under section 857(g) of the Tax Code discussed above, for the taxable year without regard to the period for which the stockholder has held its stock. Capital gain dividends are not eligible for the dividends-received deduction for corporations; however, corporate stockholders may be required to treat up to 20% of certain capital gain dividends as ordinary income.

129

Noncorporate taxpayers are generally taxable at a current maximum tax rate of 20% for long-term capital gain, but such capital gains also will be subject to the 3.8% Medicare tax on certain U.S. Holders.  *See* "—*Medicare Tax*" below.  A portion of any capital gain dividends received by noncorporate taxpayers might be subject to tax at a 25% rate to the extent attributable to gains realized on the sale of real property that correspond to the REIT's "unrecaptured section 1250 gain."

If the REIT elects to retain capital gains rather than distribute them, a U.S. Holder will be deemed to receive a capital gain dividend equal to the amount of its proportionate share of the retained capital gains.  In this case, a U.S. Holder will receive certain tax credits and basis adjustments reflecting the deemed distribution and deemed payment of taxes by the U.S. Holder.

(d)     Redemptions

The treatment accorded to any redemption of stock by the REIT for cash can only be determined on the basis of particular facts as to each holder at the time of redemption. Under section 302 of the Tax Code, a redemption of the REIT's stock will be treated as a sale or exchange of such stock only if the redemption (i) results in a "complete termination" of the holder's actual and constructive interest in all classes of the REIT's stock, (ii) is "substantially disproportionate" with respect to such holder's interest in the REIT's stock, (iii) is "not essentially equivalent to a dividend" with respect to the holder, or (iv) in the case of noncorporate stockholders, is in "partial liquidation" of the REIT.   The determination of ownership for purposes of the foregoing tests will be made by taking into account both shares actually owned by such holder and shares constructively owned by such holder pursuant to section 318 of the Tax Code.

If the redemption of stock does not meet any of these tests under section 302 of the Tax Code, then the redemption proceeds received will be treated as a distribution by the REIT with respect to its stock, which will be treated as a dividend to the extent of the REIT's current or accumulated earnings and profits.  If the redemption is treated as a dividend, the holder's adjusted tax basis in the redeemed stock will be transferred to any other stock of the REIT directly held by the holder.  If the holder owns no other stock of the REIT but is deemed to hold the stock of a related person, under certain circumstances, such basis may be transferred to such related person, or it may be lost entirely.

If a redemption of the REIT's stock otherwise treated as a sale or exchange of such stock occurs when there is a dividend arrearage on such stock, a portion of the cash received might be treated as a dividend distribution.  The holder will have dividend income to the extent that the dividend arrearage has been declared or the facts show that the REIT was legally obligated to pay the dividend.  On the other hand, if the arrearage has not been declared as a dividend and the facts do not show that the REIT was legally obligated to pay the dividend, then, even though the dividend arrearage is included in the redemption price, the entire payment is treated as a part of the sales proceeds of the stock and not as dividend income.

WEIL:\97988370\1\32626.0004

(e)     Passive Activity loss and Investment Interest limitations

The REIT's distributions and gain from the disposition of New Common Stock, will not be treated as passive activity income and, therefore, U.S. Holders may not be able to apply any passive losses against this income or gain.  The REIT's dividends, to the extent they do not constitute a return of capital, will generally be treated as investment income for purposes of the investment income limitation.  Net capital gain from the disposition of New Common Stock and capital gains generally will be eliminated from investment income unless the taxpayer elects to have the gain taxed at ordinary income rates.

(f)     Certain Dispositions of New Common Stock

A U.S. Holder will recognize gain or loss on any taxable sale or other disposition of New Common Stock in an amount equal to the difference between (1) the amount of cash and the fair market value of any property received on the sale or other disposition and (2) the U.S. Holder's adjusted basis in the New Common Stock. This gain or loss generally will be a capital gain or loss, and will be long-term capital gain or loss if the holder held the securities for more than one year.  Noncorporate U.S. Holders are generally taxable at a current maximum rate of 20% on long-term capital gain, but such capital gains also will be subject to the 3.8% Medicare tax on certain U.S. Holders.  *See* "—*Medicare Tax*" below.  The IRS has the authority to prescribe, but has not yet prescribed, regulations that would apply a capital gain tax rate of 25% (which is generally higher than the long-term capital gain tax rates for noncorporate U.S. Holders) to a portion of capital gain realized by a noncorporate U.S. Holder on the sale of the REIT's stock that would correspond to the REIT's "unrecaptured section 1250 gain." U.S. Holders are urged to consult with their own tax advisors with respect to their capital gain tax liability. Generally, a corporate U.S. Holder will be subject to tax at a rate of 21% on capital gain from the sale of New Common Stock regardless of its holding period for the stock.

In general, any loss upon a sale or exchange of New Common Stock by a U.S. Holder who has held such stock for six months or less (after applying certain holding period rules) will be treated as a long-term capital loss, to the extent distributions (actually made or deemed made in accordance with the discussion above) from the REIT are required to be treated by such U.S. Holder as long-term capital gain.

(g)     FATCA

Certain U.S. Holders may be subject to a withholding tax under FATCA.  For a discussion of the potential consequences under FATCA, see "*D. Consequences to Non-U.S. Holders of Certain Claims and Interests—FATCA*" above.

(h)     Medicare Tax

A 3.8% Medicare tax is imposed on certain U.S. Holders who are individuals, estates or trusts and whose income exceeds certain thresholds.  This tax applies to dividends on and gain from the disposition of the REIT's shares.  U.S. Holders are encouraged to consult their own tax advisors regarding the implications of the Medicare tax on their ownership of New Common Stock.

### iii. Non-U.S. Holders

The following is a summary of certain U.S. federal income tax consequences of the ownership and disposition of New Common Stock applicable to Non-U.S. Holders.

The rules governing United States income taxation of Non-U.S. Holders are complex, and the following discussion is intended only as a summary of these rules. The discussion does not consider any specific facts or circumstances that may apply to a particular Non-U.S. Holder. Special rules may apply to certain Non-U.S. Holders such as "controlled foreign corporations" and "passive foreign investment companies." Non-U.S. Holders should consult with their own tax advisors to determine the impact of U.S. federal, state and local income tax laws on the ownership and disposition of New Common Stock, including any reporting requirements.

(a)     Ordinary Dividends

The portion of dividends received by Non-U.S. Holders payable out of the REIT's current and accumulated earnings and profits which are not attributable to capital gains and which are not effectively connected with a U.S. trade or business of the Non-U.S. Holder will be subject to U.S. withholding tax at the rate of 30% (unless reduced by an applicable income tax treaty). In general, Non-U.S. Holders will not be considered engaged in a U.S. trade or business solely as a result of their ownership of New Common Stock. In cases where the dividend income from a Non-U.S. Holder's ownership of New Common Stock is effectively connected with the Non-U.S. Holder's conduct of a U.S. trade or business (or, if an income tax treaty applies, is attributable to a U.S. permanent establishment of the Non-U.S. Holder), the Non-U.S. Holder generally will be subject to U.S. tax at graduated rates, in the same manner as U.S. Holders are taxed with respect to such dividends (and may also be subject to the 30% branch profits tax in the case of a corporate Non-U.S. Holder).

(b)     Non-Dividend Distributions

Unless the REIT's stock constitutes a USRPI, distributions by the REIT which are not paid out of its current and accumulated earnings and profits will not be subject to U.S. income or withholding tax. If it cannot be determined at the time a distribution is made whether or not such distribution will be in excess of the REIT's current and accumulated earnings and profits, the distribution will be subject to withholding at the rate applicable to dividends. However, the Non-U.S. Holder may seek a refund of such amounts from the IRS if it is subsequently determined that such distribution was, in fact, in excess of the REIT's current and accumulated earnings and profits. If the REIT's New Common Stock constitutes a USRPI, a distribution in excess of current and accumulated earnings and profits will be subject to a 10% withholding tax and may be subject to additional taxation under FIRPTA. However, the 10% withholding tax will not apply to distributions already subject to the 30% dividend withholding.

The REIT generally expects to withhold U.S. federal income tax at the rate of 30% on the gross amount of any distributions of ordinary income made to a Non-U.S. Holder unless (1) a lower treaty rate applies and proper certification is provided or (2) the Non-U.S. Holder

WEIL:\97988370\1\32626.0004

files an IRS Form W- 8ECI with the REIT claiming that the distribution is effectively connected with the Non-U.S. Holder's conduct of a U.S. trade or business (or, if an income tax treaty applies, is attributable to a U.S. permanent establishment of the Non-U.S. Holder). However, the Non-U.S. Holder may seek a refund of such amounts from the IRS if it is subsequently determined that such distribution was, in fact, in excess of the REIT's current and accumulated earnings and profits.

(c)        Capital Gain Dividends

Under FIRPTA, a distribution made by the REIT to a Non-U.S. Holder, to the extent attributable to gains ("**USRPI Capital Gains**") from dispositions of USRPIs, will be considered effectively connected with a U.S. trade or business of the Non-U.S. Holder and therefore will be subject to U.S. income tax at the rates applicable to U.S. Holders, without regard to whether such distribution is designated as a capital gain dividend. The properties owned by the Operating Partnership generally are USRPIs. Distributions subject to FIRPTA may also be subject to a 30% branch profits tax in the hands of a corporate Non-U.S. Holder that is not entitled to treaty exemption. Notwithstanding the preceding, distributions received on New Common Stock, to the extent attributable to USRPI Capital Gains, will not be treated as gain recognized by the Non-U.S. Holder from the sale or exchange of a USRPI if (1) the New Common Stock is regularly traded on an established securities market located in the United States and (2) the Non-U.S. Holder did not own more than 10% of such class of stock at any time during the 1-year period ending on the date of the distribution. The distribution will instead be treated as an ordinary dividend to the Non-U.S. Holder, and the tax consequences to the Non-U.S. Holder will be as described above under "—*Ordinary Dividends.*"

Distributions attributable to the REIT's capital gains which are not USRPI Capital Gains generally will not be subject to income taxation, unless (1) investment in the shares is effectively connected with the Non-U.S. Holder's U.S. trade or business (or, if an income tax treaty applies, is attributable to a U.S. permanent establishment of the Non-U.S. Holder), in which case the Non-U.S. Holder will be subject to the same treatment as U.S. Holders with respect to such gain (except that a corporate Non-U.S. Holder may also be subject to the 30% branch profits tax) or (2) the Non-U.S. Holder is a non-resident alien individual who is present in the United States for 183 days or more during the taxable year and certain other conditions are present, in which case the nonresident alien individual will be subject to a 30% tax on the individual's capital gains.

The REIT generally will be required to withhold and remit to the IRS 21% (or 20% to the extent provided in Treasury Regulations) of any distributions to Non-U.S. Holders that are designated as capital gain dividends, or, if greater, 21% of a distribution that could have been designated as a capital gain dividend. Distributions can be designated as capital gains to the extent of the REIT's net capital gain for the taxable year of the distribution. The amount withheld is creditable against the Non-U.S. Holder's U.S. federal income tax liability. This withholding will not apply to any amounts paid to a holder of not more than 10% of the REIT's common shares while such shares are regularly traded on an established securities market. Instead, those amounts will be treated as described above under "—*Ordinary Dividends.*"

133

(d)     Sale of New Common Stock

If New Common Stock does not constitute a USRPI, a sale of New Common Stock by a Non-U.S. Holder generally will not be subject to U.S. federal income taxation unless (1) investment in the New Common Stock is effectively connected with the Non-U.S. Holder's U.S. trade or business, in which case, as discussed above, the Non-U.S. Holder would be subject to the same treatment as U.S. Holders on the gain, (2) investment in the New Common Stock is attributable to a permanent establishment that the Non-U.S. Holder maintains in the United States if that is required by an applicable income tax treaty as a condition for subjecting the Non-U.S. Holder to U.S. taxation on a net income basis, in which case the same treatment would apply to the Non-U.S. Holder as to U.S. Holders with respect to the gain or (3) the Non-U.S. Holder is a nonresident alien individual who was present in the United States for 183 days or more during the taxable year and who has a tax home in the United States, in which case the nonresident alien individual will be subject to a 30% tax on the individual's capital gain.

The New Common Stock will not constitute a USRPI if the REIT is a domestically controlled real estate investment trust. A domestically controlled real estate investment trust is a real estate investment trust in which at all times during a specified testing period less than 50% in value of its shares is held directly or indirectly by Non-U.S. Holders. The Debtors currently expect the REIT to qualify as a domestically controlled real estate investment trust. However, no assurance can be given that the REIT will be a domestically controlled real estate investment trust at emergence or thereafter.

If the REIT does not constitute a domestically controlled real estate investment trust, whether a Non-U.S. Holder's sale of New Common Stock would be subject to tax under FIRPTA as sale of a USRPI would depend on whether the New Common Stock is "regularly traded" on an established securities market (within the meaning of the applicable Treasury Regulations) and on the size of the selling stockholder's interest in the REIT. If the gain on the sale of New Common Stock were subject to taxation under FIRPTA, the Non-U.S. Holder would be subject to the same treatment as a U.S. Holder with respect to the gain, and subject to applicable alternative minimum tax or a special alternative minimum tax in the case of nonresident alien individuals. In any event, a purchaser of New Common Stock from a Non-U.S. Holder will not be required under FIRPTA to withhold on the purchase price if the purchased New Common Stock is regularly traded on an established securities market or if the REIT is a domestically controlled real estate investment trust. Otherwise, under FIRPTA, the purchaser of New Common Stock may be required to withhold 15% of the purchase price and remit that amount to the IRS.

Non-U.S. Holders are urged to consult their tax advisors regarding the U.S. federal, state, local and foreign income and other tax consequences of owning New Common Stock.

## G.     Information Reporting and Backup Withholding

The Debtors will withhold all amounts required by law to be withheld from payments of interest and dividends. The Debtors will comply with all applicable reporting requirements of the Tax Code. In general, information reporting requirements may apply to distributions or payments

made to a holder of a Claim or Interest under the Plan. Additionally, under the backup withholding rules, a holder of a Claim or Interest may be subject to backup withholding with respect to distributions or payments made pursuant to the Plan unless, in the case of a U.S. Holder, such U.S. Holder provides a properly executed IRS Form W-9 and, in the case of Non-U.S. Holder, such Non-U.S. Holder provides a properly executed applicable IRS Form W-8 (or otherwise establishes such Non-U.S. Holder's eligibility for an exemption). The current backup withholding rate is 24 percent. Backup withholding is not an additional tax but is, instead, an advance payment that may entitle the holder to a refund from the IRS to the extent it results in an overpayment of tax, provided that the required information is provided to the IRS.

**THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING DISCUSSION DOES NOT ADDRESS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS OR INTERESTS SHOULD CONSULT WITH THEIR INDEPENDENT TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, OR FOREIGN TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

**IX.**
**CERTAIN RISK FACTORS TO BE CONSIDERED**

Before voting to accept or reject the Plan, holders of Claims and Interests should read and carefully consider the risk factors set forth below, in addition to the information set forth in this Disclosure Statement together with any attachments, exhibits, or documents incorporated by reference hereto. Documents filed with the SEC may also contain important risk factors that differ from those discussed below, and such risk factors are incorporated as if fully set forth herein and are a part of this Disclosure Statement. Copies of any document filed with the SEC may be obtained by visiting the SEC website at http://www.sec.gov.

THIS SECTION PROVIDES INFORMATION REGARDING POTENTIAL RISKS IN CONNECTION WITH THE PLAN. THE FACTORS BELOW SHOULD NOT BE REGARDED AS THE ONLY RISKS ASSOCIATED WITH THE PLAN OR ITS IMPLEMENTATION. NEW FACTORS, RISKS, AND UNCERTAINTIES EMERGE FROM TIME TO TIME AND IT IS NOT POSSIBLE TO PREDICT ALL SUCH FACTORS, RISKS, AND UNCERTAINTIES.

### A. **Certain Bankruptcy Law Considerations**

#### *i.* *General*

Although the Debtors believe that the Chapter 11 Cases will not be materially disruptive to their businesses, the Debtors cannot be certain that this will be the case. Although the Plan is designed to minimize the length of the Chapter 11 Cases, it is impossible to predict with certainty the amount of time that one or more of the Debtors may spend in bankruptcy or to assure parties in interest that the Plan will be confirmed. Even if confirmed on a timely basis, bankruptcy proceedings to

135

confirm the Plan could have an adverse effect on the Debtors' businesses. Among other things, it is possible that bankruptcy proceedings could adversely affect the Debtors' relationships with their key tenants and employees.

### ii.    Risk of Non-Confirmation of the Plan

Although the Debtors believe that the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion or that modifications to the Plan will not be required for confirmation, or that such modifications would not necessitate re-solicitation of votes. Moreover, the Debtors can make no assurances that they will receive the requisite votes for acceptance to confirm the Plan. Even if all Voting Classes vote in favor of the Plan or the "cramdown" requirements are met with respect to any Class that rejected the Plan, the Bankruptcy Court could decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation are not met.

For example, it is possible that certain parties in interest may object to the Plan's separate classification and treatment of the First Lien Credit Facility Claims and the Consenting Crossholder Claims. Although the Debtors believe that the Plan's classification and treatment of such Claims comply with the requirements of the Bankruptcy Code because, among other things, the Consenting Crossholders have agreed to receive a less favorable recovery and have agreed to support the Plan, to the extent the Bankruptcy Court believes that the classification or treatment of such Claims is improper, the Bankruptcy Court may not confirm the Plan.

If the Plan is not confirmed, it is unclear what distributions holders of Claims or Interests ultimately would receive with respect to their Claims or Interests in a subsequent plan of reorganization or otherwise.

### iii.    Non-Consensual Confirmation and Conversion into Chapter 7 Cases

If any impaired class of claims or equity interests does not accept or is deemed not to accept a plan of reorganization, a bankruptcy court may nevertheless confirm such plan at the proponent's request if at least one impaired class has voted to accept the Plan (with such acceptance being determined without including the vote of any "insider" in such class), and as to each impaired class that has not accepted the Plan, the bankruptcy court determines that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes. If any Class votes to reject the Plan, then these requirements must be satisfied with respect to such rejecting Classes. The Debtors believe that the Plan satisfies these requirements.

If no plan of reorganization can be confirmed, or if the Bankruptcy Court otherwise finds that it would be in the best interest of holders of Claims and Interests, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed or elected to liquidate the Debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code. Please refer to Section XI(C)(III) hereof, as well as the Liquidation Analysis attached hereto as **Exhibit D**, for a discussion of the effects that a chapter 7 liquidation would have on the recoveries of holders of Claims and Interests.

### iv. Risk of Non-Occurrence of the Effective Date

Although the Debtors believe that the Effective Date will occur soon after the Confirmation Date, there can be no assurance as to the timing of the Effective Date. If the conditions precedent to the Effective Date set forth in the Plan have not occurred or have not been waived as set forth in Article IX of the Plan, then the Confirmation Order may be vacated, in which event no distributions would be made under the Plan, the Debtors and all holders of Claims or Interests would be restored to the status quo as of the day immediately preceding the Confirmation Date, and the Debtors' obligations with respect to Claims and Interests would remain unchanged.

### v. Risk of Termination of the RSA

The RSA contains certain provisions that give the Required Consenting Noteholders, the Required Consenting Bank Lenders (as defined in the RSA), the Required Consenting Crossholders (as defined in the RSA), and the Required Consenting Non-Crossholders (as defined in the RSA) the ability to terminate the RSA if various conditions are not satisfied. Termination of the RSA could result in a continuation of the Wells Fargo Adversary Proceeding. This could lead to protracted Chapter 11 Cases, which could significantly and detrimentally impact the Debtors' relationships with, among others, tenants and employees.

### vi. Risks Related to Possible Objections to the Plan

There is a risk that certain parties could oppose and object to either the entirety of the Plan or specific provisions of the Plan. Although the Debtors believe that the Plan complies with all relevant Bankruptcy Code provisions, there can be no guarantee that a party in interest will not file an objection to confirmation of the Plan or that the Bankruptcy Court will not sustain such an objection. Moreover, as discussed in Article XI below, the Debtors believe that the Plan distribution to holders of existing equity interests complies with the Bankruptcy Code's confirmation requirements.

### vii. Releases, Injunctions, and Exculpation Provisions May Not Be Approved

Article X of the Plan provides for certain releases, injunctions, and exculpations for Claims and Causes of Action that may otherwise be asserted against the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties, as applicable. The releases, injunctions, and exculpations provided in the Plan are subject to objection by parties in interest and may not be approved. If the releases and exculpations are not approved, certain parties may not be considered Releasing Parties, Released Parties, or Exculpated Parties, and certain Released Parties or Exculpated Parties may withdraw their support for the Plan.

### B. Risks Relating to the New Common Stock and New LP Units Issued Under the Plan

### i. Trading Market for the New Common Stock

Although the Company will use commercially reasonable efforts to list the New Common Stock on a national securities exchange, there can be no assurance that there will be an active trading

market for it.  In addition, there may be trading restrictions on shares of the New Common Stock following the Effective Date.  Accordingly, there can be no assurance that any market will exist or as to the liquidity of any market that may exist for any such securities.

### ii.     *Potential Dilution*

The ownership percentage represented by the New Common Stock distributed on the Effective Date under the Plan to the holders of Unsecured Claims, Existing LP Common Units, Existing REIT Preferred Stock, and Existing REIT Common Stock will be subject to dilution from the New Common Stock issuable upon exchange of the New Convertible Notes, the New Common Stock issued pursuant to the Management Incentive Plan, and any other shares that may be issued post-emergence, and the conversion of any options, warrants, convertible securities, exercisable securities, or other securities that may be issued post-emergence.

In the future, similar to all companies, additional equity financings or other share issuances by any of the Reorganized Debtors could adversely affect the value of the New Common Stock issuable upon such conversion.  The amount and dilutive effect of any of the foregoing could be material.

### iii.    *Significant Holders*

The holders of Senior Unsecured Notes Claims are expected to acquire a significant ownership interest in the New Common Stock pursuant to the Plan.  If such holders were to act as a group, such holders would be in a position to control the outcome of all actions requiring stockholder approval, including the election of directors, without the approval of other stockholders.  This concentration of ownership could also facilitate or hinder a negotiated change of control of the Reorganized Debtors and, consequently, have an impact upon the value of the New Common Stock and New LP Units.

### iv.    *Equity Interests Subordinated to Reorganized Debtors' Indebtedness*

In any subsequent liquidation, dissolution, or winding up of the Reorganized Debtors, the New Common Stock and the New LP Units would rank below all debt claims against the Reorganized Debtors, including the Exit Credit Facility, the New Senior Secured Notes and the New Convertible Notes.  As a result, holders of the New Common Stock will not be entitled to receive any payment or other distribution of assets upon the liquidation, dissolution, or winding up of the Reorganized Debtors until after all the Reorganized Debtors' obligations to their debt holders have been satisfied.

### v.     *Implied Valuation of New Common Stock Not Intended to Represent Trading Value of New Common Stock*

The valuation of the Reorganized Debtors is not intended to represent the trading value of New Common Stock in public or private markets and is subject to additional uncertainties and contingencies, all of which are difficult to predict.  Actual market prices of such securities at issuance will depend upon, among other things: (a) prevailing interest rates; (b) conditions in the financial markets; (c) anticipated initial securities of creditors receiving New Common Stock under the Plan, some of which may prefer to liquidate their investment rather than hold it on a long-term basis; and (d) other factors that generally influence the prices of securities.  The actual

WEIL:\97988370\1\32626.0004

market price of the New Common Stock is likely to be volatile.  Many factors, including factors unrelated to the Reorganized Debtors' actual operating performance and other factors not possible to predict, could cause the market price of the New Common Stock to rise and fall.  Accordingly, the implied value, stated herein and in the Plan, of the securities to be issued does not necessarily reflect, and should not be construed as reflecting, values that will be attained for the New Common Stock in the public or private markets.

> **C.**   **Risks Relating to the New Senior Secured Notes and the New Convertible Notes**

> > ***i.***   ***Insufficient Cash Flow to Meet Debt Obligations***

The Reorganized Debtors' ability to make scheduled payments on, or refinance their debt obligations, depends on the Reorganized Debtors' financial condition and operating performance, which are subject to prevailing economic, industry, and competitive conditions and to certain financial, business, legislative, regulatory, and other factors beyond the Reorganized Debtors' control. The Reorganized Debtors may be unable to maintain a level of cash flow from operating activities sufficient to permit the Reorganized Debtors to pay the principal, premium, if any, and interest on their indebtedness, including, without limitation, principal and interest payments with respect to the New Senior Secured Notes and the New Convertible Notes.

> > ***ii.***   ***Rating of New Senior Secured Notes and New Convertible Notes***

It is not expected that the Reorganized Debtors will seek a rating on the New Senior Secured Notes or the New Convertible Notes. If, however, one or more rating agencies rates the New Senior Secured Notes or New Convertible Notes and assigns them a rating lower than the rating expected by investors, or reduces its rating in the future, the market price of the New Senior Secured Notes or New Convertible Notes, as applicable, could be reduced.

> > ***iii.***   ***Defects in Guarantees and Collateral Securing the New Senior Secured Notes and the New Convertible Notes***

The indebtedness under the New Senior Secured Notes and the New Convertible Notes will be secured, subject to certain exceptions and permitted liens, on a first-priority basis by direct or indirect security interests in certain of the assets of the Reorganized Debtors (henceforth, the **"Notes Collateral"**).  The Notes Collateral and the related secured guarantees on a first-priority basis are subject to any and all exceptions, defects, encumbrances, liens and other imperfections as may be accepted by the respective trustee and collateral agent of the New Senior Secured Notes and the New Convertible Notes and any other creditors that also have the benefit of first liens on the Notes Collateral from time to time. The existence of any such exceptions, defects, encumbrances, liens and other imperfections could adversely affect the value of the Notes Collateral, as well as the ability of the collateral agent for the New Senior Secured Notes (the "**New Senior Secured Notes Collateral Agent**") or the New Convertible Notes (the "**New Convertible Notes Collateral Agent**" and together with the New Senior Secured Notes Collateral Agent, the "**Notes Collateral Agents**"), to realize or foreclose on such Notes Collateral, as applicable.  In addition, the Notes Collateral is subject to other liens permitted under the terms of the New Notes Indenture and New Convertible Notes Indenture, as applicable, whether arising on or after the date

WEIL:\97988370\1\32626.0004

the New Senior Secured Notes or the New Convertible Notes are issued. To the extent that third parties hold prior liens, such third parties may have rights and remedies with respect to the property subject to such liens that, if exercised, could adversely affect the value of the Notes Collateral.

The Notes Collateral and the related secured guarantees includes a first-priority pledge of certain issued and outstanding equity interests held by the New Notes Issuer and certain New Notes Issuer Subsidiaries over certain New Notes Issuer Subsidiaries that directly or indirectly own properties. To the extent the assets directly or indirectly owned by those subsidiaries are subject to any encumbrances or liens or otherwise not available, the pledges of such capital stock may be worth less than otherwise anticipated.

The security interest of each Notes Collateral Agent is subject to practical problems generally associated with the realization of security interests in Notes Collateral. For example, the Notes Collateral Agents may each need to obtain third-party consent to obtain or enforce a security interest in a contract. Certain of the Reorganized Debtors' existing agreements with their joint venture partners or property-level loans expressly require the consent of the Reorganized Debtors' joint venture partner or lender, as the case may be, to foreclose on the equity interests pledged to secure the New Senior Secured Notes or the New Convertible Notes. We cannot assure you that the Notes Collateral Agents will be able to obtain any such consent. We also cannot assure you that any third-party consents will be given when required to facilitate a foreclosure on such assets. Further, the Notes Collateral Agents may be subject to certain ongoing pledgee qualification requirements contained in certain property level financing arrangements, including the ability to meet certain financial tests, such as specific thresholds for total assets and shareholder's equity. In the event, and for the period, that any Notes Collateral Agent is unable to satisfy the applicable pledgee qualification requirements, it may be unable to foreclose on certain of the Notes Collateral, as applicable, without causing a default or event of default to occur under such property level financing arrangements and such default or event of default may allow a counterparty under such arrangements to exercise remedies against certain New Notes Issuer Subsidiaries. Accordingly, the Notes Collateral Agents may not have the ability to foreclose upon those assets and the value of the Notes Collateral may significantly decrease.

Further, the Debtors have not conducted appraisals of any of their assets constituting Notes Collateral to determine if the value of the Notes Collateral upon foreclosure or liquidation equals or exceeds the amount of the New Senior Secured Notes, the New Convertible Notes, or such other obligation secured by the Notes Collateral. It cannot be assured that the remaining proceeds from a sale of the Notes Collateral would be sufficient to repay holders of the New Senior Secured Notes and/or New Convertible Notes all amounts owed under them. The fair market value of the Notes Collateral is subject to fluctuations based on factors that include, among others, the ability to sell Notes Collateral in an orderly manner, general economic conditions, the availability of buyers, the Reorganized Debtors' failure to implement their business strategy, and similar factors. The amount received upon a sale of Notes Collateral would be dependent on numerous factors, including the actual fair market value of the Notes Collateral at such time, and the timing and manner of the sale. By its nature, portions of the Notes Collateral may be illiquid and may have no readily ascertainable market value. In the event of a subsequent foreclosure, liquidation, bankruptcy, or similar proceeding, it cannot be assured that the proceeds from any sale or liquidation of the Notes Collateral will be sufficient to pay the Reorganized Debtors' obligations under the New Senior Secured Notes or New Convertible Notes, in full or at all. There can also

be no assurance that the Notes Collateral will be saleable, and, even if saleable, the timing of its liquidation would be uncertain. Accordingly, there may not be sufficient collateral to pay all or any of the amounts due on the New Senior Secured Notes or New Convertible Notes.

### iv.     Failure to Perfect Security Interests in the Notes Collateral

The failure to properly perfect liens on the Notes Collateral could adversely affect the Notes Collateral Agents' ability to enforce their rights with respect to the Notes Collateral for the benefit of the holders of the New Senior Secured Notes and New Convertible Notes (collectively, the "**New Secured Noteholders**"), as applicable. In addition, applicable law requires that certain property and rights acquired after the grant of a general security interest or lien can only be perfected at the time such property and rights are acquired and identified. There can be no assurance that the New Secured Noteholders will monitor, or that the Reorganized Debtors will inform the New Secured Noteholders of, the future acquisition of property and rights that constitute Notes Collateral, and that the necessary action will be taken to properly perfect the security interest in such after-acquired Notes Collateral. Failure to monitor the acquisition of additional property or rights that constitute Notes Collateral or the perfection of any security interests therein may result in the loss of the practical benefits of the liens thereon or of the priority of the liens securing the New Senior Secured Notes and New Convertible Notes, as applicable, against third parties.

### v.     Defaults in Property Level Debt Documents

The commencement of the Chapter 11 Cases and the filing of the Debtors constituted an event of default or termination event, and caused the automatic and immediate acceleration of all debt outstanding under or in respect of thirty-eight (38) Property Level Debt instruments. Such Property Level Debt instruments provide that, as a result of the Chapter 11 Cases, the principal and interest due thereunder shall be immediately due and payable without notice from the lenders thereunder. In the event that the lenders under such Property Level Debt instruments exercise remedies relating to such default (including foreclosure on the collateral securing such Property Level Debt), it cannot be assured that the remaining proceeds after the sale or liquidation of the collateral securing such Property Level Debt and application of such proceeds to the Property Level Debt, will be sufficient to pay the Reorganized Debtors' obligations under the New Senior Secured Notes and New Convertible Notes, in full or at all. Any efforts to enforce such payment obligations due under such Property Level Debt instruments may not be subject to the applicable provisions of the Bankruptcy Code because the borrower under such Property Level Debt instruments may be Non-Debtor Affiliates.

Additionally, on the Effective Date, the Restructuring Transactions contemplated under the Plan may give rise to an event of default or termination event under, and cause the automatic and immediate acceleration of all debt outstanding under or in respect of, approximately ten (10) Property Level Debt instruments. While the Debtors intend to seek waivers from the lenders under such Property Level Debt instruments as necessary, there is no guarantee that such waivers will be granted. In the event that the lenders under such Property Level Debt instruments do not grant such waivers and exercise remedies relating to such potential defaults (including foreclosure on the collateral securing such Property Level Debt), then it cannot be assured that there will be any proceeds remaining after the sale or liquidation of the collateral securing such Property Level Debt and application of such proceeds to the Property Level Debt and the New Senior Secured Notes

WEIL:\97988370\1\32626.0004

Credit Parties and New Convertible Notes Credit Parties may not be able to realize any value with respect to the collateral securing such Property Level Debt.

### vi.     Any Future Pledge of Collateral Might Be Avoidable in a Subsequent Bankruptcy by the Reorganized Debtors

Any future pledge of Notes Collateral in favor of the Notes Collateral Agents, including pursuant to security documents delivered after the date of execution of the New Senior Secured Notes Documents or New Convertible Notes Documents, as applicable, might be avoidable by the pledgor (as a subsequent debtor in possession) or by its trustee in bankruptcy if certain events or circumstances exist or occur, including, among others, if the pledgor is insolvent at the time of the pledge, the pledge permits the holders of the securities under the New Senior Secured Notes or New Convertible Notes, as applicable, to receive a greater recovery than if the pledge had not been given, and a bankruptcy proceeding in respect of the pledgor is commenced within 90 days following the pledge, or, in certain circumstances, a longer period.

### vii.    There May Not be an Active Trading Market for the New Senior Secured Notes and the New Convertible Notes

There is not and there may not be a public market for the New Senior Secured Notes or the New Convertible Notes, and the Reorganized Debtors do not intend to seek any listing of the New Senior Secured Notes or the New Convertible Notes on any stock exchange or other trading market of any type whatsoever.  Accordingly, there can be no assurance that an active trading market for the New Senior Secured Notes or the New Convertible Notes will ever develop or, if such a market does develop, that it will be maintained.

Furthermore, because the amount of New Convertible Notes to be issued is dependent on elections by holders of Consenting Crossholder Claims or Senior Unsecured Notes Claims, other than in respect of the $50 million of New Money Convertible Notes to be issued pursuant to the Commitment Letter, there is no minimum amount of New Convertible Notes that may be issued. As a result, an active trading market may not develop for the New Convertible Notes.  If an active trading market does not develop or is not maintained, the market price and liquidity of the New Convertible Notes may be adversely affected.

### D.     Additional Risks Relating to the New Convertible Notes

### i.     Risk of Recharacterization of New Convertible Notes

Recharacterization of a debt obligation to a capital contribution is an equitable remedy a bankruptcy court may direct if it determines, upon an objection raised by a party in interest, a purported debt obligation is more properly characterized as a capital contribution.  In making such a determination, bankruptcy courts consider, among other things, whether the parties intended to create a debt obligation and the nature of the instrument evidencing the obligation. Although the Debtors believe, and intend, the New Convertible Notes to be a bona fide debt obligation, there can be no assurance a bankruptcy court would agree with the Debtors' interpretation.

WEIL:\97988370\1\32626.0004

ii.        *Changes to New Common Stock Affect Holders of New Convertible Notes*

Holders of the New Convertible Notes will not be entitled to any rights with respect to the New Common Stock (including, without limitation, voting rights and rights to participate in any dividends or other distributions on the New Common Stock), but holders of the New Convertible Notes will be subject to all changes affecting the New Common Stock.  Holders of the New Convertible Notes will have rights with respect to the New Common Stock only upon conversion.  For example, in the event an amendment is proposed to the Reorganized Debtors' certificate of incorporation or by-laws requiring shareholder approval and the record date for determining the shareholders of record entitled to vote on the amendment occurs prior to delivery of the New Common Stock, such holders will not be entitled to vote on the amendment, although they will, nevertheless, be subject to any changes in the powers, preferences, or rights of the New Common Stock.

E.        **Risks Relating to the Exit Credit Facility**

i.        *Insufficient Cash Flow to Meet Debt Obligations*

The Reorganized Debtors' ability to make scheduled payments on, or refinance their debt obligations, depends on the Reorganized Debtors' financial condition and operating performance, which are subject to prevailing economic, industry, and competitive conditions and to certain financial, business, legislative, regulatory, and other factors beyond the Reorganized Debtors' control. The Reorganized Debtors may be unable to maintain a level of cash flow from operating activities sufficient to permit the applicable Reorganized Debtors to pay the principal, premium, if any, and interest on their indebtedness, including, without limitation, borrowings under the Exit Credit Facility.

ii.        *Defects in Collateral Securing the Exit Credit Facility*

The indebtedness under the Exit Credit Facility will be secured, subject to certain exceptions and permitted liens, on a first-priority basis by direct or indirect security interests in certain of the Reorganized Debtors' assets (henceforth, the "**Exit Facility Collateral**").  The Exit Facility Collateral securing the Exit Credit Facility may be subject to exceptions, defects, encumbrances, liens, and other imperfections.  It cannot be assured that the remaining proceeds from a sale of the Exit Facility Collateral would be sufficient to repay holders of the securities under the Exit Credit Facility all amounts owed under them.  The fair market value of the Exit Facility Collateral is subject to fluctuations based on factors that include, among others, the ability to sell Exit Facility Collateral in an orderly manner, general economic conditions, the availability of buyers, the Reorganized Debtors' failure or success to implement their business strategy, and similar factors. The amount received upon a sale of Exit Facility Collateral would be dependent on numerous factors, including the actual fair market value of the Exit Facility Collateral at such time, and the timing and manner of the sale.  By its nature, portions of the Exit Facility Collateral may be illiquid and may have no readily ascertainable market value.  In the event of a subsequent foreclosure, liquidation, bankruptcy, or similar proceeding, it cannot be assured that the proceeds from any sale or liquidation of the Exit Facility Collateral will be sufficient to pay the applicable Reorganized Debtors' obligations under the Exit Credit Facility, in full or at all.  There can also be no assurance

that the Exit Facility Collateral will be saleable, and, even if saleable, the timing of its liquidation would be uncertain.  Accordingly, there may not be sufficient collateral to pay all or any of the amounts due on the Exit Credit Facility.

### iii. *Failure to Perfect Security Interests in Collateral*

The failure to properly perfect liens on the Exit Facility Collateral could adversely affect the Exit Credit Facility Agent's ability to enforce its rights with respect to the Exit Facility Collateral for the benefit of the holders of the Exit Credit Facility.  In addition, applicable law requires that certain property and rights acquired after the grant of a general security interest or lien can only be perfected at the time such property and rights are acquired and identified.  There can be no assurance that the Exit Credit Facility Agent will monitor, or that the Reorganized Debtors will inform the trustee or the Exit Credit Facility Agent of, the future acquisition of property and rights that constitute Exit Facility Collateral, and that the necessary action will be taken to properly perfect the security interest in such after-acquired Exit Facility Collateral.  The Exit Credit Facility Agent has no obligation to monitor the acquisition of additional property or rights that constitute Exit Facility Collateral or the perfection of any security interests therein.  Such failure may result in the loss of the practical benefits of the liens thereon or of the priority of the liens securing the notes against third parties.

### iv. *Any Future Pledge of Collateral Might Be Avoidable in a Subsequent Bankruptcy by the Reorganized Debtors*

Any future pledge of Exit Facility Collateral in favor of the Exit Credit Facility Agent, including pursuant to security documents delivered after the date of entry into the Exit Credit Facility Agreement, might be avoidable by the pledgor (as a subsequent debtor in possession) or by its trustee in bankruptcy if certain events or circumstances exist or occur, including, among others, if the pledgor is insolvent at the time of the pledge, the pledge permits the holders of the securities under the Exit Credit Facility to receive a greater recovery than if the pledge had not been given, or a bankruptcy proceeding in respect of the pledgor is commenced within 90 days following the pledge, or, in certain circumstances, a longer period.

### F. __Additional Risk Factors To Be Considered__

### i. *COVID-19 Risks*

As noted above, the Debtors have experienced operational disruption and revenue loss as a result of the global COVID-19 pandemic.  The COVID-19 pandemic has acutely impacted all states where the Company's tenants operate their businesses or where the Properties are located.  Measures taken by federal, state, and local authorities to prevent or remediate COVID-19, including "shelter-in-place" or "stay-at-home" orders or other quarantine mandates, have had an adverse effect on the Company's business and the businesses of its tenants.

The prolonged outbreak of the COVID-19 pandemic resulted in sustained closure of the Properties, as well as the cessation of the operations of certain of its tenants, which resulted in a reduction of the revenues and cash flows of many of its properties due to the adverse financial impact on its tenants, as well as reductions in other sources of income generated by the Properties.  In addition to reduced revenues, the Company's ability to obtain sufficient financing for such Properties has

WEIL:\97988370\1\32626.0004

been impaired as has its ability to lease or re-lease properties as a result of worsening market and economic conditions resulting from the COVID-19 pandemic.

Moreover, as a result of the COVID 19 pandemic, the Company experienced—and continues to experience—increased levels of requests for rent deferrals and abatements, as well as defaults on rent obligations.  The Company continues to negotiate rent deferrals and abatements with tenants.

Although restrictions have been relaxed in various jurisdictions and all of the Malls have reopened, the financial losses suffered by Properties in those jurisdictions will not be easily recovered.  In addition, an increase in restrictions, including mandated closures, due to the protraction of the COVID-19 pandemic would severely impact the Company's and its tenants' operations and financial condition going forward.

### ii.        Liquidity

The use of cash on hand and Cash Collateral (as defined in section 363 of the Bankruptcy Code) is intended to provide liquidity to the Debtors during the pendency of the Chapter 11 Cases.  If the Chapter 11 Cases take longer than expected to conclude, the Debtors may exhaust their cash.  Further, there is no assurance that the Debtors will be able to obtain additional financing from the Debtors' existing lenders or otherwise if necessary.  In such cases, the liquidity necessary for the orderly functioning of the Debtors' businesses may be materially impaired.

### iii.       Actual Claims Could Be More than Projected

There can be no assurance that the estimated amount of Allowed Claims in certain Classes will not be significantly more than projected, which in turn, could cause the value of distributions to be reduced substantially.  Inevitably, some assumptions will not materialize, and unanticipated events and circumstances may affect the ultimate results.  Therefore, the actual amount of Allowed Claims may vary materially from the Debtors' projections and feasibility analysis.

### iv.       Projections and Other Forward-Looking Statements Are Not Assured, and Actual Results May Vary

Certain of the information contained herein is, by nature, forward-looking, and contains estimates and assumptions, which might ultimately prove to be incorrect, and projections, which may be materially different from actual future experiences.  Many of the assumptions underlying the projections are subject to significant uncertainties that are beyond the control of the Debtors or Reorganized Debtors, including the timing, confirmation, and consummation of the Plan, customer demand for the Reorganized Debtors' products and services, inflation, and other unanticipated market and economic conditions.  There are uncertainties associated with any projections and estimates, and they should not be considered assurances or guarantees of the amount of funds or the amount of Claims in the various Classes that might be allowed.  Some assumptions may not materialize, and unanticipated events and circumstances may affect the actual results.  Projections are inherently subject to substantial and numerous uncertainties and to a wide variety of significant business, economic, and competitive risks, and the assumptions underlying the projections may be inaccurate in material respects.  In addition, unanticipated events and circumstances occurring after the approval of this Disclosure Statement by the Bankruptcy Court including, but not limited to, any natural disasters, terrorist attacks, or health epidemics may affect the actual financial results

achieved.  Such results may vary significantly from the forecasts and such variations may be material.

### v.        *Risks Associated with the Debtors' Business and Industry*

The risks associated with the Debtors' businesses and industry are more fully described in the Debtors' SEC filings, including the 10-K.  The risks associated with the Debtors' business and industry described in the Debtors' SEC filings include, but are not limited to, the following:

- general industry, economic, and business conditions;

- the impact of the risks and uncertainties associated with the Chapter 11 process on the Company's operations and ability to develop and execute the Company's business plans, and to satisfy the conditions and milestones applicable under the RSA, for the duration of these Chapter 11 Cases;

- interest rate fluctuations;

- costs and availability of capital, including debt, construction loans, and capital requirements;

- delisting of the Debtors' common stock and/or depositary shares representing interests in the Debtors' Series D Preferred Stock and Series E Preferred Stock, from the NYSE;

- costs and availability of real estate;

- inability to consummate acquisition opportunities and other risks associated with acquisitions;

- competition from other companies and retail formats;

- changes in retail demand and rental rates in the Debtors' markets as a result of decreased consumer spending;

- shifts in tenant demands including the impact of online shopping;

- inability of tenants to meet rent terms and tenant requests for rent abatements and/or deferrals;

- impact of additional tenant bankruptcies or store closings;

- inability to secure tenants necessary to support commercial projects;

- inability to receive reimbursement from tenants for their share of certain operating expenses, including common area maintenance, real estate taxes, and insurance;

- changes in vacancy rates at the Properties;

- difficulty replacing or renewing expiring leases with new leases at a higher base;

- changes in operating expenses;

- the construction costs of a project may exceed original estimates or available financing, possibly making the project unfeasible or unprofitable;

- changes in applicable laws, rules, and regulations;

- inability to obtain zoning, occupancy, or other required governmental permits and authorizations;

- disposition of real property;

- uncertainty and economic impact of pandemics, epidemics, or other public health emergencies or fear of such events, such as the recent COVID-19 pandemic;

- cyber-attacks or acts of cyber-terrorism;

- pending and future litigation;

- the ability to obtain suitable equity and/or debt financing and the continued availability of financing, in the amounts and on the terms necessary to support the Debtors' future refinancing requirements and businesses; and

- other risks referenced from time to time in filings with the SEC and those factors listed or incorporated by reference into this report.

### vi.    Risks Associated with the Reorganized REIT's Ability to Satisfy REIT Conditions

Following the Confirmation Date, the Reorganized REIT intends on continuing to be treated as a real estate investment trust for U.S. federal income tax purposes, subject to receiving approval from the Required Consenting Noteholders.  Despite being able to do so in the past, the Reorganized REIT may not meet the conditions for qualification as a real estate investment trust.

If, with respect to any taxable year, the Reorganized REIT fails to maintain its qualification as a real estate investment trust, it would not be allowed to deduct distributions to shareholders in computing its taxable income and federal income tax.  The corporate level income tax would apply to its taxable income at regular corporate rates.  As a result, the amount available for distribution to holders of equity securities that would otherwise receive dividends would be reduced for the year or years involved, and the Reorganized REIT would no longer be required to make distributions to shareholders.  In addition, unless it were entitled to relief under the relevant statutory provisions, the Reorganized REIT would be disqualified from treatment as a real estate investment trust for four subsequent taxable years.

### vii.      Risks Associated with the Reorganized REIT's Ability to Satisfy REIT Distribution Requirements

The Reorganized REIT generally must distribute annually at least ninety percent (90%) of its real estate investment trust taxable income, determined without regard to the dividends-paid deduction and excluding any net capital gains, in order for the Reorganized REIT to qualify to be taxed as a real estate investment trust (assuming that certain other requirements are also satisfied) so that U.S. federal corporate income tax does not apply to earnings that the Reorganized REIT distributes.  To the extent that the Reorganized REIT satisfies this distribution requirement and qualifies for taxation as a real estate investment trust but distributes less than one hundred percent (100%) of its real estate investment trust taxable income, the Reorganized REIT will be subject to U.S. federal corporate income tax on its undistributed net taxable income.  In addition, the Reorganized REIT will be subject to a four percent (4%) nondeductible excise tax if the actual amount that the Reorganized REIT distributes to its shareholders in a calendar year is less than a minimum amount specified under U.S. federal income tax laws.  The Reorganized Debtors intend that the Reorganized REIT will make distributions to its shareholders to comply with the real estate investment trust requirements of the Tax Code.

From time to time, the Reorganized REIT may generate taxable income greater than its cash flow as a result of differences in timing between the recognition of taxable income and the actual receipt of cash or the effect of nondeductible capital expenditures, the creation of reserves, or required debt or amortization payments.  If the Reorganized REIT does not have other funds available in these situations, the Reorganized REIT could be required to borrow funds on unfavorable terms, sell assets at disadvantageous prices, or distribute amounts that would otherwise be invested in future acquisitions to make distributions sufficient to enable the Reorganized REIT to pay out enough of its taxable income to satisfy the real estate investment trust distribution requirement and to avoid corporate income tax and the four percent (4%) excise tax in a particular year.  These alternatives could increase the Reorganized REIT's costs or reduce the value of its equity.  Alternatively, the Reorganized REIT could elect to satisfy its distribution requirements by making taxable distributions of cash and stock; in such a case, a holder would be taxed on one hundred percent (100%) of the distribution in the same manner as a cash distribution.  Thus, compliance with the real estate investment trust requirements may hinder the Reorganized REIT's ability to grow, which could adversely affect the value of the Reorganized REIT's stock, or cause holders of the Reorganized REIT's stock to incur tax liabilities in excess of cash distributions.

### viii.      Substantial Indebtedness

Although the Reorganized Debtors will have less indebtedness than the Debtors, the Reorganized Debtors will still have substantial indebtedness.  On the Effective Date, after giving effect to the transactions contemplated by the Plan, the applicable Reorganized Debtors will, on a consolidated basis, have approximately $1.6 billion in secured indebtedness under the Exit Credit Facility, New Senior Secured Notes, New Convertible Notes, and guarantees of property-level loans.  The Company will also have approximately $1.9 billion of Property Level Debt currently owed by Non-Debtor Affiliates that is not being reduced in the Chapter 11 Cases.

The amount of the Reorganized Debtors' indebtedness could have important consequences because it could affect the Reorganized Debtors' business, operating results, cash flows, and

financial condition, including their ability to satisfy their obligations thereunder, raise additional capital through the issuance of additional debt or equity securities, engage in acquisitions or other business development activities, fund working capital, capital expenditures and other corporate spending, respond to general and industry-specific adverse economic conditions, and compete with competitors that are less leveraged.

Despite the Reorganized Debtors' consolidated debt levels after entry into the Exit Credit Facility and issuance of New Senior Secured Notes and New Convertible Notes, the Reorganized Debtors may be able to incur certain additional debt in the future, subject to the restrictions contained in their debt instruments, some of which may be secured debt. In certain situations, the terms of the Exit Credit Facility, New Senior Secured Notes, and New Convertible Notes may permit the Reorganized Debtors to incur additional debt, secure existing or future debt, recapitalize its debt or take a number of other actions that could have the effect of diminishing the Reorganized Debtors' ability to make payments on its existing debt when due.

However, the incurrence of additional indebtedness would result in increased fixed payment obligations and could also result in certain restrictive covenants, such as limitations on the Reorganized Debtors' ability to incur additional debt and liens, consummate acquisitions, sell real estate or raise capital to develop property and other operating restrictions that could adversely impact the Reorganized Debtors' ability to conduct their business and may result in liens being placed on the Reorganized Debtors' assets. If the Reorganized Debtors were to default on such indebtedness, the Reorganized Debtors could lose such assets.

### ix.       *Claims Objections*

The Debtors or the Reorganized Debtors, as applicable, may object to a proof of claim filed by or on behalf of a holder of a Claim. The distribution estimates that will be provided in connection with this Disclosure Statement are not applicable to any holder of any Claim whose Claim is or may be subject to an objection. Any such holder may not receive its specified share of the estimated distributions described in this Disclosure Statement.

### x.       *Distributions*

While the Debtors have endeavored to project what they believe are likely distributions, if any, to be made to parties holding Allowed Claims, there can be no certainty that the projections, which the Debtors intend to provide in a supplemental filing prior to a hearing to approve this Disclosure Statement, will be accurate and that holders will receive the distributions described in the Plan. The projections will necessarily be affected by, among other things, (i) the outcome of objections to Claims and (ii) the cost and expenses of such actions and generally administering and winding down the Debtors' bankruptcy estates.

### xi.       *Debtors Could Withdraw Plan*

Subject to the terms of, and without prejudice to, the rights of any party to the RSA, the Plan may be revoked or withdrawn prior to the Confirmation Date by the Debtors.

### xii.        *Debtors Have No Duty to Update*

The statements contained in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has not been any changes in the information set forth herein since that date.  The Debtors have no duty to update this Disclosure Statement unless otherwise ordered to do so by the Bankruptcy Court.

### xiii.        *No Representations Outside this Disclosure Statement Are Authorized*

No representations concerning or related to the Debtors, the Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement.  Any representations or inducements made to secure your vote for acceptance or rejection of the Plan that are other than those contained in, or included with, this Disclosure Statement should not be relied upon in making the decision to vote to accept or reject the Plan.

### xiv.        *No Legal or Tax Advice Is Provided by this Disclosure Statement*

The contents of this Disclosure Statement should not be construed as legal, business, or tax advice. Each holder of a Claim or Interest should consult their own legal counsel and accountant as to legal, tax, and other matters concerning their Claim or Interest.

This Disclosure Statement is not legal advice to you.  This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to confirmation of the Plan.

### xv.        *No Admission Made*

Nothing contained herein or in the Plan will constitute an admission of, or will be deemed evidence of, the tax or other legal effects of the Plan on the Debtors or holders of Claims or Interests.

### xvi.        *Dismissal of Chapter 11 Cases*

If no plan can be confirmed, or if the Bankruptcy Court otherwise finds that it would be in the best interests of the creditors and/or the Debtors, one or more of the Chapter 11 Cases may be dismissed by order of the Bankruptcy Court.

Moreover, as discussed herein, the Debtors are currently party to the Wells Fargo Adversary Proceeding, pursuant to which the Administrative Agent is seeking, among other things, dismissal of the Pledged Debtors' (as defined in the Wells Fargo Counterclaims) Chapter 11 Cases.  While the Wells Fargo Adversary Proceeding is currently stayed, the Bankruptcy Court's dismissal of one or more of the Pledged Debtors' Chapter 11 Cases may impact, among other things, the ability to confirm the Plan or the distributions under the Plan to the creditors of the Debtors that remain in the Chapter 11 Cases.

# X.
## VOTING PROCEDURES AND REQUIREMENTS

Before voting to accept or reject the Plan, each holder of a Claim or Interest in a Voting Class as of the Record Date that is entitled to vote (an **"Eligible Holder"**), should carefully review the Plan attached hereto as **Exhibit A**.  All descriptions of the Plan set forth in this Disclosure Statement are subject to the terms and conditions of the Plan.

### A.    Voting Deadline

All Eligible Holders have been sent a Ballot together with instructions on how to access this Disclosure Statement.  Such holders should read the Ballot carefully and follow the instructions contained therein.  Please use only the Ballot that accompanies this Disclosure Statement to cast your vote.  Special procedures are set forth below for the beneficial holders of securities (**"Beneficial Holders"**) who hold such securities in "street name" (e.g., Unsecured Claims, Existing REIT Preferred Stock, and Existing REIT Common Stock) through a broker, dealer, commercial bank, trust company, or other agent or nominee (**"Nominee"**).

The Debtors have engaged Epiq as their Voting Agent to assist in the transmission of voting materials and in the tabulation of votes with respect to the Plan.  **FOR YOUR VOTE TO BE COUNTED, A BALLOT OR A MASTER BALLOT WITH YOUR VOTE MUST BE RECEIVED BY THE VOTING AGENT IN ACCORDANCE WITH THE INSTRUCTIONS PROVIDED WITH THE BALLOTS.  THE DEADLINE FOR RECEIPT OF BALLOTS IS ON OR BEFORE 4:00 P.M. (PREVAILING CENTRAL TIME) ON JULY 26, 2021 (THE "VOTING DEADLINE"), UNLESS EXTENDED BY THE DEBTORS.**

**IF YOU ARE A BENEFICIAL HOLDER, YOU MUST RETURN YOUR BALLOT (OR OTHERWISE CONVEY YOUR VOTE) TO YOUR NOMINEE IN SUFFICIENT TIME FOR YOUR NOMINEE TO PROCESS YOUR VOTE AND RETURN A MASTER BALLOT INCORPORATING YOUR VOTE TO THE VOTING AGENT BEFORE THE VOTING DEADLINE.**

**IF A BALLOT IS DAMAGED OR LOST, YOU MAY CONTACT THE VOTING AGENT AT THE NUMBER SET FORTH BELOW TO RECEIVE A REPLACEMENT BALLOT. IF YOU HAVE ANY QUESTIONS CONCERNING VOTING PROCEDURES, YOU MAY CONTACT THE VOTING AGENT AT:**

Epiq Corporate Restructuring, LLC
Telephone: (855) 914-4668 (domestic toll free) or 1 (503) 520-4416 (international)
E-mail: cblpropertiesinfo@epiqglobal.com (with "CBL Properties" in the subject line)

Hard copies of the Disclosure Statement are available upon request made to the Voting Agent, at the telephone numbers or e-mail address set forth immediately above.

### B.    Voting Procedures

The Debtors are providing a copy of the order approving the Disclosure Statement and notice of the Confirmation Hearing, instructions detailing how to access copies of this Disclosure Statement

and the Plan (including all exhibits and appendices), customized Ballot(s) and, if applicable, instructions for customized electronic, online transmission of Ballots (collectively, a "**Solicitation Package**") to Eligible Holders.  The Solicitation Packages for Nominees holding Claims for Beneficial Holders (*e.g.*, Unsecured Claims, Existing REIT Preferred Stock, and Existing REIT Common Stock, as applicable) will include Beneficial Holder Ballots and Master Ballots. Nominees must provide copies of the Solicitation Package to their Beneficial Holders that are the Eligible Holders thereof as of the Record Date.  Nominees are authorized to transmit Solicitation Packages and collect votes from Beneficial Holders in accordance with their customary practices, including the use of a "voting instruction form" in lieu of (or in addition to) a Beneficial Ballot, and collecting votes from Beneficial Holders through online voting, by phone, facsimile, or other electronic means.  Any Eligible Holder that is a Beneficial Holder and has not received a Ballot should contact its Nominee.  Any Eligible Holder that is not a Beneficial Holder and has not received a Ballot should contact the Voting Agent.

Eligible Holders should provide all of the information requested by the Ballot and should complete and return all Ballots received in accordance with the instructions set forth therein.

In addition to accepting hard-copy Ballots, the Debtors seek authorization to accept Ballots (from voting parties that are not required to vote through a Nominee) via electronic, online transmissions, solely through a customized online balloting portal on the Debtors' case website maintained by the Voting Agent (the "**E-Ballot Portal**").[24]  Parties entitled to vote may cast an electronic Ballot and electronically sign and submit the Ballot instantly by utilizing the E-Ballot Portal (which allows a holder to submit an electronic signature).  Instructions for electronic, online transmission of Ballots will be set forth on the forms of Ballots and included in the Solicitation Packages.  The encrypted ballot data and audit trail created by such electronic submission through the E-Ballot Portal shall become part of the record of any Ballot submitted in this manner, and the Eligible Holder's electronic signature will be deemed to be immediately legally valid and effective.

**HOLDERS ARE STRONGLY ENCOURAGED TO SUBMIT THEIR BALLOTS VIA THE E-BALLOT PORTAL.**

### C.    Parties Entitled to Vote

Under the Bankruptcy Code, only holders of Claims or Interests in "impaired" classes are entitled to vote on a plan.  Under section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "impaired" under a plan unless:  (i) the plan leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder thereof; or (ii) notwithstanding any legal right to an accelerated payment of such claim or interest, the plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

If, however, the holder of an impaired Claim or Interest will not receive or retain any distribution under the plan on account of such Claim or Interest, the Bankruptcy Code deems such holder to have rejected the Plan, and, accordingly, holders of such Claims and Interests do not actually vote on the Plan.  If a Claim or Interest is not impaired by the Plan, the Bankruptcy Code deems the

---

[24]  The Debtor's case website maintained by the Voting Agent may be found at https://dm.epiq11.com/cblproperties.

holder of such Claim or Interest to have accepted the Plan and, accordingly, holders of such Claims and Interests are not entitled to vote on the Plan, and also will not receive a Ballot.

A vote may be disregarded if the Bankruptcy Court determines, pursuant to section 1126(e) of the Bankruptcy Code, that it was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

The Bankruptcy Code defines "acceptance" of a plan by a class of (1) Claims as acceptance by creditors in that class that hold at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Claims that cast ballots for acceptance or rejection of the Plan (with such acceptance or rejection being determined without including the vote of any "insider" in such class); and (2) Interests as acceptance by interest holders in that class that hold at least two-thirds (2/3) in amount of the Interests that cast ballots for acceptance or rejection of the Plan.

The Claims and Interests in the following classes are impaired under the Plan and, subject to section X(C)(iv) below, entitled to vote to accept or reject the Plan:

- Class 3 — First Lien Credit Facility Claims;

- Class 4 — Consenting Crossholder Claims;

- Class 5 — Ongoing Trade Claims;

- Class 7 — Unsecured Claims;

- Class 9 — Existing LP Preferred Units;

- Class 10 — Existing LP Common Units;

- Class 11 — Existing REIT Preferred Stock;

- Class 12 — Existing REIT Common Stock; and

- Class 14 — Section 510(b) Claims.

An Eligible Holder should vote on the Plan by completing a Ballot in accordance with the instructions therein and as set forth above.

Except as provided below, unless the Ballot is timely submitted to the Voting Agent before the Voting Deadline together with any other documents required by such Ballot, the Debtors may, in their sole discretion, reject such Ballot as invalid, and therefore decline to utilize it in connection with seeking confirmation of the Plan.

**i.      *Fiduciaries and Other Representatives***

If a Ballot is signed by a trustee, executor, administrator, guardian, attorney-in-fact, officer of a corporation, or another, acting in a fiduciary or representative capacity, such person should indicate such capacity when signing and, if requested, must submit proper evidence satisfactory to

WEIL:\97988370\1\32626.0004

the Debtors of authority to so act.  Authorized signatories should submit the separate Ballot of each Eligible Holder for whom they are voting.

### ii. Agreements Upon Furnishing Ballots

The delivery of an accepting Ballot pursuant to one of the procedures set forth above will constitute the agreement of the creditor or equity holder (as applicable) with respect to such Ballot to accept: (a) all of the terms of, and conditions to, this Solicitation; and (b) the terms of the Plan including the injunction, releases, and exculpation set forth in Sections 10.4, 10.5, 10.6, 10.7, 10.8, and 10.9 therein.  All parties in interest retain their right to object to confirmation of the Plan pursuant to section 1128 of the Bankruptcy Code, subject to any applicable terms of the RSA.

### iii. Change of Vote

Subject to the provisions of the RSA, any party who has previously submitted to the Voting Agent before the Voting Deadline a properly completed Ballot may revoke such Ballot and change its vote by submitting to the Voting Agent before the Voting Deadline a subsequent, properly completed Ballot voting for acceptance or rejection of the Plan.

### iv. Change of Class for Holders of Property-Level Guarantee Claims

As set forth in the Plan, Property-Level Guarantee Settlement Claims will be Unimpaired under the Plan and not entitled to vote.  Other Property-Level Guarantee Claims are Impaired under the Plan and entitled to vote.  The Debtors are continuing settlement discussions with certain holders of Property-Level Guarantee Claims and will continue to do so in advance of the Confirmation Hearing.  To the extent a settlement with a holder of a Property-Level Guarantee Claim is reached, such Claim may be reclassified to Class 6 as a Property-Level Guarantee Settlement Claim. Consequently, prior to the Voting Deadline, the Debtors will file a notice with the Bankruptcy Court listing which Property-Level Guarantee Claims are Unimpaired under the Plan and not entitled to vote (Class 6) or Impaired under the Plan and entitled to vote (Class 7).

Given that Property-Level Guarantee Claims are Impaired under the Plan, holders of such Claims will be entitled to vote and solicited as Class 7 claimants.  However, to the extent any such holder reaches a settlement with the Debtors, such Claim will be reclassified as a Property-Level Guarantee Settlement Claim in Class 6.  Upon reclassification, the holders of such Claims will receive a notice of non-voting status and any Ballot previously submitted will not be counted.

### v. Waivers of Defects, Irregularities, etc.

Unless otherwise directed by the Bankruptcy Court, all questions as to the validity, form, eligibility (including time of receipt), acceptance, and revocation or withdrawals of Ballots will be determined by the Voting Agent or the Debtors, as applicable, in their sole discretion, which determination will be final and binding.  The Debtors reserve the right to reject any and all Ballots submitted by any of their respective creditors not in proper form, the acceptance of which would, in the opinion of the Debtors or their counsel, as applicable, be unlawful.  The Debtors further reserve their respective rights to waive any defects or irregularities or conditions of delivery as to any particular Ballot.  The interpretation (including the Ballot and the respective instructions thereto) by the applicable Debtor, unless otherwise directed by the Bankruptcy Court, will be final

WEIL:\97988370\1\32626.0004

and binding on all parties.  Unless waived, any defects or irregularities in connection with deliveries of Ballots must be cured within such time as the Debtors (or the Bankruptcy Court) determines.  Neither the Debtors nor any other person will be under any duty to provide notification of defects or irregularities with respect to deliveries of Ballots nor will any of them incur any liabilities for failure to provide such notification.  Unless otherwise directed by the Bankruptcy Court, delivery of such Ballots will not be deemed to have been made until such irregularities have been cured or waived.  Ballots previously furnished (and as to which any irregularities have not theretofore been cured or waived) will be invalidated.

### D.    Convertible Notes Election

Pursuant to Section 5.9 of the Plan, (i) each Consenting Crossholder entitled to receive New Senior Secured Notes on account of its Consenting Crossholder Claim and (ii) each Consenting Noteholder entitled to receive New Senior Secured Notes on account of its Senior Unsecured Notes Claim, may, at its option, elect, on a dollar-for-dollar basis, to substitute its allocated share of the New Senior Secured Notes for New Convertible Notes.  Eligible Holders entitled to make the Convertible Notes Election should follow the directions on the Ballot if you wish to make the Convertible Notes Election.

The Plan provides for an aggregate amount of $100 million of New Convertible Notes to be available for the Convertible Notes Election.  The amount of New Convertible Notes that will be available to an eligible Holder who opts to make the election will be dependent upon the total amount of Crossholder Claims and Senior Unsecured Notes Claims that make the Convertible Notes Election.  Electing Holders will receive their *pro rata* share of New Convertible Notes as set forth in the Plan (which may be different from the amount you request on the Ballot), subject to the caps described above in Section VI — Summary of the Plan — (ix) Convertible Notes Election.

If you are a Holder of a Senior Unsecured Notes Claim, you can make the Convertible Notes Election only if you are a Consenting Noteholder that is a party to the Restructuring Support Agreement.  If you wish to become a Consenting Noteholder in order to exercise the Convertible Notes Election, you may contact the Voting Agent as directed on the Ballot to receive a copy of the Joinder (as defined in the Restructuring Support Agreement) to the Restructuring Support Agreement.  For the avoidance of doubt, in order to make the Convertible Notes Election, a Holder of a Senior Unsecured Notes Claim must become a Consenting Noteholder on or before the Voting Deadline.  A Holder of a Senior Unsecured Notes Claim that executes and delivers a Joinder to (i) counsel to the Company Parties (as such term is defined in the Restructuring Support Agreement), (ii) counsel to the Consenting Noteholders (as such term is defined in the Restructuring Support Agreement), and (iii) counsel to the Bank Agent (as such term is defined in the Restructuring Support Agreement), on or before the Voting Deadline shall be deemed to be a Consenting Noteholder for all purposes including, but not limited to, exercising the Convertible Notes Election; *provided*, *however*, that the failure of a Holder of a Senior Unsecured Notes Claim to deliver a Joinder to counsel to the Consenting Noteholders or counsel to the Bank Agent shall not invalidate the exercise of the Convertible Notes Election by such Holder.  Consenting Noteholders are not required to make the Convertible Notes Election and may only do so to the extent applicable procedures outlined in the Ballot are followed.

WEIL:\97988370\1\32626.0004

### E.      Further Information, Copies of Materials

If you have any questions or require further information about the voting procedures for voting your claims or about the packet of material you received, or if you wish to obtain a hard copy of the Plan, this Disclosure Statement, or any exhibits to such documents, please contact the Voting Agent.

**XI.**
**CONFIRMATION OF PLAN**

### A.      Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a confirmation hearing upon appropriate notice to all required parties.  Notice of the Confirmation Hearing will be provided to all known creditors and equity holders or their representatives.  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the continuation date made at the Confirmation Hearing, at any subsequent continued Confirmation Hearing, or pursuant to a notice filed on the docket for the Chapter 11 Cases.

### B.      Objections to Confirmation

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to the confirmation of a plan.  Any objection to confirmation of the Plan must be in writing, must conform to the Bankruptcy Rules and the Local Rules, must set forth the name of the objector, the nature and amount of the Claims held or asserted by the objector against the Debtors' Estates or properties, the basis for the objection and the specific grounds therefore, and must be filed with the Bankruptcy Court, with a copy to the chambers of the United States Bankruptcy Judge appointed to these Chapter 11 Cases, together with proof of service thereof, and served upon the following parties, including such other parties as the Bankruptcy Court may order.

         a)      **The Debtors or Reorganized Debtors** at
                   CBL & ASSOCIATES PROPERTIES, INC.
                   2030 Hamilton Place Blvd., Suite 500
                   Chattanooga, Tennessee 37421
                   Attn:  Jeffery V. Curry, Esq., Chief Legal Officer
                   Telephone: (423) 490-8642
                   Facsimile:  (423) 893-4371
                   Email:  Jeff.Curry@cblproperties.com

b)   **Counsel to the Debtors** at
WEIL, GOTSHAL & MANGES LLP
700 Louisiana Street, Suite 1700
Houston, Texas 77002
Attn:  Alfredo R. Perez
Telephone:  (713) 546-5000
Facsimile:  (713) 224-9511
Email:  Alfredo.Perez@weil.com

   -and-

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Attn:  Ray C. Schrock, P.C., Garrett A. Fail, Esq., and Moshe A. Fink, Esq.
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Email:  Ray.Schrock@weil.com
      Garrett.Fail@weil.com
      Moshe.Fink@weil.com

c)   **Office of the U.S. Trustee** at
Office of the United States Trustee for the Southern District of Texas
515 Rusk Street, Suite 3516
Houston, Texas 77002
Attn:  Hector Duran, Jr., Esq. and Stephen D. Statham, Esq.
Telephone: (713) 718-4650
Facsimile: (713) 718 4670
Email:  Hector.Duran.Jr@usdoj.gov
      Stephen.Statham@usdoj.gov

d)   **Counsel to the Committee** at
McDermott Will & Emery LLP
2501 North Harwood Street, Suite 1900
Dallas, Texas 75201
Attn:  Charles R. Gibbs, Esq. and Jane A. Gerber, Esq.
Telephone:  (214) 295-8000
Facsimile:  (972) 232-3098
Email:  crgibbs@mwe.com
      jagerber@mwe.com

   -and-

McDermott Will & Emery LLP
340 Madison Avenue
New York, New York 10173
Attn:  Kristin K. Going, Esq. and Stacy A. Lutkus, Esq.

Telephone:  (212) 547-5400
Facsimile: (212) 547-5444
Email:  kgoing@mwe.com
          salutkus@mwe.com

**e)** **Counsel to the Consenting Noteholders** at
Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, New York 10036
Attn:  Michael Stamer, Esq., Meredith Lahaie, Esq., and Kevin Zuzolo, Esq.
Telephone:  (212) 872-1000
Facsimile:  (212) 872-1002
Email:  mstamer@akingump.com
          mlahaie@akingump.com
          kzuzolo@akingump.com

**f)** **Counsel to certain of the Consenting Crossholders** at
White & Case LLP
200 South Biscayne Boulevard, Suite 4900
Miami, Florida 33131
Attn:  Thomas Lauria, Esq., Brian Pfeiffer, Esq., and Michael Shepherd, Esq.
Telephone: (305) 371-2700
Email:    tlauria@whitecase.com
           brian.pfeiffer@whitecase.com
           mshepherd@whitecase.com

**g)** **Counsel to the First Lien Credit Facility Administrative Agent** at
Jones Day
325 John H. McConnell Boulevard
Columbus, OH 43215
Attn:  Matthew Corcoran, Esq. and Benjamin Rosenblum, Esq.
Telephone: (614) 469-3939
Email:    mccorcoran@jonesday.com
           brosenblum@jonesday.com

**IF AN OBJECTION TO CONFIRMATION IS NOT TIMELY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

**C.**    **Requirements for Confirmation of Plan**

   **i.**    *Requirements of Section 1129(a) of the Bankruptcy Code*

At the Confirmation Hearing, the Bankruptcy Court will determine whether the confirmation requirements specified in section 1129(a) of the Bankruptcy Code have been satisfied including whether:

(i).    the Plan complies with the applicable provisions of the Bankruptcy Code;

158

(ii).     the Debtors have complied with the applicable provisions of the Bankruptcy Code;

(iii).    the Plan has been proposed in good faith and not by any means forbidden by law;

(iv).    any payment made or promised by the Debtors or by a person issuing securities or acquiring property under the Plan, for services or for costs and expenses in or in connection with the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, has been disclosed to the Bankruptcy Court, and any such payment made before confirmation of the Plan is reasonable, or if such payment is to be fined after confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable;

(v).     the Debtors have disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director or officer of the Reorganized Debtors, an affiliate of the Debtors participating in the Plan with the Debtors, or a successor to the Debtors under the Plan, and the appointment to, or continuance in, such office of such individual is consistent with the interests holders of Claims and Interests and with public policy, and the Debtors have disclosed the identity of any insider who will be employed or retained by the Reorganized Debtors, and the nature of any compensation for such insider;

(vi).    with respect to each Class of Claims or Interests, each holder of an impaired Claim has either accepted the Plan or will receive or retain under the Plan, on account of such holder's Claim, property of a value, as of the Effective Date of the Plan, that is not less than the amount such holder would receive or retain if the Debtors were liquidated on the Effective Date of the Plan under chapter 7 of the Bankruptcy Code;

(vii).   except to the extent the Plan meets the requirements of section 1129(b) of the Bankruptcy Code (as discussed further below), each Class of Claims or Interests either accepted the Plan or is not impaired under the Plan;

(viii).  except to the extent that the holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that Administrative Expense Claims and Other Priority Claims, other than Priority Tax Claims, will be paid in full on the Effective Date, and that Priority Tax Claims will receive either payment in full on the Effective Date or deferred cash payments over a period not exceeding five (5) years after the Petition Date, of a value, as of the Effective Date of the Plan, equal to the allowed amount of such Claims;

(ix).    at least one Class of impaired Claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in such Class;

(x).     confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors under the Plan; and

WEIL:\97988370\1\32626.0004

(xi).    all fees payable under section 1930 of title 28, as determined by the Bankruptcy Court at the Confirmation Hearing, have been paid or the Plan provides for the payment of all such fees on the Effective Date of the Plan.

As provided above and described in more detail below, among the requirements for confirmation are that the Plan is (A) accepted by all impaired Classes of Claims and Interests entitled to vote or, if rejected or deemed rejected by an impaired Class, that the Plan "does not discriminate unfairly" and is "fair and equitable" as to such Class; (B) in the "best interests" of the holders of Claims and Interests impaired under the Plan; and (C) feasible.

### ii.        Acceptance of Plan

Under the Bankruptcy Code, a Class accepts a chapter 11 plan if (i) holders of two-thirds (2/3) in amount and (ii) with respect to holders of Claims, more than a majority in number of the allowed claims in such class (other than those designated under section 1126(e) of the Bankruptcy Code) vote to accept the Plan.  Holders of Claims or Interests that fail to vote are not counted in determining the thresholds for acceptance of the Plan.

If any impaired Class of Claims or Interests does not accept the Plan (or is deemed to reject the Plan), the Bankruptcy Court may still confirm the Plan at the request of the Debtors if, as to each impaired Class of Claims or Interests that has not accepted the Plan (or is deemed to reject the Plan), the Plan "does not discriminate unfairly" and is "fair and equitable" under the so-called "cramdown" provisions set forth in section 1129(b) of the Bankruptcy Code.  The "unfair discrimination" test applies to classes of claims or interests that are of equal priority and are receiving different treatment under the Plan.  A chapter 11 plan does not discriminate unfairly, within the meaning of the Bankruptcy Code, if the legal rights of a dissenting class are treated in a manner consistent with the treatment of other classes whose legal rights are substantially similar to those of the dissenting class and if no class of claims or interests receives more than it legally is entitled to receive for its claims or interests.  The test does not require that the treatment be the same or equivalent, but that such treatment be "fair."  The "fair and equitable" test applies to classes of different priority and status (e.g., secured versus unsecured; claims versus interests) and includes the general requirement that no class of claims receive more than 100% of the allowed amount of the claims in such class.  As to the dissenting class, the test sets different standards that must be satisfied for the Plan to be confirmed, depending on the type of claims or interests in such class.  The following sets forth the "fair and equitable" test that must be satisfied as to each type of class for a plan to be confirmed if such class rejects the Plan:

- **Secured Creditors**.  Each holder of an impaired secured claim either (a) retains its liens on the property, to the extent of the allowed amount of its secured claim, and receives deferred cash payments having a value, as of the effective date of the plan, of at least the allowed amount of such secured claim, (b) has the right to credit bid the amount of its claim if its property is sold and retains its lien on the proceeds of the sale, or (c) receives the "indubitable equivalent" of its allowed secured claim.

- **Unsecured Creditors.**  Either (a) each holder of an impaired, unsecured claim receives or retains under the Plan, property of a value, as of the effective date of the Plan, equal to the amount of its allowed claim or (b) the holders of claims and

interests that are junior to the claims of the dissenting class will not receive any property under the Plan.

- **Interests.** Either (a) each equity interest holder will receive or retain under the Plan property of a value equal to the greater of (i) the fixed liquidation preference or redemption price, if any, of such equity interest and (ii) the value of the equity interest or (b) the holders of interests that are junior to the interests of the dissenting class will not receive or retain any property under the Plan.

Holders of Property-Level Guarantee Claims may argue that the Plan is not confirmable because it provides for different treatment of Property-Level Guarantee Claims and Property-Level Guarantee Settlement Claims, both of which arise from, or are based upon, a prepetition guarantee by the Operating Partnership or REIT (or a subsidiary thereof) of a Property-Level Loan.

The Debtors believe that there is a reasonable basis for the different treatment of Property-Level Guarantee Claims and Property-Level Guarantee Settlement Claims. The filing of the Debtors' chapter 11 cases triggered events of default on certain of the Property Level Loans. The Debtors, however, believe that they have meaningful equity value in those properties which they would like to preserve. To that end, the Debtors and the settling lenders have agreed that in exchange for a waiver of defaults arising from these chapter 11 cases, such guarantee claims would be Reinstated under the Plan. Settling with these lenders serves to avoid potentially unnecessary and costly litigation surrounding such defaults or the potential foreclosure by the lenders on these properties.

Separately, holders of Existing REIT Preferred Stock may object to confirmation of the Plan on the grounds that the distribution of New Common Stock to the holders of Existing REIT Common Stock—while the holders of Existing Preferred Interests are not being paid in full—violates the Bankruptcy Code's "absolute priority rule." The absolute priority rule generally requires that senior stakeholders be paid in full before junior stakeholders may receive a recovery. The Debtors, however, believe that this argument is misplaced, and the Plan satisfies the Bankruptcy Code's confirmation requirements.

The holders of Existing REIT Preferred Stock will likely argue that they have priority over the holders of the Existing REIT Common Stock because the Existing REIT Preferred Stock has a "liquidation preference" over the Existing REIT Common Stock. Such priority, however, only exists in the context of a liquidation of the Debtors' estates, not in the restructuring scenario contemplated by the Plan where the Debtors will emerge from these Chapter 11 Cases as a going concern.

Moreover, the liquidation preference is only applicable where value is otherwise available for distribution to equity holders. Here, as demonstrated by the Valuation Analysis annexed hereto as **Exhibit F**, the value of the Debtors' assets is insufficient to pay the Debtors' *creditors* in full, let alone holders of their existing equity. Consequently, the holders of Existing REIT Preferred Stock and Existing REIT Common Stock are "out of the money" and not entitled to receive any recovery under the Plan under the Bankruptcy Code's distribution scheme. Moreover, as further demonstrated by the Liquidation Analysis annexed hereto as **Exhibit D**, the holders of equity interests in the Debtors would not recover anything in a liquidation scenario.

Here, the Consenting Noteholders, as part of the heavily negotiated settlement through Court-ordered Mediation, have agreed to allocate a portion of their recovery–11% of the New Common Stock—to the holders of Existing REIT Preferred Stock (5.5% of the New Common Stock) and Existing REIT Common Stock (5.5% of the New Common Stock).  This represents a recovery to such interest holders that they would not otherwise be entitled to in a liquidation or under the Bankruptcy Code's priority scheme.  Accordingly, under these circumstances, holders of Existing REIT Preferred Stock are not entitled to priority, whether by virtue of their liquidation preference, the Bankruptcy Code, or otherwise.  Consequently, to the extent holders of Existing REIT Preferred Stock or Existing REIT Common Stock vote to reject the Plan or object to confirmation of the Plan at the Confirmation Hearing, the Bankruptcy Court may determine that such holders are not entitled to any recovery as a matter of law.  In the event of such a determination by the Bankruptcy Court, the recovery that holders of Existing LP Units, Existing REIT Preferred Stock or Existing REIT Common Stock, as applicable, would otherwise receive under the Plan will revert to the holders of Unsecured Claims.

Thus, for the foregoing reasons and others, the Debtors believe that the Plan satisfies the absolute priority rule, including with respect to the Existing REIT Preferred Stock, and may be confirmed.  Therefore, the Debtors believe the Plan satisfies the "unfair discrimination" and "fair and equitable" tests with respect to any rejecting Class.

**IF ALL OTHER CONFIRMATION REQUIREMENTS ARE SATISFIED AT THE CONFIRMATION HEARING, THE DEBTORS WILL ASK THE BANKRUPTCY COURT TO RULE THAT THE PLAN MAY BE CONFIRMED ON THE GROUND THAT THE SECTION 1129(b) REQUIREMENTS HAVE BEEN SATISFIED.**

> ### iii. *Best Interests Test*

As noted above, with respect to each impaired class of claims and equity interests, confirmation of a plan requires that each such holder either: (a) accept the plan; or (b) receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the value such holder would receive or retain if the debtors were liquidated under chapter 7 of the Bankruptcy Code.  This requirement is referred to as the "best interests" test.

This test requires a bankruptcy court to determine what the holders of allowed claims and allowed equity interests in each impaired class would receive from a liquidation of the debtor's assets and properties in the context of a liquidation under chapter 7 of the Bankruptcy Code.  To determine if a plan is in the best interests of each impaired class, the value of the distributions from the proceeds of the liquidation of the debtor's assets and properties (after subtracting the amounts attributable to the aforesaid claims) is then compared with the value offered to such classes of claims and equity interests under the plan.

The Debtors believe that under the Plan all holders of impaired Claims and Interests will receive property with a value not less than the value such holder would receive in a liquidation under chapter 7 of the Bankruptcy Code.  The Debtors' belief is based primarily on: (a) consideration of the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to holders of impaired Claims and Interests; and (b) the Liquidation Analysis attached hereto as **Exhibit D**.

The Debtors believe that any liquidation analysis is speculative, as it is necessarily premised on assumptions and estimates that are inherently subject to significant uncertainties and contingencies, many of which would be beyond the control of the Debtors.  The Liquidation Analysis provided in **Exhibit D** is solely for the purpose of disclosing to holders of Claims and Interests the effects of a hypothetical chapter 7 liquidation of the Debtors, subject to the assumptions set forth therein.  There can be no assurance as to values that would actually be realized in a chapter 7 liquidation nor can there be any assurance that a bankruptcy court will accept the Debtors' conclusions or concur with such assumptions in making its determinations under section 1129(a)(7) of the Bankruptcy Code.

*iv.*      *Feasibility*

Section 1129(a)(11) of the Bankruptcy Code requires that a debtor demonstrate that confirmation of a plan is not likely to be followed by liquidation or the need for further financial reorganization.  For purposes of determining whether the Plan meets this requirement, the Debtors have analyzed their ability to meet their obligations under the Plan.  As part of this analysis, the Debtors have prepared the consolidated financial projections for the Reorganized Debtors (the "**Financial Projections**").  The Financial Projections, and the assumptions on which they are based, are annexed hereto as **Exhibit E**.  Based upon such Financial Projections, the Debtors believe they will have sufficient resources to make all payments required pursuant to the Plan and that confirmation of the Plan is not likely to be followed by liquidation or the need for further reorganization.  Moreover, Article IX hereof sets forth certain risk factors that could impact the feasibility of the Plan.

The Debtors do not, as a matter of course, publish their business plans or strategies, projections, or anticipated financial position.  Accordingly, the Debtors do not anticipate that they will, and disclaim any obligation to, furnish updated business plans or Financial Projections to parties in interest after the Confirmation Date or otherwise make such information public.  In connection with the planning and development of the Plan, the Financial Projections were prepared by the Debtors, with the assistance of their professionals, to present the anticipated impact of the Plan.  The Financial Projections assume that the Plan will be implemented in accordance with its stated terms.

Consequently, the estimates and assumptions underlying the Financial Projections are inherently uncertain and are subject to material business, economic, and other uncertainties.  Therefore, such Financial Projections, estimates, and assumptions are not necessarily indicative of current values or future performance, which may be significantly less or more favorable than set forth herein.

The Financial Projections should be read in conjunction with the assumptions, qualifications, and explanations set forth in this Disclosure Statement, the Plan, and the Plan Supplement, in their entirety, and the historical consolidated financial statements (including the notes and schedules thereto).

WEIL:\97988370\1\32626.0004

**XII.**
**ALTERNATIVES TO CONFIRMATION**
**AND CONSUMMATION OF PLAN**

The Debtors have evaluated several alternatives to the Plan.  After studying these alternatives, the Debtors have concluded that the Plan, which among other things, reflects a consensus among the Debtors and Consenting Creditors, is the best alternative and will maximize recoveries to parties in interest, assuming confirmation and consummation of the Plan.  If the Plan is not confirmed and consummated, the alternatives to the Plan are:  (A) the preparation and presentation of an alternative reorganization; (B) the a sale of some or all of the Debtors' assets pursuant to section 363 of the Bankruptcy Code; or (C) a liquidation under chapter 7 of the Bankruptcy Code.

>>>A.       **Alternative Plan of Reorganization**

Subject to the RSA, if the Plan is not confirmed, the Debtors (or if the Debtors' exclusive period in which to file a plan of reorganization has expired, any other party in interest) could attempt to formulate a different plan.  Such a plan might involve either: (a) a reorganization and continuation of the Debtors' businesses or (b) an orderly liquidation of their assets.  The Debtors, however, believe that the Plan, as described herein, enables their creditors to realize the most value under the circumstances.  In addition, if the Plan is not confirmed under the terms of the RSA, the Consenting Creditors have the right to terminate the RSA and all obligations thereunder.

>>>B.       **Sale Under Section 363 of the Bankruptcy Code**

If the Plan is not confirmed, the Debtors could seek from the Bankruptcy Court, after notice and hearing, authorization to sell their assets under section 363 of the Bankruptcy Code.  Holders of First Lien Credit Facility Claims may be entitled to credit bid on any property to which their security interest is attached to the extent of the value of such security interest, and to offset their Claims against the purchase price of the property.  In addition, the security interests in the Debtors' assets held by holders of First Lien Credit Facility Claims would attach to the proceeds of any sale of the Debtors' assets to the extent of their secured interests therein.  Upon analysis and consideration of this alternative, the Debtors do not believe a sale of their assets under section 363 of the Bankruptcy Code would yield a higher recovery for the holders of Claims under the Plan.

>>>C.       **Liquidation under Chapter 7 of Bankruptcy Code**

If no plan can be confirmed, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code in which a trustee would be elected or appointed to liquidate the assets of the Debtors for distribution to their creditors in accordance with the priorities established by the Bankruptcy Code.  The effect that a chapter 7 liquidation would have on the recovery of holders of Allowed Claims and Interests is set forth in the Liquidation Analysis attached hereto as **Exhibit D**.

The Debtors believe that liquidation under chapter 7 would result in smaller distributions to creditors than those provided for in the Plan because of, among other things, the delay resulting from the conversion of the Chapter 11 Cases, the additional administrative expenses associated with the appointment of a trustee and the trustee's retention of professionals who would be required

to become familiar with the many legal and factual issues in the Chapter 11 Cases, and the loss in value attributable to an expeditious liquidation of the Debtors' assets as required by chapter 7.

[*Remainder of page intentionally left blank*]

## XIII.
## <u>CONCLUSION AND RECOMMENDATION</u>

The Debtors believe the Plan is in the best interests of all stakeholders and urge the holders of Claims in Classes 3, 4, 5, 7, 10, 11, 12, and 14 to vote in favor thereof.

Dated: May 25, 2021
Chattanooga, Tennessee

Respectfully submitted,

By:     /s/ *Farzana Khaleel*
Name:  Farzana Khaleel
Title:   Chief Financial Officer and Executive
Vice President on behalf of the
Debtors

166

**<u>EXHIBIT A</u>**

**PLAN**

[Filed separately on the docket]

**<u>EXHIBIT B</u>**

**ORGANIZATIONAL CHART**

# UPPER TIER OWNERSHIP & KEY



# CBL & ASSOCIATES LIMITED PARTNERSHIP
## SUBSIDIARIES



# CBL & ASSOCIATES LIMITED PARTNERSHIP SUBSIDIARIES



# CBL & ASSOCIATES LIMITED PARTNERSHIP SUBSIDIARIES

4

# CBL & ASSOCIATES LIMITED PARTNERSHIP SUBSIDIARIES



# CBL & ASSOCIATES LIMITED PARTNERSHIP SUBSIDIARIES

# CBL & ASSOCIATES LIMITED PARTNERSHIP SUBSIDIARIES



# CBL & ASSOCIATES LIMITED PARTNERSHIP SUBSIDIARIES



# CBL & ASSOCIATES LIMITED PARTNERSHIP SUBSIDIARIES



# MADISON JOINT VENTURE, LLC &
## CBL/J I, LLC SUBSIDIARIES

10

# CBL/J II, LLC & MORTGAGE HOLDINGS, LLC SUBSIDIARIES



# MORTGAGE HOLDINGS, LLC
## SUBSIDIARIES





14

# MULTI-GP HOLDINGS, LLC
# SUBSIDIARIES



**Supplemental Key for this Chart only**

Multi-GP Holdings, LLC →

CW Joint Venture, LLC →

CBL & Associates Limited Partnership (DE)

Multi-GP Holdings, LLC (DE)

99%

GP—1%

MM—81.99%

Arbor Place Limited Partnership (GA)

18.01%

CW Joint Venture, LLC (DE)

St. Clair Square GP I, LLC (IL)

CBL/Westmoreland I, LLC (DE)

CBL/Westmoreland II, LLC (PA)

CBL/Park Plaza GP, LLC (AR)

99%

GP—1%

GP—0.5%      99.5%

99.9%

GP—0.1%

St. Clair Square Limited Partnership (IL)

CBL/Park Plaza, Limited Partnership (AR)

CBL/Park Plaza Mall, LLC (DE)

St. Clair Square SPE, LLC (DE)

CBL/Westmoreland, L.P. (PA)

Park Plaza Mall CMBS, LLC (DE)

CM

St. Clair Square

Westmoreland Mall and Crossing

Park Plaza Mall

# CBL & ASSOCIATES MANAGEMENT, INC.
## SUBSIDIARIES



# CBL & ASSOCIATES MANAGEMENT, INC.
## SUBSIDIARIES



# CBL & ASSOCIATES MANAGEMENT, INC.
## SUBSIDIARIES



# CBL & ASSOCIATES LIMITED PARTNERSHIP
## 3RD PARTY



# CBL & ASSOCIATES LIMITED PARTNERSHIP
## 3RD PARTY



# CBL & ASSOCIATES MANAGEMENT, INC.
## 3RD PARTY



# CBL & ASSOCIATES MANAGEMENT, INC.
## 3RD PARTY



# CBL & ASSOCIATES MANAGEMENT, INC.
## 3RD PARTY



# CBL/T-C, LLC
## 3ᴿᴰ PARTY













# MISCELLANEOUS
## 3RD PARTY

28

**Supplemental Key for this Chart only**

Montgomery Partners, L.P.

Cafaro Governor's Square Partnership

CBL & Associates Limited Partnership (DE)

D
P
I

CBL & Associates Management, Inc. (DE) — D

CBL/GP VI, Inc. (TN) — D

99%

CBL/Kentucky Oaks, LLC (DE)

Anthony M. Cafaro, Trustee of the Revocable Family Trust

GP—1%

Montgomery Partners, L.P. (TN) — D

50%   GP—10%

47.5%   50%

Donald J. DeSalvo

Cafaro Governor's Square Partnership (OH)

The Marion Plaza, Inc. (DE)

William A. Cafaro, Anthony M. Cafaro, Jr., Mark J. Beck, Co-Trustees of the Anthony M. Cafaro Irrevocable Trust

5%   MGP—47.5%   MGP—50%

MGP—30%   GP—10%

Governor's Square Company (OH)

Governor's Square

Governor's Square Company IB (OH)

Governor's Square Plaza

Kentucky Oaks Mall Company (OH)

Kentucky Oaks Mall

**<u>EXHIBIT C</u>**

**RSA**

THIS FIRST AMENDED AND RESTATED RESTRUCTURING SUPPORT AGREEMENT IS NOT AN OFFER OR ACCEPTANCE WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE.   ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE.  NOTHING CONTAINED IN THIS FIRST AMENDED AND RESTATED RESTRUCTURING SUPPORT AGREEMENT SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE AGREEMENT EFFECTIVE DATE ON THE TERMS DESCRIBED HEREIN, DEEMED BINDING ON ANY OF THE PARTIES HERETO.

THIS FIRST AMENDED AND RESTATED RESTRUCTURING SUPPORT AGREEMENT IS THE PRODUCT OF SETTLEMENT DISCUSSIONS AMONG THE PARTIES THERETO. ACCORDINGLY, THIS FIRST AMENDED AND RESTATED RESTRUCTURING SUPPORT AGREEMENT IS PROTECTED BY RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND ANY OTHER APPLICABLE STATUTES OR DOCTRINES PROTECTING THE USE OR DISCLOSURE OF CONFIDENTIAL SETTLEMENT DISCUSSIONS.

THIS FIRST AMENDED AND RESTATED RESTRUCTURING SUPPORT AGREEMENT DOES NOT PURPORT TO SUMMARIZE ALL OF THE TERMS, CONDITIONS, REPRESENTATIONS, WARRANTIES, AND OTHER PROVISIONS WITH RESPECT TO THE TRANSACTIONS DESCRIBED HEREIN, WHICH TRANSACTIONS WILL BE SUBJECT TO THE COMPLETION OF DEFINITIVE DOCUMENTATION INCORPORATING THE TERMS SET FORTH HEREIN AND THE CLOSING OF ANY TRANSACTION SHALL BE SUBJECT TO THE TERMS AND CONDITIONS SET FORTH IN SUCH DEFINITIVE DOCUMENTATION AND THE APPROVAL RIGHTS OF THE PARTIES SET FORTH HEREIN AND IN SUCH DEFINITIVE DOCUMENTATION.

***FIRST AMENDED AND RESTATED RESTRUCTURING SUPPORT AGREEMENT***

This FIRST AMENDED AND RESTATED RESTRUCTURING SUPPORT AGREEMENT (including all exhibits, annexes, and schedules hereto in accordance with Section 13.02, collectively, this "**Agreement**"), is made and entered into on March 21, 2021, by and among the following parties (each of the following described in sub-clauses (i) through (iii) of this preamble, collectively, the "**Parties**"):[1]

    i.      CBL & Associates Properties, Inc., a corporation incorporated under the Laws of Delaware (the "**Company**"), and each of its affiliates listed on **Exhibit A** to this Agreement and each of its and their Affiliates who are included as debtors in the Chapter 11 Cases or non-debtor Affiliates that will pledge assets or provide guarantees in support of new debt instruments to be issued pursuant to this Agreement (collectivelys and together with the Company, the "**Company Parties**");

    ii.      the undersigned beneficial owners and/or investment advisors or managers of discretionary funds, accounts, or other entities for the holders or beneficial owners of the Notes Claims and/or Consenting Crossholder Claims that have executed and delivered counterpart signature pages to this Agreement, a Joinder, or a Transfer Agreement to counsel to the Company Parties and counsel to the Bank Agent (collectively, the "**Consenting Noteholders**"); and

    iii.      the undersigned lenders and/or their respective affiliated investment advisors or managers of discretionary funds, accounts, or other entities for lenders party to that that certain Credit Agreement, dated as of January 30, 2019 (the "**First Lien Credit Agreement**"), that have executed and delivered counterpart signature pages to this Agreement, a Joinder, or a Transfer Agreement to counsel to the Company Parties and counsel to the Consenting Noteholders (collectively, but excluding any Consenting Crossholders the "**Consenting Bank Lenders**" and, together with the Consenting Noteholders and the Consenting Crossholders, the "**Consenting Creditors**").

## *RECITALS*

**WHEREAS**, the Company Parties and the Consenting Noteholders entered into that certain Restructuring Support Agreement, dated as of August 18, 2020 (the "**Original Restructuring Support Agreement**");

**WHEREAS**, the Original Restructuring Support Agreement is deemed to be amended and restated in its entirety in the form of this Agreement;

**WHEREAS**, beginning on November 1, 2020 (the "**Petition Date**"), the Company and certain of its affiliates commenced voluntary cases under chapter 11 of the Bankruptcy Code in

---

[1] Capitalized terms used but not defined in the preamble and recitals to this Agreement have the meanings ascribed to them in Section 1.

the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Court**" and the cases commenced, the "**Chapter 11 Cases**");

WHEREAS, the Parties have negotiated in good faith and at arm's length with respect to the Company Parties' capital structure and have agreed upon the terms set forth in this Agreement and as specified in the plan term sheet attached as **Exhibit B** hereto (the "**Plan Term Sheet**" and, such transactions as described in this Agreement and the Plan Term Sheet, collectively, the "**Restructuring Transactions**");

WHEREAS, the Company Parties will implement the Restructuring Transactions through the Chapter 11 Cases;

WHEREAS, the Parties have agreed to take certain actions in support of the Restructuring Transactions on the terms and conditions set forth in this Agreement and the Plan Term Sheet;

NOW, THEREFORE, in consideration of the covenants and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each of the Company Parties (jointly and severally), each of the Consenting Noteholders (severally but not jointly), and each of the Consenting Bank Lenders (severally but not jointly), intending to be legally bound hereby, agrees as follows:

*AGREEMENT*

**Section 1.**    *Definitions and Interpretation.*

1.01.  <u>Definitions</u>.  Capitalized terms used but not defined in this Agreement have the meanings given to such terms in the Plan Term Sheet.  Additionally, the following terms shall have the following definitions:

"**2023 Missed Payment**" has the meaning set forth in <u>Section 4.03</u>.

"**2023 Notes**" means CBL Limited Partnership's 5.25% Senior Notes due 2023, issued in the aggregate principal amount of $450 million, pursuant to the Indenture.

"**2026 Missed Payment**" has the meaning set forth in <u>Section 4.03</u>.

"**2026 Notes**" means CBL Limited Partnership's 5.95% Senior Notes due 2026, issued in the aggregate principal amount of $625 million, pursuant to the Indenture.

"**Adversary Proceeding**" means adversary proceeding case number 20-03454 styled *CBL & Associates Properties, Inc. et al. v. Wells Fargo Bank, National Association*.

"**Affiliate**" means, with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with, such Person as of the date on which, or at any time during the period for which, the determination of affiliation is being made (including any affiliated funds of such Person).  For purposes of this definition, the term "control" (including the correlative meanings of the terms "controlled by" and "under common control with"), as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or

3

cause the direction of the management policies of such Person, whether through the ownership of voting securities, by contract or otherwise; provided that, for the avoidance of doubt, with respect to the Company Parties, Affiliates shall not include any of the Company Parties' joint venture partners.

"**Agreement**" has the meaning set forth in the preamble.

"**Agreement Effective Date**" has the meaning set forth in Section 2.

"**Agreement Effective Period**" means, with respect to a Party, the period from the Agreement Effective Date to the Termination Date applicable to that Party.

"**Akin Gump**" means Akin Gump Strauss Hauer and Feld LLP.

"**Alternative Restructuring Proposal**" means any plan, inquiry, proposal, offer, bid, term sheet, discussion, or agreement with respect to a sale, disposition, new-money investment, restructuring, reorganization, merger, amalgamation, acquisition, consolidation, dissolution, debt investment, equity investment, liquidation, asset sale, share issuance, tender offer, recapitalization, plan of reorganization, share exchange, business combination, joint venture or similar transaction involving any one or more Company Parties, or any Affiliates of the Company Parties, or the debt, equity, or other interests in any one or more Company Parties or any Affiliates of the Company Parties, in each case other than the Restructuring Transactions.

"**Amended Employment Agreements**" means (i) the form of Amended and Restated Employment Agreement and (ii) the form of Second Amended and Restated Retention Bonus Agreement, each as prepared by the Company Parties in consultation with counsel to the Consenting Noteholders.

"**Amended Plan**" means the revised chapter 11 plan, consistent in all material respects with the terms of this Agreement and the Plan Term Sheet, to be filed by the Company Parties in the Chapter 11 Cases.

"**Bank Agent**" means Wells Fargo Bank, National Association, solely in its capacity as administrative agent under the First Lien Credit Agreement.

"**Bank Claim Subsidiaries**" has the meaning set forth in the Plan Term Sheet.

"**Bank Lender Claim**" means any First Lien Credit Facility Claim that is not a Consenting Crossholder Claim.

"**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended.

"**Bankruptcy Court**" has the meaning set forth in the recitals to this Agreement.

"**Business Day**" means any day other than a Saturday, Sunday, or a U.S. federal holiday as recognized by banking institutions in the City of New York.

4

"**Causes of Action**" means any action, Claim, cause of action, controversy, demand, right, action, lien, indemnity, existing equity interest, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, license, and franchise of any kind or character whatsoever, whether known, unknown, contingent or noncontingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, in contract or in tort, in law or in equity, or pursuant to any other theory of law.

"**CBL Limited Partnership**" means CBL & Associates Limited Partnership, a Delaware limited partnership.

"**Chapter 11 Cases**" has the meaning set forth in the recitals to this Agreement.

"**Claim**" has the meaning ascribed to it in section 101(5) of the Bankruptcy Code.

"**Commitment Letters**" means the letter agreements, in form and substance reasonably acceptable to the Company Parties and the Required Consenting Noteholders, pursuant to which the Commitment Parties agree to purchase, in the aggregate, $50 million of the New Convertible Notes.

"**Commitment Parties**" means the Consenting Creditors signatory to the Commitment Letters.

"**Common Equity Interests**" means the common stock of the Company and the common units, and all classes of special common units of the CBL Limited Partnership.

"**Company**" has the meaning set forth in the preamble.

"**Company Claims**" means any Claim against a Company Party, including the Notes Claims, the Consenting Crossholder Claims, and the Bank Lender Claims.

"**Company Corporate Governance Documents**" has the meaning set forth in the Plan Term Sheet.

"**Company Parties**" has the meaning set forth in the preamble.

"**Confirmation Order**" means the order of the Bankruptcy Court confirming the Amended Plan pursuant to Section 1129 of the Bankruptcy Code, which Confirmation Order shall be in accordance with this Agreement and the Definitive Documentation.

"**Consenting Bank Lenders**" has the meaning set forth in the preamble.

"**Consenting Creditors**" has the meaning set forth in the preamble.

"**Consenting Crossholders**" means the entities listed on **Exhibit C** hereto and any entity to which any Consenting Crossholder Claim is transferred in accordance with Section 8.01, but, in the case of each such entity listed on **Exhibit C** hereto, only for so long as such entity owns First Lien Credit Facility Claims.

"**Consenting Crossholder Claim**" means any First Lien Credit Facility Claim held by a Consenting Crossholder as of March 1, 2021.

"**Consenting Non-Crossholders**" means Consenting Noteholders who are not Consenting Crossholders.

"**Consenting Noteholders**" has the meaning set forth in the preamble.

"**Definitive Documentation**" has the meaning set forth in Section 3.01.

"**Disclosure Statement**" means the disclosure statement for the Amended Plan, consistent in all material respects with the terms of this Agreement and the Plan Term Sheet, to be filed by the Company Parties in the Chapter 11 Cases.

"**Ducera**" means Ducera Partners LLC.

"**Effective Date**" means the date, selected in consultation with the Consenting Creditors, which is the first Business Day on which (i) all conditions to the effectiveness of the Amended Plan have been satisfied or waived in accordance therewith and (ii) no stay of the Confirmation Order is in effect.

"**Entity**" has the meaning set forth in section 101(15) of the Bankruptcy Code.

"**Execution Date**" means the date hereof.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended.

"**Final Order**" means an order or judgment of the Bankruptcy Court (or any other court of competent jurisdiction) entered by the Clerk of the Bankruptcy Court (or such other court) on the docket in the Chapter 11 Cases (or the docket of such other court), which has not been modified, amended, reversed, vacated or stayed and as to which (A) the time to appeal, petition for certiorari, or move for a new trial, stay, reargument or rehearing has expired and as to which no appeal, petition for certiorari or motion for new trial, stay, reargument or rehearing shall then be pending or (B) if an appeal, writ of certiorari, new trial, stay, reargument or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court (or other court of competent jurisdiction) shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, stay, reargument or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari or move for a new trial, stay, reargument or rehearing shall have expired, as a result of which such order shall have become final in accordance with Rule 8002 of the Federal Rules of Bankruptcy Procedure; provided that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Federal Rules of Bankruptcy Procedure, may be filed relating to such order, shall not cause an order not to be a Final Order.

"**First Lien Credit Agreement**" has the meaning set forth in the preamble.

"**First Lien Credit Facility Claim**" means any claim arising under or related to the First Lien Credit Agreement.

"**Governmental Entity**" means any U.S. or non-U.S. international, regional, federal, state, municipal or local governmental, judicial, administrative, legislative or regulatory authority, entity, instrumentality, agency, department, commission, court, or tribunal of competent jurisdiction (including any branch, department or official thereof).

"**Indenture**" means that certain Indenture, dated as of November 26, 2013, among CBL Limited Partnership, as issuer, the Company, as limited guarantor, and the Indenture Trustee, as amended, modified or supplemented by that certain First Supplemental Indenture dated as of November 26, 2013 by and among the CBL Limited Partnership, the Company, and the Indenture Trustee, the Second Supplemental Indenture dated as of December 13, 2016 by and among the CBL Limited Partnership, the Company and the Indenture Trustee and the Third Supplemental Indenture dated as of January 30, 2019 by and among CBL Limited Partnership, the Company, the subsidiary guarantors of the Company party thereto (the "**Subsidiary Guarantors**"), and the Indenture Trustee, pursuant to which the Notes are outstanding.

"**Indenture Trustee**" means Delaware Trust Company, as successor trustee under the Indenture.

"**Jones Day**" means Jones Day, as counsel to the Bank Agent.

"**Law**" means any law, constitution, statute, rule, regulation, ordinance, code, judgment, order, decree, treaty, convention, governmental directive or other legally enforceable requirement, U.S. or non-U.S., of any Governmental Entity, including common law.

"**Lien**" means any mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), charge, or other security interest or preferential arrangement in the nature of a security interest of any kind or nature whatsoever (including any conditional sale or other title retention agreement, any easement, right of way or other encumbrance on title to real property, and any financing lease having substantially the same.

"**New Bank Borrower Corporate Governance Documents**" has the meaning set forth in the Plan Term Sheet.

"**New Bank Term Loan Facility Documents**" has the meaning set forth in the Plan Term Sheet.

"**New Common Equity Interests**" has the meaning set forth in the Plan Term Sheet.

"**New Convertible Notes**" has the meaning set forth in the Plan Term Sheet.

"**New Notes**" has the meaning set forth in the Plan Term Sheet.

"**Non-Consenting Creditor**" has the meaning set forth in Section 12(b).

"**Notes**" means, collectively, the 2023 Notes, the 2024 Notes and the 2026 Notes.

"**Notes Claims**" means any Claim against a Company Party arising under, derived from, based on, or related to the Notes or the Indenture.

"**Person**" means an individual, firm, corporation (including any non-profit corporation), partnership, limited liability company, joint venture, association, trust, Governmental Entity or other entity or organization.

"**Petition Date**" has the meaning set forth in the recitals to this Agreement.

"**PJT Partners**" means PJT Partners LP, as financial advisor to the Consenting Noteholders.

"**Plan Supplement**" means a supplement or supplements to the Amended Plan containing the forms of certain documents, schedules, and exhibits relevant to the implementation of the Amended Plan and Restructuring Transactions to be agreed in accordance with the terms hereof.

"**Plan Term Sheet**" has the meaning set forth in the recitals to this Agreement.

"**Qualified Marketmaker**" means an entity that (a) holds itself out to the public or the applicable private markets as standing ready in the ordinary course of business to purchase from customers and sell to customers Company Claims (or enter with customers into long and short positions in Company Claims), in its capacity as a dealer or market maker in Company Claims and (b) is, in fact, regularly in the business of making a market in claims against issuers or borrowers (including debt securities or other debt).

"**Required Consenting Bank Lenders**" means, as of the relevant date, Consenting Bank Lenders that collectively hold at least 66 2/3% of First Lien Credit Facility Claims held by all such Consenting Bank Lenders.

"**Required Consenting Creditors**" means, as of the relevant date, the Required Consenting Noteholders and the Required Consenting Bank Lenders.

"**Required Consenting Crossholders**" means, as of the relevant date, Consenting Crossholders that collectively hold at least 75% of the aggregate outstanding principal amount of the Consenting Crossholder Claims.

"**Required Consenting Non-Crossholders**" means, as of the relevant date, Consenting Non-Crossholders that collectively hold at least 75% of the aggregate outstanding principal amount of the Notes Claims held by all such Consenting Non-Crossholders.

"**Required Consenting Noteholders**" means, as of the relevant date, Consenting Noteholders that collectively hold at least 75% of the aggregate outstanding principal amount of the Notes Claims held by all such Consenting Noteholders.

"**Restructuring Transactions**" has the meaning set forth in the recitals.

"**Section 16 Officer**" means any employee of the Company Parties who is subject to the disclosure requirements of Section 16(a) of the U.S. Securities Exchange Act of 1934, as amended.

"**Securities Act**" means the Securities Act of 1933, as amended.

"**Solicitation Materials**" means all solicitation materials in respect of the Amended Plan together with the Disclosure Statement, which Solicitation Materials shall be in accordance with this Agreement and the Definitive Documentation.

"**Termination Date**" means the date on which termination of this Agreement as to a Party is effective in accordance with Sections 11.01, 11.02, 11.03, 11.04, 11.05, or 11.06.

"**Transfer**" means to sell, resell, reallocate, use, pledge, assign, transfer, hypothecate, participate, donate or otherwise encumber or dispose of, directly or indirectly (including through derivatives, options, swaps, pledges, forward sales or other transactions).

"**White & Case**" means White & Case LLP as counsel to certain Consenting Crossholders.

1.02.   Interpretation.  For purposes of this Agreement:

(a)     in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender;

(b)     capitalized terms defined only in the plural or singular form shall nonetheless have their defined meanings when used in the opposite form;

(c)     unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions;

(d)     unless otherwise specified, any reference herein to an existing document, schedule, or exhibit shall mean such document, schedule, or exhibit, as it may have been or may be amended, restated, supplemented, or otherwise modified from time to time; provided that any capitalized terms herein which are defined with reference to another agreement, are defined with reference to such other agreement as of the date of this Agreement, without giving effect to any termination of such other agreement or amendments to such capitalized terms in any such other agreement following the date hereof;

(e)     unless otherwise specified, all references herein to "Sections" are references to Sections of this Agreement;

(f)     the words "herein," "hereof," and "hereto" refer to this Agreement in its entirety rather than to any particular portion of this Agreement;

(g)     captions and headings to Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Agreement;

(h)     references to "shareholders", "directors", and/or "officers" shall also include "members", "partners", and/or "managers", as applicable, as such terms are defined under the applicable limited liability company or partnership Laws;

(i)      the use of "include" or "including" is without limitation, whether stated or not;

(j)      the phrase "counsel to the Company Parties" refers in this Agreement to counsel specified in Section 13.10(a);

(k)      the phrase "counsel to the Consenting Noteholders" refers in this Agreement to counsel specified in Section 13.10(b);

(l)      the phrase "counsel to the Bank Agent" refers in this Agreement to counsel specified in Section 13.10(c); and

(m)      the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.

**Section 2.**      *Effectiveness of this Agreement.*   This Agreement shall become effective and binding upon each of the Parties at 12:01 a.m., prevailing New York local time, (x) with respect to the Consenting Creditors, on the date on which the conditions set forth in clauses (a), (b), and (c) below have been satisfied or waived in accordance with this Agreement and (y) with respect to the Company Parties, immediately upon authorization by the Bankruptcy Court to perform pursuant to the terms of this Agreement; provided that the condition set forth in clause (d) below shall be satisfied prior to the objection deadline for the motion seeking such authorization (with respect to a Party, the date applicable to that Party,  the "**Agreement Effective Date**"):

(a)      each of the Company Parties shall have executed and delivered counterpart signature pages of this Agreement to counsel to the Consenting Noteholders and to counsel to the Bank Agent;

(b)      each of the Consenting Noteholders, who hold in the aggregate at least 60% of the aggregate outstanding principal amount of Notes shall have executed and delivered counterpart signature pages of this Agreement to counsel to the Company Parties and to counsel to the Bank Agent;

(c)      each of the Consenting Bank Lenders, who hold in the aggregate in excess of 67% of the aggregate outstanding principal amount of debt under the First Lien Credit Agreement excluding any debt held by Consenting Crossholders, shall have executed and delivered counterpart signature pages of this Agreement to counsel to the Company Parties and to counsel to the Consenting Noteholders; and

(d)      each of the Commitment Parties shall have executed and delivered the Commitment Letters to the Company Parties.

**Section 3.**      *Definitive Documentation.*

3.01.   The documents related to or otherwise utilized to implement or effectuate the Restructuring Transactions (collectively, the "**Definitive Documentation**") shall include, without limitation, the following: (A) the Amended Plan and its exhibits, ballots, and solicitation procedures; (B) the Confirmation Order; (C) the Disclosure Statement; (D) the order of the Bankruptcy Court approving the Disclosure Statement and the other Solicitation Materials; (E) the

Plan Supplement; (F) the New Convertible Notes indenture and any related documentation; (G) the documentation issuing and setting forth the rights, preferences and privileges of the New Common Equity Interests; (H) the Registration Rights Agreement, if any; (I) the Company Corporate Governance Documents; (J) the New Notes indenture and any related documentation; (K) the New Bank Term Loan Facility Documents; (L) the New Bank Borrower Corporate Governance Documents; (M) the motion seeking authority to perform pursuant to the terms of this Agreement; and (N) such other agreements and documentation reasonably desired or necessary to consummate and document the transactions contemplated by this Agreement, the Plan Term Sheet, and the Amended Plan.

3.02.   Upon completion, the Definitive Documentation and every other document, deed, agreement, filing, notification, letter or instrument related to the Restructuring Transactions shall contain terms, conditions, representations, warranties, and covenants consistent with the terms of this Agreement, as they may be modified, amended, or supplemented in accordance with Section 12.   Further, the Definitive Documentation not executed or in a form attached to this Agreement as of the Execution Date shall otherwise be in form and substance reasonably acceptable to the Company Parties and the Required Consenting Noteholders; provided that the Definitive Documentation, other than (E) (to the extent it does not relate to the New Bank Term Loan Facility Documents, the Consenting Bank Lenders, or their treatment, rights or obligations), (F), (G), (H), (I), and (J), shall be in form and substance also reasonably acceptable to the Required Consenting Bank Lenders, such approval not to be unreasonably withheld; provided further that, notwithstanding the foregoing, the Company Corporate Governance Documents shall be acceptable only to the Required Consenting Non-Crossholders and the Required Consenting Crossholders; provided further that the Required Consenting Non-Crossholders and the Required Consenting Crossholders will consult with the Company Parties regarding such Company Corporate Governance Documents, provided, that nothing in the Company Corporate Governance Documents shall adversely impact the economic recovery of the holders of Common Equity Interests as set forth in the Plan Term Sheet.

**Section 4.**   *Commitments of the Consenting Creditors.*

4.01.   General Commitments, Forbearances, and Waivers.

(a)   During the Agreement Effective Period, each Consenting Creditor severally, and not jointly, agrees to:

(i)   support the Restructuring Transactions and vote and exercise any powers or rights available to it (including in any shareholders' or creditors' meeting or in any process requiring voting or approval to which they are legally entitled to participate) in each case in favor of any matter requiring approval to the extent reasonably necessary to implement the Restructuring Transactions;

(ii)   take action in order to effectuate, if applicable, or otherwise not object to (x) a stay of the Adversary Proceeding, and (y) the dismissal with prejudice of the Adversary Proceeding and all Causes of Action asserted therein upon the Confirmation Order becoming a Final Order;

(iii)    use commercially reasonable efforts to give, subject to applicable Laws, any notice, order, instruction, or direction to the Indenture Trustee or Bank Agent, as applicable, necessary to give effect to the Restructuring Transactions; and

(iv)    negotiate in good faith and use commercially reasonable efforts to execute and implement the Definitive Documentation that are consistent with this Agreement to which it is required to be a party.

(b)    During the Agreement Effective Period, subject to applicable Laws and as otherwise set forth in this Agreement, each Consenting Creditor severally, and not jointly, agrees that it shall not directly or indirectly:

(i)    object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the Restructuring Transactions;

(ii)    propose, file, support, or vote for any Alternative Restructuring Proposal;

(iii)    file any motion, pleading, or other document with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is not materially consistent with this Agreement, the Plan Term Sheet, or the Amended Plan;

(iv)    initiate, or have initiated on its behalf, any litigation or proceeding which would materially or unreasonably delay, impede, or interfere with the implementation or consummation of the Restructuring Transactions, other than to enforce this Agreement or any Definitive Documentation or as otherwise permitted under this Agreement;

(v)    file any motion, application, adversary proceeding, or Cause of Action challenging the validity, enforceability or priority of, or seeking avoidance or subordination of any Company Claim held by any other Consenting Creditor or any transfer to the Bank Agent, the Indenture Trustee, or any Consenting Creditor on account of a Company Claim; or

(vi)    object to, delay, impede, or take any other action to interfere with the Company Parties' or their Affiliates' ownership and possession of their assets, wherever located, or interfere with the automatic stay arising under section 362 of the Bankruptcy Code; provided, however that nothing in this Agreement shall limit the right of any Party to exercise any right or remedy provided under this Agreement, the Confirmation Order, or any Definitive Documentation.

4.02.    Commitments with Respect to Chapter 11 Cases.

(a)    During the Agreement Effective Period, each Consenting Creditor that is entitled to vote to accept or reject the Amended Plan pursuant to its terms agrees that it shall (when solicited to do so after receipt of the Disclosure Statement and Solicitation Materials approved by the Bankruptcy Court):

(i)    vote each of its Company Claims to accept the Amended Plan by delivering its duly executed and completed ballot accepting the Amended Plan on a timely basis following the commencement of the solicitation of the Amended Plan and its actual receipt of the Solicitation Materials and the ballot that meet the requirements of Sections 1125 and 1126 of the Bankruptcy

Code; provided, however, that the consent or votes of the Consenting Creditors shall be immediately revoked and deemed null and void *ab initio* upon the occurrence of the Termination Date (other than a Termination Date as a result of the occurrence of the Effective Date);

       (ii)    to the extent it is permitted to elect whether to opt out of the releases set forth in the Amended Plan, elect not to opt out of the releases set forth in the Amended Plan by timely delivering its duly executed and completed ballot(s) indicating such election; and

       (iii)    not change, withdraw, amend, or revoke (or cause to be changed, withdrawn, amended, or revoked) any vote or election referred to in clauses (i) and (ii) above; provided, however, that nothing in this Agreement shall prevent any Party from withholding, amending or revoking (or causing the same) its timely consent or vote with respect to the Amended Plan if this Agreement has been terminated in accordance with its terms with respect to such Party (other than a Termination Date as a result of the occurrence of the Effective Date).

       (b)    During the Agreement Effective Period, each Consenting Creditor, in respect of each of its Company Claims, will not directly or indirectly object to, delay, impede, or take any other action to interfere with any motion or other pleading or document filed by a Company Party in the Bankruptcy Court that is contemplated by and in accordance with this Agreement.

       4.03.   Waiver of Prior Events of Default.  The Consenting Noteholders acknowledge and agree that each of the Events of Default (as such term is defined under the Indenture) under the Indenture resulting from the failure by the Company to make each of the payments of (i) the interest payment originally due and payable on June 1, 2020 for the 2023 Notes (the "**2023 Missed Payment**") and (ii) the interest payment originally due and payable on June 15, 2020 for the 2026 Notes (the "**2026 Missed Payment**") are no longer continuing under the Indenture as a result of the Company making each of the 2023 Missed Payment and the 2026 Missed Payment in full on August 5, 2020.  Further, in the event that either the Indenture Trustee or other holders of the 2023 Notes or 2026 Notes, as applicable, take any action to declare either or both of the 2023 Notes or the 2026 Notes immediately due and payable pursuant to Section 502 under the Indenture, solely due to either or both of Events of Default (as such term is defined under the Indenture) under the Indenture resulting from the 2023 Missed Payment or 2026 Missed Payment, the Consenting Noteholders agree (solely to the extent permitted under the Indenture) to rescind and cancel any such acceleration(s); provided, however, that in no event shall the Consenting Noteholders be required to provide an indemnity or bear responsibility for any out of pocket costs related to any such rescission and cancellation.

       4.04.   No Liabilities.  Notwithstanding any other provision in this Agreement, including this Section 4, nothing in this Agreement shall require any Consenting Creditor to incur any expenses, liabilities or other obligations, or agree to any commitments, undertakings, concessions, indemnities or other arrangements that could result in expenses, liabilities or other obligations to any Consenting Creditor.  Notwithstanding the immediately preceding sentence, nothing in this Section 4.04 shall serve to limit, alter or modify any Consenting Creditor's express obligations under the terms of this Agreement.

**Section 5.**    *Additional Provisions Regarding the Consenting Creditors' Commitments.* Notwithstanding anything contained in this Agreement, nothing in this Agreement shall:

(a) subject to any confidentiality obligations set forth in the Indenture or First Lien Credit Agreement, as applicable, this Agreement or in any confidentiality agreement entered into by a Company Party and a Consenting Creditor, or the advisors to the Consenting Creditors, affect the ability of any Consenting Creditor to consult with any other Consenting Creditor, the Company Parties, or any other party in interest in the Chapter 11 Cases (including any official committee and the United States Trustee); (b) impair or waive the rights of any Consenting Creditor to assert or raise any objection permitted under this Agreement in connection with the Restructuring Transactions; (c) prevent any Consenting Creditor from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement; (d) other than as may be required by a court of competent jurisdiction, including the Bankruptcy Court, require any Consenting Creditor to provide any information that it determines, in its sole discretion, to be sensitive or confidential; (e) obligate a Consenting Creditor to deliver a vote to support the Amended Plan or prohibit a Consenting Creditor from withdrawing such vote, in each case from and after the Termination Date (other than a Termination Date as a result of the occurrence of the Effective Date); provided, however, that upon the withdrawal of any such vote after the Termination Date (other than a Termination Date as a result of the occurrence of the Effective Date), such vote shall be deemed null and void *ab initio* and such Consenting Creditor shall have the opportunity to change its vote; (f) (*i*) prevent any Consenting Creditor from taking any action which is required by applicable Law or (*ii*) require any Consenting Creditor to take any action which is prohibited by applicable Law or to waive or forego the benefit of any applicable legal/professional privilege; (g) prevent any Consenting Creditor by reason of this Agreement or the Restructuring Transactions from making, seeking, or receiving any regulatory filings, notifications, consents, determinations, authorizations, permits, approvals, licenses, or the like; or (h) prohibit any Consenting Creditor from taking any action that is not inconsistent with this Agreement.

**Section 6.      *Commitments of the Company Parties.***

6.01.   <u>Affirmative Commitments</u>.  Except as set forth in <u>Section 7</u>, during the Agreement Effective Period, the Company Parties agree to:

(a)      support and take all steps reasonably necessary and desirable to consummate the Restructuring Transactions in accordance with this Agreement, including the applicable Milestones as defined and set forth herein;

(b)      take action in order to effectuate, if applicable, or otherwise not object to (x) a stay of the Adversary Proceeding, and (y) the dismissal with prejudice of the Adversary Proceeding and all Causes of Action asserted therein upon the Confirmation Order becoming a Final Order;

(c)      support and take all steps reasonably necessary and desirable to facilitate solicitation of the Amended Plan in accordance with this Agreement, the Milestones, and any orders entered by the Bankruptcy Court;

(d)      use commercially reasonable efforts to obtain entry of the Confirmation Order and to cause the Confirmation Order to become a Final Order;

(e)     to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Amended Plan or the Restructuring Transactions contemplated herein, use commercially reasonable efforts to negotiate in good faith with the Consenting Creditors in an effort to agree to appropriate additional or alternative provisions or alternative implementation mechanics to address any such impediment;

(f)     use commercially reasonable efforts to obtain any and all required regulatory (including self-regulatory) and/or third-party approvals for the Restructuring Transactions;

(g)     negotiate in good faith and use commercially reasonable efforts to execute and deliver the Definitive Documentation and any other required agreements to effectuate and consummate the Restructuring Transactions as contemplated by this Agreement;

(h)     to the extent the Company Parties receive any Joinders or Transfer Agreements, notify the Consenting Creditors of such Joinders and Transfer Agreements as soon as practicable after receiving such Joinders or Transfer Agreements;

(i)     provide draft copies of all substantive motions, documents, and other pleadings to be filed in the Chapter 11 Cases to counsel to each of the Consenting Noteholders, Bank Agent, and Consenting Crossholders if reasonably practicable at least two (2) Business Days prior to the date when the Company Parties intend to file such documents, and, without limiting any approval rights set forth in this Agreement, consult in good faith with counsel to each of the Consenting Creditors regarding the form and substance of any such proposed filing; notwithstanding the foregoing, in the event that not less than two (2) Business Days' notice is not reasonably practicable under the circumstances, the Company Parties shall provide draft copies of any such motions, documents, or other pleadings to counsel to the applicable Consenting Creditors as soon as otherwise reasonably practicable before the date when the Company intends to file any such motion, documents, or other pleading;

(j)     subject to any confidentiality agreements between the Company and the Consenting Creditors and their advisors, provide, and direct their employees, officers, advisors, and other representatives to provide, to each of the Consenting Creditors, and each of their respective legal and financial advisors, (i) reasonable access to the management and advisors of the Company Parties on reasonable advance notice to such persons and without disruption to the operation of the Company Parties' business, and (ii) such other information as reasonably requested by the Consenting Creditors or their respective legal and financial advisors;

(k)     timely file a formal objection to any motion filed with the Bankruptcy Court by a third party seeking the entry of an order, (i) directing the appointment of a trustee or examiner (with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code), (ii) converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, or (iii) dismissing the Chapter 11 Cases;

(l)     inform counsel to each of the Consenting Creditors as soon as reasonably practicable after becoming aware of:  (i) any notice of any commencement of any involuntary insolvency proceedings, legal suit for payment of debt or securement of security from or by any person in respect of any Company Party or its Affiliates; (ii) a breach of this Agreement (including

a breach by any Company Party); and (iii) any representation or statement made or deemed to be made by them under this Agreement which is or proves to have been materially incorrect or misleading in any material respect when made or deemed to be made;

(m)     upon the reasonable request of the Required Consenting Noteholders or the Required Consenting Bank Lenders, inform Akin Gump, White & Case, and PJT Partners or Jones Day and Ducera, as applicable, as to:  (i) the material business and financial performance of the Company Parties and each of their direct and indirect subsidiaries; (ii) the status and progress of the Restructuring Transactions, including progress in relation to negotiations of the Definitive Documentation and the status of any negotiations with other stakeholders; and (iii) the status of obtaining any necessary or desirable authorizations (including any consents) from any stakeholder or joint venture partner, any competent judicial body, governmental authority, banking, taxation, supervisory, or regulatory or self-regulatory) body or any stock exchange;

(n)     use commercially reasonable efforts to maintain the good standing of all Company Parties and any joint ventures or other entity in which any Company Party has an equity interest in under the Laws of the state or other jurisdiction in which they are incorporated or organized, provided, however, that the Company Parties' obligations pursuant to this Section 6.01(n) shall only apply if, and to the extent, a Company Party has authority to maintain such status per the terms of the joint venture or entity agreement;

(o)     timely pay all fees and expenses as set forth in Section 13.23 of this Agreement; provided that the Company Parties shall not be responsible for any fees incurred after the termination of this Agreement as to all Parties (other than with respect to fees and expenses incurred after the termination of this Agreement due to the consummation of the Amended Plan on the Effective Date);

(p)     timely file a formal objection to any motion filed with the Bankruptcy Court by a third party seeking the entry of an order modifying or terminating the Company Parties' exclusive right to file and/or solicit acceptances of a plan of reorganization, as applicable; and

(q)     use commercially reasonable efforts to obtain signature pages to this Agreement, a Joinder or a Transfer Agreement such that the aggregate outstanding principal amount of Notes held by Consenting Noteholders shall exceed 66 2/3% of the aggregate outstanding principal amount of all Notes and to timely update the Consenting Creditors with respect to such efforts.

6.02.   Negative Commitments.  Except as set forth in Section 7, during the Agreement Effective Period, each of the Company Parties shall not directly or indirectly:

(a)     object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the Restructuring Transactions;

(b)     take any action (i) that is inconsistent in any material respect with the Restructuring Transactions described in this Agreement, the Plan Term Sheet, or the Amended Plan, (ii) is intended to frustrate or impede approval, implementation and consummation of the Restructuring Transactions described in this Agreement, the Plan Term Sheet, or the Amended Plan, or (iii) would have the effect of frustrating or impeding approval, implementation and

consummation of the Restructuring Transactions described in this Agreement, the Plan Term Sheet, or the Amended Plan;

(c)      modify the Amended Plan, in whole or in part, in a manner that is not consistent with this Agreement or the Plan Term Sheet in all material respects;

(d)      file any motion, pleading, or Definitive Documentation with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is not materially consistent with this Agreement (including any consent rights of the Required Consenting Creditors set forth herein as to the form and substance of such motion, pleading or Definitive Document) or the Plan Term Sheet;

(e)      file any motion, application, adversary proceeding, or Cause of Action challenging the validity, enforceability or priority of, or seeking avoidance or subordination of any Company Claim held by any Consenting Creditor or any transfer to the Bank Agent, Indenture Trustee, or any Consenting Creditor on account of a Company Claim; or

(f)      seek or solicit any Alternative Restructuring Proposal.

**Section 7.**      *Additional Provisions Regarding Company Parties' Commitments.*

7.01.      Notwithstanding anything to the contrary in this Agreement, nothing in this Agreement shall require a Company Party or the board of directors, board of managers, or similar governing body of a Company Party, upon advice of counsel to the Company Parties, to continue performing under this Agreement, to take any action or to refrain from taking any action with respect to the Restructuring Transactions to the extent taking or failing to take such action would cause such Company Party or the board of directors, board of managers or similar governing body of a Company Party to violate applicable Law or its fiduciary obligations under applicable Law, and any such action or inaction pursuant to this Section 7.01 shall not be deemed to constitute a breach of this Agreement.  At all times prior to the date on which the Company Parties enter into any definitive agreement in respect of an Alternative Restructuring Proposal that a majority of the board of directors, board of managers or similar governing body of a Company Party determines in good faith consistent with its fiduciary duties, after receiving advice from counsel to the Company Parties, is a proposal that represents a higher or otherwise better recovery to the Company's stakeholders than the Restructuring Transactions contemplated herein and in the Plan Term Sheet, the Company Parties shall (x) provide to Akin Gump, White & Case, PJT Partners, Jones Day, and Ducera a copy of any written offer or proposal (and notice and a description of any oral offer or proposal) for such Alternative Restructuring Proposal, in each case, identifying the Person making such Alternative Restructuring Proposal and specifying in detail the material terms and conditions of such Alternative Restructuring Proposal within two (2) Business Day of the Company Parties' or their advisors' receipt of such offer or proposal and (y) provide such information to Akin Gump, White & Case, PJT Partners, Jones Day, and Ducera regarding such discussions (including copies of any materials provided to such parties hereunder) as necessary to keep Akin Gump, White & Case, PJT Partners, Jones Day, and Ducera contemporaneously informed as to the status and substance of such discussions.  The Company Parties shall have first exercised their right in accordance with Section 11.03(d) of this Agreement to declare a termination event prior to the date on which the Company Parties enter into a definitive agreement

in respect of such an Alternative Restructuring Proposal or make a public announcement regarding their intention to do so.  Upon any determination by any Company Party to exercise a fiduciary out, the other Parties to this Agreement shall be immediately and automatically relieved of any obligation to comply with their respective covenants and agreements herein in accordance with Section 11.07 hereof.

7.02.    Nothing in this Agreement shall:  (a) impair or waive the rights of any Company Party to assert or raise any objection permitted under this Agreement in connection with the Restructuring Transactions; or (b) prevent any Company Party from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement.

**Section 8.**        *Transfer of Interests and Securities.*

8.01.    During the Agreement Effective Period, no Consenting Creditor shall Transfer any ownership (including any beneficial ownership as defined in the Rule 13d-3 under the Exchange Act) in any Company Claims, in whole or in part, to any affiliated or unaffiliated party, including any party in which it may hold a direct or indirect beneficial interest, unless:  either (i) the transferee executes and delivers to counsel to the Company Parties, at or before the time of the proposed Transfer, either (x) a transfer agreement in the form attached here to as **Exhibit D** (each, a "**Transfer Agreement**") or (y) a joinder in the form attached hereto as **Exhibit E** (each, a "**Joinder**") or (ii) the transferee is a Consenting Creditor and the transferee provides notice of such Transfer (including the amount and type of Company Claim Transferred) to each of (a) White & Case, (b) Akin Gump, and (c) Jones Day by the close of business on the second Business Day following such Transfer.

8.02.    Upon compliance with the requirements of Section 8.01, the transferor shall be deemed to relinquish its rights (and be released from its obligations) under this Agreement to the extent of the rights and obligations in respect of such transferred Company Claims.  With respect to Company Claims held by the relevant transferee upon consummation of a Transfer, such transferee is deemed to make all of the representations and warranties of a Consenting Creditor and undertake all obligations relevant to such transferor (including, for the avoidance of doubt, the commitments made in Section 4.02) set forth in this Agreement.  Any Transfer in violation of Section 8.01 shall be null and void *ab initio*.

8.03.    This Agreement shall in no way be construed to preclude any Consenting Creditor from acquiring additional Company Claims; provided, however, that (a) such additional Company Claims shall automatically and immediately upon acquisition by a Consenting Creditor be deemed subject to the terms of this Agreement (regardless of when or whether notice of such acquisition is given to counsel to the Company Parties or to each of counsel to the Consenting Creditors) and (b) such Consenting Creditor must provide notice of such acquisition (including the amount and type of Company Claim acquired) to counsel to the Company Parties within three (3) Business Days of such acquisition.

8.04.    This Section 8 shall not impose any obligation on any Company Party to issue any "cleansing letter" or otherwise publicly disclose information for the purpose of enabling a Consenting Creditor to Transfer any of its Company Claims.  Notwithstanding anything to the contrary herein, to the extent a Company Party and another Party have entered into a

Confidentiality Agreement, the terms of such Confidentiality Agreement shall continue to apply and remain in full force and effect according to its terms, and this Agreement does not supersede any rights or obligations otherwise arising under such Confidentiality Agreements.

8.05.    Notwithstanding Section 8.01, a Qualified Marketmaker that acquires any Company Claims with the purpose and intent of acting as a Qualified Marketmaker for such Company Claims shall not be required to execute and deliver a Transfer Agreement in respect of such Company Claims if such Qualified Marketmaker subsequently Transfers such Company Claims (by purchase, sale assignment, participation, or otherwise) to a transferee that is a Consenting Creditor or a transferee who executes and delivers to counsel to the Company Parties, at or before the time of the proposed Transfer, a Transfer Agreement; provided that the original Consenting Creditor shall remain bound by the terms of this Agreement until such time as the Qualified Marketmaker transfers the Company Claims to a transferee that delivers a Transfer Agreement.

8.06.    Notwithstanding anything to the contrary in this Section 8, the restrictions on Transfer set forth in this Section 8 shall not apply to the grant of any Liens or encumbrances on any Company Claims in favor of a bank or broker-dealer holding custody of such Company Claims in the ordinary course of business and which Lien or encumbrance is released upon the Transfer of such Company Claims.

**Section 9.    *Representations and Warranties of Consenting Creditors.*** Each Consenting Creditor severally, and not jointly, represents and warrants that, as of the date such Consenting Creditor executes and delivers this Agreement:

(a)    it beneficially holds, or advises or manages for a beneficial holder, the face amount of the Company Claims reflected in such Consenting Creditor's signature page to this Agreement, a Joinder or a Transfer Agreement, as applicable (as may be updated pursuant to Section 8);

(b)    it has the full power and authority to act on behalf of, vote and consent to matters concerning, such Company Claims;

(c)    such Company Claims are free and clear of any pledge, Lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal, or other limitation on disposition, transfer, or encumbrances of any kind, that would materially and adversely affect such Consenting Creditor's ability to perform any of its obligations under this Agreement at the time such obligations are required to be performed;

(d)    it is (i) a "qualified institutional buyer" as defined in Rule 144A under the Securities Act, (ii) not a "U.S." person as defined in Regulation S under the Securities Act, or (iii) an "accredited investor" within the meaning of Rule 501 of Regulation D promulgated under the Securities Act, in each case with sufficient knowledge and experience to evaluate properly the terms and conditions of this Agreement and to consult with its legal and financial advisors with respect to its investment decision to execute this Agreement, and it has made its own analysis and decision to enter into this Agreement;

(e)    it has reviewed, or has had the opportunity to review, with the assistance of professional and legal advisors of its choosing, all information it deems necessary and appropriate

for it to evaluate the financial risks inherent in the Restructuring Transactions and the terms of the Plan Term Sheet; and

(f)      it has all necessary power and authority to vote, approve changes to, and Transfer all of its Company Claims referable to it as contemplated by this Agreement subject to applicable Law.

**Section 10.**      *Mutual Representations, Warranties, and Covenants*.   Each of the Parties, severally, and not jointly, represents, warrants, and covenants to each other Party, as of the date such Party executed and delivers this Agreement:

(a)      it is validly existing and in good standing under the Laws of the state of its organization, and this Agreement is a legal, valid, and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by applicable Laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability;

(b)      except as expressly provided in this Agreement, the Plan Term Sheet, or the Bankruptcy Code, no consent or approval is required by any other Entity in order for it to effectuate the Restructuring Transactions contemplated by, and perform its respective obligations under, this Agreement;

(c)      the entry into and performance by it of, and the transactions contemplated by, this Agreement do not, and will not, conflict in any material respect with any Law or regulation applicable to it or with any of its articles of association, memorandum of association or other constitutional documents;

(d)      except as expressly provided in this Agreement or the Bankruptcy Code, it has (or will have, at the relevant time) all requisite corporate or other power and authority to enter into, execute, and deliver this Agreement and to effectuate the Restructuring Transactions contemplated by, and perform its respective obligations under, this Agreement; and

(e)      except as expressly provided by this Agreement, it is not party to any restructuring or similar agreements or arrangements with the other Parties to this Agreement that have not been disclosed to all Parties to this Agreement.

**Section 11.**      *Termination Events*.

11.01.   Consenting Creditor Termination Events.   This Agreement may be terminated by the Required Consenting Noteholders or the Required Consenting Bank Lenders, or the Required Consenting Crossholders (but only with respect to the events set forth in (a)(y) and (g)) or the Required Consenting Non-Crossholders (but only with respect to the events set forth in (a)(y) and (g)) by the delivery to the Company Parties of a written notice in accordance with Section 13.10 hereof upon the occurrence of the following events:

(a)      (x) any Company Party shall have breached (other than an immaterial breach) its obligations under this Agreement, which breach (to the extent curable) is not cured within five (5) Business Days after the giving of written notice of such breach in accordance with Section 13.10

hereof, or (y) a Company Party files, publicly announces, or informs counsel to each of the Consenting Creditors of its intention to file a chapter 11 plan that contains terms and conditions that are not otherwise consistent in all material respects with this Agreement and the Plan Term Sheet;

(b)       any Company Party shall have breached (other than an immaterial breach) any representation, warranty, or covenant of such Company Party set forth in this Agreement that (to the extent curable) remains uncured for a period of five (5) Business Days after written notice and a description of such breach is provided to the Company Parties;

(c)       the issuance by any Governmental Entity of any final, non-appealable ruling or order that (i) would reasonably be expected to prevent the consummation of a material portion of the Restructuring Transactions and (ii) remains in effect for ten (10) Business Days after the Required Consenting Noteholders or Required Consenting Bank Lenders, as applicable, transmit a written notice in accordance with Section 13.10 hereof detailing any such issuance;

(d)       the entry of an order by the Bankruptcy Court, or the filing of a motion or application by any Company Party seeking an order (without the prior written consent of the Required Consenting Noteholders and Required Consenting Bank Lenders, as applicable), (i) converting one or more of the Chapter 11 Cases of a Company Party to a case under chapter 7 of the Bankruptcy Code, (ii) appointing an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code or a trustee in one or more of the Chapter 11 Cases of a Company Party, or (iii) rejecting this Agreement;

(e)       the Bankruptcy Court enters an order denying confirmation of the Amended Plan;

(f)       the failure of the Company Parties to meet any of the following milestones (collectively, the "**Milestones**") as and when due, unless such Milestone is extended with the express prior written consent of the Required Consenting Noteholders and Required Consenting Bank Lenders (in each case, such consent not to be unreasonably withheld), which consent may be provided via email from counsel to the Required Consenting Noteholders and counsel to the Bank Agent (as directed by Required Consenting Bank Lenders) (for the avoidance of doubt, "Agreement Effective Date" as set forth in this Section 11.01(f) shall be the Agreement Effective Date as applicable to the Consenting Creditors):

(i)       No later than 14 days after the Agreement Effective Date, the Company Parties shall have filed a motion seeking authority to perform pursuant to the terms of this Agreement;

(ii)       No later than 14 days after the Agreement Effective Date, the Bankruptcy Court shall have entered a final order approving use of cash collateral that is reasonably acceptable to the Company and the Required Consenting Creditors and not inconsistent with the terms of this Agreement and the Plan Term Sheet;

(iii)       No later than 25 days after the Agreement Effective Date, the Company Parties shall have filed the Amended Plan and related Disclosure Statement;

(iv)    No later than 45 days after the Agreement Effective Date, the Bankruptcy Court shall have entered an order authorizing performance pursuant to this Agreement or shall have held a hearing to consider such authorization;

(v)    No later than 65 days after the Agreement Effective Date, the Bankruptcy Court shall have entered an order approving the Disclosure Statement;

(vi)    No later than 180 days after the Agreement Effective Date, the Bankruptcy Court shall have entered the Confirmation Order; and

(vii)    No later than November 1, 2021 the Effective Date shall have occurred.

(g)    any Company Party (i) files, amends, or modifies, or files a pleading seeking approval of, any Definitive Document or authority to amend or modify any Definitive Document, in a manner that is inconsistent with, or constitutes a breach of, this Agreement, without the prior written consent of the Consenting Creditors who have consent rights over such Definitive Document(s), (ii) withdraws the Amended Plan without the prior consent of the Required Consenting Noteholders and the Required Consenting Bank Lenders, or (iii) publicly announces its intention to take any such acts listed in the foregoing clause (i) or (ii), in the case of each of the foregoing clauses (i) through (ii), which remains uncured (to the extent curable) for five (5) Business Days after such terminating Consenting Creditors transmit a written notice in accordance with Section 13.10 detailing any such breach;

(h)    upon delivery of notice by a Company Party pursuant to Section 7.01; or

(i)    any Company Party fails to pay the fees and expenses set forth in Section 13.23 as and when required; provided, however, that the Effective Date shall not occur until and unless the fees and expenses set forth in Section 13.23 shall have been paid in full; provided that, notwithstanding anything herein to the contrary, payment of fees and expenses pursuant to clause (A)(v) of Section 13.23 may be waived only by the Required Consenting Non-Crossholders in their sole discretion.

11.02.   Consenting Noteholder Termination Events.  This Agreement may be terminated by the Required Consenting Noteholders, or solely with respect to the events set forth in subsection (e) below, the Required Consenting Crossholders or the Required Consenting Non-Crossholders, by the delivery to the Company Parties of a written notice in accordance with Section 13.10 hereof upon the occurrence of any of the following events:

(a)    any Company Party files with the Bankruptcy Court any motion or application seeking authority to sell any material assets outside the ordinary course of business without the prior written consent of the Required Consenting Noteholders (such consent not to be unreasonably withheld); provided that this Consenting Noteholder Termination Event shall not apply if the aggregate purchase price of such assets is less than $15 million, provided further that the Company Parties shall hold the proceeds from such sales in escrow for the benefit of the Consenting Noteholders; provided further that this Consenting Noteholder Termination Event shall not apply

22

if the sale is consummated pursuant to the *Order (I) Establishing Procedures for De Minimis Asset Sales, and (II) Granting Related Relief* [Docket No. 264];

(b)      any Company Party, or Affiliate of a Company Party, or any Consenting Bank Lender files a motion, application, adversary proceeding, or Cause of Action challenging the validity, enforceability or priority of, or seeking avoidance or subordination of the Notes Claims or any transfer to the Indenture Trustee or any Consenting Noteholder on account of the Notes Claims; provided, however, that the pendency of the Adversary Proceeding will not constitute a Consenting Noteholder Termination Event unless any Consenting Bank Lender attempts after the Agreement Effective Date either (x) to prosecute any of the Causes of Action presently asserted in the Adversary Proceeding or (y) attempts to assert additional Causes of Action in the Adversary Proceeding;

(c)      any Company Party, or Affiliate of a Company Party, or any Consenting Bank Lender support any application, adversary proceeding, or Cause of Action referred to in the immediately preceding clause (b) filed by a third party, or consents to the standing of any such third party to bring such application, adversary proceeding, or Cause of Action;

(d)      the modification in any material respect of the employment terms of any member of the Section 16 Officers without the consent of the Required Consenting Noteholders; provided that the Amended Employment Agreements shall not be deemed modifications for purposes of this Section 11.02(d); and

(e)      the breach in any material respect by Consenting Bank Lenders holding an amount of Bank Lender Claims that would result in non-breaching Consenting Bank Lenders holding less than two-thirds (66.67%) of the aggregate Bank Lender Claims held by all of the Consenting Bank Lenders of any provision set forth in this Agreement that remains uncured for a period of three (3) Business Days after the receipt by such Consenting Bank Lenders of notice of such breach.

11.03.   Company Party Termination Events.   Any Company Party may terminate this Agreement as to all Parties upon prior written notice to all Parties in accordance with Section 13.10 hereof upon the occurrence of any of the following events:

(a)      the breach in any material respect by Consenting Noteholders holding an amount of Notes that would result in non-breaching Consenting Noteholders holding less than two-thirds (66.67%) of the aggregate principal amount of Notes held by all of the Consenting Noteholders of any provision set forth in this Agreement that remains uncured for a period of three (3) Business Days after the receipt by such Consenting Noteholders of notice of such breach;

(b)      the breach in any material respect by Consenting Bank Lenders holding an amount of Bank Lender Claims that would result in non-breaching Consenting Bank Lenders holding less than two-thirds (66.67%) of the aggregate Bank Lender Claims held by all of the Consenting Bank Lenders of any provision set forth in this Agreement that remains uncured for a period of three (3) Business Days after the receipt by such Consenting Bank Lenders of notice of such breach;

(c)      the issuance by any Governmental Entity of any final, non-appealable ruling or order that (i) would reasonably be expected to prevent the consummation of a material portion of the Restructuring Transactions and (ii) remains in effect for ten (10) Business Days after such

terminating Company Party transmits a written notice in accordance with <u>Section 13.10</u> hereof detailing any such issuance; <u>provided</u> that this termination right shall not apply to or be exercised by any Company Party if any Company Party sought or requested such ruling or order in contravention of any obligation or restriction set out in this Agreement; <u>provided</u> <u>further</u> that nothing in this paragraph is intended to limit the rights of the Company Parties as set forth in <u>Section 7.01</u>;

(d)     the board of directors, board of managers, or similar governing body of a Company Party determines, after receiving written advice from counsel to the Company Parties, that, based on such advice, continued performance under this Agreement would violate applicable Law or would be inconsistent with the exercise of its fiduciary duties under applicable Law; or

(e)     the entry of an order by the Bankruptcy Court (i) converting one or more of the Chapter 11 Cases of a Company Party to a case under chapter 7 of the Bankruptcy Code or (ii) appointing an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code or a trustee in one or more of the Chapter 11 Cases of a Company Party; <u>provided</u> that this termination right shall not apply to or be exercised by any Company Party if any Company Party sought or requested such order or appointment in contravention of any obligation or restriction set out in this Agreement or otherwise violated <u>Section 6.01(k)</u>.

11.04.  <u>Consenting Bank Lender Termination Events</u>.  This Agreement may be terminated by the Required Consenting Bank Lenders by the delivery to the Company Parties of a written notice in accordance with <u>Section 13.10</u> hereof upon the occurrence of any of the following events:

(a)     any Company Party files with the Bankruptcy Court any motion or application seeking authority to sell any assets of any of the Bank Claim Subsidiaries outside the ordinary course of business without the prior written consent of the Required Consenting Bank Lender; provided that this Consenting Bank Lender Termination Event shall not apply if the sale is consummated pursuant to the Order (I) Establishing Procedures for De Minimis Asset Sales, and (II) Granting Related Relief [Docket No. 264];

(b)     any Company Party, or Affiliate of a Company Party, or any Consenting Noteholder files a motion, application, adversary proceeding, or Cause of Action challenging the validity, enforceability or priority of, or seeking avoidance or subordination of the Bank Lender Claims or any transfer to the Bank Agent or any Consenting Bank Lender on account of the Bank Lender Claims; provided, however, that the pendency of the Adversary Proceeding will not constitute a Consenting Lender Termination Event unless any Company Party, or Affiliate of a Company Party, or any Consenting Noteholder attempts after the Agreement Effective Date either (x) to prosecute any of the Causes of Action presently asserted in the Adversary Proceeding or (y) attempts to assert additional Causes of Action in the Adversary Proceeding;

(c)     any Company Party, or Affiliate of a Company Party, or any Consenting Noteholder support any application, adversary proceeding, or Cause of Action referred to in the immediately preceding clause (b) filed by a third party, or consents to the standing of any such third party to bring such application, adversary proceeding, or Cause of Action; or

(d)      the breach in any material respect by Consenting Noteholders holding an amount of Note Claims that would result in non-breaching Consenting Noteholders holding less than two-thirds (66.67%) of the aggregate Note Claims held by all of the Consenting Noteholders of any provision set forth in this Agreement that remains uncured for a period of three (3) Business Days after the receipt by such Consenting Noteholders of notice of such breach.

11.05.  Mutual Termination.  This Agreement, and the obligations of all Parties hereunder, may be terminated by mutual written agreement among all of the following:  (a) the Required Consenting Noteholders; (b) the Required Consenting Bank Lenders; and (c) the Company Parties.

11.06.  Automatic Termination.  This Agreement shall terminate automatically without any further required action or notice immediately upon the later of (a) the Effective Date and (b) the date on which the Confirmation Order becomes a Final Order.

11.07.  Effect of Termination.  Upon the occurrence of a Termination Date as to a Party, this Agreement shall be of no further force and effect as to such Party and each Party subject to such termination shall be released from its commitments, undertakings, and agreements under or related to this Agreement and shall have the rights and remedies that it would have had, had it not entered into this Agreement, and shall be entitled to take all actions, whether with respect to the Restructuring Transactions or otherwise, that it would have been entitled to take had it not entered into this Agreement, including with respect to any and all Claims or Causes of Action.  Upon the occurrence of a Termination Date prior to the Confirmation Order being entered by a Bankruptcy Court, any and all consents or ballots tendered by the Parties subject to such termination before a Termination Date shall be deemed, for all purposes, to be null and void *ab initio* from the first instance and shall not be considered or otherwise used in any manner by the Parties in connection with the Restructuring Transactions and this Agreement or otherwise.  Nothing in this Agreement shall be construed as prohibiting any Party from contesting whether any such termination is in accordance with its terms or to seek enforcement of any rights under this Agreement that arose or existed before a Termination Date.  Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict (a) any right of any Company Party or the ability of any Company Party to protect and reserve its rights (including rights under this Agreement), remedies, and interests, including any Causes of Action against any Consenting Creditor, and (b) any right of any Consenting Creditor, or the ability of any Consenting Creditor, to protect and preserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any Company Party or Consenting Creditor.  No purported termination of this Agreement shall be effective under this Section 11 or otherwise if the Party seeking to terminate this Agreement is in material breach of this Agreement.  Nothing in this Section 11.07 shall restrict any Company Party's right to terminate this Agreement in accordance with Section 11.02(d).

**Section 12.      *Amendments and Waivers.***

(a)      This Agreement may not be modified, amended, or supplemented, and no condition or requirement of this Agreement may be waived, in any manner except in accordance with this Section 12.

(b)     Except as otherwise provided herein, this Agreement may not be modified, amended, amended and restated or supplemented without the express prior written consent of the Company Parties, the Required Consenting Non-Crossholders, the Required Consenting Crossholders, and the Required Consenting Bank Lenders (in each case, in their sole discretion); provided, however, that if the proposed modification, amendment or supplement has a material, disproportionate (as compared to the other Consenting Non-Crossholders, Consenting Crossholders, or Consenting Bank Lenders, as applicable) and adverse effect on any of the Consenting Creditors, then the consent of each such affected Consenting Creditor shall also be required to effectuate such modification, amendment or supplement.  In the event that an adversely affected Consenting Creditor does not consent to a modification, amendment and restatement or supplement to this Agreement (a "**Non-Consenting Creditor**"), but such modification, amendment and restatement or supplement receives the consent of the Required Consenting Non-Crossholders, the Required Consenting Crossholders, and the Required Consenting Bank Lenders, this Agreement shall be deemed to have been terminated only as to such Non-Consenting Creditor, but this Agreement shall continue in full force and effect in respect of all other Consenting Creditors who have so consented.

(c)     Any proposed modification, amendment, waiver or supplement that does not comply with this Section 12 shall be ineffective and null and void *ab initio*.

(d)     The waiver by any Party of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach.  No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy under this Agreement shall operate as a waiver of any such right, power or remedy or any provision of this Agreement, nor shall any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise of such right, power or remedy or the exercise of any other right, power or remedy.  All remedies under this Agreement are cumulative and are not exclusive of any other remedies provided by Law.

**Section 13.     *Miscellaneous.***

13.01.  Acknowledgement.  Notwithstanding any other provision herein, this Agreement is not and shall not be deemed to be an offer with respect to any securities or solicitation of votes for the acceptance of a plan of reorganization for purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise.  Any such offer or solicitation will be made only in compliance with all applicable securities Laws, provisions of the Bankruptcy Code, and/or other applicable Law.

13.02.  Exhibits Incorporated by Reference; Conflicts.  Each of the exhibits, annexes, signatures pages, and schedules attached hereto is expressly incorporated herein and made a part of this Agreement, and all references to this Agreement shall include such exhibits, annexes, and schedules.  In the event of any inconsistency between this Agreement (without reference to the exhibits, annexes, and schedules hereto) and the Plan Term Sheet, the Plan Term Sheet shall govern.  In the event of any inconsistency between this Agreement (without reference to the exhibits, annexes, and schedules hereto) and any exhibits, annexes, and schedules hereto, other than the Plan Term Sheet, this Agreement (without reference to such other exhibits, annexes, and schedules thereto that are not the Plan Term Sheet) shall govern.

13.03.  Further Assurances.  Subject to the other terms of this Agreement, the Parties agree to execute and deliver such other instruments and perform such acts, in addition to the matters herein specified, as may be reasonably appropriate or necessary, or as may be required by order of the Bankruptcy Court, from time to time, to effectuate the Restructuring Transactions, as applicable; provided, however, that this Section 13.03 shall not limit the right of any party hereto to exercise any right or remedy provided for in this Agreement (including the approval rights set forth in Section 3.02).

13.04.  Complete Agreement.  Except as otherwise explicitly provided herein, this Agreement constitutes the entire agreement among the Parties with respect to the subject matter hereof and supersedes all prior agreements, oral or written, among the Parties with respect thereto, other than any Confidentiality Agreement.

13.05.  GOVERNING LAW; SUBMISSION TO JURISDICTION; SELECTION OF FORUM.  THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN SUCH STATE, WITHOUT GIVING EFFECT TO THE CONFLICT OF LAWS PRINCIPLES THEREOF.  Notwithstanding the foregoing consent to jurisdiction in either a state or federal court of competent jurisdiction in the State of New York, Borough of Manhattan, each of the Parties hereby agrees that, so long as the Chapter 11 Cases are pending, the Bankruptcy Court shall have exclusive jurisdiction over all matters arising out of or in connection with this Agreement.  Each Party hereto agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement, to the extent possible, in the Bankruptcy Court, and solely in connection with claims arising under this Agreement:  (a) irrevocably submits to the exclusive jurisdiction of the Bankruptcy Court; (b) waives any objection to laying venue in any such action or proceeding in the Bankruptcy Court; and (c) waives any objection that the Bankruptcy Court is an inconvenient forum or does not have jurisdiction over any Party hereto.

13.06.  TRIAL BY JURY WAIVER.  EACH PARTY HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

13.07.  Execution of Agreement.  This Agreement may be executed and delivered in any number of counterparts and by way of electronic signature and delivery, each such counterpart, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement.  Except as expressly provided in this Agreement, each individual executing this Agreement on behalf of a Party has been duly authorized and empowered to execute and deliver this Agreement on behalf of said Party.

13.08.  Rules of Construction.  This Agreement is the product of negotiations among the Company Parties and each of the Consenting Creditors, and in the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement, or any portion hereof, shall not be effective in regard to the interpretation hereof.  The

Company Parties and the Consenting Creditors were each represented by counsel during the negotiations and drafting of this Agreement and continue to be represented by counsel.

13.09.  <u>Successors and Assigns; Third Parties</u>.  This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors and permitted assigns, as applicable.  There are no third party beneficiaries under this Agreement, and the rights or obligations of any Party under this Agreement may not be assigned, delegated, or transferred to any other Entity except as expressly permitted hereby.

13.10.  <u>Notices</u>.  All notices hereunder shall be deemed given if in writing and delivered, by electronic mail, courier, or registered or certified mail (return receipt requested), to the following addresses (or at such other addresses as shall be specified by like notice):

(a)  if to a Company Party, to:

CBL & Associates Properties, Inc.
2030 Hamilton Place Blvd., Suite 500
Chattanooga, Tennessee 37421-6000
Attention:      Stephen Lebovitz, Chief Executive Officer
                      Jeff Curry, Chief Legal Officer

E-mail addresses:      Stephen.Lebovitz@cblproperties.com
                                  Jeff.Curry@cblproperties.com

with a copy to (which shall not constitute notice):

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
Attention:      Ray C. Schrock, P.C.
                      Moshe A. Fink
                      Rachael L. Foust

E-mail addresses:      ray.schrock@weil.com
                                  moshe.fink@weil.com
                                  rachael.foust@weil.com

(b)  if to a Consenting Noteholder, as set forth on the signature page for such Consenting Noteholder to this Agreement, a Transfer Agreement or a Joinder, as applicable, with a copy to (which shall not constitute notice):

Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
Bank of America Tower
New York, NY 10036-6745
Attention:      Michael S. Stamer
                      Meredith A. Lahaie

28

Daniel G. Walsh

Email addresses:       mstamer@akingump.com
                             mlahaie@akingump.com
                             dwalsh@akingump.com

White & Case LLP
1221 Avenue of the Americas
New York, NY 10020-0905
Attention:     Thomas Lauria
                  Brian Pfeiffer
                  Michael Shepherd

Email addresses:       tlauria@whitecase.com
                             brian.pfeiffer@whitecase.com
                             mshepherd@whitecase.com

(c)     if to a Consenting Bank Lender, as set forth on the signature page for such Consenting Bank Lender to this Agreement, a Transfer Agreement or a Joinder, as applicable, with a copy to (which shall not constitute notice):

Jones Day
325 John H. McConnell Boulevard
Columbus, OH 43215
Attention:     Matthew Corcoran
                  Benjamin Rosenblum

Email addresses:       mccorcoran@jonesday.com
                             brosenblum@jonesday.com

Any notice given by delivery, mail, or courier shall be effective when received.

13.11. <u>Enforceability of Agreement</u>.  Each of the Parties to the extent enforceable waives any right to assert that the exercise of termination rights under this Agreement is subject to the automatic stay provisions of the Bankruptcy Code, and expressly stipulates and consents hereunder to the prospective modification of the automatic stay provisions of the Bankruptcy Code for purposes of exercising termination rights under this Agreement, to the extent the Bankruptcy Court determines that such relief is required.

13.12. <u>Waiver</u>.  If the Restructuring Transactions are not consummated, or if this Agreement is terminated for any reason, the Parties fully reserve any and all of their rights and nothing herein shall constitute or be deemed to constitute such Party's consent or approval of any chapter 11 plan of reorganization for the Company Parties or any waiver of any rights such Party may have under any subordination agreement.  Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement and all negotiations relating hereto shall not be

admissible into evidence in any proceeding other than a proceeding to enforce its terms or the payment of damages to which a Party may be entitled under this Agreement.

13.13.  Specific Performance.  It is understood and agreed by the Parties that money damages would be an insufficient remedy for any breach of this Agreement by any Party, and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief (without the posting of any bond and without proof of actual damages) as a remedy of any such breach, including an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder.

13.14.  Several, Not Joint, Claims.  Except where otherwise specified, the agreements, representations, warranties, and obligations of the Parties under this Agreement are, in all respects, several and not joint.

13.15.  Severability and Construction.  If any provision of this Agreement shall be held by a court of competent jurisdiction to be illegal, invalid, or unenforceable, the remaining provisions shall remain in full force and effect if essential terms and conditions of this Agreement for each Party remain valid, binding, and enforceable.

13.16.  Survival.  Notwithstanding (a) any Transfer of any Company Claims in accordance with Section 8 or (b) the termination of this Agreement in accordance with its terms, the agreements and obligations of the Parties in Section 11.07, Section 13 (except for Section 13.23 with respect to fees and expenses incurred after the termination of this Agreement as to all Parties (other than with respect to fees and expenses incurred after the termination of this Agreement due to the consummation of the Amended Plan on the Effective Date)), and the Confidentiality Agreements shall survive such Transfer and/or termination and shall continue in full force and effect for the benefit of the Parties in accordance with the terms hereof and thereof.

13.17.  Remedies Cumulative.  All rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at Law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party.

13.18.  Capacities of Consenting Creditors.  Each Consenting Creditor has entered into this Agreement on account of all Company Claims that it holds (directly or through discretionary accounts that it manages or advises) and, except where otherwise specified in this Agreement, shall take or refrain from taking all actions that it is obligated to take or refrain from taking under this Agreement with respect to all such Company Claims; provided, however, that any Person (other than any Consenting Creditor as of the Agreement Effective Date and any of its Affiliates) that becomes a party hereto as a Consenting Creditor pursuant to this Agreement following the Agreement Effective Date agrees that it shall cause its Affiliates that hold Company Claims (directly or through discretionary accounts that it manages or advises) to comply with the provisions of this Agreement as if such Affiliate was a Consenting Creditor.  For the avoidance of doubt, this paragraph shall be subject in all respects to the understandings in Section 13.19 below.

13.19.  <u>Relationship Among Consenting Creditors</u>.

(a)     Notwithstanding anything herein to the contrary, the duties and obligations of the Consenting Creditors under this Agreement shall be several, not joint, with respect to each Consenting Creditor.  None of the Consenting Creditors shall have any fiduciary duty, any duty of trust or confidence in any form, or other duties or responsibilities in any kind or form to each other, any Consenting Creditor, any Company Party, or any of the Company Party's respective creditors or other stakeholders, and there are no commitments among or between the Consenting Creditors as a result of this Agreement or the transactions contemplated herein or in the Plan Term Sheet, in each case except as expressly set forth in this Agreement.  No Party shall have any responsibility by virtue of this Agreement for any trading by any other entity.  The Consenting Creditors represent and warrant that as of the date hereof and for so long as this Agreement remains in effect, the Consenting Creditors have no agreement, arrangement, or understanding with respect to acting together for the purpose of acquiring, holding, voting, or disposing of any equity securities of the Company Parties.  No prior history, pattern, or practice of sharing confidences among or between the Parties shall in any way affect or negate this Agreement, and each Consenting Creditor shall be entitled to independently protect and enforce its rights, including the rights arising out of this Agreement, and it shall not be necessary for any other Consenting Creditor to be joined as an additional party in any proceeding for such purpose.  Nothing contained in this Agreement, and no action taken by any Consenting Creditor pursuant hereto is intended to constitute the Consenting Creditors as a partnership, an association, a joint venture or any other kind of entity, or create a presumption that any Consenting Creditor is in any way acting in concert or as a member of a "group" with any other Consenting Creditor or Consenting Creditors within the meaning of Rule 13d-5 under the Exchange Act.  For the avoidance of doubt no Consenting Creditor shall, nor shall any action taken by a Consenting Creditor pursuant to this Agreement, be deemed to be acting in concert or as any group with any other Consenting Creditor with respect to the obligations under this Agreement nor shall this Agreement create a presumption that the Consenting Creditors are in any way acting as a group.  The decision to commit to enter into the transactions contemplated by this Agreement has been made independently.

(b)     The Parties understand that the Consenting Creditors are engaged in a wide range of financial services and businesses, and, in furtherance of the foregoing, the Company Parties acknowledge and agree that the obligations set forth in this Agreement shall only apply to the trading desk(s) and/or business group(s) of the Consenting Creditors that principally manage and/or supervise the Consenting Creditor's investment in the Company Parties, and shall not apply to any other trading desk or business group of the Consenting Creditor so long as they are not acting at the direction or for the benefit of such Consenting Creditor.  Notwithstanding anything to the contrary in the Agreement, Company Claims, other claims, equity interests, actions or activities of a Consenting Bank Lender subject to this Agreement shall not include any Company Claims, other claims, equity interests, actions or activities held or performed in a fiduciary capacity or held, acquired or performed by any other division, business unit or trading desk of such Consenting Bank Lender, unless and until such division, business unit or trading desk is or becomes a party to this Agreement.

13.20.  <u>Email Consents</u>.   Where a written consent, acceptance, approval, or waiver is required pursuant to or contemplated by this Agreement, pursuant to <u>Section 3.02</u>, <u>Section 12</u>, or otherwise, including a written approval by the Company Parties, the Required Consenting

Noteholders, the Required Consenting Crossholders, the Required Consenting Non-Crossholders, or the Required Consenting Bank Lenders, such written consent, acceptance, approval, or waiver shall be deemed to have occurred if, by agreement between counsel to the Parties submitting and receiving such consent, acceptance, approval, or waiver, it is conveyed in writing (including electronic mail) between each such counsel without representations or warranties of any kind on behalf of such counsel.

13.21.  <u>Settlement Discussions</u>.  This Agreement is part of a proposed settlement of matters that could otherwise be the subject of litigation among the Parties.  Nothing in this Agreement shall be deemed an admission of any kind.  Pursuant to Federal Rule of Evidence 408, any applicable state rules of evidence and any other applicable law, foreign or domestic, this Agreement, and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than to prove the existence of this Agreement or in a proceeding to enforce the terms of this Agreement.

13.22.  <u>Good Faith Cooperation</u>.  The Parties shall cooperate with each other in good faith and shall coordinate their activities (to the extent reasonably practicable) in respect of all matters concerning the implementation and consummation of the Restructuring.

13.23.  <u>Fees and Expenses</u>.  Following authorization by the Bankruptcy Court to perform pursuant to the terms of this Agreement, and to the extent not paid by the Company Parties as of the date thereof, the Company shall pay in cash or reimburse all reasonable and documented fees and out of pocket expenses (regardless of whether such fees and expenses were incurred before or after the Petition Date) of the following advisors:  (A)(i) Akin Gump, as legal counsel to the Consenting Noteholders; (ii) White & Case, as legal counsel to certain Consenting Crossholders; (iii) PJT Partners, as the financial advisor retained on behalf of the Consenting Noteholders; (iv) Raider Hill Advisors, LLC and any other professionals or advisors (including one (1) local counsel in Delaware) retained by the Consenting Noteholders with the consent of the Company (such consent not to be unreasonably withheld); and (v) reasonable and documented out of pocket expenses of individual Consenting Noteholders (including fees and expenses of external counsel) in an amount not to exceed $500,000 in the aggregate; provided that if the reasonable and documented out of pocket expenses of individual Consenting Noteholders (including fees and expenses of external counsel) payable pursuant to this clause (A)(v) exceed $500,000 (or such greater amount as agreed by the Company and Required Consenting Noteholders) in the aggregate, such amounts shall be shared *pro rata* by the individual Consenting Noteholders seeking payment of out of pocket expenses based on each individual Consenting Noteholders' percentage held of the aggregate outstanding principal amount of the Notes held by all individual Consenting Noteholders seeking payment of their out of pocket expenses pursuant to this clause (A)(v); provided, further, that, for the avoidance of doubt, the Company Parties shall in no event pay in excess of the $500,000 cap; and (B)(i) Jones Day, as legal counsel to the Bank Agent; (ii) Ducera Partners, as the financial advisor retained by the Bank Agent; (iii) Newmark & Company Real Estate, Inc. d/b/a Newmark Knight Frank, as advisor to Jones Day; (iv) Consilio LLC and Epiq, as third-party litigation vendors of Bank Agent; and (v) such local counsel as Bank Agent or Jones Day may engage to assist with State specific issues related to the collateral properties, <u>provided</u> that, if practicable, such local counsel shall not duplicate efforts with the local counsel to the Consenting Noteholders engaged for the same purpose; and (C) reasonable and documented out of pocket expenses of individual Consenting Bank Lenders (including fees and expenses of

external counsel) that become Consenting Bank Lenders prior to, on, or within thirty (30) days after, the Agreement Effective Date.

13.24. <u>Public Disclosure; Confidential Information</u>.   Under no circumstances may any Party make any public disclosure of any kind that would disclose either: (i) the holdings of any Consenting Creditors (including the signature pages hereto, which shall not be publicly disclosed or filed) or (ii) the identity of any Consenting Creditor without the prior written consent of such Consenting Creditor or the order of a Bankruptcy Court or other court with competent jurisdiction, or as may otherwise be required by law.   Any obligations the Company may have under or in connection with this Agreement to furnish Confidential Information to a Consenting Creditor shall be subject to such any confidentiality agreement in place between the Company and such Consenting Creditor.

13.25. <u>Withholding</u>.   The Company Parties shall each be entitled to deduct and withhold (or cause to be deducted or withheld) from amounts otherwise payable and deliverable to any Person hereunder such amounts as it is required to deduct and withhold with respect to the making of the relevant payment under applicable law.   The Company Parties shall use commercially reasonable efforts to provide the payment recipient with reasonable advance notice of any withholding that it intends to make pursuant to this provision, and shall use its commercially reasonable efforts to cooperate with such payment recipient to minimize any applicable withholding.   To the extent that amounts are deducted and withheld, such amounts shall be paid to the appropriate Governmental Authority and treated for all purposes as having been paid to the Person in respect of which such deduction and withholding was made.   The Parties agree not to treat the Notes as a "United States real property interest" within the meaning of section 897(c)(1) of title 26 of the United States Code and no Party shall take any position (whether in audits, tax returns, or otherwise) that is inconsistent with the foregoing treatment unless required to do so by applicable law.

*[Remainder of Page Intentionally Blank.]*

33

[Signature Pages Redacted]

**EXHIBIT A**

**Company Parties**

| Entity | Case No. | Entity | Case No. |
|---|---|---|---|
| CBL/Sunrise Commons, L.P. | 20-35225 | Pearland Town Center Limited Partnership | 20-35260 |
| CBL & Associates Properties, Inc. | 20-35226 | POM-College Station, LLC | 20-35262 |
| CBL Holdings I, Inc. | 20-35227 | Turtle Creek Limited Partnership | 20-35263 |
| CBL Holdings II, Inc. | 20-35228 | Akron Mall Land, LLC | 20-35267 |
| CBL & Associates Limited Partnership | 20-35229 | Alamance Crossing II, LLC | 20-35268 |
| CBL & Associates Management, Inc. | 20-35230 | Alamance Crossing, LLC | 20-35269 |
| Arbor Place Limited Partnership | 20-35231 | APWM, LLC | 20-35270 |
| CBL RM-Waco, LLC | 20-35232 | Asheville, LLC | 20-35271 |
| CBL SM-Brownsville, LLC | 20-35233 | Brookfield Square Joint Venture | 20-35272 |
| CBL/Imperial Valley GP, LLC | 20-35234 | Brookfield Square Parcel, LLC | 20-35273 |
| CBL/Kirkwood Mall, LLC | 20-35235 | CBL Eagle Point Member, LLC | 20-35274 |
| CBL/Madison I, LLC | 20-35236 | CBL/Old Hickory II, LLC | 20-35302 |
| CBL/Richland G.P., LLC | 20-35237 | CBL/Parkdale Crossing GP, LLC | 20-35303 |
| CBL/Sunrise GP, LLC | 20-35238 | CBL/Parkdale Crossing, L.P. | 20-35304 |
| CBL/Westmoreland I, LLC | 20-35239 | CBL/Parkdale Mall GP, LLC | 20-35305 |
| CBL/Westmoreland II, LLC | 20-35240 | CBL/Parkdale, LLC | 20-35306 |
| CBL/Westmoreland, L.P. | 20-35241 | CBL/Penn Investments, LLC | 20-35310 |
| Cherryvale Mall, LLC | 20-35242 | CBL/Sunrise Commons GP, LLC | 20-35312 |

| Entity | Case No. | Entity | Case No. |
|---|---|---|---|
| CW Joint Venture, LLC | 20-35243 | CBL/Sunrise Land, LLC | 20-35313 |
| Frontier Mall Associates Limited Partnership | 20-35244 | CBL/Sunrise XS Land, L.P. | 20-35315 |
| Hixson Mall, LLC | 20-35245 | CBL-840 GC, LLC | 20-35317 |
| Imperial Valley Mall GP, LLC | 20-35246 | Charleston Joint Venture | 20-35319 |
| Imperial Valley Mall II, L.P. | 20-35247 | Coolsprings Crossing Limited Partnership | 20-35322 |
| Imperial Valley Mall, L.P. | 20-35248 | Cross Creek Anchor S GP, LLC | 20-35323 |
| JG Winston-Salem, LLC | 20-35249 | Cross Creek Anchor S, LP | 20-35325 |
| CBL HP Hotel Member, LLC | 20-35275 | D'Iberville CBL Land, LLC | 20-35327 |
| CBL Statesboro Member, LLC | 20-35276 | Dakota Square Mall CMBS, LLC | 20-35328 |
| CBL Walden Park, LLC | 20-35277 | Development Options, Inc. | 20-35330 |
| CBL/Brookfield I, LLC | 20-35278 | Dunite Acquisitions, LLC | 20-35333 |
| CBL/Brookfield II, LLC | 20-35279 | East Towne Parcel I, LLC | 20-35335 |
| CBL/Cherryvale I, LLC | 20-35282 | EastGate Anchor S, LLC | 20-35336 |
| CBL/Citadel I, LLC | 20-35283 | EastGate Company | 20-35339 |
| CBL/Citadel II, LLC | 20-35284 | Eastland Anchor M, LLC | 20-35341 |
| CBL/EastGate I, LLC | 20-35285 | Eastland Holding I, LLC | 20-35343 |
| CBL/EastGate II, LLC | 20-35286 | Eastland Holding II, LLC | 20-35345 |
| CBL/EastGate Mall, LLC | 20-35287 | Eastland Mall, LLC | 20-35347 |
| CBL/Fayette I, LLC | 20-35288 | Eastland Member, LLC | 20-35348 |
| CBL/Fayette II, LLC | 20-35295 | Fayette Middle Anchor, LLC | 20-35350 |
| CBL/GP Cary, Inc. | 20-35296 | Fayette Plaza CMBS, LLC | 20-35334 |

| Entity | Case No. | Entity | Case No. |
|---|---|---|---|
| CBL/GP II, Inc. | 20-35307 | GCTC Peripheral IV, LLC | 20-35337 |
| CBL/GP V, Inc. | 20-35309 | Gunbarrel Commons, LLC | 20-35338 |
| CBL/GP VI, Inc. | 20-35311 | Hamilton Place Anchor S, LLC | 20-35342 |
| CBL/GP, Inc. | 20-35314 | Hammock Landing/West Melbourne, LLC | 20-35344 |
| CBL/Gulf Coast, LLC | 20-35316 | Hanes Mall Parcels, LLC | 20-35346 |
| CBL/J I, LLC | 20-35318 | Pearland-OP Parcel 8, LLC | 20-35401 |
| CBL/J II, LLC | 20-35320 | Port Orange Holdings II, LLC | 20-35404 |
| CBL/Monroeville Expansion I, LLC | 20-35321 | Seacoast Shopping Center Limited Partnership | 20-35408 |
| CBL/Monroeville Expansion II, LLC | 20-35324 | Shoppes at St. Clair CMBS, LLC | 20-35396 |
| CBL/Monroeville Expansion III, LLC | 20-35326 | South County Shoppingtown LLC | 20-35400 |
| CBL/Monroeville Expansion Partner, L.P. | 20-35280 | Southaven Town Center, LLC | 20-35402 |
| CBL/Monroeville Expansion, L.P. | 20-35289 | Southaven Towne Center II, LLC | 20-35406 |
| CBL/Monroeville I, LLC | 20-35291 | Southpark Mall, LLC | 20-35413 |
| CBL/Monroeville II, LLC | 20-35292 | Southpark Mall-DSG, LLC | 20-35416 |
| CBL/Monroeville III, LLC | 20-35293 | St. Clair Square GP I, LLC | 20-35417 |
| CBL/Monroeville Partner, L.P. | 20-35298 | St. Clair Square Limited Partnership | 20-35419 |
| CBL/Monroeville, L.P. | 20-35299 | St. Clair Square SPE, LLC | 20-35421 |

| Entity | Case No. | Entity | Case No. |
|---|---|---|---|
| CBL/Nashua Limited Partnership | 20-35300 | Stroud Mall, LLC | 20-35405 |
| CBL/Old Hickory I, LLC | 20-35301 | Tenn-GP Holdings, LLC | 20-35410 |
| Harford Mall Business Trust | 20-35349 | The Courtyard at Hickory Hollow Limited Partnership | 20-35415 |
| Henderson Square Limited Partnership | 20-35351 | The Landing at Arbor Place II, LLC | 20-35418 |
| Hickory Point Outparcels, LLC | 20-35352 | The Pavilion at Port Orange, LLC | 20-35420 |
| Imperial Valley Commons, L.P. | 20-35357 | TN-Land Parcels, LLC | 20-35422 |
| Imperial Valley Peripheral L.P. | 20-35358 | TX-Land Parcels, LLC | 20-35423 |
| IV Commons, LLC | 20-35361 | Valley View Mall SPE, LLC | 20-35424 |
| IV Outparcels, LLC | 20-35364 | Volusia Mall GP, Inc. | 20-35426 |
| Jefferson Anchor M, LLC | 20-35367 | Volusia Mall Limited Partnership | 20-35427 |
| Jefferson Anchor S, LLC | 20-35369 | Volusia SAC, LLC | 20-35397 |
| Jefferson Mall Company II, LLC | 20-35359 | Volusia-OP Peripheral, LLC | 20-35399 |
| JG Gulf Coast Town Center LLC | 20-35360 | West Towne District, LLC | 20-35403 |
| Laurel Park Retail Holding LLC | 20-35362 | Westgate Crossing Limited Partnership | 20-35407 |
| Laurel Park Retail Properties LLC | 20-35363 | WestGate Mall II, LLC | 20-35409 |
| Lexington Joint Venture | 20-35365 | WestGate Mall Limited Partnership | 20-35411 |
| LHM-Utah, LLC | 20-35370 | WI-Land Parcels, LLC | 20-35412 |

| Entity | Case No. | Entity | Case No. |
|---|---|---|---|
| Meridian Mall Limited Partnership | 20-35373 | York Galleria Limited Partnership | 20-35414 |
| Mid Rivers Land LLC | 20-35374 | Arbor Place II, LLC | N/A |
| Mid Rivers Mall CMBS, LLC | 20-35375 | CBL Ambassador Member, LLC | N/A |
| Monroeville Anchor Limited Partnership | 20-35376 | CBL BI Developments II Member, LLC | N/A |
| Montgomery Partners, L.P. | 20-35378 | CBL BI Developments Member, LLC | N/A |
| North Charleston Joint Venture II, LLC | 20-35379 | CBL El Paso Member, LLC | N/A |
| Northgate SAC, LLC | 20-35382 | CBL El Paso Outparcel Member, LLC | N/A |
| Northpark Mall/Joplin, LLC | 20-35384 | CBL Fremaux Member, LLC | N/A |
| Old Hickory Mall Venture | 20-35387 | CBL Gettysburg Member, LLC | N/A |
| Old Hickory Mall Venture II, LLC | 20-35388 | CBL Laredo Member, LLC | N/A |
| Parkdale Anchor M, LLC | 20-35389 | CBL Louisville Member, LLC | N/A |
| Parkdale Crossing Limited Partnership | 20-35390 | CBL Louisville Outparcel Member, LLC | N/A |
| Parkdale Mall Associates, L.P. | 20-35391 | CBL Woodstock Member, LLC | N/A |
| Parkdale Mall, LLC | 20-35394 | CBL Woodstock Outparcel Member, LLC | N/A |
| Parkway Place Limited Partnership | 20-35395 | CBL/Kentucky Oaks, LLC | N/A |
| Parkway Place SPE, LLC | 20-35398 | CBL/MSC II, LLC | N/A |
| Kirkwood Mall Acquisition LLC | 20-35251 | CBL/MSC, LLC | N/A |

| Entity | Case No. | Entity | Case No. |
|---|---|---|---|
| Kirkwood Mall Mezz LLC | 20-35250 | CBL/Penn Investments, LLC | N/A |
| Layton Hills Mall CMBS, LLC | 20-35252 | CBL/Stroud, Inc. | N/A |
| Madison Joint Venture, LLC | 20-35254 | CBL/York Town Center GP, LLC | N/A |
| Madison/East Towne, LLC | 20-35256 | CBL/York Town Center, LLC | N/A |
| Madison/West Towne, LLC | 20-35257 | CBL/York, Inc. | N/A |
| Mall del Norte, LLC | 20-35258 | CBL-D'Iberville Member, LLC | N/A |
| Mayfaire GP, LLC | 20-35253 | CBL-TRS Member I, LLC | N/A |
| Mayfaire Town Center, LP | 20-35255 | Cross Creek Mall, LLC | N/A |
| MDN/Laredo GP, LLC | 20-35259 | Eastland Anchor M, LLC | N/A |
| Mortgage Holdings, LLC | 20-35261 | Oak Park Holding I, LLC | N/A |
| Multi-GP Holdings, LLC | 20-35265 | The Galleria Associates, L.P. | N/A |
| Pearland Ground, LLC | 20-35266 | Volusia Mall Member SPE, LLC | N/A |
| Pearland Town Center GP, LLC | 20-35264 | | |

**<u>EXHIBIT B</u>**

**Plan Term Sheet**

*Execution Version*

# CBL & ASSOCIATES PROPERTIES, INC.
## PLAN TERM SHEET

### March 21, 2021

THIS TERM SHEET IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCE OR REJECTION OF A CHAPTER 11 PLAN OF REORGANIZATION PURSUANT TO THE BANKRUPTCY CODE. ANY SUCH OFFER OR SOLICITATION WILL BE MADE ONLY IN COMPLIANCE WITH ALL APPLICABLE SECURITIES LAWS AND, IF APPLICABLE, PROVISIONS OF THE BANKRUPTCY CODE. THIS TERM SHEET IS BEING PROVIDED IN FURTHERANCE OF SETTLEMENT DISCUSSIONS AND IS ENTITLED TO PROTECTION PURSUANT TO RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND ANY SIMILAR FEDERAL OR STATE RULE OF EVIDENCE. THE TRANSACTIONS DESCRIBED IN THIS TERM SHEET ARE SUBJECT IN ALL RESPECTS TO, AMONG OTHER THINGS, EXECUTION AND DELIVERY OF DEFINITIVE DOCUMENTATION AND SATISFACTION OR WAIVER OF THE CONDITIONS PRECEDENT SET FORTH THEREIN.

NOTHING IN THIS TERM SHEET SHALL CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, A STIPULATION OR A WAIVER, AND EACH STATEMENT CONTAINED HEREIN IS MADE WITHOUT PREJUDICE, WITH A FULL RESERVATION OF ALL RIGHTS, REMEDIES, CLAIMS AND DEFENSES OF THE COMPANY PARTIES AND ANY CREDITOR PARTY. THIS TERM SHEET DOES NOT INCLUDE A DESCRIPTION OF ALL OF THE TERMS, CONDITIONS, AND OTHER PROVISIONS THAT ARE TO BE CONTAINED IN THE DEFINITIVE DOCUMENTATION, WHICH REMAIN SUBJECT TO DISCUSSION, NEGOTIATION AND EXECUTION. EXCEPT AS PROVIDED IN THE RESTRUCTURING SUPPORT AGREEMENT, THIS TERM SHEET, AND THE TERMS CONTAINED HEREIN, ARE CONFIDENTIAL.

### SUMMARY OF PRINCIPAL TERMS
### OF PROPOSED RESTRUCTURING TRANSACTION

This term sheet (the "**Plan Term Sheet**") sets forth certain key terms of a proposed restructuring transaction (the "**Transaction**") with respect to the existing debt and other obligations of CBL & Associates Properties, Inc. (the "**Company**") and certain of its affiliates and subsidiaries (collectively, the "**Company Subsidiaries**" and, together with the Company, the "**Company Parties**"). This Plan Term Sheet is the "Plan Term Sheet" referenced as Exhibit B in that certain Amended and Restated Restructuring Support Agreement, dated as of March 21, 2021 (as the same may be further amended, modified or supplemented, the "**RSA**"), by and among the Company Parties and the Consenting Creditors party thereto. Capitalized terms used but not otherwise defined in this Plan Term Sheet shall have the meanings given to such terms in the RSA. This Plan Term Sheet supersedes any proposed summary of terms or conditions regarding the subject matter hereof and dated prior to the date hereof. Subject to the RSA, the Transaction will be implemented in the cases commenced by the Company Parties under chapter 11 of the Bankruptcy Code (the "**Chapter 11 Cases**") and pursuant to a joint chapter 11 plan of reorganization to be filed in the Chapter 11 Cases to implement the Transaction (the "**Plan**").

### TREATMENT OF CLAIMS AND INTERESTS

The below summarizes the treatment to be received on or as soon as practicable after the Plan Effective Date (as defined below) by holders of claims against, and interests in, the Company Parties pursuant to the Transaction.

| Administrative, Priority, and Tax Claims | Allowed administrative, priority, and tax claims will be satisfied in full, in cash, or otherwise receive treatment reasonably acceptable to the Company and the Required Consenting Creditors and consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code. |
|---|---|

| Revolver/Term Loan Claims | On the Plan Effective Date or as soon as reasonably practicable thereafter, the Claims (the "**Revolver/Term Loan Claims**") under that certain Credit Agreement, dated January 30, 2019 (the "**Bank Credit Agreement**"), by and among CBL & Associates Limited Partnership, as borrower (the "**Bank Claim Borrower**"), the Company Parties party thereto, the lenders from time to time party thereto (the "**Bank Lenders**"), and Wells Fargo Bank, National Association, as administrative agent ("**Bank Agent**") for itself and for the benefit of the Bank Lenders, shall be treated as follows. |
|---|---|
| | The Revolver/Term Loan Claims held by the New Bank Lenders shall be allowed for all purposes in the Plan in the amount of $983.7 million (which amount takes into account a reclassification on the Plan Effective Date, which was classified prior to the Plan Effective Date as interest payments on the Revolver/Term Loan Claims and shall be reclassified on the Plan Effective Date as principal repayment). |
| | In full and complete satisfaction of all Revolver/Term Loan Claims held by the Bank Agent and all Bank Lenders, except for Revolver/Term Loan Claims held by Consenting Noteholders as of the Agreement Effective Date (the "**New Bank Lenders**" and such Revolver/Term Loan Claims, the "**New Bank Lender Claims**"), each New Bank Lender shall receive its *pro rata* share (based on the ratio of such New Bank Lender's New Bank Lender Claims to the aggregate amount of all New Bank Lender Claims) of (a) obligations under a new term loan agreement issued by a newly-formed intermediate holding company (the "**New Bank Claim Borrower**") that will (1) be owned by the Bank Claim Borrower and (2) own only the direct and indirect subsidiaries (the "**Bank Claim Subsidiaries**") that own the assets and properties that secure payment of the obligations under the Bank Credit Agreement (the "**Bank Claim Collateral**"), as borrower, (the "**New Bank Credit Agreement**") with Wells Fargo Bank, N.A., as administrative/collateral agent (the "**New Bank Agent**"), and the New Bank Lenders in an aggregate principal amount equal to $883.7 million, which shall be guaranteed by the Bank Claim Subsidiaries and secured by a first lien in and to the Bank Claim Collateral and pursuant to which new loans shall be issued having the terms set forth on **Exhibit 1** hereto (the "**New Bank Term Loans**"), and (b) $100 million in cash payable, first, from the segregated account and, second, from other cash on hand. |
| Consenting Crossholder Claims | On the Plan Effective Date or as soon as reasonably practicable thereafter, Revolver/Term Loan Claims held by Consenting Noteholders as of the Agreement Effective Date (the "**Consenting Crossholders**," and such Revolver/Term Loan Claims, the "**Consenting Crossholder Claims**") shall be treated as follows. |
| | The Consenting Crossholder Claims shall be allowed for all purposes in the Plan in the aggregate amount of $133 million. |
| | Pursuant to Bankruptcy Rule 9019, in full and complete satisfaction of Consenting Crossholder Claims, each Consenting Crossholder shall agree to receive, and receive, as less favorable treatment than the Revolver/Term Loan Claims in respect of its Consenting Crossholder Claims, its *pro rata* share (based on the ratio of such holder's Consenting Crossholder Claims to the aggregate amount of Consenting Crossholder Claims held by all Consenting Crossholders) of: |
| | (i)   cash in the amount of $15 million; |
| | (ii)  $81 million aggregate principal amount of new senior secured notes to be issued by a separate newly-formed intermediate holding company (the "**New Notes Issuer**") that will (1) be owned by the Bank Claim Borrower and (2) own all the direct and indirect subsidiaries of the Bank Claim Borrower other than the Bank Claim Subsidiaries (the "**New Notes Issuer** |

| | |
|---|---|
| | Subsidiaries") pursuant to an indenture (the "**New Notes Indenture**") having the terms set forth on **Exhibit 2** hereto (the "**New Notes**"); provided that each Consenting Crossholder (and, for the avoidance of doubt, only a Consenting Crossholder) entitled to receive New Notes on account of its Consenting Crossholder Claims shall be able to elect (the "**Convertible Note Election**"), on a dollar-for-dollar basis, to substitute its allocated share of the New Notes for new convertible notes (the "**New Convertible Notes**") to be issued by the New Notes Issuer pursuant to an indenture (the "**New Convertible Notes Indenture**") having the terms set forth on **Exhibit 3** hereto; and<br><br>(iii) 10.57143% of the new common equity in the reorganized Company (the "**New Common Equity Interests**"), subject to dilution by the Management Incentive Plan (as defined below) and subsequent issuances of common equity (including securities or instruments convertible into common equity) by the Company from time to time after the Plan Effective Date;<br><br>provided that amount of New Convertible Notes that may be issued in lieu of the New Notes pursuant to the Convertible Notes Election (inclusive of the Convertible Notes Election available for Consenting Noteholders on account of Notes Claims described below) shall be subject to a maximum principal amount of $100 million; provided, further, that the Consenting Crossholders shall be entitled to the first $10 million of New Convertible Notes on account of their Consenting Crossholder Claims. With respect to the remaining amount of New Convertible Notes available subject to the Convertible Notes Election, the Consenting Crossholders shall receive New Convertible Notes on a *pro rata* basis with holders of Notes Claims that exercise the Convertible Notes Election (with such *pro rata* allocation being determined by the electing holder's allocation of New Notes (on account of both Consenting Crossholder Claims and Notes Claims) as the numerator and the total amount of New Notes available to be received by electing holders (on account of both Consenting Crossholder Claims and Notes Claims) as the denominator). |
| **Other Secured Claims** | Secured Claims (other than Revolver/Term Loan Claims) shall be reinstated, unimpaired, or receive treatment reasonably acceptable to the Company and the Required Consenting Creditors. |
| **Notes & General Unsecured Claims** | On the Plan Effective Date or as soon as reasonably practicable thereafter, the Notes Claims and General Unsecured Claims (as will be defined in the Plan) (collectively, the "**Unsecured Claims**") shall be treated as follows: [1], [2]<br><br>In full and complete satisfaction of all Unsecured Claims, each holder of an allowed Unsecured Claim shall receive its *pro rata* share of:<br><br>(i) $80 million in cash;<br><br>(ii) $474 million aggregate principal amount of New Notes; provided that each Consenting Noteholder (and, for the avoidance of doubt, only a Consenting |

---

[1]  There will be another settlement class created of certain guarantee claims held by non-Debtor joint venture lenders that will remain unimpaired as a Rule 9019 settlement in exchange for waiving events of default related to non-Debtors and other consideration. Extent of such guarantee claims to be discussed/subject to diligence and review/approval by Required Consenting Creditors.

[2]  Treatment of General Unsecured Claims and Ongoing Trade Claims subject to ongoing diligence. The ad hoc group of Consenting Noteholders (the "**Ad Hoc Noteholder Group**") reserves the right to modify the treatment of the Notes Claims after review of general unsecured claims and review/approval by Required Consenting Creditors.

|  | Noteholder) entitled to receive New Notes on account of its Notes Claim shall be able to make the Convertible Notes Election and receive New Convertible Notes on a *pro rata* basis with holders of Crossholder Claims making the Convertible Notes Election (with such *pro rata* allocation being determined by the electing holder's allocation of New Notes (on account of both Consenting Crossholder Claims and Notes Claims) as the numerator and the total amount of New Notes available to be received by electing holders (on account of both Consenting Crossholder Claims and Notes Claims) as the denominator); and<br><br>(iii) 78.42857% of the New Common Equity Interests, subject to dilution by the Management Incentive Plan (as defined below) and subsequent issuances of common equity (including securities or instruments convertible into common equity) by the Company from time to time after the Plan Effective Date; and<br><br>For the avoidance of doubt, any New Convertible Notes issued pursuant to the Convertible Notes Election shall result in a dollar-for-dollar reduction of New Notes to be issued. |
|---|---|
| **Property-Level Debt and Guarantee Claims** | Property-level debt and guarantee claims shall be reinstated, unimpaired, or receive treatment reasonably acceptable to the Required Consenting Noteholders and the Company, which consent shall not be unreasonably withheld. |
| **Ongoing Trade Claims** | The Company may designate an unsecured Claim that is a fixed, liquidated, and undisputed payment obligation to a third-party provider of goods and services to the Company that facilitates the Company's operations in the ordinary course of business and will continue to do so after the Effective Date as an "**Ongoing Trade Claim**."<br><br>On the Plan Effective Date or as soon as reasonably practicable thereafter, holders of Ongoing Trade Claims shall receive, in full and complete satisfaction of all Ongoing Trade Claims, the following treatment:<br><br>(i) If a holder of an Ongoing Trade Claim executes a trade agreement (a "**Trade Agreement**") with the Company (the form and terms of such Trade Agreement to be determined by the Company in consultation with the Required Consenting Noteholders), such holder shall receive four (4) equal cash installments, payable on a quarterly basis, which payments shall result in full payment in the Allowed amount of such Ongoing Trade Claim.<br><br>(ii) If a holder of an Ongoing Trade Claim does not execute a Trade Agreement, such holder's Ongoing Trade Claim shall be treated, for purposes of distributions under the Plan, as a General Unsecured Claim. |
| **Intercompany Claims and Company Interests** | Intercompany claims and existing equity interests in the Company Parties shall be reinstated, unimpaired, compromised, or cancelled, at the election of the Company and the Required Consenting Noteholders such that intercompany claims and existing equity interests in the Company Parties are treated in a tax-efficient manner; provided that any intercompany claims which shall remain as liabilities of the New Bank Claim Borrower or any New Bank Claim Subsidiary shall be subject to approval by Required Consenting Bank Lenders (and absent consent from Required Consenting Bank Lenders, such remaining liabilities shall be reduced to zero). |
| **Preferred Equity Interests** | If holders of Preferred Equity Interests vote to accept the Plan as a class, each holder of an allowed Preferred Equity Interest shall receive its *pro rata* share of 5.5% of the New Common Equity Interests, which New Common Equity Interests shall be subject to dilution by the Management Incentive Plan and subsequent issuances of common |

| | stock (including securities or instruments convertible into common stock) by the Company from time to time after the Plan Effective Date. If holders of Preferred Equity Interests vote to reject the Plan as a class, holders of Preferred Equity Interests shall receive no recovery under the Plan. [3] |
|---|---|
| **Common Equity Interests and Special Common Units** | If holders of Common Equity Interests and limited partnership units of the Bank Claim Borrower designated as special common units (the "**Special Common Units**") vote to accept the Plan as a class, each holder of existing Common Equity Interests and Special Common Units shall receive its *pro rata* share of 5.5% of the New Common Equity Interests, which New Common Equity Interests shall be subject to dilution by the Management Incentive Plan and subsequent issuances of common stock (including securities or instruments convertible into common stock) by the Company from time to time after the Plan Effective Date. If holders of Common Equity Interests and Special Common Units vote to reject the Plan as a class, holders of Common Equity Interests and Special Common Units shall receive no recovery under the Plan.[4] <br><br> For the avoidance of doubt, the Transaction shall include an option for the holders of limited partnership units to receive limited partnership units in the reorganized Bank Claim Borrower in lieu of New Common Equity Interests. |
| **Section 510(b) Claims** | Section 510(b) Claims shall be cancelled, released, discharged, and extinguished as of the Plan Effective Date and shall be of no further force or effect, and holders of Section 510(b) Claims shall receive New Common Equity Interests in an amount sufficient to provide such holder a percentage recovery equal to the percentage recovery provided to holders of Common Equity Interests.  For the avoidance of doubt, any recovery for Section 510(b) Claims shall come from the 11.0% of New Common Equity Interests allocated to holders of Common Equity Interests, Preferred Equity Interests, and Special Common Units. |

**OTHER TERMS OF THE TRANSACTION**

| **New Money Convertible Notes** | Prior to the Plan Effective Date, the Debtors shall issue (i) subscription rights to the Consenting Crossholders or their affiliates or related funds/accounts (on a *pro rata* basis based on the ratio of such holder's Consenting Crossholder Claims to the aggregate amount of Consenting Crossholder Claims held by all Consenting Crossholders) to acquire up to $25 million aggregate principal amount of additional New Convertible Notes (the "**New Money Convertible Notes**"), to be issued on the same terms as the New Convertible Notes, in accordance with the New Convertible Notes Indenture, and in accordance with rights offering procedures (the "**Rights Offering Procedures**") to be agreed upon by the Company and the Required Consenting Noteholders (the "**Subscription Rights**") and (ii) Subscription Rights to the members of the Steering Committee[5] (or their affiliates or related funds/accounts) for the Ad Hoc Noteholder Group to acquire up to $25 million aggregate principal amount of New Money Convertible Notes where each member's allocable share shall be based upon the following formula:  [(0.61337265 x (such |
|---|---|

---

[3]   If not issued to preferred equity holders, such shares will not be issued.

[4]   If not issued to common equity holders, such shares will not be issued.

[5]   The Steering Committee consists of the following entities (and related investment managers, advisers, or sub-advisors:  (i) Aegon USA Investment Management, LLC; (ii) Aurelius Capital Management, LP; (iii) BP Holdings J LP; (iv) Canyon Capital Advisors LLC; (v) Cetus Capital LLC; (vi) Fidelity Management & Research Company; (vii) Oaktree Capital Management L.P.; and (viii) Pacific Investment Management Company LLC.

| | |
|---|---|
| | holders' Consenting Crossholder Claims)) + (0.34472727 x (such holders' Notes Claims))] / [81,000,000 + (0.34472727 x (aggregate amount of Notes Claims held by all members of the Steering Committee))]. |
| **Corporate Governance** | The terms and conditions of the new corporate governance documents of the reorganized Company (including the bylaws and certificates of incorporation or similar documents, among other governance documents of each of the Company Parties, collectively, the "**Company Corporate Governance Documents**"), as well as the structure and other governance matters, shall be acceptable to and determined by the Required Consenting Non-Crossholders and the Required Consenting Crossholders in their sole discretion; provided that the Required Consenting Non-Crossholders and the Required Consenting Crossholders will consult with the Company regarding such Company Corporate Governance Documents; provided, further, that nothing in the Company Corporate Governance Documents shall adversely impact the economic recovery of the holders of Preferred Equity Interests, Common Equity Interests, or Special Common Units as set forth in this Term Sheet; provided, further, that "**Company Corporate Governance Documents**" shall not include the New Bank Borrower Corporate Governance Documents (as defined below).

The terms and conditions of the new corporate governance documents of the reorganized New Bank Claim Borrower (including the bylaws and certificates of incorporation or similar documents, among other governance documents of each of the Bank Claim Subsidiaries, collectively, the "**New Bank Borrower Corporate Governance Documents**") shall be reasonably acceptable to Required Consenting Bank Lenders and the Required Consenting Noteholders. |
| **Board of Directors** | The initial board or other governing body of the reorganized Company (the "**New Board**") shall consist of seven (7) members in total, which shall include the current Chief Executive Officer, five (5) members selected by the Required Consenting Noteholders and one (1) member selected by the Company and reasonably acceptable to the Required Consenting Noteholders (it being understood that Charles Lebovitz is acceptable to the Required Consenting Noteholders). The Required Consenting Noteholders agree to consult with the Company regarding the selection of the five (5) members with the understanding that the selection of such members shall be in the sole discretion of the Required Consenting Noteholders.

There shall not be an Executive Chairman or similar role designated or otherwise provided for in connection with the Debtors' emergence from chapter 11. |
| **Management Incentive Plan** | On or after the Plan Effective Date, the reorganized Company shall adopt a management incentive plan (the "**Management Incentive Plan**") which shall provide for the grant of up to 10% of the New Common Equity Interests (or warrants or options to purchase New Common Equity Interests or other equity-linked interests) on a fully diluted basis to certain members of management of the reorganized Company; provided that the Management Incentive Plan will include customary anti-dilution protections.  The form, allocation and any limitations on the Management Incentive Plan shall be determined by the New Board (or a committee thereof). |
| **Releases & Exculpation** | To the maximum extent permitted by applicable law, the Plan and the Confirmation Order will contain customary mutual releases and other exculpatory provisions in favor of the Company Parties, the Consenting Noteholders, the Consenting Crossholders, the Consenting Bank Lenders, the indenture trustees for the Notes, the statutory committee of unsecured creditors appointed in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code by the U.S. Trustee on November 13, 2020, pursuant to the *Notice of Appointment of Committee of Unsecured Creditors* (Docket No. 204), the holders of existing Preferred Equity Interests that |

| | |
|---|---|
| | provide a release, the holders of existing Common Equity Interests and Special Common Units that provide a release, and each of their respective current and former affiliates, subsidiaries, members, professionals, advisors, employees, directors, and officers, in their respective capacities as such.  Such release and exculpation shall include, without limitation, any and all claims, obligations, rights, suits, damages, causes of action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, including any derivative claims and avoidance actions, of the Company Parties, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that the Company Parties would have been legally entitled to assert in its own right (whether individually or collectively), or on behalf of the holder of any claim or equity interest (whether individually or collectively) or other entity, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place at any time prior to or on the Plan Effective Date arising from or related in any way in whole or in part to the Company Parties, the Notes, the Chapter 11 Cases, the adversary proceeding in the Chapter 11 Cases styled *CBL & Associates Properties, Inc. et al. v. Wells Fargo Bank, N.A.*, No. 20-03454 (DRJ), the purchase, sale, or rescission of the purchase or sale of any security of the Company Parties, the subject matter of, or the transactions or events giving rise to, any claim or equity interest that is affected by the Transaction or treated in the Plan, or the negotiation, formulation, or preparation of the Definitive Documentation or related agreements, instruments, or other documents, in each case other than claims, actions, or liabilities arising out of or relating to any act or omission that constitutes willful misconduct, actual fraud, or gross negligence as determined by final order of a court of competent jurisdiction.  To the maximum extent permitted by applicable law, any such releases shall bind holders of Revolver/Term Loan Claims, Notes Claims, all parties whose Claims are unimpaired under the Plan, all parties who affirmatively agree or vote to accept the Plan, those parties who abstain from voting on the Plan if they fail to opt-out of the releases, and those parties that vote to reject the Plan unless they opt-out of the releases. <br><br> For the avoidance of doubt, the releases under the Plan shall provide mutual releases of all claims and causes of action, including claims arising under chapter 5 of the Bankruptcy Code, among the Debtors, the holders of Notes Claims and the holders of Revolver/Term Loan Claims. |
| **Injunction & Discharge** | The Plan and Confirmation Order will contain customary injunction and discharge provisions. |
| **Cancellation of Instruments, Certificates, and Other Documents** | On the Plan Effective Date and immediately prior to or concurrent with the distributions contemplated in this Term Sheet, except to the extent otherwise provided herein or in the Definitive Documentation, all instruments, certificates, and other documents evidencing debt or equity interests in the Company shall be cancelled, and the obligations of the Company thereunder, or in any way related thereto, shall be discharged. |
| **Assumption and Rejection of Executory Contracts and Unexpired Leases** | The executory contracts and unexpired leases that shall be assumed, assumed and assigned, or rejected in the Chapter 11 Cases shall be reasonably acceptable to the Company and the Required Consenting Noteholders and, solely with respect to the Bank Subsidiaries, the Required Consenting Bank Lenders; <u>provided</u> that all current employment agreements (and any modification to such employment agreements, including, without limitation, modifications to the terms of any retention or incentive arrangements for senior executives of the Company as requested by the Required Consenting Noteholders) shall be assumed pursuant to the Plan. |
| **Employee Compensation and Benefit Programs** | All employment agreements and severance policies, and all employment, compensation and benefit plans, policies, and programs of the Company Parties |

| | |
|---|---|
| | applicable to any of its employees and retirees, including, without limitation, all workers' compensation programs, savings plans, retirement plans, deferred compensation plans, SERP plans, healthcare plans, disability plans, severance benefit plans, incentive plans, life and accidental death and dismemberment insurance plans, shall be treated under the Plan in a manner acceptable to the Required Consenting Noteholders; <u>provided</u> that the assumption of the Company Parties' (as applicable) key employee retention program for "Tier 2" non-executive employees in an amount not to exceed $5 million in the aggregate (the "**Tier 2 KERP**") shall be deemed acceptable to the Required Consenting Noteholders.  Any amounts outstanding under the Tier 2 KERP shall be paid no later than the Plan Effective Date. |
| **Tax Issues** | As reasonably determined by the Company and the Required Consenting Noteholders, upon emergence from the Chapter 11 Cases, the reorganized Company may be structured as a real estate investment trust ("**REIT**") and the Transaction shall, subject to the terms and conditions of the RSA, be structured to achieve a tax-efficient structure, in a manner reasonably acceptable to the Company and the Required Consenting Noteholders. |
| **Exemption from SEC Registration** | The issuance of all securities in connection with the Plan, including the New Notes, the New Convertible Notes (including any securities issued in the event of conversion thereof), in each case, if issued, and the New Common Equity Interests, will be exempt from registration with the U.S. Securities and Exchange Commission under section 1145 of the Bankruptcy Code. |
| **Registration Rights** | The Company shall enter into a registration rights agreement with each of the Consenting Noteholders and Consenting Crossholders (unless such Consenting Noteholder or Consenting Crossholder opts out) relating to the registration of the resale of the New Common Equity Interests (including any New Common Equity Interests issued upon the conversion of the New Convertible Notes, if any), and to the extent the reorganized Company is not public post-emergence, shall be post-IPO registration rights. The registration rights agreement shall contain customary terms and conditions, including provisions with respect to demand rights, piggyback rights, shelf rights (including as to minimum ownership requirements), and blackout periods and shall be reasonably acceptable to the Company and Required Consenting Noteholders. Other registration rights and terms to be determined by the Required Consenting Noteholders, which shall be reasonably acceptable to the Company. |
| **SEC Reporting and Stock Exchange Listing** | As reasonably determined by the Company and the Required Consenting Noteholders, upon emergence from the Chapter 11 Cases, the New Common Equity Interests to be issued by the Company on the Plan Effective Date may be listed on the New York Stock Exchange, ("**NYSE**"), or NASDAQ, either by retaining or succeeding to the Company's existing NYSE listing or otherwise, so long as the Company is able to satisfy the initial listing requirements of the NYSE or NASDAQ, or such alternative exchange as the Company and the Required Consenting Noteholders reasonably determine if the Company is not able to satisfy the initial listing requirements of the NYSE or NASDAQ. |
| **D&O Liability Insurance Policies, Tail Policies, and Indemnification** | The Company shall implement a new D&O insurance policy for directors, managers, and officers of the reorganized Company from and after the Plan Effective Date on terms and conditions acceptable to the Company and the Required Consenting Noteholders. Any indemnification obligations (whether in by-laws, certificate of formation or incorporation, board resolutions, employment contracts, or otherwise) to be assumed pursuant to the Plan shall be on terms and conditions reasonably acceptable to the Company and the Required Consenting Noteholders. |
| **Plan Effective Date** | The date on which the Transaction shall be fully consummated in accordance with |

| | |
|---|---|
| | the terms and conditions of the Definitive Documentation, which shall be the effective date of the Plan (the "**Plan Effective Date**"). |
| **Conditions to the Plan Effective Date** | The Plan Effective Date shall be subject to the following conditions precedent, some of which may be waived in writing by agreement of the Company and the Required Consenting Creditors, subject to the consent rights provided for in the RSA:<br><br>(i)  the Definitive Documentation (as applicable) shall be in form and substance consistent with this Term Sheet and the RSA and such documents shall be reasonably acceptable to the Parties entitled to consent rights with respect to such documents under the RSA;<br><br>(ii)  the Bankruptcy Court shall have entered an order confirming the Plan (the "**Confirmation Order**") in form and substance consistent with this Term Sheet and the RSA, such order shall otherwise be reasonably acceptable to the Company and the Required Consenting Creditors, and such order shall be a Final Order;<br><br>(iii)  all of the schedules, documents, supplements, and exhibits to the Plan and Disclosure Statement shall be in form and substance consistent with this Term Sheet and the RSA and such documents shall be reasonably acceptable to the Parties entitled to consent rights with respect to such documents under the RSA;<br><br>(iv)  the Company Parties shall have sufficient cash on hand to make all cash payments required to be made on the Plan Effective Date pursuant to the Plan;<br><br>(v)  the issuance of the New Convertible Notes shall be approved by the Bankruptcy Court on terms substantially similar to **Exhibit 3** hereto;<br><br>(vi)  all outstanding fees and expenses of the Consenting Noteholders, Consenting Crossholders, and Consenting Bank Lenders shall have been paid in full in accordance with this Plan Term Sheet and the RSA;<br><br>(vii)  the RSA shall be in full force and effect; and<br><br>(viii)  all governmental approvals and consents that are legally required for the consummation of the Transaction shall have been obtained, not be subject to unfulfilled conditions, and be in full force and effect. |
| **Fees and Expenses of the Consenting Noteholders, Bank Agent, and Consenting Bank Lenders** | Following authorization by the Bankruptcy Court to perform pursuant to the RSA, the Company shall pay in cash or reimburse all reasonable and documented fees and out of pocket expenses (regardless of whether such fees and expenses were incurred before or after the Petition Date) of the following advisors:  (A)(i) Akin Gump, as legal counsel to the Consenting Noteholders; (ii) White & Case, as legal counsel to certain Consenting Crossholders; (iii) PJT Partners, as the financial advisor retained on behalf of the Consenting Noteholders; (iv) Raider Hill Advisors, LLC and any other professionals or advisors (including one (1) local counsel in Delaware) retained by the Consenting Noteholders with the consent of the Company (such consent not to be unreasonably withheld); and (v) reasonable and documented out of pocket expenses of individual Consenting Noteholders (including fees and expenses of external counsel) in an amount not to exceed $500,000 in the aggregate; <u>provided</u> that if the reasonable and documented out of pocket expenses of individual Consenting Noteholders (including fees and expenses of external counsel) payable pursuant to this clause (A)(v) exceed $500,000 (or such greater amount as agreed by the Company and Required Consenting Noteholders) in the aggregate, such amounts shall be shared *pro rata* by the individual Consenting Noteholders seeking payment |

of out of pocket expenses based on each individual Consenting Noteholders' percentage held of the aggregate outstanding principal amount of the Notes held by all individual Consenting Noteholders seeking payment of their out of pocket expenses pursuant to this clause (A)(v); provided, further, that, for the avoidance of doubt, the Company Parties shall in no event pay in excess of the $500,000 cap; and (B)(i) Jones Day, as legal counsel to the Bank Agent and any administrative agent's fees owing to the Bank Agent under the fee letter executed in connection with the Bank Credit Agreement; (ii) Ducera Partners, as the financial advisor retained by the Bank Agent; (iii) Newmark & Company Real Estate, Inc. d/b/a Newmark Knight Frank, as advisor to Jones Day; (iv) Consilio LLC and Epiq, as third-party litigation vendors of Bank Agent; and (v) such local counsel as Bank Agent or Jones Day may engage to assist with State specific issues related to the collateral properties, provided that, if practicable, such local counsel shall not duplicate efforts with the local counsel to the Consenting Noteholders engaged for the same purpose; and (C) reasonable and documented out of pocket expenses of individual Consenting Bank Lenders (including fees and expenses of external counsel) that become Consenting Bank Lenders prior to, on, or within thirty (30) days after, the Agreement Effective Date.

**Exhibit 1**

**Terms of New Bank Term Loan Facility**

Set forth below is a summary of certain key terms for the New Bank Term Loans under the New Bank Term Loan Facility (each as defined below) to be issued by the New Bank Claim Borrower (as defined below) to the New Bank Lenders (as defined below) that are Bank Lenders under that certain Credit Agreement, dated as of January 30, 2019 (the "**First Lien Credit Agreement**") by and among CBL & Associates Limited Partnership, as borrower (the "**Bank Claim Borrower**"), CBL & Associates Properties, Inc., the Bank Lenders party thereto, Wells Fargo Bank, National Association, as administrative agent (the "**Bank Agent**" and, together with the Bank Lenders, the "**Prepetition Secured Parties**"), U.S. Bank National Association, as syndication agent, and Citizens Bank, N.A., PNC Bank, National Association, JPMorgan Chase Bank, N.A. and Regions Bank, each as documentation agent, pursuant to a proposed chapter 11 plan of reorganization (as the same may be amended, restated, amended and restated, supplemented, or otherwise modified from time to time the "**Plan**"). This summary of proposed terms and conditions does not purport to summarize all the terms, conditions, representations and other provisions with respect to the transactions referred to herein, which will be set forth in the New Bank Term Loan Credit Facility Documents (as defined below). Capitalized terms used herein but not otherwise defined shall have the meanings given to such terms in the RSA or Plan Term Sheet, as applicable.

| | |
|---|---|
| **Borrower**: | A newly-formed wholly owned subsidiary of the Bank Claim Borrower, as reorganized pursuant to the Plan, that is the direct or indirect parent of each of the Bank Claim Subsidiaries (as defined below) but is not the direct or indirect parent of any entity that is not a Bank Claim Subsidiary (the "**New Bank Claim Borrower**"). |
| **Guarantors**: | The obligations of the New Bank Claim Borrower under the New Bank Term Loan Facility will be guaranteed by the same former direct and indirect wholly owned domestic subsidiaries of the Bank Claim Borrower that are guarantors under the First Lien Credit Agreement together with the Additional Loan Parties (collectively, the "**Bank Claim Subsidiaries**"), which such Bank Claims Subsidiaries will be direct or indirect subsidiaries of the New Bank Claim Borrower as reorganized pursuant to the Plan; provided that any non-Borrowing Base Properties (or entities that directly or indirectly own non-Borrowing Base Properties) will be transferred such that they are no longer owned directly or indirectly by the New Bank Claim Borrower. The New Bank Claim Borrower and the Bank Claim Subsidiaries are referred to herein as "**Loan Parties**" and each, a "**Loan Party**." For the avoidance of doubt, neither the Bank Claim Borrower nor its reorganized successor will be a Loan Party, other than to the limited extent set forth in the Parent Guaranty. |
| **Unsecured Parent Repayment Guaranty**: | The obligations of the New Bank Claim Borrower under the New Bank Term Loan Facility will also be guaranteed on an unsecured basis by Bank Claim Borrower (the "**Parent Guaranty**"), but such guaranty will be limited to an aggregate principal amount of $175.0 million, which amount shall be reduced, to the extent paid, by an amount equal to the following: |

(i)   100% of the first $2.5 million of mandatory amortization per year;

(ii)   50% of remaining mandatory amortization;

(iii) 100% of Excess Cash (as defined below) sweep payments; and

(iv) 150% of any voluntary prepayments of the New Bank Term Loan Facility in each case beginning immediately after the Plan Effective Date; provided that such reduction shall be exclusive of any mandatory prepayments in connection with dispositions and casualty events.

The Parent Guaranty will terminate on the earlier of the date on which (i) the outstanding principal amount of the New Bank Term Loans is reduced to less than $650.0 million and (ii) after the second anniversary of the Closing Date, the Debt Yield Ratio is greater than 15.0%.

"**Debt Yield Ratio**" means, as of any date of determination, the ratio, expressed as a percentage, of (i) the Borrowing Base Modified Cash NOI on a trailing 12-month basis, first tested as of the last day of the first quarter of 2023 and thereafter on a quarterly basis (each, a "**Testing Date**"), with a Compliance Certificate to be delivered 45 days after each Testing Date, to (ii) the aggregate outstanding principal amount of New Bank Term Loans as of such date.

As used in this summary of terms, "**Borrowing Base Modified Cash NOI**" means net operating income from collateral properties, determined on a GAAP basis that (i) excludes straight-line rents and above / below market lease rates, (ii) includes lease buyouts and landlord inducements, but not write-offs of landlord inducements, and (iii) excludes the Imputed Base Management Fee.

| | |
|---|---|
| **REIT Bad-Act Guaranty:** | CBL & Associates Properties, Inc. will provide an unsecured Guaranty (the "**REIT Guaranty**") in the same form as provided in connection with the First Lien Credit Agreement covering losses solely with respect to those suffered by reason of fraud or of willful misrepresentation by the (i) New Bank Claim Borrower, (ii) the New Notes Issuer, or the (iii) Bank Claim Borrower. |

The REIT Guaranty will be limited to an aggregate principal amount of $175.0 million, which amount shall be reduced, to the extent paid, by an amount equal to the following:

(i)   100% of the first $2.5 million of mandatory amortization per year;

(ii)   50% of remaining mandatory amortization;

(iii)   100% of Excess Cash (as defined below) sweep payments; and

(iv)   150% of any voluntary prepayments of the New Bank Term Loan Facility in each case beginning immediately after the Plan Effective Date; provided that such reduction shall be exclusive of any mandatory prepayments in connection with dispositions and casualty events.

The REIT Guaranty will terminate on the earlier of the date on which (i) the outstanding principal amount of the New Bank Term Loans is reduced to less than $650.0 million and (ii) after the second anniversary of the Closing Date, the Debt Yield Ratio is greater than 15.0%.

| | |
|---|---|
| **Lenders**: | The Bank Lenders (other than any Consenting Crossholder on account of a Consenting Crossholder Claim) under the First Lien Credit Agreement (collectively, the "**New Bank Claim Lenders**"). |
| **Closing Date:** | The earlier of (i) a date agreed upon by the Required Consenting Noteholders, the Required Consenting Bank Lenders, and the Debtors, and (ii) November 1, 2021. |
| **Principal Amount:** | $883.7 million (the "**New Bank Term Loan Facility Loan Amount**").[6] |
| **Administrative / Collateral Agent:** | Wells Fargo Bank, N.A. (the "**New Bank Agent**" and, together with the New Bank Claim Lenders, the "**New Secured Parties**"). |
| **New Bank Term Loan Facility**: | A senior secured U.S. dollar denominated term loan facility in an aggregate principal amount equal to the New Bank Term Loan Facility Loan Amount (the "**New Bank Term Loan Facility**"; the loans made thereunder, the "**New Bank Term Loans**") to be deemed issued in full and final satisfaction of the Revolver/Term Loan Claims of the New Bank Claim Lenders upon the effective date of the Plan (the "**Plan Effective Date**"). |
| **Maturity Date**: | The New Bank Term Loans will mature four (4) years from the Closing Date; provided that, so long as no (a) Default arising from an involuntary chapter 11 petition that has not |

---

[6]   This amount takes into account reclassification of interest payments as principal repayments, as set forth in the Plan Term Sheet.

been dismissed, (b) payment Default, or (c) Event of Default then exists, such date may be extended by (i) one (1) year if the outstanding principal amount of the New Bank Term Loans is reduced to $670.0 million or lower and (ii) one (1) additional year if the outstanding principal amount of the New Bank Term Loans is reduced to $615.0 million or lower.  The full principal amount of the New Bank Term Loans would be due at maturity.

| | |
|---|---|
| **New Bank Term Loan Facility Agreement Documents:** | The New Bank Term Loan Facility will be documented in a credit and guarantee agreement (the "**New Bank Term Loan Facility Agreement**") and will be secured pursuant to customary security agreements, mortgages, management contract assignment, deposit account control agreements, and pledge agreements (subject, in each case, to customary exclusion).  The documents referred to in the preceding sentence and documents ancillary or related thereto are referred to as the "**New Bank Term Loan Facility Documents**."  The New Bank Term Loan Facility Documents will be in form and substance satisfactory to the Required Consenting Creditors and the Debtors and shall include payment of an annual administrative agent's fee consistent with the annual fee paid in connection with the First Lien Credit Agreement. |
| **Interest Rate**: | The New Bank Term Loans will bear interest at the rate of LIBOR+275bps per annum (with a 100bps LIBOR floor), including benchmark replacement provisions (to reflect the ARRC "hardwired" approach) to be agreed.  Interest shall be payable in cash on the applicable LIBOR interest payment date or quarterly, in the case of a Base Rate Loan or a LIBOR loan with an interest period longer than three (3) months (each, a "**Payment Date**") subject to a five (5)-day grace period.  The New Bank Claim Borrower will have the option to choose an interest period of one (1)-month, three (3)-month, or six (6)-month LIBOR. |
| **Optional Prepayments**: | No restrictions on optional prepayment, and the New Bank Term Loans may be prepaid at any time and from time to time without premium or penalty. |
| **Mandatory Prepayment Requirements**: | The New Bank Term Loan Facility shall be prepaid (without premium or penalty) in an amount equal to 100% of the net cash proceeds received after the Closing Date from the proceeds of (i) dispositions of the collateral properties or the equity of a Bank Claim Subsidiary and (ii) casualty events with respect to the collateral properties (with reinvestment rights with respect to such casualty event proceeds to be agreed by the Required Consenting Creditors and the Company).[7] |
| **Collateral Release:** | The release of any collateral will be subject to mutually agreed-upon release prices, minimum collateral pool size, and "key property" provisions (i.e., properties that cannot be sold without the Requisite Lender consent).  For the avoidance of doubt, net proceeds from any permitted collateral release shall be applied by the New Bank Claim Borrower to repay principal on the New Bank Term Loans, and shall not run through the ECF waterfall set forth below. |
| **Monthly Payments:** | On the first day of each month following the Closing Date,[8] the Company will make combined monthly principal and interest payments, in arrears, in an amount equal to (i) $212,328.77 per day multiplied by (ii) the number of days in the calendar month just ended (such amount, the "**Monthly Payment**"), with the such Monthly Payment to be applied first to interest then due and owing, and the balance applied to repay principal outstanding under the Loan. |
| **Prepayment / Make Whole Premium**: | None. |

---

[7]   Release parcels to be discussed in connection with final loan documentation.

[8]   For the avoidance of doubt, if the Closing Date occurs on November 1, 2021, the first Monthly Payment will be due on December 1, 2021.

**Security**:

The obligations of the Loan Parties under the New Bank Term Loans will be secured by a collateral package substantially consistent with the collateral package described in the First Lien Credit Agreement together with (i) a lien on properties set forth on **Schedule 1** hereto (the "**Additional Collateral Properties**") and the Pearland Town Center-HCA Office, (ii) a pledge of the equity interests in the former direct and indirect wholly owned domestic subsidiaries of the Bank Claim Borrower that own such Additional Collateral Properties and the Pearland Town Center-HCA Office, which such entities shall be direct or indirect subsidiaries of the New Bank Claim Borrower as reorganized pursuant to the Plan (such entities, the "**Additional Loan Parties**"), and (iii) all accounts related to such collateral and proceeds therefrom; provided that any existing equity pledges granted by the Bank Claim Borrower in connection with the First Lien Credit Agreement shall be replaced by new equity pledges granted by the New Bank Claim Borrower pursuant to the New Bank Term Loan Facility Agreement.  New Bank Claim Lenders' liens on real estate collateral shall be insured by an acceptable title insurance policy from a title insurer and with reinsurance as New Bank Agent may reasonably require; provided that the current title insurer shall be deemed acceptable.  (The current collateral properties, together with the Additional Collateral Properties and the Pearland Town Center-HCA Office, collectively, the "**Borrowing Base Properties**").   For the avoidance of doubt, the Parent Guaranty will be unsecured.

**Excess Cash Flow:**

Provided no (a) Default arising from an involuntary chapter 11 petition that has not been dismissed, (b) payment Default, or (c) Event of Default then exists, on a semi-annual basis first determined on September 1, 2022 for the six (6)-month period ending June 30, 2022, an amount equal to ECF NOI—to be calculated for each period ending June 30 and December 31 and determined on September 1 and March 1 respectively—remaining after payment of:

(i)   imputed base management fees for the existing and Additional Collateral Properties in a semi-annual amount of $4.5 million (the "**Imputed Base Management Fee**"), plus any reimbursable ordinary course third-party costs of unaffiliated parties that are not otherwise included in the calculation of Borrowing Base Modified Cash NOI or required to be included under GAAP, which shall be paid in monthly installments;

(ii)  scheduled principal and interest payment of $38.75 million, which shall be paid in monthly installments, and any other payments of principal or interest made with respect to the New Bank Term Loan Facility for the immediately preceding six (6) months; and

(iii) total actual amount spent on Capital Expenditures (as defined below); provided that:

   a.   for the period January 1 through June 30 (the "**First Semi-Annual Period**"), if the total actual amount spent is less than $7.5 million, the Borrower shall put the difference into a reserve maintained by Borrower to be utilized for future Capital Expenditures; and

   b.   for the period July 1 through December 31 (the "**Second Semi-Annual Period**") if the total actual amount spent during the First Semi-Annual Period and the Second Semi-Annual Period, together with any amounts reserved during the First Semi-Annual Period under clause (a) above, is less than $15 million, the Borrower shall put the difference into a reserve maintained by Borrower to be utilized for future Capital Expenditures;

the amount remaining (the "**Excess Cash**"), for each semi-annual period, shall be applied as follows, to the extent available and so long as the minimum liquidity requirement will continue to be met following such application:

(i)   first, an amount equal to the actual ECF NOI from the Additional Collateral

Properties (after deduction of an allocated share of the Imputed Base Management Fee, *pro rata* based on ECF NOI from all collateral properties equal to $4.5 million) shall be distributed by the New Claim Borrower to the Bank Claim Borrower for general corporate uses or further distribution;

(ii) second, up to $7.5 million shall be applied by the New Bank Claim Borrower to repay principal on the New Bank Term Loans, provided that, this $7.5 million amount shall be the total amount disbursed for both the First Semi-Annual Period and Second Semi-Annual Period, and to the extent the full $7.5 million amount is disbursed during the First Semi-Annual Period, no further disbursements under this clause (ii) will be made in the Second Semi-Annual Period;

(iii) third, up to $5 million shall be distributed by the New Claim Borrower to the Bank Claim Borrower for general corporate uses or further distribution, provided that, this $5 million shall be the total amount disbursed for both the First Semi-Annual Period and Second Semi-Annual Period, and to the extent the full $5 million amount is disbursed during the First Semi-Annual Period, no further disbursements under this clause (iii) will be made in the Second Semi-Annual Period; and

(iv) fourth, with respect to any remaining Excess Cash, (a) 50% shall be used to repay principal on the New Bank Term Loans, and (b) 50% shall be distributed by the New Claim Borrower to the Bank Claim Borrower for general corporate uses or further distribution.

Prior to application as set forth above, all revenue from the collateral properties shall be deposited in either property-level operating accounts or accounts owned by New Claim Borrower, each subject to a security agreement (and control agreement, if applicable) in favor of New Bank Agent and New Secured Parties. While an Event of Default exists no distributions or application of ECF NOI or Excess Cash shall be permitted. The terms and conditions of any deposit account control agreements shall be negotiated in connection with final documentation as reasonably agreed upon by the Debtors, Required Consenting Noteholders, and Requisite Lenders.

As used in this summary of terms, "**ECF NOI**" means net operating income from collateral properties, determined on a cash basis. For the avoidance of doubt, ECF NOI excludes the Imputed Base Management Fee. Additionally, "**Capital Expenditures**" shall mean capitalized expenditures, including deferred maintenance, tenant allowances and redevelopment costs, excluding (i) any such expenses funded with reserve funds from a prior year or prior six (6)-month period and (ii) the amount of any cash reimbursements received from a third party (such as the municipalities) to reimburse a Borrower Party for such expenses, all determined on a cash basis.

**Stub Period ECF:**   Provided no (a) Default arising from an involuntary chapter 11 petition that has not been dismissed, (b) payment Default, or (c) Event of Default then exists, for the period November 1, 2021 through December 31, 2021 (the "**Stub Period**"), an amount equal to ECF NOI for the Stub Period remaining after payment of:

(i) an Imputed Base Management Fee of $1.5 million plus any reimbursable ordinary course third-party costs of unaffiliated parties for the Stub Period that are not otherwise included in the calculation of Borrowing Base Modified Cash NOI or required to be included under GAAP;

(ii) scheduled principal and interest payments made during the Stub Period; and

(iii) Capital Expenditures in the greater of (a) the actual spend during the Stub Period and (b) the lower of (1) $2.5 million and (2) $15 million minus the actual spend in FY 2021 prior to the Stub Period; in no event shall this number be lower than zero; and

(iv) $5 million to satisfy the Minimum Liquidity covenant (set forth below).

the amount remaining (the "**Stub Period Excess Cash**") shall be applied as follows, to the extent available and so long as the minimum liquidity requirement will continue to be met following such application:

(i) first, an amount equal to the actual ECF NOI from the Additional Collateral Properties for the Stub Period (after deduction of an allocated share of the Imputed Base Management Fee, *pro rata* based on ECF NOI from all collateral properties equal to $1.5 million) shall be distributed by the New Claim Borrower to the Bank Claim Borrower for general corporate uses or further distribution;

(ii) second, $1.25 million shall be applied by the New Bank Claim Borrower to repay principal on the New Bank Term Loans;

(iii) third, $833,333 shall be distributed by the New Claim Borrower to the Bank Claim Borrower for general corporate uses or further distribution; and

(iv) fourth, any remaining Stub Period Excess Cash shall be used (1) 50% to repay principal on the New Bank Term Loans, (2) and 50% shall be distributed by the New Claim Borrower to the Bank Claim Borrower for general corporate uses or further distribution.

| | |
|---|---|
| **Conditions Precedent**: | The New Bank Term Loan Facility will become effective and the New Bank Term Loans will be issued upon satisfaction of conditions precedent acceptable to the Required Consenting Creditors and the Debtors including:   (i) the issuance by the Bankruptcy Court of an order confirming a Plan on terms acceptable to the Required Consenting Creditors and the Debtors (the "**Confirmation Order**");   (ii) the Confirmation Order being in full force and effect and not subject to stay; and (iii) the occurrence of the Plan Effective Date. |

Additionally, the New Bank Term Loan Facility shall have conditions precedent that are standard and customary for a real estate secured transaction, including, but not limited to delivery of (i) PZRs or other zoning reports, appraisals, phase I environmental assessments (with follow-on phase II assessments, if required) and surveys (which, for the avoidance of doubt, may be satisfied by surveys previously delivered to New Bank Agent in connection with the First Lien Credit Agreement) for all collateral properties, as well as PCR reports for all Additional Borrowing Base Properties and the Pearland Town Center-HCA Office and seismic reports for specific Borrowing Base Properties to the extent reasonably required by New Bank Agent in order to comply with Lenders' insurance requirements (all of the foregoing obtained at Borrower's cost and  expense); (ii) financial data for the collateral properties, including three years of financial statements for the Borrowing Base Properties, actual 2020 financial statements for all Borrowing Base Properties, 2021 Borrowing Base budgets (including contemplated CapEx Projections), rent rolls and co-tenancy summaries for all Borrowing Base Properties and a two (2)-year anticipated CapEx plan for the Borrowing Base Properties; and (iii) customary estoppels and subordination agreements with respect to major leases.

| | |
|---|---|
| **Covenants**: | The New Bank Term Loan Facility Agreement will have standard real estate related covenants consistent with the First Lien Credit Agreement, as reasonably agreed upon by the Debtors, Required Consenting Noteholders, and Requisite Lenders; provided that any such covenants shall apply only to the New Bank Claim Borrower and the Bank Claim Subsidiaries.[9] |
| **Financial Covenants**: | Limited to the following with respect to the Borrowing Base Properties: |

(i) **Minimum Debt Yield**:  an 11.5% Debt Yield Ratio on the collateral securing

---

[9]   Final (non-financial) covenants to be negotiated in connection with final loan documentation.

the obligations under the New Bank Term Loan Facility to be first tested at the end of first fiscal quarter of 2023 and on a quarterly basis thereafter;

(ii) **Minimum CapEx Investment**:  Annual Capital Expenditures of not less than $15.0 million on the Borrowing Base Properties, with any shortfall in any such calendar year to be put be held in a reserve maintained by Borrower to be utilized for future Capital Expenditures, such covenant to be tested as of December 31 each calendar year beginning with December 31, 2022;

(iii) **Minimum Interest Coverage Ratio**: A 1.50x interest coverage ratio, expressed as the ratio of the Borrowing Base Modified Cash NOI on a trailing twelve (12)-month basis to the borrowing base interest expense on a trailing twelve (12)-month basis of the New Bank Term Loans at such time to be first tested at the end of the fourth fiscal quarter of 2021 and on a quarterly basis thereafter;

(iv) **Minimum Liquidity**:   On or after the first testing date, minimum unencumbered and unrestricted cash liquidity (held at the Borrower or Borrowing Base Property level, and exclusive of any amounts held in the required CapEx reserve) in an aggregate amount of $5 million, to be first tested at the end of the fourth fiscal quarter of 2021 and on a quarterly basis thereafter; and

(v) **Minimum Occupancy Rate**:  On or after the first testing date of aggregate Occupancy Rate of the Borrowing Base Properties of 75% to be first tested at the end of first fiscal quarter of 2023 and on a quarterly basis thereafter.  For the avoidance of doubt, physical and economic occupancy shall each be taken into account in determining such Occupancy Rate.

| | |
|---|---|
| **Reporting:** | As agreed by the Required Consenting Creditors and the Debtors, and typical for a secured credit facility, including quarterly reporting on Borrowing Base Modified Cash Net Operating Income, ECF NOI on a semi-annual basis (and with respect to the Stub Period) and occupancy for each Borrowing Base Property, covenant calculation reporting within 45-days of quarter-end, and annual financial reporting for the New Bank Claim Borrower, the Bank Claim Borrower, and CBL & Associates Properties, Inc. (audited, in the case of the (i) Bank Claim Borrower and, (ii) solely to the extent that it is required to file financial statements with the SEC, CBL & Associates Properties, Inc.), but within 90-days of year-end, and a rolling four (4)-quarter forecast for the Borrowing Base Properties.[10] |
| **Events of Default**: | As agreed by the Required Consenting Creditors and the Debtors, subject to agreed-upon notice and cure provisions for non-monetary defaults.  Notwithstanding the foregoing, the New Bank Term Loan Facility will contain a cross-default to the Bank Claim Borrower's and the New Notes Issuer's indebtedness in an aggregate principal amount in excess of $150 million until such time as the Parent Guaranty has been either (i) reduced to $0 or (ii) terminated in accordance with its terms; provided that the New Secured Parties will not be entitled to exercise such cross-default if the Bank Claim Borrower has agreed to a foreclosure or similar arrangement for non-Loan Party property-level indebtedness. |
| **Requisite Lenders:** | New Bank Lenders holding greater than 50.00% of the outstanding commitments and/or other exposure under the New Bank Term Loan Facility (the "**Requisite Lenders**"); provided that the commitments and/or exposure of any defaulting New Bank Lender shall be disregarded in determining the Requisite Lenders at any time. |
| **Amendments**: | Requisite Lenders, except for amendments customarily requiring approval by all lenders or all affected lenders. |

---

[10]   Additional reporting to be discussed in connection with final loan documentation.

**Governing Law and Submission to Exclusive Jurisdiction**:   State of New York.

## **Schedule 1**

**Additional Collateral Properties[11]**

- Valley View Mall

- Southaven Towne Center

- Southaven Towne Center—Self-Development

---

[11]   For the avoidance of doubt, the Additional Collateral Properties do not include the outparcels associated with Valley View Mall and Southaven Towne Center.

**Exhibit 2**

**Terms of New Notes**

Set forth below is a summary of certain key terms for the New Notes (as defined below) to be issued by the Issuer (as defined below) pursuant to a proposed chapter 11 plan of reorganization (as the same may be amended, restated, amended and restated, supplemented, or otherwise modified from time to time the "**Plan**"). This summary of proposed terms and conditions does not purport to summarize all the terms, conditions, representations and other provisions with respect to the transactions referred to herein, which will be set forth in the indenture in respect of the New Notes. Capitalized terms used but not otherwise defined in this summary of certain key terms for the New Notes shall have the meanings given to such terms in the Plan Term Sheet to which it is attached as an exhibit.

| | |
|---|---|
| **Issuer:** | A newly-formed intermediate holding company (other than the New Bank Claim Borrower) (the "**New Notes Issuer**") to (i) be owned by CBL & Associates Limited Partnership, as reorganized pursuant to the Plan ("**Bank Claim Borrower**"), and (ii) own all the direct and indirect subsidiaries of Bank Claims Borrower other than the New Bank Claim Borrower and the Bank Claim Subsidiaries (the "**New Notes Issuer Subsidiaries**"). |
| **Guarantors:** | Full guarantees by (i) the Bank Claim Borrower on an unsecured basis and (ii) all the New Notes Issuer Subsidiaries, as set forth on **Schedule 1** hereto. |
| **REIT Bad-Act Guaranty:** | CBL & Associates Properties, Inc. will provide an unsecured Guaranty (the "**REIT Guaranty**"), which shall cover losses solely with respect to those suffered by reason of fraud of or willful misrepresentation by (i) the New Bank Claim Borrower, (ii) the New Notes Issuer, or (iii) the Bank Claim Borrower. |
| **Principal Amount:** | Up to $555 million; provided that such amount may be reduced on a dollar-for-dollar basis, up to $100 million, in accordance with the Convertible Note Election. |
| **Interest Rate**: | 10.0% per annum payable in cash. |
| **Maturity Date**: | Eight (8) years from the Plan Effective Date. |
| **Security:** | Liens on unencumbered properties, priority guarantees from certain entities (including to-be-formed intermediate holding company-parents of entities holding encumbered properties and joint ventures of the Company Parties), and equity pledges of certain entities (including to-be-formed intermediate holding company-parents of entities holding encumbered properties and joint ventures of the Company Parties) as set forth on **Schedule 1** hereto. |

> • Baskets to remove collateral TBD, and based upon release prices to be negotiated.
>
> • Ability to form joint ventures with contributed land from collateral so long as joint ventures remain as credit support.

> Except for pledges of equity interests not listed on **Schedule 1** hereto to the extent such equity pledges would be prohibited by any non-recourse loan document, CMBS loan document, construction loan document, joint venture document or other document related to the foregoing (collectively, the "**Restrictive Documents**," which, for the avoidance of doubt, shall not include the Credit Agreement or related documents), in each case, remaining in effect post Plan Effective Date, liens on all other unencumbered assets not otherwise identified on **Schedule 1** hereto except as consented to by the Required Consenting Noteholders, provided that the Company Parties shall not transfer unencumbered assets to or from entities that are party to a Restrictive Document outside the ordinary course of business.

> Except, solely in the case of direct or indirect subsidiaries of the Bank Claims Borrower that are directly party to Restrictive Documents remaining in effect post-Plan Effective Date to the extent otherwise prohibited by such Restrictive Document remaining in effect post-Plan Effective Date, liens on cash, cash equivalents, and treasuries except as consented to by the Required Consenting Noteholders; provided that the Company Parties shall not transfer cash, cash equivalents, or treasuries to or from entities that are party to a

Restrictive Document outside the ordinary course of business.

**Asset Sales:**      Asset sale provision allowing for 102% pay down (which shall override any other percentage that may apply during the relevant call protection period)

**Call Protection:**      No call protection for first 18 months following Plan Effective Date; 105% call protection for the 12-month period beginning 18 months after the Plan Effective Date; 102.5% for the 12-month period beginning 30 months after the Plan Effective Date; and none thereafter.

**Parent Guaranty:**      Full Parent Guaranty.

**Make-Whole:**      Bankruptcy premium payable upon acceleration using make-whole at T+50 during first 18 months following Plan Effective Date; thereafter, bankruptcy premium payable upon acceleration shall be same as scheduled call price above in effect at such time.

**Other:**      Ability to form joint ventures with contributed land from collateral so long as joint ventures remain as credit support.

No limitations on distributions to equity.

Other terms (including covenants) to be agreed between the Required Consenting Noteholders and the Company.

The New Notes Indenture will contain a cross-default to the Bank Claim Borrower's and New Bank Claim Borrower's indebtedness in an aggregate principal amount in excess of $150 million; <u>provided</u> that the New Notes Issuer and New Notes Issuer Subsidiaries will not be entitled to exercise such cross-default if the Bank Claim Borrower or New Bank Claim Borrower have agreed to a foreclosure or similar arrangement for non-Loan Party property-level indebtedness.

## <u>Schedule 1</u>

### Collateral and Credit Support for New Notes

1. **The New Notes will be secured by a first priority lien on the following properties, which shall be evidenced by mortgages recorded in the applicable recording offices, and a pledge of the equity of the entity that owns the following properties:**

<u>Certain Mall Assets</u>

- Alamance Crossing – West
- Brookfield Square
- Dakota Square
- Eastland Mall (including (Parcel(s) in Main Project))
- Harford Mall
- Laurel Park Place
- Meridian Mall (leasehold)
- Mid Rivers Mall
- Monroeville Mall and Annex
- Monroeville Mall - Anchor
- Monroeville Mall - District
- Northpark Mall
- Old Hickory Mall
- Parkway Place
- South County Center
- St. Clair Square (fee)
- St. Clair Square (leasehold)
- Stroud Mall (leasehold)
- Stroud Mall (fee)
- York Galleria

<u>Certain Associated Centers & Other Properties</u>

- 840 Greenbrier Circle
- Pearland Town Center – Residences

2. **The New Notes will have a priority guaranty from the CBL member in the joint venture that owns the following properties. To the extent CBL Limited Partnership is a direct member of the joint venture, the Company will use reasonable efforts to seek consent to place an intermediate holding company as the new CBL member in the joint venture, which will give a priority guaranty and use reasonable efforts to seek consent to pledge the CBL interest in the joint venture.**

<u>Joint Venture Properties</u>

- CBL Center – Phase I and II

- Hamilton Corner – AAA Parcel
- Hamilton Place – Lebcon (Land)
- Hamilton Place and OP
- Hamilton Place – ALOFT Hotel

3. **The New Notes will (i) include a restriction on mortgaging the following properties to the extent such property is wholly owned directly or indirectly by CBL Limited Partnership, except (a) in connection with new financing, or in connection with a refinancing of an existing mortgage loan currently encumbering an applicable property as of the date hereof in an amount no greater than the loan being refinanced (plus customary interest and refinancing costs) and (b) if the Company uses the net proceeds of a financing to pay down the New Notes, (ii) have a priority guaranty (1) to the extent such property is owned by a joint venture, from an intermediate holding company that directly owns the entity that holds the interest in the joint venture entity that directly or indirectly owns the following properties, or (2) to the extent such property is wholly owned indirectly by CBL Limited Partnership, from an intermediate holding company that directly owns the entity that owns the following properties (except to the extent an existing intermediate holding company cannot give a priority guaranty, an intermediate holding company will be inserted as close as possible above the property-owning entity as may be permitted and such entity will give a priority guarantee) and (iii) will be secured by a pledge of the equity of such intermediate holding company:**

<u>Outparcels</u>

- Brookfield Square – Bluemound Road parcel (fee)/Lifestyle Center
- Brookfield Square – Bluemound Road parcels (leasehold)/Lifestyle Center
- CoolSprings Crossing – Parcel(s) in the Main Project
- Cross Creek – Sears - Parcel(s) in the Main Project
- Dakota Square - Parcel(s) in the Main Project
- Dakota Square – Mgmt GL Parcels
- East Towne Mall – Outparcel
- East Towne Mall – Parcel
- Eastgate Mall – Shops at Eastgate
- Hamilton Place – Sears
- Hamilton Place – Sears – Parcel(s) in the Main Project
- Hanes Mall – Restaurants
- Jefferson Mall – Self Development
- Kirkwood Mall – Mgmt GL Parcels
- Laurel Park Mall – Parcel(s) in the Main Project
- Layton Hills Mall – Mgmt GL Parcels
- Layton Hills Mall – Outparcel II
- Mall del Norte TX Outparcel
- Mayfaire Town Center – Mgmt GL Parcels
- Meridian Mall – Parcel(s) in the Main Project (leasehold)
- Meridian Mall – Parcel(s) in the Main Project (fee)

- Mid Rivers Mall – Parcel(s) in the Main Project
- Monroeville Mall - Parcel(s) in the Main Project
- Northgate Mall – Outparcel
- Northgate Mall Sears TBA – Outparcels
- Northpark Mall – Parcel(s) in the Main Project
- Northpark Mall – Mgmt GL Parcels
- Parkdale Mall – Corner (Self Dev. Tract 4/Pad B)
- Parkdale Mall - Macy's
- Parkdale Mall – Mgmt GL Parcels
- Pearland Town Center – Mgmt GL Parcels
- Pearland Town Center – Self Development (Parcel 8)
- Post Oak Mall – Mgmt GL Parcels
- South County Center – Parcel(s) in the Main Project
- South County Center – Mgmt GL Parcels
- Southaven Towne Center – Parcel(s) in the Main Project
- Southpark Mall – Dick's Sporting Goods
- St. Clair Square – Parcel(s) in the Main Project (pending subdivision)
- The Landing at Arbor Place – Parcel(s) in the Main Project
- Valley View Mall – Parcel(s) in the Main Project
- Volusia Mall – Restaurant Village
- Volusia – Sears TBA
- West Towne Crossing – Parcel(s) in the Main Project
- West Towne Mall – Restaurant District
- York Galleria – Parcel(s) in the Main Project

**4. The New Notes will (i) include a restriction on mortgaging the following properties to the extent such property is wholly owned directly or indirectly by CBL Limited Partnership, except (a) in connection with new financing or in connection with a refinancing of an existing mortgage loan currently encumbering an applicable property as of the date hereof in an amount no greater than the loan being refinanced (plus customary interest and refinancing costs), and (b) if the Company uses the net proceeds of a financing to pay down the New Notes, and (ii) will have a priority guarantee (1) to the extent such property is owned by a joint venture, from an intermediate holding company that directly owns the entity that holds the interest in the joint venture entity that directly or indirectly owns the following properties, or (2) to the extent such property is wholly owned indirectly by CBL Limited Partnership, from an intermediate holding company that directly owns the entity that owns the following properties. To the extent an existing intermediate holding company cannot give a priority guaranty, an intermediate holding company will be inserted as close as possible above the property-owning entity as may be permitted and such entity will give a priority guarantee:**

Joint Venture Properties

Malls
- Coastal Grand Mall and District

3

- Coastal Grand Mall – Dick's Sporting Goods
- Coastal Grand OP (fee)
- Coastal Grand OP (leasehold)
- CoolSprings Galleria
- CoolSprings Macy's Outparcel (leasehold)
- Friendly Shopping Center
- Friendly Center – Belk Homestore
- Governor's Square
- Kentucky Oaks
- Northgate Mall – JCP
- Northgate Mall – Sears
- Oak Park Mall
- Outlet Shoppes at Atlanta – Tract 1A
- Outlet Shoppes at Atlanta – Tract 1A1
- Outlet Shoppes at Atlanta – Outparcel
- Outlet Shoppes at Atlanta – Tract 1B and others
- Outlet Shoppes at El Paso – OP
- Outlet Shoppes at El Paso – OP II
- Outlet Shoppes at El Paso – Phase I and Phase II
- Outlet Shoppes at El Paso – .2763 Acre Tract
- Outlet Shoppes at Gettysburg – Phase I
- Outlet Shoppes at Gettysburg – Phase II
- Outlet Shoppes at Laredo
- Outlet Shoppes of the Bluegrass
- Outlet Shoppes of the Bluegrass – Phase II
- Outlet Shoppes of the Bluegrass – OP Tract 11
- Outlet Shoppes of the Bluegrass – OP Tract 8
- Shops at Friendly Center – Phase I and II
- West County Center

Associated Center
- Coastal Grand Outparcel – Fee Outparcels
- Governor's Square Plaza
- York Town Center
- York Town Center – Former Pier 1

Community Centers
- Ambassador Town Center
- Fremaux Town Center Phase I and II
- Hammock Landing – Phase I
- Hammock Landing – Phase II
- Pavilion at Port Orange – Phase I
- Promenade at D'Iberville
- Shoppes at Eagle Point

4

Storage
- Eastgate Mall – Self Storage
- Hamilton Place – Self Storage
- Mid Rivers – Self Storage
- Parkdale Mall – Self Storage

Other
- Statesboro – Land
- Pavilion at Port Orange West JV – Apts

Other Encumbered Properties

Malls
- Alamance Crossing – East
- Arbor Place Main Mall (Arbor Place II, LLC)
- Brookfield Square – Sears and Street Shops
- Cross Creek Mall
- Fayette Mall
- Hamilton Crossing and Expansion
- Jefferson Mall
- Northwoods Mall
- Parkdale Mall
- Parkdale Crossing (including Lifeway Christian Redevelopment)
- Southpark Mall
- Volusia Mall
- Westgate Mall

5. **The New Notes will be secured by (i) a first priority lien on the following properties, which shall be evidenced by mortgages recorded in the applicable recording offices (unless otherwise consented to by the Required Consenting Noteholders in their reasonable discretion, in which case the New Notes will include a restriction on mortgaging the following properties to the extent such property is wholly owned directly or indirectly by CBL Limited Partnership), provided, however, the first priority lien on the following properties (or the restriction on mortgaging as the case may be) shall be released in connection with new financing provided the Company uses the net proceeds of such financing to pay down the New Notes, and (ii) a pledge of the equity of the entity that owns the following properties, provided that the following properties will be released at the request of the New Board, subject to certain customary conditions (and there shall not be any release prices).**

Malls
- Cross Creek Mall – Sears
- EastGate Mall – Sears
- Eastland Mall – Macy's
- Fayette Mall – Sears Renovation

5

- Jefferson Mall – Macy's / Round 1
- Jefferson Mall - Sears

6. **The New Notes will be secured by (i) a first priority lien on the following properties, which shall be evidenced by mortgages recorded in the applicable recording offices, provided, however, the first priority lien on the following properties shall be released in connection with new financing provided the Company uses the net proceeds of such financing, less any required distributions to the Company's joint venture partners, to pay down the New Notes, and (ii) a pledge of the equity of the entity that owns the following properties:**

- Coolsprings Crossing
- Courtyard at Hickory Hollow
- Frontier Square
- Gunbarrel Point
- Harford Mall – Annex
- Shoppes @ St. Clair
- Sunrise Commons
- The Landing at Arbor Place
- The Plaza at Fayette (including Parcel(s) in Main Project and Johnny Carino's Redevelopment)
- West Towne Crossing
- WestGate Crossing

7. **The New Notes will (i) include a restriction on mortgaging the following properties to the extent such property is wholly owned directly or indirectly by CBL Limited Partnership, except (a) in connection with new financing or in connection with a refinancing of an existing mortgage loan currently encumbering an applicable property as of the date hereof in an amount no greater than the loan being refinanced (plus customary interest and refinancing costs), and (b) if the Company uses the net proceeds (less any distributions required to be made to the joint venture partners under the joint venture agreements) of a financing to pay down the New Notes, and (ii) have a priority guaranty from the CBL member in the joint venture that owns the following properties. To the extent CBL Limited Partnership is a direct member of the joint venture, the Company will use reasonable efforts to seek consent to place an intermediate holding company as the new CBL member in the joint venture, which will give a priority guaranty.**

- Hamilton Corner
- Hamilton Place – Regal Cinema
- The Shoppes at Hamilton Place
- The Terrace

8. **The New Notes will be secured by a pledge of the equity of the entity that owns the following properties, provided that the following properties will be released at the request of the New Board, subject to certain customary conditions (and there shall not be any release prices). Each piece of property in this Section 8 is a release parcel.**

- Alamance Crossing, LLC
- Alamance Crossing - OP
- Arbor Place - APWM, LLC
- Arbor Place - OP
- CBL/Cherryvale I, LLC - vacant property
- Cross Creek – Sears - Parcel(s) in the Main Project (vacant lot 2)
- Dakota Square OP
- Eastgate Mall – Self-Development
- Hanes Mall – Lot 2A
- Gulf Coast Galleria (D'Iberville CBL Land, LLC)
- Gulf Coast Town Center - Peripheral IV - Land
- Gulf Coast Town Center - Phase III - Land
- Hickory Point Mall - OP
- Imperial Valley Commons - Kohl's and Land
- Imperial Valley Mall - OP
- Jacksonville Regal Cinema Mgmt
- Meridian Mall - Land E. Lansing (leasehold interest)
- Meridian Mall - Township Property (leasehold interest)
- Meridian Mall – Management Fee Parcel
- Mid Rivers Land LLC (vacant parcels)
- Northpark Mall/Joplin, LLC Hollywood Parcels
- Pavilion at Port Orange – Phase II
- Pearland Town Center – Outparcel TX Land LLC
- Southaven Towne Center vacant parcels
- The Landing at Arbor Place - OP

**Exhibit 3**

**Terms of New Convertible Notes**

Set forth below is a summary of certain key terms for the New Convertible Notes (as defined below) to be issued by the Issuer (as defined below) pursuant to a proposed chapter 11 plan of reorganization (the "**Plan**"). This summary of proposed terms and conditions does not purport to summarize all the terms, conditions, representations and other provisions with respect to the transactions referred to herein, which will be set forth in the indenture in respect of the New Convertible Notes. Capitalized terms used but not otherwise defined in this summary of certain key terms for the New Convertible Notes shall have the meanings given to such terms in the Plan Term Sheet to which it is attached as an exhibit, including **Exhibit 2** thereof.

| | |
|---|---|
| **Issuer:** | The New Notes Issuer. |
| **Guarantors:** | Full guarantees by (i) the Bank Claims Borrower on an unsecured basis and (ii) all the New Notes Issuer Subsidiaries. |
| **REIT Bad-Act Guaranty** | CBL & Associates Properties, Inc. will provide an unsecured Guaranty (the "**REIT Guaranty**"), which shall cover losses solely with respect to those suffered by reason of fraud of or willful misrepresentation by (i) the New Bank Claim Borrower, (ii) the New Notes Issuer, or (iii) the Bank Claim Borrower. |
| **Amount:** | Up to $150 million, $50 million of which is new money. |
| **Strike:** | $350 million. |
| **Interest Rate**: | 7.0% per annum payable in cash. |
| **Maturity Date**: | Seven (7) years from the Plan Effective Date. |
| **Security:** | Same collateral and priority as the New Notes. |
| **Conversion Terms** | Optional conversion by holders into common shares of CBL & Associates Properties, Inc. at any time prior to maturity. |
| | No holder drag-along rights. |
| | Optional conversion by New Notes Issuer if VWAP for 20 of 30 consecutive days above 160% of strike. |
| | Upon optional conversion by New Notes Issuer prior to maturity; conversion price includes make-whole at T+50, capped at 36 months of interest payments, payable in equity at strike or in cash at New Notes Issuer's option. |
| | Standard anti-dilution provisions for convertible debt, including adjustment for regular dividends in excess of $15 million per year and any special dividends. |
| **Call Protection:** | None. |
| **Make-Whole:** | Bankruptcy make-whole at T+50. |
| **Other:** | No limitations on distributions to equity. |
| | Other terms (including covenants) to be agreed between the Required Consenting Noteholders and the Company. |

## <u>EXHIBIT C</u>

**Consenting Crossholders**

- Aegon Investment Management, LLC

- Canyon Capital Advisors LLC (on behalf of its participating clients)

- Canyon Partners Real Estate LLC (on behalf of its participating clients)

- Cetus Capital

- Oaktree Capital Management, L.P., solely on behalf of certain managed funds and accounts within its Distressed Debt and Value Opportunities strategies

## EXHIBIT D

### Form of Transfer Agreement

The undersigned (the "**Transferee**") hereby acknowledges that it has read and understands the First Amended and Restated Restructuring Support Agreement, dated as of _____ (the "**Agreement**"),[1] by and among CBL & Associates Properties, Inc. and its affiliates and subsidiaries bound thereto and the Consenting Creditors, including the transferor to the Transferee of any Company Claims (each such transferor, a "**Transferor**"), and agrees to be bound by the terms and conditions thereof to the extent the Transferor was thereby bound, and shall be deemed a "Consenting Creditor" under the terms of the Agreement.

The Transferee specifically agrees to be bound by the terms and conditions of the Agreement and makes all representations and warranties contained therein as of the date of this transfer agreement, including the agreement to be bound by the vote of the Transferor if such vote was cast before the effectiveness of the Transfer discussed herein.

Date Executed:

_____

Name:
Title:
Address:
E-mail address(es):

| Aggregate Principal Amounts Beneficially Owned or Managed on Account of: | |
|---|---|
| 2023 Notes | |
| 2024 Notes | |
| 2026 Notes | |
| Term Loan | |
| Revolver | |

---

[1]    Capitalized terms used but not otherwise defined herein shall having the meaning ascribed to such terms in the Agreement.

**EXHIBIT E**

**Form of Joinder Agreement**

The undersigned (the "**Joining Creditor**") hereby acknowledges that it has read and understands the First Amended and Restated Restructuring Support Agreement, dated as of _____ (the "**Agreement**"),[2] by and among CBL & Associates Properties, Inc. and its affiliates and subsidiaries bound thereto and the Consenting Creditors, and agrees to be bound by the terms and conditions thereof, and shall be deemed a "Consenting Creditor" under the terms of the Agreement.

The Joining Creditor specifically agrees to be bound by the terms and conditions of the Agreement and makes all representations and warranties contained therein as of the date of this joinder.

Date Executed:

_____
Name:
Title:
Address:
E-mail address(es):

| *Aggregate Principal Amounts Beneficially Owned or Managed on Account of:* | |
|---|---|
| 2023 Notes | |
| 2024 Notes | |
| 2026 Notes | |
| Term Loan | |
| Revolver | |

---

[2]   Capitalized terms used but not otherwise defined herein shall having the meaning ascribed to such terms in the Agreement.

**EXHIBIT D**

**LIQUIDATION ANALYSIS**

## LIQUIDATION ANALYSIS

### CBL & Associates Properties, Inc., *et al*.

*Overview*

Under the "best interests" of creditors test set forth in section 1129(a)(7) of the Bankruptcy Code, the Bankruptcy Court may not confirm a plan of reorganization unless the plan provides that each holder of a Claim or Interest who does not otherwise vote in favor of the plan "will receive or retain under the plan on account of such claim or interest property of a value, as of the Effective Date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7" of the Bankruptcy Code.  To demonstrate that the proposed Plan satisfies the "best interests" of creditors test, CBL & Associates Properties, Inc., et al., as debtors and debtors in possession (collectively, the "**Debtors**" or the "**Company**"), with the assistance of the Debtors' management and other advisors, have prepared the following hypothetical Liquidation Analysis (the "**Liquidation Analysis**"), which is based upon certain assumptions discussed in the Disclosure Statement and in the accompanying notes to the Liquidation Analysis.  As reflected in more detail in the Liquidation Analysis, the Debtors believe that the value of the distributions provided to each Holder of Allowed Claims under the Plan would not be less than the value of such distributions under a hypothetical chapter 7 liquidation, and the Plan therefore satisfies the "best interests" test with respect to each of the Debtors.

This Liquidation Analysis[1] has been prepared assuming that the Debtors hypothetically convert these chapter 11 cases to a liquidation under chapter 7 of the Bankruptcy Code as of June 30, 2021 (the "**Conversion Date**").  Except as otherwise noted herein, the values reflected in this Liquidation Analysis are based upon the Debtors' unaudited books and records as of February 28, 2021 with the exception of unrestricted cash, which has been rolled forward to the Conversion Date based on the current cash collateral budget. Such values were assumed to be representative of the Debtors' assets and liabilities as of the Conversion Date.  This Liquidation Analysis also assumes that the Bankruptcy Court would appoint a chapter 7 trustee (the "**Trustee**") on the Conversion Date to oversee the forced liquidation of the Debtors' bankruptcy estates (the "**Estates**"), during which time substantially all of the Debtors' assets would be sold, abandoned, surrendered, or otherwise liquidated, as applicable, and the Cash proceeds, net of liquidation-related costs, would then be distributed in accordance with applicable law.  In addition, it is assumed that all Debtors and their non-Debtor subsidiaries would undertake parallel liquidations, whereby the proceeds of such liquidations are, in turn, distributed in accordance with the priority of Claims and Interests on an entity-by-entity basis for the Debtors. However, for the avoidance of doubt, this Liquidation Analysis only reflects Debtor entities that contain both assets and liabilities and does not reflect any Debtor entities where liabilities do not currently sit, including any "pass through" entities. This Liquidation Analysis assumes that the Debtors would be liquidated in a jointly-administered case, but each Debtor is treated as an independent legal entity without substantive consolidation.

---

[1]    Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Plan or Disclosure Statement, as applicable.

1

It is further assumed that the Trustee would retain, among other professionals, legal counsel and a financial advisor, and employ or otherwise retain certain of the Debtors' current employees to wind down the Debtors' affairs.

All of the limitations and risk factors set forth in the Disclosure Statement are applicable to this Liquidation Analysis and are incorporated herein by reference.  In particular, the underlying financial information in the Liquidation Analysis has not been examined or reviewed by independent accountants in accordance with standards promulgated by the American Institute of Certified Public Accountants.  The Liquidation Analysis presents estimated chapter 7 liquidation proceeds based on the assumptions and estimates of Debtors' management relating to the proceeds estimated to be received from the forced liquidation of the assets, less the costs incurred during the liquidation. Except as otherwise noted herein, the amounts referenced as "Book Value" in the Liquidation Analysis are based on the Debtors' balance sheet as of February 28, 2021, and therefore reflects book value, and not an estimate of what could be realized in a chapter 7 liquidation (or otherwise).  Accordingly, there can be no assurance that the results set forth in this Liquidation Analysis would be realized if the Debtors were actually liquidated pursuant to chapter 7 of the Bankruptcy Code, and actual results in such a proceeding could vary materially from those presented herein.  Moreover, distributions available to holders of Claims and Interests could differ materially from the projected recoveries set forth in this Liquidation Analysis.

**THIS LIQUIDATION ANALYSIS IS A HYPOTHETICAL EXERCISE THAT HAS BEEN PREPARED FOR THE SOLE PURPOSE OF PRESENTING A REASONABLE, GOOD FAITH ESTIMATE OF THE PROCEEDS THAT WOULD BE REALIZED IF THE DEBTORS WERE LIQUIDATED IN ACCORDANCE WITH CHAPTER 7 OF THE BANKRUPTCY CODE AS OF THE CONVERSION DATE.  THIS LIQUIDATION ANALYSIS IS NOT INTENDED AND SHOULD NOT BE USED FOR ANY OTHER PURPOSE.  THIS LIQUIDATION ANALYSIS DOES NOT PURPORT TO BE A VALUATION OF THE DEBTORS' ASSETS AS A GOING CONCERN AND THERE MAY BE A SIGNIFICANT DIFFERENCE BETWEEN THE VALUES AND RECOVERIES REPRESENTED IN THIS LIQUIDATION ANALYSIS AND THE VALUES THAT MAY BE REALIZED OR CLAIMS GENERATED IN AN ACTUAL LIQUIDATION.**

**NOTHING CONTAINED IN THIS LIQUIDATION ANALYSIS IS INTENDED TO BE, OR CONSTITUTES, A CONCESSION, ADMISSION, OR ALLOWANCE OF ANY CLAIM BY THE DEBTORS.  THE ACTUAL AMOUNT OR PRIORITY OF ALLOWED CLAIMS IN THESE CHAPTER 11 CASES COULD MATERIALLY DIFFER FROM THE ESTIMATED AMOUNTS SET FORTH AND USED IN THIS LIQUIDATION ANALYSIS.  THE DEBTORS RESERVE ALL RIGHTS TO SUPPLEMENT, MODIFY, OR AMEND THE ANALYSIS SET FORTH HEREIN.**

**Basis of Presentation:**

The actual amount and/or priority of Claims allowed against the Estates may differ from the Claim amounts used in this Liquidation Analysis.  As noted above, this Liquidation Analysis is based on the Debtors' books and records as of February 28, 2021, except where otherwise indicated, and the actual value of assets available for distribution in the event of an actual liquidation may differ materially from the assets assumed to be available pursuant to this Liquidation Analysis.

2

As discussed above, the following analysis was done at each Debtor entity. Only entities with assets that generate recoveries for their creditors are considered relevant for this analysis. A list of unscheduled entities is attached to this Liquidation Analysis.

In order to determine whether the Plan satisfies the "best interests" of the creditors test, the first step is to recognize the total proceeds from the liquidation of the Debtors' assets in the context of the chapter 7 bankruptcy cases. The Debtors' gross assets are comprised of the sum of (1) the proceeds from the disposition of the Debtors' assets and (2) forecasted cash balances held by the Debtors at the end of the liquidation process. This aggregate number will then be reduced by the amount of any Claims secured by the Estates' assets, the costs and expenses of the liquidation, and additional administrative expenses that may result from the termination of the Debtors' businesses and liquidation thereof. Any remaining net cash would be allocated to creditors and shareholders in strict priority in accordance with Section 726 of the Bankruptcy Code. For purposes of this Liquidation Analysis, it is assumed that the Debtors' assets are liquidated for the benefit of the Debtors' creditors. A summary of the assumptions used by the Debtors' management and advisors in preparing this Liquidation Analysis is provided below.

**Notes & Assumptions:**

This Liquidation Analysis should be read in conjunction with, and is qualified in its entirety by, the following notes and assumptions:

      a. *Chapter 7 Process and Duration*.

            i. On the Conversion Date, it is assumed that the Trustee would begin to liquidate the Debtors' assets, during which time all of the Debtors' assets would be sold or surrendered to the respective lien holders, and the cash proceeds, net of liquidation-related costs, would then be distributed to creditors in accordance with the priority scheme under section 726 of the Bankruptcy Code. Under section 704 of the Bankruptcy Code, a Trustee must, among other duties, collect and convert property of the Debtors as expeditiously as is compatible with the best interests of parties in interest, which could result in potentially distressed recoveries.

          ii. The Liquidation Analysis assumes a nine (9) month wind-down process from the Conversion Date to conduct a forced sale of substantially all of the Debtors' assets. There can be no assurance that the liquidation would be completed within this limited time frame, nor is there any assurance that the recoveries assigned to the assets would in fact be realized. This process includes, among other things, liquidating assets/properties, collecting receivables, and arranging for distributions of available proceeds following the liquidation process. Further, the Trustee would need to wind-down the rest of the Estates which may take an additional 1-2 years depending on potential litigation claims. It is also likely to assume for purposes of this Liquidation Analysis that non-Debtor entities and their assets would have to be sold and monetized during this period, so the Trustee would also incur administrative expenses,

WEIL:\97960265\1\32626.0004

such as payroll, certain overhead, and professional expenses reasonably required to complete the wind-down of the Estates.

b.  *Additional Claims*.

i.  The cessation of business in a chapter 7 liquidation could potentially cause additional Claims to be asserted against the Estates that otherwise may not exist absent such a liquidation.  Examples of these kinds of Claims include employee-related Claims, tax liability Claims, superpriority adequate protection Claims, rejection damages Claims and litigation Claims.  These additional Claims could be significant and, in certain circumstances, may be allowed as administrative expenses or priority unsecured claims under the Bankruptcy Code.  While the Debtors have made a good faith estimate of Claims in this hypothetical Liquidation Analysis, the Claims assumed herein may vary from actual asserted Claims.

c.  *Avoidance Actions and Litigation*.

i.  No recovery or related litigation costs attributable to any potential avoidance actions under the Bankruptcy Code, including potential preference or fraudulent transfer actions, are included in this Liquidation Analysis.  In addition, this Liquidation Analysis does not consider any additional recovery or Claims that may arise from the outcome of current or potential actions by or against the Debtors.  The Debtors believe that recoveries from such actions or litigation, if any, would be speculative in nature and are therefore not presented herein.

## Specific Notes to the Liquidation Analysis:

The major assumptions utilized by the Debtors in preparing the Liquidation Analysis are outlined below. The chapter 7 liquidation period is assumed to commence on June 30, 2021, and the monetization of assets is assumed to last nine (9) months following the appointment of the Trustee. Recoveries to creditors are presented on an undiscounted basis.  For purposes of this analysis, recoveries were estimated based on the Debtors' estimated book asset balances as of February 28, 2021, with certain pro forma adjustments highlighted below.

## A.  Estimate of Proceeds

1.  *Land, Building & Improvements (Net)*:

i.  Recoveries related to Land, Building & Improvements are net of depreciation and amortization and range from $1.1 billion to $1.3 billion.

ii.  When factoring in FY21 projected net operating income and capitalization rate assumptions from various third-party valuations, recoveries on a consolidated basis range from 46.0% to 51.4% of book value.

4

2.  *Developments in Progress*:

     i.  Developments in progress reflect partially completed projects. Due to projects not being fully complete, the assumed recovery on the Conversion Date ranges from 60.0%-70.0%.

3.  *Cash and Cash Equivalents*:

     i.  Cash and Cash Equivalents consists of all cash in banks or operating accounts as of February 28, 2021, and accounts for future cash flows generated at the Properties.

     ii.  Cash balances are rolled forward from February 28, 2021 through the Conversion Date which generates $38 million.

     iii.  Once liquidation begins, cash balances at the Properties are rolled forward for the nine (9) month liquidation period and produce an additional $93 million in cash flow net of obligated capital expenditures.

     iv.  The Debtors' estimated balance of unrestricted cash at the conclusion of the liquidation is approximately $465 million. The projected cash balance reflects operations through the Conversion Date and nine (9) month liquidation period.

     v.  Cash is expected to be fully recoverable and is presented at the entity specific to the property in which the cash is generated. The cash recovered may be materially different if financial institutions have rights of offset against cash.

     vi.  This analysis assumes total Cash and Cash Equivalents of $465 million which includes $233 million of United States Treasuries.

4.  *Tenant Receivables*:

     i.  All tenant receivables owned by the Debtors on a consolidating basis are held by the Debtors' subsidiary entities. These receivables include, but are not limited to, percent rent, straight-line rent, tenant deferral related to COVID-19, and accrued year end billings. Straight-line rent has an estimated recovery of 0.0% and the net recovery for these assets range between 37.0%-42.0%.

5.  *Outstanding Receivables*:

     i.  Outstanding receivables include, but are not limited to, insurance claims, receivables related to management fees, and state taxes. Estimated recovery for these assets range between 40.0% and 50.0%.

6.  *Mortgage and Other Notes Receivable:*

     i.  Mortgage and Other Notes Receivable include, but are not limited to, notes receivable, mortgage escrows for ground rent, insurance, debt service and

5

tenant allowances. Estimated recovery for these assets range between 85.0% and 90.0%.

7.   *Investments in Unconsolidated Affiliates*:

    i.   Investments in unconsolidated affiliates are accounted for using the equity method of accounting and are reflected in the consolidated balance sheets. Assumed recovery rates range from 0.0% to 1.5%.

8.   *Intangible Lease Assets and Other Assets*:

    i.   Intangible lease assets and other assets primarily include prepaid services or deposits, IT hardware, IT software and deferred financing costs. The effect of a chapter 7 liquidation, and the costs that would have to be incurred in order to monetize these assets, would adversely impact the recovery on these assets to the detriment of the Estates. As such, the estimated recovery ranges from 2.5% to 5.0%.

9.   *Non-Debtor Assets*:

    i.   **Property Specific - Non-CMBS Properties**

        1.   Property-Level Loans that are not associated with the First Lien Credit Agreement and not associated with CMBS Properties (the "**Non-CMBS Properties**") are paid out by recoverable assets and distributed based on priority of the Claim. The Liquidation Analysis assumes that Property-Level Loan lenders who have deficiency claims will assert the full amount of their loan balance against the guarantor on such loans.[2] It is assumed any estimated excess funds are sent to the parent entity, the guarantor or the entity holding any intercompany Claims. This is reflected as dividends from non-Debtor subsidiaries and recovery on non-Debtor intercompany claims in the following exhibits attached to this Liquidation Analysis.

    ii.   **CMBS Properties**

        1.   Loans related to CMBS properties (the "**CMBS Properties**") are assessed at the entity level where recoverable assets are distributed to entity level Claims based on priority. This Liquidation Analysis assumes that Property-Level Loan lenders who have deficiency claims will assert the full amount of their loan balance at the guarantor level.[3] It is assumed that any estimated excess funds are sent to the

---

[2]   For the avoidance of doubt, the Debtors reserve all rights with respect to the amount of deficiency Claims, if any, that may be asserted against a guarantor. Nothing herein shall constitute an admission with respect to any legal argument relating to such Claims.

[3]   For the avoidance of doubt, the Debtors reserve all rights with respect to the amount of deficiency Claims, if any, that may be asserted against a guarantor. Nothing herein shall constitute an admission with respect to any legal

6

parent, the guarantor or the entity holding the intercompany Claim. CMBS Properties are assumed to be liquidated net of brokerage costs but not burdened with the costs associated with the chapter 7 liquidation. This is reflected as dividends from non-Debtor subsidiaries and recovery on non-Debtor intercompany claims in the following exhibits attached to this Liquidation Analysis.

   iii.  **Total Non-Debtor Recoveries**

      1.  Based on the aforementioned assumptions above, total net recovery from non-Debtor to Debtor entities is estimated at $126 million to $163 million.

## B.  Deductions from Gross Proceeds

1.   *Costs to Liquidate Real Estate Assets*:

   i.  In addition to professional fees related to the chapter 7 cases, as the Estates monetize real estate assets, additional fees will occur due to, among others, various real estate brokers, lawyers, and asset managers, responsible for finalizing the sale/liquidation of each property.  Based on the Debtors' historical asset sale costs, the estimated cost per real estate asset sale is 6% of sale proceeds inclusive of broker fees, legal fees and additional fees associated with these transactions.

2.   *Chapter 7 Trustee Fees*:

   i.  Pursuant to sections 326 and 330 of the Bankruptcy Code, the Bankruptcy Court may allow reasonable compensation for the Trustee's services, not to exceed 25% on the first $5,000 or less, 10% on any amount in excess of $5,000 but not in excess of $50,000, 5% on any amount in excess of $50,000 but not in excess of $1 million, and reasonable compensation not to exceed 3% of such moneys in excess of $1 million, upon all moneys disbursed or turned over in the chapter 7 cases by the Trustee to parties in interest.  For purposes of this Liquidation Analysis, these fees are estimated to be 3% of liquidation proceeds realized not including cash on hand.

3.   *Other Professional Fees*:

   i.  Pursuant to section 726 of the Bankruptcy Code, the allowed administrative expenses incurred by the Trustee, including expenses affiliated with selling/liquidating the Debtors' assets and winding down operations, will be entitled to payment in full prior to any distribution to Administrative Claims and Other Priority Claims. This Liquidation Analysis estimates professional fees to be approximately $55 million on the high recovery and $65 million on the low recovery, which is based on expected fees and expenses of legal,

---

argument relating to such Claims.

financial, and other professionals as well as the complexity of the Debtors' liquidation and wind-down, which may include extensive third-party litigation that the Estates may need to defend and pursue for purposes of settling Claim amounts and monetizing assets.

4.    *Operating Wind-Down Costs*:

    i.    Wind-down costs are assumed to consist primarily of the ordinary course general and administrative costs that will be required to operate the Debtors' businesses during the nine (9) month liquidation process and during the wind down of the Debtors' Estates thereafter which is expected to be the minimal amount of time required to expeditiously wind down the Estates.

    ii.    The Liquidation Analysis estimates wind-down costs, in the aggregate, of approximately $65 million. This figure is comprised of corporate payroll, benefits & office expenses over the nine (9) month wind-down and additional time the Trustee would need to wind down the rest of the Debtors' Estates (estimated at 1-2 years). This does not include property-related costs which are offset by Property level cash flows referenced in <u>Section (A)(3)</u> above. Moreover, this amount represents approximately 3% of gross liquidation proceeds. To maximize recoveries on the Debtors' assets, minimize the amount of Claims, and generally ensure an orderly chapter 7 liquidation, it is assumed that the Trustee will continue to employ or otherwise retain a limited number of the Debtors' employees for a limited amount of time during the liquidation process to assist with, among other things, vacating all of the Properties, the sale of any Properties, finalization of employee benefit matters, cash collections, payroll and tax reporting, accounts payable and other books and records, and responding to certain legal matters related to the wind-down of the Debtors' affairs. Other costs include, without limitation, overhead expenses for the owned parcels of real estate pending the sales of those assets in the chapter 7 liquidation and document retention and destruction.

## C.  Distribution of Proceeds

The costs, expenses, fees and any other Claims that may arise and constitute necessary costs and expenses in the event of a liquidation would be paid in full from the liquidation proceeds before the balance of those proceeds would be made available to holders of Unsecured Claims.

This analysis considers the effect that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to creditors, including: (i) the increased costs and expenses of a liquidation arising from fees payable to the Trustee and any professional advisors the Trustee would hire to effectuate the liquidation process and (ii) an erosion in the value of the Debtors' assets in the event of an expeditious liquidation.

Further, underlying the Liquidation Analysis are a number of estimates and assumptions that are inherently subject to significant economic, competitive, and operational uncertainties and contingencies beyond the control of the Debtors or the Trustee. In addition, various liquidation

8

decisions upon which certain assumptions are based, are subject to change.  Therefore, there can be no assurance that the assumptions and estimates utilized in determining the liquidation values of the Debtors' assets will result in an accurate estimate of proceeds that would be realized were the Debtors to undergo an actual liquidation.  The actual amounts of Claims against the Estates could vary significantly from the estimate set forth herein, depending on the Claims asserted during the pendency of the chapter 7 cases.  Moreover, this Liquidation Analysis may not include all liabilities that may arise as a result of additional litigation, potential tax assessments, or other potential Claims.  This analysis excludes potential recoveries from avoidance actions or intangible assets and excludes incremental costs for the pursuit of such recoveries. Therefore, the actual liquidation value of the Debtors' assets could vary materially from the estimates provided herein.

Estimated net proceeds may be realized from the liquidation of the Debtors' subsidiaries. The method of liquidation may vary greatly from subsidiary to subsidiary depending on the jurisdiction where such subsidiary is located.  The obligations are assumed to be satisfied at the individual entity level, with excess proceeds flowing upward to the parent entity and next ownership level and ultimately to CBL & Associates Limited Partnership to the extent available.

The costs, expenses, fees and such other Claims that may arise and constitute necessary costs and expenses in a chapter 7 liquidation would be paid in full by the liquidation proceeds before the balance of those proceeds would be made available for holders of Unsecured Claims.  The Debtors believe that in a chapter 7 liquidation, holders of Unsecured Claims may receive between 0% to 100% (depending on the specific Debtor entity) but on a consolidated average, such claims will receive between 26.7% and 29.9%.

1.   *First Lien Credit Facility Claims*:

   i.   The Liquidation Analysis assumes estimated First Lien Credit Facility Claims of approximately $1.115 billion in the aggregate as of the Conversion Date comprised of a (i) $439 million term loan (ii) and the balance of a $676 million revolver.

   ii.   The Liquidation Analysis concludes that holders of First Lien Credit Facility Claims including recoveries from deficiency claims, will receive 85.0% to 95.2% recovery in a chapter 7 liquidation.[4]

   iii.   In the event of a chapter 7 liquidation, the holders of First Lien Credit Facility Claims will, in the aggregate, receive all Cash currently segregated by the Debtors with respect to the Credit Facility Properties (as defined in the Final Cash Collateral Order) in accordance with section 11(a)(ii) of the Final Cash Collateral Order.

---

[4]   For the avoidance of doubt, the Debtors reserve all rights with respect to the amount of deficiency Claims, if any, that may be asserted against a guarantor. Nothing herein shall constitute an admission with respect to any legal argument relating to such Claims.

WEIL:\97960265\1\32626.0004

2.   *Administrative Claims*:

   i.   Administrative Expense Claims arising in a hypothetical chapter 7 liquidation include the costs of administering the Estates, and claims arising during the Debtors' chapter 11 cases before conversion into chapter 7 cases such as (a) postpetition service provider payables; (b) accrued postpetition employee obligations; (c) superpriority adequate protection claims, if any, in respect of prepetition secured indebtedness; (d) certain accrued taxes; (e) accrued utility payments; and (f) other liabilities incurred by the Estates in the ordinary course of business.

   ii.   This Liquidation Analysis assumes there will be approximately $76 million of Administrative Claims outstanding as of the Conversion Date comprised of priority real estate tax claims, accrued and unpaid postpetition taxes, accrued and unpaid chapter 11 professional fees & postpetition payables. The total amount of Administrative Claims allowed in these chapter 11 cases could differ materially from the assumptions set forth by this Liquidation Analysis, thereby reducing recoveries available to holders of Claims and Interests in a chapter 7 liquidation. This Liquidation Analysis does not take into account superpriority adequate protection claims in respect of the diminution in value of collateral securing prepetition secured indebtedness, which claims, if any, may be substantial.

3.   *Unsecured Claims*:

   i.   This Liquidation Analysis assumes there will be approximately $3.175 billion of Unsecured Claims outstanding as of the Conversion Date. This total is inclusive of the Senior Unsecured Notes Claims, potential deficiency claims, if any, and $56 million of accounts payable and accrued liabilities.

   ii.   The claims reconciliation process is ongoing and subject to further review. This may result in higher or lower claims depending on the outcome of such analysis.

   iii.   *Senior Unsecured Note Claims*:

      1.   The Liquidation Analysis assumes estimated Senior Unsecured Notes Claims of approximately $1.375 billion in the aggregate as of the Conversion Date comprised of (i) $450 million of 2023 Notes (ii) $300 million of 2024 Notes and (iii) $625 million of 2026 Notes. The Liquidation Analysis concludes that holders of Senior Unsecured Notes Claims will receive a 28.9% to 32.5% recovery in a chapter 7 liquidation.

   iv.   The Liquidation Analysis concludes that Unsecured Claims will receive between 0% and 100% (depending on the specific Debtor entity), but on a

10

consolidated average, such claims will receive between 26.7% and 29.9% in a chapter 7 liquidation.

**Conclusion:**

The Debtors have determined, as summarized in this Liquidation Analysis, that the Plan will provide holders of Claims and Interests with a recovery that is not less than what they would otherwise receive if the Estates were liquidated under chapter 7 of the Bankruptcy Code.

11

CBL & Associates Properties, Inc.
CBL - Consolidating Debtor Entities - Ch. 7 Liquidation Analysis
$ in Millions

| | | | | De - Consolidated | |
|---|---|---|---|---|---|
| **Consolidating Debtor Entities** | **Net Book Value** [1] | **Recovery %** | | **Recovery $** | |
| | | **Low** | **High** | **Low** | **High** |
| **I. Assets** | | | | | |
| **Liquidation Value of Real Estate Assets** | | | | | |
| 1.) Land, Building & Improvements (Net) | 2,484 | 46.0% | 51.4% | 1,142 | 1,278 |
| 2.) Subtotal | 2,484 | 46.0% | 51.4% | 1,142 | 1,278 |
| **Liquidation Value of All Other Assets** | | | | | |
| 3.) Developments in Progress | 30 | 60.0% | 70.0% | 18 | 21 |
| 4.) Dividends from Non-Debtor Subsidiaries | 61-91 | 100.0% | 100.0% | 61 | 91 |
| 5.) Cash and Cash Equivalents [1] | 465 | 100.0% | 100.0% | 465 | 465 |
| 6.) Tenant Receivables [2] | 64 | 37.0% | 42.0% | 24 | 27 |
| 7.) Outstanding Receivables | 3 | 40.0% | 50.0% | 1 | 1 |
| 8.) Mortgage and Other Notes Receivable (Mortgage Escrow) | 2 | 85.0% | 90.0% | 2 | 2 |
| 9.) Investments in Unconsolidated Affiliates | 193 | 0.0% | 1.5% | - | 3 |
| 10.) Recovery on Non-Debtor Intercompany Claims | 65-72 | 100.0% | 100.0% | 65 | 72 |
| 11.) Intangible Lease Assets and Other assets | 64 | 2.5% | 5.0% | 2 | 3 |
| 12.) Litigation & Preference/Avoidance Actions | - | N/A | N/A | - | - |
| 13.) Subtotal | 947-984 | 67.4% | 69.7% | 638 | 685 |
| **Total Estimated Proceeds from Liquidation of Assets** | | | | **1,780** | **1,963** |
| **II. Admin / Wind Down Expenses** | | | | | |
| 14.) Subtotal | | | | 307 | 312 |
| **Net Proceeds Available for Secured Claims** | | | | **1,473** | **1,651** |
| **III. Liabilities** | | | | | |
| **Liquidation Value of Secured Liabilities** | | | | | |
| 15.) First Lien Credit Facility | 1,115 | 56.1% | 62.8% | 625 | 700 |
| 16.) Subtotal | 1,115 | 56.1% | 62.8% | 625 | 700 |
| **Net Proceeds Available for Unsecured Claims** | | | | **848** | **951** |
| **Liquidation Value of Unsecured Liabilities** | | | | | |
| 17.) Senior Unsecured Notes | 1,375 | 28.9% | 32.5% | 398 | 447 |
| 18.) First Lien Credit Facility Deficiency Claim | 1,115 | 28.9% | 32.5% | 322 | 362 |
| 19.) Property Specific Non-CMBS Properties Guarantee | 191-191 | 28.9% | 32.5% | 55 | 62 |
| 20.) CMBS Properties Guarantee | 438-438 | 11.6% | 12.9% | 51 | 57 |
| 21.) Accounts Payable and Accrued Liabilities | 56 | 39.3% | 41.8% | 22 | 23 |
| 22.) Subtotal | 3,175 | | | 848 | 951 |
| **IV. Unsecured Recovery** [3] | | | | **26.7%** | **29.9%** |

| *Memo: Secured + Unsecured Recovery* | | |
|---|---|---|
| **First Lien Credit Facility Recovery** | **948** | **1,062** |
| *Recovery %* | *85.0%* | *95.2%* |
| **Property Specific Non-CMBS Properties** | **55** | **62** |
| *Recovery %* | *3.8%* | *4.2%* |
| **CMBS Properties** | **51** | **57** |
| *Recovery %* | *4.4%* | *4.9%* |

(1) Liquidation Analysis reflects books and records as of 2/28/21. Cash balance is rolled forward through liquidation period.
(2) Reflects book value of receivables which includes straight line rent. Straight line rent has $0 recovery.
(3) The analysis reflects the Debtors best estimate on General Unsecured claims using their February 2021 books and records net of eliminations.

CBL & Associates Properties, Inc.
CBL - CBL & Associates Limited Partnership - Ch. 7 Liquidation Analysis
$ in Millions

| 1) CBL & Associates Limited Partnership | Net Book Value [1] | Recovery % | | De - Consolidated Recovery $ | |
|---|---|---|---|---|---|
| | | Low | High | Low | High |
| **I. Assets** | | | | | |
| **Liquidation Value of Real Estate Assets** | | | | | |
| 1.) Land, Building & Improvements (Net) | 1 | 0.0% | 0 0% | - | - |
| 2.) Subtotal | 1 | 0.0% | 0 0% | - | - |
| **Liquidation Value of All Other Assets** | | | | | |
| 3.) Developments in Progress | - | 60.0% | 70 0% | - | - |
| 4.) Dividends from Subsidiaries | 556-651 | 100.0% | 100 0% | 556 | 651 |
| 5.) Cash and Cash Equivalents [1] | 327 | 100.0% | 100 0% | 327 | 327 |
| 6.) Tenant Receivables [2] | - | 37.0% | 42 0% | - | - |
| 7.) Outstanding Receivables | 0 | 40.0% | 50 0% | 0 | 0 |
| 8.) Mortgage and Other Notes Receivable (Mortgage Escrow) | - | 85.0% | 90 0% | - | - |
| 9.) Investments in Unconsolidated Affiliates | 182 | 0.0% | 1 5% | - | 3 |
| 10.) Recovery on Intercompany Claims | 4-4 | 100.0% | 100 0% | 4 | 4 |
| 11.) Intangible Lease Assets and Other assets | - | 2.5% | 5 0% | - | - |
| 12.) Litigation & Preference/Avoidance Actions | - | N/A | N/A | - | - |
| 13.) Subtotal | 1069-1164 | 82.9% | 84.6% | 887 | 985 |
| **Total Estimated Proceeds from Liquidation of Assets** | | | | **887** | **985** |
| **II. Admin / Wind Down Expenses** | | | | | |
| 14.) Subtotal | | | | 60 | 56 |
| **Net Proceeds Available for Secured Claims** | | | | **827** | **929** |
| **III. Liabilities** | | | | | |
| **Liquidation Value of Secured Liabilities** | | | | | |
| 15.) Subtotal | NA | NA | NA | NA | NA |
| **Net Proceeds Available for Unsecured Claims** | | | | **827** | **929** |
| **Liquidation Value of Unsecured Liabilities** | | | | | |
| 16.) Senior Unsecured Notes | 1,375 | 28.9% | 32 5% | 398 | 447 |
| 17.) First Lien Credit Facility Deficiency Claim | 1,115 | 28.9% | 32 5% | 322 | 362 |
| 18.) Property Specific Non-CMBS Properties Guarantee | 191-191 | 28.9% | 32 5% | 55 | 62 |
| 19.) CMBS Properties Guarantee | 139-139 | 28.9% | 32 5% | 40 | 45 |
| 20.) Accounts Payable and Accrued Liabilities | 40 | 28.9% | 32 5% | 12 | 13 |
| 21.) Intercompany | - | | | - | - |
| 22.) Subtotal | 2,860 | NA | NA | 827 | 929 |
| **IV. Unsecured Recovery [3]** | | | | **28.9%** | **32.5%** |
| **Net Proceeds Available for Parent** | | | | **-** | **-** |
| 23.) Payment to Parent | NA | NA | NA | - | - |

| *Memo: Secured + Unsecured Recovery* | | |
|---|---|---|
| **First Lien Credit Facility Recovery** | 322 | 362 |
| *Recovery %* | *28.9%* | *32.5%* |
| **Property Specific Non-CMBS Properties Guarantee** | 55 | 62 |
| *Recovery %* | *3.8%* | *4.2%* |
| **CMBS Properties Guarantee** | 40 | 45 |
| *Recovery %* | *3.5%* | *3.9%* |

*(1) Liquidation Analysis reflects books and records as of 2/28/21. Cash balance is rolled forward through liquidation period.*
*(2) Reflects book value of receivables which includes straight line rent.  Straight line rent has $0 recovery.*
*(3) The analysis reflects the Debtors best estimate on General Unsecured claims using their February 2021 books and records net of eliminations.*

CBL & Associates Properties, Inc.
CBL - Pearland Ground, LLC - Ch. 7 Liquidation Analysis
$ in Millions

| | Net Book Value [1] | Recovery % | | Recovery $ | |
|---|---|---|---|---|---|
| **2)  Pearland Ground, LLC** | | Low | High | Low | High |
| | | | | De - Consolidated | |
| **I. Assets** | | | | | |
| **Liquidation Value of Real Estate Assets** | | | | | |
| 1.)  Land, Building & Improvements (Net) | 97 | 51.7% | 57.7% | 50 | 56 |
| 2.)      Subtotal | 97 | 51.7% | 57.7% | 50 | 56 |
| **Liquidation Value of All Other Assets** | | | | | |
| 3.)  Developments in Progress | 8 | 60.0% | 70.0% | 5 | 6 |
| 4.)  Dividends from Subsidiaries | 0-0 | NA | NA | - | - |
| 5.)  Cash and Cash Equivalents | 6 | 100.0% | 100.0% | 6 | 6 |
| 6.)  Tenant Receivables [2] | 2 | 37.0% | 42.0% | 1 | 1 |
| 7.)  Outstanding Receivables | 0 | 40.0% | 50.0% | 0 | 0 |
| 8.)  Mortgage and Other Notes Receivable (Mortgage Escrow) | - | 85.0% | 90.0% | - | - |
| 9.)  Investments in Unconsolidated Affiliates | - | 0.0% | 1.5% | - | - |
| 10.)  Recovery on Intercompany Claims | 0-0 | NA | NA | - | - |
| 11.)  Intangible Lease Assets and Other assets | 9 | 2.5% | 5.0% | 0 | 0 |
| 12.)  Litigation & Preference/Avoidance Actions | - | N/A | N/A | - | - |
| 13.)      Subtotal | 25 | 47.9% | 52.3% | 12 | 13 |
| **Total Estimated Proceeds from Liquidation of Assets** | | | | **62** | **69** |
| **II. Admin / Wind Down Expenses** | | | | | |
| 14.)      Subtotal | | | | 12 | 12 |
| **Net Proceeds Available for Secured Claims** | | | | **51** | **57** |
| **III. Liabilities** | | | | | |
| **Liquidation Value of Secured Liabilities** | | | | | |
| 15.)  First Lien Credit Facility | 1,115 | 4.5% | 5.1% | 51 | 57 |
| 16.)      Subtotal | 1,115 | 4.5% | 5.1% | 51 | 57 |
| **Net Proceeds Available for Unsecured Claims** | | | | **-** | **-** |
| **Liquidation Value of Unsecured Liabilities** | | | | | |
| 17.)  Senior Unsecured Notes | - | NA | NA | - | - |
| 18.)  First Lien Credit Facility Deficiency Claim | - | NA | NA | - | - |
| 19.)  Property Specific Non-CMBS Properties Guarantee | - | NA | NA | - | - |
| 20.)  CMBS Properties Guarantee | - | NA | NA | - | - |
| 21.)  Accounts Payable and Accrued Liabilities | - | NA | NA | - | - |
| 22.)  Intercompany | - | NA | NA | - | - |
| 23.)      Subtotal | - | | | - | - |
| **IV. Unsecured Recovery [3]** | | | | **NA** | **NA** |
| **Net Proceeds Available for Parent** | | | | **-** | **-** |
| 24.)  Payment to Parent | NA | NA | NA | - | - |
| ***Memo: Secured + Unsecured Recovery*** | | | | | |
| **First Lien Credit Facility Recovery** | | | | **51** | **57** |
| *Recovery %* | | | | *4.5%* | *5.1%* |

(1) Liquidation Analysis reflects books and records as of 2/28/21. Cash balance is rolled forward through liquidation period.
(2) Reflects book value of receivables which includes straight line rent.  Straight line rent has $0 recovery.
(3) The analysis reflects the Debtors best estimate on General Unsecured claims using their February 2021 books and records net of eliminations.

|  | | Net Book Value [1] | Recovery % | | De - Consolidated Recovery $ | |
|---|---|---|---|---|---|---|
| **3)** | **CBL & Associates Management, Inc.** | | Low | High | Low | High |

**I. Assets**

**Liquidation Value of Real Estate Assets**

|  |  | | | | | |
|---|---|---|---|---|---|---|
| 1.) | Land, Building & Improvements (Net) | 19 | 146.5% | 163.8% | 28 | 32 |
| 2.) | Subtotal | 19 | 146.5% | 163.8% | 28 | 32 |

**Liquidation Value of All Other Assets**

|  |  | | | | | |
|---|---|---|---|---|---|---|
| 3.) | Developments in Progress | 8 | 60.0% | 70.0% | 5 | 6 |
| 4.) | Dividends from Subsidiaries | 7-13 | 100.0% | 100.0% | 7 | 13 |
| 5.) | Cash and Cash Equivalents [1] | 2 | 100.0% | 100.0% | 2 | 2 |
| 6.) | Tenant Receivables [2] | 1 | 37.0% | 42.0% | 0 | 0 |
| 7.) | Outstanding Receivables | 1 | 40.0% | 50.0% | 0 | 1 |
| 8.) | Mortgage and Other Notes Receivable (Mortgage Escrow) | 2 | 85.0% | 90.0% | 2 | 2 |
| 9.) | Investments in Unconsolidated Affiliates | 8 | 0.0% | 1.5% | - | 0 |
| 10.) | Recovery on Intercompany Claims | 0-0 | NA | NA | - | - |
| 11.) | Intangible Lease Assets and Other assets | 20 | 2.5% | 5.0% | 1 | 1 |
| 12.) | Litigation & Preference/Avoidance Actions | - | N/A | N/A | - | - |
| 13.) | Subtotal | 49-55 | 33.9% | 43.3% | 17 | 24 |
|  | **Total Estimated Proceeds from Liquidation of Assets** | | | | **45** | **55** |

**II. Admin / Wind Down Expenses**

|  |  | | | | | |
|---|---|---|---|---|---|---|
| 14.) | Subtotal | | | | 15 | 15 |
|  | **Net Proceeds Available for Secured Claims** | | | | **30** | **40** |

**III. Liabilities**

**Liquidation Value of Secured Liabilities**

|  |  | | | | | |
|---|---|---|---|---|---|---|
| 15.) | Subtotal | NA | NA | NA | NA | NA |
|  | **Net Proceeds Available for Unsecured Claims** | | | | **30** | **40** |

**Liquidation Value of Unsecured Liabilities**

|  |  | | | | | |
|---|---|---|---|---|---|---|
| 16.) | Senior Unsecured Notes | - | NA | NA | - | - |
| 17.) | First Lien Credit Facility Deficiency Claim | - | NA | NA | - | - |
| 18.) | Property Specific Non-CMBS Properties Guarantee | 0-0 | NA | NA | - | - |
| 19.) | CMBS Properties Guarantee | 0-0 | NA | NA | - | - |
| 20.) | Accounts Payable and Accrued Liabilities | - | NA | NA | - | - |
| 21.) | Intercompany | 4 | 100.0% | 100.0% | 4 | 4 |
| 22.) | Subtotal | 4 | | | 4 | 4 |
| **IV. Unsecured Recovery** [3] | | | | | **100.0%** | **100.0%** |
|  | **Net Proceeds Available for Parent** | | | | **26** | **36** |

|  |  | | | | | |
|---|---|---|---|---|---|---|
| 23.) | Payment to Parent | NA | NA | NA | 26 | 36 |

*(1) Liquidation Analysis reflects books and records as of 2/28/21. Cash balance is rolled forward through liquidation period.*
*(2) Reflects book value of receivables which includes straight line rent.  Straight line rent has $0 recovery.*
*(3) The analysis reflects the Debtors best estimate on General Unsecured claims using their February 2021 books and records net of eliminations.*

CBL & Associates Properties, Inc.
CBL - Mall del Norte, LLC - Ch. 7 Liquidation Analysis
$ in Millions

| 4) Mall del Norte, LLC | Net Book Value (1) | Recovery % | | De - Consolidated Recovery $ | |
|---|---|---|---|---|---|
| | | Low | High | Low | High |
| **I. Assets** | | | | | |
| **Liquidation Value of Real Estate Assets** | | | | | |
| 1.) Land, Building & Improvements (Net) | 123 | 69.7% | 77.9% | 86 | 96 |
| 2.) Subtotal | 123 | 69.7% | 77.9% | 86 | 96 |
| **Liquidation Value of All Other Assets** | | | | | |
| 3.) Developments in Progress | - | 60.0% | 70.0% | - | - |
| 4.) Dividends from Subsidiaries | 0-0 | NA | NA | - | - |
| 5.) Cash and Cash Equivalents (1) | 13 | 100.0% | 100.0% | 13 | 13 |
| 6.) Tenant Receivables (2) | 4 | 37.0% | 42.0% | 1 | 2 |
| 7.) Outstanding Receivables | 0 | 40.0% | 50.0% | 0 | 0 |
| 8.) Mortgage and Other Notes Receivable (Mortgage Escrow) | - | 85.0% | 90.0% | - | - |
| 9.) Investments in Unconsolidated Affiliates | - | 0.0% | 1.5% | - | - |
| 10.) Recovery on Intercompany Claims | 0-0 | NA | NA | - | - |
| 11.) Intangible Lease Assets and Other assets | 1 | 2.5% | 5.0% | 0 | 0 |
| 12.) Litigation & Preference/Avoidance Actions | - | N/A | N/A | - | - |
| 13.) Subtotal | 17 | 83.3% | 84.4% | 14 | 15 |
| **Total Estimated Proceeds from Liquidation of Assets** | | | | **100** | **110** |
| **II. Admin / Wind Down Expenses** | | | | | |
| 14.) Subtotal | | | | 14 | 15 |
| **Net Proceeds Available for Secured Claims** | | | | **86** | **96** |
| **III. Liabilities** | | | | | |
| **Liquidation Value of Secured Liabilities** | | | | | |
| 15.) First Lien Credit Facility | 1,115 | 7.7% | 8.6% | 86 | 96 |
| 16.) Subtotal | 1,115 | 7.7% | 8.6% | 86 | 96 |
| **Net Proceeds Available for Unsecured Claims** | | | | **-** | **-** |
| **Liquidation Value of Unsecured Liabilities** | | | | | |
| 17.) Senior Unsecured Notes | - | NA | NA | - | - |
| 18.) First Lien Credit Facility Deficiency Claim | - | NA | NA | - | - |
| 19.) Property Specific Non-CMBS Properties Guarantee | 0-0 | NA | NA | - | - |
| 20.) CMBS Properties Guarantee | 0-0 | NA | NA | - | - |
| 21.) Accounts Payable and Accrued Liabilities | 0 | 0.0% | 0.0% | - | - |
| 22.) Intercompany | - | NA | NA | - | - |
| 23.) Subtotal | 0 | | | - | - |
| **IV. Unsecured Recovery (3)** | | | | **0.0%** | **0.0%** |
| **Net Proceeds Available for Parent** | | | | **-** | **-** |
| 24.) Payment to Parent | NA | NA | NA | - | - |
| **Memo: Secured + Unsecured Recovery** | | | | | |
| **First Lien Credit Facility Recovery** | | | | **86** | **96** |
| *Recovery %* | | | | *7.7%* | *8.6%* |

*(1) Liquidation Analysis reflects books and records as of 2/28/21. Cash balance is rolled forward through liquidation period.*
*(2) Reflects book value of receivables which includes straight line rent. Straight line rent has $0 recovery.*
*(3) The analysis reflects the Debtors best estimate on General Unsecured claims using their February 2021 books and records net of eliminations.*

CBL & Associates Properties, Inc.
CBL - JG Winston-Salem, LLC - Ch. 7 Liquidation Analysis
$ in Millions

| | | Net Book Value [1] | Recovery % | | De - Consolidated Recovery $ | |
|---|---|---|---|---|---|---|
| *5)* **JG Winston-Salem, LLC** | | | **Low** | **High** | **Low** | **High** |
| **I. Assets** | | | | | | |
| **Liquidation Value of Real Estate Assets** | | | | | | |
| 1.) | Land, Building & Improvements (Net) | 105 | 74.9% | 83.7% | 78 | 87 |
| 2.) | Subtotal | 105 | 74.9% | 83.7% | 78 | 87 |
| **Liquidation Value of All Other Assets** | | | | | | |
| 3.) | Developments in Progress | - | 60.0% | 70.0% | - | - |
| 4.) | Dividends from Subsidiaries | 0-0 | NA | NA | - | - |
| 5.) | Cash and Cash Equivalents [1] | 8 | 100.0% | 100.0% | 8 | 8 |
| 6.) | Tenant Receivables [2] | 3 | 37.0% | 42.0% | 1 | 1 |
| 7.) | Outstanding Receivables | 0 | 40.0% | 50.0% | 0 | 0 |
| 8.) | Mortgage and Other Notes Receivable (Mortgage Escrow) | - | 85.0% | 90.0% | - | - |
| 9.) | Investments in Unconsolidated Affiliates | - | 0.0% | 1.5% | - | - |
| 10.) | Recovery on Intercompany Claims | 0-0 | NA | NA | - | - |
| 11.) | Intangible Lease Assets and Other assets | - | 2.5% | 5.0% | - | - |
| 12.) | Litigation & Preference/Avoidance Actions | - | N/A | N/A | - | - |
| 13.) | Subtotal | 10 | 82.8% | 84.2% | 9 | 9 |
| | **Total Estimated Proceeds from Liquidation of Assets** | | | | **87** | **96** |
| **II. Admin / Wind Down Expenses** | | | | | | |
| 14.) | Subtotal | | | | 13 | 14 |
| | **Net Proceeds Available for Secured Claims** | | | | **74** | **83** |
| **III. Liabilities** | | | | | | |
| **Liquidation Value of Secured Liabilities** | | | | | | |
| 15.) | First Lien Credit Facility | 1,115 | 6.6% | 7.4% | 74 | 83 |
| 16.) | Subtotal | 1,115 | 6.6% | 7.4% | 74 | 83 |
| | **Net Proceeds Available for Unsecured Claims** | | | | **-** | **-** |
| **Liquidation Value of Unsecured Liabilities** | | | | | | |
| 17.) | Senior Unsecured Notes | - | NA | NA | - | - |
| 18.) | First Lien Credit Facility Deficiency Claim | - | NA | NA | - | - |
| 19.) | Property Specific Non-CMBS Properties Guarantee | 0-0 | NA | NA | - | - |
| 20.) | CMBS Properties Guarantee | 0-0 | NA | NA | - | - |
| 21.) | Accounts Payable and Accrued Liabilities | 0 | 0.0% | 0.0% | - | - |
| 22.) | Intercompany | - | NA | NA | - | - |
| 23.) | Subtotal | 0 | | | - | - |
| **IV. Unsecured Recovery [3]** | | | | | **0.0%** | **0.0%** |
| | **Net Proceeds Available for Parent** | | | | **-** | **-** |
| 24.) | Payment to Parent | NA | NA | NA | - | - |
| *Memo: Secured + Unsecured Recovery* | | | | | | |
| **First Lien Credit Facility Recovery** | | | | | **74** | **83** |
| *Recovery %* | | | | | *6.6%* | *7.4%* |

(1) Liquidation Analysis reflects books and records as of 2/28/21. Cash balance is rolled forward through liquidation period.
(2) Reflects book value of receivables which includes straight line rent. Straight line rent has $0 recovery.
(3) The analysis reflects the Debtors best estimate on General Unsecured claims using their February 2021 books and records net of eliminations.

CBL & Associates Properties, Inc.
CBL - CBL SM-Brownsville, LLC - Ch. 7 Liquidation Analysis
$ in Millions

| | | | | De - Consolidated | |
|---|---|---|---|---|---|
| 6) CBL SM-Brownsville, LLC | Net Book Value [1] | Recovery % | | Recovery $ | |
| | | Low | High | Low | High |
| **I. Assets** | | | | | |
| **Liquidation Value of Real Estate Assets** | | | | | |
| 1.) Land, Building & Improvements (Net) | 51 | 106.3% | 118.8% | 54 | 60 |
| 2.) Subtotal | 51 | 106.3% | 118.8% | 54 | 60 |
| **Liquidation Value of All Other Assets** | | | | | |
| 3.) Developments in Progress | - | 60.0% | 70.0% | - | - |
| 4.) Dividends from Subsidiaries | 0-0 | NA | NA | - | - |
| 5.) Cash and Cash Equivalents [1] | 7 | 100.0% | 100.0% | 7 | 7 |
| 6.) Tenant Receivables [2] | 3 | 37.0% | 42.0% | 1 | 1 |
| 7.) Outstanding Receivables | 0 | 40.0% | 50.0% | 0 | 0 |
| 8.) Mortgage and Other Notes Receivable (Mortgage Escrow) | - | 85.0% | 90.0% | - | - |
| 9.) Investments in Unconsolidated Affiliates | - | 0.0% | 1.5% | - | - |
| 10.) Recovery on Intercompany Claims | 0-0 | NA | NA | - | - |
| 11.) Intangible Lease Assets and Other assets | 0 | 2.5% | 5.0% | 0 | 0 |
| 12.) Litigation & Preference/Avoidance Actions | - | N/A | N/A | - | - |
| 13.) Subtotal | 10 | 76.9% | 78.6% | 8 | 8 |
| **Total Estimated Proceeds from Liquidation of Assets** | | | | 62 | 68 |
| **II. Admin / Wind Down Expenses** | | | | | |
| 14.) Subtotal | | | | 9 | 9 |
| **Net Proceeds Available for Secured Claims** | | | | 53 | 59 |
| **III. Liabilities** | | | | | |
| **Liquidation Value of Secured Liabilities** | | | | | |
| 15.) First Lien Credit Facility | 1,115 | 4.7% | 5.3% | 53 | 59 |
| 16.) Subtotal | 1,115 | 4.7% | 5.3% | 53 | 59 |
| **Net Proceeds Available for Unsecured Claims** | | | | - | - |
| **Liquidation Value of Unsecured Liabilities** | | | | | |
| 17.) Senior Unsecured Notes | - | NA | NA | - | - |
| 18.) First Lien Credit Facility Deficiency Claim | - | NA | NA | - | - |
| 19.) Property Specific Non-CMBS Properties Guarantee | 0-0 | NA | NA | - | - |
| 20.) CMBS Properties Guarantee | 0-0 | NA | NA | - | - |
| 21.) Accounts Payable and Accrued Liabilities | 0 | 0.0% | 0.0% | - | - |
| 22.) Intercompany | - | NA | NA | - | - |
| 23.) Subtotal | 0 | | | - | - |
| **IV. Unsecured Recovery [3]** | | | | 0.0% | 0.0% |
| **Net Proceeds Available for Parent** | | | | - | - |
| 24.) Payment to Parent | NA | NA | NA | - | - |
| *Memo: Secured + Unsecured Recovery* | | | | | |
| **First Lien Credit Facility Recovery** | | | | 53 | 59 |
| *Recovery %* | | | | *4.7%* | *5.3%* |

*(1) Liquidation Analysis reflects books and records as of 2/28/21. Cash balance is rolled forward through liquidation period.*
*(2) Reflects book value of receivables which includes straight line rent. Straight line rent has $0 recovery.*
*(3) The analysis reflects the Debtors best estimate on General Unsecured claims using their February 2021 books and records net of eliminations.*

CBL & Associates Properties, Inc.
CBL - Madison/West Towne, LLC - Ch. 7 Liquidation Analysis
$ in Millions

| 7)  Madison/West Towne, LLC | Net Book Value [1] | Recovery % Low | Recovery % High | De - Consolidated Recovery $ Low | De - Consolidated Recovery $ High |
|---|---|---|---|---|---|
| **I. Assets** | | | | | |
| **Liquidation Value of Real Estate Assets** | | | | | |
| 1.)  Land, Building & Improvements (Net) | 73 | 52.4% | 58.6% | 38 | 43 |
| 2.)       Subtotal | 73 | 52.4% | 58.6% | 38 | 43 |
| **Liquidation Value of All Other Assets** | | | | | |
| 3.)  Developments in Progress | - | 60.0% | 70.0% | - | - |
| 4.)  Dividends from Subsidiaries | 0-0 | NA | NA | - | - |
| 5.)  Cash and Cash Equivalents [1] | 6 | 100.0% | 100.0% | 6 | 6 |
| 6.)  Tenant Receivables [2] | 2 | 37.0% | 42.0% | 1 | 1 |
| 7.)  Outstanding Receivables | 0 | 40.0% | 50.0% | 0 | 0 |
| 8.)  Mortgage and Other Notes Receivable (Mortgage Escrow) | - | 85.0% | 90.0% | - | - |
| 9.)  Investments in Unconsolidated Affiliates | - | 0.0% | 1.5% | - | - |
| 10.)  Recovery on Intercompany Claims | 0-0 | NA | NA | - | - |
| 11.)  Intangible Lease Assets and Other assets | 1 | 2.5% | 5.0% | 0 | 0 |
| 12.)  Litigation & Preference/Avoidance Actions | - | N/A | N/A | - | - |
| 13.)       Subtotal | 9 | 75.1% | 76.8% | 7 | 7 |
| **Total Estimated Proceeds from Liquidation of Assets** | | | | 45 | 49 |
| **II. Admin / Wind Down Expenses** | | | | | |
| 14.)       Subtotal | | | | 8 | 9 |
| **Net Proceeds Available for Secured Claims** | | | | 36 | 41 |
| **III. Liabilities** | | | | | |
| **Liquidation Value of Secured Liabilities** | | | | | |
| 15.)  First Lien Credit Facility | 1,115 | 3.2% | 3.6% | 36 | 41 |
| 16.)       Subtotal | 1,115 | 3.2% | 3.6% | 36 | 41 |
| **Net Proceeds Available for Unsecured Claims** | | | | - | - |
| **Liquidation Value of Unsecured Liabilities** | | | | | |
| 17.)  Senior Unsecured Notes | - | NA | NA | - | - |
| 18.)  First Lien Credit Facility Deficiency Claim | - | NA | NA | - | - |
| 19.)  Property Specific Non-CMBS Properties Guarantee | 0-0 | NA | NA | - | - |
| 20.)  CMBS Properties Guarantee | 0-0 | NA | NA | - | - |
| 21.)  Accounts Payable and Accrued Liabilities | 0 | 0.0% | 0.0% | - | - |
| 22.)  Intercompany | - | NA | NA | - | - |
| 23.)       Subtotal | 0 | | | - | - |
| **IV. Unsecured Recovery [3]** | | | | 0.0% | 0.0% |
| **Net Proceeds Available for Parent** | | | | - | - |
| 24.)  Payment to Parent | NA | NA | NA | - | - |
| ***Memo: Secured + Unsecured Recovery*** | | | | | |
| **First Lien Credit Facility Recovery** | | | | 36 | 41 |
| *Recovery %* | | | | *3.2%* | *3.6%* |

(1) Liquidation Analysis reflects books and records as of 2/28/21. Cash balance is rolled forward through liquidation period.
(2) Reflects book value of receivables which includes straight line rent.  Straight line rent has $0 recovery.
(3) The analysis reflects the Debtors best estimate on General Unsecured claims using their February 2021 books and records net of eliminations.

CBL & Associates Properties, Inc.
CBL - St. Clair Square SPE, LLC - Ch. 7 Liquidation Analysis
$ in Millions

| 8) St. Clair Square SPE, LLC | Net Book Value [1] | Recovery % | | De - Consolidated Recovery $ | |
|---|---|---|---|---|---|
| | | Low | High | Low | High |
| **I. Assets** | | | | | |
| **Liquidation Value of Real Estate Assets** | | | | | |
| 1.) Land, Building & Improvements (Net) | 62 | 63.7% | 71.1% | 40 | 44 |
| 2.) Subtotal | 62 | 63.7% | 71.1% | 40 | 44 |
| **Liquidation Value of All Other Assets** | | | | | |
| 3.) Developments in Progress | - | 60.0% | 70.0% | - | - |
| 4.) Dividends from Subsidiaries | 0-0 | NA | NA | - | - |
| 5.) Cash and Cash Equivalents [1] | 4 | 100.0% | 100.0% | 4 | 4 |
| 6.) Tenant Receivables [2] | 2 | 37.0% | 42.0% | 1 | 1 |
| 7.) Outstanding Receivables | 0 | 40.0% | 50.0% | 0 | 0 |
| 8.) Mortgage and Other Notes Receivable (Mortgage Escrow) | - | 85.0% | 90.0% | - | - |
| 9.) Investments in Unconsolidated Affiliates | - | 0.0% | 1.5% | - | - |
| 10.) Recovery on Intercompany Claims | 0-0 | NA | NA | - | - |
| 11.) Intangible Lease Assets and Other assets | 1 | 2.5% | 5.0% | 0 | 0 |
| 12.) Litigation & Preference/Avoidance Actions | - | N/A | N/A | - | - |
| 13.) Subtotal | 7 | 69.4% | 71.1% | 5 | 5 |
| **Total Estimated Proceeds from Liquidation of Assets** | | | | 45 | 50 |
| **II. Admin / Wind Down Expenses** | | | | | |
| 14.) Subtotal | | | | 7 | 7 |
| **Net Proceeds Available for Secured Claims** | | | | 37 | 42 |
| **III. Liabilities** | | | | | |
| **Liquidation Value of Secured Liabilities** | | | | | |
| 15.) Subtotal | NA | NA | NA | NA | NA |
| **Net Proceeds Available for Unsecured Claims** | | | | 37 | 42 |
| **Liquidation Value of Unsecured Liabilities** | | | | | |
| 16.) Senior Unsecured Notes | - | NA | NA | - | - |
| 17.) First Lien Credit Facility Deficiency Claim | - | NA | NA | - | - |
| 18.) Property Specific Non-CMBS Properties Guarantee | 0-0 | NA | NA | - | - |
| 19.) CMBS Properties Guarantee | 0-0 | NA | NA | - | - |
| 20.) Accounts Payable and Accrued Liabilities | 0 | 100.0% | 100.0% | 0 | 0 |
| 21.) Intercompany | - | NA | NA | - | - |
| 22.) Subtotal | 0 | | | 0 | 0 |
| **IV. Unsecured Recovery [3]** | | | | 100.0% | 100.0% |
| **Net Proceeds Available for Parent** | | | | 37 | 42 |
| 23.) Payment to Parent | NA | NA | NA | 37 | 42 |

*(1) Liquidation Analysis reflects books and records as of 2/28/21. Cash balance is rolled forward through liquidation period.*
*(2) Reflects book value of receivables which includes straight line rent.  Straight line rent has $0 recovery.*
*(3) The analysis reflects the Debtors best estimate on General Unsecured claims using their February 2021 books and records net of eliminations.*

CBL & Associates Properties, Inc.
CBL - Kirkwood Mall Acquisition LLC - Ch. 7 Liquidation Analysis
$ in Millions

| | Net Book Value [1] | Recovery % | | De - Consolidated Recovery $ | |
|---|---|---|---|---|---|
| **9) Kirkwood Mall Acquisition LLC** | | Low | High | Low | High |
| **I. Assets** | | | | | |
| **Liquidation Value of Real Estate Assets** | | | | | |
| 1.) Land, Building & Improvements (Net) | 112 | 35.0% | 39.1% | 39 | 44 |
| 2.) Subtotal | 112 | 35.0% | 39.1% | 39 | 44 |
| **Liquidation Value of All Other Assets** | | | | | |
| 3.) Developments in Progress | 1 | 60.0% | 70.0% | 1 | 1 |
| 4.) Dividends from Subsidiaries | 0-0 | NA | NA | - | - |
| 5.) Cash and Cash Equivalents [1] | 5 | 100.0% | 100.0% | 5 | 5 |
| 6.) Tenant Receivables [2] | 2 | 37.0% | 42.0% | 1 | 1 |
| 7.) Outstanding Receivables | 0 | 40.0% | 50.0% | 0 | 0 |
| 8.) Mortgage and Other Notes Receivable (Mortgage Escrow) | - | 85.0% | 90.0% | - | - |
| 9.) Investments in Unconsolidated Affiliates | - | 0.0% | 1.5% | - | - |
| 10.) Recovery on Intercompany Claims | 0-0 | NA | NA | - | - |
| 11.) Intangible Lease Assets and Other assets | 2 | 2.5% | 5.0% | 0 | 0 |
| 12.) Litigation & Preference/Avoidance Actions | - | N/A | N/A | - | - |
| 13.) Subtotal | 11 | 63.5% | 66.1% | 7 | 7 |
| **Total Estimated Proceeds from Liquidation of Assets** | | | | **46** | **51** |
| **II. Admin / Wind Down Expenses** | | | | | |
| 14.) Subtotal | | | | 7 | 8 |
| **Net Proceeds Available for Secured Claims** | | | | **39** | **44** |
| **III. Liabilities** | | | | | |
| **Liquidation Value of Secured Liabilities** | | | | | |
| 15.) First Lien Credit Facility | 1,115 | 3.5% | 3.9% | 39 | 44 |
| 16.) Subtotal | 1,115 | 3.5% | 3.9% | 39 | 44 |
| **Net Proceeds Available for Unsecured Claims** | | | | **-** | **-** |
| **Liquidation Value of Unsecured Liabilities** | | | | | |
| 17.) Senior Unsecured Notes | - | NA | NA | - | - |
| 18.) First Lien Credit Facility Deficiency Claim | - | NA | NA | - | - |
| 19.) Property Specific Non-CMBS Properties Guarantee | 0-0 | NA | NA | - | - |
| 20.) CMBS Properties Guarantee | 0-0 | NA | NA | - | - |
| 21.) Accounts Payable and Accrued Liabilities | 1 | 0.0% | 0.0% | - | - |
| 22.) Intercompany | - | NA | NA | - | - |
| 23.) Subtotal | 1 | | | - | - |
| **IV. Unsecured Recovery [3]** | | | | **0.0%** | **0.0%** |
| **Net Proceeds Available for Parent** | | | | **-** | **-** |
| 24.) Payment to Parent | NA | NA | NA | - | - |
| **Memo: Secured + Unsecured Recovery** | | | | | |
| **First Lien Credit Facility Recovery** | | | | **39** | **44** |
| *Recovery %* | | | | *3.5%* | *3.9%* |

*(1) Liquidation Analysis reflects books and records as of 2/28/21. Cash balance is rolled forward through liquidation period.*
*(2) Reflects book value of receivables which includes straight line rent. Straight line rent has $0 recovery.*
*(3) The analysis reflects the Debtors best estimate on General Unsecured claims using their February 2021 books and records net of eliminations.*

CBL & Associates Properties, Inc.
CBL - Layton Hills Mall CMBS, LLC - Ch. 7 Liquidation Analysis
$ in Millions

| 10)  Layton Hills Mall CMBS, LLC | Net Book Value [1] | Recovery % | | De - Consolidated Recovery $ | |
|---|---|---|---|---|---|
| | | Low | High | Low | High |
| **I. Assets** | | | | | |
| **Liquidation Value of Real Estate Assets** | | | | | |
| 1.)  Land, Building & Improvements (Net) | 73 | 51.6% | 57.6% | 38 | 42 |
| 2.)      Subtotal | 73 | 51.6% | 57.6% | 38 | 42 |
| **Liquidation Value of All Other Assets** | | | | | |
| 3.)  Developments in Progress | 0 | 60.0% | 70.0% | 0 | 0 |
| 4.)  Dividends from Subsidiaries | 0-0 | NA | NA | - | - |
| 5.)  Cash and Cash Equivalents [1] | 6 | 100.0% | 100.0% | 6 | 6 |
| 6.)  Tenant Receivables [2] | 1 | 37.0% | 42.0% | 1 | 1 |
| 7.)  Outstanding Receivables | 0 | 40.0% | 50.0% | 0 | 0 |
| 8.)  Mortgage and Other Notes Receivable (Mortgage Escrow) | - | 85.0% | 90.0% | - | - |
| 9.)  Investments in Unconsolidated Affiliates | - | 0.0% | 1.5% | - | - |
| 10.)  Recovery on Intercompany Claims | 0-0 | NA | NA | - | - |
| 11.)  Intangible Lease Assets and Other assets | 9 | 2.5% | 5.0% | 0 | 0 |
| 12.)  Litigation & Preference/Avoidance Actions | - | N/A | N/A | - | - |
| 13.)      Subtotal | 17 | 41.1% | 42.9% | 7 | 7 |
| **Total Estimated Proceeds from Liquidation of Assets** | | | | **45** | **49** |
| **II. Admin / Wind Down Expenses** | | | | | |
| 14.)      Subtotal | | | | 7 | 7 |
| **Net Proceeds Available for Secured Claims** | | | | **38** | **43** |
| **III. Liabilities** | | | | | |
| **Liquidation Value of Secured Liabilities** | | | | | |
| 15.)  First Lien Credit Facility | 1,115 | 3.4% | 3.8% | 38 | 43 |
| 16.)      Subtotal | 1,115 | 3.4% | 3.8% | 38 | 43 |
| **Net Proceeds Available for Unsecured Claims** | | | | **-** | **-** |
| **Liquidation Value of Unsecured Liabilities** | | | | | |
| 17.)  Senior Unsecured Notes | - | NA | NA | - | - |
| 18.)  First Lien Credit Facility Deficiency Claim | - | NA | NA | - | - |
| 19.)  Property Specific Non-CMBS Properties Guarantee | 0-0 | NA | NA | - | - |
| 20.)  CMBS Properties Guarantee | 0-0 | NA | NA | - | - |
| 21.)  Accounts Payable and Accrued Liabilities | - | NA | NA | - | - |
| 22.)  Intercompany | - | NA | NA | - | - |
| 23.)      Subtotal | - | | | - | - |
| **IV. Unsecured Recovery [3]** | | | | **NA** | **NA** |
| **Net Proceeds Available for Parent** | | | | **-** | **-** |
| 24.)  Payment to Parent | NA | NA | NA | - | - |

| *Memo: Secured + Unsecured Recovery* | | | |
|---|---|---|---|
| **First Lien Credit Facility Recovery** | | 38 | 43 |
| *Recovery %* | | *3.4%* | *3.8%* |

*(1) Liquidation Analysis reflects books and records as of 2/28/21. Cash balance is rolled forward through liquidation period.*
*(2) Reflects book value of receivables which includes straight line rent.  Straight line rent has $0 recovery.*
*(3) The analysis reflects the Debtors best estimate on General Unsecured claims using their February 2021 books and records net of eliminations.*

CBL & Associates Properties, Inc.
CBL - Valley View Mall SPE, LLC - Ch. 7 Liquidation Analysis
$ in Millions

|  | | Net Book Value [1] | Recovery % | | De - Consolidated | |
|---|---|---|---|---|---|---|
| **11) Valley View Mall SPE, LLC** | | | Low | High | Recovery $ | |
|  | | | | | Low | High |
| **I. Assets** | | | | | | |
| **Liquidation Value of Real Estate Assets** | | | | | | |
| 1.) | Land, Building & Improvements (Net) | 70 | 71.6% | 80.0% | 50 | 56 |
| 2.) | **Subtotal** | 70 | 71.6% | 80.0% | 50 | 56 |
| **Liquidation Value of All Other Assets** | | | | | | |
| 3.) | Developments in Progress | 0 | 60.0% | 70.0% | 0 | 0 |
| 4.) | Dividends from Subsidiaries | 0-0 | NA | NA | - | - |
| 5.) | Cash and Cash Equivalents [1] | 4 | 100.0% | 100.0% | 4 | 4 |
| 6.) | Tenant Receivables [2] | 2 | 37.0% | 42.0% | 1 | 1 |
| 7.) | Outstanding Receivables | 0 | 40.0% | 50.0% | 0 | 0 |
| 8.) | Mortgage and Other Notes Receivable (Mortgage Escrow) | - | 85.0% | 90.0% | - | - |
| 9.) | Investments in Unconsolidated Affiliates | - | 0.0% | 1.5% | - | - |
| 10.) | Recovery on Intercompany Claims | 0-0 | NA | NA | - | - |
| 11.) | Intangible Lease Assets and Other assets | 0 | 2.5% | 5.0% | 0 | 0 |
| 12.) | Litigation & Preference/Avoidance Actions | - | N/A | N/A | - | - |
| 13.) | **Subtotal** | 7 | 75.1% | 77.0% | 5 | 6 |
| | **Total Estimated Proceeds from Liquidation of Assets** | | | | 56 | 62 |
| **II. Admin / Wind Down Expenses** | | | | | | |
| 14.) | **Subtotal** | | | | 7 | 9 |
| | **Net Proceeds Available for Secured Claims** | | | | 48 | 53 |
| **III. Liabilities** | | | | | | |
| **Liquidation Value of Secured Liabilities** | | | | | | |
| 15.) | **Subtotal** | NA | NA | NA | NA | NA |
| | **Net Proceeds Available for Unsecured Claims** | | | | 48 | 53 |
| **Liquidation Value of Unsecured Liabilities** | | | | | | |
| 16.) | Senior Unsecured Notes | - | NA | NA | - | - |
| 17.) | First Lien Credit Facility Deficiency Claim | - | NA | NA | - | - |
| 18.) | Property Specific Non-CMBS Properties Guarantee | 0-0 | NA | NA | - | - |
| 19.) | CMBS Properties Guarantee | 0-0 | NA | NA | - | - |
| 20.) | Accounts Payable and Accrued Liabilities | 0 | 100.0% | 100.0% | 0 | 0 |
| 21.) | Intercompany | - | NA | NA | - | - |
| 22.) | **Subtotal** | 0 | | | 0 | 0 |
| **IV. Unsecured Recovery [3]** | | | | | 100.0% | 100.0% |
| | **Net Proceeds Available for Parent** | | | | 48 | 53 |
| 23.) | Payment to Parent | NA | NA | NA | 48 | 53 |

*(1) Liquidation Analysis reflects books and records as of 2/28/21. Cash balance is rolled forward through liquidation period.*
*(2) Reflects book value of receivables which includes straight line rent. Straight line rent has $0 recovery.*
*(3) The analysis reflects the Debtors best estimate on General Unsecured claims using their February 2021 books and records net of eliminations.*

CBL & Associates Properties, Inc.
CBL - Mayfaire Town Center, LP - Ch. 7 Liquidation Analysis
$ in Millions

| | Net Book Value [1] | Recovery % | | De - Consolidated Recovery $ | |
|---|---|---|---|---|---|
| **12)  Mayfaire Town Center, LP** | | Low | High | Low | High |
| **I. Assets** | | | | | |
| **Liquidation Value of Real Estate Assets** | | | | | |
| 1.)   Land, Building & Improvements (Net) | 127 | 29.7% | 33.2% | 38 | 42 |
| 2.)        Subtotal | 127 | 29.7% | 33.2% | 38 | 42 |
| **Liquidation Value of All Other Assets** | | | | | |
| 3.)   Developments in Progress | - | 60.0% | 70.0% | - | - |
| 4.)   Dividends from Subsidiaries | 0-0 | NA | NA | - | - |
| 5.)   Cash and Cash Equivalents [1] | 5 | 100.0% | 100.0% | 5 | 5 |
| 6.)   Tenant Receivables [2] | 2 | 37.0% | 42.0% | 1 | 1 |
| 7.)   Outstanding Receivables | 0 | 40.0% | 50.0% | 0 | 0 |
| 8.)   Mortgage and Other Notes Receivable (Mortgage Escrow) | - | 85.0% | 90.0% | - | - |
| 9.)   Investments in Unconsolidated Affiliates | - | 0.0% | 1.5% | - | - |
| 10.) Recovery on Intercompany Claims | 0-0 | NA | NA | - | - |
| 11.) Intangible Lease Assets and Other assets | 2 | 2.5% | 5.0% | 0 | 0 |
| 12.) Litigation & Preference/Avoidance Actions | - | N/A | N/A | - | - |
| 13.)        Subtotal | 9 | 64.8% | 66.8% | 6 | 6 |
| **        Total Estimated Proceeds from Liquidation of Assets** | | | | 43 | 48 |
| **II. Admin / Wind Down Expenses** | | | | | |
| 14.)        Subtotal | | | | 7 | 7 |
| **        Net Proceeds Available for Secured Claims** | | | | 37 | 41 |
| **III. Liabilities** | | | | | |
| **Liquidation Value of Secured Liabilities** | | | | | |
| 15.) First Lien Credit Facility | 1,115 | 3.3% | 3.7% | 37 | 41 |
| 16.)        Subtotal | 1,115 | 3.3% | 3.7% | 37 | 41 |
| **        Net Proceeds Available for Unsecured Claims** | | | | - | - |
| **Liquidation Value of Unsecured Liabilities** | | | | | |
| 17.) Senior Unsecured Notes | - | NA | NA | - | - |
| 18.) First Lien Credit Facility Deficiency Claim | - | NA | NA | - | - |
| 19.) Property Specific Non-CMBS Properties Guarantee | 0-0 | NA | NA | - | - |
| 20.) CMBS Properties Guarantee | 0-0 | NA | NA | - | - |
| 21.) Accounts Payable and Accrued Liabilities | 1 | 0.0% | 0.0% | - | - |
| 22.) Intercompany | - | NA | NA | - | - |
| 23.)        Subtotal | 1 | | | - | - |
| **IV. Unsecured Recovery [3]** | | | | 0.0% | 0.0% |
| **        Net Proceeds Available for Parent** | | | | - | - |
| 24.) Payment to Parent | NA | NA | NA | - | - |
| **Memo: Secured + Unsecured Recovery** | | | | | |
| **First Lien Credit Facility Recovery** | | | | 37 | 41 |
| *Recovery %* | | | | *3.3%* | *3.7%* |

*(1) Liquidation Analysis reflects books and records as of 2/28/21. Cash balance is rolled forward through liquidation period.*
*(2) Reflects book value of receivables which includes straight line rent.  Straight line rent has $0 recovery.*
*(3) The analysis reflects the Debtors best estimate on General Unsecured claims using their February 2021 books and records net of eliminations.*

CBL & Associates Properties, Inc.
CBL - Imperial Valley Mall II, L.P. - Ch. 7 Liquidation Analysis
$ in Millions

| | | | | De - Consolidated | |
|---|---|---|---|---|---|
| **13) Imperial Valley Mall II, L.P.** | **Net Book Value [1]** | **Recovery %** | | **Recovery $** | |
| | | **Low** | **High** | **Low** | **High** |
| **I. Assets** | | | | | |
| **Liquidation Value of Real Estate Assets** | | | | | |
| 1.) Land, Building & Improvements (Net) | 95 | 28.5% | 31.8% | 27 | 30 |
| 2.) Subtotal | 95 | 28.5% | 31.8% | 27 | 30 |
| **Liquidation Value of All Other Assets** | | | | | |
| 3.) Developments in Progress | - | 60.0% | 70.0% | - | - |
| 4.) Dividends from Subsidiaries | 0-0 | NA | NA | - | - |
| 5.) Cash and Cash Equivalents [1] | 4 | 100.0% | 100.0% | 4 | 4 |
| 6.) Tenant Receivables [2] | 2 | 37.0% | 42.0% | 1 | 1 |
| 7.) Outstanding Receivables | 0 | 40.0% | 50.0% | 0 | 0 |
| 8.) Mortgage and Other Notes Receivable (Mortgage Escrow) | - | 85.0% | 90.0% | - | - |
| 9.) Investments in Unconsolidated Affiliates | - | 0.0% | 1.5% | - | - |
| 10.) Recovery on Intercompany Claims | 0-0 | NA | NA | - | - |
| 11.) Intangible Lease Assets and Other assets | 1 | 2.5% | 5.0% | 0 | 0 |
| 12.) Litigation & Preference/Avoidance Actions | - | N/A | N/A | - | - |
| 13.) Subtotal | 7 | 72.9% | 74.4% | 5 | 5 |
| **Total Estimated Proceeds from Liquidation of Assets** | | | | **32** | **36** |
| **II. Admin / Wind Down Expenses** | | | | | |
| 14.) Subtotal | | | | 5 | 5 |
| **Net Proceeds Available for Secured Claims** | | | | **27** | **30** |
| **III. Liabilities** | | | | | |
| **Liquidation Value of Secured Liabilities** | | | | | |
| 15.) First Lien Credit Facility | 1,115 | 2.4% | 2.7% | 27 | 30 |
| 16.) Subtotal | 1,115 | 2.4% | 2.7% | 27 | 30 |
| **Net Proceeds Available for Unsecured Claims** | | | | **-** | **-** |
| **Liquidation Value of Unsecured Liabilities** | | | | | |
| 17.) Senior Unsecured Notes | - | NA | NA | - | - |
| 18.) First Lien Credit Facility Deficiency Claim | | NA | NA | - | - |
| 19.) Property Specific Non-CMBS Properties Guarantee | 0-0 | NA | NA | - | - |
| 20.) CMBS Properties Guarantee | 0-0 | NA | NA | - | - |
| 21.) Accounts Payable and Accrued Liabilities | - | NA | NA | - | - |
| 22.) Intercompany | - | NA | NA | - | - |
| 23.) Subtotal | - | | | - | - |
| **IV. Unsecured Recovery [3]** | | | | **NA** | **NA** |
| **Net Proceeds Available for Parent** | | | | **-** | **-** |
| 24.) Payment to Parent | NA | NA | NA | - | - |
| *Memo: Secured + Unsecured Recovery* | | | | | |
| **First Lien Credit Facility Recovery** | | | | **27** | **30** |
| *Recovery %* | | | | *2.4%* | *2.7%* |

(1) Liquidation Analysis reflects books and records as of 2/28/21. Cash balance is rolled forward through liquidation period.
(2) Reflects book value of receivables which includes straight line rent.  Straight line rent has $0 recovery.
(3) The analysis reflects the Debtors best estimate on General Unsecured claims using their February 2021 books and records net of eliminations.

CBL & Associates Properties, Inc.
CBL - CBL/Westmoreland, L.P. - Ch. 7 Liquidation Analysis
$ in Millions

| 14) CBL/Westmoreland, L.P. | Net Book Value [1] | Recovery % | | De - Consolidated Recovery $ | |
|---|---|---|---|---|---|
| | | Low | High | Low | High |
| **I. Assets** | | | | | |
| **Liquidation Value of Real Estate Assets** | | | | | |
| 1.) Land, Building & Improvements (Net) | 87 | 43.4% | 48.5% | 38 | 42 |
| 2.) Subtotal | 87 | 43.4% | 48.5% | 38 | 42 |
| **Liquidation Value of All Other Assets** | | | | | |
| 3.) Developments in Progress | 0 | 60.0% | 70.0% | 0 | 0 |
| 4.) Dividends from Subsidiaries | 0-0 | NA | NA | - | - |
| 5.) Cash and Cash Equivalents [1] | 7 | 100.0% | 100.0% | 7 | 7 |
| 6.) Tenant Receivables [2] | 2 | 37.0% | 42.0% | 1 | 1 |
| 7.) Outstanding Receivables | 0 | 40.0% | 50.0% | 0 | 0 |
| 8.) Mortgage and Other Notes Receivable (Mortgage Escrow) | - | 85.0% | 90.0% | - | - |
| 9.) Investments in Unconsolidated Affiliates | - | 0.0% | 1.5% | - | - |
| 10.) Recovery on Intercompany Claims | 0-0 | NA | NA | - | - |
| 11.) Intangible Lease Assets and Other assets | 1 | 2.5% | 5.0% | 0 | 0 |
| 12.) Litigation & Preference/Avoidance Actions | - | N/A | N/A | - | - |
| 13.) Subtotal | 9 | 78.6% | 79.7% | 7 | 8 |
| **Total Estimated Proceeds from Liquidation of Assets** | | | | **45** | **50** |
| **II. Admin / Wind Down Expenses** | | | | | |
| 14.) Subtotal | | | | 7 | 7 |
| **Net Proceeds Available for Secured Claims** | | | | **38** | **43** |
| **III. Liabilities** | | | | | |
| **Liquidation Value of Secured Liabilities** | | | | | |
| 15.) First Lien Credit Facility | 1,115 | 3.4% | 3.8% | 38 | 43 |
| 16.) Subtotal | 1,115 | 3.4% | 3.8% | 38 | 43 |
| **Net Proceeds Available for Unsecured Claims** | | | | **-** | **-** |
| **Liquidation Value of Unsecured Liabilities** | | | | | |
| 17.) Senior Unsecured Notes | - | NA | NA | - | - |
| 18.) First Lien Credit Facility Deficiency Claim | - | NA | NA | - | - |
| 19.) Property Specific Non-CMBS Properties Guarantee | 0-0 | NA | NA | - | - |
| 20.) CMBS Properties Guarantee | 0-0 | NA | NA | - | - |
| 21.) Accounts Payable and Accrued Liabilities | 2 | 0.0% | 0.0% | - | - |
| 22.) Intercompany | - | NA | NA | - | - |
| 23.) Subtotal | 2 | | | - | - |
| **IV. Unsecured Recovery [3]** | | | | **0.0%** | **0.0%** |
| **Net Proceeds Available for Parent** | | | | **-** | **-** |
| 24.) Payment to Parent | NA | NA | NA | - | - |
| ***Memo: Secured + Unsecured Recovery*** | | | | | |
| **First Lien Credit Facility Recovery** | | | | **38** | **43** |
| *Recovery %* | | | | *3.4%* | *3.8%* |

*(1) Liquidation Analysis reflects books and records as of 2/28/21. Cash balance is rolled forward through liquidation period.*
*(2) Reflects book value of receivables which includes straight line rent.  Straight line rent has $0 recovery.*
*(3) The analysis reflects the Debtors best estimate on General Unsecured claims using their February 2021 books and records net of eliminations.*

CBL & Associates Properties, Inc.
CBL - Cherryvale Mall, LLC - Ch. 7 Liquidation Analysis
$ in Millions

| 15)  Cherryvale Mall, LLC | Net Book Value [1] | Recovery % | | De - Consolidated Recovery $ | |
|---|---|---|---|---|---|
| | | Low | High | Low | High |
| **I. Assets** | | | | | |
| Liquidation Value of Real Estate Assets | | | | | |
| 1.)  Land, Building & Improvements (Net) | 71 | 38.2% | 42.7% | 27 | 31 |
| 2.)       Subtotal | 71 | 38.2% | 42.7% | 27 | 31 |
| Liquidation Value of All Other Assets | | | | | |
| 3.)  Developments in Progress | - | 60.0% | 70.0% | - | - |
| 4.)  Dividends from Subsidiaries | 0-0 | NA | NA | - | - |
| 5.)  Cash and Cash Equivalents [1] | 5 | 100.0% | 100.0% | 5 | 5 |
| 6.)  Tenant Receivables [2] | 2 | 37.0% | 42.0% | 1 | 1 |
| 7.)  Outstanding Receivables | 0 | 40.0% | 50.0% | 0 | 0 |
| 8.)  Mortgage and Other Notes Receivable (Mortgage Escrow) | - | 85.0% | 90.0% | - | - |
| 9.)  Investments in Unconsolidated Affiliates | - | 0.0% | 1.5% | - | - |
| 10.) Recovery on Intercompany Claims | 0-0 | NA | NA | - | - |
| 11.) Intangible Lease Assets and Other assets | 0 | 2.5% | 5.0% | 0 | 0 |
| 12.) Litigation & Preference/Avoidance Actions | - | N/A | N/A | - | - |
| 13.)      Subtotal | 7 | 81.8% | 83.1% | 6 | 6 |
| **Total Estimated Proceeds from Liquidation of Assets** | | | | **33** | **37** |
| **II. Admin / Wind Down Expenses** | | | | | |
| 14.)      Subtotal | | | | 7 | 7 |
| **Net Proceeds Available for Secured Claims** | | | | **26** | **29** |
| **III. Liabilities** | | | | | |
| Liquidation Value of Secured Liabilities | | | | | |
| 15.) First Lien Credit Facility | 1,115 | 2.3% | 2.6% | 26 | 29 |
| 16.)      Subtotal | 1,115 | 2.3% | 2.6% | 26 | 29 |
| **Net Proceeds Available for Unsecured Claims** | | | | **-** | **-** |
| Liquidation Value of Unsecured Liabilities | | | | | |
| 17.) Senior Unsecured Notes | - | NA | NA | - | - |
| 18.) First Lien Credit Facility Deficiency Claim | - | NA | NA | - | - |
| 19.) Property Specific Non-CMBS Properties Guarantee | 0-0 | NA | NA | - | - |
| 20.) CMBS Properties Guarantee | 0-0 | NA | NA | - | - |
| 21.) Accounts Payable and Accrued Liabilities | - | NA | NA | - | - |
| 22.) Intercompany | - | NA | NA | - | - |
| 23.)      Subtotal | - | | | - | - |
| **IV. Unsecured Recovery [3]** | | | | **NA** | **NA** |
| **Net Proceeds Available for Parent** | | | | **-** | **-** |
| 24.) Payment to Parent | NA | NA | NA | - | - |
| **Memo: Secured + Unsecured Recovery** | | | | | |
| First Lien Credit Facility Recovery | | | | 26 | 29 |
| *Recovery %* | | | | *2.3%* | *2.6%* |

(1) Liquidation Analysis reflects books and records as of 2/28/21. Cash balance is rolled forward through liquidation period.
(2) Reflects book value of receivables which includes straight line rent.  Straight line rent has $0 recovery.
(3) The analysis reflects the Debtors best estimate on General Unsecured claims using their February 2021 books and records net of eliminations.

CBL & Associates Properties, Inc.
CBL - Turtle Creek Limited Partnership - Ch. 7 Liquidation Analysis
$ in Millions

| | Net Book Value [1] | Recovery % | | Recovery $ | |
|---|---|---|---|---|---|
| **16) Turtle Creek Limited Partnership** | | **Low** | **High** | **Low** | **High** |
| | | | | De - Consolidated | |
| **I. Assets** | | | | | |
| **Liquidation Value of Real Estate Assets** | | | | | |
| 1.) Land, Building & Improvements (Net) | 17 | 135.5% | 151.4% | 24 | 26 |
| 2.) Subtotal | 17 | 135.5% | 151.4% | 24 | 26 |
| **Liquidation Value of All Other Assets** | | | | | |
| 3.) Developments in Progress | - | 60.0% | 70.0% | - | - |
| 4.) Dividends from Subsidiaries | 0-0 | NA | NA | - | - |
| 5.) Cash and Cash Equivalents [1] | 4 | 100.0% | 100.0% | 4 | 4 |
| 6.) Tenant Receivables [2] | 1 | 37.0% | 42.0% | 1 | 1 |
| 7.) Outstanding Receivables | 0 | 40.0% | 50.0% | 0 | 0 |
| 8.) Mortgage and Other Notes Receivable (Mortgage Escrow) | - | 85.0% | 90.0% | - | - |
| 9.) Investments in Unconsolidated Affiliates | - | 0.0% | 1.5% | - | - |
| 10.) Recovery on Intercompany Claims | 0-0 | NA | NA | - | - |
| 11.) Intangible Lease Assets and Other assets | 0 | 2.5% | 5.0% | 0 | 0 |
| 12.) Litigation & Preference/Avoidance Actions | - | N/A | N/A | - | - |
| 13.) Subtotal | 6 | 78.7% | 80.2% | 4 | 4 |
| **Total Estimated Proceeds from Liquidation of Assets** | | | | **28** | **31** |
| **II. Admin / Wind Down Expenses** | | | | | |
| 14.) Subtotal | | | | 4 | 4 |
| **Net Proceeds Available for Secured Claims** | | | | **24** | **26** |
| **III. Liabilities** | | | | | |
| **Liquidation Value of Secured Liabilities** | | | | | |
| 15.) First Lien Credit Facility | 1,115 | 2.1% | 2.4% | 24 | 26 |
| 16.) Subtotal | 1,115 | 2.1% | 2.4% | 24 | 26 |
| **Net Proceeds Available for Unsecured Claims** | | | | **-** | **-** |
| **Liquidation Value of Unsecured Liabilities** | | | | | |
| 17.) Senior Unsecured Notes | - | NA | NA | - | - |
| 18.) First Lien Credit Facility Deficiency Claim | | NA | NA | - | - |
| 19.) Property Specific Non-CMBS Properties Guarantee | 0-0 | NA | NA | - | - |
| 20.) CMBS Properties Guarantee | 0-0 | NA | NA | - | - |
| 21.) Accounts Payable and Accrued Liabilities | - | NA | NA | - | - |
| 22.) Intercompany | - | NA | NA | - | - |
| 23.) Subtotal | - | | | - | - |
| **IV. Unsecured Recovery [3]** | | | | **NA** | **NA** |
| **Net Proceeds Available for Parent** | | | | **-** | **-** |
| 24.) Payment to Parent | NA | NA | NA | - | - |
| **Memo: Secured + Unsecured Recovery** | | | | | |
| **First Lien Credit Facility Recovery** | | | | **24** | **26** |
| *Recovery %* | | | | *2.1%* | *2.4%* |

(1) Liquidation Analysis reflects books and records as of 2/28/21. Cash balance is rolled forward through liquidation period.
(2) Reflects book value of receivables which includes straight line rent. Straight line rent has $0 recovery.
(3) The analysis reflects the Debtors best estimate on General Unsecured claims using their February 2021 books and records net of eliminations.

CBL & Associates Properties, Inc.
CBL - Fayette Middle Anchor, LLC - Ch. 7 Liquidation Analysis
$ in Millions

| | | | | De - Consolidated | |
|---|---|---|---|---|---|
| **17)  Fayette Middle Anchor, LLC** | Net Book Value [(1)] | Recovery % | | Recovery $ | |
| | | Low | High | Low | High |
| **I. Assets** | | | | | |
| **Liquidation Value of Real Estate Assets** | | | | | |
| 1.)   Land, Building & Improvements (Net) | 49 | 48.5% | 54.3% | 24 | 27 |
| 2.)        Subtotal | 49 | 48.5% | 54.3% | 24 | 27 |
| **Liquidation Value of All Other Assets** | | | | | |
| 3.)   Developments in Progress | - | 60.0% | 70.0% | - | - |
| 4.)   Dividends from Subsidiaries | 0-0 | NA | NA | - | - |
| 5.)   Cash and Cash Equivalents [(1)] | 1 | 100.0% | 100.0% | 1 | 1 |
| 6.)   Tenant Receivables [(2)] | 1 | 37.0% | 42.0% | 0 | 1 |
| 7.)   Outstanding Receivables | - | 40.0% | 50.0% | - | - |
| 8.)   Mortgage and Other Notes Receivable (Mortgage Escrow) | - | 85.0% | 90.0% | - | - |
| 9.)   Investments in Unconsolidated Affiliates | - | 0.0% | 1.5% | - | - |
| 10.)  Recovery on Intercompany Claims | 0-0 | NA | NA | - | - |
| 11.)  Intangible Lease Assets and Other assets | 0 | 2.5% | 5.0% | 0 | 0 |
| 12.)  Litigation & Preference/Avoidance Actions | - | N/A | N/A | - | - |
| 13.)       Subtotal | 3 | 59.3% | 61.9% | 2 | 2 |
| **Total Estimated Proceeds from Liquidation of Assets** | | | | 26 | 28 |
| **II. Admin / Wind Down Expenses** | | | | | |
| 14.)       Subtotal | | | | 4 | 4 |
| **Net Proceeds Available for Secured Claims** | | | | 22 | 24 |
| **III. Liabilities** | | | | | |
| **Liquidation Value of Secured Liabilities** | | | | | |
| 15.)       Subtotal | NA | NA | NA | NA | NA |
| **Net Proceeds Available for Unsecured Claims** | | | | 22 | 24 |
| **Liquidation Value of Unsecured Liabilities** | | | | | |
| 16.)  Senior Unsecured Notes | - | NA | NA | - | - |
| 17.)  First Lien Credit Facility Deficiency Claim | - | NA | NA | - | - |
| 18.)  Property Specific Non-CMBS Properties Guarantee | 0-0 | NA | NA | - | - |
| 19.)  CMBS Properties Guarantee | 0-0 | NA | NA | - | - |
| 20.)  Accounts Payable and Accrued Liabilities | 0 | 100.0% | 100.0% | 0 | 0 |
| 21.)  Intercompany | - | NA | NA | - | - |
| 22.)       Subtotal | 0 | | | 0 | 0 |
| **IV. Unsecured Recovery [(3)]** | | | | 100.0% | 100.0% |
| **Net Proceeds Available for Parent** | | | | 21 | 24 |
| 23.)  Payment to Parent | NA | NA | NA | 21 | 24 |

*(1) Liquidation Analysis reflects books and records as of 2/28/21. Cash balance is rolled forward through liquidation period.*
*(2) Reflects book value of receivables which includes straight line rent.  Straight line rent has $0 recovery.*
*(3) The analysis reflects the Debtors best estimate on General Unsecured claims using their February 2021 books and records net of eliminations.*

CBL & Associates Properties, Inc.
CBL - POM-College Station, LLC - Ch. 7 Liquidation Analysis
$ in Millions

| | | | | De - Consolidated | |
|---|---|---|---|---|---|
| **18)  POM-College Station, LLC** | **Net Book Value** [1] | **Recovery %** | | **Recovery $** | |
| | | **Low** | **High** | **Low** | **High** |
| **I. Assets** | | | | | |
| **Liquidation Value of Real Estate Assets** | | | | | |
| 1.)   Land, Building & Improvements (Net) | 24 | 102.3% | 114.3% | 24 | 27 |
| 2.)        Subtotal | 24 | 102.3% | 114.3% | 24 | 27 |
| **Liquidation Value of All Other Assets** | | | | | |
| 3.)   Developments in Progress | - | 60.0% | 70.0% | - | - |
| 4.)   Dividends from Subsidiaries | 0-0 | NA | NA | - | - |
| 5.)   Cash and Cash Equivalents [1] | 4 | 100.0% | 100.0% | 4 | 4 |
| 6.)   Tenant Receivables [2] | 2 | 37.0% | 42.0% | 1 | 1 |
| 7.)   Outstanding Receivables | 0 | 40.0% | 50.0% | 0 | 0 |
| 8.)   Mortgage and Other Notes Receivable (Mortgage Escrow) | - | 85.0% | 90.0% | - | - |
| 9.)   Investments in Unconsolidated Affiliates | - | 0.0% | 1.5% | - | - |
| 10.)  Recovery on Intercompany Claims | 0-0 | NA | NA | - | - |
| 11.)  Intangible Lease Assets and Other assets | 0 | 2.5% | 5.0% | 0 | 0 |
| 12.)  Litigation & Preference/Avoidance Actions | - | N/A | N/A | - | - |
| 13.)       Subtotal | 6 | 78.1% | 79.7% | 5 | 5 |
| **Total Estimated Proceeds from Liquidation of Assets** | | | | **29** | **32** |
| **II. Admin / Wind Down Expenses** | | | | | |
| 14.)       Subtotal | | | | 5 | 5 |
| **Net Proceeds Available for Secured Claims** | | | | **24** | **27** |
| **III. Liabilities** | | | | | |
| **Liquidation Value of Secured Liabilities** | | | | | |
| 15.)  First Lien Credit Facility | 1,115 | 2.1% | 2.4% | 24 | 27 |
| 16.)       Subtotal | 1,115 | 2.1% | 2.4% | 24 | 27 |
| **Net Proceeds Available for Unsecured Claims** | | | | **24** | **27** |
| **Liquidation Value of Unsecured Liabilities** | | | | | |
| 17.)  Senior Unsecured Notes | - | NA | NA | - | - |
| 18.)  First Lien Credit Facility Deficiency Claim | - | NA | NA | - | - |
| 19.)  Property Specific Non-CMBS Properties Guarantee | 0-0 | NA | NA | - | - |
| 20.)  CMBS Properties Guarantee | 0-0 | NA | NA | - | - |
| 21.)  Accounts Payable and Accrued Liabilities | 0 | 0.0% | 0.0% | - | - |
| 22.)  Intercompany | - | NA | NA | - | - |
| 23.)       Subtotal | 0 | | | - | - |
| **IV. Unsecured Recovery** [3] | | | | **0.0%** | **0.0%** |
| **Net Proceeds Available for Parent** | | | | **-** | **-** |
| 24.)  Payment to Parent | NA | NA | NA | - | - |
| **Memo: Secured + Unsecured Recovery** | | | | | |
| **First Lien Credit Facility Recovery** | | | | **24** | **27** |
| *Recovery %* | | | | *2.1%* | *2.4%* |

*(1) Liquidation Analysis reflects books and records as of 2/28/21. Cash balance is rolled forward through liquidation period.*
*(2) Reflects book value of receivables which includes straight line rent.  Straight line rent has $0 recovery.*
*(3) The analysis reflects the Debtors best estimate on General Unsecured claims using their February 2021 books and records net of eliminations.*

CBL & Associates Properties, Inc.
CBL - Harford Mall Business Trust - Ch. 7 Liquidation Analysis
$ in Millions

| | Net Book Value [1] | Recovery % | | Recovery $ | |
|---|---|---|---|---|---|
| **19) Harford Mall Business Trust** | | Low | High | Low | High |
| | | | | De - Consolidated | |
| **I. Assets** | | | | | |
| **Liquidation Value of Real Estate Assets** | | | | | |
| 1.) Land, Building & Improvements (Net) | 51 | 41.9% | 46.8% | 21 | 24 |
| 2.) Subtotal | 51 | 41.9% | 46.8% | 21 | 24 |
| **Liquidation Value of All Other Assets** | | | | | |
| 3.) Developments in Progress | 0 | 60.0% | 70.0% | 0 | 0 |
| 4.) Dividends from Subsidiaries | 0-0 | NA | NA | - | - |
| 5.) Cash and Cash Equivalents [1] | 2 | 100.0% | 100.0% | 2 | 2 |
| 6.) Tenant Receivables [2] | 1 | 37.0% | 42.0% | 0 | 1 |
| 7.) Outstanding Receivables | 0 | 40.0% | 50.0% | 0 | 0 |
| 8.) Mortgage and Other Notes Receivable (Mortgage Escrow) | - | 85.0% | 90.0% | - | - |
| 9.) Investments in Unconsolidated Affiliates | - | 0.0% | 1.5% | - | - |
| 10.) Recovery on Intercompany Claims | 0-0 | NA | NA | - | - |
| 11.) Intangible Lease Assets and Other assets | 0 | 2.5% | 5.0% | 0 | 0 |
| 12.) Litigation & Preference/Avoidance Actions | - | N/A | N/A | - | - |
| 13.) Subtotal | 4 | 66.7% | 69.0% | 3 | 3 |
| **Total Estimated Proceeds from Liquidation of Assets** | | | | 24 | 26 |
| **II. Admin / Wind Down Expenses** | | | | | |
| 14.) Subtotal | | | | 4 | 4 |
| **Net Proceeds Available for Secured Claims** | | | | 20 | 23 |
| **III. Liabilities** | | | | | |
| **Liquidation Value of Secured Liabilities** | | | | | |
| 15.) Subtotal | NA | NA | NA | NA | NA |
| **Net Proceeds Available for Unsecured Claims** | | | | 20 | 23 |
| **Liquidation Value of Unsecured Liabilities** | | | | | |
| 16.) Senior Unsecured Notes | - | NA | NA | - | - |
| 17.) First Lien Credit Facility Deficiency Claim | | NA | NA | - | - |
| 18.) Property Specific Non-CMBS Properties Guarantee | 0-0 | NA | NA | - | - |
| 19.) CMBS Properties Guarantee | 0-0 | NA | NA | - | - |
| 20.) Accounts Payable and Accrued Liabilities | - | NA | NA | - | - |
| 21.) Intercompany | - | NA | NA | - | - |
| 22.) Subtotal | - | | | - | - |
| **IV. Unsecured Recovery [3]** | | | | **NA** | **NA** |
| **Net Proceeds Available for Parent** | | | | 20 | 23 |
| 23.) Payment to Parent | NA | NA | NA | 20 | 23 |

*(1) Liquidation Analysis reflects books and records as of 2/28/21. Cash balance is rolled forward through liquidation period.*
*(2) Reflects book value of receivables which includes straight line rent.  Straight line rent has $0 recovery.*
*(3) The analysis reflects the Debtors best estimate on General Unsecured claims using their February 2021 books and records net of eliminations.*

CBL & Associates Properties, Inc.
CBL - CBL RM-Waco, LLC - Ch. 7 Liquidation Analysis
$ in Millions

| 20) CBL RM-Waco, LLC | Net Book Value [1] | Recovery % | | De - Consolidated Recovery $ | |
|---|---|---|---|---|---|
| | | Low | High | Low | High |
| **I. Assets** | | | | | |
| **Liquidation Value of Real Estate Assets** | | | | | |
| 1.) Land, Building & Improvements (Net) | 37 | 62.5% | 69.8% | 23 | 26 |
| 2.) Subtotal | 37 | 62.5% | 69.8% | 23 | 26 |
| **Liquidation Value of All Other Assets** | | | | | |
| 3.) Developments in Progress | - | 60.0% | 70.0% | - | - |
| 4.) Dividends from Subsidiaries | 0-0 | NA | NA | - | - |
| 5.) Cash and Cash Equivalents [1] | 4 | 100.0% | 100.0% | 4 | 4 |
| 6.) Tenant Receivables [2] | 1 | 37.0% | 42.0% | 0 | 1 |
| 7.) Outstanding Receivables | 0 | 40.0% | 50.0% | 0 | 0 |
| 8.) Mortgage and Other Notes Receivable (Mortgage Escrow) | - | 85.0% | 90.0% | - | - |
| 9.) Investments in Unconsolidated Affiliates | - | 0.0% | 1.5% | - | - |
| 10.) Recovery on Intercompany Claims | 0-0 | NA | NA | - | - |
| 11.) Intangible Lease Assets and Other assets | 0 | 2.5% | 5.0% | 0 | 0 |
| 12.) Litigation & Preference/Avoidance Actions | - | N/A | N/A | - | - |
| 13.) Subtotal | 5 | 79.4% | 80.8% | 4 | 4 |
| **Total Estimated Proceeds from Liquidation of Assets** | | | | **28** | **30** |
| **II. Admin / Wind Down Expenses** | | | | | |
| 14.) Subtotal | | | | 5 | 5 |
| **Net Proceeds Available for Secured Claims** | | | | **23** | **26** |
| **III. Liabilities** | | | | | |
| **Liquidation Value of Secured Liabilities** | | | | | |
| 15.) First Lien Credit Facility | 1,115 | 2.1% | 2.3% | 23 | 26 |
| 16.) Subtotal | 1,115 | 2.1% | 2.3% | 23 | 26 |
| **Net Proceeds Available for Unsecured Claims** | | | | **-** | **-** |
| **Liquidation Value of Unsecured Liabilities** | | | | | |
| 17.) Senior Unsecured Notes | - | NA | NA | - | - |
| 18.) First Lien Credit Facility Deficiency Claim | | NA | NA | - | - |
| 19.) Property Specific Non-CMBS Properties Guarantee | 0-0 | NA | NA | - | - |
| 20.) CMBS Properties Guarantee | 0-0 | NA | NA | - | - |
| 21.) Accounts Payable and Accrued Liabilities | - | NA | NA | - | - |
| 22.) Intercompany | - | NA | NA | - | - |
| 23.) Subtotal | - | | | - | - |
| **IV. Unsecured Recovery [3]** | | | | **NA** | **NA** |
| **Net Proceeds Available for Parent** | | | | **-** | **-** |
| 24.) Payment to Parent | NA | NA | NA | - | - |
| **Memo: Secured + Unsecured Recovery** | | | | | |
| **First Lien Credit Facility Recovery** | | | | **23** | **26** |
| *Recovery %* | | | | *2.1%* | *2.3%* |

*(1) Liquidation Analysis reflects books and records as of 2/28/21. Cash balance is rolled forward through liquidation period.*
*(2) Reflects book value of receivables which includes straight line rent. Straight line rent has $0 recovery.*
*(3) The analysis reflects the Debtors best estimate on General Unsecured claims using their February 2021 books and records net of eliminations.*

CBL & Associates Properties, Inc.
CBL - Madison/East Towne, LLC - Ch. 7 Liquidation Analysis
$ in Millions

| 21) Madison/East Towne, LLC | Net Book Value [1] | Recovery % | | Recovery $ | |
|---|---|---|---|---|---|
| | | Low | High | Low | High |
| | | | | De - Consolidated | |
| **I. Assets** | | | | | |
| **Liquidation Value of Real Estate Assets** | | | | | |
| 1.) Land, Building & Improvements (Net) | 72 | 13.4% | 14.9% | 10 | 11 |
| 2.) Subtotal | 72 | 13.4% | 14.9% | 10 | 11 |
| **Liquidation Value of All Other Assets** | | | | | |
| 3.) Developments in Progress | 0 | 60.0% | 70.0% | 0 | 0 |
| 4.) Dividends from Subsidiaries | 0-0 | NA | NA | - | - |
| 5.) Cash and Cash Equivalents [1] | 2 | 100.0% | 100.0% | 2 | 2 |
| 6.) Tenant Receivables [2] | 1 | 37.0% | 42.0% | 1 | 1 |
| 7.) Outstanding Receivables | 0 | 40.0% | 50.0% | 0 | 0 |
| 8.) Mortgage and Other Notes Receivable (Mortgage Escrow) | - | 85.0% | 90.0% | - | - |
| 9.) Investments in Unconsolidated Affiliates | - | 0.0% | 1.5% | - | - |
| 10.) Recovery on Intercompany Claims | 0-0 | NA | NA | - | - |
| 11.) Intangible Lease Assets and Other assets | 0 | 2.5% | 5.0% | 0 | 0 |
| 12.) Litigation & Preference/Avoidance Actions | - | N/A | N/A | - | - |
| 13.) Subtotal | 4 | 69.9% | 71.9% | 3 | 3 |
| **Total Estimated Proceeds from Liquidation of Assets** | | | | **13** | **14** |
| **II. Admin / Wind Down Expenses** | | | | | |
| 14.) Subtotal | | | | 4 | 4 |
| **Net Proceeds Available for Secured Claims** | | | | **9** | **10** |
| **III. Liabilities** | | | | | |
| **Liquidation Value of Secured Liabilities** | | | | | |
| 15.) First Lien Credit Facility | 1,115 | 0.8% | 0.9% | 9 | 10 |
| 16.) Subtotal | 1,115 | 0.8% | 0.9% | 9 | 10 |
| **Net Proceeds Available for Unsecured Claims** | | | | **9** | **10** |
| **Liquidation Value of Unsecured Liabilities** | | | | | |
| 17.) Senior Unsecured Notes | - | NA | NA | - | - |
| 18.) First Lien Credit Facility Deficiency Claim | - | NA | NA | - | - |
| 19.) Property Specific Non-CMBS Properties Guarantee | 0-0 | NA | NA | - | - |
| 20.) CMBS Properties Guarantee | 0-0 | NA | NA | - | - |
| 21.) Accounts Payable and Accrued Liabilities | - | NA | NA | - | - |
| 22.) Intercompany | - | NA | NA | - | - |
| 23.) Subtotal | - | | | - | - |
| **IV. Unsecured Recovery [3]** | | | | **NA** | **NA** |
| **Net Proceeds Available for Parent** | | | | **-** | **-** |
| 24.) Payment to Parent | NA | NA | NA | - | - |
| **Memo: Secured + Unsecured Recovery** | | | | | |
| **First Lien Credit Facility Recovery** | | | | **9** | **10** |
| *Recovery %* | | | | *0.8%* | *0.9%* |

(1) Liquidation Analysis reflects books and records as of 2/28/21. Cash balance is rolled forward through liquidation period.
(2) Reflects book value of receivables which includes straight line rent. Straight line rent has $0 recovery.
(3) The analysis reflects the Debtors best estimate on General Unsecured claims using their February 2021 books and records net of eliminations.

CBL & Associates Properties, Inc.
CBL - Hixson Mall, LLC - Ch. 7 Liquidation Analysis
$ in Millions

|  |  |  |  |  | De - Consolidated | |
|---|---|---|---|---|---|---|
| **22)  Hixson Mall, LLC** | **Net Book Value** [1] | **Recovery %** | | | **Recovery $** | |
|  |  | **Low** | **High** | | **Low** | **High** |
| **I. Assets** | | | | | | |
| **Liquidation Value of Real Estate Assets** | | | | | | |
| 1.) Land, Building & Improvements (Net) | 20 | 95.6% | 106.8% | | 19 | 21 |
| 2.) Subtotal | 20 | 95.6% | 106.8% | | 19 | 21 |
| **Liquidation Value of All Other Assets** | | | | | | |
| 3.) Developments in Progress | - | 60.0% | 70.0% | | - | - |
| 4.) Dividends from Subsidiaries | 0-0 | NA | NA | | - | - |
| 5.) Cash and Cash Equivalents [1] | 3 | 100.0% | 100.0% | | 3 | 3 |
| 6.) Tenant Receivables [2] | 1 | 37.0% | 42.0% | | 0 | 0 |
| 7.) Outstanding Receivables | 0 | 40.0% | 50.0% | | 0 | 0 |
| 8.) Mortgage and Other Notes Receivable (Mortgage Escrow) | - | 85.0% | 90.0% | | - | - |
| 9.) Investments in Unconsolidated Affiliates | - | 0.0% | 1.5% | | - | - |
| 10.) Recovery on Intercompany Claims | 0-0 | NA | NA | | - | - |
| 11.) Intangible Lease Assets and Other assets | 1 | 2.5% | 5.0% | | 0 | 0 |
| 12.) Litigation & Preference/Avoidance Actions | - | N/A | N/A | | - | - |
| 13.) Subtotal | 5 | 73.4% | 74.9% | | 4 | 4 |
| **Total Estimated Proceeds from Liquidation of Assets** | | | | | **22** | **25** |
| **II. Admin / Wind Down Expenses** | | | | | | |
| 14.) Subtotal | | | | | 3 | 3 |
| **Net Proceeds Available for Secured Claims** | | | | | **19** | **21** |
| **III. Liabilities** | | | | | | |
| **Liquidation Value of Secured Liabilities** | | | | | | |
| 15.) First Lien Credit Facility | 1,115 | 1.7% | 1.9% | | 19 | 21 |
| 16.) Subtotal | 1,115 | 1.7% | 1.9% | | 19 | 21 |
| **Net Proceeds Available for Unsecured Claims** | | | | | **-** | **-** |
| **Liquidation Value of Unsecured Liabilities** | | | | | | |
| 17.) Senior Unsecured Notes | - | NA | NA | | - | - |
| 18.) First Lien Credit Facility Deficiency Claim | | NA | NA | | - | - |
| 19.) Property Specific Non-CMBS Properties Guarantee | 0-0 | NA | NA | | - | - |
| 20.) CMBS Properties Guarantee | 0-0 | NA | NA | | - | - |
| 21.) Accounts Payable and Accrued Liabilities | - | NA | NA | | - | - |
| 22.) Intercompany | - | NA | NA | | - | - |
| 23.) Subtotal | - | | | | - | - |
| **IV. Unsecured Recovery** [3] | | | | | **NA** | **NA** |
| **Net Proceeds Available for Parent** | | | | | **-** | **-** |
| 24.) Payment to Parent | NA | NA | NA | | - | - |
| *Memo: Secured + Unsecured Recovery* | | | | | | |
| **First Lien Credit Facility Recovery** | | | | | **19** | **21** |
| *Recovery %* | | | | | *1.7%* | *1.9%* |

*(1) Liquidation Analysis reflects books and records as of 2/28/21. Cash balance is rolled forward through liquidation period.*
*(2) Reflects book value of receivables which includes straight line rent.  Straight line rent has $0 recovery.*
*(3) The analysis reflects the Debtors best estimate on General Unsecured claims using their February 2021 books and records net of eliminations.*

CBL & Associates Properties, Inc.
CBL - Parkway Place SPE, LLC - Ch. 7 Liquidation Analysis
$ in Millions

| 23) Parkway Place SPE, LLC | Net Book Value [1] | Recovery % | | De - Consolidated Recovery $ | |
|---|---|---|---|---|---|
| | | Low | High | Low | High |
| **I. Assets** | | | | | |
| Liquidation Value of Real Estate Assets | | | | | |
| 1.) Land, Building & Improvements (Net) | 54 | 63.8% | 71.3% | 35 | 39 |
| 2.) Subtotal | 54 | 63.8% | 71.3% | 35 | 39 |
| Liquidation Value of All Other Assets | | | | | |
| 3.) Developments in Progress | - | 60.0% | 70.0% | - | - |
| 4.) Dividends from Subsidiaries | 0-0 | NA | NA | - | - |
| 5.) Cash and Cash Equivalents [1] | 2 | 100.0% | 100.0% | 2 | 2 |
| 6.) Tenant Receivables [2] | 2 | 37.0% | 42.0% | 1 | 1 |
| 7.) Outstanding Receivables | 1 | 40.0% | 50.0% | 0 | 0 |
| 8.) Mortgage and Other Notes Receivable (Mortgage Escrow) | - | 85.0% | 90.0% | - | - |
| 9.) Investments in Unconsolidated Affiliates | - | 0.0% | 1.5% | - | - |
| 10.) Recovery on Intercompany Claims | 0-0 | NA | NA | - | - |
| 11.) Intangible Lease Assets and Other assets | 1 | 2.5% | 5.0% | 0 | 0 |
| 12.) Litigation & Preference/Avoidance Actions | - | N/A | N/A | - | - |
| 13.) Subtotal | 5 | 54.1% | 57.4% | 3 | 3 |
| **Total Estimated Proceeds from Liquidation of Assets** | | | | 37 | 41 |
| **II. Admin / Wind Down Expenses** | | | | | |
| 14.) Subtotal | | | | 5 | 6 |
| **Net Proceeds Available for Secured Claims** | | | | 32 | 35 |
| **III. Liabilities** | | | | | |
| Liquidation Value of Secured Liabilities | | | | | |
| 15.) Subtotal | NA | NA | NA | NA | NA |
| **Net Proceeds Available for Unsecured Claims** | | | | 32 | 35 |
| Liquidation Value of Unsecured Liabilities | | | | | |
| 16.) Senior Unsecured Notes | - | NA | NA | - | - |
| 17.) First Lien Credit Facility Deficiency Claim | - | NA | NA | - | - |
| 18.) Property Specific Non-CMBS Properties Guarantee | 0-0 | NA | NA | - | - |
| 19.) CMBS Properties Guarantee | 0-0 | NA | NA | - | - |
| 20.) Accounts Payable and Accrued Liabilities | 1 | 100.0% | 100.0% | 1 | 1 |
| 21.) Intercompany | - | NA | NA | - | - |
| 22.) Subtotal | 1 | | | 1 | 1 |
| **IV. Unsecured Recovery [3]** | | | | 100.0% | 100.0% |
| **Net Proceeds Available for Parent** | | | | 31 | 34 |
| 23.) Payment to Parent | NA | NA | NA | 31 | 34 |

*(1) Liquidation Analysis reflects books and records as of 2/28/21. Cash balance is rolled forward through liquidation period.*
*(2) Reflects book value of receivables which includes straight line rent. Straight line rent has $0 recovery.*
*(3) The analysis reflects the Debtors best estimate on General Unsecured claims using their February 2021 books and records net of eliminations.*

CBL & Associates Properties, Inc.
CBL - South County Shoppingtown LLC - Ch. 7 Liquidation Analysis
$ in Millions

| | Net Book Value [1] | Recovery % | | Recovery $ | |
|---|---|---|---|---|---|
| **24) South County Shoppingtown LLC** | | **Low** | **High** | **Low** | **High** |
| | | | | *De - Consolidated* | |
| **I. Assets** | | | | | |
| **Liquidation Value of Real Estate Assets** | | | | | |
| 1.)  Land, Building & Improvements (Net) | 122 | 24.3% | 27.1% | 30 | 33 |
| 2.)      Subtotal | 122 | 24.3% | 27.1% | 30 | 33 |
| **Liquidation Value of All Other Assets** | | | | | |
| 3.)  Developments in Progress | 0 | 60.0% | 70.0% | 0 | 0 |
| 4.)  Dividends from Subsidiaries | 0-0 | NA | NA | - | - |
| 5.)  Cash and Cash Equivalents [1] | 4 | 100.0% | 100.0% | 4 | 4 |
| 6.)  Tenant Receivables [2] | 2 | 37.0% | 42.0% | 1 | 1 |
| 7.)  Outstanding Receivables | 0 | 40.0% | 50.0% | 0 | 0 |
| 8.)  Mortgage and Other Notes Receivable (Mortgage Escrow) | - | 85.0% | 90.0% | - | - |
| 9.)  Investments in Unconsolidated Affiliates | - | 0.0% | 1.5% | - | - |
| 10.) Recovery on Intercompany Claims | 0-0 | NA | NA | - | - |
| 11.) Intangible Lease Assets and Other assets | 1 | 2.5% | 5.0% | 0 | 0 |
| 12.) Litigation & Preference/Avoidance Actions | - | N/A | N/A | - | - |
| 13.)     Subtotal | 7 | 62.9% | 64.8% | 5 | 5 |
| **Total Estimated Proceeds from Liquidation of Assets** | | | | **34** | **38** |
| **II. Admin / Wind Down Expenses** | | | | | |
| 14.)     Subtotal | | | | 6 | 6 |
| **Net Proceeds Available for Secured Claims** | | | | **28** | **32** |
| **III. Liabilities** | | | | | |
| **Liquidation Value of Secured Liabilities** | | | | | |
| 15.)     Subtotal | NA | NA | NA | NA | NA |
| **Net Proceeds Available for Unsecured Claims** | | | | **28** | **32** |
| **Liquidation Value of Unsecured Liabilities** | | | | | |
| 16.) Senior Unsecured Notes | - | NA | NA | - | - |
| 17.) First Lien Credit Facility Deficiency Claim | - | NA | NA | - | - |
| 18.) Property Specific Non-CMBS Properties Guarantee | 0-0 | NA | NA | - | - |
| 19.) CMBS Properties Guarantee | 0-0 | NA | NA | - | - |
| 20.) Accounts Payable and Accrued Liabilities | 1 | 100.0% | 100.0% | 1 | 1 |
| 21.) Intercompany | - | NA | NA | - | - |
| 22.)     Subtotal | 1 | | | 1 | 1 |
| **IV. Unsecured Recovery [3]** | | | | **100.0%** | **100.0%** |
| **Net Proceeds Available for Parent** | | | | **27** | **31** |
| 23.) Payment to Parent | NA | NA | NA | 27 | 31 |

*(1) Liquidation Analysis reflects books and records as of 2/28/21. Cash balance is rolled forward through liquidation period.*
*(2) Reflects book value of receivables which includes straight line rent.  Straight line rent has $0 recovery.*
*(3) The analysis reflects the Debtors best estimate on General Unsecured claims using their February 2021 books and records net of eliminations.*

CBL & Associates Properties, Inc.
CBL - Frontier Mall Associates Limited Partnership - Ch. 7 Liquidation Analysis
$ in Millions

| 25) Frontier Mall Associates Limited Partnership | Net Book Value [1] | Recovery % | | De - Consolidated Recovery $ | |
|---|---|---|---|---|---|
| | | Low | High | Low | High |
| **I. Assets** | | | | | |
| **Liquidation Value of Real Estate Assets** | | | | | |
| 1.) Land, Building & Improvements (Net) | 12 | 146.2% | 163.4% | 17 | 19 |
| 2.) Subtotal | 12 | 146.2% | 163.4% | 17 | 19 |
| **Liquidation Value of All Other Assets** | | | | | |
| 3.) Developments in Progress | - | 60.0% | 70.0% | - | - |
| 4.) Dividends from Subsidiaries | 0-0 | NA | NA | - | - |
| 5.) Cash and Cash Equivalents [1] | 2 | 100.0% | 100.0% | 2 | 2 |
| 6.) Tenant Receivables [2] | 1 | 37.0% | 42.0% | 0 | 0 |
| 7.) Outstanding Receivables | 0 | 40.0% | 50.0% | 0 | 0 |
| 8.) Mortgage and Other Notes Receivable (Mortgage Escrow) | - | 85.0% | 90.0% | - | - |
| 9.) Investments in Unconsolidated Affiliates | - | 0.0% | 1.5% | - | - |
| 10.) Recovery on Intercompany Claims | 0-0 | NA | NA | - | - |
| 11.) Intangible Lease Assets and Other assets | 0 | 2.5% | 5.0% | 0 | 0 |
| 12.) Litigation & Preference/Avoidance Actions | - | N/A | N/A | - | - |
| 13.) Subtotal | 4 | 73.4% | 75.1% | 3 | 3 |
| **Total Estimated Proceeds from Liquidation of Assets** | | | | **20** | **22** |
| **II. Admin / Wind Down Expenses** | | | | | |
| 14.) Subtotal | | | | 3 | 3 |
| **Net Proceeds Available for Secured Claims** | | | | **17** | **19** |
| **III. Liabilities** | | | | | |
| **Liquidation Value of Secured Liabilities** | | | | | |
| 15.) First Lien Credit Facility | 1,115 | 1.5% | 1.7% | 17 | 19 |
| 16.) Subtotal | 1,115 | 1.5% | 1.7% | 17 | 19 |
| **Net Proceeds Available for Unsecured Claims** | | | | **-** | **-** |
| **Liquidation Value of Unsecured Liabilities** | | | | | |
| 17.) Senior Unsecured Notes | - | NA | NA | - | - |
| 18.) First Lien Credit Facility Deficiency Claim | - | NA | NA | - | - |
| 19.) Property Specific Non-CMBS Properties Guarantee | 0-0 | NA | NA | - | - |
| 20.) CMBS Properties Guarantee | 0-0 | NA | NA | - | - |
| 21.) Accounts Payable and Accrued Liabilities | 0 | 0.0% | 0.0% | - | - |
| 22.) Intercompany | - | NA | NA | - | - |
| 23.) Subtotal | 0 | | | - | - |
| **IV. Unsecured Recovery [3]** | | | | **0.0%** | **0.0%** |
| **Net Proceeds Available for Parent** | | | | **-** | **-** |
| 24.) Payment to Parent | NA | NA | NA | - | - |
| **Memo: Secured + Unsecured Recovery** | | | | | |
| **First Lien Credit Facility Recovery** | | | | **17** | **19** |
| *Recovery %* | | | | *1.5%* | *1.7%* |

(1) Liquidation Analysis reflects books and records as of 2/28/21. Cash balance is rolled forward through liquidation period.
(2) Reflects book value of receivables which includes straight line rent.  Straight line rent has $0 recovery.
(3) The analysis reflects the Debtors best estimate on General Unsecured claims using their February 2021 books and records net of eliminations.

CBL & Associates Properties, Inc.
CBL - Dakota Square Mall CMBS, LLC - Ch. 7 Liquidation Analysis
$ in Millions

| | Net Book Value [1] | Recovery % | | De - Consolidated Recovery $ | |
|---|---|---|---|---|---|
| **26) Dakota Square Mall CMBS, LLC** | | Low | High | Low | High |
| **I. Assets** | | | | | |
| Liquidation Value of Real Estate Assets | | | | | |
| 1.) Land, Building & Improvements (Net) | 92 | 18.5% | 20.7% | 17 | 19 |
| 2.) Subtotal | 92 | 18.5% | 20.7% | 17 | 19 |
| Liquidation Value of All Other Assets | | | | | |
| 3.) Developments in Progress | 0 | 60.0% | 70.0% | 0 | 0 |
| 4.) Dividends from Subsidiaries | 0-0 | NA | NA | - | - |
| 5.) Cash and Cash Equivalents [1] | 3 | 100.0% | 100.0% | 3 | 3 |
| 6.) Tenant Receivables [2] | 3 | 37.0% | 42.0% | 1 | 1 |
| 7.) Outstanding Receivables | 0 | 40.0% | 50.0% | 0 | 0 |
| 8.) Mortgage and Other Notes Receivable (Mortgage Escrow) | - | 85.0% | 90.0% | - | - |
| 9.) Investments in Unconsolidated Affiliates | - | 0.0% | 1.5% | - | - |
| 10.) Recovery on Intercompany Claims | 0-0 | NA | NA | - | - |
| 11.) Intangible Lease Assets and Other assets | 2 | 2.5% | 5.0% | 0 | 0 |
| 12.) Litigation & Preference/Avoidance Actions | - | N/A | N/A | - | - |
| 13.) Subtotal | 7 | 52.3% | 54.9% | 4 | 4 |
| **Total Estimated Proceeds from Liquidation of Assets** | | | | 21 | 23 |
| **II. Admin / Wind Down Expenses** | | | | | |
| 14.) Subtotal | | | | 4 | 4 |
| **Net Proceeds Available for Secured Claims** | | | | 17 | 19 |
| **III. Liabilities** | | | | | |
| Liquidation Value of Secured Liabilities | | | | | |
| 15.) Subtotal | NA | NA | NA | NA | NA |
| **Net Proceeds Available for Unsecured Claims** | | | | 17 | 19 |
| Liquidation Value of Unsecured Liabilities | | | | | |
| 16.) Senior Unsecured Notes | - | NA | NA | - | - |
| 17.) First Lien Credit Facility Deficiency Claim | - | NA | NA | - | - |
| 18.) Property Specific Non-CMBS Properties Guarantee | 0-0 | NA | NA | - | - |
| 19.) CMBS Properties Guarantee | 0-0 | NA | NA | - | - |
| 20.) Accounts Payable and Accrued Liabilities | 1 | 100.0% | 100.0% | 1 | 1 |
| 21.) Intercompany | - | NA | NA | - | - |
| 22.) Subtotal | 1 | | | 1 | 1 |
| **IV. Unsecured Recovery [3]** | | | | 100.0% | 100.0% |
| **Net Proceeds Available for Parent** | | | | 16 | 18 |
| 23.) Payment to Parent | NA | NA | NA | 16 | 18 |

*(1) Liquidation Analysis reflects books and records as of 2/28/21. Cash balance is rolled forward through liquidation period.*
*(2) Reflects book value of receivables which includes straight line rent. Straight line rent has $0 recovery.*
*(3) The analysis reflects the Debtors best estimate on General Unsecured claims using their February 2021 books and records net of eliminations.*

CBL & Associates Properties, Inc.
CBL - Northpark Mall/Joplin, LLC - Ch. 7 Liquidation Analysis
$ in Millions

| 27) Northpark Mall/Joplin, LLC | Net Book Value [1] | Recovery % | | De - Consolidated Recovery $ | |
|---|---|---|---|---|---|
| | | Low | High | Low | High |
| **I. Assets** | | | | | |
| Liquidation Value of Real Estate Assets | | | | | |
| 1.) Land, Building & Improvements (Net) | 61 | 24.3% | 27.1% | 15 | 16 |
| 2.) Subtotal | 61 | 24.3% | 27.1% | 15 | 16 |
| Liquidation Value of All Other Assets | | | | | |
| 3.) Developments in Progress | 0 | 60.0% | 70.0% | 0 | 0 |
| 4.) Dividends from Subsidiaries | 0-0 | NA | NA | - | - |
| 5.) Cash and Cash Equivalents [1] | 2 | 100.0% | 100.0% | 2 | 2 |
| 6.) Tenant Receivables [2] | 1 | 37.0% | 42.0% | 0 | 0 |
| 7.) Outstanding Receivables | 0 | 40.0% | 50.0% | 0 | 0 |
| 8.) Mortgage and Other Notes Receivable (Mortgage Escrow) | - | 85.0% | 90.0% | - | - |
| 9.) Investments in Unconsolidated Affiliates | - | 0.0% | 1.5% | - | - |
| 10.) Recovery on Intercompany Claims | 0-0 | NA | NA | - | - |
| 11.) Intangible Lease Assets and Other assets | 0 | 2.5% | 5.0% | 0 | 0 |
| 12.) Litigation & Preference/Avoidance Actions | - | N/A | N/A | - | - |
| 13.) Subtotal | 4 | 77.1% | 78.6% | 3 | 3 |
| Total Estimated Proceeds from Liquidation of Assets | | | | 18 | 19 |
| **II. Admin / Wind Down Expenses** | | | | | |
| 14.) Subtotal | | | | 3 | 3 |
| Net Proceeds Available for Secured Claims | | | | 15 | 16 |
| **III. Liabilities** | | | | | |
| Liquidation Value of Secured Liabilities | | | | | |
| 15.) Subtotal | NA | NA | NA | NA | NA |
| Net Proceeds Available for Unsecured Claims | | | | 15 | 16 |
| Liquidation Value of Unsecured Liabilities | | | | | |
| 16.) Senior Unsecured Notes | - | NA | NA | - | - |
| 17.) First Lien Credit Facility Deficiency Claim | - | NA | NA | - | - |
| 18.) Property Specific Non-CMBS Properties Guarantee | 0-0 | NA | NA | - | - |
| 19.) CMBS Properties Guarantee | 0-0 | NA | NA | - | - |
| 20.) Accounts Payable and Accrued Liabilities | 0 | 100.0% | 100.0% | 0 | 0 |
| 21.) Intercompany | - | NA | NA | - | - |
| 22.) Subtotal | 0 | | | 0 | 0 |
| **IV. Unsecured Recovery [3]** | | | | 100.0% | 100.0% |
| Net Proceeds Available for Parent | | | | 15 | 16 |
| 23.) Payment to Parent | NA | NA | NA | 15 | 16 |

*(1) Liquidation Analysis reflects books and records as of 2/28/21. Cash balance is rolled forward through liquidation period.*
*(2) Reflects book value of receivables which includes straight line rent.  Straight line rent has $0 recovery.*
*(3) The analysis reflects the Debtors best estimate on General Unsecured claims using their February 2021 books and records net of eliminations.*

CBL & Associates Properties, Inc.
CBL - Mid Rivers Mall CMBS, LLC - Ch. 7 Liquidation Analysis
$ in Millions

| | Net Book Value [1] | Recovery % | | Recovery $ De - Consolidated | |
|---|---|---|---|---|---|
| **28) Mid Rivers Mall CMBS, LLC** | | Low | High | Low | High |
| **I. Assets** | | | | | |
| **Liquidation Value of Real Estate Assets** | | | | | |
| 1.) Land, Building & Improvements (Net) | 50 | 28.4% | 31.8% | 14 | 16 |
| 2.) Subtotal | 50 | 28.4% | 31.8% | 14 | 16 |
| **Liquidation Value of All Other Assets** | | | | | |
| 3.) Developments in Progress | - | 60.0% | 70.0% | - | - |
| 4.) Dividends from Subsidiaries | 0-0 | NA | NA | - | - |
| 5.) Cash and Cash Equivalents [1] | 2 | 100.0% | 100.0% | 2 | 2 |
| 6.) Tenant Receivables [2] | 1 | 37.0% | 42.0% | 0 | 0 |
| 7.) Outstanding Receivables | 0 | 40.0% | 50.0% | 0 | 0 |
| 8.) Mortgage and Other Notes Receivable (Mortgage Escrow) | - | 85.0% | 90.0% | - | - |
| 9.) Investments in Unconsolidated Affiliates | - | 0.0% | 1.5% | - | - |
| 10.) Recovery on Intercompany Claims | 0-0 | NA | NA | - | - |
| 11.) Intangible Lease Assets and Other assets | 1 | 2.5% | 5.0% | 0 | 0 |
| 12.) Litigation & Preference/Avoidance Actions | - | N/A | N/A | - | - |
| 13.) Subtotal | 4 | 69.9% | 71.6% | 3 | 3 |
| **Total Estimated Proceeds from Liquidation of Assets** | | | | **17** | **19** |
| **II. Admin / Wind Down Expenses** | | | | | |
| 14.) Subtotal | | | | 3 | 3 |
| **Net Proceeds Available for Secured Claims** | | | | **14** | **15** |
| **III. Liabilities** | | | | | |
| **Liquidation Value of Secured Liabilities** | | | | | |
| 15.) Subtotal | NA | NA | NA | NA | NA |
| **Net Proceeds Available for Unsecured Claims** | | | | **14** | **15** |
| **Liquidation Value of Unsecured Liabilities** | | | | | |
| 16.) Senior Unsecured Notes | - | NA | NA | - | - |
| 17.) First Lien Credit Facility Deficiency Claim | | NA | NA | - | - |
| 18.) Property Specific Non-CMBS Properties Guarantee | 0-0 | NA | NA | - | - |
| 19.) CMBS Properties Guarantee | 0-0 | NA | NA | - | - |
| 20.) Accounts Payable and Accrued Liabilities | - | NA | NA | - | - |
| 21.) Intercompany | - | NA | NA | - | - |
| 22.) Subtotal | - | | | - | - |
| **IV. Unsecured Recovery [3]** | | | | **NA** | **NA** |
| **Net Proceeds Available for Parent** | | | | **14** | **15** |
| 23.) Payment to Parent | NA | NA | NA | 14 | 15 |

*(1) Liquidation Analysis reflects books and records as of 2/28/21. Cash balance is rolled forward through liquidation period.*
*(2) Reflects book value of receivables which includes straight line rent. Straight line rent has $0 recovery.*
*(3) The analysis reflects the Debtors best estimate on General Unsecured claims using their February 2021 books and records net of eliminations.*

CBL & Associates Properties, Inc.
CBL - Brookfield Square Joint Venture - Ch. 7 Liquidation Analysis
$ in Millions

| | | | | De - Consolidated | |
|---|---|---|---|---|---|
| **29)  Brookfield Square Joint Venture** | Net Book Value [1] | Recovery % | | Recovery $ | |
| | | Low | High | Low | High |
| **I. Assets** | | | | | |
| **Liquidation Value of Real Estate Assets** | | | | | |
| 1.)  Land, Building & Improvements (Net) | 56 | 21.3% | 23.8% | 12 | 13 |
| 2.)  **Subtotal** | 56 | 21.3% | 23.8% | 12 | 13 |
| **Liquidation Value of All Other Assets** | | | | | |
| 3.)  Developments in Progress | - | 60.0% | 70.0% | - | - |
| 4.)  Dividends from Subsidiaries | 0-0 | NA | NA | - | - |
| 5.)  Cash and Cash Equivalents [1] | 2 | 100.0% | 100.0% | 2 | 2 |
| 6.)  Tenant Receivables [2] | 2 | 37.0% | 42.0% | 1 | 1 |
| 7.)  Outstanding Receivables | 0 | 40.0% | 50.0% | 0 | 0 |
| 8.)  Mortgage and Other Notes Receivable (Mortgage Escrow) | - | 85.0% | 90.0% | - | - |
| 9.)  Investments in Unconsolidated Affiliates | - | 0.0% | 1.5% | - | - |
| 10.)  Recovery on Intercompany Claims | 0-0 | NA | NA | - | - |
| 11.)  Intangible Lease Assets and Other assets | 0 | 2.5% | 5.0% | 0 | 0 |
| 12.)  Litigation & Preference/Avoidance Actions | - | N/A | N/A | - | - |
| 13.)  **Subtotal** | 4 | 64.9% | 67.3% | 3 | 3 |
| **Total Estimated Proceeds from Liquidation of Assets** | | | | **15** | **16** |
| **II. Admin / Wind Down Expenses** | | | | | |
| 14.)  **Subtotal** | | | | 3 | 3 |
| **Net Proceeds Available for Secured Claims** | | | | **12** | **13** |
| **III. Liabilities** | | | | | |
| **Liquidation Value of Secured Liabilities** | | | | | |
| 15.)  **Subtotal** | NA | NA | NA | NA | NA |
| **Net Proceeds Available for Unsecured Claims** | | | | **12** | **13** |
| **Liquidation Value of Unsecured Liabilities** | | | | | |
| 16.)  Senior Unsecured Notes | - | NA | NA | - | - |
| 17.)  First Lien Credit Facility Deficiency Claim | - | NA | NA | - | - |
| 18.)  Property Specific Non-CMBS Properties Guarantee | 0-0 | NA | NA | - | - |
| 19.)  CMBS Properties Guarantee | 0-0 | NA | NA | - | - |
| 20.)  Accounts Payable and Accrued Liabilities | 1 | 100.0% | 100.0% | 1 | 1 |
| 21.)  Intercompany | - | NA | NA | - | - |
| 22.)  **Subtotal** | 1 | | | 1 | 1 |
| **IV. Unsecured Recovery [3]** | | | | **100.0%** | **100.0%** |
| **Net Proceeds Available for Parent** | | | | **11** | **12** |
| 23.)  Payment to Parent | NA | NA | NA | 11 | 12 |

*(1) Liquidation Analysis reflects books and records as of 2/28/21. Cash balance is rolled forward through liquidation period.*
*(2) Reflects book value of receivables which includes straight line rent.  Straight line rent has $0 recovery.*
*(3) The analysis reflects the Debtors best estimate on General Unsecured claims using their February 2021 books and records net of eliminations.*

CBL & Associates Properties, Inc.
CBL - Fayette Plaza CMBS, LLC - Ch. 7 Liquidation Analysis
$ in Millions

| | | | | | De - Consolidated | |
|---|---|---|---|---|---|---|
| **30) Fayette Plaza CMBS, LLC** | **Net Book Value [1]** | **Recovery %** | | | **Recovery $** | |
| | | **Low** | **High** | | **Low** | **High** |
| **I. Assets** | | | | | | |
| **Liquidation Value of Real Estate Assets** | | | | | | |
| 1.) Land, Building & Improvements (Net) | 27 | 41.0% | 45.8% | | 11 | 12 |
| 2.) Subtotal | 27 | 41.0% | 45.8% | | 11 | 12 |
| **Liquidation Value of All Other Assets** | | | | | | |
| 3.) Developments in Progress | 1 | 60.0% | 70.0% | | 1 | 1 |
| 4.) Dividends from Subsidiaries | 0-0 | NA | NA | | - | - |
| 5.) Cash and Cash Equivalents [1] | 1 | 100.0% | 100.0% | | 1 | 1 |
| 6.) Tenant Receivables [2] | 0 | 37.0% | 42.0% | | 0 | 0 |
| 7.) Outstanding Receivables | - | 40.0% | 50.0% | | - | - |
| 8.) Mortgage and Other Notes Receivable (Mortgage Escrow) | - | 85.0% | 90.0% | | - | - |
| 9.) Investments in Unconsolidated Affiliates | - | 0.0% | 1.5% | | - | - |
| 10.) Recovery on Intercompany Claims | 0-0 | NA | NA | | - | - |
| 11.) Intangible Lease Assets and Other assets | 0 | 2.5% | 5.0% | | 0 | 0 |
| 12.) Litigation & Preference/Avoidance Actions | - | N/A | N/A | | - | - |
| 13.) Subtotal | 2 | 74.3% | 79.1% | | 1 | 2 |
| **Total Estimated Proceeds from Liquidation of Assets** | | | | | **13** | **14** |
| **II. Admin / Wind Down Expenses** | | | | | | |
| 14.) Subtotal | | | | | 2 | 2 |
| **Net Proceeds Available for Secured Claims** | | | | | **11** | **12** |
| **III. Liabilities** | | | | | | |
| **Liquidation Value of Secured Liabilities** | | | | | | |
| 15.) Subtotal | NA | NA | NA | | NA | NA |
| **Net Proceeds Available for Unsecured Claims** | | | | | **11** | **12** |
| **Liquidation Value of Unsecured Liabilities** | | | | | | |
| 16.) Senior Unsecured Notes | - | NA | NA | | - | - |
| 17.) First Lien Credit Facility Deficiency Claim | - | NA | NA | | - | - |
| 18.) Property Specific Non-CMBS Properties Guarantee | 0-0 | NA | NA | | - | - |
| 19.) CMBS Properties Guarantee | 0-0 | NA | NA | | - | - |
| 20.) Accounts Payable and Accrued Liabilities | 0 | 100.0% | 100.0% | | 0 | 0 |
| 21.) Intercompany | - | NA | NA | | - | - |
| 22.) Subtotal | 0 | | | | 0 | 0 |
| **IV. Unsecured Recovery [3]** | | | | | **100.0%** | **100.0%** |
| **Net Proceeds Available for Parent** | | | | | **11** | **12** |
| 23.) Payment to Parent | NA | NA | NA | | 11 | 12 |

*(1) Liquidation Analysis reflects books and records as of 2/28/21. Cash balance is rolled forward through liquidation period.*
*(2) Reflects book value of receivables which includes straight line rent. Straight line rent has $0 recovery.*
*(3) The analysis reflects the Debtors best estimate on General Unsecured claims using their February 2021 books and records net of eliminations.*

CBL & Associates Properties, Inc.
CBL - Madison Joint Venture, LLC - Ch. 7 Liquidation Analysis
$ in Millions

| | Net Book Value [1] | Recovery % | | Recovery $ | |
|---|---|---|---|---|---|
| **31) Madison Joint Venture, LLC** | | Low | High | Low | High |
| | | | | | |
| **I. Assets** | | | | | |
| **Liquidation Value of Real Estate Assets** | | | | | |
| 1.)  Land, Building & Improvements (Net) | 6 | 205.9% | 230.1% | 13 | 15 |
| 2.)        Subtotal | 6 | 205.9% | 230.1% | 13 | 15 |
| **Liquidation Value of All Other Assets** | | | | | |
| 3.)  Developments in Progress | - | 60.0% | 70.0% | - | - |
| 4.)  Dividends from Subsidiaries | 0-0 | NA | NA | - | - |
| 5.)  Cash and Cash Equivalents [1] | 1 | 100.0% | 100.0% | 1 | 1 |
| 6.)  Tenant Receivables [2] | 0 | 37.0% | 42.0% | 0 | 0 |
| 7.)  Outstanding Receivables | - | 40.0% | 50.0% | - | - |
| 8.)  Mortgage and Other Notes Receivable (Mortgage Escrow) | - | 85.0% | 90.0% | - | - |
| 9.)  Investments in Unconsolidated Affiliates | - | 0.0% | 1.5% | - | - |
| 10.) Recovery on Intercompany Claims | 0-0 | NA | NA | - | - |
| 11.) Intangible Lease Assets and Other assets | 0 | 2.5% | 5.0% | 0 | 0 |
| 12.) Litigation & Preference/Avoidance Actions | - | N/A | N/A | - | - |
| 13.)        Subtotal | 2 | 79.3% | 80.6% | 1 | 1 |
| **Total Estimated Proceeds from Liquidation of Assets** | | | | 15 | 16 |
| **II. Admin / Wind Down Expenses** | | | | | |
| 14.)        Subtotal | | | | 2 | 2 |
| **Net Proceeds Available for Secured Claims** | | | | 12 | 14 |
| **III. Liabilities** | | | | | |
| **Liquidation Value of Secured Liabilities** | | | | | |
| 15.)        Subtotal | NA | NA | NA | NA | NA |
| **Net Proceeds Available for Unsecured Claims** | | | | 12 | 14 |
| **Liquidation Value of Unsecured Liabilities** | | | | | |
| 16.) Senior Unsecured Notes | - | NA | NA | - | - |
| 17.) First Lien Credit Facility Deficiency Claim | | NA | NA | - | - |
| 18.) Property Specific Non-CMBS Properties Guarantee | 0-0 | NA | NA | - | - |
| 19.) CMBS Properties Guarantee | 0-0 | NA | NA | - | - |
| 20.) Accounts Payable and Accrued Liabilities | - | NA | NA | - | - |
| 21.) Intercompany | - | NA | NA | - | - |
| 22.)        Subtotal | - | | | - | - |
| **IV. Unsecured Recovery [3]** | | | | **NA** | **NA** |
| **Net Proceeds Available for Parent** | | | | 12 | 14 |
| | | | | | |
| 23.) Payment to Parent | NA | NA | NA | 12 | 14 |

*(1) Liquidation Analysis reflects books and records as of 2/28/21. Cash balance is rolled forward through liquidation period.*
*(2) Reflects book value of receivables which includes straight line rent.  Straight line rent has $0 recovery.*
*(3) The analysis reflects the Debtors best estimate on General Unsecured claims using their February 2021 books and records net of eliminations.*

CBL & Associates Properties, Inc.
CBL - Shoppes at St. Clair CMBS, LLC - Ch. 7 Liquidation Analysis
$ in Millions

| | Net Book Value [1] | Recovery % | | De - Consolidated Recovery $ | |
|---|---|---|---|---|---|
| **32) Shoppes at St. Clair CMBS, LLC** | | Low | High | Low | High |
| **I. Assets** | | | | | |
| **Liquidation Value of Real Estate Assets** | | | | | |
| 1.)  Land, Building & Improvements (Net) | 16 | 60.0% | 67.1% | 10 | 11 |
| 2.)      Subtotal | 16 | 60.0% | 67.1% | 10 | 11 |
| **Liquidation Value of All Other Assets** | | | | | |
| 3.)  Developments in Progress | - | 60.0% | 70.0% | - | - |
| 4.)  Dividends from Subsidiaries | 0-0 | NA | NA | - | - |
| 5.)  Cash and Cash Equivalents [1] | 1 | 100.0% | 100.0% | 1 | 1 |
| 6.)  Tenant Receivables [2] | 1 | 37.0% | 42.0% | 0 | 0 |
| 7.)  Outstanding Receivables | 0 | 40.0% | 50.0% | 0 | 0 |
| 8.)  Mortgage and Other Notes Receivable (Mortgage Escrow) | - | 85.0% | 90.0% | - | - |
| 9.)  Investments in Unconsolidated Affiliates | - | 0.0% | 1.5% | - | - |
| 10.) Recovery on Intercompany Claims | 0-0 | NA | NA | - | - |
| 11.) Intangible Lease Assets and Other assets | 0 | 2.5% | 5.0% | 0 | 0 |
| 12.) Litigation & Preference/Avoidance Actions | - | N/A | N/A | - | - |
| 13.)     Subtotal | 1 | 67.7% | 70.0% | 1 | 1 |
| **Total Estimated Proceeds from Liquidation of Assets** | | | | **11** | **12** |
| **II. Admin / Wind Down Expenses** | | | | | |
| 14.)     Subtotal | | | | 2 | 2 |
| **Net Proceeds Available for Secured Claims** | | | | **9** | **10** |
| **III. Liabilities** | | | | | |
| **Liquidation Value of Secured Liabilities** | | | | | |
| 15.)     Subtotal | NA | NA | NA | NA | NA |
| **Net Proceeds Available for Unsecured Claims** | | | | **9** | **10** |
| **Liquidation Value of Unsecured Liabilities** | | | | | |
| 16.) Senior Unsecured Notes | - | NA | NA | - | - |
| 17.) First Lien Credit Facility Deficiency Claim | - | NA | NA | - | - |
| 18.) Property Specific Non-CMBS Properties Guarantee | 0-0 | NA | NA | - | - |
| 19.) CMBS Properties Guarantee | 0-0 | NA | NA | - | - |
| 20.) Accounts Payable and Accrued Liabilities | 0 | 100.0% | 100.0% | 0 | 0 |
| 21.) Intercompany | - | NA | NA | - | - |
| 22.)     Subtotal | 0 | | | 0 | 0 |
| **IV. Unsecured Recovery [3]** | | | | **100.0%** | **100.0%** |
| **Net Proceeds Available for Parent** | | | | **9** | **10** |
| 23.) Payment to Parent | NA | NA | NA | 9 | 10 |

*(1) Liquidation Analysis reflects books and records as of 2/28/21. Cash balance is rolled forward through liquidation period.*
*(2) Reflects book value of receivables which includes straight line rent.  Straight line rent has $0 recovery.*
*(3) The analysis reflects the Debtors best estimate on General Unsecured claims using their February 2021 books and records net of eliminations.*

| | | | | De - Consolidated | |
|---|---|---|---|---|---|
| **33)  Cross Creek Anchor S, LP** | Net Book Value [1] | Recovery % | | Recovery $ | |
| | | Low | High | Low | High |
| **I. Assets** | | | | | |
| **Liquidation Value of Real Estate Assets** | | | | | |
| 1.)   Land, Building & Improvements (Net) | 9 | 0.0% | 0.0% | - | - |
| 2.)   **Subtotal** | 9 | 0.0% | 0.0% | - | - |
| **Liquidation Value of All Other Assets** | | | | | |
| 3.)   Developments in Progress | 7 | 60.0% | 70.0% | 4 | 5 |
| 4.)   Dividends from Subsidiaries | 0-0 | NA | NA | - | - |
| 5.)   Cash and Cash Equivalents [1] | 3 | 100.0% | 100.0% | 3 | 3 |
| 6.)   Tenant Receivables [2] | 0 | 37.0% | 42.0% | 0 | 0 |
| 7.)   Outstanding Receivables | - | 40.0% | 50.0% | - | - |
| 8.)   Mortgage and Other Notes Receivable (Mortgage Escrow) | - | 85.0% | 90.0% | - | - |
| 9.)   Investments in Unconsolidated Affiliates | - | 0.0% | 1.5% | - | - |
| 10.)  Recovery on Intercompany Claims | 0-0 | NA | NA | - | - |
| 11.)  Intangible Lease Assets and Other assets | 0 | 2.5% | 5.0% | 0 | 0 |
| 12.)  Litigation & Preference/Avoidance Actions | - | N/A | N/A | - | - |
| 13.)  **Subtotal** | 11 | 72.1% | 79.0% | 8 | 8 |
| **Total Estimated Proceeds from Liquidation of Assets** | | | | **8** | **8** |
| **II. Admin / Wind Down Expenses** | | | | | |
| 14.)  **Subtotal** | | | | 1 | 1 |
| **Net Proceeds Available for Secured Claims** | | | | **7** | **8** |
| **III. Liabilities** | | | | | |
| **Liquidation Value of Secured Liabilities** | | | | | |
| 15.)  **Subtotal** | NA | NA | NA | NA | NA |
| **Net Proceeds Available for Unsecured Claims** | | | | **7** | **8** |
| **Liquidation Value of Unsecured Liabilities** | | | | | |
| 16.)  Senior Unsecured Notes | - | NA | NA | - | - |
| 17.)  First Lien Credit Facility Deficiency Claim | - | NA | NA | - | - |
| 18.)  Property Specific Non-CMBS Properties Guarantee | 0-0 | NA | NA | - | - |
| 19.)  CMBS Properties Guarantee | 0-0 | NA | NA | - | - |
| 20.)  Accounts Payable and Accrued Liabilities | 1 | 100.0% | 100.0% | 1 | 1 |
| 21.)  Intercompany | - | NA | NA | - | - |
| 22.)  **Subtotal** | 1 | | | 1 | 1 |
| **IV. Unsecured Recovery [3]** | | | | **100.0%** | **100.0%** |
| **Net Proceeds Available for Parent** | | | | **6** | **7** |
| 23.)  Payment to Parent | NA | NA | NA | 6 | 7 |

*(1) Liquidation Analysis reflects books and records as of 2/28/21. Cash balance is rolled forward through liquidation period.*
*(2) Reflects book value of receivables which includes straight line rent.  Straight line rent has $0 recovery.*
*(3) The analysis reflects the Debtors best estimate on General Unsecured claims using their February 2021 books and records net of eliminations.*

CBL & Associates Properties, Inc.
CBL - Coolsprings Crossing Limited Partnership - Ch. 7 Liquidation Analysis
$ in Millions

| | Net Book Value [1] | Recovery % | | Recovery $ | |
|---|---|---|---|---|---|
| **34) Coolsprings Crossing Limited Partnership** | | Low | High | Low | High |
| | | | | | |
| **I. Assets** | | | | | |
| **Liquidation Value of Real Estate Assets** | | | | | |
| 1.) Land, Building & Improvements (Net) | 8 | 137.3% | 153.4% | 11 | 13 |
| 2.) Subtotal | 8 | 137.3% | 153.4% | 11 | 13 |
| **Liquidation Value of All Other Assets** | | | | | |
| 3.) Developments in Progress | - | 60.0% | 70.0% | - | - |
| 4.) Dividends from Subsidiaries | 0-0 | NA | NA | - | - |
| 5.) Cash and Cash Equivalents [1] | 0 | 100.0% | 100.0% | 0 | 0 |
| 6.) Tenant Receivables [2] | 0 | 37.0% | 42.0% | 0 | 0 |
| 7.) Outstanding Receivables | - | 40.0% | 50.0% | - | - |
| 8.) Mortgage and Other Notes Receivable (Mortgage Escrow) | - | 85.0% | 90.0% | - | - |
| 9.) Investments in Unconsolidated Affiliates | - | 0.0% | 1.5% | - | - |
| 10.) Recovery on Intercompany Claims | 0-0 | NA | NA | - | - |
| 11.) Intangible Lease Assets and Other assets | 0 | 2.5% | 5.0% | 0 | 0 |
| 12.) Litigation & Preference/Avoidance Actions | - | N/A | N/A | - | - |
| 13.) Subtotal | 1 | 53.7% | 56.8% | 0 | 0 |
| **Total Estimated Proceeds from Liquidation of Assets** | | | | 12 | 13 |
| **II. Admin / Wind Down Expenses** | | | | | |
| 14.) Subtotal | | | | 2 | 2 |
| **Net Proceeds Available for Secured Claims** | | | | 10 | 11 |
| **III. Liabilities** | | | | | |
| **Liquidation Value of Secured Liabilities** | | | | | |
| 15.) Subtotal | NA | NA | NA | NA | NA |
| **Net Proceeds Available for Unsecured Claims** | | | | 10 | 11 |
| **Liquidation Value of Unsecured Liabilities** | | | | | |
| 16.) Senior Unsecured Notes | - | NA | NA | - | - |
| 17.) First Lien Credit Facility Deficiency Claim | - | NA | NA | - | - |
| 18.) Property Specific Non-CMBS Properties Guarantee | 0-0 | NA | NA | - | - |
| 19.) CMBS Properties Guarantee | 0-0 | NA | NA | - | - |
| 20.) Accounts Payable and Accrued Liabilities | 0 | 100.0% | 100.0% | 0 | 0 |
| 21.) Intercompany | - | NA | NA | - | - |
| 22.) Subtotal | 0 | | | 0 | 0 |
| **IV. Unsecured Recovery [3]** | | | | 100.0% | 100.0% |
| **Net Proceeds Available for Parent** | | | | 10 | 11 |
| | | | | | |
| 23.) Payment to Parent | NA | NA | NA | 10 | 11 |

De - Consolidated

*(1) Liquidation Analysis reflects books and records as of 2/28/21. Cash balance is rolled forward through liquidation period.*
*(2) Reflects book value of receivables which includes straight line rent.  Straight line rent has $0 recovery.*
*(3) The analysis reflects the Debtors best estimate on General Unsecured claims using their February 2021 books and records net of eliminations.*

| **35) York Galleria Limited Partnership** | Net Book Value [1] | Recovery % | | De - Consolidated Recovery $ | |
|---|---|---|---|---|---|
| | | Low | High | Low | High |
| **I. Assets** | | | | | |
| **Liquidation Value of Real Estate Assets** | | | | | |
| 1.) Land, Building & Improvements (Net) | 45 | 15.1% | 16.9% | 7 | 8 |
| 2.) Subtotal | 45 | 15.1% | 16.9% | 7 | 8 |
| **Liquidation Value of All Other Assets** | | | | | |
| 3.) Developments in Progress | 2 | 60.0% | 70.0% | 1 | 1 |
| 4.) Dividends from Subsidiaries | 0-0 | NA | NA | - | - |
| 5.) Cash and Cash Equivalents [1] | 0 | 100.0% | 100.0% | 0 | 0 |
| 6.) Tenant Receivables [2] | 1 | 37.0% | 42.0% | 0 | 1 |
| 7.) Outstanding Receivables | 0 | 40.0% | 50.0% | 0 | 0 |
| 8.) Mortgage and Other Notes Receivable (Mortgage Escrow) | - | 85.0% | 90.0% | - | - |
| 9.) Investments in Unconsolidated Affiliates | - | 0.0% | 1.5% | - | - |
| 10.) Recovery on Intercompany Claims | 0-0 | NA | NA | - | - |
| 11.) Intangible Lease Assets and Other assets | 1 | 2.5% | 5.0% | 0 | 0 |
| 12.) Litigation & Preference/Avoidance Actions | - | N/A | N/A | - | - |
| 13.) Subtotal | 4 | 43.7% | 50.9% | 2 | 2 |
| Total Estimated Proceeds from Liquidation of Assets | | | | 9 | 10 |
| **II. Admin / Wind Down Expenses** | | | | | |
| 14.) Subtotal | | | | 2 | 2 |
| Net Proceeds Available for Secured Claims | | | | 6 | 8 |
| **III. Liabilities** | | | | | |
| **Liquidation Value of Secured Liabilities** | | | | | |
| 15.) Subtotal | NA | NA | NA | NA | NA |
| Net Proceeds Available for Unsecured Claims | | | | 6 | 8 |
| **Liquidation Value of Unsecured Liabilities** | | | | | |
| 16.) Senior Unsecured Notes | - | NA | NA | - | - |
| 17.) First Lien Credit Facility Deficiency Claim | - | NA | NA | - | - |
| 18.) Property Specific Non-CMBS Properties Guarantee | 0-0 | NA | NA | - | - |
| 19.) CMBS Properties Guarantee | 0-0 | NA | NA | - | - |
| 20.) Accounts Payable and Accrued Liabilities | - | NA | NA | - | - |
| 21.) Intercompany | - | NA | NA | - | - |
| 22.) Subtotal | - | | | - | - |
| **IV. Unsecured Recovery [3]** | | | | NA | NA |
| Net Proceeds Available for Parent | | | | 6 | 8 |
| 23.) Payment to Parent | NA | NA | NA | 6 | 8 |

*(1) Liquidation Analysis reflects books and records as of 2/28/21. Cash balance is rolled forward through liquidation period.*
*(2) Reflects book value of receivables which includes straight line rent. Straight line rent has $0 recovery.*
*(3) The analysis reflects the Debtors best estimate on General Unsecured claims using their February 2021 books and records net of eliminations.*

CBL & Associates Properties, Inc.
CBL - Meridian Mall Limited Partnership - Ch. 7 Liquidation Analysis
$ in Millions

| | Net Book Value [1] | Recovery % | | De - Consolidated Recovery $ | |
|---|---|---|---|---|---|
| **36) Meridian Mall Limited Partnership** | | Low | High | Low | High |
| **I. Assets** | | | | | |
| Liquidation Value of Real Estate Assets | | | | | |
| 1.) Land, Building & Improvements (Net) | 78 | 12.0% | 13.4% | 9 | 10 |
| 2.) Subtotal | 78 | 12.0% | 13.4% | 9 | 10 |
| Liquidation Value of All Other Assets | | | | | |
| 3.) Developments in Progress | 0 | 60.0% | 70.0% | 0 | 0 |
| 4.) Dividends from Subsidiaries | 0-0 | NA | NA | - | - |
| 5.) Cash and Cash Equivalents [1] | 0 | 100.0% | 100.0% | 0 | 0 |
| 6.) Tenant Receivables [2] | 2 | 37.0% | 42.0% | 1 | 1 |
| 7.) Outstanding Receivables | 0 | 40.0% | 50.0% | 0 | 0 |
| 8.) Mortgage and Other Notes Receivable (Mortgage Escrow) | - | 85.0% | 90.0% | - | - |
| 9.) Investments in Unconsolidated Affiliates | - | 0.0% | 1.5% | - | - |
| 10.) Recovery on Intercompany Claims | 0-0 | NA | NA | - | - |
| 11.) Intangible Lease Assets and Other assets | 1 | 2.5% | 5.0% | 0 | 0 |
| 12.) Litigation & Preference/Avoidance Actions | - | N/A | N/A | - | - |
| 13.) Subtotal | 3 | 33.0% | 37.8% | 1 | 1 |
| Total Estimated Proceeds from Liquidation of Assets | | | | 10 | 11 |
| **II. Admin / Wind Down Expenses** | | | | | |
| 14.) Subtotal | | | | 3 | 3 |
| Net Proceeds Available for Secured Claims | | | | 8 | 9 |
| **III. Liabilities** | | | | | |
| Liquidation Value of Secured Liabilities | | | | | |
| 15.) Subtotal | NA | NA | NA | NA | NA |
| Net Proceeds Available for Unsecured Claims | | | | 8 | 9 |
| Liquidation Value of Unsecured Liabilities | | | | | |
| 16.) Senior Unsecured Notes | - | NA | NA | - | - |
| 17.) First Lien Credit Facility Deficiency Claim | - | NA | NA | - | - |
| 18.) Property Specific Non-CMBS Properties Guarantee | 0-0 | NA | NA | - | - |
| 19.) CMBS Properties Guarantee | 0-0 | NA | NA | - | - |
| 20.) Accounts Payable and Accrued Liabilities | 0 | 100.0% | 100.0% | 0 | 0 |
| 21.) Intercompany | - | NA | NA | - | - |
| 22.) Subtotal | 0 | | | 0 | 0 |
| **IV. Unsecured Recovery [3]** | | | | 100.0% | 100.0% |
| Net Proceeds Available for Parent | | | | 7 | 9 |
| 23.) Payment to Parent | NA | NA | NA | 7 | 9 |

*(1) Liquidation Analysis reflects books and records as of 2/28/21. Cash balance is rolled forward through liquidation period.*
*(2) Reflects book value of receivables which includes straight line rent.  Straight line rent has $0 recovery.*
*(3) The analysis reflects the Debtors best estimate on General Unsecured claims using their February 2021 books and records net of eliminations.*

CBL & Associates Properties, Inc.
CBL - CBL/Monroeville Partner, L.P. - Ch. 7 Liquidation Analysis
$ in Millions

| 37)  CBL/Monroeville Partner, L.P. | Net Book Value [1] | Recovery % | | De - Consolidated Recovery $ | |
|---|---|---|---|---|---|
| | | Low | High | Low | High |
| **I. Assets** | | | | | |
| **Liquidation Value of Real Estate Assets** | | | | | |
| 1.)   Land, Building & Improvements (Net) | 49 | 19.8% | 22.1% | 10 | 11 |
| 2.)   **Subtotal** | 49 | 19.8% | 22.1% | 10 | 11 |
| **Liquidation Value of All Other Assets** | | | | | |
| 3.)   Developments in Progress | 0 | 60.0% | 70.0% | 0 | 0 |
| 4.)   Dividends from Subsidiaries | 0-0 | NA | NA | - | - |
| 5.)   Cash and Cash Equivalents [1] | 2 | 100.0% | 100.0% | 2 | 2 |
| 6.)   Tenant Receivables [2] | 2 | 37.0% | 42.0% | 1 | 1 |
| 7.)   Outstanding Receivables | 0 | 40.0% | 50.0% | 0 | 0 |
| 8.)   Mortgage and Other Notes Receivable (Mortgage Escrow) | - | 85.0% | 90.0% | - | - |
| 9.)   Investments in Unconsolidated Affiliates | - | 0.0% | 1.5% | - | - |
| 10.)  Recovery on Intercompany Claims | 0-0 | NA | NA | - | - |
| 11.)  Intangible Lease Assets and Other assets | 1 | 2.5% | 5.0% | 0 | 0 |
| 12.)  Litigation & Preference/Avoidance Actions | - | N/A | N/A | - | - |
| 13.)  **Subtotal** | 4 | 56.4% | 59.1% | 2 | 2 |
| **Total Estimated Proceeds from Liquidation of Assets** | | | | **12** | **13** |
| **II. Admin / Wind Down Expenses** | | | | | |
| 14.)  **Subtotal** | | | | 3 | 3 |
| **Net Proceeds Available for Secured Claims** | | | | **9** | **10** |
| **III. Liabilities** | | | | | |
| **Liquidation Value of Secured Liabilities** | | | | | |
| 15.)  **Subtotal** | NA | NA | NA | NA | NA |
| **Net Proceeds Available for Unsecured Claims** | | | | **9** | **10** |
| **Liquidation Value of Unsecured Liabilities** | | | | | |
| 16.)  Senior Unsecured Notes | - | NA | NA | - | - |
| 17.)  First Lien Credit Facility Deficiency Claim | - | NA | NA | - | - |
| 18.)  Property Specific Non-CMBS Properties Guarantee | 0-0 | NA | NA | - | - |
| 19.)  CMBS Properties Guarantee | 0-0 | NA | NA | - | - |
| 20.)  Accounts Payable and Accrued Liabilities | 0 | 100.0% | 100.0% | 0 | 0 |
| 21.)  Intercompany | - | NA | NA | - | - |
| 22.)  **Subtotal** | 0 | | | 0 | 0 |
| **IV. Unsecured Recovery [3]** | | | | **100.0%** | **100.0%** |
| **Net Proceeds Available for Parent** | | | | **8** | **10** |
| 23.)  Payment to Parent | NA | NA | NA | 8 | 10 |

*(1) Liquidation Analysis reflects books and records as of 2/28/21. Cash balance is rolled forward through liquidation period.*
*(2) Reflects book value of receivables which includes straight line rent.  Straight line rent has $0 recovery.*
*(3) The analysis reflects the Debtors best estimate on General Unsecured claims using their February 2021 books and records net of eliminations.*

CBL & Associates Properties, Inc.
CBL - Gunbarrel Commons, LLC - Ch. 7 Liquidation Analysis
$ in Millions

| | | | | De - Consolidated | |
|---|---|---|---|---|---|
| **38) Gunbarrel Commons, LLC** | **Net Book Value [1]** | **Recovery %** | | **Recovery $** | |
| | | **Low** | **High** | **Low** | **High** |
| **I. Assets** | | | | | |
| **Liquidation Value of Real Estate Assets** | | | | | |
| 1.) Land, Building & Improvements (Net) | 11 | 113.1% | 126.4% | 13 | 14 |
| 2.) Subtotal | 11 | 113.1% | 126.4% | 13 | 14 |
| **Liquidation Value of All Other Assets** | | | | | |
| 3.) Developments in Progress | - | 60.0% | 70.0% | - | - |
| 4.) Dividends from Subsidiaries | 0-0 | NA | NA | - | - |
| 5.) Cash and Cash Equivalents [1] | 1 | 100.0% | 100.0% | 1 | 1 |
| 6.) Tenant Receivables [2] | 0 | 37.0% | 42.0% | 0 | 0 |
| 7.) Outstanding Receivables | - | 40.0% | 50.0% | - | - |
| 8.) Mortgage and Other Notes Receivable (Mortgage Escrow) | - | 85.0% | 90.0% | - | - |
| 9.) Investments in Unconsolidated Affiliates | - | 0.0% | 1.5% | - | - |
| 10.) Recovery on Intercompany Claims | 0-0 | NA | NA | - | - |
| 11.) Intangible Lease Assets and Other assets | 0 | 2.5% | 5.0% | 0 | 0 |
| 12.) Litigation & Preference/Avoidance Actions | - | N/A | N/A | - | - |
| 13.) Subtotal | 1 | 85.3% | 86.2% | 1 | 1 |
| **Total Estimated Proceeds from Liquidation of Assets** | | | | **14** | **15** |
| **II. Admin / Wind Down Expenses** | | | | | |
| 14.) Subtotal | | | | 2 | 2 |
| **Net Proceeds Available for Secured Claims** | | | | **12** | **13** |
| **III. Liabilities** | | | | | |
| **Liquidation Value of Secured Liabilities** | | | | | |
| 15.) Subtotal | NA | NA | NA | NA | NA |
| **Net Proceeds Available for Unsecured Claims** | | | | **12** | **13** |
| **Liquidation Value of Unsecured Liabilities** | | | | | |
| 16.) Senior Unsecured Notes | - | NA | NA | - | - |
| 17.) First Lien Credit Facility Deficiency Claim | - | NA | NA | - | - |
| 18.) Property Specific Non-CMBS Properties Guarantee | 0-0 | NA | NA | - | - |
| 19.) CMBS Properties Guarantee | 0-0 | NA | NA | - | - |
| 20.) Accounts Payable and Accrued Liabilities | 0 | 100.0% | 100.0% | 0 | 0 |
| 21.) Intercompany | - | NA | NA | - | - |
| 22.) Subtotal | 0 | | | 0 | 0 |
| **IV. Unsecured Recovery [3]** | | | | **100.0%** | **100.0%** |
| **Net Proceeds Available for Parent** | | | | **12** | **13** |
| 23.) Payment to Parent | NA | NA | NA | 12 | 13 |

*(1) Liquidation Analysis reflects books and records as of 2/28/21. Cash balance is rolled forward through liquidation period.*
*(2) Reflects book value of receivables which includes straight line rent. Straight line rent has $0 recovery.*
*(3) The analysis reflects the Debtors best estimate on General Unsecured claims using their February 2021 books and records net of eliminations.*

CBL & Associates Properties, Inc.
CBL - Laurel Park Retail Properties LLC - Ch. 7 Liquidation Analysis
$ in Millions

| | | | | De - Consolidated | |
|---|---|---|---|---|---|
| **39) Laurel Park Retail Properties LLC** | **Net Book Value [1]** | **Recovery %** | | **Recovery $** | |
| | | **Low** | **High** | **Low** | **High** |
| **I. Assets** | | | | | |
| Liquidation Value of Real Estate Assets | | | | | |
| 1.) Land, Building & Improvements (Net) | 24 | 24.1% | 26.9% | 6 | 7 |
| 2.) Subtotal | 24 | 24.1% | 26.9% | 6 | 7 |
| Liquidation Value of All Other Assets | | | | | |
| 3.) Developments in Progress | - | 60.0% | 70.0% | - | - |
| 4.) Dividends from Subsidiaries | 0-0 | NA | NA | - | - |
| 5.) Cash and Cash Equivalents [1] | 0 | 100.0% | 100.0% | 0 | 0 |
| 6.) Tenant Receivables [2] | 1 | 37.0% | 42.0% | 0 | 0 |
| 7.) Outstanding Receivables | 0 | 40.0% | 50.0% | 0 | 0 |
| 8.) Mortgage and Other Notes Receivable (Mortgage Escrow) | - | 85.0% | 90.0% | - | - |
| 9.) Investments in Unconsolidated Affiliates | - | 0.0% | 1.5% | - | - |
| 10.) Recovery on Intercompany Claims | 0-0 | NA | NA | - | - |
| 11.) Intangible Lease Assets and Other assets | 1 | 2.5% | 5.0% | 0 | 0 |
| 12.) Litigation & Preference/Avoidance Actions | - | N/A | N/A | - | - |
| 13.) Subtotal | 2 | 32.4% | 36.1% | 1 | 1 |
| **Total Estimated Proceeds from Liquidation of Assets** | | | | **7** | **7** |
| **II. Admin / Wind Down Expenses** | | | | | |
| 14.) Subtotal | | | | 1 | 2 |
| **Net Proceeds Available for Secured Claims** | | | | **5** | **6** |
| **III. Liabilities** | | | | | |
| Liquidation Value of Secured Liabilities | | | | | |
| 15.) Subtotal | NA | NA | NA | NA | NA |
| **Net Proceeds Available for Unsecured Claims** | | | | **5** | **6** |
| Liquidation Value of Unsecured Liabilities | | | | | |
| 16.) Senior Unsecured Notes | - | NA | NA | - | - |
| 17.) First Lien Credit Facility Deficiency Claim | | NA | NA | - | - |
| 18.) Property Specific Non-CMBS Properties Guarantee | 0-0 | NA | NA | - | - |
| 19.) CMBS Properties Guarantee | 0-0 | NA | NA | - | - |
| 20.) Accounts Payable and Accrued Liabilities | - | NA | NA | - | - |
| 21.) Intercompany | - | NA | NA | - | - |
| 22.) Subtotal | - | | | - | - |
| **IV. Unsecured Recovery [3]** | | | | **NA** | **NA** |
| **Net Proceeds Available for Parent** | | | | **5** | **6** |
| 23.) Payment to Parent | NA | NA | NA | 5 | 6 |

*(1) Liquidation Analysis reflects books and records as of 2/28/21. Cash balance is rolled forward through liquidation period.*
*(2) Reflects book value of receivables which includes straight line rent.  Straight line rent has $0 recovery.*
*(3) The analysis reflects the Debtors best estimate on General Unsecured claims using their February 2021 books and records net of eliminations.*

CBL & Associates Properties, Inc.
CBL - CBL/Sunrise Commons, L.P. - Ch. 7 Liquidation Analysis
$ in Millions

|  | Net Book Value [1] | Recovery % | | De - Consolidated Recovery $ | |
|---|---|---|---|---|---|
| **40) CBL/Sunrise Commons, L.P.** | | Low | High | Low | High |
| **I. Assets** | | | | | |
| **Liquidation Value of Real Estate Assets** | | | | | |
| 1.) Land, Building & Improvements (Net) | 6 | 131.5% | 147.0% | 8 | 8 |
| 2.) Subtotal | 6 | 131.5% | 147.0% | 8 | 8 |
| **Liquidation Value of All Other Assets** | | | | | |
| 3.) Developments in Progress | - | 60.0% | 70.0% | - | - |
| 4.) Dividends from Subsidiaries | 0-0 | NA | NA | - | - |
| 5.) Cash and Cash Equivalents [1] | 0 | 100.0% | 100.0% | 0 | 0 |
| 6.) Tenant Receivables [2] | 0 | 37.0% | 42.0% | 0 | 0 |
| 7.) Outstanding Receivables | - | 40.0% | 50.0% | - | - |
| 8.) Mortgage and Other Notes Receivable (Mortgage Escrow) | - | 85.0% | 90.0% | - | - |
| 9.) Investments in Unconsolidated Affiliates | - | 0.0% | 1.5% | - | - |
| 10.) Recovery on Intercompany Claims | 0-0 | NA | NA | - | - |
| 11.) Intangible Lease Assets and Other assets | 0 | 2.5% | 5.0% | 0 | 0 |
| 12.) Litigation & Preference/Avoidance Actions | - | N/A | N/A | - | - |
| 13.) Subtotal | 1 | 59.3% | 62.2% | 0 | 0 |
| **Total Estimated Proceeds from Liquidation of Assets** | | | | 8 | 9 |
| **II. Admin / Wind Down Expenses** | | | | | |
| 14.) Subtotal | | | | 1 | 1 |
| **Net Proceeds Available for Secured Claims** | | | | 7 | 8 |
| **III. Liabilities** | | | | | |
| **Liquidation Value of Secured Liabilities** | | | | | |
| 15.) Subtotal | NA | NA | NA | NA | NA |
| **Net Proceeds Available for Unsecured Claims** | | | | 7 | 8 |
| **Liquidation Value of Unsecured Liabilities** | | | | | |
| 16.) Senior Unsecured Notes | - | NA | NA | - | - |
| 17.) First Lien Credit Facility Deficiency Claim | - | NA | NA | - | - |
| 18.) Property Specific Non-CMBS Properties Guarantee | 0-0 | NA | NA | - | - |
| 19.) CMBS Properties Guarantee | 0-0 | NA | NA | - | - |
| 20.) Accounts Payable and Accrued Liabilities | 0 | 100.0% | 100.0% | 0 | 0 |
| 21.) Intercompany | - | NA | NA | - | - |
| 22.) Subtotal | 0 | | | 0 | 0 |
| **IV. Unsecured Recovery [3]** | | | | 100.0% | 100.0% |
| **Net Proceeds Available for Parent** | | | | 7 | 8 |
| 23.) Payment to Parent | NA | NA | NA | 7 | 8 |

*(1) Liquidation Analysis reflects books and records as of 2/28/21. Cash balance is rolled forward through liquidation period.*
*(2) Reflects book value of receivables which includes straight line rent.  Straight line rent has $0 recovery.*
*(3) The analysis reflects the Debtors best estimate on General Unsecured claims using their February 2021 books and records net of eliminations.*

CBL & Associates Properties, Inc.
CBL - Hamilton Place Anchor S, LLC - Ch. 7 Liquidation Analysis
$ in Millions

| | | | | De - Consolidated | |
|---|---|---|---|---|---|
| **41) Hamilton Place Anchor S, LLC** | **Net Book Value [1]** | **Recovery %** | | **Recovery $** | |
| | | **Low** | **High** | **Low** | **High** |
| **I. Assets** | | | | | |
| **Liquidation Value of Real Estate Assets** | | | | | |
| 1.) Land, Building & Improvements (Net) | 33 | 42.5% | 47.5% | 14 | 16 |
| 2.) Subtotal | 33 | 42.5% | 47.5% | 14 | 16 |
| **Liquidation Value of All Other Assets** | | | | | |
| 3.) Developments in Progress | - | 60.0% | 70.0% | - | - |
| 4.) Dividends from Subsidiaries | 0-0 | NA | NA | - | - |
| 5.) Cash and Cash Equivalents [1] | - | 100.0% | 100.0% | - | - |
| 6.) Tenant Receivables [2] | 0 | 37.0% | 42.0% | 0 | 0 |
| 7.) Outstanding Receivables | - | 40.0% | 50.0% | - | - |
| 8.) Mortgage and Other Notes Receivable (Mortgage Escrow) | - | 85.0% | 90.0% | - | - |
| 9.) Investments in Unconsolidated Affiliates | - | 0.0% | 1.5% | - | - |
| 10.) Recovery on Intercompany Claims | 0-0 | NA | NA | - | - |
| 11.) Intangible Lease Assets and Other assets | 1 | 2.5% | 5.0% | 0 | 0 |
| 12.) Litigation & Preference/Avoidance Actions | - | N/A | N/A | - | - |
| 13.) Subtotal | 1 | 6.1% | 8.8% | 0 | 0 |
| **Total Estimated Proceeds from Liquidation of Assets** | | | | 14 | 16 |
| **II. Admin / Wind Down Expenses** | | | | | |
| 14.) Subtotal | | | | 2 | 2 |
| **Net Proceeds Available for Secured Claims** | | | | 13 | 13 |
| **III. Liabilities** | | | | | |
| **Liquidation Value of Secured Liabilities** | | | | | |
| 15.) Subtotal | NA | NA | NA | NA | NA |
| **Net Proceeds Available for Unsecured Claims** | | | | 13 | 13 |
| **Liquidation Value of Unsecured Liabilities** | | | | | |
| 16.) Senior Unsecured Notes | - | NA | NA | - | - |
| 17.) First Lien Credit Facility Deficiency Claim | | NA | NA | - | - |
| 18.) Property Specific Non-CMBS Properties Guarantee | 0-0 | NA | NA | - | - |
| 19.) CMBS Properties Guarantee | 0-0 | NA | NA | - | - |
| 20.) Accounts Payable and Accrued Liabilities | - | NA | NA | - | - |
| 21.) Intercompany | - | NA | NA | - | - |
| 22.) Subtotal | - | | | - | - |
| **IV. Unsecured Recovery [3]** | | | | **NA** | **NA** |
| **Net Proceeds Available for Parent** | | | | 13 | 13 |
| 23.) Payment to Parent | NA | NA | NA | 13 | 13 |

*(1) Liquidation Analysis reflects books and records as of 2/28/21. Cash balance is rolled forward through liquidation period.*
*(2) Reflects book value of receivables which includes straight line rent.  Straight line rent has $0 recovery.*
*(3) The analysis reflects the Debtors best estimate on General Unsecured claims using their February 2021 books and records net of eliminations.*

CBL & Associates Properties, Inc.
CBL - Southpark Mall-DSG, LLC - Ch. 7 Liquidation Analysis
$ in Millions

| | | | | De - Consolidated | |
|---|---|---|---|---|---|
| **42) Southpark Mall-DSG, LLC** | **Net Book Value** [1] | **Recovery %** | | **Recovery $** | |
| | | **Low** | **High** | **Low** | **High** |
| **I. Assets** | | | | | |
| **Liquidation Value of Real Estate Assets** | | | | | |
| 1.)   Land, Building & Improvements (Net) | 8 | 93.2% | 104.1% | 8 | 9 |
| 2.)        Subtotal | 8 | 93.2% | 104.1% | 8 | 9 |
| **Liquidation Value of All Other Assets** | | | | | |
| 3.)   Developments in Progress | - | 60.0% | 70.0% | - | - |
| 4.)   Dividends from Subsidiaries | 0-0 | NA | NA | - | - |
| 5.)   Cash and Cash Equivalents [1] | 0 | 100.0% | 100.0% | 0 | 0 |
| 6.)   Tenant Receivables [2] | 0 | 37.0% | 42.0% | 0 | 0 |
| 7.)   Outstanding Receivables | - | 40.0% | 50.0% | - | - |
| 8.)   Mortgage and Other Notes Receivable (Mortgage Escrow) | - | 85.0% | 90.0% | - | - |
| 9.)   Investments in Unconsolidated Affiliates | - | 0.0% | 1.5% | - | - |
| 10.)   Recovery on Intercompany Claims | 0-0 | NA | NA | - | - |
| 11.)   Intangible Lease Assets and Other assets | 0 | 2.5% | 5.0% | 0 | 0 |
| 12.)   Litigation & Preference/Avoidance Actions | - | N/A | N/A | - | - |
| 13.)        Subtotal | 1 | 75.6% | 76.8% | 1 | 1 |
| **Total Estimated Proceeds from Liquidation of Assets** | | | | **8** | **9** |
| **II. Admin / Wind Down Expenses** | | | | | |
| 14.)        Subtotal | | | | 1 | 1 |
| **Net Proceeds Available for Secured Claims** | | | | **7** | **8** |
| **III. Liabilities** | | | | | |
| **Liquidation Value of Secured Liabilities** | | | | | |
| 15.)        Subtotal | NA | NA | NA | NA | NA |
| **Net Proceeds Available for Unsecured Claims** | | | | **7** | **8** |
| **Liquidation Value of Unsecured Liabilities** | | | | | |
| 16.)   Senior Unsecured Notes | - | NA | NA | - | - |
| 17.)   First Lien Credit Facility Deficiency Claim | - | NA | NA | - | - |
| 18.)   Property Specific Non-CMBS Properties Guarantee | 0-0 | NA | NA | - | - |
| 19.)   CMBS Properties Guarantee | 0-0 | NA | NA | - | - |
| 20.)   Accounts Payable and Accrued Liabilities | 0 | 100.0% | 100.0% | 0 | 0 |
| 21.)   Intercompany | - | NA | NA | - | - |
| 22.)        Subtotal | 0 | | | 0 | 0 |
| **IV. Unsecured Recovery** [3] | | | | **100.0%** | **100.0%** |
| **Net Proceeds Available for Parent** | | | | **7** | **8** |
| 23.)   Payment to Parent | NA | NA | NA | 7 | 8 |

*(1) Liquidation Analysis reflects books and records as of 2/28/21. Cash balance is rolled forward through liquidation period.*
*(2) Reflects book value of receivables which includes straight line rent.  Straight line rent has $0 recovery.*
*(3) The analysis reflects the Debtors best estimate on General Unsecured claims using their February 2021 books and records net of eliminations.*

CBL & Associates Properties, Inc.
CBL - Southaven Towne Center II, LLC - Ch. 7 Liquidation Analysis
$ in Millions

| | | | | De - Consolidated | |
|---|---|---|---|---|---|
| **43)  Southaven Towne Center II, LLC** | Net Book Value [(1)] | Recovery % | | Recovery $ | |
| | | Low | High | Low | High |
| **I. Assets** | | | | | |
| **Liquidation Value of Real Estate Assets** | | | | | |
| 1.)   Land, Building & Improvements (Net) | 25 | 43.0% | 48.1% | 11 | 12 |
| 2.)         Subtotal | 25 | 43.0% | 48.1% | 11 | 12 |
| **Liquidation Value of All Other Assets** | | | | | |
| 3.)   Developments in Progress | - | 60.0% | 70.0% | - | - |
| 4.)   Dividends from Subsidiaries | 0-0 | NA | NA | - | - |
| 5.)   Cash and Cash Equivalents [(1)] | 1 | 100.0% | 100.0% | 1 | 1 |
| 6.)   Tenant Receivables [(2)] | 1 | 37.0% | 42.0% | 0 | 0 |
| 7.)   Outstanding Receivables | 0 | 40.0% | 50.0% | 0 | 0 |
| 8.)   Mortgage and Other Notes Receivable (Mortgage Escrow) | - | 85.0% | 90.0% | - | - |
| 9.)   Investments in Unconsolidated Affiliates | - | 0.0% | 1.5% | - | - |
| 10.)  Recovery on Intercompany Claims | 0-0 | NA | NA | - | - |
| 11.)  Intangible Lease Assets and Other assets | 0 | 2.5% | 5.0% | 0 | 0 |
| 12.)  Litigation & Preference/Avoidance Actions | - | N/A | N/A | - | - |
| 13.)        Subtotal | 2 | 65.5% | 67.3% | 1 | 1 |
| **Total Estimated Proceeds from Liquidation of Assets** | | | | 12 | 13 |
| **II. Admin / Wind Down Expenses** | | | | | |
| 14.)        Subtotal | | | | 1 | 2 |
| **Net Proceeds Available for Secured Claims** | | | | 11 | 11 |
| **III. Liabilities** | | | | | |
| **Liquidation Value of Secured Liabilities** | | | | | |
| 15.)        Subtotal | NA | NA | NA | NA | NA |
| **Net Proceeds Available for Unsecured Claims** | | | | 11 | 11 |
| **Liquidation Value of Unsecured Liabilities** | | | | | |
| 16.)  Senior Unsecured Notes | - | NA | NA | - | - |
| 17.)  First Lien Credit Facility Deficiency Claim | - | NA | NA | - | - |
| 18.)  Property Specific Non-CMBS Properties Guarantee | 0-0 | NA | NA | - | - |
| 19.)  CMBS Properties Guarantee | 0-0 | NA | NA | - | - |
| 20.)  Accounts Payable and Accrued Liabilities | - | NA | NA | - | - |
| 21.)  Intercompany | - | NA | NA | - | - |
| 22.)        Subtotal | - | | | - | - |
| **IV. Unsecured Recovery [(3)]** | | | | **NA** | **NA** |
| **Net Proceeds Available for Parent** | | | | 11 | 11 |
| 23.)  Payment to Parent | NA | NA | NA | 11 | 11 |

*(1) Liquidation Analysis reflects books and records as of 2/28/21. Cash balance is rolled forward through liquidation period.*
*(2) Reflects book value of receivables which includes straight line rent.  Straight line rent has $0 recovery.*
*(3) The analysis reflects the Debtors best estimate on General Unsecured claims using their February 2021 books and records net of eliminations.*

CBL & Associates Properties, Inc.
CBL - Brookfield Square Parcel, LLC - Ch. 7 Liquidation Analysis
$ in Millions

| | | | | De - Consolidated | |
|---|---|---|---|---|---|
| **44)  Brookfield Square Parcel, LLC** | **Net Book Value** [(1)] | **Recovery %** | | **Recovery $** | |
| | | **Low** | **High** | **Low** | **High** |
| **I. Assets** | | | | | |
| Liquidation Value of Real Estate Assets | | | | | |
| 1.)   Land, Building & Improvements (Net) | 5 | 60.4% | 67.5% | 3 | 4 |
| 2.)         **Subtotal** | 5 | 60.4% | 67.5% | 3 | 4 |
| Liquidation Value of All Other Assets | | | | | |
| 3.)   Developments in Progress | - | 60.0% | 70.0% | - | - |
| 4.)   Dividends from Subsidiaries | 0-0 | NA | NA | - | - |
| 5.)   Cash and Cash Equivalents [(1)] | 0 | 100.0% | 100.0% | 0 | 0 |
| 6.)   Tenant Receivables [(2)] | 0 | 37.0% | 42.0% | 0 | 0 |
| 7.)   Outstanding Receivables | - | 40.0% | 50.0% | - | - |
| 8.)   Mortgage and Other Notes Receivable (Mortgage Escrow) | - | 85.0% | 90.0% | - | - |
| 9.)   Investments in Unconsolidated Affiliates | - | 0.0% | 1.5% | - | - |
| 10.) Recovery on Intercompany Claims | 0-0 | NA | NA | - | - |
| 11.) Intangible Lease Assets and Other assets | 0 | 2.5% | 5.0% | 0 | 0 |
| 12.) Litigation & Preference/Avoidance Actions | - | N/A | N/A | - | - |
| 13.)        **Subtotal** | 1 | 35.2% | 37.6% | 0 | 0 |
| **Total Estimated Proceeds from Liquidation of Assets** | | | | **3** | **4** |
| **II. Admin / Wind Down Expenses** | | | | | |
| 14.)        **Subtotal** | | | | 1 | 1 |
| **Net Proceeds Available for Secured Claims** | | | | **3** | **3** |
| **III. Liabilities** | | | | | |
| Liquidation Value of Secured Liabilities | | | | | |
| 15.)        **Subtotal** | NA | NA | NA | NA | NA |
| **Net Proceeds Available for Unsecured Claims** | | | | **3** | **3** |
| Liquidation Value of Unsecured Liabilities | | | | | |
| 16.) Senior Unsecured Notes | - | NA | NA | - | - |
| 17.) First Lien Credit Facility Deficiency Claim | - | NA | NA | - | - |
| 18.) Property Specific Non-CMBS Properties Guarantee | 0-0 | NA | NA | - | - |
| 19.) CMBS Properties Guarantee | 0-0 | NA | NA | - | - |
| 20.) Accounts Payable and Accrued Liabilities | 0 | 100.0% | 100.0% | 0 | 0 |
| 21.) Intercompany | - | NA | NA | - | - |
| 22.)        **Subtotal** | 0 | | | 0 | 0 |
| **IV. Unsecured Recovery** [(3)] | | | | **100.0%** | **100.0%** |
| **Net Proceeds Available for Parent** | | | | **3** | **3** |
| 23.) Payment to Parent | NA | NA | NA | 3 | 3 |

*(1) Liquidation Analysis reflects books and records as of 2/28/21. Cash balance is rolled forward through liquidation period.*
*(2) Reflects book value of receivables which includes straight line rent.  Straight line rent has $0 recovery.*
*(3) The analysis reflects the Debtors best estimate on General Unsecured claims using their February 2021 books and records net of eliminations.*

CBL & Associates Properties, Inc.
CBL - Old Hickory Mall Venture II, LLC - Ch. 7 Liquidation Analysis
$ in Millions

| 45) Old Hickory Mall Venture II, LLC | Net Book Value [1] | Recovery % | | De - Consolidated Recovery $ | |
|---|---|---|---|---|---|
| | | Low | High | Low | High |
| **I. Assets** | | | | | |
| **Liquidation Value of Real Estate Assets** | | | | | |
| 1.) Land, Building & Improvements (Net) | 32 | 15.5% | 17.4% | 5 | 6 |
| 2.) Subtotal | 32 | 15.5% | 17.4% | 5 | 6 |
| **Liquidation Value of All Other Assets** | | | | | |
| 3.) Developments in Progress | - | 60.0% | 70.0% | - | - |
| 4.) Dividends from Subsidiaries | 0-0 | NA | NA | - | - |
| 5.) Cash and Cash Equivalents [1] | 1 | 100.0% | 100.0% | 1 | 1 |
| 6.) Tenant Receivables [2] | 0 | 37.0% | 42.0% | 0 | 0 |
| 7.) Outstanding Receivables | 0 | 40.0% | 50.0% | 0 | 0 |
| 8.) Mortgage and Other Notes Receivable (Mortgage Escrow) | - | 85.0% | 90.0% | - | - |
| 9.) Investments in Unconsolidated Affiliates | - | 0.0% | 1.5% | - | - |
| 10.) Recovery on Intercompany Claims | 0-0 | NA | NA | - | - |
| 11.) Intangible Lease Assets and Other assets | 0 | 2.5% | 5.0% | 0 | 0 |
| 12.) Litigation & Preference/Avoidance Actions | - | N/A | N/A | - | - |
| 13.) Subtotal | 1 | 67.8% | 70.0% | 1 | 1 |
| Total Estimated Proceeds from Liquidation of Assets | | | | 6 | 6 |
| **II. Admin / Wind Down Expenses** | | | | | |
| 14.) Subtotal | | | | 1 | 1 |
| Net Proceeds Available for Secured Claims | | | | 5 | 5 |
| **III. Liabilities** | | | | | |
| **Liquidation Value of Secured Liabilities** | | | | | |
| 15.) Subtotal | NA | NA | NA | NA | NA |
| Net Proceeds Available for Unsecured Claims | | | | 5 | 5 |
| **Liquidation Value of Unsecured Liabilities** | | | | | |
| 16.) Senior Unsecured Notes | - | NA | NA | - | - |
| 17.) First Lien Credit Facility Deficiency Claim | - | NA | NA | - | - |
| 18.) Property Specific Non-CMBS Properties Guarantee | 0-0 | NA | NA | - | - |
| 19.) CMBS Properties Guarantee | 0-0 | NA | NA | - | - |
| 20.) Accounts Payable and Accrued Liabilities | 0 | 100.0% | 100.0% | 0 | 0 |
| 21.) Intercompany | - | NA | NA | - | - |
| 22.) Subtotal | 0 | | | 0 | 0 |
| **IV. Unsecured Recovery [3]** | | | | 100.0% | 100.0% |
| Net Proceeds Available for Parent | | | | 5 | 5 |
| 23.) Payment to Parent | NA | NA | NA | 5 | 5 |

*(1) Liquidation Analysis reflects books and records as of 2/28/21. Cash balance is rolled forward through liquidation period.*
*(2) Reflects book value of receivables which includes straight line rent.  Straight line rent has $0 recovery.*
*(3) The analysis reflects the Debtors best estimate on General Unsecured claims using their February 2021 books and records net of eliminations.*

| | | | | De - Consolidated | |
|---|---|---|---|---|---|
| **46) Alamance Crossing II, LLC** | **Net Book Value [1]** | **Recovery %** | | **Recovery $** | |
| | | **Low** | **High** | **Low** | **High** |
| **I. Assets** | | | | | |
| **Liquidation Value of Real Estate Assets** | | | | | |
| 1.) Land, Building & Improvements (Net) | 17 | 62.7% | 70.1% | 11 | 12 |
| 2.) Subtotal | 17 | 62.7% | 70.1% | 11 | 12 |
| **Liquidation Value of All Other Assets** | | | | | |
| 3.) Developments in Progress | - | 60.0% | 70.0% | - | - |
| 4.) Dividends from Subsidiaries | 0-0 | NA | NA | - | - |
| 5.) Cash and Cash Equivalents [1] | 1 | 100.0% | 100.0% | 1 | 1 |
| 6.) Tenant Receivables [2] | 1 | 37.0% | 42.0% | 0 | 0 |
| 7.) Outstanding Receivables | - | 40.0% | 50.0% | - | - |
| 8.) Mortgage and Other Notes Receivable (Mortgage Escrow) | - | 85.0% | 90.0% | - | - |
| 9.) Investments in Unconsolidated Affiliates | - | 0.0% | 1.5% | - | - |
| 10.) Recovery on Intercompany Claims | 0-0 | NA | NA | - | - |
| 11.) Intangible Lease Assets and Other assets | 0 | 2.5% | 5.0% | 0 | 0 |
| 12.) Litigation & Preference/Avoidance Actions | - | N/A | N/A | - | - |
| 13.) Subtotal | 2 | 70.6% | 72.5% | 1 | 1 |
| **Total Estimated Proceeds from Liquidation of Assets** | | | | **12** | **13** |
| **II. Admin / Wind Down Expenses** | | | | | |
| 14.) Subtotal | | | | 1 | 2 |
| **Net Proceeds Available for Secured Claims** | | | | **11** | **11** |
| **III. Liabilities** | | | | | |
| **Liquidation Value of Secured Liabilities** | | | | | |
| 15.) Subtotal | NA | NA | NA | NA | NA |
| **Net Proceeds Available for Unsecured Claims** | | | | **11** | **11** |
| **Liquidation Value of Unsecured Liabilities** | | | | | |
| 16.) Senior Unsecured Notes | - | NA | NA | - | - |
| 17.) First Lien Credit Facility Deficiency Claim | | NA | NA | - | - |
| 18.) Property Specific Non-CMBS Properties Guarantee | 0-0 | NA | NA | - | - |
| 19.) CMBS Properties Guarantee | 43-43 | 25.0% | 26.6% | 11 | 11 |
| 20.) Accounts Payable and Accrued Liabilities | - | NA | NA | - | - |
| 21.) Intercompany | - | NA | NA | - | - |
| 22.) Subtotal | 43 | | | 11 | 11 |
| **IV. Unsecured Recovery [3]** | | | | **25.0%** | **26.6%** |
| **Net Proceeds Available for Parent** | | | | **-** | **-** |
| 23.) Payment to Parent | NA | NA | NA | - | - |

*(1) Liquidation Analysis reflects books and records as of 2/28/21. Cash balance is rolled forward through liquidation period.*
*(2) Reflects book value of receivables which includes straight line rent. Straight line rent has $0 recovery.*
*(3) The analysis reflects the Debtors best estimate on General Unsecured claims using their February 2021 books and records net of eliminations.*

CBL & Associates Properties, Inc.
CBL - Westgate Crossing Limited Partnership - Ch. 7 Liquidation Analysis
$ in Millions

| **47)  Westgate Crossing Limited Partnership** | Net Book Value [1] | Recovery % Low | High | De - Consolidated Recovery $ Low | High |
|---|---|---|---|---|---|
| **I. Assets** | | | | | |
| **Liquidation Value of Real Estate Assets** | | | | | |
| 1.)  Land, Building & Improvements (Net) | 6 | 82.4% | 92.1% | 5 | 6 |
| 2.)     Subtotal | 6 | 82.4% | 92.1% | 5 | 6 |
| **Liquidation Value of All Other Assets** | | | | | |
| 3.)  Developments in Progress | - | 60.0% | 70.0% | - | - |
| 4.)  Dividends from Subsidiaries | 0-0 | NA | NA | - | - |
| 5.)  Cash and Cash Equivalents [1] | 0 | 100.0% | 100.0% | 0 | 0 |
| 6.)  Tenant Receivables [2] | 0 | 37.0% | 42.0% | 0 | 0 |
| 7.)  Outstanding Receivables | - | 40.0% | 50.0% | - | - |
| 8.)  Mortgage and Other Notes Receivable (Mortgage Escrow) | - | 85.0% | 90.0% | - | - |
| 9.)  Investments in Unconsolidated Affiliates | - | 0.0% | 1.5% | - | - |
| 10.)  Recovery on Intercompany Claims | 0-0 | NA | NA | - | - |
| 11.)  Intangible Lease Assets and Other assets | 0 | 2.5% | 5.0% | 0 | 0 |
| 12.)  Litigation & Preference/Avoidance Actions | - | N/A | N/A | - | - |
| 13.)     Subtotal | 0 | 28.7% | 32.4% | 0 | 0 |
| **Total Estimated Proceeds from Liquidation of Assets** | | | | 5 | 6 |
| **II. Admin / Wind Down Expenses** | | | | | |
| 14.)     Subtotal | | | | 1 | 1 |
| **Net Proceeds Available for Secured Claims** | | | | 4 | 5 |
| **III. Liabilities** | | | | | |
| **Liquidation Value of Secured Liabilities** | | | | | |
| 15.)     Subtotal | NA | NA | NA | NA | NA |
| **Net Proceeds Available for Unsecured Claims** | | | | 4 | 5 |
| **Liquidation Value of Unsecured Liabilities** | | | | | |
| 16.)  Senior Unsecured Notes | - | NA | NA | - | - |
| 17.)  First Lien Credit Facility Deficiency Claim | - | NA | NA | - | - |
| 18.)  Property Specific Non-CMBS Properties Guarantee | 0-0 | NA | NA | - | - |
| 19.)  CMBS Properties Guarantee | 0-0 | NA | NA | - | - |
| 20.)  Accounts Payable and Accrued Liabilities | 0 | 100.0% | 100.0% | 0 | 0 |
| 21.)  Intercompany | - | NA | NA | - | - |
| 22.)     Subtotal | 0 | | | 0 | 0 |
| **IV. Unsecured Recovery [3]** | | | | 100.0% | 100.0% |
| **Net Proceeds Available for Parent** | | | | 4 | 5 |
| 23.)  Payment to Parent | NA | NA | NA | 4 | 5 |

*(1) Liquidation Analysis reflects books and records as of 2/28/21. Cash balance is rolled forward through liquidation period.*
*(2) Reflects book value of receivables which includes straight line rent.  Straight line rent has $0 recovery.*
*(3) The analysis reflects the Debtors best estimate on General Unsecured claims using their February 2021 books and records net of eliminations.*

| | | | | De - Consolidated | |
|---|---|---|---|---|---|
| **48) The Courtyard at Hickory Hollow Limited Partnership** | Net Book Value [(1)] | Recovery % | | Recovery $ | |
| | | Low | High | Low | High |
| **I. Assets** | | | | | |
| **Liquidation Value of Real Estate Assets** | | | | | |
| 1.) Land, Building & Improvements (Net) | 4 | 119.5% | 133.5% | 5 | 6 |
| 2.) Subtotal | 4 | 119.5% | 133.5% | 5 | 6 |
| **Liquidation Value of All Other Assets** | | | | | |
| 3.) Developments in Progress | - | 60.0% | 70.0% | - | - |
| 4.) Dividends from Subsidiaries | 0-0 | NA | NA | - | - |
| 5.) Cash and Cash Equivalents [(1)] | 0 | 100.0% | 100.0% | 0 | 0 |
| 6.) Tenant Receivables [(2)] | 0 | 37.0% | 42.0% | 0 | 0 |
| 7.) Outstanding Receivables | - | 40.0% | 50.0% | - | - |
| 8.) Mortgage and Other Notes Receivable (Mortgage Escrow) | - | 85.0% | 90.0% | - | - |
| 9.) Investments in Unconsolidated Affiliates | - | 0.0% | 1.5% | - | - |
| 10.) Recovery on Intercompany Claims | 0-0 | NA | NA | - | - |
| 11.) Intangible Lease Assets and Other assets | 0 | 2.5% | 5.0% | 0 | 0 |
| 12.) Litigation & Preference/Avoidance Actions | - | N/A | N/A | - | - |
| 13.) Subtotal | 1 | 77.8% | 79.3% | 0 | 0 |
| **Total Estimated Proceeds from Liquidation of Assets** | | | | 5 | 6 |
| **II. Admin / Wind Down Expenses** | | | | | |
| 14.) Subtotal | | | | 1 | 1 |
| **Net Proceeds Available for Secured Claims** | | | | 5 | 5 |
| **III. Liabilities** | | | | | |
| **Liquidation Value of Secured Liabilities** | | | | | |
| 15.) Subtotal | NA | NA | NA | NA | NA |
| **Net Proceeds Available for Unsecured Claims** | | | | 5 | 5 |
| **Liquidation Value of Unsecured Liabilities** | | | | | |
| 16.) Senior Unsecured Notes | - | NA | NA | - | - |
| 17.) First Lien Credit Facility Deficiency Claim | - | NA | NA | - | - |
| 18.) Property Specific Non-CMBS Properties Guarantee | 0-0 | NA | NA | - | - |
| 19.) CMBS Properties Guarantee | 0-0 | NA | NA | - | - |
| 20.) Accounts Payable and Accrued Liabilities | - | NA | NA | - | - |
| 21.) Intercompany | - | NA | NA | - | - |
| 22.) Subtotal | - | | | - | - |
| **IV. Unsecured Recovery [(3)]** | | | | NA | NA |
| **Net Proceeds Available for Parent** | | | | 5 | 5 |
| 23.) Payment to Parent | NA | NA | NA | 5 | 5 |

*(1) Liquidation Analysis reflects books and records as of 2/28/21. Cash balance is rolled forward through liquidation period.*
*(2) Reflects book value of receivables which includes straight line rent.  Straight line rent has $0 recovery.*
*(3) The analysis reflects the Debtors best estimate on General Unsecured claims using their February 2021 books and records net of eliminations.*

CBL & Associates Properties, Inc.
CBL - WI-Land Parcels, LLC - Ch. 7 Liquidation Analysis
$ in Millions

| | | | | De - Consolidated | |
|---|---|---|---|---|---|
| **49) WI-Land Parcels, LLC** | **Net Book Value [1]** | **Recovery %** | | **Recovery $** | |
| | | **Low** | **High** | **Low** | **High** |
| **I. Assets** | | | | | |
| **Liquidation Value of Real Estate Assets** | | | | | |
| 1.) Land, Building & Improvements (Net) - Ground Lease Included | 1 | 697.4% | 779.4% | 4 | 5 |
| 2.) Subtotal | 1 | 697.4% | 779.4% | 4 | 5 |
| **Liquidation Value of All Other Assets** | | | | | |
| 3.) Developments in Progress | - | 60.0% | 70.0% | - | - |
| 4.) Dividends from Subsidiaries | 0-0 | NA | NA | - | - |
| 5.) Cash and Cash Equivalents [1] | 0 | 100.0% | 100.0% | 0 | 0 |
| 6.) Tenant Receivables [2] | - | 37.0% | 42.0% | - | - |
| 7.) Outstanding Receivables | - | 40.0% | 50.0% | - | - |
| 8.) Mortgage and Other Notes Receivable (Mortgage Escrow) | - | 85.0% | 90.0% | - | - |
| 9.) Investments in Unconsolidated Affiliates | - | 0.0% | 1.5% | - | - |
| 10.) Recovery on Intercompany Claims | 0-0 | NA | NA | - | - |
| 11.) Intangible Lease Assets and Other assets | - | 2.5% | 5.0% | - | - |
| 12.) Litigation & Preference/Avoidance Actions | - | N/A | N/A | - | - |
| 13.) Subtotal | 0 | 100.0% | 100.0% | 0 | 0 |
| **Total Estimated Proceeds from Liquidation of Assets** | | | | **4** | **5** |
| **II. Admin / Wind Down Expenses** | | | | | |
| 14.) Subtotal | | | | 1 | 1 |
| **Net Proceeds Available for Secured Claims** | | | | **4** | **4** |
| **III. Liabilities** | | | | | |
| **Liquidation Value of Secured Liabilities** | | | | | |
| 15.) Subtotal | NA | NA | NA | NA | NA |
| **Net Proceeds Available for Unsecured Claims** | | | | **4** | **4** |
| **Liquidation Value of Unsecured Liabilities** | | | | | |
| 16.) Senior Unsecured Notes | - | NA | NA | - | - |
| 17.) First Lien Credit Facility Deficiency Claim | - | NA | NA | - | - |
| 18.) Property Specific Non-CMBS Properties Guarantee | 0-0 | NA | NA | - | - |
| 19.) CMBS Properties Guarantee | 0-0 | NA | NA | - | - |
| 20.) Accounts Payable and Accrued Liabilities | 0 | 100.0% | 100.0% | 0 | 0 |
| 21.) Intercompany | - | NA | NA | - | - |
| 22.) Subtotal | 0 | | | 0 | 0 |
| **IV. Unsecured Recovery [3]** | | | | **100.0%** | **100.0%** |
| **Net Proceeds Available for Parent** | | | | **4** | **4** |
| 23.) Payment to Parent | NA | NA | NA | 4 | 4 |

*(1) Liquidation Analysis reflects books and records as of 2/28/21. Cash balance is rolled forward through liquidation period.*
*(2) Reflects book value of receivables which includes straight line rent.  Straight line rent has $0 recovery.*
*(3) The analysis reflects the Debtors best estimate on General Unsecured claims using their February 2021 books and records net of eliminations.*

CBL & Associates Properties, Inc.
CBL - Stroud Mall, LLC - Ch. 7 Liquidation Analysis
$ in Millions

| | Net Book Value [1] | Recovery % | | De - Consolidated Recovery $ | |
|---|---|---|---|---|---|
| **50) Stroud Mall, LLC** | | Low | High | Low | High |
| **I. Assets** | | | | | |
| Liquidation Value of Real Estate Assets | | | | | |
| 1.) Land, Building & Improvements (Net) | 38 | 7.4% | 8.3% | 3 | 3 |
| 2.) Subtotal | 38 | 7.4% | 8.3% | 3 | 3 |
| Liquidation Value of All Other Assets | | | | | |
| 3.) Developments in Progress | 0 | 60.0% | 70.0% | 0 | 0 |
| 4.) Dividends from Subsidiaries | 0-0 | NA | NA | - | - |
| 5.) Cash and Cash Equivalents [1] | 1 | 100.0% | 100.0% | 1 | 1 |
| 6.) Tenant Receivables [2] | - | 37.0% | 42.0% | - | - |
| 7.) Outstanding Receivables | 0 | 40.0% | 50.0% | 0 | 0 |
| 8.) Mortgage and Other Notes Receivable (Mortgage Escrow) | - | 85.0% | 90.0% | - | - |
| 9.) Investments in Unconsolidated Affiliates | - | 0.0% | 1.5% | - | - |
| 10.) Recovery on Intercompany Claims | 0-0 | NA | NA | - | - |
| 11.) Intangible Lease Assets and Other assets | 1 | 2.5% | 5.0% | 0 | 0 |
| 12.) Litigation & Preference/Avoidance Actions | - | N/A | N/A | - | - |
| 13.) Subtotal | 2 | 29.7% | 31.6% | 1 | 1 |
| Total Estimated Proceeds from Liquidation of Assets | | | | 3 | 4 |
| **II. Admin / Wind Down Expenses** | | | | | |
| 14.) Subtotal | | | | 1 | 1 |
| Net Proceeds Available for Secured Claims | | | | 2 | 3 |
| **III. Liabilities** | | | | | |
| Liquidation Value of Secured Liabilities | | | | | |
| 15.) Subtotal | NA | NA | NA | NA | NA |
| Net Proceeds Available for Unsecured Claims | | | | 2 | 3 |
| Liquidation Value of Unsecured Liabilities | | | | | |
| 16.) Senior Unsecured Notes | - | NA | NA | - | - |
| 17.) First Lien Credit Facility Deficiency Claim | - | NA | NA | - | - |
| 18.) Property Specific Non-CMBS Properties Guarantee | 0-0 | NA | NA | - | - |
| 19.) CMBS Properties Guarantee | 0-0 | NA | NA | - | - |
| 20.) Accounts Payable and Accrued Liabilities | 3 | 93.4% | 100.0% | 2 | 3 |
| 21.) Intercompany | - | NA | NA | - | - |
| 22.) Subtotal | 3 | | | 2 | 3 |
| **IV. Unsecured Recovery [3]** | | | | 93.4% | 100.0% |
| Net Proceeds Available for Parent | | | | - | 0 |
| 23.) Payment to Parent | NA | NA | NA | - | 0 |

*(1) Liquidation Analysis reflects books and records as of 2/28/21. Cash balance is rolled forward through liquidation period.*
*(2) Reflects book value of receivables which includes straight line rent.  Straight line rent has $0 recovery.*
*(3) The analysis reflects the Debtors best estimate on General Unsecured claims using their February 2021 books and records net of eliminations.*

CBL & Associates Properties, Inc.
CBL - Hanes Mall Parcels, LLC - Ch. 7 Liquidation Analysis
$ in Millions

| 51) Hanes Mall Parcels, LLC | Net Book Value [1] | Recovery % | | De - Consolidated Recovery $ | |
|---|---|---|---|---|---|
| | | Low | High | Low | High |
| **I. Assets** | | | | | |
| **Liquidation Value of Real Estate Assets** | | | | | |
| 1.) Land, Building & Improvements (Net) | 4 | 115.9% | 129.6% | 5 | 5 |
| 2.) Subtotal | 4 | 115.9% | 129.6% | 5 | 5 |
| **Liquidation Value of All Other Assets** | | | | | |
| 3.) Developments in Progress | - | 60.0% | 70.0% | - | - |
| 4.) Dividends from Subsidiaries | 0-0 | NA | NA | - | - |
| 5.) Cash and Cash Equivalents [1] | 0 | 100.0% | 100.0% | 0 | 0 |
| 6.) Tenant Receivables [2] | 0 | 37.0% | 42.0% | 0 | 0 |
| 7.) Outstanding Receivables | - | 40.0% | 50.0% | - | - |
| 8.) Mortgage and Other Notes Receivable (Mortgage Escrow) | - | 85.0% | 90.0% | - | - |
| 9.) Investments in Unconsolidated Affiliates | - | 0.0% | 1.5% | - | - |
| 10.) Recovery on Intercompany Claims | 0-0 | NA | NA | - | - |
| 11.) Intangible Lease Assets and Other assets | 0 | 2.5% | 5.0% | 0 | 0 |
| 12.) Litigation & Preference/Avoidance Actions | - | N/A | N/A | - | - |
| 13.) Subtotal | 1 | 56.0% | 58.6% | 0 | 1 |
| Total Estimated Proceeds from Liquidation of Assets | | | | 5 | 6 |
| **II. Admin / Wind Down Expenses** | | | | | |
| 14.) Subtotal | | | | 1 | 1 |
| Net Proceeds Available for Secured Claims | | | | 4 | 5 |
| **III. Liabilities** | | | | | |
| **Liquidation Value of Secured Liabilities** | | | | | |
| 15.) Subtotal | NA | NA | NA | NA | NA |
| Net Proceeds Available for Unsecured Claims | | | | 4 | 5 |
| **Liquidation Value of Unsecured Liabilities** | | | | | |
| 16.) Senior Unsecured Notes | - | NA | NA | - | - |
| 17.) First Lien Credit Facility Deficiency Claim | - | NA | NA | - | - |
| 18.) Property Specific Non-CMBS Properties Guarantee | 0-0 | NA | NA | - | - |
| 19.) CMBS Properties Guarantee | 0-0 | NA | NA | - | - |
| 20.) Accounts Payable and Accrued Liabilities | 0 | 100.0% | 100.0% | 0 | 0 |
| 21.) Intercompany | - | NA | NA | - | - |
| 22.) Subtotal | 0 | | | 0 | 0 |
| **IV. Unsecured Recovery [3]** | | | | 100.0% | 100.0% |
| Net Proceeds Available for Parent | | | | 4 | 5 |
| 23.) Payment to Parent | NA | NA | NA | 4 | 5 |

*(1) Liquidation Analysis reflects books and records as of 2/28/21. Cash balance is rolled forward through liquidation period.*
*(2) Reflects book value of receivables which includes straight line rent.  Straight line rent has $0 recovery.*
*(3) The analysis reflects the Debtors best estimate on General Unsecured claims using their February 2021 books and records net of eliminations.*

CBL & Associates Properties, Inc.
CBL - The Landing at Arbor Place II, LLC - Ch. 7 Liquidation Analysis
$ in Millions

|  |  |  |  | De - Consolidated | |
|---|---|---|---|---|---|
| **52) The Landing at Arbor Place II, LLC** | Net Book Value [1] | Recovery % | | Recovery $ | |
|  |  | Low | High | Low | High |
| **I. Assets** |  |  |  |  |  |
| **Liquidation Value of Real Estate Assets** |  |  |  |  |  |
| 1.) Land, Building & Improvements (Net) | 11 | 30.1% | 33.7% | 3 | 4 |
| 2.) Subtotal | 11 | 30.1% | 33.7% | 3 | 4 |
| **Liquidation Value of All Other Assets** |  |  |  |  |  |
| 3.) Developments in Progress | - | 60.0% | 70.0% | - | - |
| 4.) Dividends from Subsidiaries | 0-0 | NA | NA | - | - |
| 5.) Cash and Cash Equivalents [1] | - | 100.0% | 100.0% | - | - |
| 6.) Tenant Receivables [2] | 0 | 37.0% | 42.0% | 0 | 0 |
| 7.) Outstanding Receivables | - | 40.0% | 50.0% | - | - |
| 8.) Mortgage and Other Notes Receivable (Mortgage Escrow) | - | 85.0% | 90.0% | - | - |
| 9.) Investments in Unconsolidated Affiliates | - | 0.0% | 1.5% | - | - |
| 10.) Recovery on Intercompany Claims | 0-0 | NA | NA | - | - |
| 11.) Intangible Lease Assets and Other assets | 0 | 2.5% | 5.0% | 0 | 0 |
| 12.) Litigation & Preference/Avoidance Actions | - | N/A | N/A | - | - |
| 13.) Subtotal | 0 | 25.0% | 29.2% | 0 | 0 |
| **Total Estimated Proceeds from Liquidation of Assets** |  |  |  | 3 | 4 |
| **II. Admin / Wind Down Expenses** |  |  |  |  |  |
| 14.) Subtotal |  |  |  | 1 | 1 |
| **Net Proceeds Available for Secured Claims** |  |  |  | 3 | 3 |
| **III. Liabilities** |  |  |  |  |  |
| **Liquidation Value of Secured Liabilities** |  |  |  |  |  |
| 15.) Subtotal | NA | NA | NA | NA | NA |
| **Net Proceeds Available for Unsecured Claims** |  |  |  | 3 | 3 |
| **Liquidation Value of Unsecured Liabilities** |  |  |  |  |  |
| 16.) Senior Unsecured Notes | - | NA | NA | - | - |
| 17.) First Lien Credit Facility Deficiency Claim | - | NA | NA | - | - |
| 18.) Property Specific Non-CMBS Properties Guarantee | 0-0 | NA | NA | - | - |
| 19.) CMBS Properties Guarantee | 0-0 | NA | NA | - | - |
| 20.) Accounts Payable and Accrued Liabilities | 0 | 100.0% | 100.0% | 0 | 0 |
| 21.) Intercompany | - | NA | NA | - | - |
| 22.) Subtotal | 0 |  |  | 0 | 0 |
| **IV. Unsecured Recovery [3]** |  |  |  | 100.0% | 100.0% |
| **Net Proceeds Available for Parent** |  |  |  | 3 | 3 |
| 23.) Payment to Parent | NA | NA | NA | 3 | 3 |

*(1) Liquidation Analysis reflects books and records as of 2/28/21. Cash balance is rolled forward through liquidation period.*
*(2) Reflects book value of receivables which includes straight line rent.  Straight line rent has $0 recovery.*
*(3) The analysis reflects the Debtors best estimate on General Unsecured claims using their February 2021 books and records net of eliminations.*

CBL & Associates Properties, Inc.
CBL - Volusia-OP Peripheral, LLC - Ch. 7 Liquidation Analysis
$ in Millions

| | | | | De - Consolidated | |
|---|---|---|---|---|---|
| **53)  Volusia-OP Peripheral, LLC** | **Net Book Value [1]** | **Recovery %** | | **Recovery $** | |
| | | **Low** | **High** | **Low** | **High** |
| **I. Assets** | | | | | |
| **Liquidation Value of Real Estate Assets** | | | | | |
| 1.)   Land, Building & Improvements (Net) | 6 | 72.1% | 80.5% | 4 | 5 |
| 2.)        Subtotal | 6 | 72.1% | 80.5% | 4 | 5 |
| **Liquidation Value of All Other Assets** | | | | | |
| 3.)   Developments in Progress | - | 60.0% | 70.0% | - | - |
| 4.)   Dividends from Subsidiaries | 0-0 | NA | NA | - | - |
| 5.)   Cash and Cash Equivalents [1] | 0 | 100.0% | 100.0% | 0 | 0 |
| 6.)   Tenant Receivables [2] | 0 | 37.0% | 42.0% | 0 | 0 |
| 7.)   Outstanding Receivables | - | 40.0% | 50.0% | - | - |
| 8.)   Mortgage and Other Notes Receivable (Mortgage Escrow) | - | 85.0% | 90.0% | - | - |
| 9.)   Investments in Unconsolidated Affiliates | - | 0.0% | 1.5% | - | - |
| 10.)  Recovery on Intercompany Claims | 0-0 | NA | NA | - | - |
| 11.)  Intangible Lease Assets and Other assets | 0 | 2.5% | 5.0% | 0 | 0 |
| 12.)  Litigation & Preference/Avoidance Actions | - | N/A | N/A | - | - |
| 13.)       Subtotal | 1 | 58.0% | 60.2% | 0 | 0 |
| **Total Estimated Proceeds from Liquidation of Assets** | | | | **5** | **5** |
| **II. Admin / Wind Down Expenses** | | | | | |
| 14.)       Subtotal | | | | 1 | 1 |
| **Net Proceeds Available for Secured Claims** | | | | **4** | **4** |
| **III. Liabilities** | | | | | |
| **Liquidation Value of Secured Liabilities** | | | | | |
| 15.)       Subtotal | NA | NA | NA | NA | NA |
| **Net Proceeds Available for Unsecured Claims** | | | | **4** | **4** |
| **Liquidation Value of Unsecured Liabilities** | | | | | |
| 16.)  Senior Unsecured Notes | - | NA | NA | - | - |
| 17.)  First Lien Credit Facility Deficiency Claim | - | NA | NA | - | - |
| 18.)  Property Specific Non-CMBS Properties Guarantee | 0-0 | NA | NA | - | - |
| 19.)  CMBS Properties Guarantee | 0-0 | NA | NA | - | - |
| 20.)  Accounts Payable and Accrued Liabilities | 0 | 100.0% | 100.0% | 0 | 0 |
| 21.)  Intercompany | - | NA | NA | - | - |
| 22.)       Subtotal | 0 | | | 0 | 0 |
| **IV. Unsecured Recovery [3]** | | | | **100.0%** | **100.0%** |
| **Net Proceeds Available for Parent** | | | | **4** | **4** |
| 23.)  Payment to Parent | NA | NA | NA | 4 | 4 |

*(1) Liquidation Analysis reflects books and records as of 2/28/21. Cash balance is rolled forward through liquidation period.*
*(2) Reflects book value of receivables which includes straight line rent.  Straight line rent has $0 recovery.*
*(3) The analysis reflects the Debtors best estimate on General Unsecured claims using their February 2021 books and records net of eliminations.*

CBL & Associates Properties, Inc.
CBL - Eastland Mall, LLC - Ch. 7 Liquidation Analysis
$ in Millions

| 54) Eastland Mall, LLC | Net Book Value [1] | Recovery % | | De - Consolidated Recovery $ | |
|---|---|---|---|---|---|
| | | Low | High | Low | High |
| **I. Assets** | | | | | |
| **Liquidation Value of Real Estate Assets** | | | | | |
| 1.) Land, Building & Improvements (Net) | 23 | 13.3% | 14.9% | 3 | 3 |
| 2.) Subtotal | 23 | 13.3% | 14.9% | 3 | 3 |
| **Liquidation Value of All Other Assets** | | | | | |
| 3.) Developments in Progress | - | 60.0% | 70.0% | - | - |
| 4.) Dividends from Subsidiaries | 0-0 | NA | NA | - | - |
| 5.) Cash and Cash Equivalents [1] | 0 | 100.0% | 100.0% | 0 | 0 |
| 6.) Tenant Receivables [2] | 0 | 37.0% | 42.0% | 0 | 0 |
| 7.) Outstanding Receivables | 0 | 40.0% | 50.0% | 0 | 0 |
| 8.) Mortgage and Other Notes Receivable (Mortgage Escrow) | - | 85.0% | 90.0% | - | - |
| 9.) Investments in Unconsolidated Affiliates | - | 0.0% | 1.5% | - | - |
| 10.) Recovery on Intercompany Claims | 0-0 | NA | NA | - | - |
| 11.) Intangible Lease Assets and Other assets | 0 | 2.5% | 5.0% | 0 | 0 |
| 12.) Litigation & Preference/Avoidance Actions | - | N/A | N/A | - | - |
| 13.) Subtotal | 1 | 53.9% | 56.7% | 1 | 1 |
| **Total Estimated Proceeds from Liquidation of Assets** | | | | 4 | 4 |
| **II. Admin / Wind Down Expenses** | | | | | |
| 14.) Subtotal | | | | 2 | 2 |
| **Net Proceeds Available for Secured Claims** | | | | 2 | 2 |
| **III. Liabilities** | | | | | |
| **Liquidation Value of Secured Liabilities** | | | | | |
| 15.) Subtotal | NA | NA | NA | NA | NA |
| **Net Proceeds Available for Unsecured Claims** | | | | 2 | 2 |
| **Liquidation Value of Unsecured Liabilities** | | | | | |
| 16.) Senior Unsecured Notes | - | NA | NA | - | - |
| 17.) First Lien Credit Facility Deficiency Claim | | NA | NA | - | - |
| 18.) Property Specific Non-CMBS Properties Guarantee | 0-0 | NA | NA | - | - |
| 19.) CMBS Properties Guarantee | 0-0 | NA | NA | - | - |
| 20.) Accounts Payable and Accrued Liabilities | - | NA | NA | - | - |
| 21.) Intercompany | - | NA | NA | - | - |
| 22.) Subtotal | - | | | - | - |
| **IV. Unsecured Recovery [3]** | | | | NA | NA |
| **Net Proceeds Available for Parent** | | | | 2 | 2 |
| 23.) Payment to Parent | NA | NA | NA | 2 | 2 |

*(1) Liquidation Analysis reflects books and records as of 2/28/21. Cash balance is rolled forward through liquidation period.*
*(2) Reflects book value of receivables which includes straight line rent.  Straight line rent has $0 recovery.*
*(3) The analysis reflects the Debtors best estimate on General Unsecured claims using their February 2021 books and records net of eliminations.*

CBL & Associates Properties, Inc.
CBL - West Towne District, LLC - Ch. 7 Liquidation Analysis
$ in Millions

| | Net Book Value [(1)] | Recovery % | | De - Consolidated Recovery $ | |
|---|---|---|---|---|---|
| **55) West Towne District, LLC** | | Low | High | Low | High |
| **I. Assets** | | | | | |
| Liquidation Value of Real Estate Assets | | | | | |
| 1.)   Land, Building & Improvements (Net) | 4 | 89.3% | 99.8% | 3 | 4 |
| 2.)       Subtotal | 4 | 89.3% | 99.8% | 3 | 4 |
| Liquidation Value of All Other Assets | | | | | |
| 3.)   Developments in Progress | - | 60.0% | 70.0% | - | - |
| 4.)   Dividends from Subsidiaries | 0-0 | NA | NA | - | - |
| 5.)   Cash and Cash Equivalents [(1)] | 0 | 100.0% | 100.0% | 0 | 0 |
| 6.)   Tenant Receivables [(2)] | 0 | 37.0% | 42.0% | 0 | 0 |
| 7.)   Outstanding Receivables | - | 40.0% | 50.0% | - | - |
| 8.)   Mortgage and Other Notes Receivable (Mortgage Escrow) | - | 85.0% | 90.0% | - | - |
| 9.)   Investments in Unconsolidated Affiliates | - | 0.0% | 1.5% | - | - |
| 10.) Recovery on Intercompany Claims | 0-0 | NA | NA | - | - |
| 11.) Intangible Lease Assets and Other assets | 0 | 2.5% | 5.0% | 0 | 0 |
| 12.) Litigation & Preference/Avoidance Actions | - | N/A | N/A | - | - |
| 13.)      Subtotal | 0 | 64.4% | 65.7% | 0 | 0 |
| **Total Estimated Proceeds from Liquidation of Assets** | | | | 3 | 4 |
| **II. Admin / Wind Down Expenses** | | | | | |
| 14.)      Subtotal | | | | 1 | 1 |
| **Net Proceeds Available for Secured Claims** | | | | 3 | 3 |
| **III. Liabilities** | | | | | |
| Liquidation Value of Secured Liabilities | | | | | |
| 15.)      Subtotal | NA | NA | NA | NA | NA |
| **Net Proceeds Available for Unsecured Claims** | | | | 3 | 3 |
| Liquidation Value of Unsecured Liabilities | | | | | |
| 16.) Senior Unsecured Notes | - | NA | NA | - | - |
| 17.) First Lien Credit Facility Deficiency Claim | - | NA | NA | - | - |
| 18.) Property Specific Non-CMBS Properties Guarantee | 0-0 | NA | NA | - | - |
| 19.) CMBS Properties Guarantee | 0-0 | NA | NA | - | - |
| 20.) Accounts Payable and Accrued Liabilities | - | NA | NA | - | - |
| 21.) Intercompany | - | NA | NA | - | - |
| 22.)      Subtotal | - | | | - | - |
| **IV. Unsecured Recovery [(3)]** | | | | NA | NA |
| **Net Proceeds Available for Parent** | | | | 3 | 3 |
| 23.) Payment to Parent | NA | NA | NA | 3 | 3 |

*(1) Liquidation Analysis reflects books and records as of 2/28/21. Cash balance is rolled forward through liquidation period.*
*(2) Reflects book value of receivables which includes straight line rent.  Straight line rent has $0 recovery.*
*(3) The analysis reflects the Debtors best estimate on General Unsecured claims using their February 2021 books and records net of eliminations.*

CBL & Associates Properties, Inc.
CBL - Parkdale Mall, LLC - Ch. 7 Liquidation Analysis
$ in Millions

| | Net Book Value [1] | Recovery % | | De - Consolidated Recovery $ | |
|---|---|---|---|---|---|
| 56) Parkdale Mall, LLC | | Low | High | Low | High |
| **I. Assets** | | | | | |
| **Liquidation Value of Real Estate Assets** | | | | | |
| 1.) Land, Building & Improvements (Net) | 3 | 77.4% | 86.5% | 3 | 3 |
| 2.) Subtotal | 3 | 77.4% | 86.5% | 3 | 3 |
| **Liquidation Value of All Other Assets** | | | | | |
| 3.) Developments in Progress | - | 60.0% | 70.0% | - | - |
| 4.) Dividends from Subsidiaries | 0-0 | NA | NA | - | - |
| 5.) Cash and Cash Equivalents [1] | 0 | 100.0% | 100.0% | 0 | 0 |
| 6.) Tenant Receivables [2] | 0 | 37.0% | 42.0% | 0 | 0 |
| 7.) Outstanding Receivables | - | 40.0% | 50.0% | - | - |
| 8.) Mortgage and Other Notes Receivable (Mortgage Escrow) | - | 85.0% | 90.0% | - | - |
| 9.) Investments in Unconsolidated Affiliates | - | 0.0% | 1.5% | - | - |
| 10.) Recovery on Intercompany Claims | 0-0 | NA | NA | - | - |
| 11.) Intangible Lease Assets and Other assets | 0 | 2.5% | 5.0% | 0 | 0 |
| 12.) Litigation & Preference/Avoidance Actions | - | N/A | N/A | - | - |
| 13.) Subtotal | 0 | 58.0% | 60.6% | 0 | 0 |
| **Total Estimated Proceeds from Liquidation of Assets** | | | | 3 | 3 |
| **II. Admin / Wind Down Expenses** | | | | | |
| 14.) Subtotal | | | | 0 | 0 |
| **Net Proceeds Available for Secured Claims** | | | | 3 | 3 |
| **III. Liabilities** | | | | | |
| **Liquidation Value of Secured Liabilities** | | | | | |
| 15.) Subtotal | NA | NA | NA | NA | NA |
| **Net Proceeds Available for Unsecured Claims** | | | | 3 | 3 |
| **Liquidation Value of Unsecured Liabilities** | | | | | |
| 16.) Senior Unsecured Notes | - | NA | NA | - | - |
| 17.) First Lien Credit Facility Deficiency Claim | - | NA | NA | - | - |
| 18.) Property Specific Non-CMBS Properties Guarantee | 0-0 | NA | NA | - | - |
| 19.) CMBS Properties Guarantee | 0-0 | NA | NA | - | - |
| 20.) Accounts Payable and Accrued Liabilities | - | NA | NA | - | - |
| 21.) Intercompany | - | NA | NA | - | - |
| 22.) Subtotal | - | | | - | - |
| **IV. Unsecured Recovery [3]** | | | | NA | NA |
| **Net Proceeds Available for Parent** | | | | 3 | 3 |
| 23.) Payment to Parent | NA | NA | NA | 3 | 3 |

*(1) Liquidation Analysis reflects books and records as of 2/28/21. Cash balance is rolled forward through liquidation period.*
*(2) Reflects book value of receivables which includes straight line rent. Straight line rent has $0 recovery.*
*(3) The analysis reflects the Debtors best estimate on General Unsecured claims using their February 2021 books and records net of eliminations.*

CBL & Associates Properties, Inc.
CBL - Parkdale Anchor M, LLC - Ch. 7 Liquidation Analysis
$ in Millions

|  | | | | De - Consolidated | |
|---|---|---|---|---|---|
| **57)  Parkdale Anchor M, LLC** | **Net Book Value** [1] | **Recovery %** | | **Recovery $** | |
| | | **Low** | **High** | **Low** | **High** |
| **I. Assets** | | | | | |
| **Liquidation Value of Real Estate Assets** | | | | | |
| 1.)   Land, Building & Improvements (Net) | 18 | 23.6% | 26.4% | 4 | 5 |
| 2.)      **Subtotal** | 18 | 23.6% | 26.4% | 4 | 5 |
| **Liquidation Value of All Other Assets** | | | | | |
| 3.)   Developments in Progress | - | 60.0% | 70.0% | - | - |
| 4.)   Dividends from Subsidiaries | 0-0 | NA | NA | - | - |
| 5.)   Cash and Cash Equivalents [1] | 0 | 100.0% | 100.0% | 0 | 0 |
| 6.)   Tenant Receivables [2] | 0 | 37.0% | 42.0% | 0 | 0 |
| 7.)   Outstanding Receivables | - | 40.0% | 50.0% | - | - |
| 8.)   Mortgage and Other Notes Receivable (Mortgage Escrow) | - | 85.0% | 90.0% | - | - |
| 9.)   Investments in Unconsolidated Affiliates | - | 0.0% | 1.5% | - | - |
| 10.) Recovery on Intercompany Claims | 0-0 | NA | NA | - | - |
| 11.) Intangible Lease Assets and Other assets | 0 | 2.5% | 5.0% | 0 | 0 |
| 12.) Litigation & Preference/Avoidance Actions | - | N/A | N/A | - | - |
| 13.)     **Subtotal** | 1 | 43.2% | 45.3% | 0 | 0 |
| **Total Estimated Proceeds from Liquidation of Assets** | | | | 5 | 5 |
| **II. Admin / Wind Down Expenses** | | | | | |
| 14.)     **Subtotal** | | | | 1 | 1 |
| **Net Proceeds Available for Secured Claims** | | | | 4 | 4 |
| **III. Liabilities** | | | | | |
| **Liquidation Value of Secured Liabilities** | | | | | |
| 15.)     **Subtotal** | NA | NA | NA | NA | NA |
| **Net Proceeds Available for Unsecured Claims** | | | | 4 | 4 |
| **Liquidation Value of Unsecured Liabilities** | | | | | |
| 16.) Senior Unsecured Notes | - | NA | NA | - | - |
| 17.) First Lien Credit Facility Deficiency Claim | - | NA | NA | - | - |
| 18.) Property Specific Non-CMBS Properties Guarantee | 0-0 | NA | NA | - | - |
| 19.) CMBS Properties Guarantee | 0-0 | NA | NA | - | - |
| 20.) Accounts Payable and Accrued Liabilities | 0 | 100.0% | 100.0% | 0 | 0 |
| 21.) Intercompany | - | NA | NA | - | - |
| 22.)     **Subtotal** | 0 | | | 0 | 0 |
| **IV. Unsecured Recovery** [3] | | | | **100.0%** | **100.0%** |
| **Net Proceeds Available for Parent** | | | | 4 | 4 |
| 23.) Payment to Parent | NA | NA | NA | 4 | 4 |

*(1) Liquidation Analysis reflects books and records as of 2/28/21. Cash balance is rolled forward through liquidation period.*
*(2) Reflects book value of receivables which includes straight line rent.  Straight line rent has $0 recovery.*
*(3) The analysis reflects the Debtors best estimate on General Unsecured claims using their February 2021 books and records net of eliminations.*

CBL & Associates Properties, Inc.
CBL - Jefferson Anchor M, LLC - Ch. 7 Liquidation Analysis
$ in Millions

| | | | | De - Consolidated | |
|---|---|---|---|---|---|
| **58) Jefferson Anchor M, LLC** | **Net Book Value [1]** | **Recovery %** | | **Recovery $** | |
| | | **Low** | **High** | **Low** | **High** |
| **I. Assets** | | | | | |
| **Liquidation Value of Real Estate Assets** | | | | | |
| 1.) Land, Building & Improvements (Net) | 6 | 66.4% | 74.2% | 4 | 5 |
| 2.) Subtotal | 6 | 66.4% | 74.2% | 4 | 5 |
| **Liquidation Value of All Other Assets** | | | | | |
| 3.) Developments in Progress | - | 60.0% | 70.0% | - | - |
| 4.) Dividends from Subsidiaries | 0-0 | NA | NA | - | - |
| 5.) Cash and Cash Equivalents [1] | 0 | 100.0% | 100.0% | 0 | 0 |
| 6.) Tenant Receivables [2] | - | 37.0% | 42.0% | - | - |
| 7.) Outstanding Receivables | - | 40.0% | 50.0% | - | - |
| 8.) Mortgage and Other Notes Receivable (Mortgage Escrow) | - | 85.0% | 90.0% | - | - |
| 9.) Investments in Unconsolidated Affiliates | - | 0.0% | 1.5% | - | - |
| 10.) Recovery on Intercompany Claims | 0-0 | NA | NA | - | - |
| 11.) Intangible Lease Assets and Other assets | 0 | 2.5% | 5.0% | 0 | 0 |
| 12.) Litigation & Preference/Avoidance Actions | - | N/A | N/A | - | - |
| 13.) Subtotal | 1 | 57.8% | 58.9% | 0 | 0 |
| **Total Estimated Proceeds from Liquidation of Assets** | | | | **4** | **5** |
| **II. Admin / Wind Down Expenses** | | | | | |
| 14.) Subtotal | | | | 1 | 1 |
| **Net Proceeds Available for Secured Claims** | | | | **4** | **4** |
| **III. Liabilities** | | | | | |
| **Liquidation Value of Secured Liabilities** | | | | | |
| 15.) Subtotal | NA | NA | NA | NA | NA |
| **Net Proceeds Available for Unsecured Claims** | | | | **4** | **4** |
| **Liquidation Value of Unsecured Liabilities** | | | | | |
| 16.) Senior Unsecured Notes | - | NA | NA | - | - |
| 17.) First Lien Credit Facility Deficiency Claim | | NA | NA | - | - |
| 18.) Property Specific Non-CMBS Properties Guarantee | 0-0 | NA | NA | - | - |
| 19.) CMBS Properties Guarantee | 0-0 | NA | NA | - | - |
| 20.) Accounts Payable and Accrued Liabilities | - | NA | NA | - | - |
| 21.) Intercompany | - | NA | NA | - | - |
| 22.) Subtotal | - | | | - | - |
| **IV. Unsecured Recovery [3]** | | | | **NA** | **NA** |
| **Net Proceeds Available for Parent** | | | | **4** | **4** |
| 23.) Payment to Parent | NA | NA | NA | 4 | 4 |

*(1) Liquidation Analysis reflects books and records as of 2/28/21. Cash balance is rolled forward through liquidation period.*
*(2) Reflects book value of receivables which includes straight line rent.  Straight line rent has $0 recovery.*
*(3) The analysis reflects the Debtors best estimate on General Unsecured claims using their February 2021 books and records net of eliminations.*

CBL & Associates Properties, Inc.
CBL - East Towne Parcel I, LLC - Ch. 7 Liquidation Analysis
$ in Millions

| | | | | De - Consolidated | |
|---|---|---|---|---|---|
| **59) East Towne Parcel I, LLC** | **Net Book Value [(1)]** | **Recovery %** | | **Recovery $** | |
| | | **Low** | **High** | **Low** | **High** |
| **I. Assets** | | | | | |
| **Liquidation Value of Real Estate Assets** | | | | | |
| 1.) Land, Building & Improvements (Net) | 2 | 56.3% | 62.9% | 1 | 1 |
| 2.) Subtotal | 2 | 56.3% | 62.9% | 1 | 1 |
| **Liquidation Value of All Other Assets** | | | | | |
| 3.) Developments in Progress | - | 60.0% | 70.0% | - | - |
| 4.) Dividends from Subsidiaries | 0-0 | NA | NA | - | - |
| 5.) Cash and Cash Equivalents [(1)] | 0 | 100.0% | 100.0% | 0 | 0 |
| 6.) Tenant Receivables [(2)] | 0 | 37.0% | 42.0% | 0 | 0 |
| 7.) Outstanding Receivables | - | 40.0% | 50.0% | - | - |
| 8.) Mortgage and Other Notes Receivable (Mortgage Escrow) | - | 85.0% | 90.0% | - | - |
| 9.) Investments in Unconsolidated Affiliates | - | 0.0% | 1.5% | - | - |
| 10.) Recovery on Intercompany Claims | 0-0 | NA | NA | - | - |
| 11.) Intangible Lease Assets and Other assets | 0 | 2.5% | 5.0% | 0 | 0 |
| 12.) Litigation & Preference/Avoidance Actions | - | N/A | N/A | - | - |
| 13.) Subtotal | 0 | 32.0% | 34.1% | 0 | 0 |
| **Total Estimated Proceeds from Liquidation of Assets** | | | | 1 | 2 |
| **II. Admin / Wind Down Expenses** | | | | | |
| 14.) Subtotal | | | | 0 | 0 |
| **Net Proceeds Available for Secured Claims** | | | | 1 | 1 |
| **III. Liabilities** | | | | | |
| **Liquidation Value of Secured Liabilities** | | | | | |
| 15.) Subtotal | NA | NA | NA | NA | NA |
| **Net Proceeds Available for Unsecured Claims** | | | | 1 | 1 |
| **Liquidation Value of Unsecured Liabilities** | | | | | |
| 16.) Senior Unsecured Notes | - | NA | NA | - | - |
| 17.) First Lien Credit Facility Deficiency Claim | - | NA | NA | - | - |
| 18.) Property Specific Non-CMBS Properties Guarantee | 0-0 | NA | NA | - | - |
| 19.) CMBS Properties Guarantee | 0-0 | NA | NA | - | - |
| 20.) Accounts Payable and Accrued Liabilities | 0 | 100.0% | 100.0% | 0 | 0 |
| 21.) Intercompany | - | NA | NA | - | - |
| 22.) Subtotal | 0 | | | 0 | 0 |
| **IV. Unsecured Recovery [(3)]** | | | | 100.0% | 100.0% |
| **Net Proceeds Available for Parent** | | | | 1 | 1 |
| 23.) Payment to Parent | NA | NA | NA | 1 | 1 |

*(1) Liquidation Analysis reflects books and records as of 2/28/21. Cash balance is rolled forward through liquidation period.*
*(2) Reflects book value of receivables which includes straight line rent. Straight line rent has $0 recovery.*
*(3) The analysis reflects the Debtors best estimate on General Unsecured claims using their February 2021 books and records net of eliminations.*

| | | | | De - Consolidated | |
|---|---|---|---|---|---|
| **60)  Monroeville Anchor Limited Partnership** | **Net Book Value [1]** | **Recovery %** | | **Recovery $** | |
| | | **Low** | **High** | **Low** | **High** |
| **I. Assets** | | | | | |
| **Liquidation Value of Real Estate Assets** | | | | | |
| 1.)   Land, Building & Improvements (Net) | 4 | 107.9% | 120.6% | 4 | 5 |
| 2.)         Subtotal | 4 | 107.9% | 120.6% | 4 | 5 |
| **Liquidation Value of All Other Assets** | | | | | |
| 3.)   Developments in Progress | - | 60.0% | 70.0% | - | - |
| 4.)   Dividends from Subsidiaries | 0-0 | NA | NA | - | - |
| 5.)   Cash and Cash Equivalents [1] | 0 | 100.0% | 100.0% | 0 | 0 |
| 6.)   Tenant Receivables [2] | 0 | 37.0% | 42.0% | 0 | 0 |
| 7.)   Outstanding Receivables | - | 40.0% | 50.0% | - | - |
| 8.)   Mortgage and Other Notes Receivable (Mortgage Escrow) | - | 85.0% | 90.0% | - | - |
| 9.)   Investments in Unconsolidated Affiliates | - | 0.0% | 1.5% | - | - |
| 10.)  Recovery on Intercompany Claims | 0-0 | NA | NA | - | - |
| 11.)  Intangible Lease Assets and Other assets | 0 | 2.5% | 5.0% | 0 | 0 |
| 12.)  Litigation & Preference/Avoidance Actions | - | N/A | N/A | - | - |
| 13.)        Subtotal | 1 | 54.0% | 56.2% | 0 | 0 |
| **Total Estimated Proceeds from Liquidation of Assets** | | | | 5 | 5 |
| **II. Admin / Wind Down Expenses** | | | | | |
| 14.)        Subtotal | | | | 0 | 1 |
| **Net Proceeds Available for Secured Claims** | | | | 4 | 4 |
| **III. Liabilities** | | | | | |
| **Liquidation Value of Secured Liabilities** | | | | | |
| 15.)        Subtotal | NA | NA | NA | NA | NA |
| **Net Proceeds Available for Unsecured Claims** | | | | 4 | 4 |
| **Liquidation Value of Unsecured Liabilities** | | | | | |
| 16.)  Senior Unsecured Notes | - | NA | NA | - | - |
| 17.)  First Lien Credit Facility Deficiency Claim | - | NA | NA | - | - |
| 18.)  Property Specific Non-CMBS Properties Guarantee | 0-0 | NA | NA | - | - |
| 19.)  CMBS Properties Guarantee | 0-0 | NA | NA | - | - |
| 20.)  Accounts Payable and Accrued Liabilities | 0 | 100.0% | 100.0% | 0 | 0 |
| 21.)  Intercompany | - | NA | NA | - | - |
| 22.)        Subtotal | 0 | | | 0 | 0 |
| **IV. Unsecured Recovery [3]** | | | | 100.0% | 100.0% |
| **Net Proceeds Available for Parent** | | | | 4 | 4 |
| 23.)  Payment to Parent | NA | NA | NA | 4 | 4 |

*(1) Liquidation Analysis reflects books and records as of 2/28/21. Cash balance is rolled forward through liquidation period.*
*(2) Reflects book value of receivables which includes straight line rent.  Straight line rent has $0 recovery.*
*(3) The analysis reflects the Debtors best estimate on General Unsecured claims using their February 2021 books and records net of eliminations.*

CBL & Associates Properties, Inc.
CBL - TN-Land Parcels, LLC - Ch. 7 Liquidation Analysis
$ in Millions

| | | | | De - Consolidated | |
|---|---|---|---|---|---|
| **61) TN-Land Parcels, LLC** | **Net Book Value [1]** | **Recovery %** | | **Recovery $** | |
| | | **Low** | **High** | **Low** | **High** |
| **I. Assets** | | | | | |
| **Liquidation Value of Real Estate Assets** | | | | | |
| 1.) Land, Building & Improvements (Net) | 0 | 1425.3% | 1593.0% | 2 | 2 |
| 2.) Subtotal | 0 | 1425.3% | 1593.0% | 2 | 2 |
| **Liquidation Value of All Other Assets** | | | | | |
| 3.) Developments in Progress | 0 | 60.0% | 70.0% | 0 | 0 |
| 4.) Dividends from Subsidiaries | 0-0 | NA | NA | - | - |
| 5.) Cash and Cash Equivalents [1] | 0 | 100.0% | 100.0% | 0 | 0 |
| 6.) Tenant Receivables [2] | 0 | 37.0% | 42.0% | 0 | 0 |
| 7.) Outstanding Receivables | - | 40.0% | 50.0% | - | - |
| 8.) Mortgage and Other Notes Receivable (Mortgage Escrow) | - | 85.0% | 90.0% | - | - |
| 9.) Investments in Unconsolidated Affiliates | - | 0.0% | 1.5% | - | - |
| 10.) Recovery on Intercompany Claims | 0-0 | NA | NA | - | - |
| 11.) Intangible Lease Assets and Other assets | 0 | 2.5% | 5.0% | 0 | 0 |
| 12.) Litigation & Preference/Avoidance Actions | - | N/A | N/A | - | - |
| 13.) Subtotal | 0 | 64.3% | 66.2% | 0 | 0 |
| **Total Estimated Proceeds from Liquidation of Assets** | | | | **2** | **2** |
| **II. Admin / Wind Down Expenses** | | | | | |
| 14.) Subtotal | | | | 0 | 0 |
| **Net Proceeds Available for Secured Claims** | | | | **2** | **2** |
| **III. Liabilities** | | | | | |
| **Liquidation Value of Secured Liabilities** | | | | | |
| 15.) Subtotal | NA | NA | NA | NA | NA |
| **Net Proceeds Available for Unsecured Claims** | | | | **2** | **2** |
| **Liquidation Value of Unsecured Liabilities** | | | | | |
| 16.) Senior Unsecured Notes | - | NA | NA | - | - |
| 17.) First Lien Credit Facility Deficiency Claim | - | NA | NA | - | - |
| 18.) Property Specific Non-CMBS Properties Guarantee | 0-0 | NA | NA | - | - |
| 19.) CMBS Properties Guarantee | 0-0 | NA | NA | - | - |
| 20.) Accounts Payable and Accrued Liabilities | 0 | 100.0% | 100.0% | 0 | 0 |
| 21.) Intercompany | - | NA | NA | - | - |
| 22.) Subtotal | 0 | | | 0 | 0 |
| **IV. Unsecured Recovery [3]** | | | | **100.0%** | **100.0%** |
| **Net Proceeds Available for Parent** | | | | **2** | **2** |
| 23.) Payment to Parent | NA | NA | NA | 2 | 2 |

*(1) Liquidation Analysis reflects books and records as of 2/28/21. Cash balance is rolled forward through liquidation period.*
*(2) Reflects book value of receivables which includes straight line rent.  Straight line rent has $0 recovery.*
*(3) The analysis reflects the Debtors best estimate on General Unsecured claims using their February 2021 books and records net of eliminations.*

CBL & Associates Properties, Inc.
CBL - LHM-Utah, LLC - Ch. 7 Liquidation Analysis
$ in Millions

|  | | Net Book Value [1] | Recovery % | | De - Consolidated Recovery $ | |
|---|---|---|---|---|---|---|
| **62)** | **LHM-Utah, LLC** | | Low | High | Low | High |
| **I. Assets** | | | | | | |
| **Liquidation Value of Real Estate Assets** | | | | | | |
| 1.) | Land, Building & Improvements (Net) | 2 | 242.1% | 270.6% | 4 | 4 |
| 2.) | Subtotal | 2 | 242.1% | 270.6% | 4 | 4 |
| **Liquidation Value of All Other Assets** | | | | | | |
| 3.) | Developments in Progress | 0 | 60.0% | 70.0% | 0 | 0 |
| 4.) | Dividends from Subsidiaries | 0-0 | NA | NA | - | - |
| 5.) | Cash and Cash Equivalents [1] | 0 | 100.0% | 100.0% | 0 | 0 |
| 6.) | Tenant Receivables [2] | 0 | 37.0% | 42.0% | 0 | 0 |
| 7.) | Outstanding Receivables | - | 40.0% | 50.0% | - | - |
| 8.) | Mortgage and Other Notes Receivable (Mortgage Escrow) | - | 85.0% | 90.0% | - | - |
| 9.) | Investments in Unconsolidated Affiliates | - | 0.0% | 1.5% | - | - |
| 10.) | Recovery on Intercompany Claims | 0-0 | NA | NA | - | - |
| 11.) | Intangible Lease Assets and Other assets | - | 2.5% | 5.0% | - | - |
| 12.) | Litigation & Preference/Avoidance Actions | - | N/A | N/A | - | - |
| 13.) | Subtotal | 1 | 77.5% | 79.5% | 0 | 0 |
| | **Total Estimated Proceeds from Liquidation of Assets** | | | | **4** | **5** |
| **II. Admin / Wind Down Expenses** | | | | | | |
| 14.) | Subtotal | | | | 1 | 1 |
| | **Net Proceeds Available for Secured Claims** | | | | **4** | **4** |
| **III. Liabilities** | | | | | | |
| **Liquidation Value of Secured Liabilities** | | | | | | |
| 15.) | First Lien Credit Facility | 1,115 | 0.3% | 0.4% | 4 | 4 |
| 16.) | Subtotal | 1,115 | 0.3% | 0.4% | 4 | 4 |
| | **Net Proceeds Available for Unsecured Claims** | | | | **4** | **4** |
| **Liquidation Value of Unsecured Liabilities** | | | | | | |
| 17.) | Senior Unsecured Notes | - | NA | NA | - | - |
| 18.) | First Lien Credit Facility Deficiency Claim | - | NA | NA | - | - |
| 19.) | Property Specific Non-CMBS Properties Guarantee | 0-0 | NA | NA | - | - |
| 20.) | CMBS Properties Guarantee | 0-0 | NA | NA | - | - |
| 21.) | Accounts Payable and Accrued Liabilities | 0 | 0.0% | 0.0% | - | - |
| 22.) | Intercompany | - | NA | NA | - | - |
| 23.) | Subtotal | 0 | | | - | - |
| **IV. Unsecured Recovery [3]** | | | | | **0.0%** | **0.0%** |
| | **Net Proceeds Available for Parent** | | | | **-** | **-** |
| 24.) | Payment to Parent | NA | NA | NA | - | - |

| **Memo: Secured + Unsecured Recovery** | | |
|---|---|---|
| **First Lien Credit Facility Recovery** | **4** | **4** |
| *Recovery %* | *0.3%* | *0.4%* |

*(1) Liquidation Analysis reflects books and records as of 2/28/21. Cash balance is rolled forward through liquidation period.*
*(2) Reflects book value of receivables which includes straight line rent. Straight line rent has $0 recovery.*
*(3) The analysis reflects the Debtors best estimate on General Unsecured claims using their February 2021 books and records net of eliminations.*

CBL & Associates Properties, Inc.
CBL - CBL/Monroeville, L.P. - Ch. 7 Liquidation Analysis
$ in Millions

|  |  | Net Book Value [1] | Recovery % | | De - Consolidated Recovery $ | |
|---|---|---|---|---|---|---|
| | **63) CBL/Monroeville, L.P.** | | Low | High | Low | High |
| **I. Assets** | | | | | | |
| | **Liquidation Value of Real Estate Assets** | | | | | |
| 1.) | Land, Building & Improvements (Net) | 25 | 24.0% | 26.9% | 6 | 7 |
| 2.) | Subtotal | 25 | 24.0% | 26.9% | 6 | 7 |
| | **Liquidation Value of All Other Assets** | | | | | |
| 3.) | Developments in Progress | 0 | 60.0% | 70.0% | 0 | 0 |
| 4.) | Dividends from Subsidiaries | 0-0 | NA | NA | - | - |
| 5.) | Cash and Cash Equivalents [1] | 1 | 100.0% | 100.0% | 1 | 1 |
| 6.) | Tenant Receivables [2] | 0 | 37.0% | 42.0% | 0 | 0 |
| 7.) | Outstanding Receivables | - | 40.0% | 50.0% | - | - |
| 8.) | Mortgage and Other Notes Receivable (Mortgage Escrow) | - | 85.0% | 90.0% | - | - |
| 9.) | Investments in Unconsolidated Affiliates | - | 0.0% | 1.5% | - | - |
| 10.) | Recovery on Intercompany Claims | 0-0 | NA | NA | - | - |
| 11.) | Intangible Lease Assets and Other assets | 0 | 2.5% | 5.0% | 0 | 0 |
| 12.) | Litigation & Preference/Avoidance Actions | - | N/A | N/A | - | - |
| 13.) | Subtotal | 1 | 67.0% | 68.6% | 1 | 1 |
| | **Total Estimated Proceeds from Liquidation of Assets** | | | | **7** | **8** |
| **II. Admin / Wind Down Expenses** | | | | | | |
| 14.) | Subtotal | | | | 1 | 1 |
| | **Net Proceeds Available for Secured Claims** | | | | **6** | **6** |
| **III. Liabilities** | | | | | | |
| | **Liquidation Value of Secured Liabilities** | | | | | |
| 15.) | Subtotal | NA | NA | NA | NA | NA |
| | **Net Proceeds Available for Unsecured Claims** | | | | **6** | **6** |
| | **Liquidation Value of Unsecured Liabilities** | | | | | |
| 16.) | Senior Unsecured Notes | - | NA | NA | - | - |
| 17.) | First Lien Credit Facility Deficiency Claim | - | NA | NA | - | - |
| 18.) | Property Specific Non-CMBS Properties Guarantee | 0-0 | NA | NA | - | - |
| 19.) | CMBS Properties Guarantee | 0-0 | NA | NA | - | - |
| 20.) | Accounts Payable and Accrued Liabilities | 0 | 100.0% | 100.0% | 0 | 0 |
| 21.) | Intercompany | - | NA | NA | - | - |
| 22.) | Subtotal | 0 | | | 0 | 0 |
| **IV. Unsecured Recovery [3]** | | | | | **100.0%** | **100.0%** |
| | **Net Proceeds Available for Parent** | | | | **6** | **6** |
| 23.) | Payment to Parent | NA | NA | NA | 6 | 6 |

*(1) Liquidation Analysis reflects books and records as of 2/28/21. Cash balance is rolled forward through liquidation period.*
*(2) Reflects book value of receivables which includes straight line rent.  Straight line rent has $0 recovery.*
*(3) The analysis reflects the Debtors best estimate on General Unsecured claims using their February 2021 books and records net of eliminations.*

CBL & Associates Properties, Inc.
CBL - Pearland-OP Parcel 8, LLC - Ch. 7 Liquidation Analysis
$ in Millions

| 64)  Pearland-OP Parcel 8, LLC | Net Book Value [1] | Recovery % | | De - Consolidated Recovery $ | |
|---|---|---|---|---|---|
| | | Low | High | Low | High |
| **I. Assets** | | | | | |
| **Liquidation Value of Real Estate Assets** | | | | | |
| 1.) Land, Building & Improvements (Net) | 1 | 196.0% | 219.1% | 2 | 2 |
| 2.)      Subtotal | 1 | 196.0% | 219.1% | 2 | 2 |
| **Liquidation Value of All Other Assets** | | | | | |
| 3.) Developments in Progress | - | 60.0% | 70.0% | - | - |
| 4.) Dividends from Subsidiaries | 0-0 | NA | NA | - | - |
| 5.) Cash and Cash Equivalents [1] | 0 | 100.0% | 100.0% | 0 | 0 |
| 6.) Tenant Receivables [2] | 0 | 37.0% | 42.0% | 0 | 0 |
| 7.) Outstanding Receivables | - | 40.0% | 50.0% | - | - |
| 8.) Mortgage and Other Notes Receivable (Mortgage Escrow) | - | 85.0% | 90.0% | - | - |
| 9.) Investments in Unconsolidated Affiliates | - | 0.0% | 1.5% | - | - |
| 10.) Recovery on Intercompany Claims | 0-0 | NA | NA | - | - |
| 11.) Intangible Lease Assets and Other assets | 0 | 2.5% | 5.0% | 0 | 0 |
| 12.) Litigation & Preference/Avoidance Actions | - | N/A | N/A | - | - |
| 13.)      Subtotal | 0 | 75.9% | 77.3% | 0 | 0 |
| **Total Estimated Proceeds from Liquidation of Assets** | | | | 2 | 2 |
| **II. Admin / Wind Down Expenses** | | | | | |
| 14.)      Subtotal | | | | 0 | 0 |
| **Net Proceeds Available for Secured Claims** | | | | 2 | 2 |
| **III. Liabilities** | | | | | |
| **Liquidation Value of Secured Liabilities** | | | | | |
| 15.) First Lien Credit Facility | 1,115 | 0.1% | 0.2% | 2 | 2 |
| 16.)      Subtotal | 1,115 | 0.1% | 0.2% | 2 | 2 |
| **Net Proceeds Available for Unsecured Claims** | | | | 2 | 2 |
| **Liquidation Value of Unsecured Liabilities** | | | | | |
| 17.) Senior Unsecured Notes | - | NA | NA | - | - |
| 18.) First Lien Credit Facility Deficiency Claim | | NA | NA | - | - |
| 19.) Property Specific Non-CMBS Properties Guarantee | 0-0 | NA | NA | - | - |
| 20.) CMBS Properties Guarantee | 0-0 | NA | NA | - | - |
| 21.) Accounts Payable and Accrued Liabilities | - | NA | NA | - | - |
| 22.) Intercompany | - | NA | NA | - | - |
| 23.)      Subtotal | - | | | - | - |
| **IV. Unsecured Recovery [3]** | | | | NA | NA |
| **Net Proceeds Available for Parent** | | | | - | - |
| 24.) Payment to Parent | NA | NA | NA | - | - |
| **Memo: Secured + Unsecured Recovery** | | | | | |
| First Lien Credit Facility Recovery | | | | 2 | 2 |
| *Recovery %* | | | | *0.1%* | *0.2%* |

*(1) Liquidation Analysis reflects books and records as of 2/28/21. Cash balance is rolled forward through liquidation period.*
*(2) Reflects book value of receivables which includes straight line rent.  Straight line rent has $0 recovery.*
*(3) The analysis reflects the Debtors best estimate on General Unsecured claims using their February 2021 books and records net of eliminations.*

CBL & Associates Properties, Inc.
CBL - CBL/Monroeville Expansion, L.P. - Ch. 7 Liquidation Analysis
$ in Millions

| | | | | De - Consolidated | |
|---|---|---|---|---|---|
| **65)  CBL/Monroeville Expansion, L.P.** | **Net Book Value** [1] | **Recovery %** | | **Recovery $** | |
| | | **Low** | **High** | **Low** | **High** |
| **I. Assets** | | | | | |
| **Liquidation Value of Real Estate Assets** | | | | | |
| 1.)   Land, Building & Improvements (Net) | 3 | 42.0% | 47.0% | 1 | 2 |
| 2.)         Subtotal | 3 | 42.0% | 47.0% | 1 | 2 |
| **Liquidation Value of All Other Assets** | | | | | |
| 3.)   Developments in Progress | - | 60.0% | 70.0% | - | - |
| 4.)   Dividends from Subsidiaries | 0-0 | NA | NA | - | - |
| 5.)   Cash and Cash Equivalents [1] | - | 100.0% | 100.0% | - | - |
| 6.)   Tenant Receivables [2] | 0 | 37.0% | 42.0% | 0 | 0 |
| 7.)   Outstanding Receivables | - | 40.0% | 50.0% | - | - |
| 8.)   Mortgage and Other Notes Receivable (Mortgage Escrow) | - | 85.0% | 90.0% | - | - |
| 9.)   Investments in Unconsolidated Affiliates | - | 0.0% | 1.5% | - | - |
| 10.) Recovery on Intercompany Claims | 0-0 | NA | NA | - | - |
| 11.) Intangible Lease Assets and Other assets | 0 | 2.5% | 5.0% | 0 | 0 |
| 12.) Litigation & Preference/Avoidance Actions | - | N/A | N/A | - | - |
| 13.)       Subtotal | 0 | 15.9% | 19.3% | 0 | 0 |
| **Total Estimated Proceeds from Liquidation of Assets** | | | | 1 | 2 |
| **II. Admin / Wind Down Expenses** | | | | | |
| 14.)       Subtotal | | | | 0 | 0 |
| **Net Proceeds Available for Secured Claims** | | | | 1 | 1 |
| **III. Liabilities** | | | | | |
| **Liquidation Value of Secured Liabilities** | | | | | |
| 15.)       Subtotal | NA | NA | NA | NA | NA |
| **Net Proceeds Available for Unsecured Claims** | | | | 1 | 1 |
| **Liquidation Value of Unsecured Liabilities** | | | | | |
| 16.) Senior Unsecured Notes | - | NA | NA | - | - |
| 17.) First Lien Credit Facility Deficiency Claim | - | NA | NA | - | - |
| 18.) Property Specific Non-CMBS Properties Guarantee | 0-0 | NA | NA | - | - |
| 19.) CMBS Properties Guarantee | 0-0 | NA | NA | - | - |
| 20.) Accounts Payable and Accrued Liabilities | 0 | 100.0% | 100.0% | 0 | 0 |
| 21.) Intercompany | - | NA | NA | - | - |
| 22.)       Subtotal | 0 | | | 0 | 0 |
| **IV. Unsecured Recovery** [3] | | | | **100.0%** | **100.0%** |
| **Net Proceeds Available for Parent** | | | | 1 | 1 |
| 23.) Payment to Parent | NA | NA | NA | 1 | 1 |

*(1) Liquidation Analysis reflects books and records as of 2/28/21. Cash balance is rolled forward through liquidation period.*
*(2) Reflects book value of receivables which includes straight line rent.  Straight line rent has $0 recovery.*
*(3) The analysis reflects the Debtors best estimate on General Unsecured claims using their February 2021 books and records net of eliminations.*

CBL - EastGate Company - Ch. 7 Liquidation Analysis
$ in Millions

| 66) EastGate Company | Net Book Value [1] | Recovery % | | De - Consolidated Recovery $ | |
|---|---|---|---|---|---|
| | | Low | High | Low | High |
| **I. Assets** | | | | | |
| **Liquidation Value of Real Estate Assets** | | | | | |
| 1.) Land, Building & Improvements (Net) | 2 | 45.1% | 50.4% | 1 | 1 |
| 2.) Subtotal | 2 | 45.1% | 50.4% | 1 | 1 |
| **Liquidation Value of All Other Assets** | | | | | |
| 3.) Developments in Progress | - | 60.0% | 70.0% | - | - |
| 4.) Dividends from Subsidiaries | 0-0 | NA | NA | - | - |
| 5.) Cash and Cash Equivalents [1] | 0 | 100.0% | 100.0% | 0 | 0 |
| 6.) Tenant Receivables [2] | 0 | 37.0% | 42.0% | 0 | 0 |
| 7.) Outstanding Receivables | - | 40.0% | 50.0% | - | - |
| 8.) Mortgage and Other Notes Receivable (Mortgage Escrow) | - | 85.0% | 90.0% | - | - |
| 9.) Investments in Unconsolidated Affiliates | - | 0.0% | 1.5% | - | - |
| 10.) Recovery on Intercompany Claims | 0-0 | NA | NA | - | - |
| 11.) Intangible Lease Assets and Other assets | 0 | 2.5% | 5.0% | 0 | 0 |
| 12.) Litigation & Preference/Avoidance Actions | - | N/A | N/A | - | - |
| 13.) Subtotal | 0 | 65.2% | 67.2% | 0 | 0 |
| **Total Estimated Proceeds from Liquidation of Assets** | | | | 1 | 1 |
| **II. Admin / Wind Down Expenses** | | | | | |
| 14.) Subtotal | | | | 0 | 0 |
| **Net Proceeds Available for Secured Claims** | | | | 1 | 1 |
| **III. Liabilities** | | | | | |
| **Liquidation Value of Secured Liabilities** | | | | | |
| 15.) Subtotal | NA | NA | NA | NA | NA |
| **Net Proceeds Available for Unsecured Claims** | | | | 1 | 1 |
| **Liquidation Value of Unsecured Liabilities** | | | | | |
| 16.) Senior Unsecured Notes | - | NA | NA | - | - |
| 17.) First Lien Credit Facility Deficiency Claim | - | NA | NA | - | - |
| 18.) Property Specific Non-CMBS Properties Guarantee | 0-0 | NA | NA | - | - |
| 19.) CMBS Properties Guarantee | 0-0 | NA | NA | - | - |
| 20.) Accounts Payable and Accrued Liabilities | 0 | 100.0% | 100.0% | 0 | 0 |
| 21.) Intercompany | - | NA | NA | - | - |
| 22.) Subtotal | 0 | | | 0 | 0 |
| **IV. Unsecured Recovery [3]** | | | | 100.0% | 100.0% |
| **Net Proceeds Available for Parent** | | | | 1 | 1 |
| 23.) Payment to Parent | NA | NA | NA | 1 | 1 |

*(1) Liquidation Analysis reflects books and records as of 2/28/21. Cash balance is rolled forward through liquidation period.*
*(2) Reflects book value of receivables which includes straight line rent.  Straight line rent has $0 recovery.*
*(3) The analysis reflects the Debtors best estimate on General Unsecured claims using their February 2021 books and records net of eliminations.*

CBL & Associates Properties, Inc.
CBL - TX-Land Parcels, LLC - Ch. 7 Liquidation Analysis
$ in Millions

| | | | | De - Consolidated | |
|---|---|---|---|---|---|
| **67)  TX-Land Parcels, LLC** | **Net Book Value [1]** | **Recovery %** | | **Recovery $** | |
| | | **Low** | **High** | **Low** | **High** |
| **I. Assets** | | | | | |
| **Liquidation Value of Real Estate Assets** | | | | | |
| 1.)   Land, Building & Improvements (Net) | 3 | 55.7% | 62.3% | 2 | 2 |
| 2.)      **Subtotal** | 3 | 55.7% | 62.3% | 2 | 2 |
| **Liquidation Value of All Other Assets** | | | | | |
| 3.)   Developments in Progress | - | 60.0% | 70.0% | - | - |
| 4.)   Dividends from Subsidiaries | 0-) | NA | NA | - | - |
| 5.)   Cash and Cash Equivalents [1] | 0 | 100.0% | 100.0% | 0 | 0 |
| 6.)   Tenant Receivables [2] | 0 | 37.0% | 42.0% | 0 | 0 |
| 7.)   Outstanding Receivables | - | 40.0% | 50.0% | - | - |
| 8.)   Mortgage and Other Notes Receivable (Mortgage Escrow) | - | 85.0% | 90.0% | - | - |
| 9.)   Investments in Unconsolidated Affiliates | - | 0.0% | 1.5% | - | - |
| 10.)  Recovery on Intercompany Claims | 0-) | NA | NA | - | - |
| 11.)  Intangible Lease Assets and Other assets | 0 | 2.5% | 5.0% | 0 | 0 |
| 12.)  Litigation & Preference/Avoidance Actions | - | N/A | N/A | - | - |
| 13.)     **Subtotal** | 0 | 62.2% | 63.9% | 0 | 0 |
| **Total Estimated Proceeds from Liquidation of Assets** | | | | **2** | **2** |
| **II. Admin / Wind Down Expenses** | | | | | |
| 14.)     **Subtotal** | | | | 0 | 0 |
| **Net Proceeds Available for Secured Claims** | | | | **2** | **2** |
| **III. Liabilities** | | | | | |
| **Liquidation Value of Secured Liabilities** | | | | | |
| 15.)     **Subtotal** | NA | NA | NA | NA | NA |
| **Net Proceeds Available for Unsecured Claims** | | | | **2** | **2** |
| **Liquidation Value of Unsecured Liabilities** | | | | | |
| 16.)  Senior Unsecured Notes | - | NA | NA | - | - |
| 17.)  First Lien Credit Facility Deficiency Claim | - | NA | NA | - | - |
| 18.)  Property Specific Non-CMBS Properties Guarantee | 0-) | NA | NA | - | - |
| 19.)  CMBS Properties Guarantee | 0-) | NA | NA | - | - |
| 20.)  Accounts Payable and Accrued Liabilities | 0 | 100.0% | 100.0% | 0 | 0 |
| 21.)  Intercompany | - | NA | NA | - | - |
| 22.)     **Subtotal** | 0 | | | 0 | 0 |
| **IV. Unsecured Recovery [3]** | | | | **100.0%** | **100.0%** |
| **Net Proceeds Available for Parent** | | | | **2** | **2** |
| 23.)  Payment to Parent | NA | NA | NA | 2 | 2 |

*(1) Liquidation Analysis reflects books and records as of 2/28/21. Cash balance is rolled forward through liquidation period.*
*(2) Reflects book value of receivables which includes straight line rent.  Straight line rent has $0 recovery.*
*(3) The analysis reflects the Debtors best estimate on General Unsecured claims using their February 2021 books and records net of eliminations.*

CBL & Associates Properties, Inc.
CBL - Jefferson Mall Company II, LLC - Ch. 7 Liquidation Analysis
$ in Millions

| | | | | De - Consolidated | |
|---|---|---|---|---|---|
| **68) Jefferson Mall Company II, LLC** | Net Book Value [1] | Recovery % | | Recovery $ | |
| | | Low | High | Low | High |
| **I. Assets** | | | | | |
| **Liquidation Value of Real Estate Assets** | | | | | |
| 1.) Land, Building & Improvements (Net) | 1 | 144.9% | 161.9% | 1 | 1 |
| 2.) Subtotal | 1 | 144.9% | 161.9% | 1 | 1 |
| **Liquidation Value of All Other Assets** | | | | | |
| 3.) Developments in Progress | - | 60.0% | 70.0% | - | - |
| 4.) Dividends from Subsidiaries | 0-0 | NA | NA | - | - |
| 5.) Cash and Cash Equivalents [1] | 0 | 100.0% | 100.0% | 0 | 0 |
| 6.) Tenant Receivables [2] | 0 | 37.0% | 42.0% | 0 | 0 |
| 7.) Outstanding Receivables | - | 40.0% | 50.0% | - | - |
| 8.) Mortgage and Other Notes Receivable (Mortgage Escrow) | - | 85.0% | 90.0% | - | - |
| 9.) Investments in Unconsolidated Affiliates | - | 0.0% | 1.5% | - | - |
| 10.) Recovery on Intercompany Claims | 0-0 | NA | NA | - | - |
| 11.) Intangible Lease Assets and Other assets | 0 | 2.5% | 5.0% | 0 | 0 |
| 12.) Litigation & Preference/Avoidance Actions | - | N/A | N/A | - | - |
| 13.) Subtotal | 0 | 61.3% | 62.7% | 0 | 0 |
| **Total Estimated Proceeds from Liquidation of Assets** | | | | 1 | 1 |
| **II. Admin / Wind Down Expenses** | | | | | |
| 14.) Subtotal | | | | 0 | 0 |
| **Net Proceeds Available for Secured Claims** | | | | 1 | 1 |
| **III. Liabilities** | | | | | |
| **Liquidation Value of Secured Liabilities** | | | | | |
| 15.) Subtotal | NA | NA | NA | NA | NA |
| **Net Proceeds Available for Unsecured Claims** | | | | 1 | 1 |
| **Liquidation Value of Unsecured Liabilities** | | | | | |
| 16.) Senior Unsecured Notes | - | NA | NA | - | - |
| 17.) First Lien Credit Facility Deficiency Claim | - | NA | NA | - | - |
| 18.) Property Specific Non-CMBS Properties Guarantee | 0-0 | NA | NA | - | - |
| 19.) CMBS Properties Guarantee | 0-0 | NA | NA | - | - |
| 20.) Accounts Payable and Accrued Liabilities | 0 | 100.0% | 100.0% | 0 | 0 |
| 21.) Intercompany | - | NA | NA | - | - |
| 22.) Subtotal | 0 | | | 0 | 0 |
| **IV. Unsecured Recovery [3]** | | | | 100.0% | 100.0% |
| **Net Proceeds Available for Parent** | | | | 1 | 1 |
| 23.) Payment to Parent | NA | NA | NA | 1 | 1 |

*(1) Liquidation Analysis reflects books and records as of 2/28/21. Cash balance is rolled forward through liquidation period.*
*(2) Reflects book value of receivables which includes straight line rent. Straight line rent has $0 recovery.*
*(3) The analysis reflects the Debtors best estimate on General Unsecured claims using their February 2021 books and records net of eliminations.*

| | | | | De - Consolidated | |
|---|---|---|---|---|---|
| **69) Jefferson Anchor S, LLC** | Net Book Value [1] | Recovery % | | Recovery $ | |
| | | Low | High | Low | High |
| **I. Assets** | | | | | |
| **Liquidation Value of Real Estate Assets** | | | | | |
| 1.) Land, Building & Improvements (Net) | 4 | 21.9% | 25.7% | 1 | 1 |
| 2.) Subtotal | 4 | 21.9% | 25.7% | 1 | 1 |
| **Liquidation Value of All Other Assets** | | | | | |
| 3.) Developments in Progress | 1 | 60.0% | 70.0% | 1 | 1 |
| 4.) Dividends from Subsidiaries | 0-0 | NA | NA | - | - |
| 5.) Cash and Cash Equivalents [1] | 0 | 100.0% | 100.0% | 0 | 0 |
| 6.) Tenant Receivables [2] | - | 37.0% | 42.0% | - | - |
| 7.) Outstanding Receivables | - | 40.0% | 50.0% | - | - |
| 8.) Mortgage and Other Notes Receivable (Mortgage Escrow) | - | 85.0% | 90.0% | - | - |
| 9.) Investments in Unconsolidated Affiliates | - | 0.0% | 1.5% | - | - |
| 10.) Recovery on Intercompany Claims | 0-0 | NA | NA | - | - |
| 11.) Intangible Lease Assets and Other assets | 0 | 2.5% | 5.0% | 0 | 0 |
| 12.) Litigation & Preference/Avoidance Actions | - | N/A | N/A | - | - |
| 13.) Subtotal | 1 | 61.2% | 70.6% | 1 | 1 |
| **Total Estimated Proceeds from Liquidation of Assets** | | | | 2 | 2 |
| **II. Admin / Wind Down Expenses** | | | | | |
| 14.) Subtotal | | | | 0 | 0 |
| **Net Proceeds Available for Secured Claims** | | | | 2 | 2 |
| **III. Liabilities** | | | | | |
| **Liquidation Value of Secured Liabilities** | | | | | |
| 15.) Subtotal | NA | NA | NA | NA | NA |
| **Net Proceeds Available for Unsecured Claims** | | | | 2 | 2 |
| **Liquidation Value of Unsecured Liabilities** | | | | | |
| 16.) Senior Unsecured Notes | - | NA | NA | - | - |
| 17.) First Lien Credit Facility Deficiency Claim | | NA | NA | - | - |
| 18.) Property Specific Non-CMBS Properties Guarantee | 0-0 | NA | NA | - | - |
| 19.) CMBS Properties Guarantee | 0-0 | NA | NA | - | - |
| 20.) Accounts Payable and Accrued Liabilities | - | NA | NA | - | - |
| 21.) Intercompany | - | NA | NA | - | - |
| 22.) Subtotal | - | | | - | - |
| **IV. Unsecured Recovery [3]** | | | | NA | NA |
| **Net Proceeds Available for Parent** | | | | 2 | 2 |
| 23.) Payment to Parent | NA | NA | NA | 2 | 2 |

*(1) Liquidation Analysis reflects books and records as of 2/28/21. Cash balance is rolled forward through liquidation period.*
*(2) Reflects book value of receivables which includes straight line rent.  Straight line rent has $0 recovery.*
*(3) The analysis reflects the Debtors best estimate on General Unsecured claims using their February 2021 books and records net of eliminations.*

CBL & Associates Properties, Inc.
CBL - EastGate Anchor S, LLC - Ch. 7 Liquidation Analysis
$ in Millions

| | | | | | De - Consolidated | |
|---|---|---|---|---|---|---|
| **70) EastGate Anchor S, LLC** | **Net Book Value** [(1)] | **Recovery %** | | | **Recovery $** | |
| | | **Low** | **High** | | **Low** | **High** |
| **I. Assets** | | | | | | |
| **Liquidation Value of Real Estate Assets** | | | | | | |
| 1.) Land, Building & Improvements (Net) | 1 | 31.5% | 39.4% | | 0 | 1 |
| 2.) Subtotal | 1 | 31.5% | 39.4% | | 0 | 1 |
| **Liquidation Value of All Other Assets** | | | | | | |
| 3.) Developments in Progress | 1 | 60.0% | 70.0% | | 0 | 0 |
| 4.) Dividends from Subsidiaries | 0-0 | NA | NA | | - | - |
| 5.) Cash and Cash Equivalents [(1)] | - | 100.0% | 100.0% | | - | - |
| 6.) Tenant Receivables [(2)] | - | 37.0% | 42.0% | | - | - |
| 7.) Outstanding Receivables | - | 40.0% | 50.0% | | - | - |
| 8.) Mortgage and Other Notes Receivable (Mortgage Escrow) | - | 85.0% | 90.0% | | - | - |
| 9.) Investments in Unconsolidated Affiliates | - | 0.0% | 1.5% | | - | - |
| 10.) Recovery on Intercompany Claims | 0-0 | NA | NA | | - | - |
| 11.) Intangible Lease Assets and Other assets | 0 | 2.5% | 5.0% | | 0 | 0 |
| 12.) Litigation & Preference/Avoidance Actions | - | N/A | N/A | | - | - |
| 13.) Subtotal | 1 | 59.0% | 68.9% | | 0 | 0 |
| **Total Estimated Proceeds from Liquidation of Assets** | | | | | **1** | **1** |
| **II. Admin / Wind Down Expenses** | | | | | | |
| 14.) Subtotal | | | | | 0 | 0 |
| **Net Proceeds Available for Secured Claims** | | | | | **1** | **1** |
| **III. Liabilities** | | | | | | |
| **Liquidation Value of Secured Liabilities** | | | | | | |
| 15.) Subtotal | NA | NA | NA | | NA | NA |
| **Net Proceeds Available for Unsecured Claims** | | | | | **1** | **1** |
| **Liquidation Value of Unsecured Liabilities** | | | | | | |
| 16.) Senior Unsecured Notes | - | NA | NA | | - | - |
| 17.) First Lien Credit Facility Deficiency Claim | | NA | NA | | - | - |
| 18.) Property Specific Non-CMBS Properties Guarantee | 0-0 | NA | NA | | - | - |
| 19.) CMBS Properties Guarantee | 0-0 | NA | NA | | - | - |
| 20.) Accounts Payable and Accrued Liabilities | - | NA | NA | | - | - |
| 21.) Intercompany | - | NA | NA | | - | - |
| 22.) Subtotal | - | | | | - | - |
| **IV. Unsecured Recovery** [(3)] | | | | | **NA** | **NA** |
| **Net Proceeds Available for Parent** | | | | | **1** | **1** |
| 23.) Payment to Parent | NA | NA | NA | | 1 | 1 |

*(1) Liquidation Analysis reflects books and records as of 2/28/21. Cash balance is rolled forward through liquidation period.*
*(2) Reflects book value of receivables which includes straight line rent. Straight line rent has $0 recovery.*
*(3) The analysis reflects the Debtors best estimate on General Unsecured claims using their February 2021 books and records net of eliminations.*

CBL & Associates Properties, Inc.
CBL - Imperial Valley Peripheral L.P. - Ch. 7 Liquidation Analysis
$ in Millions

| 71)  Imperial Valley Peripheral L.P. | Net Book Value [1] | Recovery % | | De - Consolidated Recovery $ | |
|---|---|---|---|---|---|
| | | Low | High | Low | High |
| **I. Assets** | | | | | |
| **Liquidation Value of Real Estate Assets** | | | | | |
| 1.)   Land, Building & Improvements (Net) | 5 | 8.7% | 9.8% | 0 | 1 |
| 2.)      **Subtotal** | 5 | 8.7% | 9.8% | 0 | 1 |
| **Liquidation Value of All Other Assets** | | | | | |
| 3.)   Developments in Progress | - | 60.0% | 70.0% | - | - |
| 4.)   Dividends from Subsidiaries | 0-0 | NA | NA | - | - |
| 5.)   Cash and Cash Equivalents [1] | 0 | 100.0% | 100.0% | 0 | 0 |
| 6.)   Tenant Receivables [2] | 0 | 37.0% | 42.0% | 0 | 0 |
| 7.)   Outstanding Receivables | - | 40.0% | 50.0% | - | - |
| 8.)   Mortgage and Other Notes Receivable (Mortgage Escrow) | - | 85.0% | 90.0% | - | - |
| 9.)   Investments in Unconsolidated Affiliates | - | 0.0% | 1.5% | - | - |
| 10.)  Recovery on Intercompany Claims | 0-0 | NA | NA | - | - |
| 11.)  Intangible Lease Assets and Other assets | 0 | 2.5% | 5.0% | 0 | 0 |
| 12.)  Litigation & Preference/Avoidance Actions | - | N/A | N/A | - | - |
| 13.)     **Subtotal** | 0 | 85.4% | 86.5% | 0 | 0 |
| **Total Estimated Proceeds from Liquidation of Assets** | | | | 1 | 1 |
| **II. Admin / Wind Down Expenses** | | | | | |
| 14.)     **Subtotal** | | | | 0 | 0 |
| **Net Proceeds Available for Secured Claims** | | | | 1 | 1 |
| **III. Liabilities** | | | | | |
| **Liquidation Value of Secured Liabilities** | | | | | |
| 15.)     **Subtotal** | NA | NA | NA | NA | NA |
| **Net Proceeds Available for Unsecured Claims** | | | | 1 | 1 |
| **Liquidation Value of Unsecured Liabilities** | | | | | |
| 16.)  Senior Unsecured Notes | - | NA | NA | - | - |
| 17.)  First Lien Credit Facility Deficiency Claim | - | NA | NA | - | - |
| 18.)  Property Specific Non-CMBS Properties Guarantee | 0-0 | NA | NA | - | - |
| 19.)  CMBS Properties Guarantee | 0-0 | NA | NA | - | - |
| 20.)  Accounts Payable and Accrued Liabilities | 0 | 100.0% | 100.0% | 0 | 0 |
| 21.)  Intercompany | - | NA | NA | - | - |
| 22.)     **Subtotal** | 0 | | | 0 | 0 |
| **IV. Unsecured Recovery [3]** | | | | 100.0% | 100.0% |
| **Net Proceeds Available for Parent** | | | | 0 | 0 |
| 23.)  Payment to Parent | NA | NA | NA | 0 | 0 |

*(1) Liquidation Analysis reflects books and records as of 2/28/21. Cash balance is rolled forward through liquidation period.*
*(2) Reflects book value of receivables which includes straight line rent.  Straight line rent has $0 recovery.*
*(3) The analysis reflects the Debtors best estimate on General Unsecured claims using their February 2021 books and records net of eliminations.*

CBL & Associates Properties, Inc.
CBL - D'Iberville CBL Land, LLC - Ch. 7 Liquidation Analysis
$ in Millions

| | Net Book Value [1] | Recovery % | | De - Consolidated Recovery $ | |
|---|---|---|---|---|---|
| **72)  D'Iberville CBL Land, LLC** | | Low | High | Low | High |
| **I. Assets** | | | | | |
| **Liquidation Value of Real Estate Assets** | | | | | |
| 1.)  Land, Building & Improvements (Net) | 8 | 18.5% | 37.0% | 2 | 3 |
| 2.)       **Subtotal** | 8 | 18.5% | 37.0% | 2 | 3 |
| **Liquidation Value of All Other Assets** | | | | | |
| 3.)  Developments in Progress | - | 60.0% | 70.0% | - | - |
| 4.)  Dividends from Subsidiaries | 0-0 | NA | NA | - | - |
| 5.)  Cash and Cash Equivalents [1] | - | 100.0% | 100.0% | - | - |
| 6.)  Tenant Receivables [2] | 0 | 37.0% | 42.0% | 0 | 0 |
| 7.)  Outstanding Receivables | - | 40.0% | 50.0% | - | - |
| 8.)  Mortgage and Other Notes Receivable (Mortgage Escrow) | - | 85.0% | 90.0% | - | - |
| 9.)  Investments in Unconsolidated Affiliates | - | 0.0% | 1.5% | - | - |
| 10.)  Recovery on Intercompany Claims | 0-0 | NA | NA | - | - |
| 11.)  Intangible Lease Assets and Other assets | - | 2.5% | 5.0% | - | - |
| 12.)  Litigation & Preference/Avoidance Actions | - | N/A | N/A | - | - |
| 13.)       **Subtotal** | 0 | 37.0% | 42.0% | 0 | 0 |
| **Total Estimated Proceeds from Liquidation of Assets** | | | | **2** | **3** |
| **II. Admin / Wind Down Expenses** | | | | | |
| 14.)       **Subtotal** | | | | 0 | 0 |
| **Net Proceeds Available for Secured Claims** | | | | **1** | **3** |
| **III. Liabilities** | | | | | |
| **Liquidation Value of Secured Liabilities** | | | | | |
| 15.)       **Subtotal** | NA | NA | NA | NA | NA |
| **Net Proceeds Available for Unsecured Claims** | | | | **1** | **3** |
| **Liquidation Value of Unsecured Liabilities** | | | | | |
| 16.)  Senior Unsecured Notes | - | NA | NA | - | - |
| 17.)  First Lien Credit Facility Deficiency Claim | | NA | NA | - | - |
| 18.)  Property Specific Non-CMBS Properties Guarantee | 0-0 | NA | NA | - | - |
| 19.)  CMBS Properties Guarantee | 0-0 | NA | NA | - | - |
| 20.)  Accounts Payable and Accrued Liabilities | 1 | 100.0% | 100.0% | 1 | 1 |
| 21.)  Intercompany | - | NA | NA | - | - |
| 22.)       **Subtotal** | 1 | | | 1 | 1 |
| **IV. Unsecured Recovery [3]** | | | | **100.0%** | **100.0%** |
| **Net Proceeds Available for Parent** | | | | **1** | **2** |
| 23.)  Payment to Parent | NA | NA | NA | 1 | 2 |

*(1) Liquidation Analysis reflects books and records as of 2/28/21. Cash balance is rolled forward through liquidation period.*
*(2) Reflects book value of receivables which includes straight line rent.  Straight line rent has $0 recovery.*
*(3) The analysis reflects the Debtors best estimate on General Unsecured claims using their February 2021 books and records net of eliminations.*

CBL & Associates Properties, Inc.
CBL - CBL & Associates Properties, Inc. - Ch. 7 Liquidation Analysis
$ in Millions

| | | | | De - Consolidated | |
|---|---|---|---|---|---|
| **73)  CBL & Associates Properties, Inc.** | **Net Book Value** [1] | **Recovery %** | | **Recovery $** | |
| | | **Low** | **High** | **Low** | **High** |
| **I. Assets** | | | | | |
| **Liquidation Value of Real Estate Assets** | | | | | |
| 1.) Land, Building & Improvements (Net) | - | NA | NA | - | - |
| 2.) **Subtotal** | - | NA | NA | - | - |
| **Liquidation Value of All Other Assets** | | | | | |
| 3.) Developments in Progress | - | 60.0% | 70.0% | - | - |
| 4.) Dividends from Subsidiaries | 0-0 | NA | NA | - | - |
| 5.) Cash and Cash Equivalents [1] | 0 | 100.0% | 100.0% | 0 | 0 |
| 6.) Tenant Receivables [2] | - | 37.0% | 42.0% | - | - |
| 7.) Outstanding Receivables | 0 | 40.0% | 50.0% | 0 | 0 |
| 8.) Mortgage and Other Notes Receivable (Mortgage Escrow) | - | 85.0% | 90.0% | - | - |
| 9.) Investments in Unconsolidated Affiliates | 1 | 0.0% | 1.5% | - | 0 |
| 10.) Recovery on Intercompany Claims | 0-0 | NA | NA | - | - |
| 11.) Intangible Lease Assets and Other assets | 0 | 2.5% | 5.0% | 0 | 0 |
| 12.) Litigation & Preference/Avoidance Actions | - | N/A | N/A | - | - |
| 13.) **Subtotal** | 1 | 2.2% | 4.0% | 0 | 0 |
| **Total Estimated Proceeds from Liquidation of Assets** | | | | **0** | **0** |
| **II. Admin / Wind Down Expenses** | | | | | |
| 14.) **Subtotal** | | | | 0 | 0 |
| **Net Proceeds Available for Secured Claims** | | | | **0** | **0** |
| **III. Liabilities** | | | | | |
| **Liquidation Value of Secured Liabilities** | | | | | |
| 15.) **Subtotal** | NA | NA | NA | NA | NA |
| **Net Proceeds Available for Unsecured Claims** | | | | **0** | **0** |
| **Liquidation Value of Unsecured Liabilities** | | | | | |
| 16.) Senior Unsecured Notes | - | NA | NA | - | - |
| 17.) First Lien Credit Facility Deficiency Claim | 1,115 | 0.0% | 0.0% | 0 | 0 |
| 18.) Property Specific Non-CMBS Properties Guarantee | 0-0 | NA | NA | - | - |
| 19.) CMBS Properties Guarantee | 0-0 | NA | NA | - | - |
| 20.) Accounts Payable and Accrued Liabilities | - | NA | NA | - | - |
| 21.) Intercompany | - | NA | NA | - | - |
| 22.) **Subtotal** | 1,115 | | | 0 | 0 |
| **IV. Unsecured Recovery** [3] | | | | **0.0%** | **0.0%** |
| **Net Proceeds Available for Parent** | | | | **-** | **-** |
| 23.) Payment to Parent | NA | NA | NA | - | - |

*(1) Liquidation Analysis reflects books and records as of 2/28/21. Cash balance is rolled forward through liquidation period.*
*(2) Reflects book value of receivables which includes straight line rent.  Straight line rent has $0 recovery.*
*(3) The analysis reflects the Debtors best estimate on General Unsecured claims using their February 2021 books and records net of eliminations.*

CBL & Associates Properties, Inc.
CBL - Eastland Anchor M, LLC - Ch. 7 Liquidation Analysis
$ in Millions

| | Net Book Value [1] | Recovery % | | De - Consolidated Recovery $ | |
|---|---|---|---|---|---|
| **74) Eastland Anchor M, LLC** | | Low | High | Low | High |
| **I. Assets** | | | | | |
| Liquidation Value of Real Estate Assets | | | | | |
| 1.) Land, Building & Improvements (Net) | 1 | 6.0% | 6.7% | 0 | 0 |
| 2.) Subtotal | 1 | 6.0% | 6.7% | 0 | 0 |
| Liquidation Value of All Other Assets | | | | | |
| 3.) Developments in Progress | - | 60.0% | 70.0% | - | - |
| 4.) Dividends from Subsidiaries | 0-0 | NA | NA | - | - |
| 5.) Cash and Cash Equivalents [1] | 0 | 100.0% | 100.0% | 0 | 0 |
| 6.) Tenant Receivables [2] | - | 37.0% | 42.0% | - | - |
| 7.) Outstanding Receivables | - | 40.0% | 50.0% | - | - |
| 8.) Mortgage and Other Notes Receivable (Mortgage Escrow) | - | 85.0% | 90.0% | - | - |
| 9.) Investments in Unconsolidated Affiliates | - | 0.0% | 1.5% | - | - |
| 10.) Recovery on Intercompany Claims | 0-0 | NA | NA | - | - |
| 11.) Intangible Lease Assets and Other assets | 0 | 2.5% | 5.0% | 0 | 0 |
| 12.) Litigation & Preference/Avoidance Actions | - | N/A | N/A | - | - |
| 13.) Subtotal | 0 | 42.7% | 44.1% | 0 | 0 |
| **Total Estimated Proceeds from Liquidation of Assets** | | | | **0** | **0** |
| **II. Admin / Wind Down Expenses** | | | | | |
| 14.) Subtotal | | | | 0 | 0 |
| **Net Proceeds Available for Secured Claims** | | | | - | - |
| **III. Liabilities** | | | | | |
| Liquidation Value of Secured Liabilities | | | | | |
| 15.) Subtotal | NA | NA | NA | NA | NA |
| **Net Proceeds Available for Unsecured Claims** | | | | - | - |
| Liquidation Value of Unsecured Liabilities | | | | | |
| 16.) Senior Unsecured Notes | - | NA | NA | - | - |
| 17.) First Lien Credit Facility Deficiency Claim | | NA | NA | - | - |
| 18.) Property Specific Non-CMBS Properties Guarantee | 0-0 | NA | NA | - | - |
| 19.) CMBS Properties Guarantee | 0-0 | NA | NA | - | - |
| 20.) Accounts Payable and Accrued Liabilities | - | NA | NA | - | - |
| 21.) Intercompany | - | NA | NA | - | - |
| 22.) Subtotal | - | | | - | - |
| **IV. Unsecured Recovery [3]** | | | | **NA** | **NA** |
| **Net Proceeds Available for Parent** | | | | - | - |
| 23.) Payment to Parent | NA | NA | NA | - | - |

*(1) Liquidation Analysis reflects books and records as of 2/28/21. Cash balance is rolled forward through liquidation period.*
*(2) Reflects book value of receivables which includes straight line rent.  Straight line rent has $0 recovery.*
*(3) The analysis reflects the Debtors best estimate on General Unsecured claims using their February 2021 books and records net of eliminations.*

CBL & Associates Properties, Inc.
CBL - Volusia SAC, LLC - Ch. 7 Liquidation Analysis
$ in Millions

| | | | | | De - Consolidated | |
|---|---|---|---|---|---|---|
| **75) Volusia SAC, LLC** | **Net Book Value** [1] | **Recovery %** | | | **Recovery $** | |
| | | **Low** | **High** | | **Low** | **High** |
| **I. Assets** | | | | | | |
| **Liquidation Value of Real Estate Assets** | | | | | | |
| 1.) Land, Building & Improvements (Net) | 8 | 30.2% | 33.8% | | 2 | 3 |
| 2.) Subtotal | 8 | 30.2% | 33.8% | | 2 | 3 |
| **Liquidation Value of All Other Assets** | | | | | | |
| 3.) Developments in Progress | - | 60.0% | 70.0% | | - | - |
| 4.) Dividends from Subsidiaries | 0-0 | NA | NA | | - | - |
| 5.) Cash and Cash Equivalents [1] | - | 100.0% | 100.0% | | - | - |
| 6.) Tenant Receivables [2] | 0 | 37.0% | 42.0% | | 0 | 0 |
| 7.) Outstanding Receivables | - | 40.0% | 50.0% | | - | - |
| 8.) Mortgage and Other Notes Receivable (Mortgage Escrow) | - | 85.0% | 90.0% | | - | - |
| 9.) Investments in Unconsolidated Affiliates | - | 0.0% | 1.5% | | - | - |
| 10.) Recovery on Intercompany Claims | 0-0 | NA | NA | | - | - |
| 11.) Intangible Lease Assets and Other assets | 0 | 2.5% | 5.0% | | 0 | 0 |
| 12.) Litigation & Preference/Avoidance Actions | - | N/A | N/A | | - | - |
| 13.) Subtotal | 0 | 13.7% | 17.1% | | 0 | 0 |
| **Total Estimated Proceeds from Liquidation of Assets** | | | | | **2** | **3** |
| **II. Admin / Wind Down Expenses** | | | | | | |
| 14.) Subtotal | | | | | 0 | 0 |
| **Net Proceeds Available for Secured Claims** | | | | | **2** | **2** |
| **III. Liabilities** | | | | | | |
| **Liquidation Value of Secured Liabilities** | | | | | | |
| 15.) Subtotal | NA | NA | NA | | NA | NA |
| **Net Proceeds Available for Unsecured Claims** | | | | | **2** | **2** |
| **Liquidation Value of Unsecured Liabilities** | | | | | | |
| 16.) Senior Unsecured Notes | - | NA | NA | | - | - |
| 17.) First Lien Credit Facility Deficiency Claim | - | NA | NA | | - | - |
| 18.) Property Specific Non-CMBS Properties Guarantee | 0-0 | NA | NA | | - | - |
| 19.) CMBS Properties Guarantee | 0-0 | NA | NA | | - | - |
| 20.) Accounts Payable and Accrued Liabilities | 0 | 100.0% | 100.0% | | 0 | 0 |
| 21.) Intercompany | - | NA | NA | | - | - |
| 22.) Subtotal | 0 | | | | 0 | 0 |
| **IV. Unsecured Recovery** [3] | | | | | **100.0%** | **100.0%** |
| **Net Proceeds Available for Parent** | | | | | **2** | **2** |
| 23.) Payment to Parent | NA | NA | NA | | 2 | 2 |

*(1) Liquidation Analysis reflects books and records as of 2/28/21. Cash balance is rolled forward through liquidation period.*
*(2) Reflects book value of receivables which includes straight line rent. Straight line rent has $0 recovery.*
*(3) The analysis reflects the Debtors best estimate on General Unsecured claims using their February 2021 books and records net of eliminations.*

| 76) CBL HP Hotel Member, LLC | Net Book Value [1] | Recovery % | | De - Consolidated Recovery $ | |
|---|---|---|---|---|---|
| | | Low | High | Low | High |
| **I. Assets** | | | | | |
| Liquidation Value of Real Estate Assets | | | | | |
| 1.) Land, Building & Improvements (Net) | - | NA | NA | - | - |
| 2.) **Subtotal** | - | NA | NA | - | - |
| Liquidation Value of All Other Assets | | | | | |
| 3.) Developments in Progress | - | 60.0% | 70.0% | - | - |
| 4.) Dividends from Subsidiaries | 0-0 | NA | NA | - | - |
| 5.) Cash and Cash Equivalents [1] | - | 100.0% | 100.0% | - | - |
| 6.) Tenant Receivables [2] | - | 37.0% | 42.0% | - | - |
| 7.) Outstanding Receivables | - | 40.0% | 50.0% | - | - |
| 8.) Mortgage and Other Notes Receivable (Mortgage Escrow) | - | 85.0% | 90.0% | - | - |
| 9.) Investments in Unconsolidated Affiliates | 2 | 0.0% | 1.5% | - | 0 |
| 10.) Recovery on Intercompany Claims | 0-0 | NA | NA | - | - |
| 11.) Intangible Lease Assets and Other assets | - | 2.5% | 5.0% | - | - |
| 12.) Litigation & Preference/Avoidance Actions | - | N/A | N/A | - | - |
| 13.) **Subtotal** | 2 | 0.0% | 1.5% | - | 0 |
| **Total Estimated Proceeds from Liquidation of Assets** | | | | **-** | **0** |
| **II. Admin / Wind Down Expenses** | | | | | |
| 14.) **Subtotal** | | | | - | 0 |
| **Net Proceeds Available for Secured Claims** | | | | **-** | **0** |
| **III. Liabilities** | | | | | |
| Liquidation Value of Secured Liabilities | | | | | |
| 15.) **Subtotal** | NA | NA | NA | NA | NA |
| **Net Proceeds Available for Unsecured Claims** | | | | **-** | **0** |
| Liquidation Value of Unsecured Liabilities | | | | | |
| 16.) Senior Unsecured Notes | - | NA | NA | - | - |
| 17.) First Lien Credit Facility Deficiency Claim | - | NA | NA | - | - |
| 18.) Property Specific Non-CMBS Properties Guarantee | 0-0 | NA | NA | - | - |
| 19.) CMBS Properties Guarantee | 0-0 | NA | NA | - | - |
| 20.) Accounts Payable and Accrued Liabilities | 0 | 0.0% | 100.0% | - | 0 |
| 21.) Intercompany | - | NA | NA | - | - |
| 22.) **Subtotal** | 0 | | | - | 0 |
| **IV. Unsecured Recovery [3]** | | | | **0.0%** | **100.0%** |
| **Net Proceeds Available for Parent** | | | | **-** | **0** |
| 23.) Payment to Parent | NA | NA | NA | | 0 |

*(1) Liquidation Analysis reflects books and records as of 2/28/21. Cash balance is rolled forward through liquidation period.*
*(2) Reflects book value of receivables which includes straight line rent.  Straight line rent has $0 recovery.*
*(3) The analysis reflects the Debtors best estimate on General Unsecured claims using their February 2021 books and records net of eliminations.*

CBL & Associates Properties, Inc.
CBL - Northgate SAC, LLC - Ch. 7 Liquidation Analysis
$ in Millions

| | Net Book Value [1] | Recovery % | | De - Consolidated Recovery $ | |
|---|---|---|---|---|---|
| **77) Northgate SAC, LLC** | | Low | High | Low | High |
| **I. Assets** | | | | | |
| **Liquidation Value of Real Estate Assets** | | | | | |
| 1.) Land, Building & Improvements (Net) | 1 | 70.3% | 78.5% | 1 | 1 |
| 2.) Subtotal | 1 | 70.3% | 78.5% | 1 | 1 |
| **Liquidation Value of All Other Assets** | | | | | |
| 3.) Developments in Progress | - | 60.0% | 70.0% | - | - |
| 4.) Dividends from Subsidiaries | 0-0 | NA | NA | - | - |
| 5.) Cash and Cash Equivalents [1] | 0 | 100.0% | 100.0% | 0 | 0 |
| 6.) Tenant Receivables [2] | 0 | 37.0% | 42.0% | 0 | 0 |
| 7.) Outstanding Receivables | - | 40.0% | 50.0% | - | - |
| 8.) Mortgage and Other Notes Receivable (Mortgage Escrow) | - | 85.0% | 90.0% | - | - |
| 9.) Investments in Unconsolidated Affiliates | - | 0.0% | 1.5% | - | - |
| 10.) Recovery on Intercompany Claims | 0-0 | NA | NA | - | - |
| 11.) Intangible Lease Assets and Other assets | 0 | 2.5% | 5.0% | 0 | 0 |
| 12.) Litigation & Preference/Avoidance Actions | - | N/A | N/A | - | - |
| 13.) Subtotal | 0 | 66.9% | 68.8% | 0 | 0 |
| **Total Estimated Proceeds from Liquidation of Assets** | | | | 1 | 1 |
| **II. Admin / Wind Down Expenses** | | | | | |
| 14.) Subtotal | | | | 0 | 0 |
| **Net Proceeds Available for Secured Claims** | | | | 1 | 1 |
| **III. Liabilities** | | | | | |
| **Liquidation Value of Secured Liabilities** | | | | | |
| 15.) Subtotal | NA | NA | NA | NA | NA |
| **Net Proceeds Available for Unsecured Claims** | | | | 1 | 1 |
| **Liquidation Value of Unsecured Liabilities** | | | | | |
| 16.) Senior Unsecured Notes | - | NA | NA | - | - |
| 17.) First Lien Credit Facility Deficiency Claim | | NA | NA | - | - |
| 18.) Property Specific Non-CMBS Properties Guarantee | 0-0 | NA | NA | - | - |
| 19.) CMBS Properties Guarantee | 0-0 | NA | NA | - | - |
| 20.) Accounts Payable and Accrued Liabilities | - | NA | NA | - | - |
| 21.) Intercompany | - | NA | NA | - | - |
| 22.) Subtotal | - | | | - | - |
| **IV. Unsecured Recovery [3]** | | | | NA | NA |
| **Net Proceeds Available for Parent** | | | | 1 | 1 |
| 23.) Payment to Parent | NA | NA | NA | 1 | 1 |

*(1) Liquidation Analysis reflects books and records as of 2/28/21. Cash balance is rolled forward through liquidation period.*
*(2) Reflects book value of receivables which includes straight line rent.  Straight line rent has $0 recovery.*
*(3) The analysis reflects the Debtors best estimate on General Unsecured claims using their February 2021 books and records net of eliminations.*

| | | | | De - Consolidated | |
|---|---|---|---|---|---|
| **78)  Hickory Point Outparcels, LLC** | **Net Book Value [1]** | **Recovery %** | | **Recovery $** | |
| | | **Low** | **High** | **Low** | **High** |
| **I. Assets** | | | | | |
| **Liquidation Value of Real Estate Assets** | | | | | |
| 1.)    Land, Building & Improvements (Net) | 2 | 10.8% | 21.6% | 0 | 1 |
| 2.)         Subtotal | 2 | 10.8% | 21.6% | 0 | 1 |
| **Liquidation Value of All Other Assets** | | | | | |
| 3.)    Developments in Progress | - | 60.0% | 70.0% | - | - |
| 4.)    Dividends from Subsidiaries | 0-0 | NA | NA | - | - |
| 5.)    Cash and Cash Equivalents [1] | 0 | 100.0% | 100.0% | 0 | 0 |
| 6.)    Tenant Receivables [2] | - | 37.0% | 42.0% | - | - |
| 7.)    Outstanding Receivables | - | 40.0% | 50.0% | - | - |
| 8.)    Mortgage and Other Notes Receivable (Mortgage Escrow) | - | 85.0% | 90.0% | - | - |
| 9.)    Investments in Unconsolidated Affiliates | - | 0.0% | 1.5% | - | - |
| 10.)  Recovery on Intercompany Claims | 0-0 | NA | NA | - | - |
| 11.)  Intangible Lease Assets and Other assets | - | 2.5% | 5.0% | - | - |
| 12.)  Litigation & Preference/Avoidance Actions | - | N/A | N/A | - | - |
| 13.)       Subtotal | 0 | 100.0% | 0.0% | 0 | 0 |
| **Total Estimated Proceeds from Liquidation of Assets** | | | | **0** | **1** |
| **II. Admin / Wind Down Expenses** | | | | | |
| 14.)       Subtotal | | | | 0 | 0 |
| **Net Proceeds Available for Secured Claims** | | | | **-** | **-** |
| **III. Liabilities** | | | | | |
| **Liquidation Value of Secured Liabilities** | | | | | |
| 15.)       Subtotal | NA | NA | NA | NA | NA |
| **Net Proceeds Available for Unsecured Claims** | | | | **-** | **-** |
| **Liquidation Value of Unsecured Liabilities** | | | | | |
| 16.)  Senior Unsecured Notes | - | NA | NA | - | - |
| 17.)  First Lien Credit Facility Deficiency Claim | - | NA | NA | - | - |
| 18.)  Property Specific Non-CMBS Properties Guarantee | 0-0 | NA | NA | - | - |
| 19.)  CMBS Properties Guarantee | 0-0 | NA | NA | - | - |
| 20.)  Accounts Payable and Accrued Liabilities | 0 | 100.0% | 100.0% | 0 | 0 |
| 21.)  Intercompany | - | NA | NA | - | - |
| 22.)       Subtotal | 0 | | | 0 | 0 |
| **IV. Unsecured Recovery [3]** | | | | **100.0%** | **100.0%** |
| **Net Proceeds Available for Parent** | | | | **0** | **0** |
| 23.)  Payment to Parent | NA | NA | NA | 0 | 0 |

*(1) Liquidation Analysis reflects books and records as of 2/28/21. Cash balance is rolled forward through liquidation period.*
*(2) Reflects book value of receivables which includes straight line rent.  Straight line rent has $0 recovery.*
*(3) The analysis reflects the Debtors best estimate on General Unsecured claims using their February 2021 books and records net of eliminations.*

CBL & Associates Properties, Inc.
List of Unscheduled Entities - Entities with $0 of Recoverable Assets

| Entity Name | Assets |
|---|---|
| 1) CBL Holdings I, Inc. | - |
| 2) CBL Holdings II, Inc. | - |
| 3) Akron Mall Land, LLC | - |
| 4) Alamance Crossing, LLC | - |
| 5) APWM, LLC | - |
| 6) Arbor Place Limited Partnership | - |
| 7) Asheville, LLC | - |
| 8) CBL Eagle Point Member, LLC | - |
| 9) CBL Statesboro Member, LLC | - |
| 10) CBL Walden Park, LLC | - |
| 11) CBL/Brookfield I, LLC | - |
| 12) CBL/Brookfield II, LLC | - |
| 13) CBL/Cherryvale I, LLC | - |
| 14) CBL/Citadel I, LLC | - |
| 15) CBL/Citadel II, LLC | - |
| 16) CBL/EastGate I, LLC | - |
| 17) CBL/EastGate II, LLC | - |
| 18) CBL/EastGate Mall, LLC | - |
| 19) CBL/Fayette I, LLC | - |
| 20) CBL/Fayette II, LLC | - |
| 21) CBL/GP Cary, Inc. | - |
| 22) CBL/GP II, Inc. | - |
| 23) CBL/GP V, Inc. | - |
| 24) CBL/GP VI, Inc. | - |
| 25) CBL/GP, Inc. | - |
| 26) CBL/Sunrise XS Land, L.P. | - |
| 27) CBL/Westmoreland I, LLC | - |
| 28) CBL/Westmoreland II, LLC | - |
| 29) CBL-840 GC, LLC | - |
| 30) Charleston Joint Venture | - |
| 31) Cross Creek Anchor S GP, LLC | - |
| 32) CW Joint Venture, LLC | - |
| 33) Development Options, Inc. | - |
| 34) Dunite Acquisitions, LLC | - |
| 35) Eastland Holding I, LLC | - |
| 36) Eastland Holding II, LLC | - |
| 37) Eastland Member, LLC | - |
| 38) GCTC Peripheral IV, LLC | - |
| 39) Hammock Landing/West Melbourne, LLC | - |
| 40) Henderson Square Limited Partnership | - |
| 41) Imperial Valley Commons, L.P. | - |
| 42) Imperial Valley Mall GP, LLC | - |
| 43) Imperial Valley Mall, L.P. | - |
| 44) IV Commons, LLC | - |
| 45) IV Outparcels, LLC | - |
| 46) JG Gulf Coast Town Center LLC | - |
| 47) Kirkwood Mall Mezz LLC | - |
| 48) Laurel Park Retail Holding LLC | - |
| 49) Lexington Joint Venture | - |
| 50) Mayfaire GP, LLC | - |

| Entity Name | Assets |
|---|---|
| 51) CBL/Gulf Coast, LLC | - |
| 52) CBL/Imperial Valley GP, LLC | - |
| 53) CBL/J I, LLC | - |
| 54) CBL/J II, LLC | - |
| 55) CBL/Kirkwood Mall, LLC | - |
| 56) CBL/Madison I, LLC | - |
| 57) CBL/Monroeville Expansion I, LLC | - |
| 58) CBL/Monroeville Expansion II, LLC | - |
| 59) CBL/Monroeville Expansion III, LLC | - |
| 60) CBL/Monroeville Expansion Partner, L.P. | - |
| 61) CBL/Monroeville I, LLC | - |
| 62) CBL/Monroeville II, LLC | - |
| 63) CBL/Monroeville III, LLC | - |
| 64) CBL/Nashua Limited Partnership | - |
| 65) CBL/Old Hickory I, LLC | - |
| 66) CBL/Old Hickory II, LLC | - |
| 67) CBL/Parkdale Crossing GP, LLC | - |
| 68) CBL/Parkdale Crossing, L.P. | - |
| 69) CBL/Parkdale Mall GP, LLC | - |
| 70) CBL/Parkdale, LLC | - |
| 71) CBL/Penn Investments, LLC | - |
| 72) CBL/Richland G.P., LLC | - |
| 73) CBL/Sunrise Commons GP, LLC | - |
| 74) CBL/Sunrise GP, LLC | - |
| 75) CBL/Sunrise Land, LLC | - |
| 76) MDN/Laredo GP, LLC | - |
| 77) Mid Rivers Land LLC | - |
| 78) Montgomery Partners, L.P. | - |
| 79) Mortgage Holdings, LLC | - |
| 80) Multi-GP Holdings, LLC | - |
| 81) North Charleston Joint Venture II, LLC | - |
| 82) Old Hickory Mall Venture | - |
| 83) Parkdale Crossing Limited Partnership | - |
| 84) Parkdale Mall Associates, L.P. | - |
| 85) Parkway Place Limited Partnership | - |
| 86) Pearland Town Center GP, LLC | - |
| 87) Pearland Town Center Limited Partnership | - |
| 88) Port Orange Holdings II, LLC | - |
| 89) Seacoast Shopping Center Limited Partnership | - |
| 90) Southaven Town Center, LLC | - |
| 91) Southpark Mall, LLC | - |
| 92) St. Clair Square GP I, LLC | - |
| 93) St. Clair Square Limited Partnership | - |
| 94) Tenn-GP Holdings, LLC | - |
| 95) The Pavilion at Port Orange, LLC | - |
| 96) Volusia Mall GP, Inc. | - |
| 97) Volusia Mall Limited Partnership | - |
| 98) WestGate Mall II, LLC | - |
| 99) WestGate Mall Limited Partnership | - |
| 100) CBL Regency I | - |

# EXHIBIT E

## FINANCIAL PROJECTIONS

## FINANCIAL PROJECTIONS

In connection with the Disclosure Statement,[1] the Debtors, with the assistance of their advisors, prepared financial projections (the "**Financial Projections**") for CBL & Associates Properties, Inc. and its debtor affiliates (each, a "**Debtor**" and, collectively, the "**Debtors**") for the fiscal years 2021 through 2025 (the "**Projection Period**") for the purpose of demonstrating the feasibility of the Plan.  The Financial Projections are based upon a number of assumptions made by the Debtors and their advisors with respect to the future performance of the Debtors' operations.  **Although the Debtors have prepared the Financial Projections in good faith and believe the assumptions to be reasonable, there can be no assurance that such assumptions and results will be realized.  As described in detail in the Disclosure Statement, a variety of risk factors could affect the Debtors' financial results and must be considered.  Accordingly, the Financial Projections should be reviewed in conjunction with the risk factors set forth in the Disclosure Statement and the assumptions described herein, including all relevant qualifications and footnotes.**

The Financial Projections are based upon the internal view of the Debtors' management of the projected financial performance conducted before the filing of these Financial Projections and may differ methodologically from historical public reporting by the Debtors (*e.g.*, the Financial Projections herein are not in accordance with GAAP accounting).  The Debtors believe that the Plan meets the feasibility requirements set forth in section 1129(a)(11) of the Bankruptcy Code, as confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the Debtors or any successor under the Plan.  In connection with the planning and development of the Plan and for the purposes of determining whether the Plan would satisfy this feasibility standard, the Debtors analyzed their ability to satisfy their financial obligations while maintaining sufficient liquidity and capital resources.

**These Financial Projections were not prepared with a view toward compliance with published guidelines of the United States Securities and Exchange Commission or guidelines established by the American Institute of Certified Public Accountants for preparation and presentation of prospective financial information.  An independent auditor has not examined, compiled, or performed any procedures with respect to the prospective financial information contained in this exhibit and, accordingly, it does not express an opinion or any other form of assurance on such information or its achievability.  The Debtors' independent auditor assumes no responsibility for, and denies any association with, the prospective financial information.**

### Principal Assumptions for the Financial Projections

The Financial Projections reflect numerous assumptions with respect to the anticipated future performance of the Debtors, industry performance, general business and economic conditions, and other matters, many of which are beyond the control of the Debtors or their advisors.  In addition, the assumptions do not take into account the uncertainty and disruption of business that may accompany a restructuring pursuant to the Bankruptcy Code.

---

[1]   Capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the Disclosure Statement to which this is an exhibit or the Restructuring Support Agreement, as applicable.

Although the Financial Projections are presented with numerical specificity, the actual results achieved during the Projection Period may materially vary from the projected results. Accordingly, no definitive representation can be or is being made with respect to the accuracy of the Financial Projections or the ability of the Debtors to achieve the projected results of operations. *See* "Risk Factors" in Article IX of the Disclosure Statement. For holders of Claims that are entitled to vote to accept or reject the Plan, such holders must make their own determinations as to the reasonableness of such assumptions and the reliability of the Financial Projections. *See* "Risk Factors" in Article IX of the Disclosure Statement. Moreover, the Financial Projections were prepared solely in connection with the Restructuring pursuant to the Restructuring Support Agreement and Plan.

In connection with the planning and development of the Plan, and for the purposes of determining whether such Plan would satisfy this feasibility standard, the Debtors analyzed their ability to satisfy their financial obligations while maintaining sufficient liquidity and capital resources. Under Accounting Standards Codification "ASC" 852, "Reorganizations", the Debtors note that the Financial Projections reflect the operational emergence from these Chapter 11 Cases but do not reflect the full impact of "fresh start accounting" that will likely be required upon emergence. Fresh start accounting requires all assets, liabilities, and equity instruments to be determined at "fair value." In addition to valuing assets, liabilities, and equity instruments at fair value, the Debtors will have tax professionals analyze any go forward tax implications as a result of the transactions contemplated by the Restructuring. The Financial Projections account for the Restructuring and related transactions pursuant to the Plan, including the minimum REIT distributions, but they do not account for the final analysis that will be done upon emergence. While the Debtors expect that they will be required to implement fresh start accounting upon emergence, they have not yet completed the work required to quantify the impact to the Financial Projections. When the Debtors fully implement fresh start accounting, material differences may exist in the Financial Projections.

## Safe Harbor under the Private Securities Litigation Reform Act of 1995

The Financial Projections contain statements which constitute "forward-looking statements" within the meaning of the Securities Act and the Securities Exchange Act. Forward-looking statements in the Financial Projections include the intent, belief, or current expectations of the Debtors with respect to the timing of, completion of, and scope of the current restructuring, Plan, debt and equity market conditions, and the Debtors' future liquidity, as well as the assumptions upon which such statements are based.

While the Debtors believe that the expectations are based upon reasonable assumptions within the bounds of their knowledge of their business and operations, parties in interest are cautioned that any such forward-looking statements are not guarantees of future performance, and involve risks and uncertainties, and that actual results may differ materially from those contemplated by such forward-looking statements.

**Select Risk Factors Related to the Financial Projections**

The Financial Projections are subject to inherent risks and uncertainties, most of which are difficult to predict and many of which are beyond the Debtors' control.  Many factors could cause actual results, performance or achievements to differ materially from any future results, performance or achievements expressed or implied by these forward-looking statements.  A description of the risk factors associated with the Plan, the Disclosure Statement, and the Financial Projections is included in Article IX of the Disclosure Statement.

**Financial Projections General Assumptions**

1.  The Financial Projections were prepared based on the Company's ownership shares in the Properties and other assets.  The Debtors' projections also include revenue and expenses that flow to the Debtors from their non-Debtor subsidiaries that are either wholly owned by the Debtors or owned in a joint venture with third parties.  The following projections reflect the Debtors' share of revenue and expenses and do not reflect ownership that would be attributable to any joint venture partners.

2.  **Plan Terms and Consummation.** The Financial Projections assume the Restructuring will be consummated as of the Effective Date, which is assumed to occur no later than November 1, 2021.

3.  **Reorganized Capital Structure.** The Financial Projections assume a reorganized capital structure pursuant to the Plan and Restructuring Support Agreement.  Changes to the capital structure include the following:
    *   The Exit Credit Facility in an aggregate principal amount of $883.7M with annual principal and interest totaling $77.5M;
    *   In addition to principal and interest of $77.5M, there is an excess cash sweep that is calculated on a semi-annual basis.  Not including the stub period of 2021, the forecast assumes excess cash flow payments to pay the Exit Credit Facility ranging from $7M to $12M annually;
    *   Issuance of (i) $455M of New Senior Secured Notes with interest of 10%, secured by, among other assets, certain of the Company's currently unencumbered Properties, and (ii) $100M of New Convertible Notes with interest of 7% (assuming the Convertible Notes Election is exercised in full);
    *   Issuance of additional new money New Convertible Notes with a principal balance of $50M at an interest rate of 7%;
    *   Equitization of the Senior Unsecured Notes in exchange for 89% of the New Common Stock and a pro rata share of $95M in cash consideration ($15M to Consenting Crossholders and $80M to holders of Unsecured Claims); and
    *   The Company's existing equity holders will receive up to 11% of the New Common Stock (5.5% to holders of Existing REIT Preferred Stock and 5.5% to holders of Existing REIT Common Stock and holders of Existing LP Common Units (unless such holders of Existing LP Common Units instead elect to receive New LP Units)).

4. **Macroeconomic Factors.** The Financial Projections of total revenue include a rental revenue reserve associated with the COVID-19 pandemic along with other unforeseen business interruptions.

## Income Statement Assumptions

1. **Annual Revenue:**
   - ***Revenue*:** The Debtors' main sources of revenue are rental revenue from tenants and from property management and development activities. Total revenue from these two sources is forecasted to increase from $638M in 2021 to $718M in 2025. In addition, the Debtors are forecasting approximately $49M in revenue driven by asset sales over the Projection Period.

   - ***Revenue Reserve*:** Total revenue is net of the revenue reserve which is used to estimate unforeseen business disruptions due to COVID-19 and other unforeseen business impacts. Potential issues include, among other things, bankruptcies of the Debtors' tenants, co-tenancy issues, anchor closings and other tenant-related issues (e.g., failure to pay rent).

2. **Operating Expense:**
   - Includes property operations, real estate taxes, maintenance & repairs, & other Property-related expenses. The forecast assumes that operating expenses, which were reduced in 2021 due to the COVID-19 pandemic, will return to historic levels in the forecast.

3. **Net Operating Income ("NOI")**: NOI is defined as property operating revenues (i.e., rental revenues and other income) less property operating expenses (i.e., property operating, real estate taxes, maintenance, and repairs). The following reflects the Debtors' forecast for NOI: 2021: $402M; 2022: $406M; 2023: $431M; 2024: $452M; 2025: $471M.

4. **Depreciation & Amortization:**
   - The Debtors have excluded Depreciation & Amortization from the Financial Projections, as they have not yet completed the final analysis of fresh start accounting. This will be completed by the Debtors upon emergence.

5. **Other Income (Expense):**
   - Includes income tax payment of $2.5M per year.

6. **Interest Expense:**
   - Includes both Property interest expenses and Corporate Debt interest expense, including the Exit Credit Facility and issuance of the New Senior Secured Notes and New Convertible Notes.
   - The forecast assumes Property debt is refinanced with the same terms at maturity.

7.  **Reorganization Expenses:**
    - Includes restructuring costs of actual and estimated fees for professional advisors, financing fees, and other costs directly attributable to these Chapter 11 Cases. Reorganization expenses are estimated at $86M in 2021.

8.  **Gain on Extinguishment of Debt:**
    - Gain on extinguishment of debt in 2021 is driven by certain Properties being returned to the applicable lender & debt extinguishment associated with the Restructuring Support Agreement. While the Debtors have not yet finalized the analysis on fresh start accounting, they have estimated the gain of extinguishment of debt based on the book value of these loan amounts being retired. This is an estimate and subject to ongoing review based on the final analysis of fresh start accounting.

## Balance Sheet & Statement of Cash Flow Assumptions

1.  **Pro Forma Adjustments:**
    - While the Debtors expect that they will be required to implement fresh start accounting upon emergence, they have not yet completed the work required to quantify the impact of such accounting to the Financial Projections. Therefore, adjustments to the balance sheet for fresh start accounting are preliminary and are subject to ongoing analysis.

2.  **Capital Expenditures:**
    - Projections for capital expenditures were prepared with considerations of the Debtors' revenue and expected requirements to maintain asset values going forward. Capital Expenditures are used for maintaining the Debtors' property, developing and improving current properties and tenant improvement allowances per various current and future leases.

3.  **United States Treasury Conversion:**
    - Currently, the Debtors hold approximately $233M in United States Treasuries. The Financial Projections assume the Debtors convert those to cash in order to fund emergence costs and operate their businesses.

4.  **Capital Structure:**
    - The Financial Projections reflect the go-forward capital structure in accordance with the terms of the Plan and Restructuring Support Agreement. Changes include, but are not limited to, the Exit Credit Facility in an aggregate principal amount of $883.7M, the issuance of $455M of New Senior Secured Notes, which the Financial Projections assume will be reduced by $50M to a balance of $405M using the cash proceeds from the issuance of the New Money Convertible Notes, and the issuance of $150M of New Convertible Notes (which assumes that $100M of New Convertible Notes are issued pursuant to the Convertible Notes Election).

**5.   Minimum REIT Distributions:**

- The Financial Projections assume no tax obligations would be due in 2021 and include the minimum REIT distributions that would take place in years 2022 through 2025. These amounts are subject to change pending final tax analysis of the transaction.

## Statements of Operations:

CBL & Associates Properties, Inc.                    Unaudited / Not in Accordance with GAAP
Statements of Operations At CBL Share           Does Not Reflect Fresh Start Accounting or Final Cancellation of Debt Analysis
($ in Millions)

| Year Ended December 31<br>Forecast | 2021<br>Fcst | 2022<br>Fcst | 2023<br>Fcst | 2024<br>Fcst | 2025<br>Fcst |
|---|---|---|---|---|---|
| **Revenues** | | | | | |
| Rental Revenues & Other Income | 634 | 642 | 669 | 692 | 713 |
| Management, Development and Leasing Fees | 4 | 4 | 4 | 4 | 4 |
| **Total Revenues** | 638 | 645 | 673 | 696 | 718 |
| **Operating Expenses** | | | | | |
| Property Operating, Real Estate Taxes, Maintenance & Repairs | (232) | (235) | (238) | (240) | (242) |
| General & Administrative | (58) | (58) | (56) | (56) | (56) |
| **Total Operating Expenses** | (290) | (293) | (294) | (296) | (298) |
| **Net Operating Income** [1] | 402 | 406 | 431 | 452 | 471 |
| **Other Income (Expenses)** | | | | | |
| Other Income | 2 | 2 | 2 | 2 | 2 |
| Interest Expense | (99) | (164) | (158) | (153) | (149) |
| Reorganization Items | (86) | - | - | - | - |
| Gain on Extinguishment of Debt [2] | 892 | - | - | - | - |
| Gain on Sales of Assets | 22 | 9 | 6 | 6 | 6 |
| Income tax benefit (provision) | (3) | (3) | (3) | (3) | (3) |
| **Total Other Income (Expenses)** | 729 | (155) | (152) | (148) | (143) |
| **Net Income** | 1,077 | 197 | 227 | 252 | 276 |

[1] NOI is defined as property operating revenues (i.e., rental revenues and other income) less property operating expenses (i.e.,
property operating, real estate taxes, maintenance, and repairs).
[2] Gain on Extinguishment of Debt does not reflect final fresh start accounting analysis.

## Statements of Cash Flows:

CBL & Associates Properties, Inc.  <span style="float:right">Unaudited / Not in Accordance with GAAP</span>
Statements of Cash Flows At CBL Share  <span style="float:right">Does Not Reflect Fresh Start Accounting or Final Cancellation of Debt Analysis</span>
($ in Millions)

| Year Ended December 31 Forecast | 2021 Fcst | 2022 Fcst | 2023 Fcst | 2024 Fcst | 2025 Fcst |
|---|---|---|---|---|---|
| **Cash Flow from Operating Activities** | | | | | |
| Net Income (loss) | 1,077 | 197 | 227 | 252 | 276 |
| Change in Tenant & Other Receivables | 21 | - | - | - | - |
| Change in Accounts Payable and Accrued Liabilities | (27) | - | - | - | - |
| Gain on Extinguishment of Debt [1] | (904) | - | - | - | - |
| **Net Cash Provided (Used) by Operating Activities** | 168 | 197 | 227 | 252 | 276 |
| **Cash Flow from Investing Activities** | | | | | |
| Additions to Real Estate Assets | (55) | (43) | (47) | (56) | (63) |
| Change in Investment in US Treasuries | 233 | - | - | - | - |
| Change in Other Assets (Includes Maintenance CapEx) | 3 | (25) | (22) | (18) | (18) |
| Investments in Unconsolidated Affiliates | 4 | - | - | - | - |
| **Net Cash Provided (Used) by Investing Activities** | 186 | (68) | (69) | (75) | (81) |
| **Cash Flow from Financing Activities** | | | | | |
| Dividends/Distributions | - | (15) | (20) | (25) | (29) |
| Proceeds from Mortgage & Other Indebtedness [1] | 1,052 | - | - | - | - |
| Principal Pmts on Mortgage & Other Indebtedness [1] | (1,298) | (97) | (104) | (111) | (118) |
| **Net Cash Provided (Used) by Financing Activities** | (246) | (112) | (124) | (136) | (147) |
| **Net Cash Flow** | 108 | 17 | 34 | 42 | 49 |
| Beginning Cash Balance | 89 | 197 | 214 | 248 | 290 |
| Net Cash Flow | 108 | 17 | 34 | 42 | 49 |
| **Cash Balance** | 197 | 214 | 248 | 290 | 339 |

(1) Includes impact of extinguishment of debt due to restructuring.  Does not reflect final fresh start accounting analysis.

## Balance Sheets:

CBL & Associates Properties, Inc.
Balance Sheets At CBL Share
($ in Millions)

Unaudited / Not in Accordance with GAAP
Does Not Reflect Fresh Start Accounting or Final Cancellation of Debt Analysis

| As of December 31 Forecast | 2021 Fcst | 2022 Fcst | 2023 Fcst | 2024 Fcst | 2025 Fcst |
|---|---|---|---|---|---|
| **Assets** [1] | | | | | |
| Net Investment in Real Estate Assets | 3,151 | 2,998 | 2,854 | 2,727 | 2,617 |
| Cash & Cash Equivalents | 197 | 214 | 248 | 290 | 339 |
| Other Assets | 273 | 285 | 297 | 308 | 322 |
| **Total Assets** | **3,621** | **3,497** | **3,399** | **3,325** | **3,278** |
| **Liabilities & Equity** [1] | | | | | |
| Mortgage and other indebtedness, net | 3,063 | 2,965 | 2,861 | 2,750 | 2,633 |
| Accounts payable and accrued liabilities | 233 | 234 | 234 | 234 | 234 |
| **Total Liabilities** | **3,296** | **3,199** | **3,095** | **2,984** | **2,866** |
| Equity | 325 | 298 | 304 | 341 | 412 |
| **Total Liabilities & Equity** | **3,621** | **3,497** | **3,399** | **3,325** | **3,278** |

[1] Balance sheet does not reflect final fresh start accounting analysis.

**EXHIBIT F**

**VALUATION ANALYSIS**

REORGANIZED DEBTORS VALUATION ANALYSIS[1]

THE VALUATION INFORMATION CONTAINED HEREIN IS NOT A PREDICTION OR
GUARANTEE OF THE ACTUAL MARKET VALUE THAT MAY BE REALIZED THROUGH
THE SALE OF ANY SECURITIES TO BE ISSUED PURSUANT TO THE PLAN. THIS
VALUATION IS PRESENTED SOLELY FOR THE PURPOSE OF PROVIDING ADEQUATE
INFORMATION AS REQUIRED BY SECTION 1125 OF THE BANKRUPTCY CODE TO
ENABLE THE HOLDERS OF CLAIMS OR INTERESTS ENTITLED TO VOTE TO ACCEPT
OR REJECT THE PLAN TO MAKE AN INFORMED JUDGMENT ABOUT THE PLAN AND
SHOULD NOT BE USED OR RELIED UPON FOR ANY OTHER PURPOSE, INCLUDING
THE PURCHASE OR SALE OF CLAIMS AGAINST OR INTERESTS IN THE DEBTORS.

At the Debtors' request, Moelis & Company LLC ("Moelis") performed a valuation analysis of
the Reorganized Debtors (the "Valuation Analysis").

Based upon and subject to the review and analysis described herein, and subject to the assumptions,
limitations and qualifications described herein, Moelis' view, as of April 21, 2021, was that the
estimated going concern equity value of the Reorganized Debtors, as of an assumed valuation date,
for purposes of Moelis' valuation analysis, of June 30, 2021 (the "Assumed Valuation Date"),
would be in a range between $50 million and $550 million. The midpoint of our equity valuation
range is $300 million.

Moelis' views are necessarily based on economic, monetary, market, and other conditions as in
effect on, and the information made available to Moelis as of the date of its analysis (April 21,
2021). As you are aware, the credit, financial and stock markets have been experiencing unusual
volatility, and Moelis expresses no opinion or view as to any potential effects of such volatility on
the Reorganized Debtors or their value. It should be understood that, although subsequent
developments may affect Moelis' views, Moelis does not have any obligation to update, revise, or
reaffirm its analysis or its estimate.

At the Debtors' direction, Moelis' analysis is based on a number of assumptions, including, among
others, that: (i) the Debtors will be reorganized in accordance with the Plan, (ii) the Reorganized
Debtors will achieve the results set forth in the financial projections prepared by the Debtors'
management attached as **Exhibit E** to this Disclosure Statement (the "Financial Projections") for
2021 through 2025 (the "Projection Period") provided to Moelis by the Debtors, (iii) the
Reorganized Debtors' capitalization and available cash will be as set forth in the Plan and this
Disclosure Statement, and (iv) the Reorganized Debtors will be able to obtain all future financings
on the terms and at the times necessary to achieve the results set forth in the Financial Projections.
Moelis makes no representation as to the achievability or reasonableness of such assumptions. In
addition, based on the information available to Moelis, Moelis assumed that there will be no
material change in economic, monetary, market, and other conditions as in effect as of the
Assumed Valuation Date.

---

[1]  Capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the Disclosure
Statement.

At the Debtors' direction, Moelis assumed that the Financial Projections prepared by the Debtors' management were reasonably prepared on a basis reflecting the best currently available estimates and judgments of the Debtors' management as to the future, financial and operating performance of the Reorganized Debtors. The future results of the Reorganized Debtors are dependent upon various factors, many of which are beyond the control or knowledge of the Debtors, and consequently are inherently difficult to project. The Reorganized Debtors' actual future results may differ materially (positively or negatively) from the Financial Projections and, as a result, the actual equity value of the Reorganized Debtors may be materially higher or lower than the estimated range herein. Among other things, failure to consummate the Plan in a timely manner may have a materially negative impact on the equity value of the Reorganized Debtors.

The estimated equity value set forth in this Valuation Analysis represents a hypothetical equity value of the Reorganized Debtors, as the continuing operators of the business and their assets, after giving effect to the Plan based on consideration of certain valuation methodologies as described below. The estimated equity value in this Valuation Analysis does not purport to constitute an appraisal or necessarily reflect the actual market value that might be realized through a sale or liquidation of the Reorganized Debtors, their securities, or their assets, which may be materially higher or lower than the estimated value range set forth herein. The actual value of an operating business such as the Reorganized Debtors' business is subject to uncertainties and contingencies that are difficult to predict and will fluctuate with changes in various factors affecting the financial condition and prospects of such a business.

In conducting its analysis, Moelis, among other things: (i) reviewed certain publicly available business and financial information relating to the Reorganized Debtors that Moelis deemed relevant; (ii) reviewed the Financial Projections, furnished to Moelis by the Debtors; (iii) conducted discussions with members of senior management and representatives of the Debtors concerning the matters described in clauses (i) and (ii) of this paragraph, as well as their views concerning the Debtors' business prospects before giving effect to the Plan, and the Reorganized Debtors' business and prospects after giving effect to the Plan; (iv) reviewed publicly available financial and stock market data for certain other companies in lines of business that Moelis deemed relevant; (v) reviewed publicly available financial data for certain transactions that Moelis deemed relevant; and (vi) conducted such other financial studies and analyses and took into account such other information as Moelis deemed appropriate. In connection with its review, Moelis did not assume any responsibility for independent verification of (and did not independently verify) any of the information supplied to, discussed with, or reviewed by Moelis and, with the consent of the Debtors, relied on such information being complete and accurate in all material respects. In addition, at the direction of the Debtors, Moelis did not make any independent evaluation or appraisal of any of the assets or liabilities (contingent, derivative, off-balance-sheet, tax-related or otherwise) of the Reorganized Debtors. Moelis also assumed, with the Debtors' consent, that the final form of the Plan will not differ in any material respect to its analysis from the final draft that Moelis reviewed.

The estimated equity value in this Valuation Analysis does not constitute a recommendation to any Holder of a Claim or Interest as to how such Holder of a Claim or Interest should vote or otherwise act with respect to the Plan. Moelis has not been asked to and does not express any view as to what the trading value of the Reorganized Debtors' securities would be when issued pursuant

to the Plan or the prices at which they may trade in the future. The estimated equity value set forth herein does not constitute an opinion as to fairness from a financial point of view to any Holder of a Claim or Interest of the consideration to be received by such Holder of a Claim or Interest under the Plan or of the terms and provisions of the Plan.

[*Remainder of page intentionally left blank*]

<u>Valuation Methodologies</u>

In preparing its valuation, Moelis performed a variety of financial analyses and considered a variety of factors. The following is a brief summary of the material financial analyses performed by Moelis, which consisted of (a) a selected publicly traded companies analysis, (b) a discounted unlevered cash flow analysis, and (c) a discounted levered cash flow analysis. This summary does not purport to be a complete description of the analyses performed and factors considered by Moelis. The preparation of a valuation analysis is a complex, analytical process involving various judgmental determinations as to the most appropriate and relevant methods of financial analysis and the application of those methods to particular facts and circumstances, and such analyses and judgments are not readily susceptible to summary description. As such, Moelis' valuation analysis must be considered as a whole. Reliance on only one of the methodologies used, or portions of the analysis performed, could create a misleading or incomplete conclusion as to enterprise value.

A. ***Selected Publicly Traded Companies Analysis.*** The selected publicly traded companies analysis is based on the private market cap rates (calculated as net operating income divided by private market value of real estate) of selected publicly traded mall real estate investment trusts that have operating and financial characteristics comparable in certain respects to the Reorganized Debtors. For example, such characteristics may include similar size, margins, financial leverage, business model, geographic footprint, end-users, and asset profile. Under this methodology, Moelis applied a relevant cap rate range to the Reorganized Debtors' pro rata net operating income to derive a range of potential values of the business of the Reorganized Debtors.

Although the selected companies were used for comparison purposes, no selected publicly traded company is either identical or directly comparable to the business of the Reorganized Debtors. Accordingly, Moelis' comparison of selected publicly traded companies to the business of the Reorganized Debtors and analysis of the results of such comparisons was not purely mathematical, but instead involved considerations and judgments concerning differences in operating and financial characteristics and other factors that could affect the relative values of the selected publicly traded companies and the Reorganized Debtors. The selection of appropriate companies for this analysis is a matter of judgment and subject to limitations due to sample size and the public availability of meaningful, market-based information.

B. ***Discounted Unlevered Cash Flow Analysis.*** The discounted unlevered cash flow ("<u>DUCF</u>") analysis is an enterprise valuation methodology that estimates the value of an asset or business by calculating the estimated present value of expected future cash flows to be generated by that asset or business plus an estimated present value of the estimated terminal value of that asset or business. Moelis calculated debt-free, after-tax free cash flows for the Reorganized Debtors through December 31, 2025, utilizing the Financial Projections. These free cash flows were then discounted using an unlevered discount rate (the "<u>Unlevered Discount Rate</u>") based on a range of the estimated, weighted average cost of capital for the Reorganized Debtors. In determining the estimated terminal value of the Reorganized Debtors, Moelis utilized the perpetuity growth method which estimates a range of values of the Reorganized Debtors at the end of the Projection Period based on applying a perpetuity growth rate to final year cash flows.

To determine the Unlevered Discount Rate, Moelis used the estimated cost of equity and the estimated after-tax cost of debt for the Reorganized Debtors, assuming a targeted, long-term, debt-to-total capitalization ratio based on debt-to-capitalization ratios of the selected publicly traded companies. Moelis estimated the cost of equity for the Reorganized Debtors based on: (i) a range of target returns for distressed/opportunistic real estate investment funds; (ii) the capital asset pricing model, which assumes that the expected equity return is a function of the risk-free rate, equity risk premium, and the correlation of the stock performance of certain of the selected publicly traded companies to the return on the broader market over a 2-year and 5-year period, and an adjustment related to the estimated equity market capitalization of the Reorganized Debtors, which reflects the historical equity risk premium of small, medium, and large equity market capitalization companies; and (iii) the cost of equity implied across a range of Cap Rates, a range of debt-to-total capitalization ratios, and a fixed cost of debt. To estimate the cost of debt, Moelis held discussions with its capital markets team and determined a cost of debt rate based on the Reorganized Debtors' size, industry, geographic footprint, cash flow profile, current market environment and long-term corporate credit yield-to-worst rates. In estimating a range of perpetuity growth rates for its DUCF analysis, Moelis took into account expected global long-term GDP growth rates and held discussions with the Debtors to estimate the long-term trends of their industry. Certain of the data generated may not reflect the impact of COVID-19 or may reflect unusual volatility. The DUCF valuation ranges produced using these estimated WACC ranges are subject to the limitations to the data described by the foregoing, and, if the impact of COVID-19 were reflected in such data and/or certain of the data experiencing unusual volatility were to return to pre-COVID-19 levels, the discounted cash flow valuation ranges would likely be significantly different.

C. ***Discounted Levered Cash Flow Analysis***. The discounted levered cash flow ("DLCF") analysis is an equity valuation methodology that estimates the equity value of an asset or business by calculating the estimated present value of expected future cash flows after debt service to be generated by that asset or business plus an estimated present value of the estimated terminal value of that asset or business. Moelis calculated levered cash flows for the Reorganized Debtors through December 31, 2025, utilizing the Financial Projections. These free cash flows were then discounted using a levered discount rate (the "Levered Discount Rate") equivalent to the cost of equity used for WACC. In determining the estimated terminal value of the Reorganized Debtors, Moelis utilized the perpetuity growth method which estimates a range of values of the Reorganized Debtors at the end of the Projection Period based on applying a perpetuity growth rate to final year cash flows.

Certain of the data generated may not reflect the impact of COVID-19 or may reflect unusual volatility. The DLCF valuation ranges produced using these estimated ranges are subject to the limitations to the data described by the foregoing, and, if the impact of COVID-19 were reflected in such data and/or certain of the data experiencing unusual volatility were to return to pre-COVID-19 levels, the discounted cash flow valuation ranges would likely be significantly different.

Reorganized Debtors - Valuation Considerations

The estimated equity value in this section is not necessarily indicative of actual value, which may be significantly higher or lower than the ranges set forth herein. Accordingly, none of the Debtors, Moelis or any other person assumes responsibility for the accuracy of such estimated equity value. Depending on the actual financial results of the Debtors or changes in the economy and the financial markets, the equity value of the Reorganized Debtors as of the Assumed Valuation Date may differ from the estimated equity value set forth in this Valuation Analysis. In addition, the market prices, to the extent there is a market, of the Reorganized Debtors' securities will depend upon, among other things, prevailing interest rates, conditions in the economy and the financial markets, the investment decisions of prepetition creditors receiving such securities under the Plan (some of whom may prefer to liquidate their investment rather than hold it on a long-term basis), and other factors that generally influence the prices of securities.